THE STATE OF OHIO,      )
                           ) SS:  DENISE N. RINI, J.
COUNTY OF CUYAHOGA.     )

<u>IN THE COURT OF COMMON PLEAS</u>
<u>JUVENILE DIVISION</u>


In the matter of:        )
                           )
DALONTE WHITE          ) Case No. DL 15105751
                           )
                           )
                           ) **<u>VOLUME 1 OF 3</u>**


- - -


      Hearing held before Judge Denise N. Rini at the
Cuyahoga County Juvenile Court, 9300 Quincy
Avenue, Cleveland, Ohio, on Thursday, the 16th day
of July, 2015 commencing at 11:01 a.m.


- - -

2

1     APPEARANCES:

2     Norman Schroth, Assistant Prosecuting Attorney,

3              and

4     Brandon Piteo, Assistant Prosecuting Attorney,

5              on behalf of the State of Ohio.

6     Brian Hoffman, Assistant Public Defender,

7              on behalf of the child, Dalonte White.

8     John H. Lawson, Esq.,

9              Guardian ad Litem for the child, Dalonte White.

10

11              - - -

12     ALSO PRESENT:

13     Cameron Quarles, Stepfather

14     Alexandria Chandler, Mother

15     Keri Bryant, Probation Officer

16     David Lam, Detective

17     Audrey Del Valle, Public Defender

18     Maureen Dickson, Law Clerk with the Public Defender

19

20

21              - - -

22

23

24

25

1                            I N D E X

2  **WITNESSES**

3  **STATE'S:**                                    **Page**

4  **SAVANNAH LAFORCE**

5  Direct Examination by Mr. Schroth.................  29

6  Cross-examination by Mr. Hoffman.................  70

7  Redirect Examination by Mr. Schroth..............  94

8  Recross-examination by Mr. Hoffman...............  102

9  **COLLEEN ALLUMS**

10  Direct Examination by Mr. Schroth.................  109

11  Cross-examination by Mr. Hoffman.................  138

12  Redirect Examination by Mr. Schroth..............  149

13  **ZACKARY HALE**

14  Direct Examination by Mr. Schroth.................  154

15  Cross-examination by Mr. Hoffman.................  190

16

17                          - - -

18  **OBJECTIONS**

19                                                  **Page**

20  Mr. Hoffman.....................................  96

21

22                          - - -

23

24

25

4

1  **EXHIBITS:**

2  **STATE'S**                                          **Page**

3  1 - Picture.................................    34

4  2 - Picture.................................    41

5  3 - Picture.................................    36

6  4 - Picture.................................    42

7  68 - Medical Records of Edward Bunch..........     7

8  76 - Photo array..............................   180

9  79 - Photo array..............................   180

10  82 - Photo array..............................   180

11  85 - Photo array..............................   186

12  88 - Photo array..............................   186

13  91 - Photo array..............................    63

14  94 - Photo array..............................    63

15  97 - Photo array..............................    63

16  100 - Photo array.............................    67

17  103 - Photo array.............................    67

18  106 - Photo array.............................   128

19  109 - Photo array.............................   128

20  112 - Photo array.............................   128

21  115 - Photo array.............................   133

22  118 - Photo array.............................   133

23  120 - Video surveillance.....................     7

24  121 - DNA Report.............................     8

25

5

<u>PROCEEDINGS</u>

1

2          JUDGE DENISE N. RINI:  We are here in

3     the matter of Dalonte White.  We are set for a

4     probable cause hearing.

5              There's a notice of mandatory bindover

6     that was filed by the Prosecution's Office on

7     May 1st, 2015, as well as a motion for an order

8     to relinquish jurisdiction for the purpose of

9     criminal prosecution pursuant to RC 2152.10(B)

10    and for preliminary hearing on Case No. DL

11    15105751.  It is an 18-count complaint.

12              So beginning with Dalonte, can you say

13    your name for the record please?

14          MR. WHITE:  Dalonte White.

15          THE COURT:  Attorney, please say your

16    name for the record.

17          MR. HOFFMAN:  Brian Hoffman, attorney

18    for the Public Defender.

19          MR. PITEO:  Brandon Piteo, Assistant

20    Prosecuting Attorney for the State.

21          MR. SCHROTH:  Norm Schroth,

22    representing the State of Ohio.

23          MR. LAM:  Detective Lam, Badge 837,

24    with the Cleveland Police Department.

25          THE COURT:  Thank you.

6

```
1                      MS. BRYANT:  Keri Bryant, Probation.
2                      THE COURT:  All right.  Let's start
3            over here with Attorney Del Valle.
4                      MS. DEL VALLE:  Audrey Del Valle,
5            Public Defender.
6                      MS. DICKSON:  Maureen Dickson, Law
7            Clerk with the Public Defender's Office.
8                      MR. QUARLES:  Cameron Quarles,
9            stepfather.
10                     MS. CHANDLER:  My name is Alexandria
11           Chandler, mother.
12                     THE COURT:  Attorney Lawson?
13                     MR. LAWSON:  John Lawson, the recently
14           appointed Guardian ad Litem.
15                     THE COURT:  All right.  And who do we
16           have in the back?  Young men stand up and say
17           your name please.
18                     MR. JACKSON:  Deon.
19                     THE COURT:  Your whole name, Deon?
20                     MR. JACKSON:  Oh.  Deon Jackson.
21                     THE COURT:  Thank you.
22                     MR. BANKS:  James Banks.
23                     MR. HAYES:  Trayvion Hayes.
24                     MR. SHIP:  Ja'niya Ship.
25                     THE COURT:  All right.  Let the record
```

7

1    reflect, that the four gentlemen that just

2    introduced themselves are from the Distinguished

3    Gentleman of The Spoken Word.  They are here as

4    an intern.  I'm going to go with internship.

5            All right.  Let also the record

6    reflect that we've appointed Attorney John

7    Lawson to serve as Guardian ad Litem for Dalonte

8    White since it's been brought to the Court's

9    attention that the mother, Alexandria Chandler

10   and the stepfather -- I'm sorry.  What was your

11   name, sir?

12           MR. QUARLES:  Cameron Quarles.

13           THE COURT:  -- may be testifying and

14   the State has asked for a separation of

15   witnesses.

16           So preliminary matters, Prosecution,

17   Mr. Schroth.

18           MR. SCHROTH:  Thanks, Judge.  May it

19   please the Court.  There are some stipulations

20   between the parties in this matter.  It's the

21   State's understanding that there will be a

22   stipulation to the following Exhibits; State's

23   Exhibit 68, those are the medical records of

24   Edward Bunch.  State's Exhibit 120, that is a

25   video surveillance that is taken from 3263 West

1   54th Street, it's the outside of a residence.

2   Part and parcel of that stipulation, Judge, is

3   that the time is actually incorrect on that

4   video.  And so there will be a stipulation -- I

5   don't have the Exhibit numbers yet for these

6   two, the 911 calls that came in and they are

7   essentially the timeline for us, which is about

8   6:00 p.m.  6:01 p.m. I think is the first call.

9   The video, the parts that we're going to be

10  looking at, I believe it has a timestamp of

11  around 6:40 p.m., that's just incorrect.

12          In addition there will be a

13  stipulation to State's 121, that's a DNA report

14  dated June 8th, 2015.  State's 122, that's a DNA

15  report dated July 1st, 2015 and State's 123,

16  those are the medical records of victim, Colleen

17  Allums, A-l-l-u-m-s.

18          And, again, I'll have a number for the

19  actual 911 calls, Judge.  I don't have those

20  numbers at this point in time.  It's also the

21  State's understanding that there will be a

22  stipulation as to the age of Mr. White.  That

23  his date of birth is ████ , 1998.

24          THE COURT:  Are there two sets of

25  medical records?

9

1          MR. SCHROTH:  Yes, Judge.  State's 68

2     is the medical record for Edward Bunch and

3     State's 123 is the medical record for Colleen

4     Allums.

5          THE COURT:  And who is Colleen -- what

6     is her name?  Colleen what?

7          MR. SCHROTH:  Allums.  I'm probably

8     mispronouncing it, but it's A-l-l-u-m-s.  She's

9     the person who was residing at 3255 West 54th

10    where the home invasion occurred.  She's a

11    victim.

12         THE COURT:  All right.  Anything on

13    the Defense side?

14         MR. HOFFMAN:  Your Honor, those are

15    all correct stipulations as outlined by the

16    State.

17         The only other thing that I had

18    written down was that we would stipulate to

19    being able to use Google Maps during the trial

20    as far as evidence would show.  I know the State

21    has a couple of Exhibit's for that being made,

22    they'll either use the exhibits or the map

23    itself on the board.

24         THE COURT:  And Google Maps are going

25    to be marked as exhibits or you're just

10

1          stipulating that they're representative or

2          authentic, accurate?

3                    MR. HOFFMAN:  I believe they'll be

4          demonstrative evidence.

5                    MR. SCHROTH:  Yeah.  There are some

6          exhibits that are labeled that are Google Maps,

7          come from Google Maps, which is generally -- I

8          think Mr. Hoffman is going to be doing some free

9          styling during the trial with Google and we will

10         stipulate that the Google satellite images are

11         authentic.  They purport what they are supposed

12         to purport based on the date.  There's a date in

13         the lower right hand corner of all the Google

14         maps and as of that time they were accurate from

15         when it was taken.

16                    THE COURT:  Okay.  All right.  So if

17         there's nothing further -- mother and

18         stepfather, I will allow you to remain in the

19         courtroom during opening statements and then the

20         defense attorney will let you know when it's

21         time to step out.  But I wanted you to be as

22         much a part of the proceeding as I could.

23                    All right.  Opening statement.

24                    MR. SCHROTH:  Thanks, Judge.  May it

25         please the Court and counsel.  Judge, I know

1        that this Court has done more than it's fair

2        share of transfer proceedings in its tenure

3        here.  But I think it is important the State is

4        asking the Court, as always, as I know this

5        Court is, be mindful of the law that keeps these

6        sorts of hearings afloat.  This seminal case,

7        "seminal case" is State versus Iacona,

8        I-a-c-o-n-a, 2001 Ohio 1292.  That sets the

9        standard.

10               And I'm going to be referencing,

11        Judge, briefly a case that's out of the 10th

12        District, In Re: AJS and that's 2007 Ohio 3216.

13        And, you know, these cases succinctly, and they

14        do a good job in giving the Courts guidance in

15        terms of what we're here for.

16               I know the Court is aware that the

17        standard here is that the State need only

18        provide some credible evidence as to each and

19        every element of the offenses in the complaint.

20        That's more than a mere suspicion, but it is

21        less than a prima facie showing.  So Judge, this

22        is not beyond a reasonable doubt standard.  I

23        know this Court's aware of that.  I'm certainly

24        not trying to say the Court is not, but it does

25        leave room for doubt in these hearings.  I'm not

12

1        saying the State will bring doubt to the table,

2        but I just want the Court to be mindful of the

3        standard here.

4                In addition in that In Re: AJS, you

5        know, as that Court was following Iacona it

6        said, partially quoting Iacona and partially

7        quoting on its own.  The State's evidence must

8        be credible but need not be unassailable.

9        Determination of the merits of the competing

10        prosecution and defense theories, both of which

11        are credible ultimately is a matter for the fact

12        finder at trial.

13                Certainly, the Court here is only a

14        gate keeper determining whether there is some

15        credible evidence that Mr. White committed these

16        crimes that are alleged in this complaint here

17        today.

18                So what happened, Judge?  What are we

19        alleging?  The State is alleging that on

20        April 21st of 2015 at around 6:00 p.m., Colleen

21        Allums was brutally assaulted in her home.  This

22        happened in broad daylight.  This is one of the

23        most terrifying crimes I think for any person to

24        have to experience and it happened to her.

25                She was in her home, in her living

1      room at that time relaxing.  A friend of hers,

2      of the family named Savannah LaForce,

3      S-a-v-a-n-n-a-h, L-a-f-o-r-c-e, she came over.

4      She is a teenager.  She came over to visit

5      Colleen Allums.  So she is then seated in this

6      living room area with Colleen.  Unsuspecting.

7           In front of the house there is sort of

8      a basketball hoop up, like a transportable

9      basketball hoop, and there's some young

10     individuals playing basketball, one of which at

11     one point in time is Zackary Hale, H-a-l-e.

12     Zackary, shortly after getting to the location

13     to play basketball, decides to go inside to

14     Colleen's home.

15          When he does that, as he enters

16     Colleen's home he hears a noise and then

17     realized that someone has opened the door behind

18     him and then followed him in and then there are

19     three males that he is not familiar with.  They

20     follow him into the living room where at which

21     point Mr. White brandishes a firearm.  They

22     began to -- he began to attempt to rob the home.

23          This leads off to a violent assault on

24     Colleen.  She's pistol whipped in the head,

25     she's ultimately shot in the shoulder.  As for

14

1       some unexplainable reason Mr. White begins his

2       assault on Colleen.  She has these dogs that are

3       pit bulls that are kept up at that point in

4       time.  Sensing the need of their owner, they

5       break free and race out into that room.  One of

6       the dogs proceeds to assault the gunman,

7       Mr. White.  When that happens Mr. White began to

8       open fire at that dog.  The two people he came

9       with, they were sort of in the doorway, they

10      leave.  When they take off, the two teenagers

11      Zackary and Savannah are able to leave shortly

12      after.  Ultimately, you know, these gunshots end

13      up killing the dog and then Mr. White leaves

14      afterwards.

15              You'll see on that video, you'll see

16      sort of the two individuals running from that

17      house and they kind of run up in a northwesterly

18      direction and then the person, Mr. White, leaves

19      heading southbound on West 54th, and you're

20      going to see the person walking has a limp to

21      the right leg.  They're not bleeding, but

22      they're limping and you can see them concealing

23      something that would appear to be a firearm in

24      their jacket as they leave the scene.

25              Colleen at that point in time is able

15

1     to drag herself.  She's bleeding profusely from

2     these injuries that she sustained, but she's

3     able to pull herself onto the porch where a

4     passerby calls 911 and some other calls come in

5     and people are able to come and tend to her aid

6     and then she's taken to the hospital due to the

7     severity of her injuries.  And you'll see that

8     in the police report.

9           I don't think there's any doubt here

10    or any question between the parties that an

11    awful crime occurred.  It becomes who committed

12    the crime.  The police arrive and while they're

13    on scene, they began looking for video footage

14    and things like that.  The detectives get a tip

15    as to two possible suspects, Dalonte White and

16    another individual.

17          They create photo arrays and on

18    April 23rd, so we're talking two days after the

19    crime, they show the arrays to Zackary and to

20    Savannah separately.  And they have three

21    different suspects, they do three different

22    arrays, and at that time both Savannah and

23    Zackary identify only Dalonte White in those

24    arrays.  They don't identify anyone else in the

25    other two arrays.

16

1           The next day on the 24th, the
2      Cleveland Police Department goes to the hospital
3      and they show an array to Colleen, similar
4      arrays, and during that process she too makes
5      identification on Dalonte and not on any of the
6      other two arrays.
7           The police don't stop their
8      investigation there.  They end up on April 28th,
9      talking to some associate of Dalonte.  Then on
10     May 1st, the investigation, you know, the police
11     always are mindful of getting it right, get a
12     tip from an officer that has arrested Edward
13     Bunch.  And that officer says, hey look, you
14     know, I just arrested a guy who was injured in
15     his ankle, he has a gunshot wound to his ankle
16     from the same day as this home invasion that
17     you're investigating.  So Detective Lam, you
18     know, wants to do the right thing so he then
19     creates photo arrays to be shown to the victims
20     again.  Those arrays are shown on -- I think
21     it's on 5/13, Judge, those arrays were shown.
22          And you're going to hear the witnesses
23     tell you what happened.  Savannah makes no
24     identifications, Zackary makes I believe two
25     identifications and then Colleen initially per

1       the arrays does not make an identification, but

2       as the Court is aware when I met with her -- and

3       I expect her to testify to this.  I'm indicating

4       what the testimony will be and not my

5       substantive conversations, that, you know, she

6       had wanted to make an identification on this

7       individual, Edward Bunch and did not make, was

8       told not to make an identification because

9       during that conversation she said, hey look,

10      this person is the one that had the gun, I've

11      already identified him and I got paperwork and I

12      know his case is open.  So the officer tells her

13      then you need not make an identification, but I

14      anticipate she will make that identification in

15      Court today.

16              So at that point, Judge, the police

17      then have three photo arrays indicating Dalonte

18      White, they have one array -- two arrays with

19      Edward Bunch.  Judge, you're going to see

20      photographs, these two individuals look, they

21      look strikingly similar when you view them.

22      There are some build differences between the

23      two.  Mr. Bunch is six feet and stocky and I

24      believe Mr. White is about five-eight.  But

25      you're going to hear from Edward Bunch, you

18

1    know, he on July 2nd, the police mindful of the

2    investigation went and spoke to him to see what

3    he had to say regarding this.  And he told them,

4    look, I was not involved in this.  I did sustain

5    a gunshot wound but it was from a drive-by

6    shooting and I went to the hospital for

7    treatment on that gunshot wound, but I had

8    nothing to do with this robbery.

9         And when you look at the records,

10   Judge, when you're asking yourself -- you know,

11   essentially we're dealing with competing

12   theories here.  There is still going to be some

13   credible evidence that Dalonte White committed

14   this crime based on those photo arrays, but

15   you're going to -- and his similarity to the

16   person in the video.  But you're going to be

17   able to rule him out when you look at those

18   medical records.

19        Those records from Edward Bunch, in

20   there it says he is not ambulatory.  He can't

21   walk.  That's the nature of this gunshot wound.

22   The person who committed this crime you can see

23   walking with a mild limp past the house

24   southbound.

25        And by the way, Judge, that direction

1          that the person who was leaving that house

2          limping in is the same direction where Dalonte

3          White lives.  He lives .6 miles from where this

4          crime occurred.

5                    So, Judge, at the conclusion of this

6          the State's asking you to find that there is

7          some credible evidence that Dalonte White did

8          commit these offenses, all of these offenses,

9          the aggravated burglaries, the robberies,

10         shooting of the poor dog, and transfer him to

11         the Adult Court for further proceedings.  Thank

12         you.

13                    THE COURT:  All right.  Defense?

14                    MR. HOFFMAN:  Thank you, your Honor.

15         May it please the Court and counsel.  Your

16         Honor, I find it interesting the State chose to

17         lead with the standard, trying to remind this

18         Court how low the standard of probable cause can

19         be and that's because they know their case

20         stinks, quite honestly.  They downplayed it.

21         They have to show some credible evidence.

22                    And what you have in this case is a

23         photo array, the three victims.  And that photo

24         array is not credible for two very serious

25         reasons.  Your Honor, when this happened this

1          was a very serious offense.  Colleen Allums has

2          a fractured skull, teeth knocked out.  She was

3          busted over the head pretty viciously with a

4          pistol.

5                  When the offenders fled that day and

6          everyone rushed out we were left without any

7          suspects and I think that's important.  No

8          suspects originally.  So what does the Police

9          Department do?  They take down information as to

10         what did this shooter look like.  Are there any

11         leads?  No leads.  So what do they do?  Well,

12         they ask around.  Anyone know some black males

13         around the area.  Officer pipes up, hey, what

14         about Shetrell Harris?  What about Dalonte

15         White?  And Rayvion Edwards?  They're all in the

16         area, throw them in some photo arrays.  And what

17         the police do is they ignore what the report was

18         originally.  They lack discretion in their photo

19         arrays.

20                 Your Honor, the description that comes

21         through on the very first report is that the

22         person is 6' to 6' 1", 200 to 250 pounds with

23         dreadlocks.  They put Rayvion Edwards in a photo

24         array first, here's Rayvion Edwards, a photo

25         array with him.  And I'm going to remind you of

21

1    the game Guess Who, what we used to play as

2    little kids.  You kind of have the two sets of

3    boards and you have a card and then you ask the

4    other person descriptive information, is your

5    person male or female?  Well, is your person a

6    female?  And if they say yes, you knock all of

7    those down and you go to the next part.  Okay.

8    Does your person have earrings?  Yes.  So you

9    pull out everyone that doesn't have earrings and

10   you kind of go through that.  So you can

11   basically do this with a photo array.

12           And really with all three of them, ask

13   one question, does the person have dreads?  Yes.

14   Nope, none of them.  Rayvion Edwards doesn't

15   have dreads, clearly not the person.  Dalonte

16   White is shown in the second photo array.  Does

17   your person have dreads?  Yes.  Okay.  Well, we

18   can eliminate him, him, him, him and him.  Who

19   are we left with?  Guess who?  Dalonte White,

20   the only one depicted with dreadlocks.  Are you

21   kidding me?

22           No police discretion in putting

23   together that photo array.  Shetrell Harris,

24   same question.  The third array they show after

25   they picked out Dalonte White.  Does your person

22

1    have dreads?  Yes.  I don't know.  They all got

2    dreads.  No one is picked.  That's how they come

3    up with Dalonte White as a suspect in this case.

4         Well, we've got three people

5    identifying him.  Ignore everything we have up

6    here.  Go pick up Dalonte White.  And what do

7    they know about Dalonte?  Your Honor, if I could

8    have permission for Dalonte to stand up?

9         THE COURT:  Yes.

10        MR. HOFFMAN:  I'm about 5' 11".

11   Dalonte ain't no 6', 6'1", 200 to 250 pounds.

12   Even their array afterwards shows he's about

13   5'5" I think it was 140 pounds.  It doesn't seem

14   to fit.  So what do the police at this point

15   then?  Well, we've got enough.  We've got an

16   array.  We're going to get some search warrants,

17   we're going to go out and see him, we're going

18   to interview him.

19        And what do they do next?  They go out

20   to Dalonte's house three days after this attack.

21   And during that attack the person with the gun

22   was bitten by a pit bull.  Grabbed a hold of

23   him, the guy starts firing everywhere wildly.

24   Five, six shots out of a silver revolver, starts

25   shooting everywhere.  So the police go out on

23

1      the 24th.  All right, Dalonte, drag him out to

2      the street, cuff him, pulled him out there, let

3      me see your legs.  They start taking photographs

4      of his legs.  What do you think they find?

5      Nothing.  Dog bite from a pit bull?  Nothing.

6      Nothing.  They take a look at his shoes, white

7      tennis shoes.  Nothing.  No marks.  Not ripped

8      up.  No marks whatsoever.  So what do they do?

9      Do they arrest him?  No.  They let him go.  No

10     evidence.  Right.

11             So what do they do next?  Well, struck

12     out there.  Let's go back and get a search

13     warrant.  So three days later, maybe four, they

14     get a search warrant and they go back to his

15     house.  His mom and dad are on the porch.  They

16     come up guns armed, they're ready to do the

17     search warrant.  They come in, they drag Dalonte

18     and his sister out at gunpoint, put them out in

19     the street and they take over the house.  Do

20     they find a gun?  Nope.  Do they find the

21     cellphone of Savannah LaForce or Colleen Allums

22     that were taken in the offense?  Nope.  Nothing.

23     They come up empty.  Well, shoot.  We still got

24     three people identifying him in that photo

25     array, let's arrest him.  So they take him in.

24

1          Two days after that they are handed on

2     a silver platter Edward Bunch.  Edward Bunch is

3     stopped in a motor vehicle which is stolen with

4     two other black males, one who looks a little

5     bit Hispanic, Dandre Sanders.  And Detective Lam

6     comes across information that Edward Bunch has a

7     gunshot wound to his right ankle.  It was an

8     accidental gunshot wound.  Mmmm.  How could that

9     fit?  Maybe the dog biting shooting him up.

10          Edward Bunch goes to the hospital the

11    same night of the incident, they check back and

12    they get his medical records.  This offense

13    happened right around 6:01 is when the first 911

14    call came in.  At 6:38 Edward Bunch is at

15    Lakewood Hospital being seen for an accidental

16    gunshot wound to his ankle.

17          Of course, Edward Bunch can't say how

18    he got that gunshot wound, so instead he leads

19    them on a wild goose chase and says, well, it

20    was a drive-by shooting up off of West Boulevard

21    and I was riding my bike and I got shot.  So

22    they go out, they check, there's no bike found

23    on the scene where he says he was.  And

24    apparently there's no reports.  No one called

25    911, no one decided to report this.  And Edward

25

1       Bunch won't tell the police anything other than
2       I was shot.

3               So before this is revealed, myself and
4       an investigator from our office, Ms. Amanda, go
5       out and speak to Ms. Allums and Ms. Allums
6       relates in a similar conversation that Mr.
7       Schroth had with her, that she identified
8       another shooter.  Wait?  What?  You identified
9       someone else?  Yeah.  Okay.  Yeah, that's the
10      shooter.  I know him.  I know that's the guy.
11      He's the one who shot me.  I've already
12      identified him.  I know him.  That's him.  His
13      name is Dalonte White.  They have given over the
14      name, the information on him.  She's done her
15      own research.  She is trapped in her mind that
16      this is Dalonte White, that he must have been
17      the one who shot me all from that photo array.

18              So it's interesting to hear about the
19      coverup because that's really the second part of
20      why that's not a credible photo array, is the
21      coverup and it stinks.  Because I believe what
22      Mr. Schroth was telling you is, you know, the
23      police I believe are mindful of always getting
24      it right.

25              Well, here's what happened in this

26

1    case, Judge, and it's disgusting.  Detective

2    Kubas sat down with the victim, she picked out

3    Edward Bunch in that photo array.  That's my

4    shooter.  And what did he do?  Don't mark it.

5    You already picked the shooter, honey.  Don't

6    put that.  Framing the case up against Dalonte.

7    She picked the named suspect that had the

8    gunshot wound consistent with the injuries seen

9    in the video and Detective Lam notes that in his

10   report it is a consistent injury.  Everything

11   pointing towards Edward Bunch.  Oh, who by the

12   way is six-foot tall, 215 pounds with

13   dreadlocks.  And we kind of want to sweep it

14   under the rug that Detective Kubas just kind of

15   -- well, you already did identify a shooter,

16   maybe you shouldn't pick someone.  He tampered

17   with evidence, Judge.  He is withholding

18   exculpatory information.  He tampered with it.

19            But now it's a mess.  Now, what do we

20   do?  Have they talked to Detective Kubas?  No,

21   they don't want to raise that up.  That would

22   look bad for the Police Department.  We're just

23   going to let it go.  And what does that mean?

24   We're going to keep going to trial on Dalonte

25   White.  We're going to keep pursuing him.  We

1    can't really go after Bunch now.  She picked

2    him, but we kind of told her not to do it.

3         It's disgusting.  They're trying to

4    paint it up as Dalonte White.  He doesn't fit.

5    He doesn't have the injury.  Bunch does.

6    Timeframe fits Bunch and his report to the

7    hospital.  The height, the weight, everything is

8    a match.  They also do DNA.  Swab the dogs

9    mouth, they take blood samples from the floor.

10   They don't bother to send the blood down.  They

11   get a jacket from Dalonte's house, the one they

12   think that could be involved in all of this.

13   There's no blood found on it.  None of his DNA

14   is anywhere.

15        Do they even bother to go interview

16   Edward Bunch?  No.  Not until July 2nd, months

17   and months after they discover all this evidence

18   against him.  Do they bother even doing a search

19   warrant at Edward Bunch's place?  Nope.  Do they

20   even get pictures of his leg?  Nope.  Well, now

21   it's too late.  It's in July, this was back in

22   April.  It's probably all healed anyway, what's

23   the point?  They didn't do their job.  And then

24   they fudge their job.

25        And those are the reasons, your Honor,

1    that photo array, those photo arrays are not

2    credible.  Because one, it's not fair to him.

3    He doesn't fit the suspect anyway and the array

4    they put him in only has him depicted with

5    dreadlocks.  It's just unfair and it goes

6    against any sort of discretion.

7         And secondly, because the police

8    tampered with the evidence.  They withheld it.

9    They covered it up.  That's why these photo

10   arrays are crap.  They're not worth anything and

11   Dalonte White should not be bound over in this

12   case.  Thank you.

13        THE COURT:  All right.  Without

14   further ado, mom and step-dad -- at this point

15   you're going to call your first witness,

16   Prosecutor Schroth?

17        MR. SCHROTH:  Yes.  Thanks, Judge.

18        THE COURT:  Can you escort mom and

19   step-dad out?

20        **SAVANNAH LAFORCE, Sworn.**

21        THE COURT:  Good morning.  I am Judge

22   Denise Rini.  Welcome to my courtroom.  I am

23   sorry that you are here under these

24   circumstances, but what I want you to understand

25   is if you don't know the answer to a question,

29

1           just say I don't know.  Don't try and please

2           anyone in the room including me.

3                    If you need a break or a timeout, just

4           let me know and I will call a recess.  And if

5           either side says objection, just go ahead and

6           stop talking and I'll make a ruling.  Okay?

7           Yes?

8                    You have to speak because she's typing

9           down what you say.

10                   THE WITNESS:  Okay.

11                   THE COURT:  And this is Prosecutor

12          Schroth, have you met him?  Yes?

13                   THE WITNESS:  Yes.

14                   THE COURT:  Okay.  And he is going to

15          ask you questions and then the attorney will

16          follow-up.  Okay?

17                   THE WITNESS:  Okay.

18                   THE COURT:  All right.  Go ahead.  You

19          may proceed.

20          **DIRECT EXAMINATION OF SAVANNAH LAFORCE**

21     **BY MR. SCHROTH:**

22     Q.   Savannah, you're soft spoken.  I need you to keep

23          your voice up.  Okay.  I need you to use your outside

24          voice when you're talking.

25     A.   Okay.

30

1   Q.   Okay.  And if you need to you can lean into that -- I

2        know this isn't easy.  I need you to lean into that

3        microphone to keep it up.  Okay?

4   A.   Okay.

5   Q.   Do we have a deal?  Is that a yes?

6   A.   Yes.

7   Q.   Okay.  Could you please just say your name for the

8        Court?

9   A.   Savannah LaForce.

10  Q.   Okay.  And how do you spell Savannah?

11  A.   S-a-v-a-n-n-a-h.

12  Q.   And how do you spell LaForce?

13  A.   L-a-f-o-r-c-e.

14  Q.   And how old are you?

15  A.   Fifteen.

16  Q.   All right.  Are you in school?

17  A.   Yes.

18  Q.   What year in school are you?

19  A.   Huh?

20  Q.   What year?  What grade?

21  A.   Tenth.

22  Q.   You're going into tenth grade?

23  A.   Mm-hmm.  This year.

24  Q.   Okay.  Do you like to do anything in school, play any

25       sports or anything or any clubs?

31

1   A.   No.

2   Q.   Okay.  Now, do you know someone named Zackary Hale?

3   A.   Yes.

4   Q.   How do you know Zackary?

5   A.   He's my cousin.

6   Q.   All right.  And do you know someone named Colleen

7        Allums?

8   A.   Yes, she's my aunt.

9   Q.   Okay.  Have you ever been to Colleen's house before?

10  A.   Yes.

11  Q.   And what street did Colleen -- where did Colleen live

12       on April 21st of 2015?

13  A.   West 54th.

14  Q.   Do you remember the address?

15  A.   3255, I believe.

16  Q.   All right.  Do you know how long she had lived there

17       for?

18  A.   (Indicating.)

19  Q.   Is that a no?

20  A.   No.

21  Q.   I know when we're talking like normally you can just

22       shake your head or make gestures, but since this

23       young lady is taking everything down, I need you to

24       let the world know what you're saying.  Okay?

25  A.   Okay.

32

```
1    Q.   All right.  Do you remember April 21st of 2015?

2    A.   Yes.

3    Q.   Okay.  Did you go anywhere that day?

4    A.   To Colleen's.

5    Q.   Colleen's?

6    A.   (Indicating.)

7    Q.   The West 54th address?

8    A.   Yes.

9    Q.   Do you remember around what time you went?

10   A.   5:30ish.

11   Q.   Okay.  In the morning or evening?

12   A.   Evening.

13   Q.   And what made you go over to Colleen's?  Why'd you go

14        there?

15   A.   To hang out with my cousins.

16   Q.   All right.  Specifically what cousins?

17   A.   Her daughters.

18   Q.   How old were they?

19   A.   Twelve, I believe, and one's thirteen.

20   Q.   Okay.  So did you make it all the way to Colleen's

21        house?

22   A.   Yes.

23   Q.   And when you got to her house before you went in, did

24        you see anything before you went in the house?

25   A.   People outside playing basketball.
```

33

| | | |
|---|---|---|
| 1 | Q. | All right.  How was it they were playing basketball? |
| 2 | A. | They were playing basketball. |
| 3 | Q. | Okay.  Was there like a hoop out there or what were |
| 4 | | they doing? |
| 5 | A. | Yeah, a hoop. |
| 6 | Q. | Okay.  Did you know any of the people at that time |
| 7 | | that were playing basketball? |
| 8 | A. | Yes. |
| 9 | Q. | Who? |
| 10 | A. | Her son, Alex, John and the kid across the street, |
| 11 | | Roger. |
| 12 | Q. | The kid across the street from Colleen or across the |
| 13 | | street from where you lived? |
| 14 | A. | Across the street from Colleen. |
| 15 | Q. | Okay.  Did you stay outside and hang out with those |
| 16 | | kids at all? |
| 17 | A. | No. |
| 18 | Q. | What did you do? |
| 19 | A. | Go inside to Colleen's house. |
| 20 | Q. | All right.  And what happened when you went inside? |
| 21 | A. | I sat down. |
| 22 | Q. | Well, where did you go inside the house? |
| 23 | A. | In the living room. |
| 24 | Q. | Were you by yourself in the living room? |
| 25 | A. | Yes, with Colleen. |

1   Q.   Okay.  So it's just you and Colleen at that point?

2   A.   Yes.

3   Q.   Does she have any pets?

4   A.   Yes, dogs.

5   Q.   What kind of dogs?

6   A.   Pit bulls.

7   Q.   How many dogs did she have on April 21st?

8   A.   Three.

9   Q.   And when you were in the living room with Colleen,

10       where were the dogs?

11  A.   Locked up in the back room.

12  Q.   What kind of room in the back room?

13  A.   A bedroom -- kitchen.

14  Q.   Okay.  Some kind of room in the back?

15  A.   Yes.

16  Q.   All right.  Now, if you were to see a picture of

17       Colleen's house, do you think you'd recognize it?

18  A.   Yes.

19  Q.   All right.

20                  MR. SCHROTH:  Judge, if I can approach

21          the witness?

22                  THE COURT:  Yes.

23  Q.   (BY MR. SCHROTH)  Savannah, I'm going to show you

24       what's been marked as State's Exhibit 1.  Do you

25       recognize that?

1    A.   Yes.

2    Q.   How do you recognize it?

3    A.   It's Colleen's house.

4    Q.   Okay.  Is that how Colleen's house looked on

5         April 21st?

6    A.   Yes.

7    Q.   All right.  Can you kind of describe for the Court --

8         you said you were in the living room with her?

9    A.   Mm-hmm.

10   Q.   Can you describe for the Court how is it set up?

11        What's inside the living room?

12   A.   When you walk in there's a curtain and then when you

13        walk in there's a sectional right there.

14   Q.   I'm going to stop you.  When you walk in there's a

15        sectional.  As you walk in the room, as you're

16        entering where is the sectional compared to the

17        person walking into the room?

18   A.   The sectional is right here and they walk in right

19        there.

20   Q.   So is it on your right or your left?

21   A.   My right.

22   Q.   Okay.  What else is in there besides the sectional?

23   A.   A TV, a little chair.

24   Q.   Okay.  So there's a TV, a chair, a sectional.  Is

25        there any other furniture in there at all?

36

1    A.   A love seat.

2    Q.   A love seat.  And where is the love seat?

3    A.   On the back wall where you walk in.

4    Q.   Okay.  When you were in there, were you seated or

5         were you standing?

6    A.   I was seated.

7    Q.   Where were you seated?

8    A.   On the sectional.

9    Q.   Okay.  And you said Colleen was in the room with you?

10   A.   Yes.

11   Q.   Where was she?

12   A.   On the love seat.

13   Q.   All right.  Now, if you were to see pictures of the

14        inside of the house, would you recognize it?

15   A.   Yes.

16   Q.   Okay.  Backing up for a minute.  You said to get into

17        the living room you walk through a curtain?

18   A.   Yeah.

19   Q.   Okay.  So what room leads you into the living room?

20   A.   The dining room.

21   Q.   Okay.  And if you were to walk into the house from

22        the outside, where would that door lead you to?

23   A.   The dining room.

24   Q.   Okay.  To go outside you go through the dining room

25        and to go into the living room you go through the

```
 1              dining room, is that right?
 2     A.   Yes.
 3     Q.   All right.  I'm going to show you State's 3.  Okay.
 4              Savannah, I've handed you what's been marked as
 5              State's Exhibit 3.  Does that look familiar to you?
 6     A.   Yes.
 7     Q.   Okay.  How is that familiar to you?
 8     A.   It's her dining room.
 9     Q.   Whose dining room?
10     A.   Colleen's.
11     Q.   Okay.  Can you hold that up for the Court.  All
12              right.  So as we look at State's 3 is that what the
13              dining room looked like on April 21st?
14     A.   Yes.
15     Q.   Okay.  You had mentioned there was a door that leads
16              to the outside, right?
17     A.   Yes.
18     Q.   Can you see it there?
19     A.   Yes.
20     Q.   All right.  Which one's that?
21     A.   This one.
22     Q.   All right.  So as you look at the photo it's on the
23              left, is that what you're saying?
24     A.   Mm-hmm.
25     Q.   So State's Exhibit 3 that you have in your hand, does
```

38

 1      that look similar at all to what we see on this big

 2      screen?

 3   A.   Yes.

 4   Q.   It does.  You have a really soft voice.  I need you

 5      to speak loud.  Okay.

 6   A.   Okay.

 7   Q.   Pretend like I'm hard of hearing.  All right.  Point

 8      for me, again, where the entrance is to the outside

 9      on your Exhibit.

10   A.   (Indicating.)

11   Q.   Okay.  Am I pointing to the same spot up here on the

12      Mondopad?

13   A.   Yes.

14   Q.   Okay.  I guess, if you walk out this door to the

15      outside what's out here?

16   A.   Her porch.

17   Q.   All right.  And where is -- can you see the living

18      room at all in there?

19   A.   A little bit.

20   Q.   All right.  Where is the entrance to the living room?

21   A.   Huh?

22   Q.   Where is the entrance to the living room?

23   A.   Right here.

24   Q.   Okay.  Right here?

25   A.   Yes.

39

```
 1    Q.   Am I pointing to the right spot?

 2    A.   Yes.

 3    Q.   Okay.  You mentioned curtains as you go into the

 4         living room.  Are those the curtains you're referring

 5         to?

 6    A.   Yes.

 7    Q.   So as you enter from the dining room into the living

 8         room, does State's 3 show at all where you were

 9         seated?

10    A.   No.

11    Q.   Does it show at all the furniture you were on?

12    A.   You barely could see it.

13    Q.   Yours is closer, take a look at that.

14    A.   Yeah.

15    Q.   It does?

16    A.   Yeah.

17    Q.   It does.  Okay.  What piece of furniture are you

18         referring to when you say you can kind of see where

19         you were seated?

20    A.   Right here.

21    Q.   If you can hold that up for Mr. Hoffman and for the

22         Court.  Point to that again.  This is where you're

23         pointing right here?

24    A.   Mm-hmm.

25    Q.   So you can kind of see some sort of furniture.  You
```

40

1        said that's where you were seated?

2    A.   Mm-hmm.

3    Q.   I'm sorry?

4    A.   Yes.

5    Q.   Okay.  I know nobody is used to testifying.  I know.

6        All right.  Now, where was Colleen seated at the

7        time?

8    A.   Behind the wall right here.

9    Q.   Okay.  It's right here.  All right.  Take a look at

10       yours and point.

11    A.   She was seated behind this wall.

12    Q.   Keep your finger there.  Behind this wall here?

13    A.   Yes.

14    Q.   Okay.  And why?  What's right behind this wall?

15    A.   A love seat.

16    Q.   All right.  Take a look at State's 3.  Can you see

17       any piece of the love seat at all in that photo?

18    A.   No.

19    Q.   All right.  What's the love seat look like?  Describe

20       it for us.

21    A.   It's tan.

22    Q.   Okay.

23    A.   Like a khaki color.

24    Q.   Okay.  All right.  I'm going to show you what's been

25       marked for identification purposes as State's 2.  All

41

```
 1            right.  I'm going to show you what's been marked as
 2            State's 2.  Okay?
 3      A.    Okay.
 4      Q.    Take a minute and let me know if you recognize what
 5            you're looking at in State's 2.
 6      A.    Yeah.
 7      Q.    You do.  What do you see there?
 8      A.    The sectional where I was sitting.
 9      Q.    Okay.  And is that how it looked on April 21st?
10      A.    Yes.
11      Q.    Okay.  State's Exhibit 2 that's in front of you, does
12            that look at all like what we see on the big screen?
13      A.    Yes.
14      Q.    All right.  Where were you seated on that sectional,
15            does that show on State's 2?
16      A.    Yes (indicating).
17      Q.    Hold your finger there for Mr. Hoffman and for the
18            Judge.  And you're pointing to right here?
19      A.    Yes.
20      Q.    Okay.  And where is it on State's 2, where is the
21            entranceway?  Where would you walk in from if you
22            look at that photo?
23      A.    Maybe like over here.
24      Q.    You're pointing down here?
25      A.    Yeah, like.
```

42

1   Q.   Okay.  So if you walk in, is this sofa -- is this on

2        your left?

3   A.   Yes.

4   Q.   So here is the entrance where you walk into, right

5        here?

6   A.   Over a little more that way.

7   Q.   Which way?  Over this way, over here a little bit?

8   A.   Yes.

9   Q.   All right.  And in the bottom right hand corner of

10       State's Exhibit 2 there's sort of like a zebra thing,

11       do you see that?

12   A.   Yes.

13   Q.   What's that?  Do you recognize that?

14   A.   That's the handle of the couch, of the love seat.

15   Q.   Okay.  Who was on the love seat?

16   A.   Colleen.

17   Q.   Colleen.  Okay.  I'm going to show you State's 4.  I

18       just handed you what's been marked as State's Exhibit

19       4.  Does that look familiar?

20   A.   Yes.

21   Q.   Okay.  How does that look familiar to you?

22   A.   Colleen's house.

23   Q.   Okay.  What part of the house does it look like?

24   A.   The living room.

25   Q.   Same room as where State's Exhibit 2 is?

43

1    A.    Yes.

2    Q.    Now, what do we see in State's Exhibit 4?

3    A.    The love seat.

4    Q.    Okay.  Now we're looking at State's Exhibit 4.  Can

5          you please hold that picture up, point to yourself

6          where it is and then show us?

7    A.    (Indicating).

8    Q.    So this is State's Exhibit 4, this is the love seat

9          right here?

10   A.    Yes.

11   Q.    Okay.  And does it show where Colleen was seated?

12   A.    Yes.

13   Q.    Where?

14   A.    Right here.

15   Q.    Kind of toward the middle-type of the couch?

16   A.    Yeah.

17   Q.    You're pointing right here?

18   A.    Yeah.

19   Q.    Is that right?

20   A.    Yeah.

21   Q.    Okay.  Where is the TV compared to -- on State's

22         Exhibit 4, where is the TV?

23   A.    It's on this wall.

24   Q.    So it's on this wall over here?

25   A.    Yeah.

44

1     Q.   All right.  Is the living room, is this in the front

2          of the house?

3     A.   Yes.

4     Q.   Okay.  Just so I'm clear.  I want you to spread

5          State's 2, 3, and 4 out in front of you.  Okay.  So

6          on State's 4 you kind of see there's like a -- what's

7          this, like a zebra pillow, is that right?

8     A.   Yeah.

9     Q.   And in State's 3, do you see that zebra pillow at

10         all?

11    A.   Yeah.

12    Q.   Okay.  Can you point to it?

13    A.   (Indicating).

14    Q.   Okay.  Right here this is that zebra pillow, is that

15         right?

16    A.   Yes.

17    Q.   Okay.  And then I'm going to direct your attention to

18         State's 2.  You said this is the couch that you were

19         seated on?

20    A.   Yes.

21    Q.   And in the bottom it sort of looks like a tan, tan

22         and white pillow?

23    A.   Yes.

24    Q.   And I'm going to bring you to look at State's 3.  Is

25         that pillow sort of right here?

45

```
 1   A.   Yes.
 2   Q.   Okay.  All right.  So back to what happened on
 3        April 21st.  It's you and Colleen in this front room
 4        here, right?
 5   A.   Yes.
 6   Q.   Okay.  So what happens at this point.  Just you and
 7        her.  Does anyone else come in at any point?
 8   A.   Then a couple seconds later Zack came walking in.
 9   Q.   Okay.  Your cousin?
10   A.   Yes.
11   Q.   All right.  And how do you know Zack came walking in?
12        How did you know that?
13   A.   Because he walked through the curtain.
14   Q.   Okay.  So did you see him?
15   A.   Yes.
16   Q.   All right.  And was Zack by himself when he first
17        walked in?
18   A.   No.
19   Q.   All right.  What do you mean he wasn't by himself?
20   A.   He was with the other guys.
21   Q.   What do you mean other guys?  Did you recognize those
22        guys at all?
23   A.   No.
24   Q.   Okay.  Had you ever seen them before at all?
25   A.   No.
```

46

1   Q.   Okay.  And can you describe for us what did those

2          guys look like?

3   A.   There was a Puerto Rican guy, he had baggy jogging

4          pants and he had a hoodie and he had a hat on and it

5          was like real tight in the front and he had a hoodie

6          on over his head.

7   Q.   I'm going to hold you.  You kind made a gesture when

8          you said a hat on, you kind of put your fingers like

9          an upside down U, is that right?

10   A.   Yeah.

11   Q.   What kind of hat is that?  Was it like a baseball

12          hat?

13   A.   Yeah.

14   Q.   Oh, okay.  All right.  So there's a Puerto Rican guy

15          with a hat on and what did you say, a hoodie on?

16   A.   Yeah, hoodie.

17   Q.   Was the hoodie up or down?

18   A.   Up.

19   Q.   Okay.  Could you see any part of his face?

20   A.   Yes.

21   Q.   All right.  How much of his face did you see?

22   A.   His face was like sunk in and he had like a beard

23          like that, his beard was starting to grow in and he

24          had a lot of acne and his checks were like sunk in.

25   Q.   Okay.  How many guys total did you see?

47

1    A.    Three.

2    Q.    All right.  What about the next guy that you saw?

3    A.    I really didn't get a look at the other guy.

4    Q.    Okay.  So there's a Puerto Rican, there's another

5          guy, what do you mean you didn't get a good look at

6          him?

7    A.    He stayed behind the curtain.

8    Q.    Okay.  So that's two.  You said you saw three.

9          What's the third guy?  How many guys did you see walk

10         in?

11   A.    Three.

12   Q.    Okay.  And so you said there's a Puerto Rican guy,

13         that's one of the guys, right?  Is that right?

14   A.    Yes.

15   Q.    And then there's another guy you didn't get a look

16         at, is that right?

17   A.    Yes.

18   Q.    Was there another person?

19   A.    Yes.

20   Q.    Okay.  What did that person look like?

21   A.    He was black, he had dreads, he had a Hollister

22         jacket on.

23   Q.    What do you mean a Hollister jacket?  What's that?

24   A.    It was like -- the name brand is Hollister, but it

25         was like a rain jacket and it had a collar and it was

48

```
 1           dark blue.
 2      Q.   Dark blue.  Okay.  Had you ever seen him before?
 3      A.   No.
 4      Q.   Did he have anything on, a hoodie or a hat or
 5           anything?
 6      A.   No.
 7      Q.   Okay.  So what happens when these guys walk in?
 8      A.   The one guy walked in the middle of the room and then
 9           everything happened so fast.  He started hitting
10           Colleen and then a couple of seconds later the dog
11           walked out, the dogs got out.
12      Q.   I'm going to hold you for one second.  Okay.  When
13           these guys walked in the room, where are you
14           positioned?
15      A.   I'm on the love seat.
16      Q.   Are you seated or standing?
17      A.   I mean on the sectional.  I was seated.
18      Q.   On the sectional.  Where was Zack?
19      A.   Right next to me.
20      Q.   How is he next to you, what's he doing?
21      A.   Sitting.
22      Q.   Okay.  On the sectional?
23      A.   Yes.
24      Q.   All right.  And is Colleen still in the same spot?
25      A.   Yes.
```

49

1    Q.   Okay.  So take us through it step-by-step.  All

2         right.  Do any of these guys come into the living

3         room?

4    A.   Yes.

5    Q.   How many?

6    A.   Two.

7    Q.   Two.  Okay.  Which two come into the living room?

8    A.   The Puerto Rican and the one with the dreads.

9    Q.   Okay.  And what happens now?  They come in the living

10        room, did they say anything?

11    A.   No.

12    Q.   All right.  Do you guys say anything?

13    A.   No.

14    Q.   What happens now?

15    A.   He walked up to Colleen and started hitting -- well,

16        first he spun the gun around at all of us and then he

17        started hitting Colleen.

18    Q.   When you say he, which guy, which one are you

19        describing?

20    A.   The one with the dreads.

21    Q.   Okay.  The one with the dreads.  And what do you mean

22        he spun the gun, what do you mean he spun the gun

23        around?

24    A.   He went like that (indicating).

25    Q.   Okay.  Just do that one more time.  So you got your

50

1      arm fully extended, your right.  Was it his right

2      arm, do you know, if you remember?  You don't

3      remember which arm it was?

4   A.   It was the right arm.

5   Q.   His right arm.  And if you're not sure, don't feel

6      like you have to give an answer.  Okay.  Do you

7      remember if it was his right arm?

8   A.   Yeah.

9   Q.   You think it's his right arm?

10  A.   Yeah.

11  Q.   Okay.  Do that gesture one more time.  You had your

12     arm fully extended and you're bringing it across your

13     body in a sweeping motion, is that right?

14  A.   Yes.

15  Q.   Okay.  Now, when he does that, is that the first

16     thing that he does, the person with the gun?

17  A.   Yes.

18  Q.   Does he say anything at that time?

19  A.   No.

20  Q.   All right.  So what happens at this point now?

21     What's the other guy -- you said the Puerto Rican guy

22     walked in the room?

23  A.   Mm-hmm.

24  Q.   Is that a yes?  I'm sorry.

25  A.   Yes.

51

```
 1    Q.   All right.  You're doing fine.  Okay.  What happens
 2         at this point, no one says anything?
 3    A.   No.
 4    Q.   Okay.  So now what happens?
 5    A.   He started hitting Colleen in her head.
 6    Q.   And when you say he, which guy was that?
 7    A.   The one with the dreads.
 8    Q.   All right.  Started hitting Colleen in the head, is
 9         that what you said?
10    A.   Yes.
11    Q.   How?  Help us understand.
12    A.   Well, pistol whipping her.
13    Q.   Okay.  Do you know what part of the pistol, if you
14         know?
15    A.   No.
16    Q.   How do you know he was using the pistol to hit her in
17         the head?
18    A.   Because I seen it.
19    Q.   Okay.  All right.  So at this point in time has
20         anyone said a single word before the guy with the
21         dreads was pistol whipping Colleen?
22    A.   No.
23    Q.   Okay.  Now, what happens?
24    A.   He just keeps hitting her and then the dogs break out
25         and then he started shooting.  He said, get the dogs,
```

1      get the dogs and then my cousin Zack said, they don't

2      bite, they don't bite and he kept shooting at the

3      dogs.

4    Q.   Well, when he's shooting at the dogs, where are the

5         dogs in the -- are the dogs in the room?

6    A.   Yes.

7    Q.   Where are they?

8    A.   They came running in this way.

9    Q.   Just for the record, you're using State's Exhibit 2.

10        Okay.

11   A.   Okay.  They came running in this way and the dogs

12        were right here, I was right here and Zack was right

13        there.

14   Q.   I need you to hold it up just so Mr. Hoffman can see

15        that and so the Court can see that.  You're on

16        State's Exhibit 2.  If you can, indicate again and

17        I'll use the big screen to show what you're showing.

18        Where are the dogs?

19   A.   They came running in this way (indicating).

20   Q.   They came running in this way?

21   A.   Yes.

22   Q.   And where are they when they're being shot at?

23   A.   Over here (indicating).

24   Q.   You got to hold your finger there.  Sort of by this

25        pillow, is that where the dogs were at?

```
 1    A.    Yes.

 2    Q.    You said dogs.  How many dogs?

 3    A.    Three.

 4    Q.    Okay.  The guy with the dreadlocks is shooting at the

 5          dogs?

 6    A.    Yes.

 7    Q.    Okay.  Did any of the dogs get hit at that time?

 8    A.    Yes.

 9    Q.    They do?

10    A.    No, not at that time.

11    Q.    Not at that time.  Okay.  Does Zack get hit?

12    A.    No.

13    Q.    How close is Zack to the dogs?

14    A.    We're both pretty close to the dogs, they're right in

15          front of you.

16    Q.    Okay.  The dogs are in front of you two?

17    A.    Yeah.

18    Q.    Do you get hit at all at that time?

19    A.    No.

20    Q.    If you know, does Zack get hit at all at that time?

21    A.    No.

22    Q.    That question was worded weird.  I'm asking two

23          parts.  Do you know if Zack got hit at all?

24    A.    No.

25    Q.    You do know or you don't know if he got hit?
```

54

1    A.    I don't know.

2    Q.    You don't know.  Oh, okay.  All right.  So what

3         happens now?  What are the two other guys who came in

4         with the guy with the dreads doing when this starts?

5    A.    Just standing around.

6    Q.    All right.  So what's the next thing that happens?

7         The guy with the dreads is shooting at the dogs that

8         are in front of you.  Now what?

9    A.    The one dog bit the guy with the dreads above his

10        feet.

11    Q.    Okay.

12    A.    And the guy with the dreads fell on Colleen and he

13        was still hitting Colleen with the gun and then the

14        dudes ran out.

15    Q.    All right.

16    A.    And me and my cousin Zack ran out.

17    Q.    Okay.  Now, only if you saw it, when you were in

18        there, did you see any of the dogs get shot?

19    A.    No.

20    Q.    All right.  Did you ever see Colleen get shot?

21    A.    No.

22    Q.    Did you see the person with the gun shoot himself?

23    A.    No.

24    Q.    All right.  Now, I want to talk about the person with

25        the dreads.  Were you able to see that person's face?

55

```
 1   A.   Yes.
 2   Q.   All right.  Explain for the Court, how was it you
 3        were able to see that person's face?
 4   A.   Because he was standing literally right in front of
 5        me.
 6   Q.   Okay.  While you were sitting down?
 7   A.   Yes.
 8   Q.   Could you tell how tall he was?
 9   A.   Well, I was sitting down, so he was pretty tall.
10   Q.   Okay.  So he's taller than you when you're seated?
11   A.   Yes.
12   Q.   All right.  Are you able to say how tall he was at
13        all from where you were seated?
14   A.   No.
15   Q.   Okay.  Was the guy with the dreads -- how tall was he
16        compared to the two other guys, if you know?
17   A.   I didn't see the one other guy.  I only seen the
18        Puerto Rican.
19   Q.   Okay.  Can you tell who was taller between the Puerto
20        Rican guy and the guy with the dreads at all?  Are
21        you able to say who was taller?
22   A.   No.
23   Q.   Okay.  All right.  So the person with the dreads who
24        had the gun, do you see that person in Court at all
25        today?
```

```
 1   A.   Yes.
 2   Q.   Okay.  Could you please indicate where that person is
 3        and what they're wearing?
 4   A.   He's right there wearing the orange jumper suit.
 5   Q.   Okay.  You kind of made a head motion.  Just so
 6        everyone, so I understand who you're referring and
 7        the Court does.  You can take your time.  There's no
 8        hurry.  All right.  I need you to point to where that
 9        person is located.
10   A.   Sitting right there.
11   Q.   Okay.  What is that person wearing then?
12   A.   A blue jumper suit.
13   Q.   A blue jumper suit?
14   A.   Yes.
15   Q.   Okay.  Did you say orange before too?
16   A.   Yeah.
17   Q.   Okay.  Is there any part of him that's orange?
18   A.   Yes, his undershirt.
19                    MR. SCHROTH:  Judge, I'd ask that the
20            record reflect that the witness has identified
21            Mr. White?
22                    THE COURT:  So identified.
23   Q.   (BY MR. SCHROTH)  All right.  The dreads.  I want to
24        talk about the dreads.  The dreads that you saw, what
25        did they look like?
```

57

1    A.   They were black thingy things.

2    Q.   Okay.  Well, here, the person you identified, does

3         his hair look the same or different than when the

4         crime happened?

5    A.   Different.

6    Q.   How is his hair different today than it was on April

7         21st?

8    A.   Because it's an afro and he had dreads.

9    Q.   Okay.  All right.  So you mentioned that you and Zack

10        ran out of the house?

11   A.   Yes.

12   Q.   Did I hear that right, that you ran out after the two

13        people that were with the gunman left the house?

14   A.   Yes.

15   Q.   Where did you go?  When you run outside, what's the

16        first thing you see?

17   A.   I'm outside and I'm asking what happened, what

18        happened, and I ran and I hopped a fence and I went

19        into the neighbor's house.

20   Q.   Where is the neighbor compared to where Colleen's

21        house is?

22   A.   Two houses down.

23   Q.   All right.  So you went to someone else's house?

24   A.   Yes.

25   Q.   Okay.  Now, what happens at this point?  How long do

58

```
 1        you stay at that house for?

 2   A.   Until the cops come.

 3   Q.   Okay.  When the cops come, what do you do?

 4   A.   I come outside.

 5   Q.   All right.  What happens when you go outside?

 6   A.   They asked if anybody witnessed the crime and I said,

 7        yeah.

 8   Q.   Okay.  And did you tell them what you saw?

 9   A.   Yes.

10   Q.   Okay.  After you spoke with the police, what else do

11        you do at that time, anything?

12   A.   Huh?

13   Q.   After you talked to the police, did you stay around?

14   A.   Yes, I was in the back of a cop car.

15   Q.   Okay.  How long were you in the back of the cop car

16        for?

17   A.   I'm not for sure.

18   Q.   Okay.  Did you see Colleen at all after when you came

19        back?

20   A.   No.

21   Q.   Did you go up into the house at all after you came

22        back?

23   A.   No.

24   Q.   Okay.  Did you go onto the porch at all when you came

25        back?
```

59

```
 1    A.    No.
 2    Q.    Okay.  All right.  So after you talked to the police
 3          while you were in that cop car, do you do anything
 4          else that day that relates to this?
 5    A.    No.
 6    Q.    Okay.  Now, is there ever a time when you meet with
 7          the police again?
 8    A.    Yes.
 9    Q.    Okay.  Do you know about how much time passes before
10          you meet with the police again?
11    A.    A couple hours, like an hour.
12    Q.    That same day?
13    A.    Yes.
14    Q.    What happens then?
15    A.    We was at the hospital.  And my phone got snatched
16          out of my hand.
17    Q.    I'm going to hold you right there.  Okay.  Let's go
18          back.  You said your phone got snatched out of your
19          hand.  When did that happen?
20    A.    In the house.
21    Q.    Okay.  Who snatched your phone?
22    A.    I believe the Puerto Rican dude.
23    Q.    All right.  And was this before or after the person
24          with the dreads started firing their gun?
25    A.    Yes.
```

60

1  Q.  Was it before or after?

2  A.  Before.

3  Q.  It was before.  Was it before or after the dogs came

4     in?

5  A.  Before.

6  Q.  Okay.  When that person snatched your phone, did they

7     say anything before they took your phone?

8  A.  No.

9  Q.  I mean, where was your phone when they snatched it?

10     How did they take it, how did he take it from you?

11  A.  I had it in my hands, I was on it and they snatched

12     it.

13  Q.  How long after they entered the room that they

14     snatched it?

15  A.  It was like a couple seconds.

16  Q.  Okay.  Back to the -- was anything else taken from

17     you at that time?

18  A.  No.

19  Q.  Back to the hospital.  So you're at the hospital?

20  A.  Yes.

21  Q.  And what happens in the hospital?

22  A.  Colleen's mother told me about this app to find your

23     phone.  So I put my number in this app and it was

24     saying that the phone was at the hospital.

25  Q.  Okay.

61

```
 1    A.   And so we called the police.

 2    Q.   And what happens then?

 3    A.   Nothing.  They said that it wasn't accurate.

 4    Q.   What hospital were you at?

 5    A.   Metro.

 6    Q.   Oh, okay.  All right.  So what happens now?

 7    A.   Nothing.

 8    Q.   Okay.  Well, do you meet with the police again after

 9         that at all?

10    A.   No.

11    Q.   You never talked to the police again on this case?

12    A.   Yeah.

13    Q.   Okay.  When's that?

14    A.   To pick Dalonte out of the lineup.

15    Q.   Okay.  Well, you said to pick Dalonte.  Did you know

16         the person's name who had the gun beforehand?

17    A.   No.

18    Q.   Okay.  Do you remember how much time passes from the

19         day of the crime to when you look at the photos?

20    A.   No.

21    Q.   Okay.  Where does it happen?  Where do you look at

22         these photos?

23    A.   Colleen's house.

24    Q.   Okay.  You're at Colleen's house?

25    A.   (Indicating).
```

62

1    Q.   Okay.  So what happens?  Like how do you know to be

2         there to look at pictures?

3    A.   Oh, I was at my house.

4    Q.   Oh, okay.  So you're at home?

5    A.   Yes.

6    Q.   All right.  How do you know that the police want you

7         to look at pictures?

8    A.   They called my mom.

9    Q.   Okay.  All right.  So when you look at the pictures

10        where are you in the house when you look at the

11        pictures?

12   A.   In the kitchen.

13   Q.   Okay.  Is anyone else there?

14   A.   Yes.

15   Q.   Who?

16   A.   My mom.

17   Q.   Okay.  Is Zack there?

18   A.   No.

19                   MR. HOFFMAN:  Excuse me.  What was the

20            answer?

21                   MR. SCHROTH:  It was her mom.

22                   MR. HOFFMAN:  Mom.

23                   MR. SCHROTH:  Mom, yeah.

24   Q.   (BY MR. SCHROTH)  Did you say mom?

25   A.   Yes.

63

1    Q.   Okay.  All right.  Anyone else present?

2    A.   No.

3    Q.   Okay.  And how many pieces of paper did they give you

4         to look at?

5    A.   Two packets.

6    Q.   All right.  And does anyone in those two packets look

7         familiar, are you able to pick anyone out?

8    A.   Yes.

9    Q.   Okay.  And how many people are you able to pick out?

10   A.   One.

11   Q.   Is it possible that they showed you three instead of

12        two pieces of paper?

13   A.   Yes.

14   Q.   All right.  I'm going to show you State's 91, 94 and

15        97, but one at a time.

16                   THE COURT:  What were the numbers?

17                   MR. SCHROTH:  91, 94 and 97.

18   Q.   (BY MR. SCHROTH)  Okay.  Handing you State's 91, does

19        that look familiar?

20   A.   Yes.

21   Q.   How is that familiar to you?

22   A.   It's the pictures the cop showed me.

23   Q.   Okay.  When the cop showed you those pictures, did

24        you circle anyone?

25   A.   Huh?

64

```
 1    Q.   Did you pick anyone out?

 2    A.   No.

 3    Q.   Okay.  And how come you didn't pick anyone off of

 4         that?

 5    A.   Because nobody was present at the time it happened.

 6    Q.   Okay.  And I want to show you State's 94, does that

 7         one look familiar at all?

 8    A.   Yes.

 9    Q.   How is that familiar?

10    A.   It's the lineup.

11    Q.   I know I'm like right in front of you, but I need you

12         to project for me.  Okay.  I'm sorry.  What about

13         State's 94, how is that familiar?

14    A.   It's the lineup.

15    Q.   What do you mean the lineup?

16    A.   The person I picked out.

17    Q.   Okay.  Is the person you picked out in State's 94?

18    A.   Yes.

19    Q.   All right.  Could you point in the Court?  Hold it up

20         and point to it.  Okay.

21                    THE COURT:  Let the record reflect

22              she's pointing to the top row middle, correct?

23                    THE WITNESS:  Yes.

24                    MR. SCHROTH:  Thanks, Judge.

25    Q.   (BY MR. SCHROTH)  Did you put any markings on that
```

65

1          piece of paper when you picked him out?

2     A.    Yes.

3     Q.    What did you do to it?

4     A.    I circled it.

5     Q.    Okay.

6                         THE COURT:  You can put it down now.

7     Q.    (BY MR. SCHROTH)  I think this is a little bit

8           darker, but does this look similar to what you have?

9     A.    Yes.

10    Q.    Okay.  And where is the person located you picked

11          out?

12    A.    In the top row, second picture.

13    Q.    All right.  And why did you pick that person out?

14          What made you circle that person?

15    A.    Because that's the person that was at the crime.

16    Q.    Okay.  And how do you know that's the person that was

17          at the crime?

18    A.    He just caught my eye when I looked at him.

19    Q.    How long did it take you to pick him out?

20    A.    A couple seconds.

21    Q.    Okay.  What did that person do that you picked out,

22          do during the crime?

23    A.    He's the one with the gun.

24    Q.    All right.  You say the one with the gun.  Is that

25          the person that was shooting in the house?

66

1    A.    Yes.

2    Q.    And was pistol whipping Colleen?

3    A.    Yes.

4    Q.    Okay.  And I'm going to show you State's 97.  Does

5          that look familiar?

6    A.    Yes.

7    Q.    How is that familiar?

8    A.    It was with the lineup.

9    Q.    And did you pick anyone out in 97?

10   A.    No.

11   Q.    Okay.  This looks darker too.  Why didn't you pick

12         anyone out in State's 97?

13   A.    Because no one was there.

14   Q.    Okay.  All right.  You looked at three photo arrays?

15   A.    Yes.

16   Q.    All right.  How many people came into the house?

17   A.    A cop and --

18   Q.    No.  How many people came in during the crime?

19   A.    Three.

20   Q.    Okay.  Now, do you ever meet again with the police

21         after the day you look at those pictures?

22   A.    Yes.

23   Q.    All right.  Do you remember how long goes by?

24   A.    A couple -- like a week.

25   Q.    Okay.  Where does that happen when you meet with the

67

 1          police again?

 2     A.   At the police station.

 3     Q.   All right.  And how did that happen, how do you end

 4          up going to the police station?

 5     A.   They call and ask for us to look at a different set

 6          of lineups.

 7     Q.   And you say us, what do you mean?  Did you go to the

 8          police station?

 9     A.   Yes.

10     Q.   Who went down?

11     A.   Me and my mom.

12     Q.   Okay.  Was anyone else there when you went to the

13          police station?

14     A.   Yeah, Zack and Colleen.

15     Q.   Okay.  So what happens when you, your mom, Zack and

16          Colleen are at the police station?

17     A.   They pull us to look at a lineup.

18     Q.   Okay.  So do you look at more pictures?

19     A.   Yes.

20     Q.   Are you by yourself or with other people?

21     A.   By myself.

22     Q.   Okay.  I'm going to show you what's been marked for

23          identification as State's 100 and 103.  I'm going to

24          show you State's 100 first.  Does that look familiar

25          at all?

1   A.   Yes.

2   Q.   Okay.  How does that look familiar?

3   A.   It's the lineup we looked at.

4   Q.   You say we, what do you mean we looked at?

5   A.   Me and the cop.

6   Q.   Okay.  And did you pick anyone out in -- what was

7       that, State's 100?

8   A.   No.

9              THE COURT:  Yes.

10   Q.   (BY MR. SCHROTH)  I think this is a little grainier

11       than the one in front of you, is that all right?

12   A.   Yes.

13   Q.   So what we see on the Mondopad, on the big board, is

14       that State's 100?

15   A.   Yes.

16   Q.   Did you make any markings or pick anyone out there?

17   A.   No.

18   Q.   Okay.  And why not?

19   A.   Because they wasn't present at the time.

20   Q.   Okay.  And lastly, I'm showing you State's 103.  Does

21       that look familiar at all to you?

22   A.   Yes.

23   Q.   Okay.  How is that familiar, Savannah?

24   A.   It was the lineup I looked at.

25   Q.   And did you pick anyone out on State's 103?

1    A.   No.

2    Q.   All right.  Why not?

3    A.   Because nobody looked familiar.

4    Q.   I'm sorry?

5    A.   Nobody looked familiar.  Nobody was at the scene.

6    Q.   The scene of the crime?

7    A.   Yes.

8    Q.   Okay.  And did you have any other interaction with

9        the police at all?

10    A.   No.

11    Q.   Besides what you've already testified to?

12    A.   No.

13    Q.   Okay.

14                MR. SCHROTH:  Can I have a moment,

15        Judge?

16                THE COURT:  Yes.

17                MR. SCHROTH:  Thank you.  Nothing

18        further.

19                THE COURT:  All right.  At this

20        juncture it is 12:22.  What we are going to do

21        is take a short break so that everyone can get a

22        little bit of something to eat.  There's a

23        cafeteria on two.  Okay.

24                You are not to speak of your

25        testimony.  You are under oath and you remain

1          under oath until your testimony is completed.

2          So you cannot talk to anyone, not your aunt, not

3          Zackary, no one about your testimony and even

4          the attorneys.  Do you understand?

5               THE WITNESS:  Yes.

6               THE COURT:  All right.  We can go off

7          the record now.

8                (Recess taken.)

9               THE COURT:  We are here in the matter

10         of Dalonte White, Case No. DL 15105751.

11              We are on cross-examination.  Attorney

12         Hoffman, it is your witness.

13              MR. HOFFMAN:  Thank you, your Honor.

14              THE COURT:  Let me remind you,

15         Savannah, that you are under oath still.  Do you

16         have water?

17              THE WITNESS:  Yes.

18              THE COURT:  Okay.  Do you need

19         anything?

20              THE WITNESS:  No.

21              THE COURT:  All right.  Go ahead.

22              MR. HOFFMAN:  Thank you, your Honor.

23          **CROSS-EXAMINATION OF SAVANNAH LAFORCE**

24   **BY MR. HOFFMAN:**

25  Q.  Savannah, my name is Brian Hoffman.  I work with the

71

1      Public Defender's Office and I represent Dalonte

2      White.  I'm going to ask you some follow-up

3      questions.  Okay?

4   A.  Okay.

5   Q.  And same thing as before, you just have to answer out

6      loud and try to keep your voice up as best you can.

7      Okay?

8   A.  Okay.

9   Q.  All right.  I think you said earlier that you had

10      jumped a fence and gone like two houses down?

11   A.  Yes.

12   Q.  Is that where, is it your grandmother lives?

13   A.  No.

14   Q.  Who lives there?

15   A.  My cousins.

16   Q.  Your cousins?

17   A.  Yes.

18   Q.  Okay.  So your aunt Colleen lives about two or three

19      doors down from your cousin's house?

20   A.  Yes.

21   Q.  Okay.  And your cousin's house, is that her mom's

22      house?

23   A.  Her mother-in-law.

24   Q.  Her mother-in-law.  Okay.  And that's where she's at

25      nowadays, right?

72

```
 1   A.   Yes.

 2   Q.   Okay.  And the houses, they're kind of close together

 3        so it wouldn't take you long to basically run from

 4        Colleen's house to your cousin's house, right?

 5   A.   Right.

 6   Q.   Maybe ten or fifteen seconds?

 7   A.   Yes.

 8   Q.   How long do you think?  About that?

 9   A.   Yes.

10   Q.   Okay.  You also mentioned, you said Zack kind of came

11        into the room?

12   A.   Yes.

13   Q.   And then pretty quickly after him these three guys

14        came in?

15   A.   Yes.

16   Q.   And you said one was Puerto Rican?

17   A.   Yes.

18   Q.   And you mentioned something like he had a baggy or

19        something.  I couldn't understand exactly what you

20        said.

21   A.   He had baggy jogging pants on.

22   Q.   Baggy jogging pants?

23   A.   Yes.

24   Q.   Oh, okay.  And were they dark you said?

25   A.   They were blue.
```

73

```
 1   Q.   Blue.  Okay.  And so when the people came in the
 2        room, we were kind of showing you on the board the
 3        layout for the room and everything like that?
 4   A.   Yes.
 5   Q.   And at first you kind of come through the dining
 6        room, right?
 7   A.   Yes.
 8   Q.   And then it turns and you go through the curtain and
 9        you're in the living room?
10   A.   Yes.
11   Q.   And so as you're going that way, you would have been
12        off to the left and Colleen's off to the right?
13   A.   Yes.
14   Q.   So the guy that came in with dreads, he goes and kind
15        of points around and then he goes right at Colleen?
16   A.   Yes.
17   Q.   So he goes pretty quickly right after Colleen?
18   A.   Yes.
19   Q.   And after all of this was over, you talk to the
20        police that night shortly after?
21   A.   Yes.
22   Q.   Okay.  And you recall telling them as much as you
23        could?
24   A.   Yes.
25   Q.   But it was pretty scary?
```

74

1    A.    Yes.

2    Q.    And you're still probably pretty terrified.  But you

3          told the police as much information as you could,

4          right, the best you could do?

5    A.    Yes.

6    Q.    And you said that the guy was about 6', 6'1"?

7    A.    Yeah.

8    Q.    And 200 to 250 pounds?

9    A.    No.

10    Q.    Isn't that what you told the police?

11    A.    I don't remember.

12    Q.    Okay.  But the police were taking down notes of what

13          you were saying and everything?

14    A.    Yes.

15    Q.    Okay.  So they were documenting everything that was

16          going on, but you were pretty freaked out at that

17          point, is that right?

18    A.    Yes.

19    Q.    Okay.  So you said -- how long of a look did you get

20          on him?  Was it real quick just while he was turning

21          the gun, is that when you saw his face?

22    A.    I seen it plenty of times.

23    Q.    Plenty of times.  Did he keep looking back or how did

24          it happen?

25    A.    I looked at him when he was hitting Colleen.

75

1    Q.   All right.  Did you notice like -- you said he had

2        some dreadlocks hanging down?

3    A.   Yes.

4    Q.   Were they like in front of his face at all or were

5        they like flopping around when he was turning his

6        head?

7    A.   They were just hanging.

8    Q.   They were hanging down?

9    A.   Yes.

10   Q.   Do you know, did he have like a bandanna or anything

11       else on his head at all?

12   A.   No.

13   Q.   He didn't have a hat or anything like that?

14   A.   No.

15   Q.   Okay.  So all you could see basically were the

16       dreadlocks hanging down?

17   A.   Yes.

18   Q.   And were they kind of flopping up and down or

19       anything like that?

20   A.   I didn't pay attention.

21   Q.   Okay.  Did the guy have anything like hanging from

22       the bottoms of them or anything, like little beads or

23       barrettes or anything like that or was it just plain

24       dreadlocks?

25   A.   Plain dreadlocks.

1    Q.    Okay.  And then you said the other guy you thought he

2         was Puerto Rican, but his face was covered up with a

3         hat and a hoodie?

4    A.    Yeah.

5    Q.    So all you could see was kind of this part?

6    A.    Yeah.

7    Q.    And he had like a thin -- like he hadn't shaved right

8         away?

9    A.    Yeah.

10    Q.    Okay.  Mustache too?

11    A.    Mm-hmm.

12    Q.    So the guy with the dreadlocks, he comes in the room,

13         he turns and he just starts going after Colleen

14         pretty quickly?

15    A.    Yes.

16    Q.    Is that when the dogs came out to help Colleen?

17    A.    Yeah.

18    Q.    Okay.  Was Colleen screaming or anything like that?

19    A.    Yes.

20    Q.    How about you, were you screaming or anything or were

21         you just kind of afraid and not moving?

22    A.    Yes, I was calm and kept quiet.

23    Q.    And later when you talked to the police and they were

24         recording you at the hospital, you said you kind of

25         tried to keep your head down?

77

```
 1    A.    Yes.

 2    Q.    You just kind of wanted to huddle up and stay safe?

 3    A.    Yes.

 4    Q.    And is that when the guy came over and snatched your

 5          phone?

 6    A.    They snatched my phone and I just went like that

 7          (indicating).

 8    Q.    Okay.  Did you try to stay covered up?

 9    A.    I would look and then I would cover up.

10    Q.    Okay.  So you were kind of like peeking up a little

11          bit every once in a while.  So if you imagine the

12          room being this way, the guy comes in with the

13          dreadlocks and he turns towards Colleen and he starts

14          hitting her here on the couch, right?

15    A.    Yes.

16    Q.    And then the dogs come in behind him?

17    A.    Yes.

18    Q.    And they start biting his leg, right?

19    A.    Yes.

20    Q.    Pretty hard, I think you said before, correct?

21    A.    Yes.

22    Q.    And it was Sandy, right?

23    A.    Missy.

24    Q.    Missy was the dog?

25    A.    Yes.
```

1    Q.    So Missy got ahold of his leg.  And is that when the

2        guy started shooting then?

3    A.    He started shooting when they first came into the

4        room.

5    Q.    Okay.  And when he started shooting did he just start

6        shooting all over the place?

7    A.    No.  Just aiming at the dogs.

8    Q.    Okay.  So he's aiming downward?

9    A.    Yes.

10    Q.    Trying to hit the dogs.  And meanwhile, Missy's kind

11        of biting on his leg?

12    A.    Yes.

13    Q.    Was he shooting while Missy was on his leg too?

14    A.    Yes.

15    Q.    Did you notice if Missy had torn a piece of clothing

16        off or taken a chunk of skin out or anything like

17        that?

18    A.    No.

19    Q.    I know that's pretty detailed for the time.  But you

20        didn't see anything laying on the ground afterwards

21        or anything?

22    A.    No.

23    Q.    Okay.  But Missy had a good bite on him, though?

24    A.    Yes.

25    Q.    All right.  So the guy when he came in he was kind of

1          -- he was facing Colleen when he was hitting her?

2    A.   Yes.

3    Q.   But when the dogs came in, that's when he looked

4         backwards and you could kind of see him?

5    A.   Yes.

6    Q.   But it was fast, though, right?

7    A.   Yeah.

8    Q.   I think originally you had told the police you

9         thought that this was going for like it seemed like

10        it was like 20 minutes?

11   A.   Yes.

12   Q.   But it wasn't anywhere near that long, was it?

13   A.   No.

14   Q.   It just seemed like that, right, because you were

15        scared?

16   A.   Yeah.

17   Q.   How long do you think the whole thing lasted, maybe

18        one, two minutes?

19   A.   Two.

20   Q.   Two minutes.  Okay.  So it was pretty quick.  When

21        did the two others start running out of the house?

22        Did they start running when the dogs came in or when

23        the guy started shooting?

24   A.   When the guy started shooting.

25   Q.   And that's when they said whoa, I'm out of here and

80

1       they got out?

2   A.   Yes.

3   Q.   And then as soon as they left, is that when you

4       bolted for the door?

5   A.   Yes.

6   Q.   And so did you go out the front door then?

7   A.   Yes.

8   Q.   Okay.  And then you went right to your cousins as

9       fast as you could, right?

10  A.   Yes.

11  Q.   And you said you saw someone there, it was Colleen's

12      mom, is that right?

13  A.   Yeah, at the house.

14  Q.   Her mom was there.  Did you tell her what was going

15      on, like, hey, hey, call the police, call the police?

16  A.   Yes.

17  Q.   Okay.  That probably happened within like a minute,

18      less than a minute?

19  A.   Yeah.

20  Q.   Okay.  Did her mom call the police?

21  A.   Yes.

22  Q.   Like she called like right away first thing?

23  A.   Yeah.

24  Q.   Okay.  So not much time had passed and the police got

25      there right away, right?

81

```
 1    A.    Yeah.
 2    Q.    Okay.  I think before you said the guy had the gun
 3          with his right arm, right?  He kind of turned around
 4          and came at Colleen, right?
 5    A.    Yes.
 6    Q.    When he was hitting her, she was sitting on the
 7          couch?
 8    A.    Yes.
 9    Q.    So was he kind of like leaning over like this to hit
10          her?
11    A.    Yes.
12    Q.    Or was he standing straight up?
13    A.    Leaning.
14    Q.    He was leaning.  How many times did he hit her?
15    A.    He hit her a lot.
16    Q.    A lot.  Was he saying anything?
17    A.    No.
18    Q.    He was just hitting her?
19    A.    Just hitting her.
20    Q.    Okay.  I think before when you talked to the police
21          you indicated that you saw a silver gun, right?
22    A.    Yes.
23    Q.    And it was a revolver, right?
24    A.    Yes.
25    Q.    Are you familiar with a revolver versus a
```

82

```
 1          semiautomatic?
 2   A.    Yes.
 3   Q.    It looks like a cowboy gun, it's got the spin?
 4   A.    Yes.
 5   Q.    Okay.  And that's what kind of gun it was?
 6   A.    Yes.
 7   Q.    Did you say that you were there to see Colleen's
 8          daughters?
 9   A.    Yes.
10   Q.    How old are they?
11   A.    One's 12 and one's 13.
12   Q.    Okay.  Do they live there with her?
13   A.    No.
14   Q.    Where do they live?
15   A.    At her mother's.
16   Q.    Okay.  So they live three doors down?
17   A.    Yes.
18   Q.    They weren't home at the time this happened?
19   A.    No.
20   Q.    Okay.  And going back.  You said the dog was biting
21          the person above the foot?
22   A.    Yes.
23   Q.    Was it right leg?
24   A.    I'm not for sure.
25   Q.    Okay.  And you said you saw the person's face at
```

83

1        least a couple times, right?

2    A.   Yes.

3    Q.   Probably when he first came in the room and did this?

4    A.   Yes.

5    Q.   And probably when he turned around because of the

6        dogs, right?

7    A.   Yes.

8    Q.   Okay.  And you said he was pretty tall?

9    A.   Yeah.

10   Q.   And you said you thought he had a dark blue Hollister

11       hoodie?

12   A.   Yes.

13   Q.   I think their symbol is like an eagle or something,

14       right?

15   A.   It's a bird.

16   Q.   Some sort of a bird.  Did you see that symbol or did

17       you see the words Hollister?

18   A.   It was a bird and the words were underneath.

19   Q.   Okay.  So it was both.  And you said it was kind of

20       like a rain jacket?

21   A.   Yeah.

22   Q.   Okay.  The other interesting thing you said is you

23       tried to ping your cellphone or you tried to locate

24       your cellphone?

25   A.   Yes.

84

1    Q.    And who was trying to help you do that?

2    A.    My mother.

3    Q.    Okay.  So you downloaded an app or you had an app on

4          the Find My Phone?

5    A.    Yeah.

6    Q.    That's on Apple products, right?  An iPhone?

7    A.    No.

8    Q.    No.  What kind of a phone was it?

9    A.    A Blu.

10   Q.    Is that the company?

11   A.    No.  It's the name of the phone.

12   Q.    Oh, okay.  And you said it was through Verizon?

13   A.    No.  It's not a contract phone.

14   Q.    Oh, it's not.  Okay.  So this is just an app you had

15         on this particular phone that let's you find it?

16   A.    Yeah.

17   Q.    Okay.  And so your mom was trying to trace that?

18   A.    Yes.

19   Q.    And you were able to find out that it was at a

20         hospital?

21   A.    Yes.

22   Q.    Do you know which hospital?

23   A.    Metro.

24   Q.    It was saying it was at Metro Hospital?

25   A.    Yes.

85

```
 1    Q.   Are you sure it wasn't another hospital?

 2    A.   No, Metro.

 3    Q.   Okay.  And that's where you were at, right?

 4    A.   Yes.

 5    Q.   Okay.  That's kind of strange, isn't it?  So it's

 6         saying that the phone that they took was at the

 7         hospital with you?

 8    A.   Yes.

 9    Q.   Was it maybe finding a different phone?

10    A.   I don't know.

11    Q.   Are you sure it wasn't another hospital?

12    A.   I'm sure it was Metro.

13    Q.   Okay.  Have you ever heard of a hair style called

14         twists or twisties?

15    A.   Yes.

16    Q.   Where it's kind of like nubs and it kind of spikes

17         out different, right?

18    A.   Yes.

19    Q.   Those are different from dreads, right?

20    A.   Mm-hmm.

21    Q.   You would know the difference if you saw them?

22    A.   Yeah.

23    Q.   Okay.  When did you find out Dalonte White's name?

24    A.   The day of the lineup.

25    Q.   Who told you his name?
```

86

1   A.   The officer.

2   Q.   He said that's Dalonte White?

3   A.   No, in the recording.

4   Q.   So during the recording, after you identified him he

5        said that's Dalonte White?

6   A.   I identified him in the house and then we went to the

7        car for the recording.

8   Q.   You went to the where?

9   A.   The car, the cop car for the recording.

10  Q.   Okay.  So you already found out his name before you

11       did your statement then?

12  A.   Yeah.

13  Q.   Did they tell you anything else about him?

14  A.   No.

15  Q.   Okay.  They just said his name's Dalonte White?

16  A.   (Indicating.)

17  Q.   Have you talked to Colleen at all about the name

18       Dalonte White?

19  A.   No.

20  Q.   Has she told you anything that she's done in regards

21       to Dalonte?

22  A.   No, she was in the hospital.

23  Q.   I mean, since then?

24  A.   No.

25  Q.   You've never talked to her about the case or

1    anything?

2  A.   No.

3  Q.   Never?  You never discussed it, like hey, I'm scared,

4       this is what happened or anything like that?

5  A.   Yeah.

6  Q.   Okay.  And you met with the Prosecutor already,

7       correct?

8  A.   Yes.

9  Q.   And has anyone else told you anything else about

10      Dalonte White?

11 A.   No.

12 Q.   Did you know he was going to be here today?

13 A.   Yes.

14 Q.   How did you know that?

15 A.   Because it's the bindover.

16 Q.   And who told you about a bindover?

17 A.   The Prosecutor.

18 Q.   Okay.  So he told you that Dalonte was going to be in

19      the room today?

20 A.   Yes.

21 Q.   And so that's how you knew to point to him, right?

22 A.   Yeah.

23 Q.   Before you said he was like wearing orange, you

24      didn't really look at him, you didn't want to look at

25      him before?

88

1   A.   Yes.

2   Q.   But basically since April 24th or so the only name in

3        your mind has been Dalonte White?

4   A.   Yes.

5   Q.   Have they shared any other suspect information with

6        you or anything of that nature?

7   A.   No.

8   Q.   So all you know so far through the last few months is

9        the name Dalonte White?

10  A.   Yes.

11  Q.   Have you seen any other photos of him, anything like

12       that?

13  A.   No.

14  Q.   You stayed over at your cousin's house three doors

15       down, you waited until the police got there?

16  A.   Yes.

17  Q.   But you said you told your cousin right away, call

18       them, get them here, we need help, that kind of

19       stuff?

20  A.   Yeah.

21  Q.   Okay.  How quickly did the police arrive?

22  A.   In seconds.

23             MR. HOFFMAN:  May I approach?

24             THE COURT:  Yeah.

25  Q.   (BY MR. HOFFMAN)  Savannah, I'm handing you what was

89

1    previously marked as State's Exhibit No. 94.  Do you

2    remember talking about this photo?

3 A. Yes.

4 Q. And this is the one that you originally IDed, right?

5 A. Yes.

6 Q. When you were shown it originally, was it black and

7    white?

8 A. Yes.

9 Q. And was it all six pictures together?

10 A. Yes.

11 Q. Okay.  And you'd agree with me that in this picture

12    the person in the top middle he's the only one with

13    dreadlocks in that photo array, right?

14 A. Yes.

15 Q. So your eye is kind of drawn to him because of that,

16    right?

17 A. No.

18 Q. But you would agree with me, he's the only one there

19    with dreadlocks, right?

20 A. Yes.

21 Q. The person that came in that day, was his hair

22    hanging down similar like that?

23 A. It was a little bit longer.

24 Q. A little bit longer than that?

25 A. Yes.

90

```
 1    Q.    Okay.  But it was hanging down similar?

 2    A.    Yes.

 3    Q.    Did the detective give you any instructions during

 4          the photo array, did he tell you anything before

 5          saying pick someone out?

 6    A.    Yes.

 7    Q.    What did he tell you, if you remember?

 8    A.    I don't remember.

 9    Q.    Did he tell you that the person may or may not be in

10          there?

11    A.    Yes.

12    Q.    Or did he say there's definitely someone in there?

13    A.    He didn't say that.

14    Q.    What about the second time when they came back in the

15          middle of May, did they tell you that there was a

16          person in there or no?

17    A.    No.

18    Q.    Okay.  So they didn't tell you whether or not to

19          identify anyone or not, you did that on your own?

20    A.    Yes.

21    Q.    When they came back out the second time -- I'm going

22          to show you Exhibits 100 and 103.  Were you looking

23          for the other people, the Puerto Rican guy and the

24          other guy that came in or were you looking for the

25          shooter?
```

91

1    A.    We was looking for the other guys.

2    Q.    So you weren't looking for the shooter when you

3          looked at those two photo arrays, right?

4    A.    Right.

5    Q.    And you don't think any of these guys look like the

6          Puerto Rican guy?

7    A.    Hmm-mm.

8    Q.    Or the other guy?

9    A.    No.

10   Q.    And you said you didn't really even see the third

11         guy, right, he was behind the curtain?

12   A.    Yeah.

13   Q.    Okay.  Savannah, I know it may not be comfortable to

14         talk about, but in State's Exhibit No. 4, can you

15         tell us what you right there see on that table where

16         that yellow thing is?

17   A.    Where?

18   Q.    Do you know what that is?

19   A.    A cone.

20   Q.    Yeah.  A little marker there?

21   A.    Yeah.

22   Q.    Does it have a number on it?

23   A.    Three.

24   Q.    What is usually on that table?

25   A.    I don't know.

92

1   Q.   I guess what I'm getting at is, is that generally

2       where there's usually some marijuana and things kept?

3   A.   I don't know.

4   Q.   I mean, clearly you weren't doing anything wrong that

5       day, right?

6   A.   Right.

7   Q.   Do you know if there was any marijuana or anything in

8       the house that day?

9   A.   I don't know.

10   Q.   Okay.  You didn't smell it or anything like that?

11   A.   No.

12   Q.   All right.  Do you know if what -- was anything taken

13       from that table during this incident that you saw?

14   A.   No.

15   Q.   Was there money taken?

16   A.   I don't know.

17   Q.   Okay.  So you really didn't see what this guy was

18       taking at all?

19   A.   No.

20   Q.   Okay.  Was he yelling and asking for money?

21   A.   No.

22   Q.   I noticed that the windows are kind of pulled shut.

23       Does it stay pretty dark in that room?

24   A.   No.

25   Q.   So you can see pretty well.  Were the lights on and

93

```
 1        things?
 2   A.   No.
 3   Q.   Okay.  So the lights were off, but the windows you
 4        can see through?
 5   A.   Yeah.
 6   Q.   Okay.  And this happened around like 6:00, right?
 7   A.   Yes.
 8   Q.   Do you remember if it was still light out or was it
 9        dark out?
10   A.   I believe it was still light out.
11   Q.   Okay.  Do you wear contacts or glasses or anything
12        like that?
13   A.   No.
14   Q.   You have good vision?
15                  THE COURT:  You have to say yes.
16                  THE WITNESS:  Yes.
17   Q.   (BY MR. HOFFMAN)  When the guy came in with the
18        dreadlocks and pulled the gun out, did most of your
19        attention go to that gun then?
20   A.   Yes.
21   Q.   I mean, it was pretty scary, you just didn't want
22        that thing pointed at you anymore?
23   A.   Yes.
24   Q.   All right.  Do you know anyone from the neighborhood
25        by the name of Boy Boy?
```

94

1   A.   No.

2   Q.   JR?

3   A.   No.

4   Q.   You never heard that name?

5   A.   No.

6   Q.   Have you ever heard the name Edward Bunch before?

7   A.   No.

8              MR. HOFFMAN:  Nothing further.  Thank

9        you, your Honor.

10             THE COURT:  Any follow-up?

11             MR. SCHROTH:  Yeah, just a couple.

12        Thanks, Judge.

13             THE COURT:  You're almost done.

14        **REDIRECT EXAMINATION OF SAVANNAH LAFORCE**

15   **BY MR. SCHROTH:**

16   Q.   Savannah, did you get a chance to see the person's

17        face with the gun?

18   A.   Yes.

19   Q.   Okay.  And could you just describe for the Court how

20        it is that you saw that person's face?

21   A.   I looked at him.

22   Q.   Did you look at him dead in the face?

23   A.   Yes.

24   Q.   Did he look back at you in the face?

25   A.   I'm not sure.

95

1   Q.   Okay.  Where were you when you looked into his face?

2   A.   I was sitting on the couch.

3   Q.   And where was he?

4   A.   Like I was sitting right here and he was like by

5       Colleen.

6   Q.   Okay.  What part of his face, the front, the side?

7   A.   The front.

8   Q.   Okay.  How many times did you see the front of his

9       face?

10   A.   A couple times.

11   Q.   And what's a couple?

12   A.   Five, four.

13   Q.   Four or five times you saw him directly right on in

14       the face?

15   A.   Yes.

16   Q.   Will you ever forget the face?

17   A.   No.

18   Q.   Now, the first part of your testimony when I asked

19       you questions before, I asked if you saw the person

20       in the courtroom today who had the gun, do you

21       remember that?

22   A.   Yes.

23   Q.   Okay.  Do you remember you pointed someone out?

24   A.   Yes.

25   Q.   Now, why is it you pointed that person out in court?

96

```
 1    A.    Because that's the one with the gun.  That's the one
 2          I picked out of the lineup.
 3    Q.    Okay.  Did you point him out because you saw, because
 4          you recognized the person from the house or just
 5          because you knew --
 6                      MR. HOFFMAN:  Objection.
 7                      THE COURT:  Basis?
 8                      MR. HOFFMAN:  Leading.
 9                      THE COURT:  Can you rephrase the
10          question?  I'll sustain it.
11    Q.    (BY MR. SCHROTH)  Yeah.  What exactly made you --
12          when I asked you to identify the person in Court,
13          what exactly made you identify the person over there
14          with the blue and orange on?
15    A.    Because he's the one I seen in the house.
16    Q.    Okay.  And how sure are you of that?
17    A.    I'm positive.  I'm sure.
18    Q.    Okay.  You were asked some questions -- do you
19          remember being asked some questions by Mr. Hoffman
20          about the height, about you telling officers what
21          height people were in there?  Do you remember those
22          questions at all?
23    A.    Not really.
24    Q.    Okay.  The three individuals that came into the
25          room -- you know, strike that question.  The entire
```

```
 1           time this was happening were you seated or standing?
 2   A.   I was seated the whole time.
 3   Q.   All right.  So are you able to give a good guess on
 4           how tall people were that were in that room?
 5   A.   No.
 6   Q.   I'm sorry.  What's that?
 7   A.   No.
 8   Q.   Okay.  Now, are you able to put a number on how long
 9           it was that you were in the room during this crime?
10   A.   No.
11   Q.   Okay.  Do you think it was quicker -- do you think it
12           was a long time or a short period of time that you
13           were in that room?
14   A.   Short period.
15   Q.   All right.  And from the point that the dogs come
16           into the room, come running into the room, how much
17           longer are you in that room from that point on?
18   A.   Just a couple seconds later.
19   Q.   You're only there for a couple more seconds?
20   A.   Yes.
21   Q.   Okay.  And that's after the dogs first come in the
22           room?
23   A.   Yes.
24   Q.   So how long -- do you actually see one of the dogs
25           bite the guy with the gun?
```

98

1   A.   Yes.

2   Q.   Okay.  And how long are you able to see that before

3        you take off out of there?

4   A.   Just like a second.

5   Q.   Okay.  So you only see one second of that?

6   A.   Yes.

7   Q.   All right.  So is it fair to say, you can't say how

8        long it was before something happens to that dog?

9   A.   Yes.

10  Q.   Okay.  Now, I think Mr. Hoffman showed you the

11       different photo arrays a few moments ago, do you

12       remember, with pictures of people?

13  A.   Yes.

14  Q.   Now, you looked at pictures of people twice, right?

15  A.   Yes.

16  Q.   Okay.  When you looked at pictures of people the

17       second time, if you saw any one of the three that

18       were involved in the crime in those photo arrays,

19       would you have picked them out?

20  A.   They told us when we went to the District, they said

21       don't pick him out if you already picked him out.

22  Q.   Oh, they did?

23  A.   Yes.

24  Q.   Okay.  All right.  Now, when did that happen?

25  A.   That's the second time we went.

1    Q.    Oh, okay.

2                      THE COURT:  Before we continue, can

3              you read that back to me?  I want to make sure I

4              heard that correctly.

5                      (Question read by reporter.)

6    Q.    (BY MR. SCHROTH)  Okay.  Just to make sure that I'm

7          clear on, you know, what was going through your mind

8          when you saw the second set of pictures.  So we're

9          just going to start with State's Exhibit 100.

10              State's 100 that's in front of you, is that the

11         same thing we've got on the screen up here?

12   A.    Yes.

13   Q.    All right.  Just to make sure, just so I understand.

14         When you saw it on that day, when you looked at these

15         pictures, did any of those six individuals look

16         familiar to you in terms of whether they were

17         involved or not?

18   A.    No.

19   Q.    Okay.  In any way?  And there's no right or wrong

20         answer to this, just whatever you observed.  I mean,

21         whether it's the Puerto Rican guy, the other guy or

22         the guy who had the gun.  Did any of those come to

23         mind when you look at that photo array?

24   A.    No.

25   Q.    Okay.  And then we're just going to go to No. 103.

100

```
 1            Okay.  State's 103, that's in front of you right now?
 2    A.   Yes.
 3    Q.   All right.  Is that the same thing that's on the
 4         screen?
 5    A.   Yes.
 6    Q.   Okay.  Now, when you looked at these pictures the
 7         first time, I don't remember the exact date, but when
 8         you're in the police station looking at those
 9         pictures, did any of those pictures -- when you
10         viewed them, in your mind, did any one of those six
11         people look at all like anyone who was involved in
12         the crime back on April 21st in any way, shape or
13         form?
14    A.   Yes.
15    Q.   Okay.  And which person looked to you to be like they
16         were involved in any way at all?  And you can use the
17         piece of paper in front of you and I'll just use the
18         board.
19    A.   (Indicating).
20    Q.   Okay.  So that's the bottom row in the middle, is
21         that right?
22    A.   Yes.
23    Q.   This guy right here, 85048?
24    A.   Yes.
25    Q.   All right.
```

101

1               THE COURT:  Which Exhibit is that?

2               MR. SCHROTH:  Oh, I'm sorry.  State's

3          103, Judge.

4               THE COURT:  Thank you.

5     Q.   (BY MR. SCHROTH)  When you looked at that picture,

6          did you say anything about this guy looks familiar at

7          all?

8     A.   Yes.

9     Q.   You did?

10    A.   Yes.

11    Q.   Oh, okay.  And so what happened then when you said

12         that?

13    A.   They said don't circle him if you already picked him

14         out of a lineup.

15    Q.   Okay.  All right.  And so when you see that, when you

16         looked at that, what role did the person who's 85048,

17         what role did they have?

18    A.   The gun.

19    Q.   Okay.  All right.  Why do you say that?

20    A.   Because it looks like the other lineup.

21    Q.   Okay.  So you didn't pick this guy in 103 because you

22         already picked him out, is that what you're saying?

23    A.   Yes.

24    Q.   So State's 94.  When you see State's 94 and State's

25         103 together, is that the same person in both of

1        those, is that what you're saying?

2    A.   Yes.

3    Q.   Okay.

4                     MR. SCHROTH:  Okay.  That's it.

5            Thanks, Judge.  Nothing further.

6                     THE COURT:  All right.  Any recross?

7                     MR. HOFFMAN:  Just briefly.

8        **RECROSS-EXAMINATION OF SAVANNAH LAFORCE**

9    **BY MR. HOFFMAN:**

10   Q.   You said his dreads were hanging down, but longer

11        than in those photos?

12   A.   Yes.

13   Q.   Longer than in both of those photos?

14   A.   Yes.

15   Q.   And you would know the difference between those long

16        dreads and twists, right?

17   A.   Yes.

18   Q.   And Mr. Schroth just asked you about, you were

19        sitting down the whole time?

20   A.   Yes.

21   Q.   So it was hard to tell height a little bit?

22   A.   Yes.

23   Q.   How tall are you?

24   A.   Five-seven.

25   Q.   So you're kind of familiar with your own height at

1    least, right?

2 A. Yes.

3 Q. So you said the person was pretty tall?

4 A. Yes.

5 Q. Okay.  So taller than you, right?

6 A. Yes.

7 Q. When you were looking at this particular one, 103,

8    the one that you have there, did you tell the

9    detective that this guy down here in the middle, he

10    looks familiar?

11 A. Yes.

12 Q. And as far as you know that person's Dalonte White?

13 A. Yes.

14 Q. And no one's ever told you differently, right?

15 A. Right.

16 Q. And prior to coming here to court today, you did meet

17    with the Prosecutor?

18 A. Yes.

19 Q. And you knew that you had previously picked out

20    Dalonte White in a photo array, right?

21 A. Yes.

22 Q. And you knew Dalonte White was going to be sitting

23    here, right?

24 A. Yes.

25        THE COURT:  I'm sorry.  I need that

104

```
 1          repeated.
 2                    (Question read by reporter.)
 3                    MR. HOFFMAN:  Nothing further.
 4                    THE COURT:  I just need a couple of
 5          clarifications.  One is, do you know how the
 6          dogs got loose?
 7                    THE WITNESS:  No.
 8                    THE COURT:  No.  And the dog Missy bit
 9          the man with the dreadlocks, correct?
10                    THE WITNESS:  Yes.
11                    THE COURT:  Okay.  Do you know if he
12          actually got a hold of his pant leg or did he
13          actually bite him?
14                    THE WITNESS:  It look like she had a
15          hold of his leg.
16                    THE COURT:  His leg.  Why do you think
17          that?
18                    THE WITNESS:  Because it looked like
19          she was biting him.
20                    THE COURT:  Describe for me what you
21          saw.
22                    THE WITNESS:  He fell back onto
23          Colleen on the couch and his legs were like
24          crossed and she had a hold of his leg.
25                    THE COURT:  Was the person with the
```

```
 1          dreadlocks screaming, hollering, could you tell

 2          anything like that?

 3                    THE WITNESS:  He kept saying get the

 4          dog.

 5                    THE COURT:  I'm sorry?

 6                    THE WITNESS:  He kept saying get the

 7          dog.

 8                    THE COURT:  Okay.  Did he say anything

 9          else, it bit my leg, it's got my pant leg,

10          anything?

11                    THE WITNESS:  Hm-mm.

12                    THE COURT:  You didn't hear?

13                    THE WITNESS:  No.

14                    THE COURT:  No.  Okay.  When you said

15          that the phone was at Metro Hospital?

16                    THE WITNESS:  Yeah.

17                    THE COURT:  Tell me how you knew that.

18                    THE WITNESS:  It was an app.

19                    THE COURT:  I realize that, but go

20          through the process, what you did, what you put

21          in and how you learned that --

22                    THE WITNESS:  I downloaded the app and

23          I put my number in.

24                    THE COURT:  So the app was not loaded

25          on the phone, you put it in?
```

1               THE WITNESS:  I had another phone and

2       I downloaded the app on my other phone and I put

3       my number in for that phone that was stolen and

4       it was saying it was here, but the officer said

5       it probably wasn't accurate.

6               THE COURT:  Did the officer go to look

7       for the phone?

8               THE WITNESS:  Yes.

9               THE COURT:  And how do you know he

10      went to look for the phone?

11              THE WITNESS:  Because he took the

12      phone and was walking, seeing if it was accurate

13      or not.

14              THE COURT:  Okay.  And do you know

15      whether he was going to different floors or did

16      he just kind of go like this?

17              THE WITNESS:  He went inside the

18      building and I stayed outside.

19              THE COURT:  I'm sorry.  Say that

20      again.

21              THE WITNESS:  He went inside the

22      emergency room and I stayed outside of the

23      emergency room.

24              THE COURT:  Okay.  So you were outside

25      when you put this in?

```
 1                    THE WITNESS:  Yes.

 2                    THE COURT:  Why were you at Metro

 3          Hospital?

 4                    THE WITNESS:  I was seeing Colleen.

 5                    THE COURT:  Okay.  And was it the same

 6          day?

 7                    THE WITNESS:  Yes.

 8                    THE COURT:  So do you remember what

 9          time it was?

10                    THE WITNESS:  No.

11                    THE COURT:  Was it night by then,

12          dark?

13                    THE WITNESS:  Night.  Dark.

14                    THE COURT:  So the officer went into

15          the hospital with your mom's phone?

16                    THE WITNESS:  Yes.

17                    THE COURT:  And walked around and

18          couldn't locate your phone?

19                    THE WITNESS:  Yes.

20                    THE COURT:  Okay.  All right.  Do you

21          have any follow-up based on the Court's inquiry?

22                    MR. SCHROTH:  No.  Thanks, Judge.

23                    THE COURT:  Do you?

24                    MR. HOFFMAN:  No.  I don't think so,

25          your Honor.
```

 1          THE COURT:  Thank you.  You have been

 2    very brave.  I appreciate you coming down and

 3    testifying.  You may step down.  You may call

 4    your next witness.

 5          MR. SCHROTH:  Can we just approach for

 6    a second, Judge?

 7        (Sidebar discussion held.)

 8          THE COURT:  All right.  We're back on

 9    the record.  Prosecutor Schroth, you may call

10    your next witness.

11          **COLLEEN ALLUMS, Sworn.**

12          THE COURT:  Ms. Allums, hi.  I'm Judge

13    Rini.  Welcome to my courtroom.  Do you need

14    some water?  No?  What's going to happen is

15    Prosecutor Schroth is going to ask you questions

16    and then Attorney Hoffman is going to ask you

17    questions.  If either side says objection, just

18    stop talking and I'll make a ruling.  And if you

19    don't know an answer to a question, then just

20    say I don't know.  Don't try and please anyone

21    in the room except yourself.  All right.  Thank

22    you.

23          You're going to have to speak verbally

24    because we are taking everything down.  Not only

25    are we recording, but this nice girls is.  Okay?

109

1          Say yes.

2                         THE WITNESS:  Yes.

3                         THE COURT:  Okay.  Thank you.  You may

4          proceed.

5              **DIRECT EXAMINATION OF COLLEEN ALLUMS**

6     **BY MR. SCHROTH:**

7     Q.   Good afternoon.  Can you please just introduce

8          yourself to the Court and to counsel?

9     A.   I'm Colleen Allums.

10    Q.   And Colleen, how do you spell your first name?

11    A.   C-o-l-l-e-e-n.

12    Q.   And how do you spell your last name?

13    A.   A-l-l-u-m-s.

14    Q.   All right.  And Colleen, how old are you?

15    A.   Thirty-four.

16    Q.   Okay.  And where did you live on April 21st of 2015?

17    A.   3255 West 54th.

18    Q.   Okay.  What city was that in?

19    A.   Cleveland.

20    Q.   What county?

21    A.   Cuyahoga.

22    Q.   And what state?

23    A.   Ohio.

24    Q.   All right.  If you can, I need you to help me out and

25         just keep your voice up.  Okay.  You're doing a good

1           job and you're leaning in.  There's a microphone

2           right there just so everybody can hear.  Do we have a

3           deal?

4    A.    Yes.

5    Q.    Okay.  All right.  So on April 21st, 2015 who did you

6           live with in the house at that time?

7    A.    I lived with my boyfriend.

8    Q.    With who?

9    A.    My boyfriend.

10   Q.    Okay.  And what's his first name?

11   A.    Don.

12   Q.    Don.  Okay.  And did anyone else live in the house?

13   A.    No.

14   Q.    Did you have any pets?

15   A.    I have three dogs.  Had.

16   Q.    Okay.  What were their names?

17   A.    Mischief, Diddy and Mayhem.

18   Q.    Now, do you know someone named Savannah LaForce?

19   A.    Yes.

20   Q.    How do you know her?

21   A.    It is my nephew's girlfriend.

22   Q.    Okay.  And is she considered sort of like family for

23           you?

24   A.    Yes.

25   Q.    Do you know someone name Zackary Hale?

1   A.   That's my nephew.

2   Q.   All right.  Now, did you see either of those two that

3        day?

4   A.   Yes.

5   Q.   Okay.  Did you see them at the same time, did you see

6        one first?

7   A.   Savannah was in the house with me and we were just

8        chitchatting.

9   Q.   Do you remember around what time Savannah came over?

10   A.   About 5:00, 5:15.

11   Q.   Is that morning or night?

12   A.   Evening.

13   Q.   And you said you were chitchatting, where were you

14        guys at?

15   A.   Sitting in my living room.

16   Q.   Okay.  And where were you seated in the living room?

17   A.   I was sitting on one of the couches in my living

18        room.

19   Q.   Okay.  What color was the couch?

20   A.   Like a tannish color.

21   Q.   In relationship to the TV, how was it in terms of

22        where the TV was situated?

23   A.   Basically like right in front of it.

24                MR. SCHROTH:  Judge, can I approach

25       the witness?

112

1              THE COURT:  Yes.

2     Q.   (BY MR. SCHROTH)  All right.  I'm going to show you

3          State's Exhibits 2 and 4.  State's Exhibit 4, does

4          that look familiar?

5     A.   Yes.

6     Q.   How is that familiar to you?

7     A.   That's the couch that I was sitting on.

8     Q.   Okay.  And does it show where it was you were seated?

9     A.   Generally, yeah.

10    Q.   Okay.  Could you just hold it up and show the Court

11         and counsel.  Sort of near the opposite end of where

12         the photographer was standing?

13    A.   Yes.

14              THE COURT:  Let the record reflect

15          that she's pointed to the right side of the

16          photograph if you're looking directly at the

17          photo.

18              MR. SCHROTH:  Thank you, Judge.

19    Q.   (BY MR. SCHROTH)  And then State's Exhibit 2, does

20         that look familiar?

21    A.   That's the sectional that was in my living room.

22    Q.   All right.  And was anyone seated there?

23    A.   Savannah was sitting about here.

24    Q.   And so you're pointing to the bottom of the

25         photograph, towards the end?

113

1    A.    Yeah.  And Zacky was sitting about here.

2    Q.    He's at the end closest to the TV?

3    A.    At the opposite end, yes.

4    Q.    Okay.  And does State's Exhibit 2, does that show at

5          all how you would enter the room?

6    A.    No.  It doesn't show where you would enter, but it

7          would be a little bit like around here.

8    Q.    And you're pointing to the bottom underneath the

9          couch?

10   A.    Yeah.

11   Q.    Okay.  So at this point it's just -- who's in the

12         house at this point when you're talking with

13         Savannah?

14   A.    Just me and her.

15   Q.    All right.  Where is Don?

16   A.    He went to take Zacky's brother, Jacob, to get his

17         brakes fixed.

18   Q.    Okay.  How much earlier did he leave to go for the

19         brakes?

20   A.    About 4:15, 4:20.

21   Q.    All right.  So you and Savannah are talking, does

22         anyone else come in the house at this point?

23   A.    Zacky came in.

24   Q.    All right.  And how do you know Zackary came in?

25   A.    I heard the screen door.

114

1    Q.   Okay.  And is there any point where you see him?

2    A.   I stood up and I went -- I had curtains over my

3         doorway and I peeked through the curtains and I seen

4         Zacky come in.

5    Q.   Okay.  Where are the curtains in comparison to the

6         living room?

7    A.   From the photo that you showed of the sectional

8         they're a little bit away from where Savannah was

9         sitting.

10   Q.   Okay.  So if you go through the curtains, where would

11       you go?  What room would you be in?

12   A.   When --

13   Q.   I'm sorry.  Let me clarify that.  If you leave the

14       living room and you go through the curtains, what

15       room would you be in?

16   A.   The dining room.

17   Q.   All right.  I'm going to show you State's 3.  And

18       does that look familiar at all?

19   A.   Yeah.

20   Q.   Okay.  What do we see there?

21   A.   The entrance to my front door.

22   Q.   If you could just hold it up when you do that.

23   A.   The entrance to my front door.  The entrance to my

24       living room (indicating).

25   Q.   Okay.  You said you peeked through the curtains or

115

```
 1              whatever?
 2      A.      Yeah.
 3      Q.      All right.  And what did you see?
 4      A.      Zacky.
 5      Q.      And you can put that photo down.  Thank you.  Did you
 6              see anyone else at that time?
 7      A.      No.
 8      Q.      All right.  So now what happens?
 9      A.      I went to sit back down and --
10      Q.      Did you make it back to the couch?
11      A.      I made it back to the couch and went to -- I sit on
12              my feet.  And I went to cross back down and sit on my
13              feet and three gentlemen, they walked in.
14      Q.      Okay.  Had you ever seen either of these three
15              individuals before?
16      A.      No.
17      Q.      Okay.  Were you able to -- are you able to describe
18              any of the three gentlemen?
19      A.      At the time when they came in he had braids
20              (indicating).
21      Q.      Okay.  So are you saying one of them had braids?
22      A.      (Indicating).
23      Q.      All right.  Can you describe for the Court what did
24              the braids look like?
25      A.      They were about that big (indicating), about that
```

116

```
 1              high off his head.
 2   Q.   Okay.  Could you do that one more time?  That's how
 3              long the braids were?
 4   A.   Like sticking out all over.
 5   Q.   Okay.  Did the braids cover his forehead at all?
 6   A.   Over like a sweatband came down.
 7   Q.   Was there a sweatband?
 8   A.   (Indicating).
 9   Q.   There was a sweatband?  I know if we talk normally
10              you can just nod or make gestures.  Since there is a
11              court reporter taking everything down, I need you to
12              verbalize it.  Okay?
13   A.   Yes.
14   Q.   So there was a sweatband?
15   A.   Yes.  It looked like it.
16   Q.   Okay.  I know I'm being that picky, but do you
17              remember the color of the sweatband at all, if you
18              remember?
19   A.   Everything kind of looked black, like it blended in.
20   Q.   All right.  Well, did it cover that person's face at
21              all?
22   A.   No.
23   Q.   Did he -- what did you call the hair things?
24   A.   It looked like dookie braids.
25   Q.   Dookie braids.  Did the dookie braids -- how far down
```

117

```
 1          -- did they go past the sweatband?

 2   A.    No.

 3   Q.    Okay.  And how far down did the sweatband go on the

 4         forehead?

 5   A.    Only about that far (indicating).

 6   Q.    So you just indicated about --

 7   A.    Just the very top of the forehead.

 8   Q.    Okay.  Like an inch, is that what you're saying?

 9   A.    Yeah.

10   Q.    Okay.  The person with those dookie braids, did you

11         get a look at that person's clothing at all?

12   A.    Yes.

13   Q.    Could you describe that for the Court?

14   A.    Had a royal blue Hollister coat on.

15   Q.    Royal blue Hollister coat.  Okay.  Why do you say

16         it's a Hollister?

17   A.    Because of the white bird that was on the -- the

18         insignia that was on the coat.

19   Q.    You're kind of gesturing to yourself, what part of

20         the coat was it on?

21   A.    It was on the -- I don't know what it's called.

22         Around the zipper area.  It was like a white bird.

23   Q.    So you're kind of indicating up on the --

24   A.    Like the shoulder area.

25   Q.    Yeah, left shoulder, left breast area?
```

1    A.    Yeah.

2    Q.    Okay.  Now, did you see any other clothing on the

3          person that we're talking about?

4    A.    Black jeans.

5    Q.    All right.  At any point in time are you able to get

6          a look at the other two people that were there?

7    A.    One of them.

8    Q.    Okay.  Help us out, what did that person -- describe

9          that person for us.

10   A.    A shorter individual, rather slim, looked to be

11         Hispanic, had a goatee, had on a baseball cap and a

12         hood.

13   Q.    Are you able to see that person's face at all?

14   A.    Just the front.  He had a goatee.  That's all I can

15         see.

16   Q.    Okay.  I mean, is that someone you could identify

17         later on?

18   A.    Possibly.

19   Q.    Possibly.  Okay.  What about the first person, is

20         that someone you would have been able to identify

21         later on?

22   A.    Yes.

23   Q.    Now, did you get any look at all at the third person?

24   A.    No.  I just can tell that he was tall and slender.

25         He had his face completely covered.

119

1    Q.   Okay.  Could you tell at all what race that person

2         was?

3    A.   Black just because I seen his hands.  He was a black

4         individual.

5    Q.   Okay.  Now, of those three, could you tell in terms

6         of relative heights of each other, could you rank the

7         heights of these guys?

8    A.   The first one, he was about five-nine, maybe six

9         foot.

10   Q.   All right.  The first one is five-nine to six feet,

11        is that what you said?  You just nodded, was that a

12        yes?

13   A.   Yes.  I'm sorry.

14   Q.   And the second guy that you talked about?

15   A.   Was rather short and maybe about five-foot, maybe

16        five-two at best.

17   Q.   Okay.  And then the last guy?

18   A.   Was taller.  I would say about six-two if not a

19        little bit taller.

20   Q.   Okay.  So the heights range from five foot to 5-2 to

21        5-9 to 6 foot to 6 foot to 6-2?

22   A.   Yeah.

23   Q.   Could you tell anything about their builds at all?

24   A.   The first individual was kind of like a huskier build

25        and the other two were more slender.

120

| | | |
|---|---|---|
| 1 | Q. | Okay.  All right.  So what happens?  So did these |
| 2 | | guys come into the living room? |
| 3 | A. | Yes. |
| 4 | Q. | All right.  Do all of them come into the living room? |
| 5 | A. | Yes. |
| 6 | Q. | And at that time -- who is in the living room at that |
| 7 | | time when they come in? |
| 8 | A. | Me, Zacky and Savannah. |
| 9 | Q. | All right.  And what happens now? |
| 10 | A. | Before I even was sat back down on the couch I was |
| 11 | | hit with a blunt object in the left side of my head. |
| 12 | Q. | Before this happens did anyone say anything? |
| 13 | A. | I'm not real sure. |
| 14 | Q. | Did you say anything before this happened? |
| 15 | A. | No. |
| 16 | Q. | Could you just indicate to the Court where were you |
| 17 | | struck? |
| 18 | A. | About my temple area. |
| 19 | Q. | On the left side? |
| 20 | A. | Yes. |
| 21 | Q. | So what happens now? |
| 22 | A. | I was struck several more times over and over and |
| 23 | | over. |
| 24 | Q. | Had you ever seen these guys before? |
| 25 | A. | No. |

121

1   Q.   All right.  Could you tell which of the three

2        individuals was striking you?

3   A.   Yes.

4   Q.   Which one?

5   A.   Him (indicating).

6   Q.   I'm sorry?

7   A.   Him (indicating).

8   Q.   You sort of pointed.  What do you mean by him?

9   A.   The first guy that I described.

10  Q.   Is that person in court?

11  A.   Yes.

12  Q.   Could you please indicate where that person is seated

13       or standing and what they're wearing?

14  A.   He's sitting right there.

15  Q.   You pointed.  What's the person wearing?

16  A.   A blue jumpsuit.

17  Q.   Okay.  And where are they positioned in the

18       courtroom?

19  A.   On the right-hand side.  My left.

20  Q.   Your left because I'm facing the right-hand side?

21  A.   Yes.

22            MR. SCHROTH:  Judge, I would ask that

23        the record reflect that she's identified the

24        alleged delinquent.

25            THE COURT:  So identified.

122

```
 1    Q.   (BY MR. SCHROTH)  Now, what is it that is making you

 2         say that the person in court is the person that

 3         struck you, why do you say that?

 4    A.   I'll --

 5    Q.   What's that?

 6    A.   I'll never forget those eyes.

 7    Q.   The eyes.  What about his eyes?

 8    A.   They're evil.

 9    Q.   Okay.  So while you're being struck, if you know,

10         what the other two people are doing, individuals in

11         the living room?

12    A.   No, I don't.

13    Q.   If you know, do you know what Savannah and Zacky are

14         doing?

15    A.   No, I don't.

16    Q.   Okay.  What happens now?

17    A.   I honestly don't know.  I know I was being beaten and

18         I fought with my couch.

19    Q.   What do you mean?

20    A.   I was being beaten into the cushion of my couch.

21    Q.   Okay.

22    A.   And I was gripping it trying to hold onto it.

23    Q.   What part are you gripping on the couch?

24    A.   My arms.  I kept grabbing it trying to hold it so

25         that I couldn't be brought back up and hit down
```

```
 1              again.
 2     Q.   Are we talking about the cushion?  Is that yes?
 3     A.   Yes.
 4     Q.   Okay.  So what happens at this point?  You're holding
 5          onto the couch, now what happens?
 6     A.   I had a gun in the couch I know that I -- I had a gun
 7          in the couch, I was trying to fight for it to defend
 8          myself, but I was incoherent very much at the time
 9          and I didn't get to it in time and I was blacked out.
10     Q.   Okay.  Why was there a gun -- why do you guys keep a
11          gun in the couch?
12     A.   Safety.  The neighborhood.
13     Q.   Okay.
14     A.   It's usually put up.
15     Q.   What does that mean by put up?
16     A.   It's usually in a lockbox somewhere.
17     Q.   All right.  Are you ever able to pull that gun out to
18          defend yourself?
19     A.   I never was able to pull it out to defend myself, no.
20     Q.   Okay.  What's the next thing that you remember?
21     A.   Waking up on the floor.
22     Q.   And what is it you first see when you wake up?
23     A.   Blood.
24     Q.   Okay.  Do you know whose blood that is?
25     A.   At first, no, and then I sat up and realized that I
```

```
 1              was bleeding out my chest.
 2    Q.    Okay.  Do you know what caused you to be bleeding
 3          from my chest?
 4    A.    At that point I didn't.
 5    Q.    Did you come to learn?
 6    A.    Yeah.
 7    Q.    What?
 8    A.    I had been shot.
 9    Q.    All right.  How many times?
10    A.    Once in my shoulder blade and it exited out my chest.
11    Q.    Okay.  Did you actually see yourself bleeding?
12    A.    Yes.
13    Q.    All right.  And when you come to is anyone else in
14          the room with you at that time?
15    A.    No.
16    Q.    So what do you do?
17    A.    I walked out to the front porch and I yelled for help
18          and I collapsed.
19    Q.    Okay.  Would you recognize your house if you saw it?
20    A.    Yes.
21    Q.    I'm showing you State's Exhibit 1.  Does that look
22          familiar?
23    A.    Yes.
24    Q.    What do we see there?
25    A.    The front of my house and my porch.
```

125

```
 1    Q.    Okay.  And if you could just show the Court where

 2          exactly your porch is compared to your house?

 3    A.    It's my porch (indicating).

 4    Q.    So as you look at the photo, it's on the right-hand

 5          side?

 6    A.    Yes.

 7    Q.    And the door on the porch, where does that go into?

 8    A.    That leads into my dining room.

 9    Q.    Okay.  So what happens when you exit your porch?

10    A.    Yes.

11    Q.    Okay.  What happens there?

12    A.    I dropped about there (indicating).

13    Q.    So you're pointing towards the end of the porch?

14    A.    Yeah, about right at the end.  I couldn't hear

15          anything.

16    Q.    You're still bleeding at that time?

17    A.    Yes.

18    Q.    Okay.  How strongly are you bleeding, would you say?

19    A.    Very badly.

20    Q.    What happens at this point?

21    A.    My daughter, my 13-year-old daughter found me lying

22          there and screamed mommy.  I responded to her and

23          told her to go get granny, that I had been shot and

24          she ran and got my mom.

25    Q.    Okay.  Does anyone call for any sort of assistance or
```

126

1      anything?

2   A.   My mom did.

3   Q.   All right.  Does anyone come?

4   A.   The EMS.

5   Q.   Okay.  Where does EMS take you?

6   A.   To Metro Health.

7   Q.   Before you got to Metro Health did you ever talk to

8        any police officers?

9   A.   Not that I know of.

10  Q.   All right.  And then what happens when you get to

11       Metro Health?

12  A.   I really don't know because I was too out of it.  I

13       wasn't really told of anything until I woke up the

14       next morning.

15  Q.   What do you mean you weren't told of anything?

16  A.   I didn't know of anything that happened at the

17       hospital until the next morning.

18  Q.   Until the 22nd?

19  A.   Yes.

20  Q.   Did any family members come to visit you on the 22nd?

21  A.   My mom and my kids later in the evening and then

22       later in the evening my cousins earlier in the day.

23  Q.   Did Zack or Savannah stop in at all that day, do you

24       remember?

25  A.   Not that I remember.

127

```
 1                    THE COURT:  Can we take a little bit
 2          of timeout?
 3                    MR. SCHROTH:    Yeah.
 4                    (Short recess taken.)
 5                    THE COURT:  We're back on the record.
 6          You may continue your inquiry.
 7                    MR. SCHROTH:  Thank you, your Honor.
 8   Q.   (BY MR. SCHROTH)  Colleen, I think we left off and we
 9          were talking about when you were in the hospital.
10          Okay.  At any point in time -- well, let me back up.
11          We were talking about the 22nd of April.  I think the
12          last thing you said was, I asked if Savannah and Zack
13          had stopped up that day and I think you said no, is
14          that right?
15   A.   Yes.
16   Q.   Okay.  Is there any point in time where any law
17          enforcement visited the hospital?
18   A.   Not until the following Friday.
19   Q.   Do you remember the day at all, if you know?
20   A.   I know they came Friday.
21   Q.   Okay.  What happened when the police came?
22   A.   They gave me a photo lineup.
23   Q.   All right.  Did they give you one, did they give you
24          more than one, do you remember?
25   A.   I'm not sure.
```

128

1 Q. Okay.  You looked at photo lineup or lineups, is that

2   right?

3 A. Yes.

4 Q. Were you able to identify anyone in those photo

5   arrays?

6 A. Yes.

7 Q. Who is it that you identified, what role did that

8   person play?

9 A. The person that beat me.

10 Q. The person with the gun?

11 A. Yes.

12 Q. All right.  I'm going to show you what's marked as

13   State's 106, 109 and 112.  I'm handing you what has

14   been marked as State's 106.  Does that look familiar?

15 A. Yes.

16 Q. How does that look familiar to you?

17 A. It was one of the lineups that I had to look at.

18 Q. Okay.  Is that 106, is that what I said?  Did anyone

19   look familiar at all in there?  What you see in front

20   of you, 106, is that the same thing we see on the

21   screen?

22 A. Yes.

23 Q. Okay.  And when you looked at that did you see anyone

24   that you recognized as playing any role from the home

25   invasion?

1    A.    No.

2    Q.    All right.  State's 109, does that look familiar?

3    A.    Yes.

4    Q.    How is that familiar?

5    A.    It's what I circled.

6    Q.    Okay.  It's a little darker on the screen.  State's

7          109, is that what we see on the big screen?

8    A.    Yes.

9    Q.    Okay.  Did anyone look familiar in terms of the crime

10       here?

11    A.    Yes, this picture.

12    Q.    All right.  And where is that person, did you make

13       any markings on the page?

14    A.    The first picture.

15    Q.    Okay.  If you could hold it up and point for me.  So

16       you're pointing in the top row, far left?

17    A.    Yes.

18    Q.    Okay.  What marking did you make on that picture?

19    A.    I circled it and initialled it.

20    Q.    All right.  Why did you circle that photo?

21    A.    Because that's who beat me.

22    Q.    Okay.  And how do you know it's the same person?

23    A.    The eyes.

24    Q.    Okay.  And I'm showing you State's 112.  Does that

25       look familiar?

130

1    A.   Yes.

2    Q.   How is that familiar?

3    A.   It was another lineup that I was shown.

4    Q.   Okay.  And is that what's on the big screen here?

5    A.   Yes.

6    Q.   Did you see anyone there that resembled anyone from

7         the crime?

8    A.   No.

9    Q.   Okay.  And these Exhibits 106, 109 and 112, are they

10        the photo arrays that you looked at?

11   A.   Yes.

12   Q.   Okay.  And this is while you're at Metro?

13   A.   Yes.

14   Q.   All right.  And up to this point in time had you had

15        any interaction with Savannah or Zackary?

16   A.   Savannah came to the hospital, but was only there for

17        a few minutes.

18   Q.   Were you aware if she looked at any pictures at all

19        up to that point?

20   A.   No.

21   Q.   All right.  So how long were you in the hospital for?

22   A.   A week.

23   Q.   If you can, what exactly were your injuries that you

24        sustained as a result of this?

25   A.   A fractured skull, brain damage, two broken ribs, a

131

```
 1          broken shoulder blade, my lung collapsed and I almost
 2          died.
 3     Q.   Okay.  As you sit here now, do you still feel some of
 4          the effects of what happened?
 5     A.   Yes, everyday.
 6     Q.   Okay.  When you were released from the hospital --
 7          let me back up for a second.  After you circled the
 8          person in State's Exhibit 109, at that point did you
 9          know who that person was?
10     A.   I didn't know his name until after I circled and
11          identified who it was.
12     Q.   Okay.  And how did you learn his name?
13     A.   The detectives told me.
14     Q.   All right.  After you made the identification?
15     A.   Yes.
16     Q.   Have you ever heard that name before?
17     A.   No.
18     Q.   Okay.  Have you ever seen him around before?
19     A.   No.
20     Q.   All right.  So did you do any independent research or
21          anything before you picked out anyone in a photo
22          array?
23     A.   No, I was in the hospital.  My phone was stolen.
24     Q.   Okay.  From the time you left the hospital, after you
25          left the hospital, did you ever meet or speak with
```

132

1    any police regarding this case?

2 A. Yes, but I'm not sure how long it was after I left

3    the hospital.

4 Q. Okay.  And how did that come to be?

5 A. I was called and asked to come look at a few photo

6    lineups.

7 Q. Okay.  Do you know around the date when that was?

8 A. I'm not positive.

9 Q. Okay.  Do you know why they wanted you to come back

10    in?

11 A. That there was more evidence found.  I wasn't real

12    sure.

13 Q. Okay.  The police wanted you to look at more

14    pictures, is that fair to say?

15 A. Yeah.

16 Q. All right.  Now, where did that take place at?

17 A. Second District.

18 Q. And did you go down there by yourself or with anyone

19    else?

20 A. Savannah and Zacky went with me.

21 Q. Same car?

22 A. Yes.

23 Q. All right.  And when you went down there, what

24    happened when you got to the Second District?

25 A. We were separated.

133

| | | |
|---|---|---|
| 1 | Q. | Okay.  How soon after you got there were you |
| 2 | | separated? |
| 3 | A. | We waited in the lobby for about five, ten minutes |
| 4 | | and then we were separated when we went in the back. |
| 5 | Q. | What happened to you when you went in the back? |
| 6 | A. | I was sat with another detective and they were sat |
| 7 | | with other detectives. |
| 8 | Q. | Okay.  And then what happens with you and the |
| 9 | | detective? |
| 10 | A. | I was given another photo lineup and they asked me if |
| 11 | | I recognized anybody, to circle them. |
| 12 | Q. | Okay.  And at that time did you -- did you circle |
| 13 | | anyone at that time? |
| 14 | A. | I did not. |
| 15 | Q. | Okay.  Was there anyone that looked familiar to you, |
| 16 | | though, at that time? |
| 17 | A. | The same person that I had already circled |
| 18 | | previously, but the same detective told me not to |
| 19 | | circle him if they'd already -- I had already |
| 20 | | received a letter that he'd been arrested. |
| 21 | Q. | Before this you had received a letter? |
| 22 | A. | Mm-hmm. |
| 23 | Q. | Okay.  All right.  So I'm going to show you State's |
| 24 | | 115 and 118.  State's 115, does that look familiar? |
| 25 | A. | Yes. |

134

1    Q.    All right.  How is that familiar?

2    A.    It was one of the lineups that the detective showed

3         me.

4    Q.    Okay.  And is that what we're looking at on the big

5         screen here?

6    A.    Yes.

7    Q.    All right.  When you looked at it, did anyone at all

8         look familiar to you in terms of the crime on

9         April 21st?

10    A.    No.

11    Q.    Okay.  I'm handing you what has been marked as

12         State's 118.  Does that look familiar?

13    A.    Yes.

14    Q.    How is that familiar?

15    A.    It was the other lineup that I was shown.

16    Q.    All right.  Is that what's on the big screen?

17    A.    Yes.

18    Q.    Did you actually ever make any markings?

19    A.    No, I did not.

20    Q.    Did you want to?

21    A.    Yes.

22    Q.    Okay.  Who in that array did you want to place a mark

23         on?

24    A.    The second picture in the first row.

25    Q.    Can you just for the Court and Counsel hold it up?

135

```
 1         Second picture first row.  Okay.  So the person
 2         85018?
 3   A.    Yes.
 4   Q.    Okay.  What made you want to pick that person as
 5         well?
 6   A.    Again, the eyes.
 7   Q.    Okay.  And take us through what happened.  So what
 8         did you say when you saw that picture?
 9   A.    I showed the detective that I was with and I told him
10         that I recognized him, but I knew that I'd already
11         received a letter for his arrest and he said not to
12         circle him because we were -- that they were looking
13         for the other two suspects and that if he was already
14         arrested, that it would be them going in circles.
15   Q.    Okay.  So then you did not make an identification?
16   A.    Correct.
17   Q.    Again, just to be clear, what role did that person
18         play?
19   A.    The one with the gun.
20   Q.    So is that the same person then that we see in
21         State's 109?
22   A.    Yes.
23   Q.    Okay.  Colleen, to be fair, we had met a few times
24         before, but we met one time and talked at length
25         about your recollection of the events, is that right?
```

```
 1    A.   Yes.

 2    Q.   All right.  And after that did you have any

 3         recollection or did you interact with police again

 4         after that?

 5    A.   I'm sorry?

 6    Q.   Did you interact with police again after that photo

 7         array, talk with them again?

 8    A.   One time after that.

 9    Q.   When was that?

10    A.   When his defense attorney came to my house.

11    Q.   Oh, okay.  And I think you relayed that to the police

12         officer as well as the events of what happened?

13    A.   Yes.

14    Q.   Okay.  Going back to the events of April 21st, were

15         you able to get a look at the gun that was used to

16         pistol whip you?

17    A.   No, I did not.

18    Q.   All right.  And you were shot, right?

19    A.   Yes.

20    Q.   Were you able to hear gunshots go off?

21    A.   No, I did not.

22    Q.   And then you indicated at that time that you had

23         three dogs?

24    A.   Yes.

25    Q.   Okay.  Do you still have all three dogs?
```

137

 1    A.    No, I don't.

 2    Q.    All right.  How many do you have?

 3    A.    I have two.

 4    Q.    And what happened to the third dog?

 5    A.    He shot and killed her.

 6    Q.    What was that dog's name?

 7    A.    Mischief.

 8    Q.    Okay.  And do you know, was anything taken from your

 9          home?

10    A.    My cellphone, my niece's cellphone, a $5 bill and a

11          gun.

12    Q.    Which gun was that?

13    A.    Mine.

14    Q.    You had mentioned a gun earlier that you were trying

15          to use, is that the same gun?

16    A.    Yes.

17    Q.    All right.

18                        MR. SCHROTH:  Can I have a moment,

19          Judge?

20                        THE COURT:  Sure.

21                        MR. SCHROTH:  Thank you, Judge.

22          Nothing further.

23                        THE COURT:  All right.

24          Cross-examination.

25                        MR. HOFFMAN:  Thank you.

138

<u>**CROSS-EXAMINATION OF COLLEEN ALLUMS**</u>

<u>**BY MR. HOFFMAN:**</u>

Q.   Hi, Colleen.

A.   Hi.

Q.   Again, I know we've met before.  My name is Brian
     Hoffman with the Public Defender's Office and I
     represent Dalonte White.  I'm going to ask you some
     follow-up questions.  Okay.

          Just for notes, I think we met back on
     June 10th, was that right, with my investigation
     Amanda, do you remember her?

A.   Yes.

Q.   Tall with short black hair?

A.   Yes.

Q.   At that time that's when you said you had made
     another identification, correct?

A.   I'm sorry?

Q.   That you had told the detective that you picked out
     that picture right there, correct?

A.   No.

Q.   You don't recall telling myself and Amanda that you
     told the detective that you said yeah, that's the
     shooter, but he told you not to mark anyone?

A.   That's what I just said.

Q.   And that's what you had relayed to us back in June,

139

```
 1           correct?
 2    A.     Yeah.
 3    Q.     And it was actually a very comfortable meeting, there
 4           was no animosity between us at the time, was there?
 5    A.     Not until I found out that you were representing him.
 6    Q.     When you found out that I was representing Dalonte
 7           White because in your mind all you've known is
 8           Dalonte White, correct, for this case?
 9    A.     I know what I seen.
10    Q.     All right.  And I think you said the first time you
11           had heard the name Dalonte White was after you made
12           the first identification and they told you his name,
13           correct?
14    A.     Correct.
15    Q.     Did they tell you anything else about any evidence or
16           anything like that that they had?
17    A.     No.
18    Q.     Okay.  So all you knew was the name Dalonte White?
19    A.     Yes.
20    Q.     Did the police ever tell you later anything about the
21           investigation?
22    A.     No.
23    Q.     So you had just been waiting to hear -- all you knew
24           was the name Dalonte White?
25    A.     Yes.
```

140

1    Q.   But you did try to look up Dalonte White on Facebook

2         and things like that?

3    A.   No, I did not.

4    Q.   You never looked him up before?

5    A.   No, I did not.  I don't get on Facebook.  I don't

6         know how to use Facebook.

7    Q.   Okay.  So you never saw any other independent

8         pictures of him or anything like that?

9    A.   I was sent pictures.  I did see pictures, but I did

10        not look them up.

11   Q.   Oh, okay.  You were sent pictures by someone?

12   A.   Yes.  Outside of the family.

13   Q.   Who was that?

14   A.   Star.

15   Q.   Star?

16   A.   Yes.

17   Q.   Who's Star?

18   A.   Savannah's mom.

19   Q.   Oh, okay.  So a family friend?

20   A.   Yes.

21   Q.   Okay.  So Savannah's mom also knew the name Dalonte

22        White?

23   A.   Well, yeah.

24   Q.   Okay.  So that's been the name ran around that you've

25        been basically in fear of for the last three months

141

```
 1        or so?
 2   A.   You can say that.
 3   Q.   Well, is that pretty fair?
 4   A.   Yeah.
 5   Q.   In looking at this Exhibit No. 118, are you saying
 6        today that when you met with the detective you said,
 7        that's the shooter and pointed at that middle photo,
 8        the top middle?  I'm sorry.  You have to answer out
 9        loud.
10   A.   Yes.
11   Q.   And the detective just told you, don't mark it?
12   A.   I said that that was the shooter, but I know he was
13        arrested.
14   Q.   And that's why he told you then, well, don't mark
15        him?
16   A.   Yes.
17   Q.   But you're sure that's the guy?
18   A.   Yes.
19   Q.   Because you know those eyes?
20   A.   Yes.  They looked at me while I was lying on the
21        floor bleeding to death.
22   Q.   All right.  Have you ever heard of a name around the
23        neighborhood Boy-Boy?
24   A.   No.
25   Q.   JR?
```

142

```
 1    A.    I work.  I'm not on the street.  So how would I know
 2          these names?
 3    Q.    All right.  I'm just asking if you might know these
 4          people from the neighborhood.
 5                        THE COURT:  Ma'am, I understand what
 6                happened to you was awful, but you understand
 7                that he has a right to representation.  Attorney
 8                Hoffman is not trying to antagonize you.  He is
 9                not trying to do anything.  So please just
10                answer his questions as best you can.  Okay?
11                        THE WITNESS:  Yes.
12    Q.    (BY MR. HOFFMAN)  You said the person had a bandanna
13          on and the dreads were hanging over the bandanna?
14    A.    Just a little bit.
15    Q.    Okay.  So it was like medium length hair?
16    A.    Yes.
17    Q.    Coming into the forehead a little bit?
18    A.    No, it didn't come nowhere near the forehead.
19    Q.    Down the sides at all?
20    A.    No.
21    Q.    Okay.  Do you know anyone by the name of Edward
22          Bunch?
23    A.    No.
24    Q.    Have you ever heard the name Edward Bunch before?
25    A.    No.
```

143

```
 1    Q.   You've never heard the name before?

 2    A.   No.  Never ever.

 3    Q.   No one --

 4    A.   Never.

 5    Q.   No one from the police has ever told you anything

 6         about Edward Bunch?

 7    A.   No.

 8    Q.   Anyone from the Prosecutor's Office?

 9    A.   No.

10    Q.   So as far as you've been told today you think that

11         that's Dalonte White?

12    A.   Yes.

13    Q.   No one has ever told you that that's Edward Bunch?

14    A.   No.

15                   MR. SCHROTH:  Objection, Judge.

16                   THE COURT:  What's your basis?

17                   MR. SCHROTH:  Can we approach?

18                   THE COURT:  Yeah.

19                   (Sidebar discussion held.)

20                   THE COURT:  All right.  We're back on

21         the record.

22    Q.   (BY MR. HOFFMAN)  Ms. Allums, approximately how long

23         do you think the whole event took place from the time

24         that the guy first walked in until the time you can't

25         remember anymore?
```

144

```
 1    A.    Probably about 20 minutes to half an hour.

 2    Q.    The whole thing took that long?

 3    A.    About 20 minutes.  It was over as quick as it

 4          started.

 5    Q.    You said the Hispanic guy was shorter and slimmer?

 6    A.    Yes.

 7    Q.    And the third guy was tall and slender?

 8    A.    Yes.

 9    Q.    Since that last time then, you haven't met with the

10          police or anything additional since that last time

11          that you mentioned, correct?

12    A.    Yes.

13    Q.    And you were aware Dalonte was going to be in the

14          room today?

15    A.    Yes.

16    Q.    And you knew where he would be sitting?

17    A.    For the most part.

18    Q.    And you were told this by who?

19    A.    The Prosecutor.

20    Q.    And you have already been given his name by the

21          police?

22    A.    Yes.

23    Q.    So even when we first talked about the case back in

24          June, even then you said it's Dalonte, we know him,

25          he's in jail, we know who he is, they got him, right?
```

145

1    A.    Yes.

2    Q.    I think there was one other interesting thing when we

3           talked that day.  We kind of asked that question that

4           detectives often ask about, do you know anyone who

5           would want to hurt you and I believe you said there

6           might be someone, correct?

7    A.    I didn't say that there would be somebody.  I had

8           gotten into an altercation with a female over my

9           13-year-old daughter.

10    Q.    That was this Cheyenna Cole, is that right?

11    A.    Yes.

12    Q.    And I think that you and Don were mentioning that

13           there was an incident, was it like a month beforehand

14           with them?

15    A.    Yes.

16    Q.    And Cheyenna Cole and maybe two of her friends or

17           sisters attacked you?

18    A.    Her sisters, and they didn't attack me.

19    Q.    They didn't?

20    A.    No.

21    Q.    They were trying to get at your daughter?

22    A.    She was threatening my 13-year-old daughter.

23    Q.    And these girls were older?

24    A.    Yes.  She's 20 years old and I got into a fist fight

25           with a 20-year-old trying to fight with my

1          13-year-old daughter.

2     Q.   And they were making some threats towards you?

3     A.   They busted out my window.

4     Q.   And that was back in like March?

5     A.   Yes.

6     Q.   Okay.  And I think you had mentioned that the day

7          that this happened and the day you went to the

8          hospital for the break-in, that was the day Cheyenne

9          Cole got arrested?

10    A.   From what I understood.

11    Q.   And you started getting harassing phone calls, right?

12    A.   I did not.

13    Q.   Who was getting harassing phone calls?

14    A.   There was crap being sent around Facebook, from what

15         I was told.

16    Q.   Okay.  Was Don getting harassed?

17    A.   No.  He got a phone call.

18    Q.   And it was from a guy, Christian Hughes?

19    A.   Yes.

20    Q.   Who is Christian Hughes?

21    A.   Her boyfriend.

22    Q.   Where does he live?

23    A.   Down the street.

24    Q.   A block?  Two blocks?

25    A.   A block towards Clark.

147

1    Q.    And Cheyenne is his girlfriend, right?

2    A.    Yes.

3    Q.    Okay.  So you understood Cheyenne Cole got arrested

4          that day?

5    A.    I'm not positive.

6    Q.    But it's possible?

7    A.    It's possible.

8    Q.    And Christian Hughes was threatening you or Don?

9    A.    No, he was not threatening either one of us.  He was

10         calling to get bond money.

11   Q.    Okay.  Was he asking why his girlfriend got arrested?

12   A.    I don't know.  I wasn't involved in the conversation.

13   Q.    After Cheyenne Cole and the other people -- they

14         threw bottles through your window?

15   A.    They threw a bottle at my window.

16   Q.    Okay.  And they broke the window?

17   A.    Yes.

18   Q.    Did they threaten to come back and shoot up the house

19         or something?

20   A.    No.

21   Q.    Okay.  So as far as you know this was over, but there

22         was possibly some link to a Christian Hughes?

23   A.    There was crap being said, again, on Facebook that I

24         was being -- it's hearsay.  It was all rumors.

25   Q.    Okay.

1   A.   I don't get on Facebook.  I don't have a Facebook

2        page and neither does Don and we do not -- it was

3        just stuff being said, so and so said this and so and

4        so.  We don't know what was true and what was not.

5   Q.   But you did get a call from Christian Hughes that

6        day?

7   A.   Don did.  And again, I did not get the phone call.  I

8        was not with Don and I do not know what was said.

9   Q.   Okay.  But he would be a possible person that you

10       thought might be involved in retaliation?

11  A.   I don't know.

12  Q.   But you suspected that, right?

13  A.   Well, anybody is a suspect when something like this

14       happens.

15  Q.   Did the police ever ask you about Christian Hughes?

16  A.   I mentioned it to them.

17  Q.   Do you know if they ever investigated it?

18  A.   I do not know.

19  Q.   Okay.  We noticed in some of the photographs that the

20       windows have, is it curtains on them?

21  A.   Yes.

22  Q.   Does it block a lot of light or does it let light

23       through?

24  A.   Block them.

25  Q.   Was it pretty dark in the room then?

1   A.   Yes.

2   Q.   But you were still able to see clearly enough the

3        people that were there that day?

4   A.   Yes, because I had lights on.

5   Q.   The lights were on inside the house?

6   A.   Yes.

7   Q.   Did you describe the weapon as silver or chrome?

8   A.   No, I did not.

9   Q.   You don't remember the color of it at all?

10  A.   No, I do not.  I've never seen it.

11  Q.   Okay.  So as far as you know you just basically got

12       blind sided on one side while you were sitting there?

13  A.   Yes.

14  Q.   And you don't remember the person saying anything?

15  A.   No, I didn't hear anything.  I was beaten in my head.

16       I did not hear anything.

17  Q.   Did he take anything off the table nearby?

18  A.   I do not know.

19            MR. HOFFMAN:  Nothing further.  Thank

20       you, your Honor.

21            THE COURT:  Do you have any redirect?

22            MR. SCHROTH:  Just real brief, Judge.

23       Thank you.

24       **REDIRECT EXAMINATION OF COLLEEN ALLUMS**

25  **BY MR. SCHROTH:**

1   Q.   You used the phrase it was over as quick as it

2        started.  What do you mean by that?

3   A.   I was being hit and the next thing I knew I was

4        waking up bleeding.

5   Q.   Okay.  Can you fairly put a time on how long this

6        whole thing took at all?

7   A.   Well, like I said, it was 5:15, 5:30ish when I was

8        aware of it starting and I was told that I was in the

9        emergency room of Metro Hospital by 6:39.

10  Q.   Okay.

11  A.   So that's the only reason I know of the time.

12  Q.   Why do you say it was starting at 5:15?  What makes

13       you say that?

14  A.   The TV shows that I was watching.

15  Q.   Oh, they were on between 5:00 and 5:30?

16  A.   Yeah.

17  Q.   Okay.

18                  MR. SCHROTH:  All right.  Nothing

19           further.

20                  THE COURT:  Do you have anything

21           further?

22                  MR. HOFFMAN:  Nothing on that.

23                  THE COURT:  The Court does have just a

24           couple of clarifications.  How did the boys or

25           the men get into your house, do you know?

151

```
1              THE WITNESS:  I had my front door open
2         and just the screen door shut and they just
3         walked in.
4              THE COURT:  Okay.  And when they
5         walked in, did they make any demands?
6              THE WITNESS:  I don't know.
7              THE COURT:  You don't remember if they
8         said, get on the ground?
9              THE WITNESS:  I don't know.
10             THE COURT:  Okay.  And at one point in
11        time you said the dogs came into the room?
12             THE WITNESS:  I was unaware of my dogs
13        being -- my dogs were in my back bedroom.  My
14        female that was killed is kind of a rough one so
15        we leave her put up when I have the door open
16        because I don't want her getting out.
17             So I had her in the back bedroom.  It
18        was a rather decent day out.  I had the front
19        door open because my son and my nephews were out
20        front playing basketball.  And I did not know
21        that my dogs got out or that my dog was killed
22        until two days before I was released from the
23        hospital.
24             THE COURT:  Were you aware that the
25        dog attacked one of the men in your living room?
```

152

1           THE WITNESS:  Again, not until about

2     two days before I was released from the

3     hospital.

4           THE COURT:  Okay.  The Court has no

5     further inquiry.

6           MR. SCHROTH:  No.  Thank you, your

7     Honor.

8           THE COURT:  Thank you very much for

9     taking the time to come down.  You may step down

10    now.

11          Let's take a five-minute break.  It is

12    a quarter till 4:00.  We are going to finish

13    Zackary -- what is Zackary's last name?

14          MR. SCHROTH:  Hale.

15          THE COURT:  We'll do Zackary Hale and

16    then we'll break.  Is that everyone's

17    understanding?

18          MR. SCHROTH:  Yeah, that's ideal,

19    Judge.

20          THE COURT:  All right.  So let's take

21    a seven-minute break.

22          (Short recess taken.)

23          THE COURT:  All right.  We are back on

24    the record in the matter of Dalonte White, Case

25    No. DL 15105751.  We took a short recess.

1          Prosecutor Schroth, you may call your

2     next witness.

3          MR. SCHROTH:  Thank you, your Honor.

4     At this time the State will call Zackary Hale.

5          **ZACKARY HALE, Sworn.**

6          THE COURT:  Hi, Zackary.  I'm Judge

7     Rini.  How are you today?

8          THE WITNESS:  Good.  How about you?

9          THE COURT:  Tired of being here?

10         THE WITNESS:  Yeah.

11         THE COURT:  All right.  Well, we're

12    almost done.  You've never testified before, I

13    presume?

14         THE WITNESS:  Huh?

15         THE COURT:  Have you ever testified

16    before?

17         THE WITNESS:  No.

18         THE COURT:  No.  Okay.  First, we're

19    recording so you need to speak out loud.

20         THE WITNESS:  All right.

21         THE COURT:  Okay.  Secondly, both

22    Prosecutor Schroth and then Attorney Hoffman are

23    going to ask you questions.  If you hear the

24    word objection, stop talking and I will make a

25    ruling.  Do you understand?

154

```
 1                        THE WITNESS:  Yes.
 2                        THE COURT:  If you don't know the
 3              answer to a question, just say I don't know.
 4              Okay?
 5                        THE WITNESS:  Okay.
 6                        THE COURT:  Do you want water or
 7              anything?
 8                        THE WITNESS:  No.
 9                        THE COURT:  All right.  You may begin.
10              DIRECT EXAMINATION OF ZACKARY HALE
11    BY MR. SCHROTH:
12    Q.   Okay.  Good afternoon.  Zackary, can you please
13         introduce yourself to the Court, your first and last
14         name?
15    A.   Zackary Hale.
16    Q.   How do you spell your first name?
17    A.   Z-a-c-k-a-r-y.
18    Q.   How do you spell your last name?
19    A.   H-a-l-e.
20    Q.   Okay.  You're doing a good job.  I just need you to
21         make sure that you keep your voice up this whole
22         time.  Okay?
23    A.   All right.
24    Q.   Deal.  Zackary, do you know Savannah LaForce?
25    A.   Yes.
```

1    Q.   How do you know her?

2    A.   That's my cousin.

3    Q.   All right.  How old are you?

4    A.   Thirteen.

5    Q.   What was it?

6    A.   Thirteen.

7    Q.   You're 13.  Okay.  And what grade in school are you?

8    A.   Seventh in Orchard.

9    Q.   Are you going into 7th?

10   A.   Yes.

11   Q.   Okay.  Did you do anything at school, do you play any

12        sports or anything?

13   A.   No.

14   Q.   Okay.  Savannah is your cousin.  How do you know --

15        or do you know Colleen Allums?

16   A.   Yes.

17   Q.   How do you know her?

18   A.   That's my aunt.

19   Q.   All right.  And have you ever been to your aunt's

20        house before?

21   A.   Have I?

22   Q.   Yeah.  Have you been to Colleen's house before?

23   A.   Yeah.

24   Q.   Okay.  I want to talk with you about April 21st of

25        2015.  Do you remember that day?

1    A.    April 21st?

2    Q.    Yeah, April 21st.

3    A.    No, not really.

4    Q.    All right.  Well, do you recall a day where something

5          happened at Colleen's house?

6    A.    Oh, yeah.

7    Q.    Okay.  You yourself can't say it's April 21st, but do

8          you remember a day where it happened?

9    A.    Yeah.

10   Q.    All right.  Do you know around what time things

11         happened at her house?

12   A.    Around 6:00, 5:30, 6:00.

13   Q.    5:30, 6:00.  In the morning or night?

14   A.    Night.

15   Q.    Okay.  How soon did you arrive at Colleen's house

16         before things went down?

17   A.    Like five minutes before.

18   Q.    Okay.  And when you arrived at Colleen's house, what

19         was going on before you went inside?  What was

20         happening at the house?

21   A.    My brothers and my cousins were playing basketball.

22   Q.    All right.  And where was that happening?

23   A.    Outside.

24   Q.    Okay.  In the street?

25   A.    Yeah.

```
 1    Q.   Is there like a hoop in the street or what's going

 2         on, how are you playing basketball?

 3    A.   The hoop's in the street.

 4    Q.   Okay.  Where is the hoop compared to Colleen's house?

 5    A.   It's right at the end of the driveway.

 6    Q.   Whose driveway?

 7    A.   Colleen's.

 8    Q.   All right.  Now, who's outside with you?  What are

 9         their first names?

10    A.   John, Alex and Roger.

11    Q.   John, Alex and Roger.  Now, they're playing

12         basketball, is that what you said?

13    A.   Yeah.

14    Q.   All right.  Do you play basketball with them at all?

15    A.   No.

16    Q.   Okay.  Why not?

17    A.   Because I was going in to go see Colleen and get

18         something to drink and then I was coming out to play

19         basketball.

20    Q.   So did you go in Colleen's house?

21    A.   Yeah.

22    Q.   Okay.  Where is it that you entered Colleen's house?

23    A.   The front door.

24    Q.   Okay.  How do you get to the front door?

25    A.   The steps.
```

```
 1    Q.    Okay.  Do the steps lead right up to the door?

 2    A.    Yeah.

 3    Q.    They do?

 4    A.    Well, you walk up the steps and you walk straight to

 5          the door.

 6    Q.    Okay.  If I showed you a picture of Colleen's house,

 7          would you recognize it?

 8    A.    Yes.

 9                        MR. SCHROTH:  Can I approach the

10          witness?

11                        THE COURT:  Yes.

12    Q.    (BY MR. SCHROTH)  Okay.  I'm handing you what has

13          been marked as State's Exhibit 1.  Does that look

14          familiar to you?

15    A.    Yes.

16    Q.    How is that familiar?

17    A.    It's my aunt's house.

18    Q.    Which aunt?

19    A.    Colleen.

20    Q.    All right.  I'm just going to draw your attention to

21          the big screen up here.  Does that look familiar?

22    A.    Yes.

23    Q.    Is that what's in front of you?

24    A.    Yes.

25    Q.    Okay.  Does that show the door that you walked in?
```

1   A.   Yes.

2   Q.   All right.  On the piece of paper in front of you,

3        can you hold it up for her Honor and for Mr. Hoffman

4        and point to where that door is, if you can show her

5        Honor and I will point on the screen.

6               THE COURT:  Thank you.

7   Q.   (BY MR. SCHROTH)  Zackary, is this it right here, is

8        that the front door?

9   A.   Yes.

10   Q.   Okay.  What's in front of it, what's this area right

11        here?

12   A.   What area?

13   Q.   Is there like a porch before you get to the door?

14   A.   Yeah.

15   Q.   Okay.  So when you go in that door, where does it

16        lead you to?

17   A.   The dining room.

18   Q.   Okay.  Now, when you went into the house, did you go

19        into the house with anybody?

20   A.   Did I go in the house with anybody?

21   Q.   Yeah.

22   A.   I went like -- it was them, then me, and then they

23        shut the door.

24   Q.   Did you make it into the house?

25   A.   Yeah.

160

```
1   Q.   All right.  And was anyone in front of you when you
2        went in the house?
3   A.   Was they in front of me?
4   Q.   Well, yeah, did anybody go in the house before you?
5   A.   No.
6   Q.   Okay.  So when you get to the door, is the door open
7        or closed?
8   A.   The big door is open and the screen door is shut.
9   Q.   All right.  So did you have to open the screen door?
10  A.   Yes.
11  Q.   Okay.  And did the screen door close behind you?
12  A.   Yes.
13  Q.   All right.  And at that point when the screen door
14       closes behind you and you're in the house, at that
15       very moment is anyone else in the house with you?
16  A.   No.  They was -- Colleen was letting them in.  When
17       it shut, then Colleen let them in.
18  Q.   Colleen let who in?
19  A.   Them.
20  Q.   The people that Colleen let in, how many of them were
21       there?
22  A.   Three.
23  Q.   All right.  You say Colleen let them in, what do you
24       mean she let them in?
25  A.   They knocked on the door and she thought they was
```

1        neighborhood kids, I guess.  I don't know.

2   Q.   Okay.  So what did she do?

3   A.   Opened the door.

4   Q.   So Colleen opened the door for them?

5   A.   Yeah.

6   Q.   Oh, okay.  When they knocked on the door, did they

7        say anything?

8   A.   I don't remember.

9   Q.   All right.  Do you remember if Colleen said anything?

10   A.   I don't remember.

11   Q.   Okay.  How soon after you got in the house were they

12        knocking on the door?

13   A.   Right after the door shut.

14   Q.   So as soon as the door shuts, there's a knock on the

15        door, is that what you're saying?

16   A.   The screen door, yeah.

17   Q.   Yeah.  Okay.  Had you ever seen those guys before?

18   A.   No.

19   Q.   Okay.  But Colleen let them in?

20   A.   Yeah.

21   Q.   All right.  So what happens now?

22   A.   She let them in and I walked in the -- she walked in

23        the living room and then she sat down on the couch

24        and I walked in the living room and sat down and he

25        pulled out the gun and said he wanted everything.

162

1    Q.   Okay.  Let's go through this.  How many of them were

2         there?

3    A.   Three.

4    Q.   All right.  How many of them are you able to describe

5         for us?

6    A.   Two.

7    Q.   Okay.  Did any of them show any weapons at all?

8    A.   Yeah, a gun.

9    Q.   All right.  How many of them showed a weapon?

10    A.   One.

11    Q.   All right.  Are you able to give a description of

12         him?

13    A.   You said give a description?

14    Q.   Yeah.  Are you able to describe for us what that

15         person looked like on that day?

16    A.   He had kind of twisty dreads.

17    Q.   In terms of the twisty dreads, do you remember

18         anything about their length?

19    A.   They was like not that long.

20    Q.   What do you mean by not that long?

21    A.   Like right here (indicating).

22    Q.   What you're indicating for the record, at your

23         eyebrows?

24    A.   Yeah, like around there.  Something like that.

25    Q.   So did the twisties go down over his forehead?

```
 1    A.    Like down -- they went down a little bit, they wasn't

 2          long though.

 3    Q.    Well, I need you to show me on you how long they

 4          were, just so I understand.

 5    A.    I don't know exactly how long they were.

 6    Q.    All right.  So you think they were shorter?

 7    A.    Yeah.

 8    Q.    Okay.  But did they go this far down?

 9    A.    I don't even remember.

10    Q.    You don't remember.  Okay.  They're shorter, but

11          you're not sure how far down they went, is that fair

12          to say?

13    A.    Yeah.

14    Q.    Did he have anything on his head at all that you

15          remember?

16    A.    I think he had his hat on.

17    Q.    You think he had a hat.  Why do you say that?

18    A.    Because I barely seen his face.  But I seen his face,

19          but I barely seen it.

20    Q.    What do you mean?  Help me out.  What part of his

21          face did you see?

22    A.    His face right here (indicating).  Around right here.

23    Q.    All right.  In terms of what you saw of his face,

24          start at the top, put your hand, like flatten it out

25          and hold your hand to where it is that you saw the
```

```
 1              highest part of his face.
 2    A.   The highest part I seen was like come up to like
 3         right here (indicating).
 4    Q.   Okay.  So you're pointing to the top of where your
 5         eyebrows are?
 6    A.   Yes.
 7    Q.   So my hand is a straight line right where my eyebrows
 8         are, is that right?
 9    A.   I don't think it was that low down, the hat.
10    Q.   You don't think it was this low down?
11    A.   No.
12    Q.   Do you think it was higher up?
13    A.   I really don't remember.
14    Q.   Okay.  Is it fair to say that it was no lower than
15         his eyebrows?
16    A.   Yeah.
17    Q.   All right.  Well, how do you know -- you described
18         his hair as like little twisties.  How do you know he
19         had twisties if he had a hat on?
20    A.   You could see like popping out the hat.
21    Q.   All right.  What kind of hat was it, do you know?
22    A.   Hm-mm.
23    Q.   I'm sorry.  I didn't tell you.  This young lady is
24         taking everything down.  So if you and I were just
25         like having a conversation at the rec center, we
```

1    could mm-hmm and nod our heads, but since she's

2    writing everything down, she can't look at you.

3    She'll look at you sometimes, she just looked when I

4    said that.  You have to say yes or no or maybe.  You

5    actually have to say the word.  Okay?

6  A.  Okay.

7  Q.  All right.  So he has -- oh, you can't tell what kind

8    of hat it is, is that what you said, but you can see

9    hair and short twisties, is that right?

10  A.  Yeah.

11  Q.  All right.  And the hat is no lower than his

12    eyebrows, right?

13  A.  Yeah.

14  Q.  Okay.  Was there anything else blocking the gunman's

15    face at all besides that hat?

16  A.  Blocking his face?

17  Q.  Yeah.  Did he have a mask on or anything, bandanna?

18  A.  No.

19  Q.  No.  Okay.  All right.  What about -- could you see

20    what other clothing he had on?

21  A.  Not really.  I really didn't get a look at his

22    clothes.  I didn't think to look at his clothes.

23  Q.  Okay.  All right.  So you don't know what he had on

24    for a top?

25  A.  Not really.  I know he had a sweater.

1    Q.   He had a sweater on?

2    A.   Yeah.

3    Q.   Why do you say that?

4    A.   Because he had like a pocket right here and that's

5         where he pulled the gun out.

6    Q.   Okay.  You're kind of gesturing.  Do that one more

7         time.  Can you stand up and do that so everybody can

8         see it?  I'm sorry.

9    A.   He had like a pocket right here.

10   Q.   It's a pocket that's across his stomach?

11   A.   Yeah.

12   Q.   All right.  So you saw that.  Could you tell anything

13        about the color of that sweater?

14   A.   No.

15   Q.   Could you tell was there any markings on the sweater

16        at all?

17   A.   Not that I know of.  I don't remember.

18   Q.   Any symbols or anything?

19   A.   I don't really remember.

20   Q.   Okay.  He pulled the gun out of it, is that what you

21        said?

22   A.   Yeah.

23   Q.   So you actually see him pull the gun?

24   A.   Yes.

25   Q.   What did the gun look like?

1  A.  It was silver.

2  Q.  Could you tell the type of gun, if it was like an

3      automatic or --

4  A.  Revolver.

5  Q.  It was a revolver.  Okay.  That's one person.  Are

6      you able to describe at all the second person out of

7      the three?

8  A.  Not really everything.  I know he was Puerto Rican,

9      he looked Puerto Rican, light skinned.  That's the

10     only thing I really remember about the second person.

11 Q.  Anything about the Puerto Rican individual's dress?

12 A.  No.

13 Q.  Okay.  Now, the third guy, did you get a look at him

14     at all?

15 A.  No.

16 Q.  All right.  Do you remember anything that he was

17     wearing at all, any clothing?

18 A.  Not really, no.

19 Q.  Could you tell at all anything about his -- whether

20     he was white, black, Hispanic or Asian, if you know?

21     Don't guess.

22 A.  Black.

23 Q.  Why do you say he was black?

24 A.  Because when I walked in the door I seen them when

25     they was walking up and I seen three people, two

```
 1           black people and one Puerto Rican.
 2     Q.    So the first person with the gun, he was black as
 3           well?
 4     A.    Yes.
 5     Q.    Okay.  So when those three people come into the house
 6           does anyone, do you or Colleen or any of them say
 7           anything when you're first in that dining room?  Is
 8           there any conversation at all that you remember?
 9     A.    No.
10     Q.    So where is it you go once this happens?
11     A.    Huh?
12     Q.    Where do you go after these guys come in the house?
13     A.    Where do I go?
14     Q.    Yeah.  Do you stay in the dining room?
15     A.    In the living room and sat down on that same couch
16           that Savannah was.
17     Q.    All right.  I'm going to show you what's been marked
18           as State's Exhibit 2.  Does State's Exhibit 2, does
19           that look familiar?
20     A.    Yes.
21     Q.    How so?
22     A.    It's Colleen's living room.
23     Q.    All right.  Anything familiar about that couch in
24           terms of that day?
25     A.    It's the couch I was sitting on.
```

1   Q.   All right.  That's what's on the big screen, the same

2        picture?

3   A.   Yes.

4   Q.   All right.  Can you see on State's Exhibit 2 where it

5        is you were seated and show it?

6   A.   About in the middle.

7   Q.   Can you hold it up for us?  So just to make sure I'm

8        right, you're pointing right in the middle sort of

9        where the couch splits?

10  A.   Yeah.

11  Q.   Is this like a pillow or something right in front of

12       where you're seated, is that right?

13  A.   Yeah.

14  Q.   Okay.  Where's Savannah?

15  A.   She's at the end of the couch.

16  Q.   All right.  End closest to?

17  A.   The doorway.

18  Q.   Okay.  So as I'm looking at the picture, State's

19       Exhibit 2, she's closest to me, she would be closest

20       to the bottom of State's Exhibit 2, is that right?

21  A.   Yes.

22  Q.   Okay.  And where is Colleen at this time?

23  A.   On the other couch.

24  Q.   Okay.  I'm going to show you State's 4.  Does State's

25       4 look familiar?

1    A.    Yes.

2    Q.    All right.  How is that familiar?

3    A.    It's the couch Colleen was sitting on.

4    Q.    Okay.  And what's on the big screen, is that the same

5          as what you're looking at?

6    A.    Yes.

7    Q.    All right.  Do you see on there where Colleen was

8          seated?

9    A.    Yes, at the end.

10   Q.    Can you hold it up and please show the Court?  Okay.

11         On the far end.  So you say like right down here, am

12         I pointing right?

13   A.    Yes.

14   Q.    The edge furthest away from where the photographer

15         would be standing on State's Exhibit 4?

16   A.    Yes.

17   Q.    Okay.  So you guys go in and sit down.  When you guys

18         do that, what do these three other individuals do?

19   A.    The two stay at the curtain and one went to Colleen

20         and pulled the gun out.

21   Q.    All right.  Now, the two at the curtain, did they

22         come inside or did they stay on the outside of the

23         room?

24   A.    The Puerto Rican dude does.

25   Q.    Does what?

171

 1    A.    Comes in the curtain.

 2    Q.    Okay.  One thing about these guys, when you're with

 3          them in the dining room, are you able to tell their

 4          heights compared to each other?

 5    A.    Height?

 6    Q.    Yeah, can you tell how tall these guys are?

 7    A.    The Puerto Rican dude, like he wasn't tall but he

 8          wasn't short.  He was like around five-five or

 9          something around there.

10    Q.    How tall are you?

11    A.    Five-three.

12    Q.    Okay.  So he's a little bit taller than you.  So the

13          Puerto Rican guy, how tall was he compared to the

14          other two guys?  Shorter, same height or taller or

15          don't you know?

16    A.    I don't know.

17    Q.    Okay.  Are you able to tell at all anything about the

18          height of the guy with the gun?

19    A.    Not really.

20    Q.    Okay.  Do you know, was he taller than you?

21    A.    Yes.

22    Q.    Can you tell if he was taller than the Puerto Rican

23          guy, do you remember?

24    A.    No, I don't remember.

25    Q.    You don't remember.  Okay.  What about the third guy,

172

1    do you remember how tall he was compared to

2    everybody?

3  A.   No.

4  Q.   Okay.

5  A.   When I walked in I seen him and he was taller than

6    the other two people.

7  Q.   The third guy?

8  A.   Yeah.

9  Q.   He was the tallest of everybody?

10  A.   Yes.

11  Q.   You're shaking your head, is that a yes?

12  A.   Yes.

13  Q.   Okay.  Back to where you were.  You're on the couch

14    with Savannah, Colleen is on another couch and which

15    guy goes up to Colleen?

16  A.   The one with the gun.

17  Q.   What does he look like?

18  A.   The one with the dreads.

19  Q.   The guy with the dreads goes up -- does he say

20    anything at all?

21  A.   He said I want everything.

22  Q.   He said I want everything?

23  A.   Yes.

24  Q.   What did you take that to mean?

25  A.   I didn't know what anything -- I don't know.

1   Q.  Okay.  Well, what did you think was happening at that

2       point in time?

3   A.  When I seen him pull out the gun and then hit Colleen

4       I knew what was going -- I already knew what was

5       happening when he hit Colleen.

6   Q.  What?

7   A.  With the gun.  I already knew he was robbing us.

8       Well, trying.  I don't know.

9   Q.  All right.  So when he said I want everything, did

10      Colleen get a chance to respond at all?

11  A.  No.

12  Q.  So what does he do?

13  A.  Hit her with the gun.

14  Q.  Okay.  Where?

15  A.  In the head.

16  Q.  So when he hits her in the head with the gun, what

17      are the other two guys doing?

18  A.  I don't know.

19  Q.  What are you focused on at that point in time?

20  A.  I was focused on seeing if Colleen was all right.

21  Q.  So she gets hit in the head, what do you do,

22      anything?

23  A.  No.  I just sat there.

24  Q.  All right.  So what happens next?

25  A.  He got on top of her and started beating her.

1   Q.   Okay.  And then what happens?

2   A.   The dogs come out.

3   Q.   All right.  What dogs?  How many dogs?

4   A.   There's a puppy, the grown one, the old dog and

5        there's another puppy.

6   Q.   Two puppies and a grown dog?

7   A.   Mm-hmm.

8   Q.   Is that a yes?

9   A.   Yes.

10  Q.   All right.  So what do they do?  What happens with

11       the dogs, what do they do?

12  A.   They attacked his foot.

13  Q.   Okay.  How many of them attack his foot?

14  A.   One.

15  Q.   Do you see it happen?

16  A.   Yes.

17  Q.   How is it they attack his foot, what do they do?

18  A.   They just grabbed his foot.  And when the dogs

19       grabbed his foot he said, get the dogs and then he

20       just started shooting.

21  Q.   Okay.  So the dog grabs his foot and he says, get the

22       dogs, is that right?

23  A.   Yes.

24  Q.   And then starts shooting?

25  A.   Or he said, get the dogs before I kill him or

175

1         something like that and started shooting.

2    Q.   All right.  So what happens at this point?  He starts

3         shooting, what happens?

4    A.   The two other people left, ran out the door.

5    Q.   Okay.  And now what?

6    A.   When they ran, me and Savannah ran.

7    Q.   All right.  Did you actually see him shooting?

8    A.   Yes.

9    Q.   You did.  Do you know how many times that you saw him

10        shoot?

11   A.   No.

12   Q.   Okay.  Did you see him hit anything?

13   A.   Hit anything?

14   Q.   Yeah.  Did he hit you?

15   A.   No.

16   Q.   Did you see if he hit Savannah?

17   A.   No.

18   Q.   Did you see if he hit any of the dogs?

19   A.   No.

20   Q.   Did you see if he hit Colleen?

21   A.   With the gun, yeah.

22   Q.   I'm sorry.  Shooting wise with a bullet?

23   A.   No.

24   Q.   All right.  Did you see if he hit himself?

25   A.   No.

1  Q.  So you're not sure?

2  A.  I'm not sure.

3  Q.  How long after the dog is on his foot is he shooting?

4      How much time does it take for him to start shooting?

5  A.  Really not that long.  They came in and Missy grabbed

6      his foot and he said, get the dogs before I start

7      shooting or I mean, kill him and I started yelling

8      for the dog and he just started shooting.

9  Q.  All right.  So how long are you in that room when he

10     starts shooting?

11 A.  How long was I in the room?

12 Q.  Yeah, how long did you stay in that room when he

13     starts shooting?

14 A.  How long was I in there?

15 Q.  Yeah.

16 A.  Not even like five minutes.

17 Q.  You were in there for five minutes while he was

18     shooting?

19 A.  Something like that.  I don't remember.

20 Q.  Okay.  Did you see what part of his foot the dog was

21     on?

22 A.  No.

23 Q.  Okay.  So you don't know if it was his sneaker or his

24     pants or his ankle?

25 A.  No.

1    Q.   Okay.  Do you remember which foot it was, if it was

2         his right foot or left foot, if you remember?

3    A.   No.

4    Q.   All right.  So this entire time that this happens in

5         the living room, did the other two guys, the

6         non-gunmen ever say a word, that you remember?

7    A.   The Puerto Rican did.

8    Q.   Oh yeah.  What did he say?

9    A.   He asked -- he was asking where is the stuff too and

10        I told him I don't know what he was talking about.

11                       THE COURT:  I'm sorry.  I didn't hear

12            that.

13                       (Answer read back by reporter.)

14                       THE COURT:  Thank you.

15   Q.   (BY MR. SCHROTH)  And was this before or after the

16        dogs came in the room?

17   A.   This was before.

18   Q.   Was it before or after, if you remember, the guy with

19        the gun started pistol whipping Colleen?

20   A.   It was -- I don't remember.

21   Q.   Okay.  All right.  And then once those other guys --

22        am I understanding you correctly, once those other

23        two guys run out of the room, you and Savannah run

24        out of the room?

25   A.   Yeah, and out the door.

178

```
 1    Q.   Of the three guys that were in the living room, in
 2         the house that day, do you see any of them in Court
 3         today?
 4    A.   Yes.
 5    Q.   You do.  What role did that person play of the guy
 6         you see in Court?
 7    A.   The one with the gun.
 8    Q.   Okay.  Can you just point to where that person is and
 9         I need you to describe what that person is wearing.
10         Can you do that?
11    A.   Blue and orange.
12    Q.   Orange what?  What's blue and what's orange?
13    A.   Orange is the undershirt.
14                   MR. SCHROTH:  Judge, I'd ask that the
15              record reflect that the witness has identified
16              the alleged delinquent.
17                   THE COURT:  So identified.
18    Q.   (BY MR. SCHROTH)  And what about the person that you
19         just pointed to -- why do you say that's the same
20         person, what makes you say that's the same person?
21    A.   Because I seen a little bit of his face.
22    Q.   You saw a little bit?
23    A.   Yeah.
24    Q.   What part?  What do you mean by a little bit?
25    A.   I told you what I seen.
```

1    Q.   From the eyebrows down?

2    A.   Yeah.

3    Q.   Okay.  So after you ran out of the house, where did

4         you go?

5    A.   To my uncle's house.

6    Q.   Okay.  Did you go back to Colleen's at all that day?

7    A.   Yeah.

8    Q.   All right.  How much time went by before you went

9         back to Colleen's?

10   A.   Like 30 minutes.

11   Q.   Okay.  And when you went back there, was Colleen

12        there?

13   A.   No.

14   Q.   Was there any police there?

15   A.   Yes.

16   Q.   Did you talk to them?

17   A.   Did I talk?

18   Q.   Yeah.  Did you talk to the cops?

19   A.   Yeah.

20   Q.   Did you tell them what happened?

21   A.   Yeah.

22   Q.   Okay.  Did you talk to police again after that day?

23   A.   Yes.

24   Q.   All right.  Where'd that happen?

25   A.   My house.

```
 1    Q.   And who was home when the cops came?

 2    A.   My mom.

 3    Q.   Anyone else there?

 4    A.   No.

 5    Q.   Okay.  Did anything happen when the cops were there

 6         when they came by your house?  Did they do anything

 7         with you?

 8    A.   Showed me pictures.

 9    Q.   All right.  Did anybody in any of those pictures look

10         familiar?

11    A.   The one at my house?

12    Q.   Yeah, at your house.

13    A.   Yeah.

14    Q.   Okay.  How many people looked familiar?

15    A.   One.

16    Q.   Okay.  What did that person do?

17    A.   It was the one with the gun.

18    Q.   Okay.  I'm going to show you State's Exhibit 76, 79

19         and 82.

20                    THE COURT:  What are the numbers

21            again?  I'm sorry.

22                    MR. SCHROTH:  I'm sorry.  There's 76,

23            79 and 82.

24    Q.   (BY MR. SCHROTH)  Okay.  Zack, I'm handing you

25         State's Exhibit 76.  Does that look familiar?
```

```
 1   A.   Yes.

 2   Q.   How?

 3   A.   It's one of the lineups I seen.

 4   Q.   Okay.  Is that what we're looking at on the screen up

 5        here?

 6   A.   Yes.

 7   Q.   All right.  Did you pick anybody out?

 8   A.   No.

 9   Q.   Why?

10   A.   I didn't recognize nobody.

11   Q.   State's 79.  Does that look familiar?

12   A.   Yes.

13   Q.   How?

14   A.   It's a lineup that I picked out of.

15   Q.   Okay.  Is that what we're looking at on the big

16        screen?

17   A.   Yes.

18   Q.   And it's a lineup you picked out of, is that what you

19        said?

20   A.   I picked a person out of this lineup.

21   Q.   Could you hold it up for the Court and show who you

22        picked?

23   A.   (Indicating.)

24   Q.   So on State's 79 you're pointing to the person in the

25        upper right corner?
```

182

1    A.    Yes.

2    Q.    Did you make any markings on the paper?

3    A.    Circled it.

4    Q.    And did you do anything else to it?

5    A.    Wrote the date.

6    Q.    What date?

7    A.    4/23/15.

8    Q.    Okay.  Now, why did you circle this person in the

9          upper right corner on State's Exhibit 79?

10   A.    Because I recognized him.

11   Q.    Okay.  How did you recognize him?

12   A.    He looks like the person that shot Colleen.

13   Q.    That what?

14   A.    Shot Colleen.

15   Q.    That shot Colleen?

16   A.    Yes.

17   Q.    Did you see him actually shoot Colleen?

18   A.    No.

19   Q.    Okay.  So what did you actually see this person

20         doing?

21   A.    Hitting -- beating Colleen.

22   Q.    All right.  And did he have any weapons?

23   A.    A gun.

24   Q.    Okay.  And I'm showing you what's been marked as

25         State's 82.  Is that what we see on the big screen?

1   A.   Yes.

2   Q.   All right.  And does State's 82 look familiar to you?

3   A.   Yes.

4   Q.   How is that familiar?

5   A.   It's one of the lineups I looked at.

6   Q.   Anybody look familiar in that?

7   A.   No.

8   Q.   Okay.  All right.  Now, when you looked at these

9        pictures on the 23rd of April, do you know if anyone

10       else had looked at pictures before you did?  When you

11       look at the photographs, were you aware if anyone had

12       ever looked at photographs at all before you?

13  A.   Not before.  I knew Savannah was looking at a photo

14       lineup when I was.

15  Q.   At the same time?

16  A.   Yeah, but in different rooms.

17  Q.   So Savannah was in the house?

18  A.   Yeah, and I was in the hallway.

19  Q.   Oh.  So it was more than just you and your mom?

20  A.   Oh, I thought you was talking about -- we live in

21       separate houses.

22  Q.   Let me back up.  When you looked at these photo

23       arrays here, State's 76, 79 and 82, was Savannah in

24       the same house as you were?

25  A.   Was she in the same house as me?

184

1    Q.    Yeah.  When it's you and the police and they're

2          showing you these pictures, was Savannah in that same

3          house with you?

4    A.    No.  I think she went out to the car.

5    Q.    Okay.  All right.  When you looked at the pictures,

6          Savannah was not with you?

7    A.    No.

8    Q.    All right.  Was she in the same kind of general area

9          as you?

10   A.    Yeah.

11   Q.    Okay.  As you were looking at those exhibits, State's

12         82, 79 and 76, I believe, did you know if Savannah

13         had circled anybody?

14   A.    No.

15   Q.    Okay.  Now, did there ever come a time when you met

16         with police again?

17   A.    Yeah.

18   Q.    And where was that at?

19   A.    The police station.

20   Q.    Okay.  Do you remember when that was?

21   A.    I don't know what day it was.

22   Q.    Okay.  Who did you go down to the police station

23         with?

24   A.    My mom, Savannah and Savannah's mom.

25   Q.    Okay.  And what happened when you got to the police

185

1       station?

2   A.  We looked at lineups.

3   Q.  Okay.  Give me an overview of how it is you looked at

4       the lineups, where was Savannah and Colleen while you

5       looked at your lineup?

6   A.  With somebody different.  I don't know who they was,

7       though.

8   Q.  Okay.  Were you guys in the same room?

9   A.  No.

10  Q.  Okay.  And did you pick anybody out at that time?

11  A.  I think I picked one person out of one of those.

12  Q.  I'm going to show you State's 88 and 85.  All right.

13      I'm handing you State's Exhibit 85.  Does that look

14      familiar?

15  A.  Yes.

16  Q.  All right.  How is that familiar?

17  A.  It was one of the lineups I looked at.

18  Q.  Okay.  Did you mark anybody?

19  A.  Yes.

20  Q.  So as we look at State's 85, point to me, show me

21      which one it is?  Top middle, top row middle 33013 on

22      State's 85.  Why did you pick that guy out?

23  A.  I think this was -- oh, yeah.  I told them that was a

24      mistake.  I forgot who was with me when I looked at

25      these ones.

1   Q.   So you think that was a mistake when you circled

2        that?

3   A.   Yes.

4   Q.   Okay.  Who did you think you were picking out?

5   A.   The one with the gun.

6   Q.   Okay.  Here is State's 88.  Does that look familiar?

7   A.   Yes.

8   Q.   Okay.  And did you make an identification on 88 too?

9   A.   Yes.

10  Q.   All right.  Which one did you pick out?

11  A.   The third one on the top row.

12  Q.   Top row all the way to the right on State's 88,

13       85-02-8?  Zack, is that right?

14  A.   Yes.

15  Q.   Okay.  So why did you pick him out?

16  A.   Because it kind of looked like the guy that shot

17       Colleen.

18  Q.   Okay.  Let me ask you this.  As you look at those two

19       Exhibit's 85 and 88, are either of those guys that

20       you circled people from the home invasion with

21       Colleen?

22  A.   What'd you say again?

23  Q.   You circled two guys back -- I think there's a date

24       May 13th, does that look right?

25  A.   Yes.

187

1  Q.  Okay.  Are either of those two guys -- I mean, what

2      role did those guys play, I guess, why did you circle

3      them?

4  A.  I circled the one on 85 because that's the first

5      picture I seen that looked like the one that shot

6      Colleen.  That kind of looks like him.

7  Q.  Okay.

8  A.  The cop said pick out somebody if you recognize him,

9      if you think it's him or not.  If you recognize him.

10 Q.  Okay.  And you circled him because you thought he

11     might have been the guy who shot Colleen?

12 A.  Yes.

13 Q.  Okay.  I guess you didn't see the shooting, to be

14     fair.  That had the gun.  And then you circled

15     someone on 88, why did you circle that guy?

16 A.  Because it looked like the guy that shot Colleen.

17 Q.  Okay.  So he looks like the same person too?

18 A.  This looks more like him.

19 Q.  What number that you're looking at?

20 A.  On 88.

21 Q.  Looks more like who?

22 A.  The one that shot Colleen.

23 Q.  Okay.  So as you look at it -- as you looked at it on

24     that day on May 13th, 2015, were you circling the

25     person that shot Colleen?

188

```
 1    A.   What did you say?

 2    Q.   Back when you looked at these, it was May 13th.

 3         Okay.  Were you circling a person that you thought

 4         had the gun that day?

 5    A.   Yes.

 6    Q.   Okay.  And do you still feel that way, that that

 7         person looks like the person that had the gun that

 8         day?

 9    A.   It's between that one and the other one in the

10         lineup.

11    Q.   Which one?

12    A.   I don't know what number it is.  The one we just went

13         over.

14    Q.   Is it 85 or a different one?

15    A.   No, it's not on 85.

16    Q.   I'm going to hand you 76, 79 and 82.  Which one are

17         you referring to?

18    A.   This one.

19    Q.   What number is that?

20    A.   79.

21    Q.   Okay.  And what about 79 and 88?

22    A.   They look familiar.  They look like the same people,

23         but like -- because he said the picture could be now

24         or could be back a long time ago.

25    Q.   Okay.  Appearance may change, things like that?
```

1    A.    Yeah.

2    Q.    All right.  So you were given instructions before you

3          looked at the arrays, before you looked at pictures?

4    A.    Yeah.

5    Q.    Okay.  So as you look at State's Exhibits 79 and 88,

6          do you think those are the same people, different

7          people, what do you think?  There's no right or wrong

8          answer.  Just what you think.

9    A.    No, I don't think so.  No.

10   Q.    You don't think what?

11   A.    They're the same people.

12   Q.    Okay.  Do they both resemble the person that had the

13         gun that day?

14   A.    Yes.

15   Q.    So as you look at those Exhibits 79 and 88, correct

16         me if I'm wrong, it could be either one of the people

17         in those photos, is that what you're saying?

18   A.    Yes.

19   Q.    Okay.  So then what about State's Exhibit 85, does

20         that look at all like anyone who was in the house the

21         day of the crime, the robbery?

22   A.    No.

23   Q.    Okay.  So for you it's between State's Exhibit 79 and

24         State's Exhibit 88?

25   A.    Yes.

```
1    Q.    Okay.  Was anything taken from you at all that day?

2    A.    No.

3    Q.    Okay.

4               MR. SCHROTH:  Can I have just a

5          moment, Judge?

6               THE COURT:  Yes.

7               MR. SCHROTH:  All right.  Thanks,

8          Judge.  Nothing further.

9               THE COURT:  Okay.  Attorney Hoffman,

10         do you have any questions for this witness?

11              MR. HOFFMAN:  Thank you, your Honor.

12          CROSS-EXAMINATION OF ZACKARY HALE

13   BY MR. HOFFMAN:

14   Q.    Zackary, my name's Brian Hoffman.  I'm with the

15         Public Defender's Office and I represent Dalonte.

16         I'm going to ask you a few follow-up questions.

17         Okay?

18   A.    Okay.

19   Q.    You were talking about on the photo arrays you've

20         kind of picked out three people with pretty much the

21         same hair style in those photo arrays, right?

22   A.    Yes.

23   Q.    It's kind of like short dread hanging down almost to

24         eyebrow length?

25   A.    Yes.
```

1    Q.   And when you saw the guy that night, you saw the

2          dreads hanging down?

3    A.   Yeah, a little bit of them.

4    Q.   Okay.  And you said you got a look at his face, but

5          not really a great look, right, it was just kind of

6          quick?

7    A.   Yes.

8    Q.   And because he had a hat on and there was a lot of

9          movement going on?

10   A.   A lot of movement going on.

11   Q.   Yeah.  Like people were moving around a lot and

12         fighting and stuff like that?

13   A.   Yeah.

14   Q.   All right.  And then at some point Colleen's dog goes

15         in and starts biting the guy, right?

16   A.   Yeah.

17   Q.   Was it one of the younger dogs or was it the older

18         dog?

19   A.   The older dog.

20   Q.   Okay.  Was it Missy?

21   A.   Yeah.

22   Q.   Missy starts grabbing his leg and starts biting him.

23         Do you remember which leg it was?

24   A.   No.

25   Q.   Was it kind of both legs or you can't tell?

```
 1    A.    I know she attacked his leg, but I really don't
 2          remember what leg it was.
 3    Q.    Do you know, did the dog have a hold of like the
 4          meaty part of his leg or was it just the pants and
 5          kind of holding him like this?
 6    A.    I don't really remember.
 7    Q.    Okay.  So all you know is the dog got on there
 8          somehow and that was it?
 9    A.    Yeah.
10    Q.    Okay.  Missy got on pretty good, though, onto his
11          leg?
12    A.    I don't know.  I was worrying about calling for her.
13    Q.    Okay.  So you were calling her back?
14    A.    Yeah.  I was trying to get her to come to me.
15    Q.    Oh, okay.  And then did he start shooting before she
16          started biting him or after?
17    A.    I think he started shooting I think when Missy bit
18          him.
19    Q.    Okay.  So he really notices and then he starts?
20    A.    Yeah.
21    Q.    Does he just start spraying back, like shooting
22          everywhere?
23    A.    I don't think so because I didn't hear that many
24          shots.
25    Q.    How many shots did you hear?
```

1   A.   A couple, two.

2   Q.   Okay.

3   A.   Somewhere around there.

4   Q.   Okay.  So you hear a couple shots and was he aiming

5        at the dogs?

6   A.   Somewhere around there.  Around the couch where the

7        dog was.

8   Q.   Okay.  And at that point Missy was already on his

9        leg?

10  A.   I don't remember.  I think she was off.  I don't

11       remember if she was on or off when he started

12       shooting.

13  Q.   Okay.  But near his leg at least?

14  A.   Yeah.

15  Q.   Okay.  Now, when you were doing the photo arrays, I

16       think the first one you did use percentages of how

17       sure you were, do you remember doing that?

18  A.   Yes.

19  Q.   So in Exhibit 79 on this one you indicated that you

20       were about 70% sure that that was the guy?

21  A.   Yes.

22  Q.   And then later when you saw the fourth one in State's

23       Exhibit 85, the top middle guy, you said you were

24       about 80% sure?

25  A.   Yes, but it was a mistake.

194

1  Q.  So you said that was a mistake.  Why do you say it

2      was a mistake?  Because you don't think that guy

3      looked enough like the shooter?

4  A.  Yeah.

5  Q.  All right.  Did you think he was one of the other

6      guys or you thought he kind of looked like the

7      shooter?

8  A.  He kind of looked like the shooter because the

9      dreads.

10 Q.  His hair kind of fits him?

11 A.  Yeah.

12 Q.  Okay.  So he looked most like the shooter out of that

13     set?

14 A.  Yes.

15 Q.  Okay.

16 A.  When I first seen that picture, yes.

17 Q.  Okay.  And then kind of the same thing then in the

18     last one, you said you were about 90% sure and this

19     was State's Exhibit 88 and you identified the top

20     right guy, right?

21 A.  Yes.

22 Q.  And so you were about 90%.  So you thought the person

23     in No. 88 looked the most like the shooter?

24 A.  Yeah, when I seen that picture.

25 Q.  Okay.  And so today you're kind of in between those

195

```
 1             two that -- I think it was 79 and 88, right?
 2   A.   Yeah.
 3   Q.   Okay.  The detective didn't tell you anything
 4        about -- they just said, hey, here's the lineup, you
 5        pick someone out?
 6   A.   No.  They just said --
 7   Q.   If you recognize someone, pick someone out?
 8   A.   Yeah.  If you think it's him, then pick him out.
 9   Q.   Okay.  And so you said, hey, that guy looks like him
10        and that guy looks like him?
11   A.   Yeah.
12   Q.   Okay.  From the time the guys were let into the
13        house, did they start attacking Colleen almost right
14        away?
15   A.   When they got in the living room.
16   Q.   Do you know what they took from the house?
17   A.   No.
18   Q.   But they didn't take anything from you?
19   A.   No.
20   Q.   From the time the guys started attacking Colleen
21        until the time you ran out, was it like one, two
22        minutes?
23   A.   About two minutes.
24   Q.   So it happened pretty quick?
25   A.   Yeah.
```

1    Q.   All right.  And then as soon as the shots started

2          firing, the other two guys, they kind of booked it

3          out of there?

4    A.   Yeah.

5    Q.   And as soon as they left you decided, hey, let's get

6          out of here and call the police?

7    A.   Yeah, because he was shooting at the dogs and I knew

8          he was focused on the dogs, so I had my time to run

9          out.

10   Q.   Okay.  And you ran out and where did you run?

11   A.   To my uncle's house.

12   Q.   To your uncle's house?

13   A.   Yes.

14   Q.   How far away does your uncle live?

15   A.   He lived down Clark.

16   Q.   Okay.  So you and Savannah kind of split directions?

17   A.   Yeah.  She went one way and I went the other way.

18   Q.   Okay.  When you got to your uncle's house, did you

19         call the police or anything?

20   A.   No, because they said they was already called.

21   Q.   Who said?

22   A.   My grandma.  She was there when I got there.

23   Q.   At your uncle's?

24   A.   Yeah.  And my uncle was on his way down to Colleen's.

25   Q.   Okay.  By the time you even can get to your uncle's,

| | | |
|---|---|---|
| 1 | | the police are already there, the ambulance is |
| 2 | | already there, everything is going on? |
| 3 | A. | Yeah. |
| 4 | Q. | How long of a period of time is that, a couple |
| 5 | | minutes? |
| 6 | A. | Me getting to my uncle's? |
| 7 | Q. | Yeah. |
| 8 | A. | About two minutes because I ran the whole time. |
| 9 | Q. | Okay.  And so within that two minutes the police and |
| 10 | | the ambulance were already on scene? |
| 11 | A. | I think the ambulance was there. |
| 12 | Q. | Okay.  The police maybe not yet? |
| 13 | A. | No, not yet. |
| 14 | Q. | Okay. |
| 15 | | MR. HOFFMAN:  Nothing further.  Thank |
| 16 | | you, your Honor. |
| 17 | | THE COURT:  Any redirect? |
| 18 | | MR. SCHROTH:  No.  Thank you, Judge. |
| 19 | | THE COURT:  I just have two quick |
| 20 | | questions.  After you heard the shots, did you |
| 21 | | hear the guy with the dreads scream at all? |
| 22 | | THE WITNESS:  No. |
| 23 | | THE COURT:  Did you hear him say |
| 24 | | anything at all? |
| 25 | | THE WITNESS:  No.  I don't remember. |

198

```
 1                    THE COURT:  And you said you were
 2         outside playing with your cousins before this
 3         all happened?
 4                    THE WITNESS:  I walked up and when I
 5         walked up because I was walking from home to my
 6         uncle's and --
 7                    THE COURT:  Before this happened where
 8         were you?
 9                    THE WITNESS:  Home.
10                    THE COURT:  And where is that?
11                    THE WITNESS:  Down the street.
12                    THE COURT:  How far down the street?
13         Five houses?  Ten houses?
14                    THE WITNESS:  Like about fifteen
15         houses down.
16                    THE COURT:  So you walked fifteen
17         houses to Colleen's house?
18                    THE WITNESS:  Yes.
19                    THE COURT:  Okay.  And did you happen
20         to see anybody outside?
21                    THE WITNESS:  Outside when I showed
22         up?
23                    THE COURT:  Before you went in
24         Colleen's house, yes.
25                    THE WITNESS:  Yeah, I seen three
```

```
 1                    people walking.
 2                           THE COURT:  You saw three people
 3              walking?
 4                           THE WITNESS:  Yeah.
 5                           THE COURT:  Was it the same three
 6              people that came into Colleen's house?
 7                           THE WITNESS:  Yes.
 8                           THE COURT:  Which way were they
 9              walking?
10                           THE WITNESS:  They was coming from the
11              alley -- they came from the alley and they was
12              in the street and then turned down Colleen's
13              street.
14                           THE COURT:  Have you ever seen those
15              three people in the neighborhood before?
16                           THE WITNESS:  No.
17                           THE COURT:  Okay.  Do you have any
18              inquiry based on the Court's questions?
19                           THE WITNESS:  No.
20                           MR. SCHROTH:  Neither do I, Judge.
21                           THE COURT:  Attorney Hoffman?
22                           MR. HOFFMAN:  No, not at this time.
23                           THE COURT:  All right.  Let the record
24              reflect -- ma'am, what is your name?
25                           MS. HALE:  Rochelle Hale.
```

200

1          THE COURT:  And how are you related to

2     Zackary?

3          MS. HALE:  I'm his mother.

4          THE COURT:  All right.  So let the

5     record show that Zackary's mother has been in

6     the room at the same time he was testifying.  I

7     apologize.  I forgot to have you introduce

8     yourself when you came in.

9          All right.  Zackary, you did a great

10    job.  Thank you very much.  You can step down.

11    Do we have anything before we go off the record?

12          MR. SCHROTH:  Not for the State,

13    Judge.

14          MR. HOFFMAN:  I don't think so, your

15    Honor.

16          THE COURT:  All right.  So we are off

17    the record.

18          (Hearing in recess.)

19

20

21

22

23

24

25

1

2

3

4                        C E R T I F I C A T E

5

6

7

8            I, Dawn M. Peck, a stenographic

9    reporter, do hereby certify that I attended the

10   foregoing proceedings in their entirety; that I

11   wrote the same in Stenotype, which was

12   subsequently transcribed into typewriting by

13   means of computer-aided transcription under my

14   direction; and that the foregoing Transcript of

15   Proceedings is a true and correct transcript of

16   my Stenotype notes.

17

18            Signed this 13th day of October, 2015.

19

20   _____
     Dawn M. Peck
21   Mizanin Reporting Service, Inc.
     5755 Granger Road
22   335 Independence Tower
     Independence, OH 44131

23

24

25

THE STATE OF OHIO,          )
                           )  SS:  DENISE N. RINI, J.
COUNTY OF CUYAHOGA.         )

IN THE COURT OF COMMON PLEAS
JUVENILE DIVISION


In the matter of:          )
                           )
DALONTE WHITE              )  Case No. DL 15105751
                           )
                           )  **VOLUME 2 of 3**


- - -


        Continued audio-recorded hearing held before

    Judge Denise N. Rini at the Cuyahoga County Juvenile

    Court, 9300 Quincy Avenue, Cleveland, Ohio, on

    Tuesday, July 21, 2015, commencing at 11:01 a.m.


- - -

1    APPEARANCES:

2    Norman Schroth, Assistant Prosecuting Attorney,

3              on behalf of the State of Ohio.

4    Brian Hoffman, Assistant Public Defender,

5              on behalf of Juvenile, Dalonte White.

6    John H. Lawson, Esq.,

7              Guardian ad Litem for Juvenile, Dalonte White.

8

9

10   ALSO PRESENT:

11   Dalonte White, Juvenile.

12   Alexandria Chandler, mother.

13   David Lam, Detective.

14

15

16                        - - -

17

18

19

20

21

22

23

24

25

204

1                          I N D E X

2     **WITNESS**

3     **STATE'S:**                                    Page

4     **EDWARD BUNCH**

5     Direct Examination by Mr. Schroth.  .   .   .   . 209

6     Cross-examination by Mr. Hoffman .   .   .   .   . 240

7     Redirect Examination by Mr. Schroth .   .   .   . 252

8     Recross-examination by Mr. Hoffman  .   .   .   . 257

9     Further Redirect Examination by Mr. Schroth.  . 259

10    Further Recross-examination by Mr. Hoffman.  . 260

11

12                         - - -

13    **OBJECTIONS:**

14    By Mr. Schroth.  .  .  .  .  .  .  .  .  . 248

15    By Mr. Hoffman.  .  .  .  .  .  .  .  .  . 259

16

17                         - - -

18

19

20

21

22

23

24

25

1          PROCEEDINGS

2              JUDGE DENISE N. RINI:  All right.  We

3      are here in the matter of Dalonte White.  We are

4      resuming the probable cause hearing that was

5      heard last week.  The Case Number is DL

6      15105751.

7              So beginning with Dalonte, say your

8      name for the record, please.

9              DALONTE WHITE:  Dalonte White.

10             MR. LAWSON:  John Lawson, Guardian ad

11     Litem.

12             MR. HOFFMAN:  Brian Hoffman, attorney

13     for Dalonte White.

14             MR. SCHROTH:  Norm Schroth for the

15     State of Ohio.

16             DETECTIVE LAM:  Detective Lam with the

17     Cleveland P.D.

18             THE COURT:  All right.  We have in the

19     courtroom Edward Bunch, who is a witness that

20     was transported from County Jail, and he is on

21     the witness stand, so we may swear him in.

22             **EDWARD BUNCH, sworn**.

23             THE COURT:  All right.  Is there

24     anything preliminary that we have to deal with,

25     Prosecutor Schroth?

1              MR. SCHROTH:  I talked to Mr. Bunch.

2       He's not charged in this case with anything, but

3       he is testifying as a witness for the State of

4       Ohio.

5              I did instruct -- I told Mr. Bunch I

6       don't want him to talk at all about his case.

7       He's obviously in a case, okay, and I instructed

8       him that he's not to talk about that at all

9       under any circumstances because it's a pending

10      case and he has counsel in that case.  And so I

11      don't want to know about it and the Court

12      doesn't need to know about it.

13             And I told him you're going to -- he

14      was Mirandized before he talked to Detective

15      Lam.  I told him he was going to be Mirandized

16      again when he testifies.  That's all.  So I

17      would just ask the Court to do that.

18             THE COURT:  Has anyone spoken to his

19      attorney?

20             MR. SCHROTH:  No, because he's not

21      charged in this, and that's a completely

22      different matter.

23             THE COURT:  I understand it's a

24      completely different matter.  I just wanted to

25      know, Mr. Bunch, who are your attorneys

207

1    downtown?

2              THE WITNESS:  Michael L. Moore.

3              THE COURT:  Did you tell him that you

4         were going to come here and testify?

5              THE WITNESS:  I didn't know I was

6         coming.

7              THE COURT:  Okay.  All right.  Well,

8         what we will do is, what I want you to

9         understand is anything that has to do with your

10        pending case, if they ask you any questions

11        about it, just say -- don't even answer, okay?

12             All right.  You wanted me to Mirandize

13        him?

14             MR. SCHROTH:  Yeah.  I mean, he is

15        compelled to testify, so he has a right not to

16        talk.  He doesn't have to talk if he doesn't

17        want to, so I would just ask the Court just to

18        do that.

19             I don't know if the Court knows the

20        Miranda -- Lam does.  He knows the Miranda

21        warnings by heart.

22             THE COURT:  That you have a right to

23        remain silent?

24             MR. SCHROTH:  Yeah.

25             THE COURT:  Anything you say can and

1   will be used against you in a Court of law.

2              MR. SCHROTH:  Okay, Judge.  Your

3   Honor, you're showing off.

4              (Laughter.)

5              THE COURT:  So, Mr. Bunch, here's what

6   I want you to understand.  You know when the

7   police arrest you, what is the first thing they

8   say?  You have a right to remain silent.

9              THE WITNESS:  Yes.

10             THE COURT:  So you have that right to

11  remain silent in the courtroom.  Anything you

12  say can and will be used against you in not only

13  this Court of law, but possibly a Court of law

14  downtown or any other Court of law.  Do you

15  understand?

16             You have a right to have an attorney

17  present for every part of your testimony.  Do

18  you understand that?

19             THE WITNESS:  Yes.

20             THE COURT:  So anything missed?

21             MR. SCHROTH:  I wanted to -- can you

22  make sure he understands he's not to talk about

23  his current case?

24             THE COURT:  You understood that,

25  right?

1           MR. SCHROTH:  Yeah, I know.  I just

2      want to make sure he -- I just want him to

3      acknowledge that -- he's nodding just for the

4      record -- that he knows he's not to talk about

5      his current case.

6           THE COURT:  Yes.  You understand that

7      you are not permitted to speak about your case

8      at all?

9           THE WITNESS:  Um-hmm.

10          THE COURT:  The current one.  Yes?

11     You have to answer verbally.  We're recording.

12          THE WITNESS:  Yes.

13          THE COURT:  Where is the court

14     reporter?

15          So are you ready to proceed?

16          THE WITNESS:  Yes.

17          THE COURT:  All right.

18          MR. SCHROTH:  Okay.

19          **DIRECT EXAMINATION OF EDWARD BUNCH**

20  **BY MR. SCHROTH:**

21  Q.  Mr. Bunch, I'm Norm Schroth, the Prosecutor.  We just

22      talked for a minute back there in the cell waiting to

23      testify.  You remember that?

24  A.  Yes.

25  Q.  And, you know, when you're talking to people normally

1  you can bow your head or whatever, but this is a

2  Court hearing so they're recording things, so you

3  have to say like yes or no or whatever, okay?

4    All right.  I wanted to talk about the day that

5  you were shot in your -- what was it, your right

6  ankle?

7 A. Right.

8 Q. Okay.  Do you remember that day?

9 A. Yes.

10 Q. Okay.  Do you remember what time, around what time

11  you were shot at?

12 A. No.

13 Q. Okay.  Do you know if it was daylight or if it was

14  dark out?

15 A. Daylight.

16 Q. It was daylight.  Okay.  Do you remember where you

17  were coming from when you were shot?

18 A. My brother's house.

19 Q. Your brother's house.  Okay.  I don't want you to

20  describe the address, but what street does your

21  brother live on?

22 A. 95th.

23 Q. What are the two cross streets between?

24 A. What you mean?

25 Q. 95th and what?

211

1   A.   He live on 95th and Detroit.

2   Q.   95th and Detroit?

3   A.   Yeah.

4   Q.   All right.  So he's still in Cleveland?  That's

5        Cleveland?

6   A.   Yeah.

7   Q.   And were you at your brother's house by yourself or

8        with someone else?

9   A.   I was by myself locking up.  I was about to go home.

10  Q.   Okay.  Who was at your brother's house when you were

11       there?

12  A.   A friend of mine.

13  Q.   Okay.  Was your brother there?

14  A.   No.

15  Q.   Oh, okay.  So it was just you and your friend and no

16       one else?

17  A.   We was about to go to my house.

18  Q.   All right.  Okay.  Did your brother let you go to his

19       house like that all the time, stop in whenever?

20  A.   Yeah.

21  Q.   Okay.  Were you living with your brother at the time?

22  A.   No, I live with my aunt.

23  Q.   Okay.  What street's that?

24  A.   Curtis.

25  Q.   Okay.  How long have you lived with your aunt for?

1    A.   Since I came home from ODYS.

2    Q.   Okay.  When was that?

3    A.   November 12th.

4    Q.   Okay.  Your buddy that you were with, how long have

5         you known him?  Is it a guy or a girl?

6    A.   It's a guy.

7    Q.   How long have you known him for?

8    A.   A couple years.

9    Q.   Okay.  Does he have a nickname or something?  What do

10        you call him.

11             What's his first --

12                      THE COURT:  You have to answer

13        verbally.

14   A.   Nick.

15   Q.   Is that his real first name?

16   A.   No.  We call him Nick.  That's his nickname,

17        whatever.

18   Q.   Do you know his real name?

19   A.   No.

20   Q.   You don't know Nick's real name?

21   A.   No.

22   Q.   I don't want his address, but do you know what street

23        Nick stays at?

24   A.   No.

25   Q.   Okay.  How did you guys link up?

```
 1    A.   On the outs at the rec center.

 2    Q.   Oh, the rec center.  Which one?

 3    A.   Cudell.

 4    Q.   Oh, okay.  Is that where you met on that day?

 5    A.   No.

 6    Q.   Where did you --

 7    A.   He was with me at my brother's house.

 8    Q.   Like how did you end up being with him at your

 9         brother's house?

10    A.   What you mean?

11    Q.   Well, did he just show up there?

12    A.   No.  He called me.

13    Q.   Oh, he called you.  Okay.  All right.  How long had

14         you been at your brother's house for, do you know?

15    A.   He called me.  I was leaving.  I was about to lock

16         up.  He didn't come to my brother's house with me.  I

17         was locking up, and when I was coming out, he was

18         coming in.  We met like that.

19    Q.   Lock up, you mean like locking the house up?

20    A.   Yeah.

21    Q.   All right.  So where were you guys going from your

22         brother's house?

23    A.   We was about to go to my house.

24    Q.   All right.  And how were you getting there?

25    A.   The bike.
```

```
1    Q.   Okay.  Who's bike?

2    A.   It was his bike.

3    Q.   His bike.  Okay.

4    A.   Yeah.

5    Q.   Was it --

6    A.   It was both our bikes.

7    Q.   Okay.  You guys shared a bike?

8    A.   Yeah.

9    Q.   All right.  How did you guys share a bike?  I don't

10        understand how you guys share a bike together.

11   A.   If I ain't got it, he got it.

12   Q.   Okay.  How did you get to your brother's house?

13   A.   How did I get there?

14   Q.   Yeah.

15   A.   On a bike.

16   Q.   So who rode the bike first?

17   A.   Him.

18   Q.   He did.  So you were at your brother's house first,

19        though?  Is that a yes?

20   A.   Yes.

21   Q.   And then you rode the bike there?  You kind of --

22                     THE COURT:  You have to say yes or no.

23   A.   Yes.

24   Q.   So he gets on a bike, too, or did he walk there?

25   A.   My bike.
```

215

1   Q.   Okay.  But I thought you had the bike, you went to

2        your brother's house on a bike.

3   A.   You can assume that we do.

4   Q.   So when you go to your brother's house, do you ride a

5        bike to your brother's house?  You're nodding your

6        head yes?

7   A.   Yes.

8   Q.   And then when Nick gets there, he rides a bike, too?

9   A.   Yeah.

10  Q.   Okay.  All right.  So then when you guys leave the

11       house --

12  A.   Sometimes he had his own bike, though.

13  Q.   How is it that he got shot?  Did he have his own bike

14       or did you give it to him?

15  A.   I was riding.

16  Q.   You were riding.  He was on your handlebars?

17  A.   Yeah.

18  Q.   Okay.  On his bike -- your bike or his bike or your

19       team bike?

20  A.   On my bike.

21  Q.   Okay.  So you're going from your brother's house on

22       95th and Detroit to your house on Puritas?  You're

23       nodding again.

24  A.   Yes.

25  Q.   Do you remember like the way you went, like what

1        street you took?

2    A.    Yeah.  I took West Boulevard and I was about to cut

3        -- I was about to hit a right on West Boulevard right

4        there by BP, over the bridge by BP and Lorain on the

5        corner.

6    Q.    BP on Lorain, okay.

7    A.    But I wasn't that far.  Like I was like between

8        Madison and Lorain.  I was between, in the middle of

9        like West Boulevard.

10   Q.    Oh, okay.  So you get to West Boulevard.  What street

11       did you take to get to West Boulevard?

12   A.    What street?

13   Q.    Yes.  How did you get to West Boulevard?

14   A.    I took 95th up, and then I bust a right on Detroit.

15       I went over the bridge.  I bust a left by Cudell and

16       the Rapid Station, I bust a left.  And then I went

17       over to the (inaudible).

18   Q.    Okay.  All right.  So you come on Detroit, you turn

19       where the RTA Station is with the Rapid?

20   A.    Yeah.

21   Q.    You turn up onto West Boulevard, and then were you

22       able to, before you got shot, did you cross Madison?

23   A.    Yeah.

24   Q.    Okay.  So you're on West Boulevard now past Madison

25       and you're going towards Lorain?

```
 1    A.   Um-hmm.
 2    Q.   And then when you go to Lorain -- did you make it to
 3         Lorain?
 4    A.   No.
 5    Q.   Which way would you have turned if you got to Lorain?
 6    A.   Right.
 7    Q.   You would have made a right.  Okay.  At that BP?
 8    A.   Um-hmm.
 9    Q.   Okay.  And I think that's right past where the
10         highway is?  Isn't the highway up the overpass?
11    A.   Yeah.
12    Q.   So how far up Madison -- I'm sorry.  How far up West
13         Boulevard did you make it, do you remember?
14    A.   Like the middle.  Like not even that far.
15    Q.   The middle.  Okay.  Did you come up West Boulevard
16         first, a little bit of a curve, and then go straight
17         again?
18    A.   Um-hmm.
19    Q.   Did you make it past the curve?
20    A.   Yeah.
21    Q.   Okay.  And are you really familiar -- do you know
22         West Boulevard pretty well?
23    A.   Yes.
24    Q.   Okay.  If you ride your bike up West Boulevard,
25         before you get to Lorain there's like another street
```

```
 1           with a street light on it, you know, before the
 2           highway.  Do you know what I mean?
 3     A.    Yeah.
 4     Q.    Did you make it to that street light?
 5     A.    No.
 6     Q.    Okay.  I think it's called Western.  Do you know the
 7           name of that street?
 8     A.    Yeah.
 9     Q.    You do?  Okay.  So you didn't make it to that light?
10     A.    No.
11     Q.    And then as you and Nick are biking along, where are
12           you?  At the end of the street, are you on the walk,
13           or how are you riding?
14     A.    Yeah, on the sidewalk.
15     Q.    You're on the sidewalk.  So as you're riding towards
16           Lorain, you looked to your left and your right?
17     A.    Um-hmm.
18     Q.    Okay.  Then you're on your right side or your left
19           side of the street?
20     A.    I was on my right side.
21     Q.    You were on the right side of the street?
22     A.    Yeah.
23     Q.    Okay.  So you're on --
24     A.    No.  I was on my left side.
25     Q.    You were on your left side.  Okay.  So this is --
```

1   A.   I was on this side (indicating).

2   Q.   Oh, you're on this side.  And you're gesturing on

3        your left.  Okay.  So you're on the left side of the

4        street?

5   A.   Yeah.

6   Q.   Okay.  So what happens now?  So you're riding your

7        friend on your handlebars, and what happens now?

8   A.   I got shot.

9   Q.   Okay.  Well, I mean, did you hear anything before you

10       got shot?

11  A.   Yeah, I heard like five shots.

12  Q.   Okay.  Could you tell where they were coming from?

13  A.   A car.

14  Q.   I mean, you think that they came from a car?

15  A.   Yeah.

16  Q.   You do?  Did you see the car that was shooting at

17       you?

18  A.   No.

19  Q.   Okay.  What makes you say it was coming from a car?

20  A.   Because the car like -- when it was gone past, like I

21       heard the shots and I was looking and I seen somebody

22       just out the window.

23  Q.   You did see somebody out the window?

24  A.   Yeah.

25  Q.   Okay.  Do you know which way the car was going?  Was

1       it going toward Madison?  Was it coming at you and

2       going towards Madison or was it going past you

3       towards Lorain?

4    A.   It was coming past Madison, going to Madison.

5    Q.   Going to Madison.  Okay.  So are you telling me that

6       they were driving like that, coming at you?  And your

7       nodding your head, so is that a yes?

8    A.   Yes.

9    Q.   Okay.  All right.  When did you first notice the car?

10       Did you notice it at all before they shot you?

11    A.   No.

12    Q.   Okay.  Did you see anything about the car?  Do you

13       remember anything about the color it was?

14    A.   No.

15    Q.   No?  Do you know if it had two doors or four doors on

16       it?

17    A.   No.

18    Q.   No.  Okay.  Do you know how many people were in the

19       car?

20    A.   No.  I couldn't see that.

21    Q.   What's that?

22    A.   How was I able to see that?

23    Q.   I don't know.  All right.  And so you saw a person

24       hanging out the window or how did you --

25    A.   I didn't see him hanging out.  I seen the gun out the

221

```
 1          window.
 2    Q.    You saw a gun out the window.  Okay.  Did you get a
 3          look at what color it was?
 4    A.    No.
 5    Q.    All right.  Did they say anything when they drove by?
 6    A.    No.
 7    Q.    They just drove by and shot you?
 8    A.    Yeah.  It was a drive-by.
 9    Q.    Well, I know it was a drive-by.  (Inaudible) they
10          didn't say anything like gang stuff or, you know,
11          we're gonna get you, nothing?
12    A.    No.
13    Q.    Okay.  I mean, is there anybody out there that would
14          be mad at you to shoot you, like you know why you got
15          shot?
16    A.    No.
17    Q.    Okay.  So you get shot.  Did you hear the gunshot?
18    A.    Yeah.
19    Q.    All right.  How long after the gunshot is it before
20          you realize that you've been hit?
21    A.    Like we jumped off the bike -- he jumped off the bike
22          and he was like, man, you is shot.  And I didn't
23          believe him at first.
24    Q.    Nick realized you were shot first?  Oh, okay.
25                         THE COURT:  He's nodding at somebody
```

222

1             else.

2     Q.    All right.  So do you feel you're shot at that point?

3     A.    Yeah.

4     Q.    You did.  All right.  So what happened?  You realized

5           you were shot.  What happened?  What do you do now?

6     A.    I fell.

7     Q.    So are you on the ground?  Is that what you're

8           saying?

9     A.    Yeah.

10    Q.    What happens while you were on the ground?  What are

11          you doing?

12    A.    Crying.

13    Q.    Okay.  Well, did it hurt?

14    A.    Yeah, it hurt.

15    Q.    All right.  On a scale, like 1 is the least amount of

16          pain and 10 is like a lot of pain, between 1 and 10,

17          what would you say you were at?

18    A.    A 10.

19    Q.    Okay.  Could you walk at that point in time?

20    A.    No.

21    Q.    Did you try to walk?

22    A.    No.

23    Q.    Okay.  So you're on the ground.  You're in a ton of

24          pain.  What happens?  What do you do?

25    A.    Somebody pulled up and put me in a car.

223

```
 1    Q.   Okay.  Did you call anybody before that happened?

 2    A.   My mom.

 3    Q.   You did.  All right.  Did you get ahold of her?

 4    A.   Yeah.

 5    Q.   Okay.  And what did you tell your mom?

 6    A.   I got shot.

 7    Q.   Okay.  So at that point someone -- did you call

 8         9-1-1?  You don't call the police?  How come you

 9         didn't call 9-1-1 or anything for an ambulance?

10    A.   I don't know.

11    Q.   Okay.

12                        THE COURT:  Let the record reflect

13             there was a 9-1-1.

14    Q.   How long after you call your mom does someone pull up

15         and give you a ride?

16    A.   I don't know.

17    Q.   Do you think it was quick or do you think it was a

18         long period of time before someone pulled up while

19         you were laying on the ground?

20    A.   Say it again.

21    Q.   Yes.  When you were on the ground, you call your mom,

22         right?

23    A.   Yeah.

24    Q.   Okay.  And then someone comes and picks you up?

25    A.   Um-hmm.
```

224

1   Q.   A stranger stops for you, is that right?

2   A.   Yeah.

3   Q.   Now, when that stranger stops for you, does it take a

4        while for someone to stop for you, to stop and help

5        you while you're laying on the ground?

6   A.   No.

7   Q.   Okay.  Do you think it was quick that someone stopped

8        to help you?

9   A.   Quick enough to get me to the hospital, yeah.

10  Q.   Okay.  All right.  And had you ever seen that person

11       before that picked you up?

12  A.   No.

13  Q.   What is Nick doing while you're laying on the ground

14       in pain?

15  A.   Left.

16  Q.   He took off on you?  And you're nodding your head?

17  A.   Yeah.

18  Q.   Okay.  Not a very good friend thing to do.  Where is

19       the bike?  When Nick leaves, what happens to the

20       bike, anything?

21  A.   He took it.

22  Q.   He took your bike?  Okay.  Was Nick there when the

23       person came and gave you a ride?

24  A.   No.

25  Q.   He already left?  Okay.  And what does Nick look

```
 1            like?  Is he white, black, Spanish?
 2   A.   Black.
 3   Q.   He's black.  How tall are you?
 4   A.   I don't know.
 5   Q.   Is he taller or shorter than you, or the same height?
 6   A.   Shorter.
 7   Q.   Shorter than you.  Okay.  What is his hair like?
 8   A.   I don't know.  A haircut.
 9   Q.   Well, yeah.  But like is it like yourself?  You've
10        got a certain haircut, right, with dreadlocks -- or
11        not dreadlocks, but like twisties or whatever.
12   A.   Yeah.
13   Q.   Was his hair like yours?  Was it different, or is
14        it --
15   A.   It's different.
16   Q.   It's different?
17   A.   Yeah.
18   Q.   Okay.  All right.  And he's shorter than you.  Okay.
19        Like if you were to describe your skin tone, what
20        would you describe your skin tone as?
21   A.   I don't know.
22   Q.   Well --
23   A.   Light-skinned.
24   Q.   Okay.  Would you call yourself -- I don't know.
25        Would you call yourself light-skinned, is that what
```

226

```
 1           you're saying?
 2    A.    Yeah.
 3    Q.    What's Nick compared to your skin?  Is he darker or
 4           is he lighter?
 5    A.    Darker.
 6    Q.    He's darker.  Okay.  Is he really dark or is he in
 7           between?  How would you --
 8    A.    Between.
 9    Q.    Okay.  So what hospital do you go to?
10    A.    Huh?
11    Q.    What hospital do you go to?
12    A.    Lakewood.
13    Q.    Okay.  How long are you at Lakewood for?
14    A.    I don't know.  I wasn't trying to count time and
15           that.
16    Q.    Okay.  Did you stay overnight at Lakewood?
17    A.    No.
18    Q.    Okay.  Did you go to another hospital that night?
19    A.    Yeah.  Fairview.
20    Q.    Did you stay overnight at Fairview?
21    A.    No.  I went home on that night like 1, 2 probably, in
22           the morning.
23    Q.    Okay.
24    A.    Probably later than that.
25    Q.    So were you at the hospital at all the day after you
```

1      got shot?

2   A.   No.

3   Q.   No hospital.  Okay.  So did you ever go to Metro

4        Hospital?

5   A.   No.

6   Q.   Okay.  So when you're at the hospital --

7   A.   Pediatrics.

8   Q.   Pediatrics.  Okay.  When did you go to Pediatrics?

9        When was that?

10  A.   Like May.

11  Q.   In May.  Okay.  So did you go a while after you were

12       shot?

13  A.   Yeah.  I had to get my -- no, I think it was April.

14       I had to get some medicine or something.  I don't

15       know.  My mom made the appointment.

16  Q.   Mom made the appointment and you went to Metro.  Do

17       you know how long after it was that you went to

18       Metro?

19  A.   No.

20  Q.   Do you know if it was the same week?

21  A.   No.  I wasn't paying attention like that.

22  Q.   Okay.  So when you're in Lakewood Hospital, remember

23       I asked you if your ankle hurt, like 1 is the least,

24       no pain, and 10 is a ton of pain.  When you were

25       laying in the hospital, what did it feel like?

1    A.   Huh?

2    Q.   When you're in the hospital, when you're at

3         Lakewood --

4    A.   Yeah.

5    Q.   -- and I'm asking you a question asking if 1 is no

6         pain and 10 is a lot of pain, okay, where is your

7         pain level?

8    A.   10.

9    Q.   Still 10.  Can you walk?

10   A.   No.

11   Q.   Okay.  Were you able to walk at any point after you

12        got shot in the ankle?

13   A.   No.

14   Q.   Okay.

15   A.   Not that much.  Not like for two months.

16   Q.   Really?  You couldn't walk for two months?

17   A.   Yeah.  I was in a boot.

18   Q.   Oh, okay.  All right.  So when did you get the boot

19        taken off, do you remember the day that was?

20   A.   They take it off when I was in County.

21   Q.   Oh, they did.  Okay.  Do you recognize anyone in

22        Court?

23   A.   No.

24   Q.   Look around first.  Do you recognize anyone that's in

25        the Court?

229

1   A.   No.

2   Q.   Okay.  Do you know a person named Dalonte White?

3   A.   No.

4   Q.   Do you know a person named Scoobie?

5   A.   No.

6   Q.   Jo'Von Evans?

7   A.   No.

8   Q.   Do you know Rayvion Edwards?

9   A.   No.

10  Q.   Romell Thomas?

11  A.   Who?

12  Q.   Romell Thomas.

13  A.   No.

14  Q.   Okay.  Hey, when you got -- what were you wearing

15       when you went to the hospital, do you remember?

16  A.   What was I wearing?

17  Q.   Yeah.  What kind of clothes did you have on?

18  A.   I had on some -- I had on my white shoes, some pants,

19       and a jacket.

20  Q.   Okay.  And do you remember what your pants looked

21       like, what color?

22  A.   They was blue.

23  Q.   Blue pants.  Are you talking jeans or what are you

24       talking about?

25  A.   Yeah.

1    Q.   Okay.  And you believe you had a jacket on?

2    A.   A black hoodie.

3    Q.   A black hoodie.  Okay.  Do you remember where you got

4        it, where it's from, at what store?

5    A.   No.

6    Q.   Okay.  Did it have like any -- did it say anything on

7        it at all, on the hoodie?

8    A.   No.

9    Q.   It didn't say anything on it?

10   A.   No.

11   Q.   No brand?  Like sometimes it'll have Polo or Nike or

12       North Face or whatever.  Did it have anything on it?

13   A.   No.

14   Q.   No markings at all?

15   A.   No.

16   Q.   Okay.  Did it have any pockets on it?

17   A.   No.

18   Q.   No pockets at all on the hoodie?

19   A.   It's like a little sport hoodie.

20   Q.   What does a sport hoodie look like?

21   A.   It's got a green hood and it's black.

22   Q.   Green hood, black.  So did it have side pockets?

23   A.   No.

24   Q.   Did it have a front pocket?

25   A.   Yeah, like to put both of your hands in.

```
 1    Q.   So it does have a pocket?

 2    A.   Yeah, like in the front.

 3    Q.   Yeah, right.  So it has a big pocket in the front?

 4    A.   Yeah.  You put both of your hands in.

 5    Q.   Okay.  And there was no marking at all, there's no

 6         brand on it?

 7    A.   No.

 8    Q.   All right.  Have you ever -- this is going to sound

 9         weird.  Have you ever been bitten by a dog before?

10    A.   No.

11    Q.   Did you ever speak with a detective?

12    A.   Yes.

13    Q.   Do any police officers look familiar in here?

14    A.   Yeah.

15    Q.   This detective?

16    A.   Yeah.

17    Q.   Okay.  So when I asked you if anybody looked familiar

18         in here, he looks familiar though, right?

19    A.   Oh yeah.

20    Q.   Okay.  Here.  Let me just make sure of this.  So he

21         looks familiar.  I guess I look familiar from ten

22         minutes ago, right?

23    A.   Yeah.

24    Q.   Okay.  Does anyone else in this courtroom look

25         familiar to you?  And you look, and if you see
```

232

1          anybody else that's familiar, I need you to tell me.

2    A.   The sheriff.

3    Q.   Okay.  The sheriff.  Okay.  Anyone else at all in

4         here familiar?

5    A.   No.

6    Q.   Okay.  When you met with the detectives, did they

7         show you any pictures?

8    A.   Yeah.

9    Q.   Okay.  Did any of those people -- the pictures that

10        were shown to you, did any of those people look

11        familiar to you?

12   A.   Yeah.

13   Q.   Okay.  How many of them looked familiar?

14   A.   One.

15   Q.   Okay.  All right.  Mr. Bunch, I'm gonna show you two

16        pictures, okay?  I'm gonna show you State's 200 and

17        201.

18              MR. SCHROTH:  May I approach the

19         witness?

20              THE COURT:  Yes.

21   Q.   Mr. Bunch, I'm gonna show you, this has been marked

22        as State's 200.  Okay.  Can you see that?

23   A.   Um-hmm.

24   Q.   Does that guy look familiar at all?

25   A.   Yeah.  The detective showed me.

```
1   Q.   Okay.  So you've seen his picture before, right?

2   A.   Yeah.

3   Q.   But have you seen the person in that picture at all

4        before beside the time the detective showed you the

5        photo?

6   A.   No.

7   Q.   Okay.  I'm showing you State's 201.  All right.  Have

8        you seen that picture before?

9   A.   Yeah.

10  Q.   Okay.  With the detective?

11  A.   Yeah.

12  Q.   Okay.  Does that guy look familiar?

13  A.   Yeah.

14  Q.   He does.  Okay.  How do you know that person?

15  A.   I went to school with him.

16  Q.   What school?

17  A.   Lincoln West.

18  Q.   Lincoln West.  Okay.  Was he the same grade as you, a

19       different grade?

20  A.   No.

21  Q.   No, what?

22  A.   He wasn't in the same grade with me.

23  Q.   Okay.  Was he older or younger than you?

24  A.   I don't know.

25  Q.   Okay.  You don't know if he was (inaudible)?
```

1    A.   Huh?

2    Q.   Do you know if he was -- did he finish school before

3         you did?

4    A.   No.  I went to jail.

5    Q.   Okay.  All right.  So you just see him at school.

6         You don't know what grade he's in?

7    A.   Yeah.  I never talked to him.  I just seen him in

8         school.

9    Q.   Oh, you never even talked to him before?

10   A.   No.

11   Q.   Oh.  Do you know what his name is?

12   A.   Yeah.

13   Q.   What?

14   A.   Poohead.

15   Q.   Poohead.  Now, if you don't know him, how do you know

16        his name is Poohead?

17   A.   Around the school.

18   Q.   Okay.  All right.  Do you know his real name?

19   A.   No.

20   Q.   His government name?

21   A.   No.

22   Q.   Okay.  All right.

23                  THE COURT:  When you say Poohead, is

24        it P-o-o?

25                  THE WITNESS:  I don't know.  They just

1          call him Poohead.

2   Q.   Okay.  Do you know why they call him Poohead?

3   A.   No.

4   Q.   Okay.  Have you ever had a conversation with Poohead?

5   A.   No.

6   Q.   Were you in any classes -- did you guys share any

7        classes at all, you and Poohead?

8   A.   You just asked me that.

9   Q.   And what was your answer?

10  A.   No.

11  Q.   Okay.  Have you ever heard of something called HMF, a

12       group of people who call themselves HMF?

13  A.   No.

14  Q.   Hungry Money Family, have you ever heard that before?

15  A.   No.

16  Q.   Okay.  Hey, Mr. Bunch, when you met with the police,

17       did they ever have you sign anything at all?

18  A.   Yeah.

19  Q.   Okay.  Do you know what was that for, do you

20       remember?

21  A.   To get my medical records.

22  Q.   Okay.  Did you sign it?  Were you willing to do that?

23  A.   Yeah.

24  Q.   Okay.  Did you have any hesitation when the police

25       asked can you sign for us to get your medical

236

```
 1          records, did you have any hesitation when you signed
 2          it?
 3   A.     Yeah.
 4   Q.     You did?
 5   A.     At first, yeah.
 6   Q.     Why?
 7   A.     Because I thought the (inaudible) did sign some other
 8          stuff for me.
 9   Q.     Okay.  So did you eventually sign it for them?
10   A.     Yeah, I signed it for them.
11   Q.     All right.  I'm gonna show you State's 68.  Mr.
12          Bunch, I'm gonna show you State's 68, okay?  I'm
13          gonna show you page 3 of State's 68.  How are you at
14          reading?  Are you okay reading?
15   A.     Yeah.  No.
16   Q.     Well, let me know if you can just say -- I just want
17          to know, can you see it says, Patient Information.
18          Who's the name of that?
19   A.     Me.
20   Q.     Okay.  What name is that?
21   A.     Bunch.
22   Q.     Okay.  Now, you don't need to read this into the -- I
23          don't want you to say it out loud, but is there an
24          address there?  Don't read the address, but do you
25          see where there's an address?
```

```
 1    A.   Yes.

 2    Q.   Does that -- don't say what the address is, but does

 3         that address look familiar?

 4    A.   Yes.

 5    Q.   Okay.  Who's address is that?

 6    A.   Mine.

 7    Q.   Okay.  And is there a date of birth?

 8    A.   Yes.

 9    Q.   Okay.  Who's date of birth is that?

10    A.   Mine.

11    Q.   Okay.  Mr. Bunch, I want to talk about your pain when

12         you got shot.  How long, you know, did it take for

13         the pain level to go down from the highest amount

14         possible, a 10, how long did it take for it to

15         subside at all?

16    A.   What you mean?

17    Q.   It sounds like you were in a ton of pain from the

18         moment you got shot, is that right?

19    A.   Um-hmm, yeah.

20    Q.   Okay.  How long did it take for you not to be in

21         excruciating and a lot of pain?

22    A.   I don't know.  Like two months, three months, two and

23         a half.

24    Q.   So it took a while?

25    A.   Yes.
```

238

```
 1    Q.   Would you have been able to, from the time you got

 2         shot, so back when you're laying on the ground now,

 3         okay?  Do you think you would have been able to get

 4         up and walk up to Lorain Avenue --

 5    A.   No.

 6    Q.   No.  Okay.

 7                   MR. SCHROTH:  Could I have a moment,

 8         Judge?

 9                   THE COURT:  Yes.

10    Q.   Did you ever hear anything, Mr. Bunch, about a home

11         break-in that happened on the same day you were shot?

12    A.   No.

13    Q.   Do you know a person named -- do you know or have you

14         ever heard of a person named Cheyenna Cole?

15    A.   No.

16    Q.   What about a Charlotte Cole?

17    A.   No.

18    Q.   What about a Cherish Jones, have you ever heard of

19         her?

20    A.   No.

21    Q.   Have you ever hear of a guy named Christopher Hughes

22         or Christian Hughes?

23    A.   No.

24    Q.   Never heard of him?

25    A.   No.
```

239

```
 1    Q.   A white kid?

 2    A.   Huh?

 3    Q.   He's white.  Did you ever hear of him?

 4    A.   No.

 5    Q.   Have you ever heard of a girl named Shetrell,

 6         S-h-e-t-r-e-l-l, Harris?

 7    A.   Who?

 8    Q.   Shetrell Harris.

 9    A.   No.

10    Q.   Do you know anyone by the nickname of Scoobie?

11    A.   You asked me that.

12    Q.   I did?  Okay.  What did you say?

13    A.   No.

14    Q.   Okay.  Did you ever hear of a girl named Daisy,

15         Daisyonna?

16    A.   No.

17    Q.   What about have you ever heard of a person named

18         Colleen Allums, A-l-l-u-m-s?  Does that sound

19         familiar?

20    A.   No.

21    Q.   She lives over on West 54th.

22    A.   No.

23    Q.   Do you know anybody that lives around 54th?

24    A.   No.

25    Q.   Okay.  Do you know a girl named Savannah LaForce?
```

1   A.   No.

2   Q.   What about a kid named Zackary Hales?

3   A.   Uh-uh.

4   Q.   Okay.  Thanks.  Nothing further.  This gentleman here

5        may have a couple questions for you, okay?

6                    THE COURT:  All right.  Attorney

7           Hoffman, any questions for this witness?

8                    MR. HOFFMAN:  Thank you, your Honor.

9        **CROSS-EXAMINATION OF EDWARD BUNCH**

10  **BY MR. HOFFMAN:**

11  Q.   Mr. Bunch, I'm Brian Hoffman.  I represent Dalonte

12       White, okay?

13  A.   Um-hmm.

14  Q.   I'm going to ask you a few follow-up questions, okay?

15  A.   Uh-huh.

16  Q.   Sir, the day you got shot, you met with the police

17       that day, right?

18  A.   Uh-huh.

19  Q.   They came out to the hospital?

20                   THE COURT:  Let the record reflect he

21          is nodding his head yes.

22  Q.   Is that a yes?

23  A.   Yes.

24  Q.   Okay.  And you didn't want to talk to them that day?

25  A.   No.

241

```
1    Q.   So you didn't give them any information?

2    A.   No.

3    Q.   You didn't tell them about Nick or whoever this other

4         guy was?

5    A.   No.

6    Q.   Okay.  So this is the first day you've ever given a

7         name to this person Nick, right?

8    A.   Yeah.

9    Q.   Do you have Nick's phone number?

10   A.   Huh?

11   Q.   Do you have Nick's phone number?

12   A.   On my phone.

13   Q.   On your phone.  But you don't know it by heart?

14   A.   No.

15   Q.   All right.  So you were going down West Boulevard

16        toward Lorain?

17   A.   Yes.

18   Q.   You're on your bike, Nick's on top of your

19        handlebars?

20   A.   Yeah.

21   Q.   Okay.  And then you saw a car drive by and then you

22        hear shots?

23   A.   Uh-huh.

24   Q.   Was it just the driver shooting?

25   A.   No.
```

```
 1    Q.    Who was shooting?  The passenger?

 2    A.    Yes.

 3    Q.    Okay.  So was the passenger shooting out of the

 4          driver's side or the passenger's side?

 5    A.    The passenger's side.

 6    Q.    And all you saw was the gun?

 7    A.    Yeah.

 8    Q.    And they didn't yell anything or say anything.  They

 9          just started shooting?

10    A.    Yeah.

11    Q.    I believe originally you said that Nick ran off when

12          you talked to Detective Lam.  Do you remember that?

13    A.    Yeah.

14    Q.    So that he left the bike behind and you had the bike,

15          right?

16    A.    Huh?

17    Q.    You had the bike, right?

18    A.    No.

19    Q.    Didn't you tell Detective Lam that, that you drove

20          the bike and Nick ran off?  That's what you told

21          Detective Lam before, right?

22    A.    Who, him?  The detective right there (indicating)?

23    Q.    Yeah.

24    A.    Did I tell him that?

25    Q.    Yes.
```

1   A.   I told him what?

2   Q.   Didn't you tell him that Nick ran away, he didn't get

3        on a bike and go away?

4   A.   I don't remember.  I don't know.

5   Q.   All right.  So you don't know if Nick just ran away

6        or if he took the bike and got away?

7   A.   He took the bike.  He ran away.

8   Q.   Because before you said that you each had your own

9        bike that day, right?

10  A.   Yeah.

11  Q.   So why would he take both bikes to your house?

12  A.   I don't know.

13  Q.   Okay.  Did Nick get shot?

14  A.   No.

15  Q.   All right.  So you get shot, you hit the ground, you

16       go a little ways.  You said you didn't realize you

17       got shot right away, right?

18  A.   Yeah.

19  Q.   So you went a little ways on the bike and then you

20       felt it?

21  A.   Yeah.

22  Q.   And that's when you fell?

23  A.   Yeah.

24  Q.   All right.  And then Nick takes off.  Did Nick have a

25       cell phone?

244

1   A.   Did he have a cell phone?

2   Q.   Yeah.

3   A.   I don't know what he have.

4   Q.   Okay.  And you had your cell phone, right?

5   A.   Yeah.

6   Q.   Okay.  So you're there, you got shot, so you decide

7        to call your mom.

8   A.   Um-hmm.

9   Q.   So you picked up your cell phone and called your mom.

10       Did you know her number or did you have it programmed

11       in your phone?

12  A.   What you mean?

13  Q.   Was your mom's number already in your phone and you

14       used that or --

15  A.   I knew my mom's phone.

16  Q.   What's that?

17  A.   Knew it already.

18  Q.   Okay.  So did you dial it by hand, all the numbers?

19  A.   Yeah.

20  Q.   Okay.  So you called your mom from your cell phone?

21  A.   Yeah.

22  Q.   Okay.  And told her you got shot?

23  A.   Yeah.

24  Q.   And you didn't call the police?

25  A.   No.

245

1   Q.   And you didn't call the ambulance, correct?

2   A.   Yeah.

3   Q.   You said a guy picked you up then?

4   A.   Yeah.

5   Q.   Like right off of West Boulevard.  That's a pretty

6       busy area, right?

7   A.   Yeah.

8   Q.   A lot of cars, a lot of people out?

9   A.   I don't remember.

10   Q.   But generally, it's a pretty busy area?

11   A.   I guess.

12   Q.   So that's how this guy sees you?

13   A.   Yeah.

14   Q.   So he's driving by and he sees you laying there, asks

15       you what's wrong?

16   A.   Yeah.  He already knew.  I guess he already knew.  I

17       don't know.

18   Q.   Okay.  So he says he's gonna give you a ride?

19   A.   Yeah.

20   Q.   Were you bleeding?

21   A.   Yes.

22   Q.   Okay.  Did you put anything on it or anything, or

23       what did you do to stop the bleeding?

24   A.   There was a bag right there.  He put a bag on my leg.

25   Q.   What did the guy look like?

```
 1    A.   Huh?

 2    Q.   What did he look like?

 3    A.   A black guy.

 4    Q.   What kind of car was he driving?

 5    A.   I don't know.

 6    Q.   So you called your mom and you said you got shot.

 7         Did you then call her again later to tell her you

 8         were going to Lakewood?

 9    A.   Yeah.

10    Q.   All right.  So you called her twice then?

11    A.   No, I called her once.

12    Q.   Okay.  When you were on your way?

13    A.   Yeah.

14    Q.   Because when you were on the ground you called her.

15         That's what you said, right?

16    A.   Yeah.

17    Q.   Okay.  Were you telling her like, hey, come pick me

18         up?

19    A.   No.  I said, come to Lakewood Hospital, because the

20         guy already pulled up.

21    Q.   Okay.  So the guy pulled up already pretty quickly

22         after you got shot?

23    A.   Yeah.

24    Q.   What type of gun was it, do you know?

25    A.   No.
```

1    Q.   All right.  You didn't see color?

2    A.   No.

3    Q.   Do you know if it was a semi-automatic or a revolver?

4    A.   No.

5    Q.   Do you know the difference between a semi-automatic

6         and a revolver?

7    A.   No.

8    Q.   Okay.  A revolver is like the little spinning

9         cowboy-type gun.

10   A.   Um-hmm.

11   Q.   That's right?

12   A.   Um-hmm.

13   Q.   So you don't know what kind of gun it was?

14   A.   No.

15   Q.   So you go to the hospital and they help you out?

16   A.   Uh-huh.

17   Q.   Where did the bullet hit, like your ankle?

18   A.   Yes.

19   Q.   Right ankle?

20   A.   Yeah.

21   Q.   Did it leave scarring?

22   A.   Yeah.

23   Q.   All right.  So it went in -- where did it go out, the

24        bottom of your foot?

25   A.   It didn't go out.

```
 1    Q.   It's still in there?

 2    A.   Yeah.

 3    Q.   So is it still lodged in there?  The hospital

 4         couldn't remove it at all?

 5    A.   No.

 6    Q.   Did it hit a bone in your ankle?

 7    A.   It hit the knee -- I mean, it hit the ankle.

 8    Q.   But right on that little bone?

 9    A.   Yeah.

10    Q.   You know Deondre Sanders, right?

11    A.   Who?

12    Q.   Deondre Sanders?

13                    MR. SCHROTH:  Objection.

14                    THE WITNESS:  No.

15                    THE COURT:  What's your basis?

16                    MR. SCHROTH:  It's part of what he was

17            arrested with.

18                    MR. HOFFMAN:  I'm just asking if he

19            knows.  I don't want to ask anything about the

20            arrest.

21                    THE COURT:  You know the drill.  I

22            will overrule it.  Go ahead.  You can ask it.

23    Q.   (BY MR. HOFFMAN)  You know Deondre Sanders?

24    A.   No.

25    Q.   Rayshawn Hutch?
```

1   A.   No.

2   Q.   You don't know him at all?

3   A.   No.

4   Q.   In your medical records it indicates that you were

5       dropped off at the Emergency Department by a friend.

6       Is that not true?

7   A.   No.  I guess the dude say he was my friend because he

8       -- I don't know.  He picked me up out of nowhere and

9       took me to the hospital.

10   Q.   So he said he was your friend?

11   A.   Yeah.

12   Q.   But you didn't know him?

13   A.   No.

14   Q.   In any case, you got there about 6:38 p.m.  Does that

15       sound about right?

16   A.   Huh?

17   Q.   About 6:38 p.m.?

18   A.   Where?

19   Q.   At the hospital.  Does that sound right?

20   A.   I don't know what time it was.

21   Q.   All right.  But that sounds about right?

22   A.   I don't know.  I never seen the time.  I was in the

23       hospital.

24   Q.   All right.  You said Nick got to your brother's house

25       on a bike, right?

250

```
 1    A.    Huh?

 2    Q.    Nick got to your brother's house on a bike?

 3    A.    Yeah.

 4    Q.    What color was his bike?

 5    A.    I don't know.

 6    Q.    You don't know what color his bike is?

 7    A.    No.

 8    Q.    Okay.

 9    A.    I don't pay attention to all that.

10    Q.    Okay.  But you also rode a bike, a separate bike to

11          your house, right -- to your brother's house?

12    A.    Yeah.

13    Q.    What color is that bike?

14    A.    I don't know.

15    Q.    All right.  So you don't remember the bikes that you

16          were riding?

17    A.    No.  I ride heli bikes.

18    Q.    Okay.  That means a lot of bikes?

19    A.    Yeah.  I ride a lot of bikes.

20    Q.    Did you see anyone else out on the street where you

21          got shot?

22    A.    No.

23    Q.    Are you sure you don't know Deondre Sanders?

24    A.    Huh?

25    Q.    Are you sure you don't know Deondre Sanders?
```

251

```
 1   A.   No.

 2   Q.   Or Rayshawn Hutch?

 3   A.   No.

 4   Q.   You said you had on a hoodie that day?

 5   A.   Yeah.

 6   Q.   Was it a dark-colored hoodie?

 7   A.   Yeah.

 8   Q.   And most of them have some sort of a brand, though,

 9        right?

10   A.   Yeah.

11   Q.   Like Abercrombie or Hollister, something like that?

12   A.   Yeah.

13   Q.   Did it have one and you just don't remember what kind

14        it was?

15   A.   I know what I had on.

16   Q.   What kind was it then?

17   A.   It was a black hoodie.  It had pockets in the front

18        and it had a green hood.  There was no name brand.

19        It was like a little sport that you get from like --

20        a sport like.

21   Q.   So you don't know the brand it was?

22   A.   No.  It ain't have no brand.

23   Q.   Did you ever get the bike back?

24   A.   Huh?

25   Q.   Did you ever get the bike back?
```

252

```
 1    A.    No.  I wasn't thinking about the bike.
 2    Q.    So you never called Nick and said, hey, can you get
 3          my bike back?
 4    A.    No.
 5    Q.    Did Nick ever call you and say, hey, what do you want
 6          me to do with the bike?
 7    A.    No.
 8    Q.    You never talked to Nick then since you got shot?
 9    A.    He came to my house.
10    Q.    He came to your house.  When was that?
11    A.    A couple days after I got shot.  I don't know when.
12          I don't keep the days and times and stuff like that.
13    Q.    It was awhile ago, right?
14    A.    No, I still don't do it, keep time and dates.
15    Q.    So you don't really keep track of much of anything,
16          right?
17    A.    No.
18    Q.    Okay.
19                    MR. HOFFMAN:  Nothing further.  Thank
20          you, your Honor.
21                    THE COURT:  Any redirect?
22                    MR. SCHROTH:  Just a couple.
23           REDIRECT EXAMINATION OF EDWARD BUNCH
24    BY MR. SCHROTH:
25    Q.    Mr. Bunch, would you consider yourself a person who
```

1     has a lot of friends?

2  A.  No.

3  Q.  Okay.  Of the friends that you have, do you know all

4     of your friends, like their government names, their

5     real first and last names?

6  A.  No, not all of them.

7  Q.  All right.  Do you have some friends whose government

8     or their real name you don't know?

9  A.  What?

10 Q.  Do you have some friends whose real name you don't

11    know what it is?

12 A.  Do I know what?

13 Q.  Do you have friends and you don't know what their

14    real name is?

15 A.  Yeah.

16 Q.  All right.  Is that uncommon for people that you hang

17    out with or know, to not be aware of what a person's

18    real name is?

19 A.  What you mean?

20 Q.  Is it unusual for, like where you went to school and

21    where you live, does everybody in the neighborhood

22    know everybody's real first and last name?

23 A.  No.

24 Q.  All right.

25 A.  I don't know.  I don't get in people's business.  I

254

1       don't be into that.

2   Q.  Okay.  All right.  But you don't know everybody's

3       real first or last name that you hang out with, is

4       that right?

5   A.  Yeah.

6   Q.  That's correct.  Okay.

7   A.  You say what?

8                   THE COURT:  I get it.  He knows

9           nicknames.  He doesn't know real names.  I get

10          it.

11                  MR. SCHROTH:  Okay.

12  Q.  (BY MR. SCHROTH)  But is that right, sometimes you

13      just know people's nicknames you hang out with, not

14      their actual real first and last names?

15  A.  Yeah.

16  Q.  All right.  Now, you mentioned you were wearing a

17      hoodie, you know, the black with the green, but let's

18      say if someone was to walk behind you, would they

19      actually be able to see the hood hanging down on the

20      sweatshirt?

21  A.  Yeah.

22  Q.  Okay.  Was it a big hood, a small hood?

23  A.  What you mean?

24  Q.  How far down did the hood go?

25  A.  As far as a hoodie go.

255

```
1    Q.   So it was a typical hoodie that you normally see out
2         and about, right?
3    A.   Yeah.
4    Q.   All right.  You had your cell phone on you when you
5         got shot, right?
6    A.   Got what?
7    Q.   You had your cell phone on you when you got shot?
8    A.   Yeah.
9    Q.   Okay.  Did you have any other cell phones on you
10        besides yours?
11   A.   No.
12   Q.   Okay.  And the day you went to County, did you have
13        the same cell phone -- did you have a cell phone on
14        you?
15   A.   No.
16   Q.   Okay.
17   A.   My phone got turned off.
18   Q.   Oh, it did?
19   A.   Yeah.
20   Q.   When was that?
21   A.   Like two days after I got shot.
22   Q.   Okay.  Did you keep the phone after that, or what did
23        you do with it?
24   A.   It's at home.
25   Q.   Oh, so you still have it.  It's at home?
```

```
 1    A.    Yeah.

 2    Q.    And then it sounds like on cross-examination by Mr.

 3          Hoffman that you -- were you on the phone with your

 4          mom when this random guy stopped to help you?

 5    A.    Yeah.

 6    Q.    Okay.  Did the police come to the hospital to talk to

 7          you at all that day?

 8    A.    Yeah.

 9    Q.    Okay.  And did you tell them everything that

10          happened?

11    A.    No.

12    Q.    Okay.  How come?

13    A.    Because my mom told me not to say anything.

14    Q.    Oh, she did.  Okay.  Why?

15    A.    I don't know.

16    Q.    Did you know the person at all that did the drive-by?

17    A.    No.

18    Q.    Okay.

19    A.    I didn't see him.

20    Q.    Okay.  So I still don't understand why not tell them

21          that, everything that happened?

22    A.    I don't know.

23    Q.    Okay.  All right.  And were you afraid of snitching

24          at all?

25    A.    Yeah.
```

1    Q.   You were?

2    A.   Yeah.

3    Q.   Okay.  Nothing further.  Thanks, Ed.

4                   THE COURT:  Any recross based on the

5         Prosecutor's questions?

6              **RECROSS-EXAMINATION OF EDWARD BUNCH**

7    **BY MR. HOFFMAN:**

8    Q.   You were talking about your cell phone that got

9         turned off.  Which company were you with before?

10   A.   Metro PCS.

11   Q.   Do you remember the phone number?

12   A.   No.

13   Q.   The Prosecutor just asked you about why you didn't

14        want to tell the police anything.  You didn't want

15        them to find out how you got shot, right?

16   A.   Huh?

17   Q.   You didn't want the police to find out how you got

18        shot, right?

19   A.   I told the hospital.

20   Q.   But you didn't tell the police that because you

21        didn't want the police to snoop around, right?

22   A.   To what?

23   Q.   You didn't want the police to find out how you got

24        shot.

25   A.   I didn't want the police to find out how I got shot?

1   Q.   Yes.

2   A.   What you mean?

3   Q.   The reason why you didn't want to talk to the police

4        is you didn't want them to find out how you got shot,

5        right?

6   A.   No.  They knew how I got shot if the hospital told

7        them.

8   Q.   But you said like you didn't --

9   A.   I just didn't want to say nothing because my momma

10       told me not to say nothing.

11  Q.   Because you didn't want them to find out how you got

12       shot, right?

13  A.   I guess.  I don't know.

14  Q.   The guy you were talking about earlier, his name is

15       Dregs.  You were talking about you know nicknames,

16       street names?

17  A.   Say what?

18  Q.   You're more familiar with street names or something

19       of your friends?

20  A.   Yeah.

21  Q.   Dreg Ondre, something like that?

22  A.   What you mean?

23  Q.   Does that sound familiar?

24  A.   No.

25  Q.   How about a guy, real light-skinned, kind of looks

1      Hispanic.  Has like pin-stripe like little facial

2      hair around his mouth and a chin strap.  Do you know

3      what I'm talking about?

4   A.   No.

5   Q.   And Rayshawn, you don't know Rayshawn, a real tall

6      black guy?

7   A.   No.

8   Q.   Real skinny?

9   A.   No.

10              MR. HOFFMAN:  Nothing further.  Thank

11      you.

12              MR. SCHROTH:  I just have one

13      question, Judge, if that's okay.

14              THE COURT:  Sure.

15   **FURTHER REDIRECT EXAMINATION OF EDWARD BUNCH**

16   **BY MR. SCHROTH:**

17   Q.   Mr. Bunch, when Mr. Hoffman was asking questions, you

18      said I told the hospital in terms of what happened.

19      Do you remember saying that?

20   A.   Yeah.

21   Q.   Did you tell the hospital the truth of what happened

22      to you when you got shot?

23              MR. HOFFMAN:  Objection.

24              THE WITNESS:  Yeah.

25              THE COURT:  What's your basis?

260

1           MR. HOFFMAN:  It's outside the scope.

2           THE COURT:  I'll allow it.  You can

3    answer it.

4           THE WITNESS:  Yeah.

5           MR. SCHROTH:  Nothing further.

6           THE COURT:  All right.

7           MR. HOFFMAN:  Can I ask just one

8    follow-up?

9           THE COURT:  Go ahead, if you have

10   follow-up.

11   **FURTHER RECROSS-EXAMINATION OF EDWARD BUNCH**

12   BY MR. HOFFMAN:

13   Q.   The only thing you said to the hospital was, I was

14        shot in a drive-by, right?

15   A.   Huh?

16   Q.   The only thing you told the hospital was, I was shot

17        in a drive-by, and that was it, right?

18   A.   No.  I told them where I got shot at --

19   Q.   Okay.  So I got shot in a drive-by on West Boulevard.

20   A.   Yeah.

21   Q.   That's it, right?

22   A.   That's all they asked me.

23   Q.   You didn't tell them about Nick?

24   A.   No.

25   Q.   You didn't tell them about anything else?

1  A.  No.

2  Q.  And you wouldn't tell the police any of it?

3  A.  No.

4  Q.  Okay.  Nothing further.

5                  THE COURT:  All right.  Sheriff, you

6          can take him back there and then we'll call to

7          have him transported.

8                  (Discussion had off the record.)

9                  THE COURT:  All right.  Prosecutor,

10         are you going to call -- I saw what looked like

11         a police officer walk through, but I don't know

12         if it was for you or not.

13                 Do you want to step out and check?

14                 MR. SCHROTH:  I don't think he's here

15         for me, Judge.  I only had, because of the

16         window, Mr. Bunch and Lam here because they're

17         here from 10 till 12.

18                 THE COURT:  Unfortunately, had we

19         started relatively on time, I could have made

20         the commitment I have.

21                 All right.  So what are we going to

22         do?  Are we going to -- are you going to call

23         anyone else today or are we going to resume on

24         Friday?

25                 MR. SCHROTH:  I sort of was

1  anticipating we'd be finishing at noon, so I

2  have a meeting at 1.  That's all.

3     THE COURT:  I have a meeting at 12

4  down at Domestic Relations.  It's because we

5  were waiting here for a half-hour to bring a

6  witness, to bring him over.

7     MR. SCHROTH:  But we don't have a

8  whole lot on Friday.  I mean, there's officers

9  and stuff.  They should be -- the testimony

10  should be a little more fluid, a little simpler.

11  They'll understand the questions.

12     MR. HOFFMAN:  It's a lot.

13     MR. SCHROTH:  It's a lot, but Lam is a

14  smart guy.  He'll understand the questions.

15     THE COURT:  All right.  We're gonna

16  start Friday.  Be here at 10.  We'll start at

17  10:30.  You're gonna have to talk to O'Malley's

18  room, because I need to get this finished.

19     MR. SCHROTH:  I hear you.  I just

20  don't want to make any Judges mad ever, Judge.

21     THE COURT:  Yeah, I know.

22     MR. SCHROTH:  I'm sort of the low man

23  and all that.

24     MR. LAWSON:  Judge, I have a hearing

25  in Portage County set for 10 on Friday.  I'm

1          supposed to be back here in the afternoon.  I'll

2          get here as quickly as I can.

3                    THE COURT:  All right.  Anything you

4          have an issue with?

5                    MR. HOFFMAN:  No, not for Friday,

6          Judge.

7                    THE COURT:  Now I have three

8          sheriff's.  All right.  See you on Friday.

9                    (End of audio-recording.)

10                         -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

264

C E R T I F I C A T E

I, James M. Mizanin, a stenographic
reporter, do hereby certify that I wrote the
foregoing audio-recorded proceedings in their
entirety in Stenotype, which was subsequently
transcribed into typewriting by means of
computer-aided transcription under my direction; and
that the foregoing Transcript of Proceedings is a
true and correct transcript.

Signed this 13th day of October, 2015.

_____
James M. Mizanin
5755 Granger Road
335 Independence Tower
Independence, OH  44131

```
THE STATE OF OHIO,          )
                            ) SS:  DENISE N. RINI, J.
COUNTY OF CUYAHOGA.         )
```

<u>IN THE COURT OF COMMON PLEAS</u>
<u>JUVENILE DIVISION</u>

```
In the matter of:          )
                           )
DALONTE WHITE              ) Case No. DL 15105751
                           )
                           )
                           ) VOLUME 3 OF 3
```

- - -

      Continue hearing held before Judge Denise N.

Rini at the Cuyahoga County Juvenile Court, 9300

Quincy Avenue, Cleveland, Ohio, on Friday, the

24th day of July, 2015 commencing at 11:44 a.m.

- - -

1     <u>APPEARANCES:</u>

2     Norman Schroth, Assistant Prosecuting Attorney,

3              on behalf of the State of Ohio.

4     Brian Hoffman, Assistant Public Defender,

5              on behalf of the child, Dalonte White.

6     John Lawson, Esq.,

7              Guardian ad Litem for the child, Dalonte White.

8

9                          - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2    **WITNESSES**

3    **STATE'S:**                                            **Page**

4    **DETECTIVE DAVID LAM**

5    Direct Examination by Mr. Schroth.................   270

6    Cross-examination by Mr. Hoffman.................   344

7    Redirect Examination by Mr. Schroth..............   398

8    Recross-examination by Mr. Hoffman...............   404

9    Further Redirect Examination by Mr. Schroth.......   406

10

11                              - - -

12   **OBJECTIONS**

13                                        **Page**

14   Mr. Hoffman............ 283, 308, 324, 326, 393, 403, 410,

15                                 412, 430, 431

16   Mr. Schroth........... 347, 348, 352, 353, 353, 358, 370,

17                         370, 372, 380, 381, 385, 391, 391,

18                              396, 397, 398, 403

19

20                              - - -

21

22   **EXHIBITS:**

23   **STATE'S:**                                            **Page**

24   34 - Picture..................................   277

25   64 - Picture..................................   276

1    69A - Picture...................................    330

2    69B - Picture...................................    330

3    70 - Picture....................................    303

4    71 - Picture....................................    303

5    72 - Picture....................................    303

6    73 - Google Maps................................    341

7    74 - Google Maps................................    338

8    75 - Google Maps................................    339

9    78 - Photo array identifier.....................    292

10   84 - Photo array................................    319

11   86 - Photo array................................    319

12   87 - Photo array identifier.....................    321

13   89 - Photo array................................    321

14   93 - Photo array identifier.....................    293

15   108 - Photo array identifier....................    296

16   200 - Picture...................................    305

17   201 - Picture...................................    287

18   202 - Facebook search warrant results...........    324

19   203 - Picture...................................    328

20   204 - Picture...................................    328

21   **DEFENSE:**

22   A - Picture.....................................    345

23   B - Incident Report.............................    350

24   D - Interview of Colleen Allums.................    405

25

PROCEEDINGS

JUDGE DENISE N. RINI:  We are on the
record for Dalonte White.  We are in the middle
of a probable cause hearing on Case DL 15105751.

Beginning with Dalonte, can you say
your name for the record.

MR. WHITE:  Dalonte White.

THE COURT:  Thanks.

MR. LAWSON:  John Lawson, Guardian ad
Litem.

MR. HOFFMAN:  Brian Hoffman, Assistant
Public Defender, representing Dalonte White.

MR. SCHROTH:  Norm Schroth,
representing the State of Ohio.

MR. LAM:  Detective Lam, with the
Cleveland Police Department.

THE COURT:  Okay.  Let the record
reflect that Dalonte's mother and stepfather are
in the hallway.  They may be potential witnesses
and the Prosecution has asked for a separation
of witnesses.  We have the Guardian ad Litem
here on behalf of Dalonte.

So Prosecutor Schroth, it is your
witness.

MR. SCHROTH:  Thanks, Judge.  At this

270

1          time the State will call Detective Lam.

2                    **DETECTIVE DAVID LAM, Sworn.**

3                    THE COURT:  You have heard my little

4          introduction to my courtroom.

5                    THE WITNESS:  Yes.

6                    THE COURT:  Do you need water or

7          anything?

8                    THE WITNESS:  No, I'm fine.

9                    THE COURT:  If Norm makes you cry,

10          there's tissue here.  If you need anything, just

11          let me know.  Okay?

12                    THE WITNESS:  Okay.

13                    THE COURT:  All right.  You may

14          proceed.

15                    MR. SCHROTH:  Thank you, your Honor.

16            **DIRECT EXAMINATION OF DETECTIVE DAVID LAM**

17     **BY MR. SCHROTH:**

18     Q.   Good afternoon or good morning, Detective.  Could you

19          please introduce yourself to the Court and Counsel?

20     A.   Detective Lam, Badge 837 with the Cleveland Police

21          Department.

22     Q.   How long have you worked for the Cleveland Police

23          Department?

24     A.   Six years.

25     Q.   And did you have any prior military or law

271

```
 1            enforcement experience?
 2     A.    Eleven years of military experience.
 3     Q.    Okay.  What branch?
 4     A.    Army National Guard.
 5     Q.    Okay.  What did you do for the Army National Guard,
 6            what was your job?
 7     A.    I'm still serving.  I'm a Captain right now.  I'm a
 8            Plans Officer for an infantry battalion.
 9     Q.    What does that mean?  What does that do?
10     A.    Operations, planning future operations, specifically
11            training.
12     Q.    Okay.  And when you became a Cleveland Police
13            Officer, did you receive any training?
14     A.    Yes, OPOTA.
15     Q.    And do you know what OPOTA stands for?
16     A.    Ohio Peace Officer Training Academy.
17     Q.    Okay.  And how long was that training for?
18     A.    Approximately half a year.
19     Q.    What kind of topics do you guys cover in that
20            training?
21     A.    Firearms operations, self defense, driving, ORC,
22            specifically laws pertaining to search and seizure,
23            arrests.
24     Q.    You name it, a little bit of everything?
25     A.    A little bit of everything.
```

272

1    Q.   Okay.  And once you finished your preliminary

2         training, where did you go for the Cleveland Police,

3         what district were you in?

4    A.   I started out in the Fifth District on the east side,

5         eventually I made my way over to the Second District

6         on the west side.

7    Q.   How long were you in the Fifth for?

8    A.   About half a year.

9    Q.   Okay.  And then when you went to the Second District,

10        what was your title, what were you doing?

11   A.   Patrol Officer for about five years.

12   Q.   All right.  And then after patrol where'd you go?

13   A.   To the Detective Bureau.

14   Q.   Okay.  The general Detective Bureau or anything

15        specific?

16   A.   Major Crimes Detail.

17   Q.   What's that, what's Major Crimes Detail?

18   A.   If there's a high profile incident, that case may be

19        diverted from the regular Detective Bureau to the

20        Major Crimes Detail and then we handle the follow-up

21        investigation.

22   Q.   How many folks are in that in particular specialized

23        unit?

24   A.   There's four detectives and a sergeant.

25   Q.   Okay.  Are you familiar at all with the incident that

1    happened on April 21st, 2015 at 3255 West 54th

2    Street?

3  A.  Yes, I am.

4  Q.  How did you first become aware of this incident?

5  A.  The incident was broadcasted via dispatch while I was

6    working with Sergeant Shoulders and Detective Moore.

7    We heard the broadcast come over the radio so we

8    responded on scene shortly after.

9        THE COURT:  Can we take a quick time

10        out?  Go off the record.

11        (Short recess taken.)

12  Q.  (BY MR. SCHROTH)  All right.  Back to where we left

13    off.  You indicated that you heard a dispatch.

14    You're on duty and a dispatch came across regarding

15    this incident?

16  A.  Yes.

17  Q.  All right.  Where were you when you heard the

18    dispatch?

19  A.  We were in the Second District.  I don't recall the

20    specific location of where we were at.

21  Q.  Were you guys mobile?

22  A.  Yeah, we were mobile in a detective vehicle, Crown

23    Vic.

24  Q.  So was it you, Sergeant Shoulders and Detective

25    Moore?

1   A.   Yes.

2   Q.   All right.  How long did it take you to respond, do

3       you think?

4   A.   Within several minutes.  An estimate, three to four

5       minutes at the most.

6   Q.   Okay.  And when you got there, what did you see as

7       you arrived on scene?

8   A.   As we arrived on scene the EMS ambulance was on

9       scene.  They had one of the victims, Colleen Allums,

10      inside the vehicle.  According to the EMS medics, she

11      was bleeding profusely from the head.  So their first

12      priority was transporting her to Metro Health

13      Hospital.  So after EMS left --

14   Q.   I'm going to hold you there.  Did you observe any of

15      the bleeding yourself?

16   A.   I did not.

17   Q.   Okay.  So you just got information from the medics?

18   A.   Correct.

19   Q.   So were you able to speak to Colleen on scene?

20   A.   Not on scene.

21   Q.   Okay.  So what do you do now?  What's your next step?

22   A.   We speak to the responding officers, Officers

23      Harrigan and Daugenti.  The first order of business

24      was going into the victim's house and clearing it to

25      ensure that there were no suspects inside.

275

```
 1           So we entered the house through the front door,
 2      walked up the porch, went into the front door,
 3      cleared the first floor and then we cleared the
 4      second floor as well.
 5   Q.  Okay.  Did you go in every room of the house while
 6      you were clearing it?
 7   A.  I did not personally go into every room.
 8   Q.  Okay.  Did you or Sergeant Shoulders or Detective
 9      Moore go into every part of the house?
10   A.  They did not.
11   Q.  Okay.
12   A.  It was a team effort in clearing the house.  So each
13      officer or detective would clear a certain room and
14      keep moving forward.
15   Q.  Well, between the three of you was the entire house
16      cleared?
17   A.  Yes.
18   Q.  All right.  And when you're in the house, did you go
19      in the living room at all?
20   A.  I did.
21   Q.  Okay.  Did you go upstairs at all?
22   A.  I did.
23   Q.  Okay.  Did you have any observations of upstairs?
24   A.  There was a dog that was lying on the second floor.
25      The dog was dead.  It had a bullet wound on its back.
```

```
 1    Q.   Okay.  I'm going to show you what's been marked for

 2         identification as State's 64.

 3                        MR. SCHROTH:  Judge, if I can

 4           approach?

 5                        THE COURT:  Yes.  Thank you.

 6    Q.   (BY MR. SCHROTH)  Okay.  Detective, I've handed you

 7         what's been marked as State's Exhibit 64.  Do you

 8         recognize it?

 9    A.   Yes.

10    Q.   What is it?

11    A.   It's the dead dog that I observed with the bullet

12         wound to the back.

13    Q.   Okay.  I'm just going to have you, if you can just

14         circle where the bullet wound is.  Put your initials

15         there, if you could, sir, and then today's date.

16         Okay.  Were there any other defects in the animal

17         besides its back?

18    A.   Not that I observed, no.

19    Q.   Okay.  All right.  And State's 64, is that a true and

20         accurate depiction of what you saw?

21    A.   Yes.

22    Q.   Okay.  All right.  So the house is cleared, do you

23         observe any blood in the house at all?

24    A.   Yes.

25    Q.   Where is that?
```

1    A.    There was blood on the couch that's located in the

2          front living room.

3    Q.    Okay.

4    A.    There's also blood that's located on the floor in the

5          living room.

6    Q.    Okay.  I'm going to show you State's 34.  Detective,

7          I've handed you what's been marked as State's 34.

8          Does that look familiar to you?

9    A.    Yes.

10   Q.    How?

11   A.    It's the couch that I observed in the living room and

12         blood that I observed on the couch and on the floor

13         of the living room.

14   Q.    Okay.  After the house is cleared, what's the next

15         step for you folks?

16   A.    The responding officers began to interview Savannah

17         LaForce and Zackary Hale.  While they're interviewing

18         those two victims I start canvassing the neighborhood

19         for any surveillance cameras.  I was able to locate

20         one at 3263 West 54th Street.  I spoke to a resident,

21         his name was Joseph Maxomovich.

22   Q.    Okay.  Just for the record, would that be spelled

23         M-a-x-i-m-o-v-i-c-h, does that sound right?

24   A.    I think it's M-a-x-o-m-o-v-i-c-h.

25   Q.    Okay.  And so the location of Mr. Maxomovich's house

278

1     compared to the crime scene, what is their

2     relationship?

3  A.   It's located south of the victim's house on the east

4     side of the street.

5  Q.   So is it on the same side or a different side of the

6     street?

7  A.   Same side.

8  Q.   And about how many houses away is it, if you recall?

9  A.   I don't recall the precise amount of houses.  An

10    estimate would be four to five.

11  Q.  All right.  And you said is it north or south of the

12    victim's house?

13  A.  It's south of the victim's house.

14  Q.  Okay.  And the house where this crime happened at,

15    what city is that in?

16  A.  Cleveland.

17  Q.  County?

18  A.  Cuyahoga County.

19  Q.  State?

20  A.  Ohio.

21  Q.  Now, what do you do at this point?  How do you

22    realize that there's cameras there?

23  A.  I started walking on foot, started looking at the

24    fronts of all the residences and there was a camera

25    on the front of the residence.

1   Q.   You were able to observe that?

2   A.   Yes.

3   Q.   So what do you do when you see the camera, anything?

4   A.   I knocked on the front door and spoke to Mr.

5       Maxomovich who agreed to let me into his house and we

6       started to look at his surveillance system.

7   Q.   Okay.  Do you look at it at that moment?

8   A.   Yes.

9   Q.   All right.  What do you observe, if anything?

10   A.   In the surveillance video it depicts several

11       juveniles in the street playing basketball.  From the

12       north you can see several suspects walking towards

13       the direction of Colleen's residence.  Approximately

14       30 to 60 seconds later two of those suspects flee

15       from the direction of Colleen's residence in a north,

16       northwest direction.  The kids playing basketball

17       eventually disperse.  After they disperse, the video

18       depicts a black male suspect limping north to south

19       on West 54th Street from the direction of Colleen's

20       residence.

21   Q.   What direction are they traveling, is that suspect

22       traveling in?

23   A.   He's traveling south.

24   Q.   All right.  Okay.  So what -- when the suspect

25       appears on the camera is there anyone left in the

1       street at that time, if you recall?

2   A.  Not that I can recall, no.

3   Q.  Okay.  All right.  So what happens now?  Do you do

4       anything with this video?

5   A.  Yes.  We take a USB drive and download the video file

6       onto the USB drive.

7   Q.  Okay.  Is it fair to say that the time on the video

8       is a little bit off from when the crime actually

9       happens based on 911 calls?

10  A.  Yes, it is.

11  Q.  Okay.  All right.  Is it fair, it's approximately

12      40 minutes off, 40 minutes -- it depicts a time

13      40 minutes after the actual incident happens?

14  A.  Yes.

15  Q.  Okay.  Approximately.  All right.  So you obtain the

16      video on a thumb drive and what do you guys do at

17      this point?

18  A.  At this point I notify the responding officers of the

19      video that we had retrieved.  Based on the suspect's

20      direction of travel from Colleen's residence north to

21      south, I start retracing the suspect's direction of

22      travel to see if I could locate any evidence, such as

23      blood or anything that he may have dropped behind.

24  Q.  Okay.  So where does it begin, where do you start

25      your walk?

281

1    A.   From Colleen's residence from the front porch I start

2          walking from north to south on West 54th Street.

3    Q.   Did you see any blood on the porch?

4    A.   Yes.

5    Q.   Okay.  How was that situated, how was that blood?

6          How would you describe how it's positioned on the

7          porch?

8    A.   It's positioned in front of the front door of the

9          residence.  It appears that when Colleen Allums went

10         onto the front porch, that's where she collapsed.  So

11         it was consistent to the location where she was when

12         she was on the porch.

13    Q.   Okay.  Besides from where Colleen Allums was found,

14         is there any other blood on the porch?

15    A.   There is not, no.

16    Q.   Okay.  Did you look anywhere else besides the porch?

17    A.   I did.

18    Q.   Okay.  What did you do?

19    A.   The sidewalks and streets of West 54th Street.  I

20         checked the sidewalks on both sides of the street and

21         I also checked the actual street itself.

22    Q.   Had you watched the video before you're doing this

23         sort of blood check or evidence check?

24    A.   Yes.  I watched the video previously before I started

25         checking.

282

1    Q.   So were you aware of the direction of travel of the

2         suspect?

3    A.   Yes, I was.

4    Q.   Okay.  Did that play any role in terms of where you

5         were looking for evidence?

6    A.   It did.

7    Q.   Okay.  What role did it play?

8    A.   I checked the street south of Colleen's residence, I

9         checked approximately one to two blocks south.

10    Q.   What about sidewalks, did you check sidewalks?

11    A.   I checked sidewalks on both sides of the street.

12    Q.   Did you observe any evidence at all in that path of

13         travel?

14    A.   I did not.

15    Q.   Did you observe shell casings?

16    A.   I did not.

17    Q.   Did you observe blood?

18    A.   No.

19    Q.   Droplets of blood, any at all?

20    A.   No.

21    Q.   Okay.  Did you even observe anything with blood in

22         that path of travel, anything at all that had blood

23         on it?

24    A.   No.

25    Q.   Okay.  No napkins, no bandages, nothing of that

```
 1              nature at all?

 2       A.     No.

 3       Q.     Okay.  All right.  So after you traced the path of

 4              the suspect, what do you do at this point, if you

 5              recall?

 6       A.     After I retraced the steps of the suspect, I go back

 7              to the crime scene and start speaking with the

 8              officers on scene.

 9       Q.     Okay.  Now, when you do that, when you return back to

10              speak with the officers on scene at this very moment

11              in time that we're talking about, do you have any

12              suspects at that exact moment before you talk to any

13              of the officers on scene?

14       A.     Not at that point in time, no.

15       Q.     All right.  So what happens now?

16       A.     While on scene I spoke with Officer Schade.

17       Q.     How do you spell that?

18       A.     S-c-h-a-d-e.

19       Q.     All right.

20       A.     Officer Schade stated that there was aggravated

21              menacing and a discharging a firearm within city

22              limits complaint over the past weekend.  He stated

23              that the suspects from that complaint were Dalonte

24              White and Rayvion Edwards.

25                        MR. HOFFMAN:  Objection.
```

284

```
 1                    THE COURT:  Basis?

 2                    MR. HOFFMAN:  Hearsay, your Honor.

 3                    MR. SCHROTH:  It's not being used for

 4           the truth, Judge.  That's where he got Dalonte's

 5           name from.  We're not saying Dalonte actually

 6           committed those offenses.

 7                    THE COURT:  I'm going to allow it.

 8           It's not offered as to whether Dalonte committed

 9           this act or not.

10                    MR. HOFFMAN:  Okay.

11                    THE COURT:  You may continue.

12    Q.  (BY MR. SCHROTH)  Okay.  What names did you receive

13         at that point in time?

14    A.  Dalonte White and Rayvion Edwards.

15    Q.  Okay.  So what happens at this point?  Now what do

16         you do?  You've got two names, you spoke with this

17         officer.  Do you do anything else on scene?

18    A.  Not that I can recall.

19    Q.  Okay.

20    A.  I think that concludes everything that I did on

21         scene.

22    Q.  All right.  And in terms of the dispatch time is it

23         fair to say that that call came in at about

24         6:04 p.m.?

25    A.  Yes.
```

285

1   Q.   In terms of the timeline?

2   A.   Yes.

3   Q.   All right.  So at that moment do you yourself speak

4        to any of the victims on scene?

5                    THE COURT:  Can you clarify which call

6             came in 6:04?  The one with Dalonte or

7             the incident that occurred?

8                    MR. SCHROTH:  Yeah.  Thanks, Judge.

9   Q.   (BY MR. SCHROTH)  The one involving this particular

10       crime, the one you're investigating?

11  A.   Yes.

12  Q.   That came about 6:04?

13  A.   Yes.

14  Q.   Okay.  The menacing complaint was not from the same

15       day, right?  That was the weekend before?

16  A.   It was the previous weekend.

17  Q.   Okay.  All right.  So now you leave the scene, is

18       that fair to say?

19  A.   Yes.

20  Q.   All right.  What's the next thing that happens in

21       your investigation?

22  A.   On the following day I speak with Officer Beveridge.

23  Q.   And how do you spell Beveridge?

24  A.   B-e-v-e-r-i-d-g-e.

25  Q.   Okay.  So this is on April 22nd?

1    A.    April 22nd, yes.

2    Q.    Okay.  And why do you speak with Officer Beveridge?

3    A.    He has very intimate knowledge of all the juveniles

4          and gangs on Storer Avenue.  So I spoke with him

5          because he's a subject matter expert on these kids.

6    Q.    Okay.  And what is it that you relay to Officer

7          Beveridge?

8    A.    When I spoke with Officer Beveridge we discussed the

9          home invasion and we also discussed the aggravating

10         menacing complaint and the two names that were

11         brought up, Dalonte White and Rayvion Edwards.

12         Officer Beveridge stated to me that Shetrell Harris

13         is also closely affiliated with Dalonte White and

14         Rayvion Edwards.

15   Q.    Okay.  So Shetrell Harris, what do you make of that

16         name now, is that a possible suspect?

17   A.    Yes, that's a possible suspect.

18   Q.    All right.  So now what is it that you do?

19   A.    Based on that information I created three photo

20         arrays of Dalonte White, Rayvion Edwards and Shetrell

21         Harris to be shown to the three victims.

22   Q.    Okay.  Detective Lam, Shetrell Harris, are you

23         familiar with the spelling of Shetrell Harris, just

24         for the record?

25   A.    Yes.

287

```
 1    Q.   Can you spell that?

 2    A.   S-h-e-t-r-e-l-l.

 3    Q.   Last name?

 4    A.   Last name Harris, H-a-r-r-i-s.

 5    Q.   Shetrell Harris, is that a male or a female?

 6    A.   That's a male.

 7    Q.   Okay.  Are you aware if Shetrell Harris has any

 8         nicknames?

 9    A.   Poohead.

10    Q.   Poohead?

11    A.   Yes.

12    Q.   Okay.  I'm going to show you what's been marked for

13         identification purposes as State's 201.  All right.

14              I've handed you what's been marked for

15         identification purposes as State's 201.  Does that

16         photograph look familiar to you at all, Detective?

17    A.   Yes.

18    Q.   How is that familiar?

19    A.   That's Shetrell Harris.

20    Q.   Okay.  Jumping ahead a minute.  In terms of your

21         investigation, do you do anything with that

22         particular photograph?  Did you ever show that

23         photograph to anyone?

24    A.   I did.

25    Q.   Okay.  Who did you show it to?
```

288

1    A.    Edward Bunch.

2    Q.    All right.  Now, in terms of the timeline of the

3          investigation, we're back on April 22nd, 2015 and I

4          think you indicated you now have three persons of

5          interest, Dalonte White, Rayvion Edwards and Shetrell

6          Harris, Poohead, is that correct?

7    A.    Yes.

8    Q.    Okay.  So what happens now?

9    A.    I created three photo arrays which were eventually

10         shown to all three victims.

11   Q.    All right.  In terms of the photo arrays, when you

12         create the arrays, Detective, where is it you get the

13         different pictures from for comparison purposes?

14   A.    Through OLEG.

15   Q.    And what's that?

16   A.    I believe it stands for Ohio Law Enforcement Gateway.

17   Q.    Okay.  And what are you trying to do when you're

18         creating a photo array?

19   A.    You take your person of interest and his or her

20         physical characteristics, such as gender, race,

21         height, weight, hair color, eye color.  You input it

22         into the database to retrieve other people that share

23         similar physical characteristics.

24   Q.    Okay.  And in terms of your placement of the suspect,

25         if you're doing multiple photo arrays, is that always

289

```
 1              going to be in the same location?
 2    A.    No.
 3    Q.    What do you mean no, what do you do?
 4                    THE COURT:  I'm not sure what you mean
 5          by that.
 6    Q.    (BY MR. SCHROTH)  You created three photo arrays in
 7          this instance, is that correct?
 8    A.    Yes.
 9    Q.    Did you put the suspects in the same location in
10          every similar photo array that they're in?
11    A.    I did not.
12    Q.    Okay.  And why is it you move them around for
13          different witnesses?
14    A.    Just to vary the location of the person of interest
15          versus the other people.
16    Q.    Okay.  So for example, I'm showing you State's 79 and
17          109.  Detective, does State's 79 look familiar?
18    A.    Yes.
19    Q.    What's that?
20    A.    This is the photo array with Dalonte White in it.
21    Q.    Who is that shown to?
22    A.    Zackary Hale.
23    Q.    And then I'm showing you State's Exhibit 109.  Does
24          that look familiar?
25    A.    Yes.
```

1   Q.   What's that?

2   A.   A photo array of Dalonte White.

3   Q.   All right.  Can you tell from that array who that was

4        shown to?

5   A.   Colleen Allums.

6   Q.   Okay.  Now, where is Dalonte White positioned in

7        State's 79?

8   A.   Top right corner.

9   Q.   Okay.  And where is Dalonte White positioned in

10       State's 109?

11  A.   Top left corner.

12  Q.   All right.  So you created the photo arrays on

13       April 22nd.  Do you do anything with them on that

14       particular day?

15  A.   Not that particular day, no.

16  Q.   Okay.  So when is it you do something with those

17       photo arrays?

18  A.   I believe it was April 23rd.  It's in my police

19       report, but Sergeant Shoulders and I go and interview

20       Zackary Hale and Savannah LaForce.

21  Q.   This is April 23rd, so this is what, two days after

22       the crime?

23  A.   Two days after the crime.

24  Q.   So now, when you do that, where is it you interview

25       Savannah LaForce at?

1    A.    At their residence.

2    Q.    Okay.  And where do you interview Zackary Hale at?

3    A.    He's also at her residence.

4    Q.    So they're at the same location?

5    A.    Yes.

6    Q.    All right.  Take us through that interview process,

7          how is that done?

8    A.    The first thing we did is we requested a marked

9          patrol car with two officers to come show the photo

10         arrays to the victims.

11   Q.    Why do you do that?

12   A.    Because they're blind administrators.  They have no

13         knowledge of the case or the suspects.

14   Q.    Why is that important?

15   A.    They're impartial.  They can't influence the victim

16         on selecting a specific person.

17   Q.    Okay.  So you request -- how many patrol cars?

18   A.    One patrol car with two officers inside.

19   Q.    Okay.  What happens now?

20   A.    The patrol officers show the photo arrays to Zackary

21         and Savannah.  After the photo arrays were shown,

22         Sergeant Shoulders and I took Savannah into our

23         detective car and we interviewed her.

24   Q.    How many arrays were shown to Savannah and to

25         Zackary?

292

1   A.   Three photo arrays for each person.

2   Q.   Did you become aware of the results of those three

3        photo arrays?

4   A.   Yes.

5   Q.   Okay.  What were the results for Zackary?

6   A.   He identified the photo array that had Dalonte White

7        in it.

8   Q.   And are you aware if there was a certain percentage

9        that was noted in terms of his certainty?

10  A.   Not that I can recall.

11  Q.   Well, in terms of the arrays, would it be noted if

12       there was a certain percentage given in terms of

13       their certainty?

14  A.   Yes.

15  Q.   All right.  Did you obtain these sheets from the

16       blind administrator?

17  A.   Yes, I did.

18  Q.   Okay.  I'm going to show you State's 78.  Handing you

19       what's been marked for identification purposes as

20       State's 78, what is that sheet?  Does that sheet look

21       familiar?

22  A.   Yes, it does.

23  Q.   How so?

24  A.   Zackary Hale and the administrator that conducted the

25       photo array completed this sheet.

```
1    Q.   And does it indicate Zackary's percentage on there?

2    A.   It does.

3    Q.   And what's that?

4    A.   70%.

5    Q.   Okay.  And did Zackary make any identifications on

6         the other two photo arrays?

7    A.   No, he did not.

8    Q.   All right.  Did you become aware of the results for

9         Savannah LaForce?

10   A.   Yes.

11   Q.   And did she make any identifications?

12   A.   She did.  The photo array that had Dalonte White in

13        it.

14   Q.   Okay.  And was there a percentage noted on hers?

15   A.   100%.

16   Q.   Okay.  I'm handing you State's 93.  Does State's 93

17        look familiar?

18   A.   Yes, it does.

19   Q.   And who is that for?

20   A.   Savannah LaForce.

21   Q.   Okay.

22                   THE COURT:  What was the number on

23            that?  I'm sorry.

24                   MR. SCHROTH:  Exhibit 93.

25                   THE COURT:  Thank you.
```

294

1    Q.    (BY MR. SCHROTH)   And what does that indicate?   What

2          percentage is indicated there?

3    A.    100%.

4    Q.    All right.   I'm going to hand you State's 94 as well,

5          Detective.   State's 94, is that familiar?

6    A.    Yes.

7    Q.    Okay.   Whose array is 94?

8    A.    Savannah LaForce.

9    Q.    And who is identified, if anyone, in that photo

10         array?

11   A.    Dalonte White.

12   Q.    All right.   And where is Dalonte White located in

13         that photo array?

14   A.    Top center.

15   Q.    Okay.   Is that the same or different than where he

16         was located in State's 79 and 109?

17   A.    It's different.

18   Q.    How so?

19   A.    They're all each in a different location.

20   Q.    Okay.   Now, what happens after the arrays are done

21         with Savannah and Zackary?

22   A.    Sergeant Shoulders and I interviewed Savannah LaForce

23         in our detective car.

24   Q.    Okay.   And was that interview reduced to writing or

25         audio recorded at all?

```
 1    A.   It was recorded, audio.

 2    Q.   Okay.  And was Zackary interviewed as well that day?

 3    A.   Not an audio statement.  He indicated that he didn't

 4         have much information to provide.  So no audio

 5         statement was taken on that specific day.

 6    Q.   Okay.  But did you speak with him at all on that

 7         particular day?

 8    A.   Yes.

 9    Q.   Okay.  All right.  Now, what happens in terms of the

10         investigation?

11    A.   At this point since Dalonte -- let me back up.  On

12         the following day, Sergeant Shoulders, Detective

13         Moore and myself go to Metro Hospital to interview

14         Colleen Allums and also to show her the photo arrays.

15    Q.   All right.  So this is April 24th?

16    A.   Yes.

17    Q.   Okay.  And take us through, how is that process done,

18         the photo array with Colleen?

19    A.   The first thing we did is we requested a marked

20         patrol car to respond to the hospital so he could

21         show the photo arrays to Colleen Allums.

22    Q.   And how many photo arrays in total are shown to her?

23    A.   Three.

24    Q.   Does she make any identifications?

25    A.   She does.
```

1   Q.   Okay.  How many?

2   A.   One identification.

3   Q.   On who?

4   A.   Dalonte White.

5   Q.   All right.  And do you recall her level of certainty

6       in her identification?

7   A.   She stated 100%.

8   Q.   All right.  I'm going to show you State's 108.

9       Handing you State's 108, does that look familiar?

10   A.   Yes.

11   Q.   How?

12   A.   Colleen Allums completed this.

13   Q.   Does it indicate her level of certainty on there?

14   A.   100%.

15   Q.   All right.  Now, other than the photo arrays, do you

16       have any conversation with Colleen about what

17       happened?

18   A.   Yes, we interview her and it was recorded as well.

19   Q.   Okay.  All right.  Now, at this point you indicated

20       before you had seen the video?  I'm backing up a

21       minute.  The video of the crime itself from the

22       neighbors, you had seen it up to this point in time?

23   A.   Had I seen it up to this point in time?

24   Q.   Yeah.  You had seen the video from -- I'm sort of

25       jumping back to the 21st.  You had watched the video

```
 1            on that day?

 2    A.    Yes.

 3    Q.    Okay.  All right.  And were you part of that

 4          retrieval process?

 5    A.    I was.

 6    Q.    I'm just going to play for you State's 120.  Can you

 7          see that from there, Detective?

 8    A.    Yes.

 9    Q.    Okay.  Detective, on State's 120 I'm going to

10          begin -- well, first, what we see on the screen,

11          State's 120, does that look familiar?

12    A.    It does.

13    Q.    How is that familiar to you?

14    A.    It depicts West 54th Street with several juveniles

15          playing basketball in the street.

16    Q.    All right.  Is there a date listed on that?

17    A.    April 21st, 2015.

18    Q.    And in terms of that street, I mean, does that street

19          itself look familiar, does the video itself look

20          familiar to you?

21    A.    It does.

22    Q.    How?

23    A.    I responded on scene on the same day.

24    Q.    I mean, does this look like the video you retrieved

25          on that day?
```

298

1    A.    Yes.

2    Q.    Okay.  All right.  I'm going to start State's 120

3          using -- just for the record, there's essentially two

4          time counters, one on the bottom that's at 36:53 and

5          there's a time in terms of what would be like the

6          clock, the daylight time which we understand is

7          incorrect, but for purposes of the record this is at

8          6:37:42 seconds p.m., this is where I'll start the

9          video.

10                        (Playing State's Exhibit 120.)

11   Q.    (BY MR. SCHROTH)  Detective, what do we see happening

12         in the video at this point?

13   A.    There's several juveniles playing basketball in the

14         street, traffic moving down the street as well.

15   Q.    Several, how many do you see?

16   A.    Three.

17   Q.    Is it fair to say, Detective, that north in terms of

18         direction would be to the right of State's 120 where

19         this street goes?

20   A.    Yes.

21   Q.    And south is to the left?

22   A.    Yes.

23   Q.    All right.  What do we see, stopping at the time of

24         6:39:19?  What do we see?

25   A.    Two suspects running away from the direction of

1          Colleen's residence.

2     Q.   What direction are they going?

3     A.   They're going from east to west, so west, northwest

4          direction.

5     Q.   And could you see at all where they went on that

6          video, Detective?

7     A.   Looks like they went westbound through the alleyway

8          just located to the north of Colleen's residence.

9     Q.   Okay.  So westbound, as you're looking at this, would

10         be to your right or your left?

11    A.   Westbound would be to the left.

12    Q.   Okay.  Now, what's happening?

13    A.   Three juveniles running away from the basketball

14         hoop.

15    Q.   We're at 6:39:42.  All right.  Now, what are we

16         seeing here?

17    A.   That's the suspect limping away from north to south.

18         He has what appears to be a firearm in his right hand

19         and if you play the video, he'll be concealing the

20         firearm into his waistband.

21    Q.   Okay.  We're at the 6:40:17 p.m.  And which way does

22         the suspect travel?

23    A.   From north to south.

24    Q.   And in terms of the limping.  And I'll stop it at

25         6:40:24 p.m.  You see there's a limp.  What leg does

1    it appear to be on?

2  A.   It appears to be the right leg.

3  Q.   Okay.  And is there anything significant that happens

4       from this point on in the video?

5  A.   No, nothing significant.

6  Q.   Okay.  How would you categorize the way he's walking,

7       the suspect?

8  A.   He's limping north to south I would say pretty

9       casually.

10  Q.   All right.  What do you mean by casually?

11  A.   Doesn't look like he's in a rush.  He's not running

12       away.

13  Q.   Okay.  All right.  Backing up to your investigation.

14       Okay.  So now we are at -- we left off on April 24th,

15       2015, you had spoken with Colleen, is that right?

16  A.   Yes.

17  Q.   Okay.  Does anything happen now after this point in

18       terms of your investigation?  Like what do you do

19       next?  Does it stop there?

20  A.   No.  So based on the positive identification from all

21       three victims, we speak with the Prosecutors and we

22       obtain an arrest warrant for Dalonte White and a

23       search warrant for his residence.

24  Q.   Okay.  Do you know what day that is, by any chance?

25  A.   I don't recall.

301

1 Q. Okay.  So what's the next step after you receive the

2   arrest warrant and the search warrant, what do you do

3   at this point?

4 A. On the day that we executed the arrest and search

5   warrant we received information that Dalonte White

6   was possibly located at a residence on West 58th

7   Street.

8 Q. Actually, let me back up for one second, Detective.

9   In terms of the timeline, the dates that you get the

10   arrest warrant and the search warrant, would that be

11   something that's in your report?

12 A. It is.

13 Q. Would it help you to remember the date of that?

14 A. Say that again?

15 Q. Would your report help you to remember the date of

16   that?

17 A. It would.

18 Q. Okay.  Don't read it out loud, Detective.  Just look

19   in there and see if the date is located in there.

20 A. Yes, the date's in here.

21 Q. Okay.  What date was that?

22 A. April 28th, 2015.

23 Q. Okay.  April 28th.  Now, prior to April 28th -- I

24   want to back up for a minute in terms of April 24th.

25   Are you aware if anything was done by other officers

1        in terms of this investigation?

2    A.   On April 24th?

3    Q.   Yeah.  Correct.

4    A.   Not that I can recall.

5    Q.   Did there come a time where you had received

6        photographs from patrol officers that were taken of

7        Dalonte White on the 24th of April?

8    A.   Yes.

9    Q.   You did?

10   A.   I did.

11   Q.   Okay.  Did you receive those photographs?

12   A.   Yes, I did.

13   Q.   Did you talk to those officers about how they got

14       those photographs, what were the circumstances of

15       that?

16   A.   Briefly.  I'm not familiar with the specific

17       circumstances.

18   Q.   Just the overview?  Like what happened?

19   A.   One of the patrol officers observed Dalonte White in

20       the neighborhood so they stopped him, spoke with him

21       and took several photographs of Dalonte White.

22   Q.   Okay.  And did they take photographs of anyone else

23       besides Dalonte?

24   A.   Yes.

25   Q.   Who was that?

1   A.   Shetrell Harris and his brother, Cedric Harris.

2   Q.   Okay.  And is it fair to say that you received those

3        photographs?

4   A.   Yes.

5   Q.   Okay.  I'm going to show you State's 70, 71 and 72

6        and then two exhibits that had been identified

7        previously, 200 and 201.  All right.

8                      THE COURT:  Thank you.

9                      MR. SCHROTH:  Thanks, Judge.

10  Q.   (BY MR. SCHROTH)  We'll take these one at a time,

11       Detective.  State's 70, does that look familiar?

12  A.   Yes.

13  Q.   Okay.  What do we see there?  How is that familiar?

14  A.   Dalonte White is depicted in the picture.

15  Q.   All right.  And is there a date that it was taken on

16       there?

17  A.   April 24th, 2015.

18  Q.   Okay.  And I think there's -- don't read them into

19       the record, but there's some identifiers for him as

20       well, his Social Security Number and date of birth

21       are on there sort of?

22  A.   Yes.  It's cut off, but it's on here.

23  Q.   Okay.  What's in that picture, what part of Dalonte?

24  A.   His face and upper body.

25  Q.   All right.  Does it have his face, does it have --

| | | |
|---|---|---|
| 1 | | like can you see his hair? |
| 2 | A. | Yes. |
| 3 | Q. | Describe for us what that looks like? |
| 4 | A. | It look likes dreadlocks to me. |
| 5 | Q. | Okay.  And State's 71, does that look familiar to |
| 6 | | you? |
| 7 | A. | Yes. |
| 8 | Q. | What do we see there?  Let me ask you this, how many |
| 9 | | photos are on State's 71? |
| 10 | A. | There's two photos. |
| 11 | Q. | And do those both look familiar to you? |
| 12 | A. | Yes, it does. |
| 13 | Q. | And what are they? |
| 14 | A. | The photo on the left is a picture of Dalonte's left |
| 15 | | leg.  The picture on the right is a pair of white |
| 16 | | tennis shoes that he was wearing. |
| 17 | Q. | Okay.  And State's 72, how many photos are there? |
| 18 | A. | Three photos. |
| 19 | Q. | Let's take them one at a time.  In the upper left |
| 20 | | hand corner of State's 72, what's that a photo of? |
| 21 | A. | A photo of Dalonte White's lower body. |
| 22 | Q. | Okay.  What part of his lower body? |
| 23 | A. | About the waistline down. |
| 24 | Q. | All right. |
| 25 | A. | And legs. |

305

1    Q.   And are they both legs or one leg?

2    A.   Both legs.

3    Q.   Okay.  What's in the lower left hand corner of

4       State's 72?

5    A.   A photo of Dalonte White's right leg.

6    Q.   Okay.  Do you see anything there?

7    A.   No.

8    Q.   Any injuries?

9    A.   Does not appear to be any injuries.

10   Q.   All right.  And in the lower, the last photo I think

11      in the lower right hand corner of State's 72, what's

12      that?

13   A.   A photograph of both legs of Dalonte White.

14   Q.   Okay.  Are the shoes on or off in that?

15   A.   Shoes are off.

16   Q.   Any injuries in that, does it appear?

17   A.   It does not appear.

18   Q.   Okay.  And just the lower left corner of State's 72,

19      are his shoes on or off?

20   A.   His shoes are off.

21   Q.   Okay.  State's 200, does that look familiar?

22   A.   Yes.

23   Q.   What do we see in State's 200?

24   A.   It's a photo of Cedric Harris.

25   Q.   Okay.  And State's 201?

1    A.   This is a photo of Shetrell Harris.

2    Q.   Poohead?

3    A.   Poohead.

4    Q.   Okay.  And to your knowledge, were these three

5         individuals together at the time the photos were

6         taken or don't you know?

7    A.   I don't know.

8    Q.   Okay.  And this is April 24th, right, these were

9         taken?

10   A.   Yes.

11   Q.   Okay.  And these are true copies and accurate copies

12        of what you -- you didn't see it yourself, but what

13        you received from the police?

14   A.   Yes, that's what I received.

15   Q.   Okay.  All right.  Back to where we were April 28th,

16        I believe is where we left off in terms of your

17        personal investigation.  What happens on that day?

18   A.   We receive information from one of the residents in

19        that neighborhood, she stated that Dalonte White was

20        seen in a residence located on West 58th Street.

21   Q.   All right.  West 58th Street?

22   A.   Yes.

23   Q.   Okay.  So what do you do at this point?

24   A.   Sergeant Shoulders, Detective Moore and myself go to

25        that residence.  It's 3483 West 58th Street.  So as

```
 1          we approach the residence we began knocking on the
 2          side door, two juveniles open the door.
 3    Q.    Who is that?  Do you ever come to learn who those
 4          people are?
 5    A.    Rayvion Edwards and Daisyonna Mikula.
 6    Q.    And if you can, just for the record, can you spell
 7          those names?
 8    A.    Yes.  Rayvion, R-a-y-v-i-o-n, Edwards, E-d-w-a-r-d-s.
 9          Daisyonna, D-a-i-s-y-o-n-n-a, last name Mikula,
10          M-i-k-u-l-a.
11    Q.    All right.  So those two juveniles are at the
12          residence?
13    A.    Yes, they are.
14    Q.    Any adults there?
15    A.    There were no adults present.
16    Q.    All right.  Do you interact with these two
17          individuals?
18    A.    Yes.
19    Q.    Okay.  So what happens at this point in time?
20    A.    At that point in time we detained both juveniles,
21          explained to them what was going on.  They were
22          willing to go back to the police station and give us
23          a statement on their knowledge of what they knew in
24          regards to this home invasion on West 54th Street.
25    Q.    All right.  Do you learn the relationship between
```

1          Daisyonna and Rayvion?

2   A.   Yes.  They're boyfriend/girlfriend relationship.

3   Q.   Okay.  And on that day, do you actually get a full

4          interview from Daisyonna?

5   A.   Later in that evening we do.

6   Q.   Okay.  And do you get a full interview later in that

7          evening from Rayvion?

8   A.   Yes.

9   Q.   All right.  Okay.  You said later that evening, what

10         happens at this point in time, they're detained,

11         you're at the residence of 3483 West 58th, what do

12         you do now?

13   A.   They let us check the residence.  Dalonte White was

14         not at the residence.  Daisyonna then stated to us

15         that he may have been at --

16                MR. HOFFMAN:  Objection.

17                MR. SCHROTH:  This is for what they

18        know.

19                THE COURT:  Basis?

20                MR. HOFFMAN:  Just hearsay, your

21        Honor.

22                THE COURT:  I'll allow it.  Go ahead.

23   Q.   (BY MR. SCHROTH)  What did Daisyonna indicate at that

24         time?

25   A.   She stated to us that Dalonte White was possibly at

309

1          Tootie's house.

2                    THE COURT:  At whose house?

3                    THE WITNESS:  Tootie's.  T-o-o-t-i-e.

4     Q.   (BY MR. SCHROTH)  Like in that TV show?

5     A.   We eventually ID and find out who Tootie is.

6     Q.   Who is Tootie?  If you look at your report, would it

7          help refresh your memory?

8     A.   It would.  Rochelle Harris.

9                    THE COURT:  Who's that?

10                   THE WITNESS:  Rochelle,

11          R-o-c-h-e-l-l-e.  Harris.

12    Q.   (BY MR. SCHROTH)  Okay.  So where is Rochelle Harris

13         located?  What address would that be?

14    A.   I'm mistaken.  It's actually Rochelle Rivera, not

15         Rochelle Harris.

16    Q.   All right.  Rivera, R-i-v-e-r-a?

17    A.   Yes.

18    Q.   Tootie, that's Rochelle?

19    A.   That's Rochelle Rivera.

20    Q.   Do you learn what address that is?

21    A.   It's on West 61st Street.

22    Q.   Do you get an address for it?

23    A.   I did.  3250 West 61st Street.

24    Q.   Okay.  Armed with that information, what do you do

25         now?

| | | |
|---|---|---|
| 1 | A. | We go over to that residence, knocked on the front |
| 2 | | door and the side door and received no response. |
| 3 | Q. | All right.  So what happens now? |
| 4 | A. | At this point in time we go to Dalonte White's |
| 5 | | residence to execute the arrest and search warrant. |
| 6 | Q. | Now, how come you didn't go there first to his |
| 7 | | residence? |
| 8 | A. | Because we received information from one of the |
| 9 | | citizens that he was at the house on West 58th |
| 10 | | Street. |
| 11 | Q. | Oh, so you thought he was somewhere else at this |
| 12 | | time? |
| 13 | A. | Right.  So we didn't want to go to his residence and |
| 14 | | tip him off that we were looking for him. |
| 15 | Q. | I see.  All right.  Where is Mr. White's residence? |
| 16 | A. | 3347 West 59th Place. |
| 17 | Q. | All right.  3483 West 58th Street, how far is that |
| 18 | | from -- now, this is the first residence you went to. |
| 19 | | How far is that from where Daisyonna and Rayvion -- |
| 20 | | or how far is that from the location of the crime? |
| 21 | A. | Location of the crime? |
| 22 | Q. | Yeah. |
| 23 | A. | An estimate would be five to six blocks away. |
| 24 | Q. | So is it far or is it close? |
| 25 | A. | It's relatively close. |

311

| | | |
|---|---|---|
| 1 | Q. | And Dalonte White lives where? |
| 2 | A. | 3347 West 59th Place. |
| 3 | Q. | Do you know how far that is from the scene of the |
| 4 | | home invasion? |
| 5 | A. | Three to four blocks away. |
| 6 | Q. | Okay.  So what happens?  You then go to Mr. White's |
| 7 | | house, what happens then? |
| 8 | A. | As we approach the house, we announce that we're the |
| 9 | | police, we have an arrest warrant and search warrant |
| 10 | | for Dalonte White.  Mr. White's mother was on the |
| 11 | | porch so she was the first person that we interacted |
| 12 | | with and informed her of the nature of our visit. |
| 13 | Q. | What did you tell her?  What did you tell his mom, |
| 14 | | why did you say you were there? |
| 15 | A. | We had an arrest warrant for her son and we had a |
| 16 | | search warrant for her house. |
| 17 | Q. | Did you tell her the underlying circumstances, like |
| 18 | | why? |
| 19 | A. | Not at that particular time, no. |
| 20 | Q. | Okay.  So now what happens?  You're at the house, is |
| 21 | | Mr. White there? |
| 22 | A. | Yes, he is.  He's in the front bedroom. |
| 23 | Q. | And what's your interaction like with Mr. White? |
| 24 | A. | Brief interaction.  We informed Mr. White that we had |
| 25 | | an arrest warrant for him, a search warrant for his |

312

1      house.  Mr. White was placed in handcuffs, he was

2      escorted outside to the rear of one of the patrol

3      cars.

4  Q.  Okay.  Did you pat him down for weapons or anything

5      like that?

6  A.  Yes.

7  Q.  Any weapons found?

8  A.  No weapons were found on him.

9  Q.  Okay.  The search warrant, do you execute the search

10      warrant?

11  A.  Yes.

12  Q.  And do you find anything?

13  A.  Yes.  We recover a black North Face jacket, a cell

14      phone, a pink sock containing stones.

15  Q.  What stones, what do you mean?

16  A.  Rocks, pebbles inside a pink sock all tied up.

17  Q.  Okay.  Why do you collect that?

18  A.  We confiscated it because we had reason to believe

19      that that was a potential weapon that may have been

20      used for other crimes.

21  Q.  Oh, okay.  And you take the North Face jacket?

22  A.  Yes.

23  Q.  All right.  Now, do you do anything in terms of --

24      during the course of the investigation, is anything

25      done at all with the cell phone?

313

1    A.   Yes, I obtained a search warrant for two of the cell

2          phones.  Those cell phones were taken to our

3          narcotics unit for analysis.  They're still currently

4          working on breaking the cell phones in regards to the

5          password or pass code on the phones.

6    Q.   Okay.  So they're still pending?

7    A.   Yes.

8    Q.   And then the North Face jacket, do you do anything

9          with that?

10    A.   Yes.  That was submitted to BCI for DNA analysis to

11         compare it with Mr. White's DNA.

12    Q.   Why did you collect the North Face jacket?

13    A.   Because when I had originally viewed the surveillance

14         video it appeared to be a dark colored jacket,

15         possibly a North Face jacket.

16    Q.   Okay.  I'm sorry.  What did you say you did with the

17         jacket?

18    A.   Submitted it to BCI for DNA analysis.

19    Q.   All right.  Are you aware of what those results were?

20    A.   The results were positive for Mr. White's DNA on the

21         jacket.

22    Q.   Okay.  The Mr. White that you arrested, is he present

23         at all today?

24    A.   He is.

25    Q.   Could you just indicate where he is located and what

 1          he's wearing?

 2     A.   He's seated to my left, black afro, he's wearing a

 3          dark colored sweatshirt, blue pants, orange-yellowish

 4          sandals.

 5                    MR. SCHROTH:  All right.  Judge, I'd

 6               ask the record to reflect that he's identified

 7               the alleged delinquent.

 8                    THE COURT:  Yes.  So identified.

 9     Q.   (BY MR. SCHROTH)  Okay.  What was his hair like when

10          you arrested him?

11     A.   He had dreadlocks that were sticking up.

12     Q.   Okay.  So was it the same or different than what we

13          see today?

14     A.   It's different than what we see today.

15     Q.   All right.  Okay.  And does anything else happen?  I

16          think you mentioned before you interviewed Daisyonna

17          and Rayvion at the station?

18     A.   Yes.

19     Q.   Okay.  After those interviews are done, what do you

20          do, if anything, with those two individuals?

21     A.   They were released back to their parents or

22          guardians.

23     Q.   Now, after their interviews, what do you do in the

24          investigation?

25     A.   After their interviews I created two additional photo

315

1       arrays.

2   Q.   Of who?

3   A.   Edward Bunch and Romell Thomas.

4   Q.   Do you -- after you speak with Rayvion and Daisyonna,

5        do you speak with any officers?

6   A.   Yes.

7   Q.   Who is that?

8   A.   Patrol Officer McCoy.

9   Q.   Okay.  What about before you speak with McCoy?

10  A.   Not that I can recall.

11  Q.   Okay.  Do you put every step of your investigation in

12       your police report?

13  A.   Yes.

14  Q.   Would it assist you in remembering if you did

15       anything if you looked at your report?

16  A.   It will.

17  Q.   Okay.  Is your memory refreshed?

18  A.   It is.

19  Q.   Okay.  After the interviews with Daisyonna and

20       Rayvion, do you talk to anybody?

21  A.   I spoke with Officer Beveridge again.

22  Q.   Okay.  Why is that?

23  A.   He has intimate knowledge of the juveniles on Storer

24       Avenue.

25  Q.   And does he help you in terms of identifying anyone?

316

1    A.   Yes.  Romell and Scooby are now identified.

2    Q.   So you learned the name Romell?

3    A.   Yes.

4    Q.   Okay.  When did you learn the name Romell?

5    A.   Through my interviews with Daisyonna Mikula.

6    Q.   And so did you come to learn who Romell is?

7    A.   Yes.

8    Q.   Who's that?

9    A.   Romell Thomas.

10   Q.   How do you spell Romell?

11   A.   R-o-m-e-l-l.

12   Q.   And based on your discussions, your interviews with

13        Rayvion and Daisyonna, do you learn any other names?

14        You get Romell, did you learn any other names at all,

15        any other suspect names?

16   A.   No.

17   Q.   Are you familiar with the name Scooby?

18   A.   I am.

19   Q.   Okay.  How did you become familiar with the name

20        Scooby?

21   A.   Through my interview with Daisyonna and Rayvion.

22   Q.   Okay.  Do you ever learn the identity, the government

23        name of Scooby?

24   A.   Yes.

25   Q.   What's that?

1    A.    It's Jo'von Owens.

2    Q.    How do you spell Jo'von?

3    A.    J-o-'-v-o-n.

4    Q.    Okay.  Owens is spelled just like Jesse Owens,

5         O-w-e-ns?

6    A.    Yes.

7    Q.    Okay.  Now, you had mentioned an Officer McCoy?

8    A.    Yes.

9    Q.    All right.  When does that happen?

10    A.    On May 1st.

11    Q.    Okay.  Just to get that timeline straight in my head,

12         the interviews and the search warrant, those are done

13         on the same day, is that right?

14    A.    Yes.

15    Q.    Okay.  That's April 28th?

16    A.    Yes.

17    Q.    Okay.  When do you talk to Officer McCoy?

18    A.    On May 1st.

19    Q.    Okay.  And what do you learn from him?

20    A.    I learn that he and his partner, Officer Katynski,

21         arrested Edward Bunch for GTMV and RSP.

22    Q.    What's that, what's GTMV?

23    A.    Grand theft motor vehicle, receiving stolen property.

24    Q.    All right.  And why is that important?  So you

25         learned he got arrested for being in a stolen car?

318

```
 1    A.    They also discovered that on April 21st he suffered a
 2          gunshot wound to his right ankle as well.
 3    Q.    Okay.  And why is that important for you?
 4    A.    That's important to me because now Mr. Bunch is a
 5          person of interest in relation to this home invasion
 6          because on the same date and the same approximate
 7          timeframe that this home invasion occurred Mr. Bunch
 8          suffered a gunshot wound to his right ankle.  So
 9          there were some similarities between Mr. Bunch and
10          the incident on West 54th Street.
11    Q.    All right.  So now what do you do with these -- you
12          got some new names, what's the next step in the
13          investigation?
14    A.    Based on my interaction with Officer McCoy and the
15          interviews with Daisyonna and Rayvion, I created two
16          additional photo arrays of Romell Thomas and Edward
17          Bunch.
18    Q.    All right.  You have two new photo arrays, is that
19          what you're saying?
20    A.    Yes.
21    Q.    So now you're armed with two new photo arrays, what
22          do you do and when do you do it?
23    A.    On May 13th, 2015 I was able to get in contact with
24          the three victims from the home invasion.  They
25          agreed to the come to the Second District Police
```

319

```
 1            Station to take a look at the two photo arrays that I
 2            created.
 3    Q.      And in terms of -- can you just walk us through that
 4            process?  Do all three victims come down at the same
 5            time?
 6    A.      Yes.
 7    Q.      All right.  How are those arrays administered?
 8    A.      By blind administrators.  Detectives in the Detective
 9            Bureau that had no knowledge about the case
10            administered those photo arrays.
11    Q.      Okay.  Now, at the time did you become aware of the
12            results of those arrays?
13    A.      Yes.
14    Q.      All right.  And at that time what did you learn of
15            the results of the arrays?  Were there any
16            identifications made by any of the witnesses?
17    A.      Yes, Zackary Hale made two identifications.
18    Q.      Okay.  Do you know who it was he identified?
19    A.      I don't recall.  I would need to reference the photo
20            arrays.
21    Q.      Okay.  We will do these one at a time.  I'm going to
22            hand you State's 84, 85 and 86.
23                      MR. SCHROTH:  Judge, this is 84, 85
24            and 86.
25                      THE COURT:  Thank you.
```

320

1    Q.    (BY MR. SCHROTH)  All right.  I'm going to start with

2          State's 85.  Does that look familiar?

3    A.    Yes, it does.

4    Q.    How is that familiar?

5    A.    It's the identification that Zackary Hale made on

6          this photo array.

7    Q.    Where is that person located in State's 85?

8    A.    Top center.

9    Q.    Okay.  I'm going to hand you State's 86.  Does that

10         look familiar?

11   A.    Yes, it does.

12   Q.    So is that sort of the answer key for 85?

13   A.    Yes.

14   Q.    Who is it that Zackary identified?

15   A.    Shiloh Smalls-Moore.

16   Q.    Could you spell that, just for the record?

17   A.    Shiloh, S-h-i-l-o-h, last name Smalls, S-m-a-l-l-s

18         M-o-o-r-e.

19   Q.    And was he a person of interest in this?

20   A.    He was not.

21   Q.    He's a filler?

22   A.    He was a filler.

23   Q.    Okay.  Handing you State's 84, does that look

24         familiar to you?

25   A.    Yes, it does.

1    Q.    All right.  What is it?

2    A.    Zackary Hale completed this identification sheet.

3    Q.    Okay.  Does it have his level of certainty?

4    A.    80%.

5    Q.    Okay.  And that's State's 84.  Retracing on State's

6          85, what's the hairstyle like on the person he

7          indicated?

8    A.    On 85?

9    Q.    Yeah.

10   A.    Dreadlocks.

11   Q.    Okay.  And the person of interest was who in this

12         photo array?

13   A.    It was Romell Thomas as a person of interest.

14   Q.    And on State's 85, where is Romell Thomas located?

15   A.    Top right corner.

16   Q.    Okay.  Was he identified?

17   A.    He was not.

18   Q.    All right.  And then I think I said Zackary was shown

19         two arrays, is that right?

20   A.    Yes.

21   Q.    Do you know if he made identification on another

22         array?

23   A.    He did.

24   Q.    Okay.  I'm going to hand you 87, 88 and 89.  I'm

25         handing you State's 88.  To be fair, you received all

1    of these.  You didn't administer them but you

2    received the results and all of these?

3  A.  That's correct.

4  Q.  Okay.  State's 88, is that familiar?

5  A.  Yes, it is.

6  Q.  And what's that?

7  A.  Identification made by Zackary Hale on Edward Bunch.

8  Q.  And where is Mr. Bunch located in there?

9  A.  Top right corner.

10  Q.  Okay.  I'm just going to hand you State's 87.  Does

11    that look familiar, State's 87?

12  A.  It does.

13  Q.  And what's that?

14  A.  This was completed by Zackary Hale, it's the

15    identification sheet.

16  Q.  All right.  Does it have a level of certainty?

17  A.  90%.

18  Q.  Okay.  Now, at that time were you aware of any

19    identifications by any of the other witnesses?

20  A.  I was aware of the results.

21  Q.  And what were the results as you came to know them at

22    that time?

23  A.  No identifications were made.

24  Q.  Okay.  What was your impression at that time in terms

25    of whether the other witnesses identified anyone at

```
 1              all at that time?  Did you think that the other

 2              witnesses did not identify anyone at that point in

 3              time?

 4       A.     Yes, that's correct.  That was my impression.

 5       Q.     And how many administrators were used on this

 6              particular day?

 7       A.     Three administrators.

 8       Q.     And this is what, May 13th, is that right?

 9       A.     May 13th, yes.

10       Q.     Okay.  So are you saying that each witness had a

11              different administrator?

12       A.     That's correct.

13       Q.     Okay.  What's your next step in the investigation

14              now?

15       A.     I obtained search warrants for two of the cell phones

16              that were recovered from the search warrant.  I also

17              obtained a search warrant for Mr. White's Facebook

18              account.

19       Q.     What day was that?  And if it helps you refresh your

20              memory in your report.

21       A.     June 12th, 2015.

22       Q.     Okay.  Just for the sake of completeness, you

23              interviewed Colleen on one more time just on the

24              10th, is that right?

25       A.     Yes, I did.
```

324

```
 1    Q.   All right.  So on the 12th you get a search warrant

 2         for Mr. White's Facebook account.  Did you ever

 3         receive that back?

 4    A.   Yes, I received the results of that search warrant.

 5    Q.   Okay.  I'm going to show you what's been marked for

 6         identification as State's 202.

 7                   MR. HOFFMAN:  Your Honor, for the

 8             record, we would object to this exhibit on

 9             grounds that the date of the photographs on

10             there as provided in other evidence by the State

11             are clearly wrong.  The photographs come from

12             approximately March of 2014.

13                   I think they attempt to show character

14             evidence of my client rather than actual suspect

15             information from the case in hand.  I think that

16             would be the basis of my objection.  The

17             photograph is actually from March of 2015, not

18             the date depicted on the time stamp from

19             Facebook.

20                   THE COURT:  Response?

21                   MR. SCHROTH:  Thanks, Judge.  Yes.

22             This is a profile photo that's uploaded on the

23             day of the incident, on April 21st.  And the

24             reason I think it's important is it shows Mr.

25             White wearing another North Face jacket that
```

```
1              also looks similar to what's depicted in the
2              still frames on the video.
3                      THE COURT:  I belive it's going to go
4              to weight and not admissibility so I will permit
5              it and then you may cross-examine.
6                      MR. HOFFMAN:  Thank you.
7                      THE COURT:  Can we go off the record
8              for a quick second?
9                      (Short recess taken.)
10                     THE COURT:  We are back on the record
11             with Dalonte White, Case No. DL 15105751.  We
12             broke so that Dalonte could get some food.  Did
13             you eat, Dalonte?
14                     MR. WHITE:  Mm-hmm.
15                     THE COURT:  Was it good?
16                     MR. WHITE:  Yeah.
17                     THE COURT:  All right.  Say your name
18             for the record.
19                     MR. WHITE:  Dalonte White.
20                     MR. LAWSON:  John Lawson, Guardian ad
21             Litem.
22                     MR. HOFFMAN:  Brian Hoffman, Assistant
23             Public Defender, representing Dalonte White.
24                     MR. SCHROTH:  Norm Schroth,
25             representing the State of Ohio.
```

326

```
 1                    MR. LAM:  Detective Lam, with the
 2          Cleveland Police Department.
 3                    THE COURT:  All right.  Detective Lam
 4          is in the middle of his direct testimony.
 5          Prosecutor, you may proceed.
 6                    MR. SCHROTH:  Thank you, your Honor.
 7     Q.   (BY MR. SCHROTH)  Detective, I believe before we
 8          broke you had discussed that you had subpoenaed and
 9          received records from Facebook and I was about to
10          show you what's been marked for identification
11          purposes as State's 202.  I'm handing you what's been
12          marked for identification purposes as State's 202.
13          Does that look familiar?
14     A.   Yes.
15     Q.   How is that familiar to you?
16     A.   This was part of the results that were returned from
17          the search warrant on Dalonte White's Facebook
18          account.
19     Q.   Okay.  And what is that a picture of, what is it
20          exactly?
21     A.   Top left picture is a picture of Dalonte White
22          wearing a blue colored North Face jacket holding a --
23                    MR. HOFFMAN:  Your Honor, we would
24          object to what he's holding.
25                    THE COURT:  Let the record reflect
```

1               that the defense Attorney Hoffman has a

2               continuing objection to the photo.

3                    MR. HOFFMAN:  Thank you.

4                    THE COURT:  Go ahead.

5   Q.  (BY MR. SCHROTH)  You can proceed.

6   A.  Holding a black pistol in his left hand.

7   Q.  All right.  Is he clothed?  What's he wearing?

8   A.  Blue colored North Face jacket and jeans.

9   Q.  Okay.  Is there a date on there in terms of when that

10      was posted or uploaded?

11  A.  April 21st, 2015 at 23:14:47 UTC.

12  Q.  And UTC, is it fair to say, Detective, that's London,

13      that is the time in London, that UTC stands for

14      essentially Greenwich Time?

15  A.  Yes.

16  Q.  Okay.  And is it fair that's four hours ahead of the

17      Eastern Standard Time?

18  A.  Yes.

19  Q.  Okay.  So four hours, if you subtract four hours from

20      -- what's the time there, 21 what?

21  A.  23:14.

22  Q.  All right.  If you subtract four hours from 23:14,

23      what time would that be?

24  A.  19:14 hours.  About 7:00 p.m. in the evening.

25  Q.  All right.  You mentioned that Mr. White's wearing a

1       North Face jacket in that photo?

2    A.    Yes.

3    Q.    Okay.  And how does that compare to the North Face

4          jacket that you obtained in your search warrant?

5    A.    It's a very similar style.  The difference is the

6          color of the jacket.

7    Q.    Okay.  And in terms of the backing of the jacket that

8          you had confiscated as part of the search warrant,

9          did you do anything besides just taking the jacket.

10          Did you do anything to help memorialize that jacket?

11    A.    Yes, it was submitted to BCI for DNA analysis.

12    Q.    Sure.  Did you take any photographs?

13    A.    Yeah, we took two photographs of the jacket.

14    Q.    Okay.  I'm going to show you State's 203 and 204.

15          Detective, I'm showing you State's 203, does that

16          look familiar?

17    A.    Yes.

18    Q.    What do we have there?

19    A.    It's the black North Face jacket that was recovered

20          during the search warrant of Mr. White's residence.

21    Q.    All right.  Showing you State's 204, what do we have

22          there?

23    A.    Same jacket, different angle.

24    Q.    What's the angle in State's 203?

25    A.    It's a close up of the front of the jacket around the

1        chest area.

2   Q.   Specifically what do we see, though, what's showing

3        there?

4   A.   It's got a North Face logo on it.

5   Q.   Okay.  And then what do we see, what angle is on

6        State's 204?

7   A.   It's a shot of the rear of the jacket, which also

8        depicts a North Face logo.

9   Q.   And State's 202, the North Face jacket that Mr. White

10       is wearing, can you tell if there's any pockets on

11       that?

12   A.   Yes, it looks like there's three pockets.

13   Q.   Where are they located?

14   A.   One pocket on the left chest and two on the lower

15       section of the jacket near the hands.

16   Q.   Okay.  Where is it positioned exactly, front, back,

17       side?

18   A.   Front.  Front left and front right.

19   Q.   Okay.  Backing up for a minute in terms of the video

20       that was obtained from the street where the incident

21       happened on West 54th Street, in addition to the

22       video did you guys do anything else to that video?

23   A.   We took the video to the Parma Police Department and

24       had one of their officers take several still images

25       from the video and enhance the images.

1    Q.    Okay.  I'm going to hand you what's been marked for

2          identification as State's 69A and 69B.  All right.

3          I'm handing you State's 69A, what do we have there?

4    A.    It depicts a suspect from the home invasion.  He's

5          concealing a firearm into his waistband area.

6    Q.    A little more broadly, what is that, what's the

7          source of those photos?

8    A.    It's from the surveillance camera system.

9    Q.    All right.  How many pictures are on State's 69A?

10   A.    Seven.

11   Q.    Okay.  I'm sorry.  Now, continue, what do you see

12         portrayed in the pictures there?

13   A.    It depicts a black male suspect wearing what appears

14         to be a dark colored jacket, dark colored pants, with

15         some type of logo on the front of the jacket, front

16         left.

17   Q.    Front left?

18   A.    Yes.

19   Q.    In terms of State's 203 and 202, where are the logos

20         located there?

21   A.    On the front left of the jacket.

22   Q.    And how does that compare to State's 69A?

23   A.    Similar location.

24   Q.    Okay.  And State's 69B, I'm handing you that now.

25         Does that look familiar?

1    A.    Yes, it does.

2    Q.    What is the origin of what is located on State's 69B?

3    A.    The origin is the surveillance video camera system.

4    Q.    And how does that compare -- how does 69B compare to

5          69A, is there a difference?

6    A.    The photos in 69B are zoomed in, but they appear to

7          be similar photographs.

8    Q.    Okay.  Back to the timeline of your investigation,

9          the request itself was made June 12th, 2015, is that

10         right?

11   A.    For the search warrants?

12   Q.    Yeah, the search warrant for the Facebook.

13   A.    Yes.

14   Q.    All right.  And I sort of rocketed ahead with the

15         results of that.  But in terms of where we left off

16         in the timeline, in the sequence, in terms of the

17         investigation itself after the day that the search

18         warrants were issued, June 12th, 2015, did you guys

19         do anything else in relationship to this

20         investigation?

21   A.    Yes.  Sergeant Shoulders and myself continued to

22         locate Romell Thomas and Jo'von Owens so we could

23         speak with them.  We were unsuccessful in locating

24         Romell Thomas.  However, we were able to have Jo'von

25         Owens and his mother come in yesterday evening for an

332

```
 1          interview.
 2     Q.   Okay.  Well, in terms of June 24th itself, I just
 3          want to take it chronologically.  Did you have any
 4          luck locating Romell or Jo'von Owens AKA Scooby at
 5          all on June 24th?
 6     A.   No.
 7     Q.   All right.  Where did you go, what happened when you
 8          tried to find them?
 9     A.   For Jo'von Owens we went to his previous addresses
10          located at 6632 Collier Avenue and 3933 East 67th
11          Street.
12     Q.   So you went to those residences?
13     A.   Yes.
14     Q.   What happened?
15     A.   We knocked on the doors and there was no response and
16          the residences appeared to be vacant.
17     Q.   Okay.  What about, what happened in terms of Romell?
18     A.   For Romell Thomas we went to his listed residence at
19          13218 Durkee Avenue in Cleveland, spoke to a
20          female --
21     Q.   I'm sorry.  Durkee?
22     A.   Yes.
23     Q.   Spell that.
24     A.   D-u-r-k-e-e.
25     Q.   Okay.
```

1    A.   We spoke to a female who identified herself as

2         Ms. Perkins, stated she was the grandmother of Romell

3         Thomas, but we were unable to locate Romell and speak

4         with him.

5    Q.   Did you provide any contact information for yourself

6         there?

7    A.   I did.  I provided my name and my phone number to the

8         police station.

9    Q.   Okay.  So what happens?  You're unsuccessful in your

10        attempts to locate them in the neighborhood.  What

11        happens now, anything else happen that day?

12   A.   Later that day Ms. Perkins, who identified herself as

13        the mother of Romell Thomas, called me.  I explained

14        to her that I needed her son Romell Thomas to contact

15        me so that I could speak with him in regards to this

16        matter.

17   Q.   Okay.  So you actually spoke with her?

18   A.   Yes.

19   Q.   All right.  Did anything else happen?  Did Romell

20        come in that day?

21   A.   No, he did not come in.  He has not contacted me at

22        all.

23   Q.   Okay.  So you've spoken to, what, his grandmother and

24        his mother, though?

25   A.   Yes.

334

```
 1   Q.   All right.  And they both have your contact info?
 2   A.   Yes.
 3   Q.   Okay.  What's the next thing that occurs with you in
 4        terms of this investigation?
 5   A.   When I received the results from the search warrant
 6        for Mr. White's Facebook account, I forwarded the
 7        results to you, it was a PDF file.  After that I
 8        scheduled an interview with Mr. Bunch at the County
 9        Jail.
10   Q.   What day was that interview?
11   A.   July 2nd.
12   Q.   Okay.
13   A.   Correction.  July 8th.
14   Q.   What happened on July 2nd?
15   A.   July 2nd I contacted an employee at the County Jail
16        to schedule the interview with Mr. Bunch, but the
17        interview itself did not occur until July 8th.
18   Q.   Oh, I see.  You got the ball rolling on July 2nd?
19   A.   Yes.
20   Q.   Okay.  Now, were you successful in actually talking
21        to Mr. Bunch on July 8th?
22   A.   I was.
23   Q.   Where did that take place?
24   A.   At the Cuyahoga County Jail.
25   Q.   All right.  Who did the interview, who was there?
```

1    A.    Sergeant Shoulders and myself.

2    Q.    Okay.  Was that interview, was it put to writing, was

3          it recorded, how was that done?

4    A.    The interview was recorded, video and audio on the

5          body cameras.

6    Q.    Now, did you do anything to Mr. Bunch before you

7          interviewed him?

8    A.    We explained to him the nature of our visit,

9          explained to him his Miranda Rights.  He stated he

10         understood the rights and was still willing to give

11         us a statement.

12   Q.    What rights did you explain to him?

13   A.    His Miranda Rights.

14   Q.    Yeah.  What are they?

15   A.    You have the right to remain silent.  Anything you

16         say can and will be used against you in a court of

17         law.

18             Prior to any questioning, you have the right to

19         speak with an attorney.  If you cannot afford an

20         attorney, one will be appointed for you.  Do you

21         understand your rights?

22   Q.    Okay.  So you told him that he didn't have to speak

23         to you, is that what you're saying?

24   A.    Yes.

25   Q.    Or if he did speak to you, he could have an attorney

1       present?

2    A.   Correct.

3    Q.   All right.  Did he ask for an attorney?

4    A.   He did not.

5    Q.   Did he say I'm not talking to you, no way?

6    A.   No, he did not.

7    Q.   Okay.  What did he do?  Did he comply with the

8       interview?

9    A.   He did.  He actually completed a HIPPA Statement and

10      then that's when we began the interview.

11    Q.   What's a HIPPA Statement?

12    A.   It's a document that he completed which releases his

13      medical records to the Prosecutor's Office.

14    Q.   Okay.  So are you saying that Mr. Bunch gave you

15      permission to get his medical records from that same

16      day of the incident?

17    A.   Yes.

18    Q.   Okay.  So you're saying that he didn't have to speak

19      with you but he did?

20    A.   He did.

21    Q.   And that he could have had a lawyer, but he didn't

22      want one?

23    A.   He did not want one.

24    Q.   And that he willingly signed a form giving the police

25      department access to his medical records?

1    A.   That's correct.

2    Q.   All right.  Okay.

3                    THE COURT:  Attorney Lawson, if you

4           need to step out and find out what is going on,

5           go for it.

6                    MR. LAWSON:  Okay.  I need to find out

7           what happened.

8                    THE COURT:  Yeah, go ahead.

9    Q.   (BY MR. SCHROTH)  We can't get into what he said, but

10          did you have a conversation with Mr. Bunch about the

11          events of April 21st, 2015 for him?

12   A.   Yes.

13   Q.   All right.  And then what, if anything, else that

14          occurred as part of this investigation?

15   A.   After I spoke with Mr. Bunch, I also spoke with

16          Jo'von Owens yesterday evening.

17   Q.   Okay.  And that's Scooby?

18   A.   Yeah, Scooby.

19   Q.   All right.  And since that was just last night, have

20          you had the opportunity to summarize your interview?

21   A.   I have not.

22   Q.   Okay.  Was that interview, was it a written

23          statement, was it audio-recorded, video-recorded?

24   A.   It was video and audio via the body cameras.

25   Q.   All right.  Now, Detective, are you familiar with the

1          location of the crime?

2   A.    Yes.

3   Q.    What's that address again?

4   A.    3255 West 54th Street in Cleveland.

5   Q.    All right.  And did you become familiar with the

6          location of where Mr. Bunch was residing on

7          April 21st, 2015?

8   A.    Yes, on Puritas Avenue.

9   Q.    Okay.  Generally are you -- you've been a police

10         officer for how long?

11  A.    Six years.

12  Q.    Are you familiar with the locations of Mr. Bunch's

13        home address and the location of the crime itself,

14        generally where they are located in Cleveland?

15  A.    Yes.

16  Q.    All right.  I'm going to show you State's Exhibit 74

17        and 75.  I'm handing you what's been marked for

18        identification purposes as State's 74.  Does that

19        look familiar to you?

20  A.    Yes, it does.

21  Q.    All right.  What do we see generally there, what is

22        that?

23  A.    It's an overview of the west side of Cleveland border

24        between the First and Second Districts.

25  Q.    And are there any addresses highlighted on there?

1   A.   There's two highlighted.

2   Q.   Which ones?

3   A.   The first one is 3255 West 54th Street and the second

4        address is 13415 Puritas Avenue.

5   Q.   Okay.  And does that give a distance between the two?

6   A.   Yes, 5.9 miles.

7   Q.   Okay.  Does it indicate how long it would take you to

8        travel by car approximately?

9   A.   Thirteen minutes.

10  Q.   Okay.  I'm going to hand you what has been marked for

11       identification as State's 75, and what do we see

12       there?

13            What we saw in State's 74, the first one, so

14       that's substantially similar to what we see here on

15       the Mondopad?

16  A.   It's similar, yes.

17  Q.   Okay.  And State's 75, what's the different between

18       State's 75?

19  A.   On State's 75 it depicts the distance between those

20       two addresses except it's by foot.

21  Q.   Okay.  And the quickest route, how long would it take

22       by foot?

23  A.   One hour and thirty-five minutes.

24  Q.   Now, the path of travel on foot, where does it take

25       you?

340

1   A.   It's generally in a southwest direction from West

2        54st Street to Puritas Avenue.

3   Q.   All right.  And are you familiar with the location

4        where Mr. Bunch indicated he was when he was shot?

5   A.   He stated he was on West Boulevard somewhere between

6        Lorain Avenue and Madison.

7   Q.   And how does that compare to the quickest path of

8        travel home for him from the incident location, the

9        crime location?

10   A.   It would be in a completely different direction in

11        relation to West 54th Street.

12   Q.   Okay.  Where exactly would it be on there?  Can you

13        point on the map for the Judge?

14   A.   To the north, northwest.

15   Q.   Okay.  So in your estimation would that be the

16        quickest route back -- the location where Mr. Bunch

17        indicated he was shot, is that at all part of the

18        quickest route back home if he was coming from that

19        location of the crime?

20   A.   No, it's not.

21   Q.   Okay.  Are you familiar with the address where

22        Mr. White was residing on April 21st, 2015?

23   A.   Yes.

24   Q.   And what address is that?

25   A.   It's on West 59th Place.  I don't recall the specific

| | | |
|---|---|---|
| 1 | | house numbers. |
| 2 | Q. | Would that be something that would be in your report? |
| 3 | A. | It would be. |
| 4 | Q. | Is that in front of you? |
| 5 | A. | Yes. |
| 6 | Q. | If you looked at it, would that help refresh your |
| 7 | | recollection? |
| 8 | A. | 3347 West 59th Place. |
| 9 | Q. | I'm going to show you what's been marked for |
| 10 | | identification purposes as State's 73.  All right. |
| 11 | | Handing you what's been marked for identification as |
| 12 | | State's 73 and what do we see there? |
| 13 | A. | This depicts a path of travel between Colleen's |
| 14 | | residence and Mr. White's residence. |
| 15 | Q. | Okay.  And how far is that from there? |
| 16 | A. | 0.3 miles. |
| 17 | Q. | Okay.  Does it give an estimate of how long it would |
| 18 | | take to walk that? |
| 19 | A. | Six minutes. |
| 20 | Q. | Detective, is one of those two locations closer than |
| 21 | | the other from the location of the crime?  Between |
| 22 | | the two houses that we discussed, Mr. Bunch's house |
| 23 | | and Mr. White's house, how do those two locations |
| 24 | | compare in relationship to where the crime occurred? |
| 25 | A. | Mr. White's residence is located significantly closer |

342

1          to Colleen's residence than Mr. Bunch's.

2    Q.   We had discussed a little bit earlier that you

3         obtained a copy of records for Mr. White's Facebook,

4         is that correct?

5    A.   Yes.

6    Q.   Okay.  Now, are you aware if Mr. Bunch has -- do you

7         know if -- have you located a Facebook account for

8         Mr. Bunch?

9    A.   I'm not aware of a Facebook account for Mr. Bunch.

10                   MR. SCHROTH:  Can I just have a

11            moment, Judge?

12                   THE COURT:  Sure.  Absolutely.

13   Q.   (BY MR. SCHROTH)  Detective, there was some DNA

14        results that were obtained in this case and we

15        discussed some of those earlier, is that right?

16   A.   Yes.

17   Q.   Okay.  Was there any sort of DNA analysis done in

18        regards to the deceased pit bull?

19   A.   Yes.

20   Q.   What was that?

21   A.   The detective that responded to the crime scene took

22        several swabs from the deceased dog's mouth.  Those

23        samples were sent to BCI for analysis and compared to

24        Mr. White's DNA.  The results came back as

25        inconclusive.

343

1    Q.    What do you mean inconclusive?  They weren't able to

2          get a sample off of the dog's mouth?

3    A.    I guess there was no DNA in the dog's mouth.

4    Q.    Okay.

5    A.    It could have been mixed in with the saliva.

6    Q.    Now, were there swabs taken of the blood on the

7          porch?

8    A.    No.

9    Q.    Okay.  Were there swabs taken of any of the blood?

10   A.    I'm sorry.  Yes, there was.

11   Q.    They were taken.  And were those sent out to BCI?

12   A.    They were not.

13   Q.    And why is that?

14   A.    We didn't have any reason to believe that the blood

15         came from anybody else except Ms. Allums.

16   Q.    And the blood that was located in the house, how does

17         that compare to where Ms. Allums was located in the

18         house?

19   A.    The blood that was located in the house was located

20         on the couch in the living room and on the living

21         room floor and that's where Ms. Allums was seated

22         during the home invasion.

23   Q.    And was there any blood outside?

24   A.    Yes, there was blood located outside on the front

25         porch of the residence.

344

1    Q.   And how does that compare to your understanding of

2         where Ms. Allums may have been located?

3    A.   Ms. Allums stated that she had gone outside to her

4         porch and that's consistent with where the blood was

5         located.

6    Q.   And did you find any blood, any trails or any blood

7         anywhere other than the locations where you

8         understood Ms. Allums to have been?

9    A.   I did not locate any other blood trails.

10   Q.   Okay.

11            MR. SCHROTH:  Thank you.  Nothing

12        further.

13            THE COURT:  Okay.  Do you need a

14        minute Attorney Hoffman or are you ready?

15            MR. HOFFMAN:  I think we're okay.

16            THE COURT:  All right.

17            MR. HOFFMAN:  Thank you.

18       **CROSS-EXAMINATION OF DETECTIVE DAVID LAM**

19  **BY MR. HOFFMAN:**

20   Q.   Detective Lam, I'm Brian Hoffman.  I represent

21         Dalonte White.  How are you doing today?

22   A.   Doing well.  How about yourself?

23   Q.   Good.  I'm going to ask you a few follow-up

24         questions.  Okay?

25   A.   Okay.

345

1    Q.    First things first.  Prior to sending a subpoena for

2          the Facebook records, you had done some Facebook

3          research yourself, correct?

4    A.    Yes.

5    Q.    Okay.  And you had actually found that photograph

6          that you previously testified to with Dalonte White

7          sitting in the blue North Face jacket, correct?

8    A.    Yes.

9    Q.    Okay.  I'm handing you what has been marked as

10         Defense Exhibit A.  That's the photograph that you

11         had previously found, correct?

12   A.    Yes.

13   Q.    And there's timestamps on those, correct?

14   A.    There's a date stamp in two locations.  Which one are

15         we talking about?

16   Q.    Let's start with the top.  What's the first date you

17         see there?

18   A.    March 2nd, 2014.

19   Q.    Okay.  So you know that that photograph was much

20         older than the one that you got from the Facebook

21         records that you just testified about, right?

22               THE COURT:  Can I take a gander at

23           what you're showing him so I have an idea?

24               MR. HOFFMAN:  Oh, I'm sorry, your

25           Honor.  I apologize.

346

```
 1                    THE COURT:  Thank you.

 2   Q.   (BY MR. HOFFMAN)   This photograph in Defense Exhibit

 3        A, it's the same one that you testified to about on

 4        direct, correct?

 5   A.   Yes.

 6   Q.   But this one shows that it's clearly a much older

 7        photograph, correct?

 8   A.   It is.

 9   Q.   Over a year older than when this incident occurred?

10   A.   Yes.

11   Q.   So even if it was used in a photograph and uploaded

12        today, it would show today's timestamp, right?

13   A.   Sure.

14   Q.   But we know that it must have been older?

15   A.   Correct.

16   Q.   Since we just finished up with the map situation.

17        You were aware that Edward Bunch was arrested on a

18        different case, correct?

19   A.   Yes, I was aware.

20   Q.   Okay.  And that was for a grand theft motor vehicle,

21        correct?

22   A.   Yes.

23   Q.   And that car was stolen from 1961 West 54th Street,

24        correct?

25   A.   I don't recall the location where the vehicle was
```

```
 1          taken from without referencing the report.

 2    Q.   Have you reviewed that report previously?

 3    A.   Yes.

 4                    MR. SCHROTH:  I'm just going to object

 5           to that, Judge.

 6                    THE COURT:  What's your objection?

 7                    MR. SCHROTH:  I mean, it's hearsay.

 8           He wasn't part of the investigation at all on

 9           that case.

10                    THE COURT:  Do you want to respond to

11           that?

12                    MR. HOFFMAN:  Your Honor, my response

13           would be he used this as part of the preparation

14           for the investigation against Edward Bunch in

15           this case and I think it shows the proximity of

16           where Bunch was previously known to frequent and

17           be involved.  He's reviewed it as part of his

18           investigation.

19                    MR. SCHROTH:  Judge, I don't think he

20           did.  I think he just got -- only the officer

21           can answer this.  His source of information from

22           Bunch wasn't from the police report, but only he

23           knows, from the officer telling him.

24                    THE COURT:  I'll let him inquire and

25           then you can object again if you find it
```

348

```
 1              inappropriate.
 2    Q.   (BY MR. HOFFMAN)  So just to be clear, Detective Lam,
 3         you did review that report where Edward Bunch was
 4         arrested?
 5    A.   Yes, I've reviewed the arrest report for the GTMV.
 6    Q.   Okay.  And that happened right around April 22nd,
 7         correct?
 8    A.   I would have to reference the report if we're going
 9         to get specific on dates and times.
10    Q.   If you had a chance to review that report again,
11         would that refresh your recollection as to what you
12         reviewed previously?
13    A.   It would.
14              MR. SCHROTH:  Judge, I'm still going
15         to object.  I mean, it's still total hearsay.
16         It's being used to prove the truth of the matter
17         asserted.
18              MR. HOFFMAN:  Your Honor, the only
19         thing I want to offer it for is that it puts
20         Edward Bunch in that area around the same date
21         and time.
22              I think the evidence on direct
23         examination tries to put him down on Puritas far
24         away from this.  Clearly he was arrested in this
25         area right after the events.
```

1                    THE COURT:  And it does appear to the

2          Court as if the Prosecution's trying to show

3          that Edward Bunch lives on Puritas and it's five

4          miles from the site where Dalonte White lives .3

5          miles away.  And I do think it's then relevant

6          whether Mr. Bunch can travel.  So I'm going to

7          permit it.

8                    MR. HOFFMAN:  Thank you.

9                    THE COURT:  But let's be clear, it

10          only goes to weight and not necessarily

11          admissibility.

12     Q.   (BY MR. HOFFMAN)  Mr. Lam, if you can please take a

13          moment to review the top portion of that police

14          report.

15     A.   Is this the original GTMV report or is this the

16          arrest report for the grand theft motor vehicle?

17          Because those would be two separate reports with

18          separate dates and times.

19     Q.   That I'm not sure.  Could you review that and let me

20          know which one it is?

21     A.   Okay.  Because I have a copy of the arrest report in

22          my case file.

23     Q.   Okay.  So there's two different reports?

24     A.   Yes.  There's an original report when the victim

25          reports his or her vehicle stolen and then there's an

350

```
 1          arrest report when the officers arrested Mr. Bunch
 2          and the other gentleman for those crimes.
 3                        THE COURT:  Let's go off the record.
 4                        (Short recess taken.)
 5                        THE COURT:  All right.  Let's go back
 6              on the record.
 7     Q.   (BY MR. HOFFMAN)  Detective Lam, I'm actually going
 8          to start you with the incident report.
 9     A.   Okay.
10     Q.   And at the top of that it gives some dates and times.
11          Could you review those and let me know if that
12          refreshes your recollection as to when that incident
13          took place and where?
14                        THE COURT:  Is that marked as an
15              Exhibit?
16                        MR. HOFFMAN:  Defense B, your Honor.
17                        THE COURT:  Thank you.
18     A.   Based on this incident report, it says the crime was
19          reported on April 23rd, 2015 at 12:44 a.m.
20     Q.   (BY MR. HOFFMAN)  Okay.  And where was that incident
21          from?
22     A.   1961 West 54th Street.
23     Q.   Okay.  And is that the incident report from when
24          Edward Bunch was arrested?
25                        THE COURT:  Can you say that address
```

351

1          again please?

2                    THE WITNESS:  1961 West 54th Street.

3     Q.   (BY MR. HOFFMAN)  Okay.  So you had a vehicle stolen

4          from West 54th?

5     A.   Correct.

6     Q.   And Edward Bunch was subsequently then arrested for

7          that, correct?

8     A.   He was arrested approximately a week later.

9     Q.   And where was he arrested at, what location?

10    A.   West 58th Street and Otto Court.

11    Q.   So right around here (indicating)?

12    A.   I've got bad vision, but --

13                   THE COURT:  You can get up if you need

14         to look.

15    Q.   (BY MR. HOFFMAN)  We're referencing the map that you

16         had just testified regarding the placement of the

17         victim's house on 3254 West 54th.  You indicated that

18         Edward Bunch was arrested at West 58th and Otto

19         Court?

20    A.   Yes, somewhere in that area.

21    Q.   And that's approximately three blocks west of the

22         incident?

23    A.   Sure.

24    Q.   And then the vehicle was actually stolen from

25         somewhere on West 54th Street itself?

1  A.  The vehicle was stolen at 1961 West 54th Street and

2  that would have been north of Lorain Avenue.

3  Q.  You said 1954?

4  A.  1961 West 54th Street.  A little bit north of Lorain

5  Avenue.

6  Q.  So that's north of the incident over off of Lorain?

7  A.  Correct.

8  Q.  But still in the same area?

9  A.  Still in the Second District, yes.

10  Q.  Okay.  Did you have a chance to review any of Edward

11  Bunch's prior cases?

12  MR. SCHROTH:  Objection.

13  THE COURT:  Basis?

14  MR. SCHROTH:  Judge, his priors have

15  absolutely no relevance on this case whatsoever.

16  THE COURT:  Well, I'm going to allow

17  it as to whether he reviewed them, but I don't

18  necessarily want to go into specifics.

19  Q.  (BY MR. HOFFMAN)  Did you review any of Edward

20  Bunch's prior reports in cases in this matter?

21  A.  I did not.

22  Q.  Okay.  Were you made aware of any of them?

23  A.  No.

24  Q.  So you never heard that Edward Bunch had a prior case

25  in the area of Second District?

```
 1   A.   Not to my knowledge, no.

 2   Q.   Do you know that Sergeant Shoulders was on that as

 3        well?

 4   A.   I was not aware.

 5   Q.   You were here in Court the other day when you heard

 6        me asking about that, correct, to review the police

 7        reports in connection with Edward Bunch?

 8   A.   Yes.  I think you made a comment, yes.

 9   Q.   But you chose not to review those?

10   A.   I did not review it.

11   Q.   So you wouldn't be aware if Edward Bunch --

12                   MR. SCHROTH:  Objection, Judge.  He's

13             not aware.

14                   THE COURT:  I'll let him finish his

15             question and then you can object and then I'll

16             sustain it.

17                   MR. SCHROTH:  Okay.

18   Q.   (BY MR. HOFFMAN)  You wouldn't be aware that Edward

19        Bunch was a suspect in an aggravated burglary a mile

20        and a half south of the incident in question in this

21        case?

22                   MR. SCHROTH:  Objection.

23                   THE COURT:  Sustained.

24   Q.   (BY MR. HOFFMAN)  Did you review an incident report

25        regarding Edward Bunch in terms of the shooting on
```

354

```
 1          West Boulevard?
 2     A.   I did.
 3     Q.   Okay.  And did you pull police reports regarding
 4          that?
 5     A.   Yes.
 6     Q.   Did you speak with any detectives regarding that?
 7     A.   I did not.
 8     Q.   Okay.  But you became aware of the allegations there?
 9     A.   Yes.
10     Q.   And you actually spoke to him yourself, Mr. Bunch?
11     A.   Yes, I did.
12     Q.   And basically, he puts himself in the area of West
13          Boulevard in between Madison and Lorain?
14     A.   Yes, somewhere in that area.
15     Q.   Detective, you indicated that you heard previously
16          that Edward Bunch went to Lakewood Hospital, right?
17     A.   Yes.
18     Q.   And you pulled those records?
19     A.   What records?
20     Q.   You requested his medical records from Lakewood
21          Hospital?
22     A.   I didn't personally request it, but I had him
23          complete the HIPPA form.
24     Q.   And you're aware that those have been completed?
25     A.   Yes.
```

1   Q.   And you're aware that Edward Bunch arrived there

2        6:38 p.m.?

3   A.   I'm not sure on the precise time.

4   Q.   Have you reviewed his medical records at all?

5   A.   I have not.

6   Q.   Okay.  Have you found out how far Lakewood Hospital

7        is from the incident?

8   A.   No, I do not know.

9   Q.   I'm showing you up on the Mondopad a couple of

10       different addresses here, one being 3255 West 54th,

11       one being Madison Avenue and West Boulevard and

12       another being Lakewood Hospital.  Does that look

13       accurate to you?

14  A.   It does.

15  Q.   Would you agree with me Madison and West Boulevard

16       appears to be on the way from 3255 West 54th to

17       Lakewood Hospital?

18  A.   Depending on which route you take, it could be, yes.

19  Q.   And that's about where Edward Bunch says he was shot?

20  A.   Based on the route that you've got depicted, yes.

21  Q.   His information hasn't been very helpful, has it?

22       Edward Bunch?

23  A.   In terms of what?

24  Q.   He said he was with a friend, correct?

25  A.   Correct.

356

1   Q.   Did he ever provide that name of anyone prior to him

2        testifying on Tuesday?

3   A.   He did not.

4   Q.   Refused to give you a name?

5   A.   Of his friend?

6   Q.   Yes.

7   A.   Yes, he did not provide a name of his friend.

8   Q.   Wouldn't give you an address?

9   A.   Address?

10   Q.   Of his friend.

11   A.   He did not provide one.

12   Q.   You can't follow-up on any of that, can you?

13   A.   I cannot.

14   Q.   And you heard him asked, did your friend have a

15        nickname, correct?

16   A.   Yes.

17   Q.   He said his name's Nick?

18   A.   Correct.

19   Q.   Not much to follow-up on there, is there?

20   A.   That's correct.

21   Q.   Detective Lam, I was trying to understand, so you

22        were in the military for about eleven years?

23   A.   Yes, I was.

24   Q.   And then you went to CPD or Cleveland Police and

25        you've been there for about five years?

1   A.   I'm actually serving both careers at the same time.

2        I'm actually still in the service.

3   Q.   Very good.  Okay.  And so you've been a detective for

4        how long?

5   A.   About four months.

6   Q.   Okay.  So you're still kind of in training?

7   A.   There's no formal training.  It's on-the-job-training

8        I guess.

9   Q.   Is that why Sergeant Shoulders is with you pretty

10       much the whole time?

11  A.   Correct.

12  Q.   Helping do the reports and everything, correct?

13  A.   Sure.

14  Q.   Guide you along?

15  A.   Sure.

16  Q.   Okay.  So your first step is you go out on the scene,

17       you meet with people, you canvas the area, all of

18       those things, correct?

19  A.   Yes.

20  Q.   That's what you're trained to do, correct?

21  A.   Yes.

22  Q.   And initially, you don't have any suspects, correct?

23  A.   Initially, no.

24  Q.   And so at that point in time, Officer Daugenti and

25       Officer Harrigan, they're speaking with the victims,

358

1          correct?

2     A.   Yes.

3     Q.   And they create a police report, correct?

4     A.   Yes.

5     Q.   And you rely on that information when you're

6          conducting your investigation too, correct?

7     A.   Yes.

8     Q.   And the first information that you received regarding

9          the gunman in this case is that he's 6 foot, 6 foot

10         1?

11                    MR. SCHROTH:  Objection.  That's

12         hearsay.

13                    THE COURT:  I'm going to allow it.  Go

14         ahead.

15    Q.   (BY MR. HOFFMAN)  Correct?

16    A.   Based on the initial police report, yes.

17    Q.   Okay.  And that the suspect was 200 to 250 pounds?

18    A.   Yes.

19    Q.   Black male with dreadlocks?

20    A.   Yes.

21    Q.   You then get basically a set of individuals including

22         Dalonte White and you prepare photo arrays, right?

23    A.   Yes.

24    Q.   And that's basically asking around with other

25         officers, correct?

```
 1    A.   Asking for what?

 2    Q.   Asking for names from other officers, correct?

 3         Potential suspects in the area.

 4    A.   Yes.

 5    Q.   So you go on OLEG to create photo arrays, right?

 6    A.   Yes.

 7    Q.   Okay.  And when you do that, you type in their name,

 8         correct?

 9    A.   The person of interest?

10    Q.   Yes.

11    A.   Yes.

12    Q.   So first you take Rayvion Edwards, right?

13    A.   Okay.

14    Q.   Is that right?

15    A.   Yes.

16    Q.   Okay.  And so you plug his name in and you get a

17         photo of him?

18    A.   Yes.

19    Q.   And then at some point does OLEG automatically put

20         suspects in the lineup for you, do you pick them, how

21         does that work?

22    A.   You input your person of interest and then it shows

23         you the physical characteristics for that person of

24         interest, such as race, gender, height, weight, hair

25         color, eye color, and you can select various of other
```

360

 1          photographs that may pull based on that person of
 2          interest.  So for example, if you pull a person of
 3          interest that's five-six in height, the range for the
 4          other photos could be between five-four to
 5          five-eight.
 6     Q.   Okay.  So you do that with each of these suspects,
 7          correct?
 8     A.   That's correct.
 9     Q.   And when it comes to hair, does it give you an
10          ability to choose a length?
11     A.   I don't recall.
12     Q.   What about a hair style?
13     A.   I don't recall.
14     Q.   Well, when you created the photo array for Rayvion
15          Edwards, Rayvion Edwards has short cut hair, much
16          like yourself, correct?
17     A.   Yes.
18     Q.   So clearly not dreadlocks, right?
19     A.   Yes.
20     Q.   But he was still included in a photo array, correct?
21     A.   Yes.
22     Q.   And in that photo array everyone else had similar
23          type of hair, correct?
24     A.   Short hair style?
25     Q.   Yes.

1   A.   Yes.

2   Q.   All right.  And then you did one for Shetrell Harris,

3        who has been called Poohead, right?

4   A.   Yes.

5   Q.   Okay.  Everyone in his photo array kind of had longer

6        dreads, correct?

7   A.   Yes.

8   Q.   And then you did one or Dalonte White, right?

9   A.   Yes.

10  Q.   And this is a fair and accurate copy of one of his

11       photo arrays that he was put in, correct?

12  A.   Correct.

13                   THE COURT:  What exhibit is that, do

14            you remember?

15                   MR. HOFFMAN:  109, your Honor.

16                   THE COURT:  Okay.  Photograph array

17            with Dalonte White is the one that was shown to

18            Ms. Allums.

19                   MR. HOFFMAN:  I believe that's

20            correct.  Yes.

21  Q.   (BY MR. HOFFMAN)  Detective, on the screen.  As I was

22       mentioning, Dalonte White was depicted in this photo

23       array, correct?

24  A.   Correct.

25  Q.   And then these other images were populated with other

```
 1              people, correct?
 2    A.    Yes.
 3    Q.    None of them have dreadlocks, correct?
 4    A.    That's correct.
 5    Q.    So he's really the only one with dreadlocks?
 6    A.    Yes.
 7    Q.    And they're kind of a thin short dreadlock, correct?
 8    A.    Yes.
 9    Q.    But they're hanging down by his ears, down past the
10          middle of his face, correct?
11    A.    They're hanging down his forehead, yes.
12    Q.    Okay.  And you can see them kind of hanging down on
13          the side here and on the top a little bit?
14    A.    A little bit, yes.
15    Q.    Okay.  But you would agree with me, he's the only one
16          in that photo array with dreadlocks?
17    A.    Yes.
18    Q.    And so at that point in time then you show these
19          photo arrays to the three victims, correct?
20    A.    Yes.
21    Q.    And all three of them pick out Dalonte White, right?
22    A.    Yes.
23    Q.    And so based on that then some other officers went
24          out on April 24th, which is about two or three days
25          later, correct?
```

1   A.   Yes.

2   Q.   And they took photographs of Dalonte, right?

3   A.   Yes.

4   Q.   Detective, I'm handing you what has been marked as

5       State's Exhibit No. 70.  Do you recall that

6       photograph that you testified about on direct?

7   A.   Yes.

8   Q.   And that photograph, that's Dalonte White, right?

9   A.   Yes, it is.

10   Q.   In that photograph, his locks in that picture or

11       twists are kind of a little bit thicker and

12       everything is kind of sticking out and up, right?

13   A.   Yes.

14   Q.   Kind of like a fro that was kind of like some twists

15       put into it, right?

16   A.   Yeah, possibly.

17   Q.   It's not bouncing up and down or anything like that,

18       hanging way over his forehead anymore, correct?

19   A.   I mean, there's one strand that's over his forehead

20       slightly.

21   Q.   But clearly not hanging down like they were in the

22       picture in the photo array, correct?

23   A.   Yes.

24   Q.   And that's because the picture from the photo array

25       was an older photograph of him, correct?

364

1   A.   Yes.

2                  THE COURT:  What date was that one

3        taken?

4   Q.   (BY MR. HOFFMAN)  It was April 24th, correct?

5   A.   April 24th.

6   Q.   And then on that same day there were photographs

7        taken of both of his legs and his white shoes,

8        correct?

9   A.   Yes.

10  Q.   And there's no marks or injuries whatsoever?

11  A.   None visible, yes.

12  Q.   No bruising, right?

13  A.   No.

14  Q.   No teeth marks?

15  A.   Not visible, no.

16  Q.   Nothing swollen?

17  A.   No.

18  Q.   Nothing.  And that's like two days afterwards, right,

19       two, two and half, three days?

20  A.   Closer to three days after the incident, yes.

21  Q.   And you would agree with me that on that video you

22       can clearly see someone limping and favoring their

23       right leg, right?

24  A.   Yes.

25  Q.   Okay.  So when the officers went out there you're

1        looking for injuries to a leg, correct?

2  A.    That's what they were looking for, yes.

3  Q.    And the white shoes that he had on, those are

4        important because in the video you can see someone

5        with white shoes, right?

6  A.    Yes.

7  Q.    So the thought might be that there might be dogs

8        marks or something, some bite marks in the shoes,

9        correct?

10  A.   Yes.

11  Q.   But nothing was disturbed in the photographs we saw,

12       shoes appeared fine?

13  A.   Yes.

14  Q.   And so at that point there's no additional evidence,

15       no marks from a dog, so Dalonte White was let go, he

16       wasn't arrested?

17  A.   He was let go, yes.

18  Q.   Okay.  And then it was, I believe on the 28th, about

19       four days later you conduct a search warrant,

20       correct?

21  A.   Arrest and search warrant, yes.

22  Q.   How many officers were there?

23  A.   Based on what I recall, at least six to seven.

24  Q.   And you're all trained officers, correct?

25  A.   Yes.

366

1    Q.   Trained not only to do search warrants, but to write

2         them, correct?

3    A.   To write search warrants?

4    Q.   Yes.  Search warrants, search warrant affidavits?

5    A.   Yes.

6    Q.   Put those together and get a Judge to sign it, right?

7    A.   Yes.

8    Q.   And then you know how to conduct those, correct?

9    A.   Yes.

10   Q.   You've been trained to go in houses, how to apprehend

11        suspects there, correct?

12   A.   Yes.

13   Q.   So you're going in guns drawn, correct?

14   A.   Yes.

15   Q.   Okay.  And Dalonte doesn't put up any fight, hey, I'm

16        here, right?

17   A.   Correct.

18   Q.   So you guys are not only searching to find the people

19        in there, you're also searching to look for evidence,

20        correct?

21   A.   Yes.

22   Q.   And you're primarily looking for a gun, right?

23   A.   Yes.

24   Q.   Stolen cell phones?

25   A.   Yes.

1    Q.    And a black North Face jacket?

2    A.    Yes.

3    Q.    You don't find a gun?

4    A.    No.

5    Q.    You looked all over?

6    A.    Yes.

7    Q.    You looked for the cell phones all over?

8    A.    Yes.

9    Q.    The cell phones you recovered were not the victims

10         cell phones?

11   A.    Does not appear so.

12   Q.    Well, you would have checked that, right?

13   A.    Yes.

14   Q.    And then you take the black jacket, correct?

15   A.    Yes.

16   Q.    And you send it to a lab?

17   A.    Yes.

18   Q.    And primarily looking for blood on that jacket,

19         right?

20   A.    DNA.

21   Q.    Okay.  No DNA outside of Dalonte White, right?

22   A.    Correct.

23   Q.    And there was no blood found on it either?

24   A.    Not that I'm aware of, no.

25   Q.    And then you do an inventory afterwards, right, where

```
 1            you detail out what items were collected?

 2    A.   Yes.

 3    Q.   And I believe in your report you mentioned there was

 4         a black Alcatel cell phone that was taken, correct?

 5    A.   Yes.

 6    Q.   Was that taken from Dalonte's person then?

 7    A.   I believe it was taken from his bedroom, front

 8         bedroom.

 9    Q.   Clearly his?

10    A.   It was located next to his other belongings, so that

11         was our guess, yes.

12    Q.   So that was the cell phone found on him or in the

13         area of Dalonte, right?

14    A.   Yes.

15    Q.   The other cell phone was found in another bedroom

16         where his sister stayed?

17    A.   In a separate bedroom.

18    Q.   All right.  Where his sister stays, right?

19    A.   Yes.

20    Q.   And she was taken out of the house too?

21    A.   Yes.

22    Q.   So this black Alcatel cell phone, is this the one

23         that you're running -- the team was trying to

24         basically encrypt and get a search warrant on?

25    A.   We have the search warrant.  They're trying to break
```

```
 1                the pass code on it.

 2    Q.   Okay.  So at the time of the search warrant and the

 3         arrest warrant, that's when you actually formally

 4         arrest Dalonte, correct?

 5    A.   That's correct.

 6    Q.   And at that point in time you have identifications

 7         from three of the victims, correct?

 8    A.   Yes.

 9    Q.   That's pretty much it, right?

10    A.   Yes.

11    Q.   And so you relied on that information when you

12         charged Dalonte?

13    A.   Correct.

14    Q.   Two days after that, I believe right around May 1st,

15         you find out information about Edward Bunch?

16    A.   Yes.

17    Q.   And you found out that he was arrested for grand

18         theft of motor vehicle?

19    A.   Correct.

20    Q.   He was also arrested with two other black males,

21         right?

22    A.   I don't think that's accurate.  I think he was

23         arrested with one other person.

24    Q.   If you had a chance to review your report, do you

25         think that would refresh --
```

1      MR. SCHROTH:  Objection, Judge.  He

2  wasn't the arresting officer for Edward Bunch.

3      MR. HOFFMAN:  The reason I would offer

4  it, your Honor, is that in the case at hand that

5  we're talking about, three black male suspects,

6  there's three black males in this particular

7  report that he was arrested with and I believe

8  they fit the description of the people also

9  described as going into the home.

10      MR. SCHROTH:  He just can't speak to

11  it because he wasn't there.

12      THE COURT:  Go off the record for a

13  second.

14      (Short recess taken.)

15      MR. SCHROTH:  I object to any

16  discussion about Bunch's arrest.  I mean, he

17  wasn't the officer there.  Anything that he's

18  reading on the report is hearsay.  He doesn't

19  really know.  He can't verify it.

20      THE COURT:  No, he can't.  But what he

21  can testify to is if he is aware of the report

22  and read the report, what he did in connection

23  with that to this investigation.

24      MR. SCHROTH:  Right.  What he did.  He

25  just can't testify to the contents of the

1           report.

2                       THE COURT:  Correct.

3       Q.  (BY MR. HOFFMAN)  All right.  So that's when you

4           became aware of Edward Bunch having a gunshot wound

5           to the right ankle, correct?

6       A.  Correct.

7       Q.  And that was just a couple of days after you had

8           arrested Dalonte, correct?

9       A.  Correct.

10      Q.  And you discovered that Edward Bunch matched the

11          description originally given of the gunman in the

12          incident on West 54th?

13      A.  In comparison to the initial report, yes.

14      Q.  He was 6 feet tall, about 213 pounds, correct?

15      A.  In the initial report, yes.

16      Q.  Black male, dreadlocks, looking like he fits the

17          description, correct?

18      A.  Yes.

19      Q.  Actually, his photograph kind of looks like Dalonte's

20          photograph from the photo array, correct?

21      A.  Yes, it could be mistaken.

22      Q.  And so Edward Bunch went to the hospital that night,

23          correct?

24      A.  Yes.

25      Q.  And it was believed to be 30, 40 minutes after the

372

```
1              incident at Colleen Allum's house?
2    A.    Yes.
3    Q.    And Bunch refused to give any details about how he
4          got shot originally, correct?
5                        MR. SCHROTH:  Objection.
6                        THE COURT:  Basis?
7                        MR. SCHROTH:  All of these questions
8              are about things that this officer was not a
9              part of.  I mean, he can't testify just because
10             he read a police report.  That's hearsay.
11                       MR. HOFFMAN:  I think it goes to show
12             how Edward Bunch became a suspect in the case.
13                       THE COURT:  Yes.  But if he didn't
14             interview Bunch, he would not have known whether
15             he gave an accurate report or not.
16                       So again, you can ask him questions as
17             to what he learned from that and what he did
18             hear.  But if you don't know or you didn't speak
19             to the officer, you are more than welcome to say
20             I don't know.  Okay?
21                       THE WITNESS:  Okay.
22   Q.    (BY MR. HOFFMAN)  Okay.  So based on what you know
23          from it, Edward Bunch claimed he got shot off of West
24          Boulevard, correct?
25   A.    That's correct.
```

1    Q.   And I'm assuming you attempted to pull police reports

2          from that area, correct?

3    A.   Yes, I did.

4    Q.   Review any 911 calls that may have came in, correct?

5    A.   I did not review 911 calls.

6    Q.   That's a pretty busy area, correct?

7    A.   It is.

8    Q.   6:00 p.m., right?

9    A.   Yes.

10   Q.   You'd expect to get some 911 calls for a drive-by

11        shooting, correct?

12   A.   Yes.

13   Q.   You'd expect there to be some police reports out

14        there, correct?

15   A.   Yes.

16   Q.   There aren't any?

17   A.   There was an injury to person report generated for

18        that incident, yes.

19   Q.   Let me back up.  So Edward Bunch when he gets to the

20        hospital he says he got shot in a drive-by off of

21        West Boulevard, right?

22   A.   Yes.

23   Q.   The hospital calls the police on those type of

24        reports, correct?

25   A.   Yes.

374

1    Q.   The police get involved at that point, that's where

2          the report comes from, from the hospital, right?

3    A.   Correct.

4    Q.   But no other citizens, no one else has called 911 or

5          created a report in that area for that date and time,

6          right?

7    A.   Not that I'm aware of.

8    Q.   Did you check?

9    A.   I did.

10   Q.   And there was no bike found in that area either,

11         right?

12   A.   No.

13   Q.   And so at that point in time Edward Bunch is now a

14         prime suspect in this case, correct?

15   A.   He's a person of interest.

16   Q.   All right.  And he matches the height?

17   A.   In the initial police report, yes.

18   Q.   And he matches the weight?

19   A.   Yes.

20   Q.   Matches the hair, right?

21   A.   Yes.

22   Q.   And also in your report you note specifically he has

23         an injury consistent with what you saw in the video,

24         correct?

25   A.   Yes.

1    Q.   He has the right leg injury, right?

2    A.   Correct.

3    Q.   So at that point in time then you create a photo

4         array with Edward Bunch, right?

5    A.   Yes.

6    Q.   And I believe in between that period you get

7         information that there was not a DNA match with

8         Dalonte White as well, correct?  That DNA could not

9         be pulled from the dog?

10   A.   From the dog's mouth.

11   Q.   And you didn't send the blood, right?

12   A.   The blood was not sent.

13   Q.   So then you create the photo array with Edward Bunch,

14        right?

15   A.   Correct.

16   Q.   And in his photo array everyone is depicted with

17        dreadlocks, correct?

18   A.   Yes.

19   Q.   And at that point in time as far as you were aware no

20        one picked out Edward Bunch except for Zackary Hale?

21   A.   Correct.

22   Q.   And are you familiar with Senate Bill 77 and how to

23        conduct photo arrays?

24   A.   I'm not.

25   Q.   Have you ever been trained on the proper procedure

1            for photo arrays?

2    A.     I have.

3    Q.     And are you familiar with the Ohio Revised Code

4           statute dealing with how to administer photo arrays?

5    A.     I am not.

6    Q.     But you know that if one of the witnesses makes an

7           ID, that needs to be written down and collected as

8           evidence, correct?

9    A.     Correct.

10   Q.     And we've heard evidence here recently that that was

11          not done correctly in this case, correct?

12   A.     Correct.

13   Q.     And just to be clear, I think it was Detective

14          Santiago presented the photo array to Colleen Allums

15          which contained Edward Bunch?

16   A.     I would have to review my follow-up, but I don't

17          think that's accurate actually.

18   Q.     Could you check?

19   A.     Sure.  Detective Kubas showed the photo arrays to

20          Colleen Allums.

21   Q.     All right.  Who showed the one to Savannah LaForce

22          then?

23   A.     Detective Santiago.

24   Q.     Okay.  So I flipped them.  So Detective Kubas shows

25          it to Colleen Allums.  Did you speak with Detective

377

```
 1          Kubas before the presentation of the photo array?
 2    A.    Briefly.
 3    Q.    Did you give him any information about the case?
 4    A.    No.
 5    Q.    Did Detective Kubas know that you were looking for a
 6          shooter?
 7    A.    He did not.
 8    Q.    Did Detective Kubas know anything about the case
 9          whatsoever?
10    A.    As far as I know, no, he does not.
11    Q.    But you've heard that there's now evidence that
12          Colleen Allums did make a positive identification of
13          Edward Bunch that day, correct?
14    A.    Yes.
15    Q.    And that would be definitely a severe violation if
16          that was, in fact, true, correct?
17    A.    Yes.
18    Q.    And that actually changes the way that you
19          investigated this case, right?
20    A.    Yes.
21    Q.    And the same thing in regards to Detective Santiago.
22          If you knew that identification of Edward Bunch had
23          been made, that would have changed things
24          significantly, correct?
25    A.    Yes.
```

378

```
 1   Q.   You would have wanted to know that all three victims
 2        did, in fact, identify Edward Bunch?
 3   A.   Correct.
 4   Q.   Instead because that information was withheld from
 5        you, you pretty much closed your case on Edward
 6        Bunch, right?
 7   A.   At that point, yes.
 8   Q.   So you didn't conduct any other follow-up at that
 9        point concerning Edward Bunch?
10   A.   No.
11   Q.   You didn't interview him?
12   A.   I did not.
13   Q.   You didn't interview the other people that he was
14        arrested with?
15   A.   I did not.
16   Q.   You didn't follow any other leads on people he may be
17        connected with?
18   A.   Correct.
19   Q.   You didn't contact the hospital to find out if there
20        was video available of him arriving?
21   A.   I did not.
22   Q.   But you would agree with me that it's possible on the
23        ER they have cameras there for when people are
24        dropped off in the ER?
25   A.   Yes.
```

1   Q.   Do we know if that video is available?

2   A.   I do not know.

3   Q.   And it's partly because there's been now a

4        substantial delay in realizing some of this

5        information, correct?

6   A.   Correct.

7   Q.   Was Detective Santiago familiar with the case at all?

8   A.   As far as I'm aware, no, he's not.

9   Q.   Were either of them informed before the array that a

10      shooter had already been identified?

11   A.   No, I did not tell them that.

12   Q.   Okay.  Were they instructed by you or Sergeant

13      Shoulders, did you say, hey, don't pick someone out

14      if it's the shooter?

15   A.   No, they were not.

16   Q.   That would be wrong, right?

17   A.   Correct.

18   Q.   So now you're aware of these basically two separate

19      detectives possibly violating the photo array

20      guidelines, correct?

21   A.   Correct.

22   Q.   And that, in fact, changes your investigation,

23      correct?

24   A.   It does.

25   Q.   It hindered it in some way, right?

380

1    A.   Okay.  Sure.

2    Q.   It distracted from it?

3    A.   Yes.

4    Q.   It takes away from the evidence that you can give the

5         Prosecutor in this case?

6    A.   Correct.

7    Q.   It takes away from the ability of Dalonte to be able

8         to defend his case, right?

9    A.   Yes.

10   Q.   And it was just on the record a few days ago that we

11        learned, hey, that not only one witness had this

12        issue but two, correct?

13   A.   Correct.

14   Q.   Have you confronted Detective Kubas or Detective

15        Santiago at all in regards to these allegations?

16                   MR. SCHROTH:  Objection.  That's not

17             relevant.

18                   THE COURT:  Can you repeat that?

19                   MR. HOFFMAN:  Have you confronted

20             either Detective Kubas or Detective Santiago in

21             regard to these allegations?

22                   THE COURT:  I'm going to allow it.

23             Overruled.

24   A.   No.

25   Q.   (BY MR. HOFFMAN)  And because of this delay you

381

```
 1          weren't able to actually then go interview Edward

 2          Bunch until July 8th?

 3     A.   Correct.

 4     Q.   And due to the time constraints you were able to

 5          request his initial medical records from Lakewood

 6          Hospital, correct?

 7     A.   Correct.

 8     Q.   But we don't have the Fairview records, correct?

 9     A.   Not to my knowledge, no.

10     Q.   So he's had plenty of time to sort of basically come

11          up with a story about his whereabouts that day,

12          correct?

13                    MR. SCHROTH:  Speculation, Judge.

14            Objection.

15                    THE COURT:  Sustained.

16     Q.   (BY MR. HOFFMAN)  Bunch initially claimed he was home

17          all day, right?

18     A.   That's what he stated, yes.

19     Q.   First thing like right out of the gate, I was home

20          all day, right?

21     A.   Correct.

22     Q.   And you said, well, I'm talking about the day you got

23          shot and then he sort of went on the story about West

24          Boulevard, right?

25     A.   Right.
```

382

```
 1    Q.   You said the incident location was 3255 West 54th, is
 2         that right?
 3    A.   Yes.  Of the home invasion?
 4    Q.   Yes.
 5    A.   That's correct.
 6                   THE COURT:  Attorney, you know you can
 7           move the keyboard up.
 8                   MR. HOFFMAN:  Thank you, your Honor.
 9    Q.   (BY MR. SCHROTH)  And can you again give us the
10         address for Dalonte White?  3347?
11    A.   West 59th Place.
12    Q.   And earlier when we saw the video, it was pretty
13         clear that you could see a suspect limping away,
14         right?
15    A.   Correct.
16    Q.   Not running, right?
17    A.   Not running.
18    Q.   I belive you said kind of casually walking actually,
19         right?
20    A.   I think I said casually limping away.
21    Q.   Okay.  So casually limping away?
22    A.   Yeah.
23    Q.   But at a pretty slow speed, correct?
24    A.   Correct.
25    Q.   I believe here on Google map you said it was about .3
```

383

```
 1            miles and the normal walking time would be about six

 2            minutes, is that correct?

 3     A.     Yes.

 4     Q.     So with an injury slowing you down, is it safe to say

 5            that that's going to take at least ten minutes?

 6     A.     It could, yes.

 7     Q.     Well, let's make sure we can nail it down.  Can we

 8            say that it's going to take at least eight minutes,

 9            it's going to take a little bit longer than six

10            minutes, right?

11     A.     Well, I've never been shot and limped away so now

12            we're just speculating.  So I don't want to put a

13            precise time on it.

14     Q.     There's some main streets in here as well, correct?

15     A.     Yes, there is.

16     Q.     Some stop lights?

17     A.     Some major intersections, yes.

18     Q.     Some traffic going through this area?

19     A.     Yes.

20     Q.     It's going to slow people up?

21     A.     Yes.

22     Q.     And a lot of these backyards, they have high fences,

23            correct?

24     A.     Some of them do, yes.

25     Q.     Not likely to be scaling through backyards over
```

384

```
 1          there, right?  You're pretty much going to have to go

 2          by the street to get back over to 59th Place,

 3          correct?

 4    A.    Yes.

 5    Q.    Especially with a leg injury?

 6    A.    Correct.

 7    Q.    Have you walked that distance?

 8    A.    I have not.

 9    Q.    So you have never traveled from the incident location

10          to Dalonte White's house?

11    A.    Not using that path, no.

12    Q.    It's safe to say it's going to take at least six

13          minutes, though?

14    A.    Walking?

15    Q.    Yeah.

16    A.    For a normal person it would probably take less, less

17          than six minutes.

18    Q.    And then a person with a limp kind of casually

19          walking, at least six minutes, though, right?

20    A.    Possibly, yes.

21    Q.    You said there was no blood or any trail or anything

22          like that?

23    A.    There was not.

24    Q.    You're aware that one of the people that Edward Bunch

25          was arrested with, his name's Dandre Sanders, right?
```

385

```
 1                       MR. SCHROTH:  Objection, Judge, as to
 2            who he's arrested with.  This wasn't an
 3            arresting officer.
 4                       THE COURT:  I'm going to give you a
 5            little leeway.  So I'll overrule.
 6    Q.   (BY MR. HOFFMAN)  You know that from reviewing those
 7            reports, correct?
 8    A.   Yes, I'm aware of the name.
 9    Q.   And you did some Facebook research in this case
10            previously, correct?
11    A.   I did.
12    Q.   Did you ever look up Dandre Sanders?
13    A.   I did not.
14    Q.   Is it pretty easy to do?
15    A.   I haven't tried.
16    Q.   If you were able to find him, you could kind of
17            compare him to the suspects that were discussed here
18            in court today, right?
19    A.   Yes.
20    Q.   And the suspects that were described by the victims
21            previously, right?
22    A.   Yes.
23    Q.   You could do the same with Rayvion, correct?
24    A.   Yes.
25    Q.   But you haven't been able to do that yet, correct?
```

1    A.    Correct.

2    Q.    One of the other things we didn't talk about was the

3          overall condition of the house.  What was it like at

4          the incident, Colleen Allum's house?

5    A.    Pretty deplorable conditions.

6    Q.    And we saw some of the photographs, but it was pretty

7          bad, right?

8    A.    Yes.

9    Q.    The upstairs was covered in dog feces?

10   A.    Yes.

11   Q.    Clothing everywhere.  It looked like they were using

12         like a gas grill for heat in the living room?

13   A.    I don't recall.

14   Q.    Pretty deplorable, though, right?

15   A.    Yes.

16   Q.    Couldn't take fingerprints, is that true?

17   A.    Fingerprints off of what?

18   Q.    Well, I mean, you heard her testify about like a

19         stool where money was taken from, correct?

20   A.    Right.

21   Q.    Did you guys try to take fingerprints off the stool?

22   A.    I'm not sure if the crime scene detective attempted

23         or not.

24   Q.    But you would agree that the conditions in the house

25         are kind of adverse to fingerprinting, correct?

1   A.   Yes.

2   Q.   Okay.  And there was definitely evidence of drug

3        paraphernalia there, correct?

4   A.   I didn't personally observe any.

5   Q.   Well, in the one room there was a large bag of

6        baggies and a little cutting board, a little rolling

7        board?

8   A.   Which room are you referencing?

9   Q.   In the main living room where Colleen Allums was

10       attacked.  Do you recall there being like a little

11       nightstand on the side there, a little table?

12  A.   I don't recall.

13  Q.   If there was drug evidence there, would you have

14       noted it?

15  A.   I would have.

16  Q.   Would it be in your report?

17  A.   It would be in the initial report, yes.

18  Q.   Would it be something that maybe you would ask the

19       victims in investigating this case?

20  A.   Yes.

21  Q.   Because it might lead to potential suspects, right?

22  A.   Sure.

23  Q.   You didn't ask her about that, though, did you?

24  A.   About what?

25  Q.   About any potential suspects related to drugs.  Did

1          you owe a drug dealer money?

2     A.    We did ask the question.

3     Q.    You did?

4     A.    Yes.

5     Q.    Would that be in your report?

6     A.    It's not.

7     Q.    Would it be in her statement, her audio-recorded

8          statement?

9     A.    I don't recall if it's in there or not.

10    Q.    So you asked if she ever used drugs?

11    A.    I believe the question was, is this drug related?

12    Q.    Okay.  Was it drug related?

13    A.    I can't determine that.

14    Q.    Do you know if she owed any drug dealers money?

15    A.    Not that I'm aware of.

16    Q.    Were you aware of this incident involving Christian

17         Hughes?

18    A.    Yes, I am.

19    Q.    When did you become aware of that?

20    A.    Shortly after the home invasion.

21    Q.    So after the home invasion you learned about the

22         incident with Christian Hughes?

23    A.    Correct.

24    Q.    That's not in your report, though, is it?

25    A.    It's not.

389

1    Q.   That would be a potential lead as to someone who may

2          want to do harm to Colleen Allums, though, correct?

3    A.   It's possible, yes.

4    Q.   Did you follow-up on that at all?

5    A.   I did not.

6    Q.   When you indicated about the surveillance video, you

7          indicated that you thought it was like four or five

8          houses away, is that right?

9    A.   Correct.

10   Q.   Would two sound correct as well?

11   A.   It could.

12   Q.   Okay.  Because in the video you can see kind of the

13        basketball hoop, right?

14   A.   Yes.

15   Q.   And that basketball hoop is the one that was right in

16        front of Colleen Allum's house?

17   A.   Yes.

18   Q.   Detective, this is the surveillance video that you

19        pulled as well, correct?

20   A.   Yes.

21   Q.   And we can see the basketball hoop right here,

22        correct?

23   A.   Yes.

24   Q.   So this is about two houses down, right?

25   A.   Yes.

390

```
 1    Q.   And you also see a fence along the street here,

 2         right?

 3    A.   Yes.

 4    Q.   It's about a four-foot fence, right?

 5    A.   I'm not sure on the height.

 6    Q.   You don't recall that from your time out there?

 7    A.   I don't recall.

 8    Q.   Now, at this point you see the suspect walking

 9         through, correct?

10    A.   Yes.

11    Q.   It looks like Edward Bunch, right?

12    A.   No.

13    Q.   It doesn't?  That doesn't look like Edward Bunch?

14    A.   No.

15    Q.   That hair isn't the same as Edward Bunch?  You saw

16         him in Court the other day, right?

17    A.   I did.

18    Q.   He's got the same style hair as this, correct?

19         Right?

20    A.   He's got a similar hair style, yes.

21    Q.   Dreadlocks kind of down to the middle of his

22         forehead, right?

23    A.   Yes.

24    Q.   I can play it again if you need?

25                        THE COURT:  He can get up closer if
```

1          you want him.

2                    MR. HOFFMAN:  Yeah.  Your Honor, can I

3          have permission for him to step down?

4                    THE COURT:  Sure.  Norm?

5                    MR. SCHROTH:  I can see it.  Judge,

6          I'm going to object.  This has been asked and

7          answered.  He already indicated it doesn't look

8          like Edward Bunch to him.

9                    MR. HOFFMAN:  Your Honor, I think the

10         reason I would proffer this part of it is that I

11         think if you view it a few times sequentially

12         because it's such a short clip, you can get a

13         pretty clear picture of the person involved.

14                   MR. SCHROTH:  Judge, I still object.

15         The detective has seen this video before.  It's

16         not like this is his first time.

17                   THE COURT:  Let's just do it for the

18         Court.

19                   MR. SCHROTH:  Yeah, that's fine.

20    Q.   (BY MR. HOFFMAN)  Do you see the hair kind of

21         flopping?

22    A.   Yes.

23    Q.   The dreadlocks hanging down, right?

24    A.   I see the dreadlocks sticking up.

25    Q.   You don't see any dreadlocks laying down on here?

1          Coming down on the side right there?

2     A.   On the side, sure.

3     Q.   Do you see some dreadlocks sticking up in the back,

4          kind of flopping there, moving up and down a little

5          bit?

6                    THE COURT:  All right.  Asked and

7               answered.  Let's move on.

8     Q.   (BY MR. HOFFMAN)  Now that you've had a chance to see

9          the video again, it clearly looked like Edward Bunch,

10         doesn't it?

11    A.   I still don't think so, no.

12    Q.   Consistent with his injuries, right?  Consistent with

13         his hair style, right?

14    A.   Yes.

15    Q.   You can't really see facial hair, right?

16    A.   No.

17    Q.   Can't really make out a face that well, right?

18    A.   Correct.

19    Q.   All you can see is a black male who appears to be

20         tall and husky, right?

21    A.   I can't determine the height.  It's stocky built.

22    Q.   Okay.  And you don't remember that that's a four-foot

23         fence either, right?

24    A.   I don't recall.

25    Q.   If that fence is four-foot tall, that guy looks

```
 1            pretty tall, doesn't he?

 2   A.   If it is indeed four-feet in height.

 3   Q.   And you can go back and check that, right?

 4   A.   Correct.

 5   Q.   So you want us to believe that that person is short

 6        in that video?

 7                    MR. SCHROTH:  Objection.  Judge, this

 8            is the same line of questioning.  He said he

 9            doesn't look like Edward Bunch.  That was his

10            answer.

11                    THE COURT:  Sustained.  It was asked

12            and answered.

13   Q.   (BY MR. HOFFMAN)  You've heard all the witnesses

14        testify in this case, right?

15   A.   Yes.

16   Q.   And the consensus is the male on that video, the

17        gunman in this case is pretty tall, and pretty

18        heavyset, right?

19   A.   There's been some variances in the statements.  On my

20        initial interview with Colleen Allums at the

21        hospital --

22                    MR. HOFFMAN:  Objection.

23   Q.   (BY MR. HOFFMAN)  I'm going to stop you there.

24                    THE COURT:  Wait a minute.  You are

25            objecting to his response?
```

394

```
 1                         MR. HOFFMAN:  I think he was going
 2              outside of what I asked.  I apologize.  I guess
 3              not really objecting but --
 4                         THE COURT:  So are you saying
 5              unresponsive?
 6                         MR. HOFFMAN:  Unresponsive, yes.
 7                         THE COURT:  All right.  I will sustain
 8              that.  Go ahead and repeat the question.
 9    Q.   (BY MR. HOFFMAN)  Your initial report says 6 foot, 6
10         foot 1, correct?
11    A.   Correct.
12    Q.   200 to 250 pounds, correct?
13    A.   Correct.
14    Q.   Colleen Allums says pretty tall, heavyset, correct?
15    A.   During which occasion?
16    Q.   When she testified here in Court.  She said 5 foot 9
17         to 6 foot, the guy was pretty tall, right?
18    A.   Yes.
19    Q.   Savannah LaForce, same thing, the guy is tall, right?
20    A.   Yes.
21    Q.   Dalonte White's not tall, is he?
22    A.   He's about 5 foot 7, 5 foot 8.
23    Q.   You get a photo lineup key when you create photo
24         arrays, don't you?
25    A.   That's correct.
```

```
 1    Q.   Can you see up on the screen?

 2    A.   I can.

 3    Q.   What's it say for Dalonte White?

 4    A.   Five-five.

 5    Q.   Weight?

 6    A.   135.

 7    Q.   A little different than 5 foot 7 or 5 foot 8, isn't

 8         it?

 9    A.   It is.

10    Q.   How tall are you?

11    A.   Five-six.

12    Q.   So he's actually shorter than you?

13    A.   Correct.

14    Q.   Not going to be mistaken for tall, right?

15    A.   It's based on their perception so I can't speak on

16         them.

17    Q.   I'm not asking about their perception, your

18         perception?

19    A.   My perception.

20    Q.   He's not going to be tall, right?

21    A.   What's not tall?  Dalonte?

22    Q.   Five foot five inch suspects aren't tall, are they?

23    A.   No.

24    Q.   But you kind of need to kick his height up a little

25         bit to make this case work against him, right?
```

396

```
 1                    MR. SCHROTH:  Objection.

 2                    THE COURT:  I'm going to overrule it.

 3           I'll let him answer.

 4    A.   No.

 5    Q.   (BY MR. HOFFMAN)  The bottom line is Dalonte White's

 6         short, right?

 7    A.   He's short, yes.

 8    Q.   And all along the gunman in this case has been

 9         described as tall, right?

10    A.   In the initial report, yes.

11    Q.   And in court, right?  We just went through that,

12         right?

13    A.   Yes.

14    Q.   And Edward Bunch fits that, right?

15    A.   Potentially he could.

16    Q.   And now you got three people identifying Edward

17         Bunch, right?

18    A.   Yes.

19    Q.   Don't you wish you knew that earlier?

20    A.   Yes.

21    Q.   Did it make you mad when you found that out?

22    A.   No.

23    Q.   It doesn't make you mad when you hear that fellow

24         officers may have withheld evidence, withheld an

25         identification on your case?
```

397

```
 1              MR. SCHROTH:  Judge, objection.
 2         Listen, we've been through this that the
 3         information would have been helpful if he would
 4         have been aware of it initially.  We're beating
 5         a dead horse here.
 6              THE COURT:  We are.  We can move on,
 7         but I'll let him answer that.
 8    A.   No.  I try not to take anything that's work related
 9         and have it affect me personally.  So I try to keep
10         my personal life and work life separate.  So, no, it
11         doesn't impact me on the emotional level, if that's
12         what you're insinuating.
13    Q.   (BY MR. HOFFMAN)  Yeah, that's what I'm asking.  Does
14         it?
15    A.   No.  No, it doesn't.
16    Q.   So it doesn't bother you if fellow officers violate
17         the law?
18    A.   It does.
19    Q.   So you get upset about that, right?
20    A.   Not on a personal level, no.
21    Q.   But on a professional level that irks you, doesn't
22         it?
23    A.   Yes.
24    Q.   I mean, your job is to uphold the laws of the State
25         of Ohio, right?
```

1    A.    Absolutely.

2    Q.    And so when officers come by and violate the rights

3         of someone in one of your cases, doesn't that bother

4         you?

5                  MR. SCHROTH:  Objection.  This has

6            been asked and answered.

7                  THE COURT:  Sustained.  I gave you a

8            little leeway.  Let's move on to something else.

9                  MR. HOFFMAN:  Nothing further.  Thank

10         you, your Honor.

11                  THE COURT:  All right.  Do you have

12         any redirect?

13                  MR. SCHROTH:  I do, Judge.

14        **REDIRECT EXAMINATION OF DETECTIVE DAVID LAM**

15    **BY MR. SCHROTH:**

16    Q.    Detective, you were asked I think a question about

17         the distance to Lakewood Hospital from the crime

18         screen, 3255 West 54th, do you recall that question?

19    A.    Yes.

20    Q.    Is Lakewood Hospital the closest hospital to 3255

21         West 54th?

22    A.    No, it's not.

23    Q.    What's the closest hospital?

24    A.    Metro Health Hospital.

25    Q.    All right.  I'm going to direct your attention to the

399

1      board.  Can you see this?  Do you need to come down,

2      Detective?

3                      MR. SCHROTH:  Judge, will the Court

4          indulge me?

5                      THE COURT:  Of course.  I will even

6          get the light.  Attorney Hoffman, do you want to

7          watch this?

8   Q.  (BY MR. SCHROTH)  All right.  Detective, what address

9       do we see over here, what's that?

10  A.  3255 West 54th Street.

11  Q.  All right.  What happened at that location?

12  A.  The home invasion on April 21st.

13  Q.  And what do we see up here, what location is that?

14  A.  Lakewood Hospital.

15  Q.  Does that appear to be in the right location based on

16      your knowledge?

17  A.  Yes.

18  Q.  Did this give an estimation of how many miles it is

19      walking?

20  A.  4.9 miles.

21  Q.  Okay.  And what's the walking time?

22  A.  One hour and thirty-seven minutes.

23  Q.  And you said there's a closer hospital?

24  A.  Yes, there is.

25  Q.  Okay.  Now, what do we see here in the left hand

400

1           corner?

2    A.    3255 West 54th Street.

3    Q.    And then what's that again?

4    A.    The crime scene home invasion.

5    Q.    And does it show Metro Health?

6    A.    It does.

7    Q.    Where's that?

8    A.    2500 Metro Health Drive.

9    Q.    Does it give an indication of how many miles it is

10          between the two?

11   A.    1.6 miles.

12   Q.    So how many minutes?

13   A.    Thirty-one minutes.

14   Q.    Is it fair to say that Lakewood Hospital is over

15          double the distance from the crime location than

16          Metro Health?

17   A.    That's a fair statement.

18   Q.    Okay.

19                    THE COURT:  Okay.  Now that we know

20               all of the geographical locations on the west

21               side of Cleveland, can we please move on?

22   Q.    (BY MR. SCHROTH)  I think there was some questions

23          about Dalonte, Mr. White not being arrested on 4/24,

24          is that right?

25   A.    That's correct.

1   Q.   Was there an arrest warrant out for him for that

2        time?

3   A.   There was not.

4   Q.   Would the officers have -- did those officers who

5        stopped him and took photographs, did they see

6        Mr. White commit a crime at that time, to your

7        knowledge?

8   A.   I'm not aware.

9   Q.   Okay.  So would they have the ability to just arrest

10       him at that time without a warrant and without

11       witnessing him commit a crime?

12  A.   No.

13  Q.   Okay.  And there's some questions I believe about

14       whether the victims's, one of the victims's phones --

15       Savannah's phone was taken, is that correct?

16  A.   That's correct.

17  Q.   Whether her phone was in Mr. White's house at the

18       time of the search warrant, is that correct?

19  A.   Can you repeat that?

20  Q.   There was a question whether her phone was in Mr.

21       White's house, is that correct?

22  A.   Correct.

23  Q.   Okay.  And during your investigation and from the

24       testimony do you recall if it was Mr. White or

25       someone else that he was with that actually took her

```
 1            phone?

 2     A.    Somebody else that had taken the victims' phones.

 3     Q.    Okay.  So it wasn't Mr. White that took the phones?

 4     A.    No, it wasn't.

 5     Q.    Okay.  You were asked if there was any 911 calls from

 6            West Boulevard from the time of the drive-by shooting

 7            for Mr. Bunch, do you recall that?

 8     A.    Yes.

 9     Q.    You've been an officer for six years in Cleveland in

10            the major crimes -- well, at least for six years

11            total?

12     A.    Yes.

13     Q.    Every time there's a shooting in Cleveland does that

14            always equal a 911 call?

15     A.    Not necessarily, no.

16     Q.    Okay.  I think you were asked about the incident with

17            Christopher Hughes, is that correct?

18     A.    Correct.

19     Q.    Okay.  And that incident with Christopher Hughes, was

20            that a fight just involving Colleen and other

21            females, is that right?

22     A.    That's what it appeared to be, yes.

23     Q.    Okay.  Were there any weapons used, from your

24            understanding in that incident?

25     A.    I don't think so, no.
```

403

```
 1    Q.    Now, on direct you were asked about testimony
 2          identification of height and the initial report and
 3          at one point you were referencing Colleen's statement
 4          in the hospital.  What were you referencing, what
 5          were you trying to say?
 6    A.    When we interviewed Ms. Allums at the hospital during
 7          that --
 8                    MR. HOFFMAN:  Objection.  Hearsay.
 9                    THE COURT:  I'm going to overrule it.
10    Q.    (BY MR. SCHROTH)  Go ahead.
11    A.    Can I refer to the police report?
12    Q.    Yes, if it helps refresh your recollection.
13    A.    So during the interview Ms. Allums stated the black
14          male suspect --
15                    MR. HOFFMAN:  Objection.
16                    MR. SCHROTH:  What's your basis?
17                    MR. HOFFMAN:  Hearsay of what Ms.
18          Allums told them.
19                    MR. SCHROTH:  Judge, the description
20          given in the initial report is the same thing.
21          I'm just asking for the same rules to apply here
22          on redirect as that were on cross.
23                    THE COURT:  Yeah, I'm going to permit
24          it.  Go ahead.
25    A.    Ms. Allums stated that the gunman was wearing a black
```

404

 1          jacket, black jeans, approximately five foot five

 2          inches, 160 to 170 in weight and dreadlocks sticking

 3          up, is how she described the gunman to us at the

 4          hospital.

 5     Q.   (BY MR. SCHROTH)  And that was how far after the

 6          incident happened?

 7     A.   I believe two days.

 8     Q.   And to your knowledge, did she speak with patrol at

 9          all or did she go to the hospital?

10     A.   She went directly from the crime scene to the

11          hospital.

12                    MR. SCHROTH:  Nothing further.

13                    THE COURT:  Okay.  Recross?

14          **RECROSS-EXAMINATION OF DETECTIVE DAVID LAM**

15     **BY MR. HOFFMAN:**

16     Q.   Detective, you just said that in that audio-recorded

17          statement of Colleen Allums she said that he was five

18          foot five inches, 160 pounds, right?

19     A.   Correct.

20     Q.   It's about a 15 minute interview, isn't it?

21     A.   Correct.

22     Q.   She never says that, does she?  I mean, do we need to

23          go through the loophole of playing that whole

24          interview right now just to make sure that she

25          doesn't say that?

405

```
 1                    THE COURT:  Put it in.  Do we need

 2          speakers or can you play it through the

 3          Mondopad?

 4                    MR. HOFFMAN:  For identification

 5          purpose, your Honor, I think we will call this

 6          Defense Exhibit D.

 7                    THE COURT:  So we have to listen to a

 8          fifteen minutes interview, is that what we're

 9          saying?

10                    MR. HOFFMAN:  I believe it's about

11          fifteen minutes long.

12                    THE COURT:  All right.

13                    (Short recess taken.)

14   Q.   (BY MR. HOFFMAN)  Detective, just to move this along,

15          I want you to just raise your hand and get our

16          attention when you hear that statement.

17                    (Playing interview tape.)

18   Q.   (BY MR. HOFFMAN)  Detective, that was the full

19          interview with Colleen Allums, correct?

20   A.   Yes.

21   Q.   You didn't raise your hand, did you?

22   A.   I did not.

23   Q.   Because Colleen Allums did not make that statement,

24          correct?

25   A.   She made the statement, but it wasn't captured on the
```

406

1      audio.

2  Q.   Kind of like the identifications of Edward Bunch were

3       not captured, correct?

4  A.   Correct.

5  Q.   We're human, we make mistakes, don't we?

6  A.   Sure.  Yes.

7               MR. HOFFMAN:  Nothing further.  Thank

8       you, your Honor.

9               THE COURT:  All right.

10              MR. SCHROTH:  I just have a couple on

11      that.

12              THE COURT:  Okay.

13  **FURTHER REDIRECT EXAMINATION OF DETECTIVE DAVID LAM**

14  **BY MR. SCHROTH:**

15  Q.   Detective, the photo array, was that done on the

16      audio?

17  A.   Which photo arrays?

18  Q.   The photo arrays with Colleen.  Was that part of that

19      audio interview, her photo arrays?

20  A.   Yes, she looked at the initial three photo arrays and

21      then we took the audio statement.

22  Q.   Okay.  So the photo arrays were done off the audio

23      statement?

24  A.   Off the audio statement.

25  Q.   So are you saying that you folks at the Cleveland

1   Police had some interaction with her off of the

2   audio?

3 A. We did.

4 Q. Okay.  So every part of the interaction between the

5   Cleveland Police that day and Colleen, not all of it

6   was captured on your audio, is that fair to stay?

7 A. That's correct.

8      MR. SCHROTH:  Okay.  Thank you.

9      THE COURT:  All right.  You may step

10   down.

11      THE COURT:  Prosecutor Schroth, do you

12   have any more witnesses?

13      MR. SCHROTH:  We do, but can we

14   approach on this, Judge?

15      (Sidebar discussion held.)

16      THE COURT:  Prosecutor Schroth, do you

17   have any further witnesses?

18      MR. SCHROTH:  Judge, we do have a

19   further witness that we would like to call,

20   Daisyonna.  The Court has heard reference

21   through the detective.  She did make a statement

22   to Detective Lam and Detective Cynthia Moore,

23   she made a statement too that we think is

24   important.  She is unavailable because she is

25   currently -- she's in the hospital.  So she's

408

1   not able to testify at this point in time.  So

2   the State would like to have the opportunity to

3   bring her in.  We think her testimony is

4   material to this bindover hearing.

5         THE COURT:  When did she make this

6   statement?

7         MR. SCHROTH:  That statement was made

8   on April 28th.

9         THE COURT:  And she presumably was on

10   the witness list?

11         MR. SCHROTH:  She was on the witness

12   list.  Yeah, she's been on the entire time.

13   Well, I can't say the entire time.  Since we got

14   the secondary report.  So for a couple weeks.

15   She wouldn't have been in the initial report.

16         THE COURT:  And when was she

17   subpoenaed?

18         MR. SCHROTH:  She was subpoenaed last

19   Friday.  Her mom was personally served and she

20   got subpoenaed again between Tuesday and today.

21         THE COURT:  We started trial on this

22   on Monday?

23         MR. SCHROTH:  We started last

24   Thursday.  The first subpoena that went out for

25   her had the correct address, but it had West

409

```
 1              54th instead of West 58th on it.  So that didn't

 2              make it to her before the hearing started

 3              itself.

 4                      THE COURT:  Wouldn't that be the

 5              incorrect address?

 6                      MR. SCHROTH:  The incorrect address.

 7              Right.  And then a second subpoena went out

 8              after the first day of hearings.  So that

 9              actually would aim true because the error was

10              realized and that was given to her -- her mom by

11              Sergeant Shoulders last Friday.

12                      THE COURT:  What was this -- are you

13              going to proffer the statement?

14                      MR. SCHROTH:  What?

15                      THE COURT:  Are you going to proffer

16              the statement?

17                      MR. SCHROTH:  I will if the Court's

18              not -- and just for service she was then served

19              again by -- her mom was served again by an

20              investigator from the Prosector's Office between

21              Tuesday and today and in response to that

22              subpoena the mom contacted, I believe, the

23              Court.

24                      THE COURT:  And how old is Daisyonna?

25                      MR. SCHROTH:  I don't know.
```

410

```
 1                    THE COURT:  Is she under 18?

 2                    MR. SCHROTH:  She would be under 18.

 3                    THE COURT:  And is she in the custody

 4           of her mother?

 5                    MR. SCHROTH:  Well, she's technically

 6           in the custody of the State.

 7                    THE COURT:  Is that Children & Family

 8           Services?  She's in temporary custody or --

 9                    MR. SCHROTH:  I just know she was

10           staying at Carrington.  That's all I know.  The

11           social worker was her -- in fact, I spoke with

12           her social worker yesterday, her social worker

13           is, in fact, her guardian.

14                    THE COURT:  You mean Children & Family

15           Services?

16                    MR. SCHROTH:  Yes.  Whoever it is.  I

17           don't know who the social worker works for.

18           Just whoever that was that -- her name is --

19                    THE COURT:  Okay.  Do you want to

20           respond?

21                    MR. HOFFMAN:  Your Honor, I would

22           object to continuing this case further.  We have

23           been at trial since last Thursday.  Daisyonna

24           has been in Carrington as far as I can remember

25           up until this past weekend.  It was not
```

1    difficult to locate her.  I've been able to

2    speak with her.  I don't believe that she is

3    going to testify as to what the State

4    anticipates at this point in time.  So we would

5    object to a continuance.

6         THE COURT:  When did you speak to

7    Daisyonna?

8         MR. HOFFMAN:  Weeks ago.

9         THE COURT:  Weeks ago.  And she was at

10   Carrington at that point?

11        MR. HOFFMAN:  Yes.  I want to say it

12   was -- I can't remember if it was before or

13   after the last trial date was set.  I think it

14   was maybe the week after the last trial date was

15   set.  So maybe June, middle of June.

16        THE COURT:  And when's the last time

17   you spoke to Daisyonna?

18        MR. SCHROTH:  I haven't spoke to

19   Daisyonna, Judge.

20        THE COURT:  All right.  Then I'm going

21   to deny the continuance.  We've been doing this

22   since last Thursday.  So we should have some

23   conclusion to this matter.

24        MR. SCHROTH:  Okay.  If I could just

25   proffer, Judge, what the State would have

1     expected her --

2              THE COURT:  Yes.

3              MR. HOFFMAN:  Your Honor, we would

4     just object to proffering just because it is a

5     bench trial or an outdoor request that could

6     rebut the evidence that would be offered in the

7     proffer.

8              MR. SCHROTH:  Judge, I think you could

9     separate just against suppression, but -- a

10    bench trial after a suppression hearing if the

11    evidence has been suppressed.  I think the Court

12    has the ability to separate the wheat from the

13    chaff and then not use this in your -- we're not

14    asking you to use this as part of our case in

15    chief.  We certainly can't do that because I'm

16    not a witness.

17             THE COURT:  Yes.  You can either

18    proffer after closing arguments or you can

19    proffer now.  I cannot use whatever she was

20    going to say, but if you'd like to put it on the

21    record, let's put it on now.

22             MR. SCHROTH:  Okay.  All right.  This

23    information comes by way, as I indicated before,

24    Detective Cynthia Moore and Detective lam.

25    Daisyonna stated she is Rayvion's girlfriend,

413

1      she stated that she and Rayvion are affiliated

2      with the HMF Gang, HMF stands for Hungry Money

3      Family.

4            Daisyonna further stated she has

5      intimate knowledge of the other members of the

6      gang that are closely associated with Dalonte

7      and Rayvion.  Daisyonna stated Shetrell Harris

8      is the CO, and a male she knows as Scooby is the

9      Co-CO of the HMF Gang.

10           She stated that a male she knows as

11     Romell and Dalonte White are affiliated as the

12     main members of HMF Gang.  Daisyonna then stated

13     that Tootie is Rochelle Rivera.  Rochelle is

14     Shetrell's girlfriend and they both reside at

15     3250 West 61st.  Dalonte is known to frequent

16     the house because the HMF Gang meetings are held

17     at his residence -- I'm sorry.  This residence,

18     not his residence.  This residence.

19           Daisyonna stated that Rayvion is best

20     friends with Dalonte.  She stated that she

21     overheard during a conversation between the two

22     males that Dalonte had been bitten by a dog

23     approximately a week ago on a weekday.  She

24     stated she did not have any other knowledge

25     about the incident on West 54th Street.

414

1        MR. HOFFMAN:  Your Honor, if I may

2    offer what --

3        THE COURT:  I'll allow it.

4        MR. HOFFMAN:  In response to that, I

5    actually had a personal conversation with

6    Daisyonna who said that is not true.  That

7    interview was not audio-recorded.  So unlike

8    some of the other things in this case that were

9    misstated, she told me that that was not true,

10   that Dalonte was not bitten by a dog, was not

11   bitten about a week before.  That the only time

12   she's ever heard Dalonte being any type of

13   victim or bit by a dog was back in December and

14   there's medical records that show that.  We

15   could introduce that if that's trying to be used

16   against him in some way that he was bit the day

17   of the incident.

18        THE COURT:  Okay.  I understand that

19   there may be conflicting statements by a young

20   girl who is now at University Hospital, is in

21   the care of Children & Family Services and may

22   or may not have some physical or psychological

23   issues.  So with that stated, I have heard the

24   proffer and I've heard the counter proffer.  So

25   now, can we go to closing arguments?

415

1          MR. SCHROTH:  Yeah.  Sure.

2          THE COURT:  Great.

3          MR. SCHROTH:  May it please the Court.

4      Judge, after all of the testimony sort of what I

5      alluded to in opening statement, I don't think

6      there will be a dispute that there was a crime

7      here.  That Colleen Allums was victimized beyond

8      anyone's worst nightmare, pistol whipped and

9      shot in her own home to the point where you have

10     to drag yourself bleeding to the front porch so

11     a passerby can call 911.  I don't think there's

12     any dispute, Judge, that there were three

13     individuals that were part of this incident.

14          The real question at hand is a who

15     done it in this matter?  So, you know, certainly

16     the State is submitting to this Court that we

17     have met our burden in terms of probable cause

18     here on Dalonte White.  I do know it would

19     appear -- and I don't want to speak for the

20     defense.  The defense wants this Court to

21     believe that it is Edward Bunch.

22          Judge, what I can tell you is what you

23     have, there are two conflicting versions of

24     events, two conflicting opinions as to who

25     committed this crime and that is better left for

416

1    a jury Downtown.  This is just a gateway as to

2    whether there's probable cause.  But what I can

3    tell you, Judge, is there is certainly evidence

4    that shows that Edward Bunch is not the

5    individual who committed this crime.  And that

6    comes in a few different ways.  First and

7    foremost, is that, you know, the severity of

8    Edward Bunch's injury, such as there's just

9    absolutely no way that he wouldn't be bleeding

10   as he left the crime scene if he literally shot

11   himself in the foot through the ankle and where

12   the bullet is still lodged in his foot.  There

13   would be blood.  There was no blood trail.

14           Moreover, Judge, you know, that sort

15   of devastating wound to what is a pressure point

16   in a body, the ankle, which is used for

17   locomotion, would render someone unable to --

18   I'm not sure if this is a word, but ambulate, to

19   be ambulatory, to make it any significant

20   distance at all, if at all.  And, in fact, the

21   medical records show that Mr. Bunch was unable

22   to be ambulatory.  It's indicated plain as day

23   in those medical records.

24           Judge, what I can also tell you is

25   that Mr. Bunch, you know, certainly didn't have

1      to -- and I'm asking you to give some weight to

2      this.  You've got a guy who is in jail on

3      charges.  Okay.  And he is then confronted by

4      two police detectives who are recording his

5      interview and he's given a right not to talk

6      about what happened and what does he do?  He

7      goes right into it.

8           Now, either he is incredibly slick or

9      incredibly stupid if he committed this crime or,

10     Judge, he just didn't do this crime and that's

11     why he was willing to make a statement.

12          And you heard him when he was on the

13     stand.  You know, at first he was reluctant to

14     sign the HIPPA, but he thought it was maybe

15     something that would be incriminating, and then

16     he realized it was just for his medical records

17     for the day he got shot.  No big deal.  So he

18     then signed that medical form and then let the

19     police have those records, you know.

20          He didn't stop there.  He came into

21     this courtroom under oath and gave a statement.

22     I certainly know you can believe some, all or

23     none, but he did it before being Mirandized.  I

24     mean, the guy then -- he talks to a Prosecutor

25     for three minutes and then -- a Prosecutor and

418

1          then is brought into the courtroom with the

2          Judge on the record under oath, gets Mirandized

3          and then says, you know what, no big deal.  I'll

4          tell you what happened on that day.

5                    Judge, you are certainly -- this Court

6          has been evaluating credibility of witnesses for

7          some time now.  And I submit to you that makes

8          him and his story credible that he came here to

9          tell that story.

10                   Also, if this guy basically almost

11         blew his ankle off during this crime, he's not

12         going to walk all the way over to Lakewood

13         Hospital.  That is ludicrous to try to travel

14         that distance on that devastating injury, if he

15         could walk, which again, there's no way he could

16         walk.  Metro is literally a hop, skip and a jump

17         from that location.  I mean, he'd have to hop.

18         So that also helps to what I say, fly in the

19         face of common sense that he could go that

20         ridiculous distance to do that.

21                   Judge, those all demonstrate that

22         Edward Bunch is not the person who committed

23         this crime.  I mean, it's a rare situation where

24         the State can call someone who is accused of the

25         crime to let you be the judge of his credibility

1          much less those sort of under penny and factual

2          circumstances, those things that are objective,

3          where the hospital was, what the injury is that

4          are strongly corroborative of Mr. Bunch's story.

5                    And so instead what we have here today

6          is three identifications in court.  And Judge,

7          you know, the question is, is there some

8          credible evidence?

9                    He had three people come in here who

10         then see Dalonte White face-to-face and say

11         yeah, that's still the guy even though his hair

12         has changed, you know, that's still the guy.

13                   Now, people can make assertion they

14         knew Dalonte would be here, you know, whatever

15         in court.  But this Court has seen circumstances

16         where witnesses have not identified people in

17         court even though they're right at the defense

18         table.  That's happened before in this very

19         courtroom.  A person is not necessarily going to

20         come in and pick a person out just because

21         they're at the table.

22                   That's a credibility issue, though,

23         for you, Judge.  If you think that's what

24         Colleen Allums and Savannah LaForce and Zackary

25         Hale did, that's up to you.  I submit to you

1    that's not the type of people they are, all

2    three to do that.  To identify him in the flesh.

3    They also picked him up out of photo arrays.  I

4    understand there were identifications on Edward

5    Bunch as well from them, but they certainly were

6    steadfast in identifying Mr. White in court.

7         Also I'd ask this Court to consider

8    that -- you know, Judge, this house --  we don't

9    know the reason that this house was targeted.

10   Colleen Allums does not know the reason why this

11   house was targeted at this point.  Only the

12   people who committed this crime know the reason

13   for this house -- why this house was targeted in

14   this way.  But certainly, this very manner of

15   invasion lends itself to people who would be

16   familiar with this particular house and have a

17   reason for this house.

18        And you had Edward Bunch, yes, he has

19   been in the area, but certainly he doesn't live

20   there.  And he hasn't been even out from DYS for

21   that long of a period of time -- he got out in

22   the fall -- to formulate this plan and hit this

23   house.

24        Dalonte White, I think it is

25   significant that he lives in that area, Judge.

1          I think it's important.  It gives him a certain

2          familiarity, you can infer, with this location

3          and the residents in this area.

4               You know, when it comes to prior

5          descriptions of what individuals, you know,

6          height and weight, I'm asking you to listen to

7          what the witnesses testified to in court.

8          Savannah has no idea.  She has no clue.  She

9          told you that on direct and redirect.  I was

10         sitting down.  I don't know how tall these guys

11         were.  Colleen gave a five-nine, six foot, but,

12         again, she's seated.  You know, the thing is all

13         these witnesses are seated and they're all taken

14         by surprise.  You know, they follow Zack in so

15         he's standing.  He's also diminutive in stature.

16              Judge, you're the best judge on what

17         Zack said.  I think he may have said five foot

18         five inches when he testified.  That's

19         ultimately up to you.  I know you take

20         exceptional notes.  But for some reason I wrote

21         down he indicated that person was five foot five

22         inches with the gun.  But that's your call, not

23         mine in terms of whether he actually said that.

24         And he was the one who was standing at time of

25         this offense.  The other two were seated.  And

422

1     so any sort of height description I think is

2     suspect at best.

3              I mean, there's a reason -- people are

4     just not good, your Honor, at determining

5     heights, especially people who are not

6     sophisticated.  And I'm not trying to take shots

7     at these witnesses, but they're not

8     sophisticated people.  I mean, there's a reason

9     they even have at the exit for corner stores,

10    for gas stations, they put height charts there

11    because people just naturally have a hard time

12    picking out height.  I mean, these aren't people

13    who work at a circus who for a living, you know,

14    determine height and weight.  They're just

15    average people who were taken by surprise and

16    were seated during this event.  But they were

17    steadfast in their identification of Dalonte in

18    court.

19              Judge, I submit to you that that is

20    some credible evidence here and that is the

21    standard and I'd ask that this Court transfer

22    this matter to the Criminal Division for further

23    proceedings.

24              And Judge, I'm not sure if this Court

25    prefers, but I would ask for a little bit of

1      time for any rebuttal from Mr. Hoffman's

2      closing.

3           THE COURT:  Yes, you may.  Thank you.

4      Attorney Hoffman.

5           MR. HOFFMAN:  Thank you, your Honor.

6      May it please the Court.  Your Honor, not much

7      really changed since my opening except for one

8      big thing and that was on the stand Savannah

9      LaForce basically saying look, yeah, I

10     identified Edward Bunch and the police told me

11     not to do it.  I think what we find out is that

12     was not fair to Detective Lam in his efforts to

13     try to investigate this case.  It's not fair to

14     Mr. Schroth who's trying to get the right guy as

15     he said in his opening and that comes out on the

16     stand and afterwards.  And that's the second

17     person who said, yeah, the police, they were

18     wrong in this case.  They got it wrong.

19          More importantly, it's not fair to

20     Dalonte and it's not fair to the victims in this

21     case, all three of them, Edward Bunch.  Judge

22     we're primarily focusing on the credibility.

23     And this is just a brief Power Point of why I

24     don't think the evidence is credible in this

25     case.

424

```
 1              First, we have a cross racial
 2       identification in the photo arrays.  We know
 3       from the studies that those aren't as reliable.
 4       We have multiple IDs by each witness.  Now, we
 5       have each witness identifying Dalonte and Edward
 6       Bunch.  We're on an even plain for basically
 7       both of them.  It's three and three.  It just
 8       wasn't known until it played out in court.
 9              We also have evidence that it was an
10       unduly suggestive photo array that Dalonte was
11       in to begin with.  Even the detective admitted
12       he was the only one in the photo array with
13       dreadlocks.  That's not supposed to happen.
14              And then mostly because the police
15       violated 2983.33(B)(4)(d), which is when a
16       witness makes an identification, you record it
17       in writing.  Not only did they fail to do that,
18       but they tampered with the evidence, they
19       disclosed it, they withheld it.  They even
20       withheld it from Detective Lam.  I know that may
21       not make him upset, but it really should make
22       everyone else upset.  It's a fundamental thing
23       to do.
24              He also let us know that the only
25       thing against Dalonte White in this case is
```

1           those photo arrays of the three people.  The

2           physical evidence doesn't match up, the height

3           and weight.  And I know the State wants to say,

4           well, height and weight, people aren't good with

5           that.  It's tall or short, Judge.  It's not that

6           hard.  Any lay person can figure it out.  Here

7           we have someone described as 6 foot, six foot

8           one, 200, 250 pounds.  He was tall.  He was

9           heavyset.  He was pretty tall.  Taller than

10          Savannah.  Those were the descriptions given.

11          Those descriptions don't fit Dalonte White.

12          They do fit Edward Bunch.

13                 There's no evidence from the search

14          warrant.  There's no marks on Dalonte's legs.

15          There's no ruffles in his shoes from a dog.

16          There's no physical evidence whatsoever, but

17          there is on Edward Bunch.  There was no gun

18          found during the search warrant.  There was no

19          cell phone found.  None of those things.

20                 And the big thing is, what about

21          Edward Bunch?  The problem is we don't know

22          because like Detective Lam said, these two

23          detectives interfered with his investigation.

24          He basically closed it off at that point

25          allowing Edward Bunch to kind of fly under the

426

1      radar.  There was no search warrant done there.

2      No checks for him.  None of the physical

3      evidence matches up.  All it is is the three

4      photo arrays, same photo arrays that identified

5      Edward Bunch.

6              I would submit to you that this isn't

7      just we can have probable cause on two people

8      here.  Yes, Edward looks guilty, we'll go with

9      him.  You know, it's got to be the credible

10     evidence.  The credible evidence the way it came

11     out during the trial supports that Edward Bunch

12     looks bad.  He looks guilty on this.  All the

13     evidence just swung his way and all the evidence

14     went away from Dalonte.

15             I think it's a far cry to say that

16     Edward Bunch was credible at all, and he came in

17     here and gave a truthful story of some nature.

18     Edward Bunch, his story made no sense.  It was

19     piecemeal.

20             When asked, hey, does your friend who

21     he would not identify have a name, the

22     Prosecutor suggested do you have a nickname --

23     or does he have a nickname and then the name

24     became Nick.  He clearly doesn't want the police

25     to find out how he got shot that day.

1             There's no 911 calls, there's no

2        reports in that area.  It's West Boulevard.

3        Someone's going to call.  Someone's going to see

4        something.

5             This stranger who drops him off,

6        they're going to know something.  He doesn't

7        know a car, he doesn't know what bikes because

8        he got heli bikes.  He was anything but

9        credible.  And we know he's in the area because

10       the car that he stole was from West 54th.  And

11       where he was arrested in that car that was

12       stolen from West 54th was three blocks away on

13       58th and Otto.  He's very much in that area,

14       very much active in that area and goes to the

15       hospital within 40 minutes of this incident with

16       a gunshot wound consistent, in the detective's

17       words, with the injury we saw on the video.

18            Your Honor, because of this we submit

19       that the evidence against Dalonte is not

20       credible and that's why we would ask you to not

21       find probable cause at this time and stop it

22       here.  It would be -- to allow the police

23       misconduct to go on and unchallenged and --

24       through this point I think it would be unfair to

25       everyone including the State as I mentioned, who

428

1      was thrust upon that information at the end.  So

2      we would ask that you find no probable cause in

3      this case.  Thank you.

4              THE COURT:  Rebuttal?

5              MR. SCHROTH:  Judge, there is probable

6      cause for Dalonte White and there is no probable

7      cause -- not that the State needs to show at

8      this point, for Edward Bunch.  You know, one

9      significant thing -- you know, there was some

10     discussion about marks on legs.  Guess who went

11     to the hospital that day?  Edward Bunch?  Guess

12     who an examination on his ankle?  Edward Bunch.

13     Guess whose medical records don't mention

14     anything about any dog bite?  Edward Bunch.  All

15     it says there is a gunshot wound.

16              Judge, a hospital is going to know any

17     injuries to that area that he's there to be

18     treated for and there is not a single lick of

19     information -- you're going to have these

20     medical records, that says that he was bit by a

21     dog, that there's lacerations, that there's

22     injury to the ankle other than a gunshot.  All

23     they have is that gunshot wound because that's

24     all that was there.  So Edward Bunch was not bit

25     by a dog.  He wasn't in that house.

1           Judge, that dog also -- no witness

2      heard or saw the suspect shoot themselves in the

3      ankle.  The dog is not shot -- this is a big

4      dog.  Judge, the dog is shot in the back, not in

5      the head.  I want you to look at that photo and

6      see how far down the body that is.  The person

7      shooting at the dog was not shooting directly

8      down -- putting their leg in jeopardy.  They

9      were shooting at the body of the dog.  Edward

10     Bunch -- the person who committed this crime --

11     Dalonte White didn't shoot himself, Judge.

12     Edward Bunch was shot, but it's not from this

13     incident.  It's not from himself.  It defies the

14     medical records.  It defies the injuries

15     described by the hospital, unless the hospital

16     is blatantly incompetent and it defies the fact

17     that he couldn't walk.  He told you he couldn't

18     walk.  His medical records said he couldn't

19     walk.  He was in a boot after that.  It couldn't

20     be Edward Bunch.

21           Judge, look, I know that the police

22     did the right thing by getting a search warrant

23     for Dalonte White's house.  The biggest problem

24     is that they may have gotten it a little bit too

25     late.  They got it on 4/28.  Dalonte White is

430

1              tipped off about this investigation the moment

2              the police take photographs of him.

3                      MR. HOFFMAN:  Objection.

4                      MR. SCHROTH:  You can draw that

5              inference.

6                      THE COURT:  Yeah, I can.

7                      MR. SCHROTH:  I mean, Judge, you can

8              draw inference that, look, Dalonte White gets

9              stopped -- the crime is on 4/21, patrol stop him

10             on 4/24 and they take photographs of him.  They

11             take photographs of his ankles, of his feet, of

12             his shoes.  You can infer at this point the

13             light bulb goes off in Dalonte's mind, I need to

14             get rid of anything that's related to this

15             crime, anything at all.  Because that search

16             warrant happens on -- he has four days.  If he

17             wasn't a smart criminal already to get rid of

18             any of the evidence that was used in this crime.

19             That's more than enough time, Judge.

20                     And, you know, in regards to the

21             credible evidence against Mr. Bunch -- the lack

22             of credible evidence against Mr. Bunch speaks

23             for itself now with the medical records and the

24             fact that he had the courage to come in here and

25             tell you his story after being Mirandized.

1              And then you have the in-court

2          identifications.  These are witnesses who are

3          not going to -- who I don't think are going to

4          just willy nilly make an identification because

5          they feel like they have to.  They certainly

6          were forthcoming about making identifications in

7          the photo array.  If they saw Dalonte in person

8          and they didn't think it was him, Judge, I think

9          you can take that credibility --

10              MR. HOFFMAN:  I'm going to object to

11          this line actually.  This is an inference on an

12          inference.

13              MR. SCHROTH:  I think it's just an

14          inference, Judge.  That they would have not

15          picked him out if it wasn't him in Court.

16              MR. HOFFMAN:  I think he's just

17          vouching for credibility.

18              THE COURT:  I've already heard all the

19          evidence so I understand.

20              MR. SCHROTH:  So, Judge, I think this

21          Court can put some stock in the fact that those

22          witnesses if it wasn't Dalonte White, they

23          wouldn't have picked him out in Court and they

24          did.  And they did because he is, in fact, the

25          person who was part of this awful home invasion

432

1    and we'd ask that you find some credible

2    evidence and that you transfer this matter to

3    the Criminal Division of the Court of Common

4    Pleas.  Thank you.

5            THE COURT:  Thank you.  Let's go off

6    the record.

7            (Short recess taken.)

8            THE COURT:  All right.  Anything

9    before the Court rules?

10           MR. SCHROTH:  Not on behalf of the

11   State.  Thank you, Judge.

12           THE COURT:  On behalf of Dalonte?

13           MR. HOFFMAN:  No, your Honor.

14           THE COURT:  All right.  After

15   reviewing all of the exhibits and reviewing my

16   notes from the evidence and I have 17 pages of

17   notes, the Court finds that -- I understand that

18   there was an awful crime that was committed to

19   Ms. Allums and Zackary as well as Savannah.  But

20   the question is, was it Edward Bunch, was it

21   Dalonte White or was it a whole another set of

22   three people?

23           The witnesses stated that it was

24   Dalonte White in three of the photo arrays and

25   in an in-court identification the same three

1    witnesses identified Edward Bunch in three

2    separate photo arrays.

3              Now, the photo arrays that I reviewed

4    clearly indicated that Edward Bunch's photo

5    arrays, they all had similar hair styles and

6    Zackary circled one and then the other two had

7    said that they identified him.  In Dalonte's

8    photo arrays Dalonte was the only one that had

9    the dreads or the twists or whatever they are

10   calling them these days.

11             The police never notified the

12   witnesses that Edward Bunch and Dalonte White

13   were two separate persons.  And I don't know

14   whether they were supposed to or not, but it was

15   clear from their testimony that they still

16   believe that photo array three and photo array

17   one contained the same person.  And they never

18   had an opportunity to really distinguish was it

19   Edward Bunch or was it Dalonte White because

20   they were never given the opportunity.

21             And to complicate matters, initially

22   the descriptions was six feet approximately

23   200 pounds.  The statement by the police report

24   stated that the height and weight was five foot

25   five inches, about 150 pounds, though,

434

1   unfortunately, that part is not in the recording

2   and we only have the detective's testimony.

3     And I understand that sitting down and

4   looking at somebody with a gun it would be

5   really hard to judge how tall that person is.

6   So it is really clear by the photo arrays that

7   Dalonte White and Edward Bunch have similar

8   features.

9     When I read the hospital reports, the

10   fact that Edward Bunch was not ambulatory was by

11   his own statement.  There was nowhere in the

12   nurses or doctor notes that said he could not

13   walk.  As a matter of fact, it does not even say

14   how he got to the hospital, did he walk in on

15   his own, did they have to go get a wheelchair,

16   did they have to get a gurney.  All they know is

17   he appeared in ER and the hospital report is

18   void of any indication of what he was wearing

19   and how he actually came through the doors.

20     There is no corroborating evidence.

21   Nothing from the search warrant, the DNA or the

22   blood.  There are no marks on Dalonte's legs or

23   shoes as well as there was no marks on Edward

24   Bunch's legs as far as whether it was a dog bite

25   or not.  Did the dog just have a hold of the

1        pant leg?  Did the dog actually bite the

2        intruder?  This Court -- we don't know because

3        that evidence isn't before us.

4                So therefore, the Court does not find

5        probable cause that Dalonte White was part of

6        the home invasion.  But, Dalonte, two things.

7        That doesn't mean -- this will be set for trial.

8                MR. SCHROTH:  Judge, I think if you

9        find no PC, you have to dismiss it.

10               THE COURT:  Go off the record for a

11       second.

12               (Short recess taken.)

13               THE COURT:  The Court has had some

14       discussion as to whether the matter should be

15       dismissed outright because the Court did not

16       find probable cause.  There seems to be

17       conflicting opinions.  The 8th District has said

18       that it is the State's case and if they wish to

19       dismiss it, they may.  This Court does not feel

20       comfortable dismissing the charges outright.  So

21       we are setting this matter for trial.

22               The burden, Dalonte, is beyond a

23       reasonable doubt.  Meaning, that it's a higher

24       burden.  Okay.  And the Court can't dismiss it.

25       The Prosecution may after they go back, dismiss

436

1      the case and then they can re-file it.  So know

2      that.  They can always re-file.  So we have a

3      pretrial set for August 21st at 9:30.

4              Dalonte, you're going to stay with us

5      because you have pending cases.  I want you to

6      understand that.  You know what the cases are,

7      correct?  You also have a violation of court

8      order, do you not?

9              MR. WHITE:  Yes.

10             THE COURT:  Okay.  We can go off the

11     record if there's nothing further.

12             MR. HOFFMAN:  Your Honor, Dalonte did

13     just want me to make a formal request for home

14     detention.  He has been in the Detention Center

15     for about 90 days now on the two assault charges

16     that happened in the Detention Center and the

17     violation of Court order, but I think that may

18     have been because of the charges in this case.

19     So we would ask for a consideration.  He did

20     have a good Detention Center report.

21             THE COURT:  Which one?  You mean the

22     one before or after he got his jaw broken?

23             MR. HOFFMAN:  Since that point in

24     time, your Honor.

25             THE COURT:  You mean since someone

1          broke your jaw you've been behaving yourself?

2                    MR. WHITE:  Before I was.

3                    THE COURT:  Well, you have an assault

4          charge from the Detention Center.  You know

5          that.  It's pending.  And I belive you're also

6          the victim.  But what I will do, Dalonte, is I'm

7          going to talk to your probation officer and I'm

8          going to have her give me a report as to how

9          well you did in the community.  Because I

10         ordered very specific things for you to do while

11         you were out, did I not?

12                   MR. WHITE:  Yes.

13                   THE COURT:  And have you completed

14         them?

15                   MR. WHITE:  I did community service.

16                   THE COURT:  Okay.  All right.  So next

17         week on Monday we will contact Keri Bryant,

18         who's your officer and if she believes that you

19         would be fine being at home on an ankle monitor,

20         I will consider it.  All right.  Is that fair?

21                   MR. WHITE:  Yes.

22                   THE COURT:  All right.  I know you

23         want to get out of here, but you need to

24         understand that you need to find a better set of

25         friends to hang out with or you are always going

438

1     to be back here.  Do you understand that?

2         MR. WHITE:  Yes.

3         THE COURT:  All right.  So I'll let

4    you know next week.

5         (Hearing concluded at 5:34 p.m.)

6            - - -

1

2

3

4                          C E R T I F I C A T E

5

6

7

8               I, Dawn M. Peck, a stenographic

9       reporter, do hereby certify that I attended the

10      foregoing proceedings in their entirety; that I

11      wrote the same in Stenotype, which was

12      subsequently transcribed into typewriting by

13      means of computer-aided transcription under my

14      direction; and that the foregoing Transcript of

15      Proceedings is a true and correct transcript of

16      my Stenotype notes.

17

18               Signed this 13th day of October, 2015.

19

20                    _____
                      Dawn M. Peck
21                    Mizanin Reporting Service, Inc.
                      5755 Granger Road
22                    335 Independence Tower
                      Independence, OH 44131

23

24

25