IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **DALONTE WHITE**<br><br>*Plaintiff,*<br><br>v.<br><br>**CITY OF CLEVELAND,** *et al.*<br><br>*Defendants.* | Case No.: 1:17-CV-1165<br><br>Judge Pamela A. Barker<br><br>Magistrate Judge Jonathan D. Greenberg |
| **PLAINTIFF DALONTE WHITE'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** | |

Plaintiff Dalonte White respectfully opposes Defendants' Motions for Summary Judgment

(ECF #191, 193, 195, 197, 199). His opposition is explained in the attached memorandum.

June 17, 2020

Respectfully submitted,

*/s/ Brian D. Bardwell*
Subodh Chandra (0069233)
Donald P. Screen (0044070)
Patrick Haney (0092333)
Brian D. Bardwell (0098423)
The Chandra Law Firm LLC
The Chandra Law Building
1265 West Sixth Street, Suite 400
Cleveland, OH 44113
T: 216.578.1700
F: 216.578.1800
Subodh.Chandra@ChandraLaw.com
Don.Screen@ChandraLaw.com
Patrick.Haney@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

*Counsel for Plaintiff Dalonte White*

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... ii

Table of Authorities ........................................................................................................ v

Introduction .................................................................................................................... 1

Issues Presented ............................................................................................................. 3

Factual background ........................................................................................................ 3

    Someone robs a house the same way Edward Bunch robs houses................................. 4

    Edward Bunch suffers the same leg injury the robber did. ........................................... 5

    The victims say the robber looks the same as Edward Bunch. ...................................... 5

    Cleveland police fabricate evidence against White, who looks nothing like the robber. ... 6

    Police find no evidence linking White to the robbery. They arrest him anyway. .............. 7

    The victims say Edward Bunch did it. Cleveland police order them to say he didn't........ 8

    Police dishonesty costs White 20 months of his life........................................................ 10

Legal Standard .............................................................................................................. 11

Law & Argument .......................................................................................................... 11

    I.   Genuine disputes as to material facts preclude summary judgment on any of White's claims. .................................................................................................................. 11

        A.  Defendants have admitted all the elements of White's claims for malicious prosecution (Claims 1 and 6)................................................................................ 11

            1.   Defendants admit their influence on the decision to prosecute White. ...................... 12

                a.   Lam admits the information from Schade and Beveridge contributed to the decision to arrest and detain White. ............................................................ 13

                b.   Kubas and Santiago admit they foresaw their actions contributing to the decision to detain White. ......................................................................................... 14

            2.   Defendants admit the court's finding of probable cause was made without material, exculpatory information. ....................................................................................... 15

            3.   Defendants admit White's prosecution resolved in his favor. ..................................... 20

            4.   Defendants' admissions allow a jury to conclude they acted with malice. .................. 23

                a.   The evidence suggests Defendants acted to indulge Shoulders's racial animus rather than to bring an offender to justice. ................................................... 23

                b.   The evidence suggests Defendants acted to shield each other from accountability rather than to bring an offender to justice. .................................................. 25

        B.  Defendants have admitted all the elements of White's claims for false arrest and false imprisonment (Claims 2, 7, and 8). ......................................................... 27

            1.   Defendants admit White's warrant included false statements and omissions. ............ 27

            2.   Defendants admit facts allowing a jury to conclude they made those false statements or omissions knowingly, deliberately, or with a reckless disregard for the truth. ....... 28

            3.   Defendants admit those false statements and omissions were material...................... 29

**C.    Defendants have admitted all the elements of White's claim for wrongful detention (Claim 3).** ............................................................................. **30**

**D.    Defendants have admitted all the elements of White's claim for *Brady* violations (Claim 4).** ....................................................................................... **31**

1.    Defendants admit the suppression of evidence favorable to White. ............................31

2.    Defendants admit their failure to disclose evidence may have prejudiced White. .......32

**E.    Defendants have admitted all the elements of White's claim for *Monell* liability (Claim 5).** ............................................................................................. **34**

1.    The City admits to having an unlawful policy. ..............................................................35

    a.    The City admits its policy permits misrepresentations to obtain arrest warrants. 35

    b.    The City admits its policy allows lineups that experts say are unduly suggestive. 37

    c.    The City's records show it revoked its policy requiring officers to comply with *Brady*. ..........................................................................................................38

2.    The City admits failing to train and supervise the individual defendants. ....................39

    a.    The City admits its training and supervision were inadequate. ...............................39

    b.    The City admits it knew the risks of its inadequate training and supervision. .......44

**F.    Defendants have admitted all the elements of White's claim for intimidation under Ohio Rev. Code §§ 2921.03 and 2307.60 (Claim 9).** ..................................... **47**

1.    Defendants admit the use of false writings in this case. ................................................47

2.    Defendants' admissions allow a jury to conclude they acted with malicious purpose, in bad faith, or in a wanton or reckless manner. ...........................................................48

**G.    Defendants have admitted all the elements of White's claim for interference with civil rights under Ohio Rev. Code § 2307.60 (Claim 10).** ....................................... **49**

1.    The evidence shows Defendants attempted to interfere with White's right to be free from unreasonable search and seizure. ..........................................................................49

2.    The evidence shows Defendants attempted to interfere with White's right to a fair trial. ...............................................................................................................................50

3.    The evidence shows Defendants attempted to interfere with White's right to due process. ..........................................................................................................................50

**II.    Genuine disputes as to material facts preclude Defendants from claiming qualified immunity or political-subdivision immunity.** .......................................................... **51**

**III.   Genuine disputes as to material facts preclude the Court from limiting White's damages on summary judgment.** ........................................................................... **53**

**A.    Defendants' admissions create a genuine dispute as to the proximate cause of White's injuries.** ................................................................................................ **53**

1.    Defendants waived fact questions related to causation. ................................................53

2.    Defendants' admissions create a genuine dispute as to the foreseeability of White's damages. ........................................................................................................................54

    **B.** **Defendants' admissions create a genuine dispute as to the availability of punitive damages.**................................................................................................**57**

        1.  Defendants have not met their initial burden of demonstrating the absence of a genuine issue of material fact.......................................................................57

        2.  A reasonable jury could find Defendants acted with sufficient culpability to warrant punitive damages. .........................................................................................58

**IV.** **White's claims against Beveridge and Santiago are not barred by any statute of limitations.** ......................................................................................................**59**

    **A.** **The statute of limitations does not bar claims against Santiago.**.........................**59**

        1.  White's claims against Santiago relate back to the original complaint.........................59

        2.  Santiago had constructive knowledge of White's lawsuit. ...............................................60

        3.  Santiago knew or should have known that this lawsuit would have been brought against him but for a mistake concerning his identity.................................................61

    **B.** **The statute of limitations does not bar claims against Beveridge.** .......................**63**

**Conclusion** .............................................................................................................**65**

**Loc. R. 7.1 Certification** .........................................................................................**65**

## TABLE OF AUTHORITIES

### Cases

*Abrahams v. Cooper*, 81 Pa. 232 (1876)................................................................54

*Alexander v. CareSource*, 576 F.3d 551 (6th Cir. 2009) .............................................9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .............................................11

*Baker v. McCollan*, 443 U.S. 137 (1979)............................................................30

*Bear v. Delaware Cty., Ohio,*
  No. 2:14-CV-0043, 2016 WL 234848 (S.D. Ohio Jan. 20, 2016)........................53, 57

*Beck v. State of Ohio*, 379 U.S. 89 (1964) ..........................................................15

*Benton v. City of Cleveland,*
  No. 1:18-CV-2159, 2020 WL 1233949 (N.D. Ohio Mar. 13, 2020)........................24

*Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812 (6th Cir. 2010) ..........................46

*Burdine v. Szilagyi*, No. 3:98CV7094, 1999 WL 675294 (N.D. Ohio Aug. 20, 1999) ..........61

*Campbell v. City of Springboro, Ohio*, 700 F.3d 779 (6th Cir. 2012) ......................44, 51

*Campbell v. Lazaroff*, No. 1:15-CV-01302, 2016 WL 6876299 (N.D. Ohio July 19, 2016) ............37

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................57

*Chidester v. Shelby Cty.,*
  No. 02-2556 MA/A, 2006 WL 418002 (W.D. Tenn. Feb. 21, 2006)..........................61

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989)..............................................39

*City of Cleveland v. Bruner*, No. 81227, 2002-Ohio-6512 (Ohio Ct. App. Nov. 27, 2002) ..........45

*Clark v. Oakland Cty.*, No. 08-14824, 2009 WL 5217682 (E.D. Mich. Dec. 29, 2009)..........64

*Cline v. Myers*, 495 F. App'x 578 (6th Cir. 2012)................................................51

*Cooper v. Cty. of Washtenaw*, 222 F. App'x 459 (6th Cir. 2007) ..........................53, 54

*Cox v. Treadway*, 75 F.3d 230 (6th Cir. 1996)....................................................64

*Craig v. Chicago Police Officers,*
  No. 05 C 0172, 2005 WL 1564982 (N.D. Ill. June 9, 2005) ................................34

*Criss v. Springfield Twp.*, 56 Ohio St. 3d 82 (1990)..........................................23, 26

*D'Ambrosio v. Bagley*, No. 1:00 CV 2521, 2006 WL 1169926 (N.D. Ohio Mar. 24, 2006) ............46

*Daily v. Monte*, 26 F. Supp. 2d 984 (E.D. Mich. 1998)..........................................64

*Dorr v. City of Ecorse*, 305 F. App'x 270 (6th Cir. 2008) ....................................58

*Drumm v. Cessnum*, 61 Kan. 467 (1900)............................................................54

*Ehrman v. Hoyt*, 1858 WL 4543 (Ohio Super. 1858)..............................................23

*Force v. City of Memphis*, 101 F.3d 702 (6th Cir. 1996) ......................................60

*Graham v. Connor*, 490 U.S. 386 (1989) ..........................................................56

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) ..............................15, 52

*Harris v. Bornhorst*, 513 F.3d 503 (6th Cir. 2008)..............................................56

*Harris v. Langley*, 647 Fed.Appx. 585 (6th Cir.2016)..........................................45

*Henry v. City of Flint*, No. 19-1801, 2020 WL 2520695 (6th Cir. May 18, 2020)..................11

*Herzog v. Vill. of Winnetka, Ill.*, 309 F.3d 1041 (7th Cir. 2002) ..........................54

*Hoover v. Radabaugh*, 307 F.3d 460 (6th Cir. 2002) .................................................................51

*Howard v. Bouchard*, 405 F.3d 459 (6th Cir. 2005).................................................................50

*In re T.W.*, 100 N.E.3d 1239 (Ohio Ct. App. 2017) .................................................................45

*In the Matter Finley*, No. 48356, 1984 WL 6377 (Ohio Ct. App. Dec. 20, 1984)..................45

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)..............................................*passim*

*Jacobson v. Kaforey*, 149 Ohio St. 3d 398 (2016) .................................................................49

*James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002) .....................................................53

*Jells v. Mitchell*, 538 F.3d 478 (6th Cir. 2008) ................................................................ 45, 46

*Jerome v. Crum*, 695 F. App'x 935 (6th Cir. 2017) ................................................................33

*Jones v. Cannizzaro*, No. CV 18-503, 2019 WL 2289470 (E.D. La. May 28, 2019) ..............46

*Jones v. Clark Cty., Kentucky*, 959 F.3d 748 (6th Cir. 2020) .........................................*passim*

*Keenan v. Bagley*, No. 1:01 CV 2139, 2012 WL 1424751 (N.D. Ohio Apr. 24, 2012)...........45

*Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004) .......................................................56

*King v. Zamiara*, 788 F.3d 207 (6th Cir. 2015)......................................................................58

*Kirk v. Cronvich*, 629 F.2d 404 (5th Cir. 1980)..........................................................62, 63, 64

*Ledbetter v. Edwards*, 35 F.3d 1062 (6th Cir. 1994) ...............................................................37

*Linetsky v. City of Solon*, No. 1:16-CV-52, 2016 WL 6893276 (N.D. Ohio Nov. 23, 2016)...................20

*Logsdon v. Hains*, 492 F.3d 334 (6th Cir. 2007) ....................................................................19

*Malley v. Briggs*, 475 U.S. 335 (1986) ...................................................................................52

*Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 913 (2017)........................................................49

*McCune v. City of Grand Rapids*, 842 F.2d 903 (6th Cir. 1988) .............................................32

*Mills v. Barnard*, 869 F.3d 473 (6th Cir. 2017)......................................................................12

*Mobley v. City of Detroit*, 938 F. Supp. 2d 669 (E.D. Mich. 2012)........................................21

*Neil v. Biggers*, 409 U.S. 188 (1972) .....................................................................................37

*Offineer v. Kelly*, 454 F. App'x 407 (6th Cir. 2011) ..............................................................33

*Paige v. Coyner*, 614 F.3d 273 (6th Cir. 2010)......................................................................57

*Parnell v. City of Detroit, Michigan*, 786 F. App'x 43 (6th Cir. 2019) ..................................21

*Patrizi v. Huff*, 690 F.3d 459 (6th Cir.2012)..........................................................................45

*Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592 (6th Cir. 2007) .................... 54, 57

*Pugh v. Akron-Chicago Transp. Co.*, 64 Ohio App. 479 (1940) .............................................54

*Ringrose v. Engelberg Huller Co.*, 692 F.2d 403 (6th Cir. 1982) ...........................................64

*Rolen v. City of Cleveland*, No. 1:12 CV 1914, 2015 WL 12803699 (N.D.Ohio 2015) ...........45

*Ross v. Kohler*, 163 Ky. 583 (1915)......................................................................................54

*Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007)................................................ 30, 52

*San Antonio & A.P. Ry. Co. v. Griffin*, 20 Tex. Civ. App. 91 (1898)......................................54

*Seales v. City of Detroit, Michigan*, 959 F.3d 235 (6th Cir. 2020)........................................30

*Simpkins v. Grace Brethren Church of Delaware*, 16 N.E.3d 687 (Ohio Ct. App. 2014) ...........55

*Simpson v. City of Maple Heights*, 720 F. Supp. 1303 (N.D. Ohio 1988)..............................62

*State ex rel. Flynt v. Dinkelacker*, 156 Ohio App. 3d 595 (2004)..........................................22

*State v. Broom*, 40 Ohio St. 3d 277 (1988) ...................................................................................45

*State v. Buehner*, No. 106319, 2018 WL 5734615 (Ohio Ct. App. Nov. 1, 2018) ....................45

*State v. Jefferson*, No. 35010, 1976 WL 191029 (Ohio Ct. App. Apr. 8, 1976) .........................45

*State v. Johnstone*, No. 92885, 2010 WL 1712237 (Ohio Ct. App. Apr. 29, 2010) ...................45

*State v. Merrill*, 22 Ohio App. 3d 119 (1984) ...............................................................................45

*State v. Phillips*, 95 N.E.3d 1017 (Ohio Ct. App. 2017) ..............................................................45

*State v. Reniff*, No. 78481, 768 N.E.2d 667 (Ohio Ct. App. Sept. 24, 2001) .............................45

*State v. Steele*, 138 Ohio St. 3d 1 (2013) .......................................................................................47

*Stewart v. Sonneborn*, 98 U.S. 187 (1878) ....................................................................................23

*Strickler v. Greene*, 527 U.S. 263 (1999) ......................................................................................31

*Stumpf v. Robinson*, 722 F.3d 739 (6th Cir. 2013) .......................................................................50

*Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) ................................................................... 12, 27

*Thornton v. City of Columbus*, 171 F. Supp. 3d 702 (S.D. Ohio 2016) ......................................21

*United States v. Gonzales*, 246 F.3d 683 (10th Cir. 2000) ...........................................................37

*United States v. Hughes*, 606 F.3d 311 (6th Cir. 2010) ................................................................15

*Vakilian v. Shaw*, 335 F.3d 509 (6th Cir. 2003) .....................................................................29, 57

*Wagner v. Fawcett Publications*, 307 F.2d 409 (7th Cir. 1962) ...................................................46

*Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015) .......................................................................19

*Wesley v. Campbell*, 864 F.3d 433 (6th Cir. 2017) ................................................................. 58, 59

**Statutes**

Ohio Rev. Code § 2307.60 ...............................................................................................................49

Ohio Rev. Code § 2901.22 ...............................................................................................................48

Ohio Rev. Code § 2901.22 ...............................................................................................................48

Ohio Rev. Code § 2921.03 ...............................................................................................................49

Ohio Rev. Code § 2921.45 .........................................................................................................49, 50

Ohio Rev. Code § 2923.03 ...............................................................................................................50

Ohio Rev. Code § 2933.83 ...............................................................................................................37

**Rules**

Fed. R. Civ. P. 15 .......................................................................................................................*passim*

Fed. R. Civ. P. 56 .......................................................................................................................*passim*

Fed. R. Evid. 801 .............................................................................................................................9

**Secondary Sources**

C. Wright & A. Miller, *Federal Practice and Procedure* (1972) ...................................................64

## Introduction

The Cleveland Division of Police received a report of a robbery-turned-shooting. Latching on to the first name they heard as a possible suspect, detectives slapped together a case as quickly as they could. Relying on a witness who never really had a chance to view the shooter or his two accomplices, detectives rigged a lineup and bullied their witness to get the identification they wanted. When a second lineup yielded information that would have cleared their suspect, they ordered the witness to falsify the results and claimed the witness had been intimidated. From there, the detectives obtained an arrest warrant and proceeded with the case without ever revealing to the prosecutor, court, or defense that they had falsified evidence and concealed exculpatory information.

In that case, Cleveland police got the conviction they were looking for, and their victim—Ricky Jackson—was wrongfully sentenced to death. But the truth eventually won out. Although Jackson's civil-rights claims against the City and its officers were dismissed on summary judgment, the Sixth Circuit reversed last year, holding that the district court improperly skewed its interpretation of the evidence in the police's favor, and that the abundant evidence of police misconduct, lineup tampering, and *Brady* violations barred the defendants from claiming qualified immunity and required the case to go to trial.[1] The City opted to pay Mr. Jackson and his co-defendants $18 million instead.[2]

History repeats itself here. As in *Jackson*, Cleveland's detectives took the first name they came across and cobbled together whatever evidence they could—true or false—to make an arrest. As in *Jackson*, they rigged one line-up, falsified a second, lied in their affidavits, made unsubstantiated allegations of witness tampering, and withheld exculpatory evidence, all in a bid to get a win. As in

---

[1] *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019).

[2] Eric Heisig, *Cleveland to pay $18 million to trio who spent decades in prison for wrongful 1975 murder convictions*, Cleveland.com (May 8, 2020), https://www.cleveland.com/court-justice/2020/05/cleveland-to-pay-18-million-to-trio-who-spent-decades-in-prison-for-wrongful-1975-murder-convictions.html.

*Jackson*, the City and its detectives now ask for qualified immunity on summary judgment. But as in *Jackson*, there remains far too much evidence in the record that would allow a reasonable jury to conclude Defendants violated White's civil rights.

Their motions rise or fall, in large part, on whether White's arrest and continued detention were supported by probable cause, which in turn requires consideration of whether the arrest warrant relied on false statements and material omissions about White (1) being identified by the victims in a photo lineup; and (2) participating in a related crime. Despite the Rule 56 standard, Defendants largely ignore the most critical piece of evidence in this case: the previous finding by the juvenile court that White's arrest and detention weren't supported by probable cause.[3] Among other problems, the court said half the case for probable cause was defective because the first set of photo arrays used to identify him were unduly suggestive, and Defendants tampered with a second set. Since then, White has also discovered evidence—concealed by the City for years—showing that he was never a suspect in the other crime.

The City and its officers now defend themselves by claiming amnesia and blaming each other for all the false information fed to the court and prosecutor. In so doing, they have, even without White's assistance, created their own disputes as to what went wrong and why—thus precluding summary judgment. Because of the abundance of resulting genuine disputes as to the material facts, summary judgment for Defendants is improper.

White deserves his day in Court.

---

[3] Tr. of Juvenile Court Bindover Hrng., at 432:14–435:7 (attached as Ex. 1-A). Defendants object that the Court **must not read** the juvenile court's ruling, lest it violate a state law prohibiting its use except "as authorized by order of the court." State law cannot dictate what evidence a federal court may consider, and argument to the contrary is particularly inappropriate in a Section 1983 case, where the gravamen is always that defendants are exploiting state law to violate civil rights. Defendants' argument is also beside the point; Defendants fail to disclose to this Court they've been in possession—for well over a year—of the journal entry where White's use of the transcript was "authorized by order of the court" (Ex. 1-B), in response to a motion explicitly disclosing his plans to use it in this civil proceeding (Ex. 1-C).

**ISSUES PRESENTED**

1. Probable-cause determinations must consider both inculpatory and exculpatory evidence. Defendants prosecuted White based on a probable-cause determination that they admit included false information and omitted a long list of exculpatory information. Given Defendants' admissions, should the Court deny White his day in Court by granting summary judgment on the question of whether probable cause supported White's arrest?

2. On summary judgment, the moving party must demonstrate the absence of any genuine issue of material fact, after construing all facts in the nonmoving party's favor. Defendants neither acknowledge nor purport to fulfill their obligation to construe the facts in White's favor, and instead present only on the facts most favorable to them. Should the Court grant summary judgment despite the resulting factual disputes left outstanding on all White's claims?

3. Qualified immunity and political-subdivision immunity are not available when genuine disputes exist as to material facts. Defendants seek immunity based solely on their self-serving denials of misconduct, while leaving unaddressed the fact questions that could result in liability. Should the Court declare Defendants immune with such factual disputes left outstanding?

4. An amended complaint relates back to the original for statute-of-limitations purposes, where the defendant had constructive notice that he was its target. Two defendants were identified by their conduct in the original complaint and represented by the same team of attorneys who have been on the case from its inception. Should the Court dismiss claims against them as untimely filed?

**FACTUAL BACKGROUND[4]**

Edward Bunch is a career criminal. According to the City's records, Mr. Bunch is suspected of or has been convicted of committing numerous offenses dating back at least to 2010, including domestic violence, rape, felonious assault, theft, grand theft, receiving stolen property, robbery, aggravated burglary, drug possession, drug abuse, and drug trafficking.[5]

On April 13, 2013, for example, Defendant Thomas Shoulders, with the help of Defendant Robert Beveridge, arrested Mr. Bunch for a home invasion on Denison Avenue, about a mile away from the Cleveland Division of Police's Second District Headquarters.[6] Mr. Bunch, backed up by two other males, waited for the homeowner to open the front door and forced his way in.[7] The victim was held at gunpoint, ordered to hand over "everything" and struck repeatedly in the face

---

[4] Largely drawn from Defendants' own testimony and undisputed, these are the facts and inferences that a jury could reasonably find, based on the evidence in the record so far.

[5] Cleveland Division of Police Global Subject Activity Report at CLE07756–59 (attached as Ex. 1-D).

[6] Cleveland Division of Police Report #2013-101126 (ECF #207-18).

[7] *Id.* at WHITE03320.

with a gun.[8] Bunch and his accomplices took cash, a cell phone, and a gun before fleeing on foot.[9]

When Shoulders found him, Bunch confessed to the crime.[10]

**Someone robs a house the same way Edward Bunch robs houses.**

A crime with an eerily similar M.O. occurred at the West 54th Street home of Colleen Allums

on April 21, 2015 ("the Allums incident").[11] Again, a group of three men—one of them carrying a

gun—targeted a home about a mile from the Second District. [12] Again, they waited for someone

from the house to open the front door, and then they forced their way in.[13] Again, one of the men,

carrying a gun, told the homeowner—this time Ms. Allums—that he wanted "everything" and then

repeatedly struck her in the face with his gun.[14] Again, the gunman and his accomplices took cash, a

cell phone, and a gun.[15] This time, though, the gunman shot Ms. Allums.[16]

One other difference from the Denison Avenue robbery: Ms. Allums had three pit bulls.

During the commotion, one of them broke loose and came into the room where she and the other

two victims were being held.[17] The dog attacked the shooter, and a police investigation indicated that

during the attack, the dog may have bitten the shooter's ankle, or the shooter may have accidentally

---

[8] *Id.* at WHITE03321.

[9] *Id.*

[10] *Id.*

[11] Dep. of David Lam, ECF #207 at 328:6–13 ("Q Okay. It's fair to say that the MO in this case with Edward Bunch matched the Colleen Allums incident, correct? … A It's similar."); Dep. of Michael Connelly (Rule 30(b)(6) designee for the City of Cleveland), ECF #210, 213:11–15 ("Q All right. Do you agree that the MO of the Colleen Alums case was similar to the MO in at least one of Bunch's previously crimes? … A Yes.").

[12] Cleveland Division of Police Report #2015-110291 (ECF #207-9).

[13] Lam Dep. 324:11–328:13.

[14] *Id.*

[15] *Id.*

[16] Report #2015-110291 at WHITE03271 (ECF #207-9).

[17] *Id.* at WHITE03268.

shot himself while trying to get free from the dog.[18] His two accomplices ran off when the shooting began, and a neighbor's surveillance camera showed the shooter hobbling away soon after. [19]

### Edward Bunch suffers the same leg injury the robber did.

Within half an hour, Edward Bunch arrived at the emergency room at Lakewood Hospital with a gunshot wound to the ankle.[20] Following standard procedure, two officers interviewed Mr. Bunch about his injury, but they were apparently not yet aware of the possible connection to the incident on West 54th Street.[21] Bunch reported that he was shot while riding his bicycle on West Boulevard, but police were unable to find the bicycle he reported abandoning there.[22] Bunch told hospital employees "friends and family" brought him to the hospital,[23] then told police a stranger found him on the side of the road and gave him a ride.[24] Over the course of several interviews, Bunch gave three different accounts of how we was shot, none of which the police found credible.[25]

### The victims say the robber looks the same as Edward Bunch.

Meanwhile, other officers had arrived to begin investigating the robbery on West 54th Street.[26] Officer Donato Daugenti was first on the scene.[27] He spoke with the two other people in Ms. Allums's house during the robbery: her niece Savannah LaForce and nephew Zachary Hale.[28] From their accounts, he pieced together a description of the shooter: a black male, with black hair

---

[18] Connelly Dep. 209:20–210:12.
[19] Report #2015-110291 at WHITE03268–70 (ECF #207-9).
[20] Cleveland Division of Police Report #2015-110336 at WHITE03060 (ECF #207-4).
[21] *Id.*
[22] *Id.*
[23] Edward Bunch medical records at 3 (attached as Ex. 1-E.)
[24] Report #2015-110291 at WHITE03278 (ECF #207-9).
[25] Lam Dep. 349:20–350:8.
[26] Report #2015-110291 at WHITE03268 (ECF #207-9).
[27] *Id.*
[28] *Id.* at WHITE03268–69.

and brown eyes, 19 years old, just over six feet tall, about 225 pounds, and likely suffering from a nasty ankle injury.[29] Every piece of the description matched Edward Bunch.[30]

**Cleveland police fabricate evidence against White, who looks nothing like the robber.**

Soon after, three detectives arrived on the scene: Shoulders, Detective Cynthia Moore, and their trainee, Defendant David Lam.[31] Although Lam had only joined the detective bureau about a month earlier[32] and the vast majority of his training was incomplete, Shoulders assigned Lam to act as lead detective, giving him "complete responsibility for the investigation."[33]

Lam and the other detectives viewed the Allums residence, canvassed for witnesses, took a copy of the surveillance video showing the shooter limping away from the scene, and obtained the descriptions collected by Officer Daugenti.[34] The detectives also spoke with Defendant Michael Schade, who told them that White was the suspect in "an aggravated menacing complaint in the area of W. 59th St." that happened during the weekend immediately before.[35] In fact, White, a mildly cognitively challenged teenage boy,[36] wasn't a suspect in that case but was "playing peacekeeper."[37] Lam found no record of White having been a suspect in the West 59th Street incident,[38] and the City admits that the report Schade had told Lam about ("the Exculpatory Report") *explicitly exonerated White*.[39]

---

[29] Report #2015-110291 at WHITE03259 (ECF #207-9).

[30] Report #2015-110336 at WHITE03059 (ECF #207-4); Lam Dep. 315:24–320:1.

[31] Lam Dep. 127:12–23.

[32] *Id.* at 158:23–25.

[33] *Id.* at 162:11–12.

[34] Report #2015-110291 at WHITE03270 (ECF #207-9).

[35] *Id.*

[36] Psychological Report of Dr. Stephen A. Kushnick at WHITE003047 ("Both scores place White in the mild mental retardation category.") (attached as Ex. 1-F).

[37] Connelly Dep. 389:20–39010.

[38] Lam Dep. 293:18–20.

[39] Connelly Dep. 388:21–390:10 ("According to the witness, Dalonte White was not involved in the menacing and in fact attempted to convince the other two males that the witness was not who they thought.").

Lam spoke next to Beveridge, who said White was part of a "gang" called "Hungry Money Family" or "Heartless Money Family."[40] Beveridge can't attribute a single crime to this gang. The only crime he identifies as involving this gang was one in which the gang member was the victim.[41] Nor did White match the description of the shooter that officers gathered at the crime scene[42]— White was younger, "7 or 8 inches shorter," and "65 to 115 pounds lighter"[43] Inexplicably, Lam already had photo lineups targeting White and his friends before the attack on Ms. Allums.[44] Although the propriety of the methods used for assembling and administering the arrays is disputed, it's undisputed that using those arrays, the police were eventually able to extract statements from each of the three victims that White was the shooter.

**Police find no evidence linking White to the robbery. They arrest him anyway.**

Police went to White's house looking for any evidence that could corroborate the witnesses' identifications. They pulled White from his front yard and demanded that he show them his legs. There was no sign of any dog bite, gun shot, or any other injury like the one that left the shooter limping away from the Allums house.[45] Although this made Lam less suspicious of White, he decided to arrest White anyway.[46] He and Shoulders sought and secured warrants for White's arrest and a search of his house.[47] But their affidavits:

- didn't disclose the disparities between White's size and the description of the shooter assembled the night of the shooting;

---

[40] Cleveland Division of Police Report #2015-110291 at WHITE03270 (ECF #207-9).

[41] Dep. of Robert Beveridge, ECF #206, 100:2–16.

[42] Lam Dep. 289:2–6.

[43] *Id.* at 289:6–19 (emphasis added).

[44] *Id.* at 171:21–172:4. Although Lam testified in juvenile court and in his deposition that he created the photo lineups the day after the robbery, records from the Ohio Bureau of Criminal Investigation show that he did not create another lineup until after arresting White. Decl. of Zahid H. Siddiqi at ¶ 8 (attached as Ex. 2).

[45] Lam Dep. at 221:5–17.

[46] *Id.* at 222:17–20.

[47] *Id.* at 207:15–22.

- didn't disclose that White had none of the injuries they knew the perpetrator had sustained during the incident; and
- falsely alleged that Dalonte was a suspect in the case Schade had identified.[48]

Days later, police arrested White on charges of burglary, kidnapping, and felonious assault, and transported him to the Cuyahoga County Juvenile Justice Detention Center.[49] Throughout his detention, he was repeatedly subjected to threats and assaults by other detainees. One left White so badly injured that doctors had to wire his mouth shut.[50] While White waited to see a judge, Detective Lam learned about Edward Bunch's hospital visit immediately after the Allums incident.[51] He quickly identified Bunch as a "person of interest" in the case, based on the proximity of the "date, time, and location" to the Allums incident, based on Bunch's inconsistent accounts of how he'd been shot, and based on surveillance video of the limping perpetrator, which Lam described as "consistent with the injuries sustained by Edward Bunch."[52]

**The victims say Edward Bunch did it. Cleveland police order them to say he didn't.**

Lam prepared photo arrays with Edward Bunch and another possible suspect.[53] He asked Defendants John Kubas and David Santiago, as well as Detective Thomas Balak, to administer them to the three victims.[54] Detective Balak administered the arrays to Zachary Hale.[55] Despite having identified White as the shooter previously (with 70% certainty), he now identified a second person as the shooter (with 80% certainty), and he then identified Bunch as the shooter (with 90% certainty).[56]

---

[48] Shoulders Aff. at CLE07392–93 (ECF #210-6); Lam Aff. at CLE07397–98 (ECF #210-8).

[49] Report #2015-110291 at WHITE03273 (ECF #207-9).

[50] Dep. of Dalonte White, ECF #189, 302:17–305:24.

[51] Report #2015-110291 at WHITE03275 (ECF #207-9).

[52] *Id.*

[53] *Id.*

[54] *Id.* at WHITE03275–76.

[55] *Id.* at WHITE03276.

[56] *Id.*

While Kubas claims not to remember administering the photo array to Ms. Allums, he doesn't dispute doing so.[57] Although he denies remembering literally any facts about his involvement in this case,[58] Ms. Allums remembered the interaction in detail. She testified in juvenile court that when she saw Edward Bunch, she immediately recognized him and the eyes that "looked at me while I was lying on the floor bleeding to death."[59] Having identified her shooter, she wanted to circle his picture but didn't,[60] following the instructions of Kubas, who told her not to identify someone who she thought had already been already arrested, because he didn't want his investigation "going in circles."[61]

Santiago too claims amnesia over administering the photo array to Ms. LaForce, but he doesn't dispute doing so.[62] Although Santiago denies remembering literally any facts about his involvement in this case,[63] Ms. LaForce remembered the interaction in detail. She testified in juvenile

---

[57] Dep. of John Kubas, ECF #208, 93:17–94:8 ("Q Do you dispute that you conducted these photo lineups? A I'm not disputing, no. I don't remember.").

[58] *Id.* at 99:6–106:7.

[59] Bindover Tr. 141:20–21. In a separate bid to keep the bindover transcript out of the record, Defendants object that it is inadmissible hearsay under Fed. R. Evid. 801. But the question of what evidence parties may use at summary judgment is governed by Fed. R. Civ. P. 56, which permits the parties to demonstrate a genuine dispute as to a material fact by relying on a variety of written statements. The question is not, therefore whether facts are presented as admissible evidence, but whether they could be "presented in a form that *would be* admissible in evidence." Rule 56 (c)(2). *See also Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial.") By Defendants' definition, virtually any statement offered as evidence on summary judgment would be "inadmissible hearsay." The absurdity of their argument is apparent when reviewing their own motions for summary judgment, which are of course supported entirely by equally "inadmissible hearsay," such as discovery responses, expert reports, deposition testimony, and declarations from previously undisclosed witnesses. Instead, the Court should, as the Sixth Circuit allows, take review "the record in the state court in an effort to ascertain the facts." *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980).

[60] Bindover Tr. 134:11–21 ("Q. Did you actually ever make any markings? A. No, I did not. Q. Did you want to? A. Yes.").

[61] *Id.* at 135:7–14 ("[H]e said not to circle him because we were -- that they were looking for the other two suspects and that if he was already arrested, that it would be them going in circles.").

[62] Dep. of David Santiago, ECF #209, 97:8–15.

[63] *Id.* at 83:14–17; 87:8–91:20.

court that when she saw Edward Bunch, she recognized him as the one with the gun.[64] Having identified the shooter, she was going to circle him but didn't, following Santiago's instructions. He told her, "don't circle him if you already picked him out of a lineup."[65]

Instead of following up on Bunch, Lam and Shoulders push harder on White. Again relying on misleading affidavits, they obtained search warrants for his phones, Facebook records, and DNA. None of them yields anything corroborating their theory that he was the shooter.[66] Instead, the Facebook records indicate that White was home at the time of the robbery.[67]

### Police dishonesty costs White 20 months of his life.

White's attorney was unable to use those facts to argue for White's release, and the judge supervising the case was unable to consider them in deciding whether to continue White's detention until the bindover hearing, because neither Kubas nor Santiago told the prosecutor on the case that they had tampered with their witnesses' identifications.[68]

Throughout his prosecution and detention—and to this day—White has always unequivocally maintained his innocence. When the case finally reached Cuyahoga County Juvenile Court Judge Denise Rini, both the prosecutor and the court learned for the first time about the "serious and exculpatory" improprieties in how Kubas and Santiago handled the photo arrays.[69] Relying on the complete lack of evidence corroborating the initial identification of White as the shooter[70] and new information about witnesses identifying Bunch[71] along with her findings that the

---

[64] Bindover Tr. 101:15–18.

[65] *Id.* at 101:5–13.

[66] Lam Dep. 333:2–335:6.

[67] *Id.* at 337:15–339:24.

[68] Schroth Decl. ¶¶ 6–7.

[69] *Id.* at ¶¶ 6–7.

[70] *Id.* at 434:20–435:3 ("There is no corroborating evidence.").

[71] Bindover Tr. 432:23–433:2.

photo array used to make that identification was too suggestive,[72] that the shooter was much larger

than White,[73] that Lam's assertion that Ms. Allums described the shooter as matching White's height

was refuted by his audio recording of that conversation,[74] and that Bunch was at the hospital with

injuries matching the description of the shooter's,[75] the court found that there was no "probable

cause that Dalonte White was part of the home invasion."[76] By the time White was freed, he'd spent

nearly 20 months in detention of one form or another.

LEGAL STANDARD

Under Fed. R. Civ. P. 56, the Court may not grant summary judgment unless "there is no

genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of

law." The Court is precluded from entering summary judgment unless it is *impossible* "that a

reasonable jury could return a verdict for the nonmoving party."[77] "Only if that party's claim cannot

survive even with every factual inference in his or her favor, [does the Sixth Circuit] uphold the

district court's decision to terminate the lawsuit before it reaches a jury."[78]

LAW & ARGUMENT

I.  **Genuine disputes as to material facts preclude summary judgment on any of White's claims.**

A.  **Defendants have admitted all the elements of White's claims for malicious prosecution (Claims 1 and 6).**

"Under federal law, a plaintiff must prove four elements to establish a malicious prosecution

claim: (1) that a criminal prosecution was initiated against the plaintiff and that the defendant 'made,

influenced, or participated in the decision to prosecute;' (2) that the state lacked probable cause for

---

[72] *Id.* at 433:3–10.

[73] *Id.* at 433:21–23.

[74] *Id.* at 433:23–434:2.

[75] *Id.* at 434:9–19.

[76] *Id.* at 435:4–6.

[77] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[78] *Henry v. City of Flint*, No. 19-1801, 2020 WL 2520695, at *4 (6th Cir. May 18, 2020).

the prosecution; (3) that the plaintiff suffered a deprivation of liberty because of the legal proceeding; and (4) that the criminal proceeding was 'resolved in the plaintiff's favor.'"[79] Malicious-prosecution claims may arise from the initiation of criminal proceedings without probable cause; they may also arise from the maintenance of criminal proceedings without probable cause.[80]

### 1. Defendants admit their influence on the decision to prosecute White.

An officer has sufficiently "made, influenced, or participated in the decision to prosecute" to satisfy the first element of a malicious-prosecution claim not when he makes a decision to prosecute, but if he engages in conduct that he "could reasonably foresee … *would contribute* to an independent decision that results in a deprivation of liberty."[81] This includes both actions that precede the decision to prosecute and those that "influenced the Plaintiffs' continued detention."[82] It specifically can include the use of false or fabricated statements and tampering with a lineup.[83]

Because this claim doesn't require "but-for" causation, ample evidence exists for a reasonable jury to conclude that Defendants could have foreseen that their conduct in the Allums case could have contributed to someone else making an independent decision that would result in a deprivation of White's liberty.

Neither the City nor Defendants Lam or Shoulders dispute that this element is satisfied in their cases. Lam was the lead investigator, primarily responsible for pushing the prosecution forward,[84] and the state's main witness at trial.[85] Shoulders was responsible for supervising Lam's

---

[79] *Jones v. Clark Cty., Kentucky*, 959 F.3d 748, 756 (6th Cir. 2020).

[80] *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017) ("[T]he § 1983 version of 'malicious prosecution' is not limited to the institution of proceedings; it can also support a claim for 'continued detention without probable cause.'").

[81] *Jackson*, 925 F.3d at 820.

[82] *Sykes v. Anderson*, 625 F.3d 294, 316 (6th Cir. 2010).

[83] *Jackson*, 925 F.3d at 821 ("[H]ad he known about what actually happened on the day of the line-up … the prosecutor would not have proceeded.").

[84] Dep. of Thomas Shoulders, ECF #242, 77:21–25.

[85] Bindover Tr. 269–407.

investigation[86] and personally sought the warrant for White's arrest.[87] The City admits that this element is satisfied.[88]

### a.  Lam admits the information from Schade and Beveridge contributed to the decision to arrest and detain White.

Contrary to Schade and Beveridge's assertions, an officer can't escape liability simply because "he did not make the decision to prosecute."[89] Because the decision to prosecute rests with a prosecutor, applying their standard would effectively immunize all police against malicious-prosecution claims. Instead, the question is whether they could have *foreseen* that their statements about White could have contributed to an independent decision resulting in a deprivation of his liberty.[90]

Here, there is sufficient evidence for a jury to conclude that Schade and Beveridge meet that test. Lam admits that it wasn't until he added information from Beveridge and Schade together that White became a target of his investigation.[91] Schade told Lam that White was a suspect in a nearby aggravated-menacing case just days earlier,[92] but the City acknowledges that the report Schade was talking about actually shows that White was trying to play peacemaker in that incident.[93] Beveridge told a brand-new detective that White's neighborhood clique, Hungry Money Family, was a criminal gang "*known* to rob people,"[94] when he admits that, in fact—other than an incident in which a clique

---

[86] Shoulders Dep. 38:14–16.

[87] *Id.* at 299:13–15 ("[Y]ou signed an affidavit supporting the arrest warrant for Dalonte, correct? A Correct.").

[88] Connelly Dep. 368:18–21 ("Q All right. Does the city agree that those actions it took influenced the decision to prosecute Dalonte? A Yes.").

[89] Schade and Beveridge Mot. for Summary Judgment, ECF #199-1 at 7.

[90] *Jackson*, 925 F.3d at 820.

[91] Lam. Dep. 168:16–21.

[92] Report #2015-110291 at WHITE03270 (ECF #207-9).

[93] Connelly Dep. 388:21–390:10 ("Q He's actually trying to stop the crime from happening, correct? A Yes.).

[94] Lam Dep. 169:25–170:15 (emphasis added).

member was the *victim*—the clique's connections to criminal activity were "in [his] mind" and not established through any evidence.[95]

From this, a jury could conclude Schade and Beveridge's false or exaggerated statements about White's criminal activity influenced the decision to prosecute him.

### b.  Kubas and Santiago admit they foresaw their actions contributing to the decision to detain White.

Kubas and Santiago offer a different—but equally unsupported—theory for escaping liability, arguing that because their misconduct came *after* the arrest, "it would have been impossible for them to have influenced White's arrest or the decision to prosecute."[96] But the question is not *when* they engaged in their misconduct; it is whether they could have foreseen that their misconduct would contribute to a decision that would deprive White of his liberty.

Santiago admits he could foresee this information as being of interest to supervisors, prosecutors, and judges—each of whom is responsible for "an independent decision that results in a deprivation of liberty."[97] Even their own expert witness acknowledges that given the evidence available, a genuine issue of material fact remains to be tried on this question.[98] Here, two of the victims testified that Kubas and Santiago directed them to falsify the lineups that could have exonerated White,[99] and the prosecutor says that Kubas and Santiago never disclosed that fact to the

---

[95] Beveridge Dep. 98:8–101:10 ("We could not get cooperative victims or victim IDs, so they may not have been charged, but in my mind I do believe they were involved.").

[96] Kubas and Santiago Mot. for Summary Judgment, ECF #195-1 at 12.

[97] Santiago Dep. 63:12–65:16.

[98] Campisi Report at ¶ 59 ("[W]e find and opine to a reasonable degree of professional certainty that a concrete determination cannot be made as to whether or not Ms. Allums and/or Ms. Laforce were improperly instructed not to circle the photograph of an individual they believe they recognized.") (attached as Ex. 1-G).

[99] Bindover Tr. 101:5–14; 133:10–20.

prosecution.[100] The prosecutor also acknowledges that those facts were just the kind of information that "would have been a factor … in evaluating the case."[101]

From these facts, a jury may reasonably conclude that Kubas and Santiago made false statements and covered up their misconduct, and that their actions were both intended to and did influence the decision to prosecute White. Because their own admissions and testimony create a genuine dispute as to whether Defendants influenced the decision to prosecute White, the Court must move on to consider whether there was probable cause to support that prosecution.

> **2.      Defendants admit the court's finding of probable cause was made without material, exculpatory information.**

"A probable cause determination is based upon the totality of the circumstances and must consider both the inculpatory and exculpatory evidence. That means an officer cannot simply turn a blind eye toward evidence favorable to the accused."[102]

As the Supreme Court has previously admonished the Cleveland Division of Police, the existence of probable cause is evaluated "at the moment of the arrest."[103] Therefore, police may not "look for after-the-fact justifications for [seizures] that would otherwise be impermissible."[104] Subsequent investigation supporting probable cause cannot relieve a defendant of liability for an arrest without probable cause, but subsequent investigation undermining probable cause can create liability for continued detention without probable cause.[105]

---

[100] Schroth Decl. ¶¶ 6–7.

[101] *Id.* at ¶¶ 12–13.

[102] *Jones*, 959 F.3d 748 (cleaned up).

[103] *Beck v. State of Ohio*, 379 U.S. 89, 96 (1964).

[104] *United States v. Hughes*, 606 F.3d 311, 316 (6th Cir. 2010).

[105] *See, e.g., Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) ("Because there exists a genuine issue of material fact about whether Katz intentionally withheld exculpatory information in order to continue Plaintiff's detention without probable cause, this Court reverses the district court's grant of summary judgment on this claim.").

While Defendants are free to argue that there was probable cause to suspect White shot Colleen Allums, their argument that they are entitled to summary judgment on this question relies entirely on their refusal to engage the controlling standard. The question is not, of course, whether Defendants deny violating White's Fourth Amendment rights, but whether there is enough evidence for a reasonable jury to conclude that they did. Across all their motions, not a single defendant ever suggests that *that* question can be answered in their favor.

How could they? The evidence from which a jury could find the absence of probable cause is overwhelming. Most prominently, the Juvenile Division of the Cuyahoga County Court of Common Pleas spent three days hearing evidence against Dalonte, and it ruled that there was no probable cause.[106] This wasn't the result of a sloppy prosecution—as the prosecutor says he "put on every piece of evidence of Dalonte's guilt" available to him.[107] The City agrees, admitting the prosecutors "did what they were supposed to do," and denies that the court overlooked any evidence in reaching its decision.[108]

Defendants implore the Court not to review the transcript of these proceedings. Although undertaken contemporaneously and by a court with a more intimate familiarity with the players involved, the juvenile court's determination may not be binding or preclusive in this case, but Defendants offer no explanation why a reasonable jury cannot take it as evidence of the absence of probable cause. Their naked assertion that no juror could credit Judge Rini's decision and that this Court should discard it like trash when looking for genuine disputes is a unique interpretation of the Court's duty to maintain comity with the state courts.

---

[106] Bindover Tr. 435:4–6.

[107] Schroth Decl. ¶ 8.

[108] Connelly Dep. 372:18–373:5.

This is hardly all the evidence from which a jury could conclude there was never probable cause. The expert report of Seth Stoughton lays out in painstaking detail the many and gaping holes in Defendants' case against White.[109] These include "improperly and problematically suggestive" photo line-ups,[110] Kubas and Santiago's interference with the identification of another suspect,[111] and investigators' many curious decisions not to record key interactions with witnesses.[112]

Add to this the abundance of evidence—available to Defendants while White remained in detention—that Edward Bunch was in fact the person who shot Ms. Allums, including:

- his close match to the description provided by the victims;
- his M.O. matched the Allums robbery;
- he suffered an injury just like the one police suspected the robber had suffered;
- he made inconsistent statements about the source of his injuries; and
- *all three victims said it was Edward Bunch.*

On top of all that, a jury could certainly conclude that Defendants never had a reasonable belief that White was guilty because they abandoned their efforts to convict him as soon as a court called them out for their shenanigans. A reasonable jury could certainly infer that if there had truly been some reasonable basis for suspecting White, the City's diligent investigators would have continued to look for evidence against him instead of walking away and pretending no one ever shot Ms. Allums in the first place.

Defendants offer little explanation why a reasonable jury couldn't credit any of this evidence. Schade, Beveridge, Kubas, and Santiago, for instance, offer no argument that White's arrest was supported by probable cause, and have therefore failed to bear even their initial burden on summary judgment of demonstrating the absence of a genuine dispute. Defendants merely serve up their

---

[109] Decl. of Seth Stoughton, 21–48 (attached as Ex. 3).
[110] Stoughton Decl., 25–27.
[111] *Id.* at 27–29.
[112] *Id.* at 43–45.

disputed facts while ignoring the evidence in opposition, which is the only evidence relevant at this stage. For instance, Shoulders continues to cling to the dubious photo line-ups. He casually disregards (1) their complete incongruity with the victims' description of the shooter and White's physical features, (2) Dr. Margaret Bull Kovera's expert opinion that the police used "a photo array that was biased against White,"[113] and (3) Professor Stoughton's conclusion that "the identifications were based on a deeply flawed photographic lineup that was not a reliable source of information."[114] Instead, Shoulders notes blithely that "[t]he suspect and White had the same race, age range and gender."[115] In other words, Shoulders believes he had probable cause to arrest White because White was a young, black man who "lived in close proximity" to a crime. Fortunately for black children across the country, that kind of naked racial stereotyping is no longer accepted as probable cause.[116]

Lam argues he had probable cause because several officers "raised the possibility" that White was guilty, and then the witnesses picked White out of a lineup. But a mere "possibility" is not the same as probable cause, and a jury could reasonably conclude, as Dr. Kovera and Professor Stoughton did, that those lineups were not reliable enough to factor into the probable-cause determination. Lam can't explain why a jury could not reasonably credit that evidence.

The City makes the same mistake. It argues it has brought forward "ample evidence" of probable cause,[117] but that argument has no relevance when it is the party moving for summary judgment. It claims White was involved in a "street gang," but there's no evidence that this gang was ever involved in criminal activity. It claims White's appearance "matched" the person seen on video

---

[113] Decl. of Margaret Bull Kovera at 11–12 (attached as Ex. 4).

[114] Stoughton Decl., 36.

[115] Shoulders Mot. for Summary Judgment, ECF #193-1 at 12.

[116] *Davis v. Mississippi*, 394 U.S. 721, 722 (1969) (suppressing fingerprint evidence obtained based on victim's description, where "[t]he victim could give no better description of her assailant than that he was a Negro youth."); *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir.2013) ("The fact that Jeter was a black man on a bicycle in a 'high crime area' is not enough to support reasonable suspicion, let alone probable cause.").

[117] City's Mot. for Summary Judgment, ECF #197 at 3.

limping away from the crime scene, but its lead detective disagrees, saying the video was "lower quality," that it didn't allow him to evaluate the subject's height or other physical characteristics, and that it did nothing to make him doubt the previous description he'd received of the shooter,[118] which didn't match White.[119] The City also relies on the photo line-ups, but again, a reasonable jury could credit the experts' conclusion that any reasonable officer would have known that those lineups were unduly suggestive. Even if they weren't, "[p]robable cause is created only by eyewitness allegations that are '*reasonably trustworthy*.'"[120] These identifications were anything but; Lam himself admitted that the victims' own descriptions of the incident indicated they were all limited in their ability to see any of the men who came into the house that day.[121]

Finally, the City notes that police found a North Face jacket in White's home, but it is again trying do what the Supreme Court told it was forbidden in *Beck*: using after-acquired evidence to redeem its defective warrant after the fact. Even if it were allowed to do that, a jury could reasonably conclude that living in the same house as someone who owns one of the nation's most popular brands of outerwear is insufficient to give rise to probable cause.

Setting aside the holes in literally every piece of evidence offered in support of a probable-cause determination, Defendants' argument also fails because proving the absence of a jury question requires them to consider the "totality of the circumstances," *including exculpatory evidence*. Whether it was the problems with the lineups or the evidence that Bunch was the shooter, this is a subject Defendants studiously avoid, even though they collectively spent hours admitting in depositions to exculpatory evidence that never factored into the decision to detain White, often because that

---

[118] Lam Dep. 184:5–185:3.

[119] *Id.* at 175:9–11.

[120] *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (quoting *Logsdon v. Hains*, 492 F.3d 334, 342 (6th Cir. 2007)).

[121] Lam Dep. 308:7–312:14.

evidence was misrepresented or never revealed to prosecutors or the magistrate.[122] In the final calculus, even the City admits that it could be that probable cause pointed "all the way toward Edward Bunch."[123] Defendants don't explain why a jury couldn't embrace that admission.

### 3. Defendants admit White's prosecution resolved in his favor.

A malicious-prosecution plaintiff "must demonstrate that his dismissal indicates that he may be innocent of the charges, *or that a conviction has become improbable.*"[124] A dismissal "without prejudice" is a termination in the plaintiff's favor.[125] "[T]he determination of whether a termination is sufficiently favorable ultimately rests with the trial court as a matter of law, absent a factual dispute relative to the circumstances of the dismissal."[126]

---

[122] *See, e.g.*, Connelly Dep. 141:4–142:4 ("The affidavit does not include all the exculpatory information."); *id.* at 547:23–548:23 (discussing failure to disclose evidence of Defendant Shoulders's racial bias); *id.* at 415:19–425:15 (discussing failure to disclose discrepancies between the shooter's size and White's); Lam Dep. 250:15–251:4 (acknowledging the identification of Bunch may be exculpatory); *id.* at 288:16–291:2 (discussing mismatches between White and victims' description of the shooter); *id.* at 292:10–302:3 (discussing Lam's failure to verify assertions in his affidavit); *id.* at 303:10–307:10 (discussing Lam's failure to disclose to the magistrate exculpatory information about the first set of photo lineups); *id.* at 307:11–312:14 (discussing Lam's failure to disclose to the magistrate the victims' admitted inability to see the shooter); *id.* at 313:4–315:7 (discussing lack of incriminating evidence recovered from first search warrant); *id.* at 315:8–320:1 (discussing similarities between the description of the shooter and Edward Bunch); *id.* at 320:20–322:15 (discussing the general fishiness of Bunch's behavior); *id.* at 322:16–323:12 (acknowledging that Bunch was a better match to the description of the shooter than Dalonte was); *id.* at 323:13–328:17 (acknowledging similarities between Bunch's M.O. and the shooter's); *id.* at 331:20–333:1 (discussing failure to disclose exculpatory information to judge when pursuing second round of search warrants); *id.* at 333:2–25 (discussing lack of incriminating evidence recovered from second search warrant); *id.* at 334:1–335:6 (discussing lack of incriminating evidence recovered from third search warrant); *id.* at 336:3–340:3 (discussing exculpatory evidence recovered from third search warrant); *id.* at 340:23–343:20 (discussing sworn testimony that someone other than White was the shooter); *id.* at 346:18–350:17 (discussing still more fishy behavior by Bunch).

[123] Connelly Dep. 443:11–444:18 ("The city's position is that the pendulum may or may not have swung all the way toward Edward Bunch, right? MS. MILEY: Objection. A Correct.").

[124] *Jones*, 959 F.3d 748 (cleaned up, emphasis added).

[125] *Jones*, 959 F.3d 748 ("Categorically construing the favorable termination requirement to exclude plaintiffs whose cases were dismissed without prejudice would undermine the ability of malicious prosecution claims to hold officials accountable for baseless legal proceedings simply because those proceedings ended prior to a verdict."); *Linetsky v. City of Solon*, No. 1:16-CV-52, 2016 WL 6893276 (N.D. Ohio Nov. 23, 2016) *13 ("Plaintiff Linetsky's criminal prosecution was terminated in his favor. The charges were dismissed on June 15, 2015. The dismissal was "without prejudice," meaning that the government could re-file criminal charges against Linetsky. However, Defendants fail to offer any evidence that the dismissal was not a favorable termination on the merits.").

[126] *Jones*, 959 F.3d 748.

In this case, a reasonable jury could conclude the circumstances surrounding the dismissal of the criminal charges against White indicate his innocence. The juvenile court made clear that it had concluded that there was no probable cause to support the charges. And the prosecutor acknowledged that dismissal was the appropriate course of action based on that decision,[127] and Kubas, Santiago, and Shoulders concede this issue.[128]

Only Lam offers any substantial argument that this element is not satisfied, but he relies on binding precedent saying just the opposite. In *Parnell v. City of Detroit, Michigan*,[129] the prosecutor had abandoned the case against the plaintiff after dismissing without prejudice. Examining the termination-in-favor element, the Sixth Circuit held that it requires a final decision indicating the accused's innocence and said that "appears to be exactly what we have here."[130] In doing so, the court acknowledged the conflicting authority among the lower courts and rejected those that forbade claims like White's from moving forward.

The Sixth Circuit revisited this question just last month in *Jones*.[131] There, the plaintiff brought a malicious-prosecution claim, but the district court dismissed it, finding that "a dismissal without prejudice is not a favorable termination." The Sixth Circuit reversed, noting its previous holding that a termination is favorable where the dismissal is one-sided, rather than a result of a settlement or compromise.[132] The court acknowledged that accepting Defendants' proposed rule "would undermine the ability of malicious prosecution claims to hold officials accountable for

---

[127] Schroth Decl. ¶ 15.

[128] Kubas and Santiago Mot. for Summary Judgment, ECF #195-1 at 13–14; Shoulders Mot. for Summary Judgment, ECF #193-1 at 21.

[129] 786 F. App'x 43 (6th Cir. 2019).

[130] *Parnell*, 786 F. App'x at 51.

[131] 959 F.3d 748.

[132] In doing so, the Sixth Circuit explicitly rejected two more cases Lam relies on: *Mobley v. City of Detroit*, 938 F. Supp. 2d 669, 687 (E.D. Mich. 2012) and *Thornton v. City of Columbus*, 171 F. Supp. 3d 702, 710 (S.D. Ohio 2016).

baseless legal proceedings simply because those proceedings ended prior to a verdict[,] … weaken the protections and deterrence provided by § 1983 and effectively deny an entire class of plaintiffs a remedy for their constitutional violations."[133]

In this case, no one has argued that White's dismissal doesn't indicate his innocence—only that it wasn't favorable enough. But under *Jones*, the Sixth Circuit rejects that stingy approach and looks instead to see whether the dismissal was the result of a bargain, whether it indicates his possible innocence, or whether a conviction has become improbable. White's dismissal checks all the boxes. It was not the result of negotiations but rather a front-to-back collapse of the state's case. It indicates his innocence because the judge found the prosecution was not supported even by probable cause—"not a high bar," Lam reminds the Court.[134] And a conviction is improbable because the prosecutor agreed the case should have been dismissed,[135] and there has been no investigatory activity in nearly five years.[136] To quote the prosecutor assigned to it, the case is "done, finished, over, kaput," and "the strength of the State's case is unchanged."[137]

Because White's case ended purely because the state had no reliable evidence of his guilt, and evidence that Bunch was guilty, a reasonable jury could conclude that the circumstances of the dismissal indicate his innocence and that the case terminated in his favor.

---

[133] *Jones*, 959 F.3d 748.

[134] Lam Mot. for Summary Judgment, ECF #191-1 at 14.

[135] Schroth Decl. ¶ 15.

[136] Lam Dep. 360:17–24 ("Q Was receiving that report [on August 4, 2015] the last action you took to investigate the Colleen Allums case? … A Based on what I can recall, yes.").

[137] State's Opp. to Mot. to Amend at 2  (quoting *State ex rel. Flynt v. Dinkelacker*, 156 Ohio App. 3d 595, 600 (2004)) (attached as Ex. 1-H).

### 4. Defendants' admissions allow a jury to conclude they acted with malice.

"For purposes of malicious prosecution, [malice] means an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice."[138] It has long been established that a jury may infer malice from the absence of probable cause.[139]

As demonstrated above, there is ample evidence from which a jury a could conclude that Defendants lacked probable cause, which as a matter of law permits an inference that they acted out of malice. The City's attempt to hide the Exculpatory Report also serves as evidence of malice, as do the bizarre circumstances surrounding Defendants' use of photo lineups. The City admits that the don't-circle instruction may have been the result of "maliciousness,"[140] and a jury could conclude that if Lam was skilled enough to assemble four nonsuggestive lineups with filler photos matching their suspects, the fact that he used such comically bad fillers in White's lineup shows he was acting in bad faith to dupe the victims into identifying White. But this is only the beginning of the evidence that would allow a jury to infer that Defendants acted with malice.

### a. The evidence suggests Defendants acted to indulge Shoulders's racial animus rather than to bring an offender to justice.

Most prominent is the evidence that Shoulders is deeply and violently racist, and that his hatred for black children leads to his violation of their civil rights. In another case—which Defendants never disclosed in response to discovery requests, despite the same lawyers defending it contemporaneously with this case—Shoulders effectively kidnapped a black child from the Cuyahoga County Juvenile Justice Detention Center after staff repeatedly rejected his attempts to interrogate him. Shoulders and Lam held the boy for five hours while he and Lam interrogated him,

---

[138] *Criss v. Springfield Twp.*, 56 Ohio St. 3d 82, 85 (1990).

[139] *Stewart v. Sonneborn*, 98 U.S. 187, 191 (1878) ("Malice, the existence of which is a question exclusively for the jury… [T]he jury may infer malice from the want of probable cause."); *Ehrman v. Hoyt*, 1858 WL 4543 (Ohio Super. 1858) ("[T]he want of probable cause might in itself raise an inference of malice.").

[140] Connelly Dep. 488:1.

even after the boy asked for his mother or his lawyer.[141] Having taken Shoulders's testimony that he

took the child from the jail "to have the individual processed" on another charge, the juvenile court

found his account "not credible."[142] Instead, it described Shoulders's under-oath explanations as a

"pretext" and "ruse," designed to allow him to "unlawfully interrogate the child without the

knowledge of the Court, the child's attorney and/or his mother"[143]—conduct that he "kept secret

for approximately five (5) months."[144]

   Another incident involved a report that Shoulders verbally and physically assaulted a young

black man named Patrick Carner, whom he had picked up for a traffic warrant. According to the

report, Shoulders called Mr. Carner "an animal," a "piece of shit," a "little nigger," and a "dumb

nigger"; told him, "You should die, you fucking nigger"; and then punched the handcuffed man in

the face.[145] Although Shoulders's victim said he had recorded the entire incident and filed yet

another civil-rights lawsuit against Shoulders, the City testified it has no information that its internal-

affairs bureau even bothered to investigate.[146]

   Add in the other facts above, and a jury has plenty of evidence from which it could infer that

Shoulders and his co-workers rigged the investigation against White. For instance, he and Lam claim

they built a photo lineup targeting White on April 22, based on the descriptions provided to Officer

Daugenti the night before,[147] but records from the state show that neither of them created *any* photo

lineups in that period. And when asked why the police selected White to include in a lineup, even

---

[141] *Benton v. City of Cleveland*, No. 1:18-CV-2159, 2020 WL 1233949, at *1 (N.D. Ohio Mar. 13, 2020). Defendants never disclosed this case in discovery, even though it was squarely within White's requests and was being defended by the same lawyers, while this case was ongoing.

[142] Magistrate's Order, *In the matter of J.B.*, No. DL-15113409 at 6 (Cuyahoga C.P. Apr. 7, 2016) (attached as Ex. 1-I).

[143] *Id.* at 8–9.

[144] *Id.* at 8.

[145] Complaint, *Carner v. Cleveland*, No. 1:14-cv-02820-CAB, ECF #1-1 at ¶¶ 2–8 (N.D. Ohio Dec. 29, 2014).

[146] Connelly Dep. 547:23–548:15.

[147] Lam Dep. 230:18–24.

counsel for the City couldn't help wondering whether it was only because the "the witness said the perpetrators were black."[148]

A reasonable jury could infer from this evidence that Shoulders was already cooking up plans to charge White whenever an opportunity arose. Because Shoulders has a history of racism and disregard for the civil rights of young black men, a reasonable jury could conclude that he was motivated by racism rather than justice, and that the lower-ranking officers followed his lead.

> **b.  The evidence suggests Defendants acted to shield each other from accountability rather than to bring an offender to justice.**

The evidence in this case indicates that Defendants are loath to address any errors in each other's work, whether they are dealing with minor policy violations or allegations that their co-workers have committed felonies.

The City's failure to even investigate Shoulders's attack on Mr. Carner is only one example. Lam testified that when he learned how Kubas and Santiago tampered with the second lineups, he never even asked them about what happened.[149] Lam claims he reported the allegations of their misconduct to Shoulders, but Shoulders testified he didn't know of it until this case started.[150] Regardless of whether Lam reported it to Shoulders, the City admits that neither of them ever reported the allegation to internal affairs as required by Division policy.[151]

And the City's Rule 30(b)(6) representative, Commander Connelly, acknowledged that even after *he* learned of the allegation, he was required to report it himself but never bothered to.[152]

---

[148] Dep. of Alexandria Chandler, ECF #237, 147:12–15 ("A. … Why just them? They are not the only boys from Storer. Q Could it be because the witness said the perpetrators were black?").

[149] Lam Dep. 341:20–21 ("Q Did you ever ask Kubas about this? A I did not."); id. at 343:11–12 ("Q Did you ever ask Santiago about this? A I did not.").

[150] Shoulders Dep. 167:10–12 ("Q [H]ave you ever heard of [a don't-circle instruction] happening? A No. I believe not.").

[151] Connelly Dep. 316:2–318:11.

[152] *Id.* at 321:21–323:3.

Confronted with his own violation of policy, Commander Connelly pledged to file a report to internal affairs,[153] but when he returned to continue his deposition more than a month later, Connelly admitted that he still had not bothered to file the report.[154] Since then, the City—which has ongoing discovery obligations—has produced no records suggesting that there has been any investigation into the Kubas and Santiago's misconduct.

Defendants' failures of reporting and discipline are part of a larger pattern within the Division, where supervisors virtually never provide meaningful oversight or discipline until third parties force their hand. Detective Santiago, for instance, in more than 30 years of policing, has never been told he was doing *anything* wrong, from safeguarding constitutional rights down to even the most minor points of division policy.[155] The same is true for Kubas, with the exception of the day he forgot to wear his hat,[156] and for Beveridge, who likewise has only once been disciplined in his decades as an officer.[157] Perhaps all the officers in this case are truly perfect, but a jury could conclude they are conspiring to insulate themselves from accountability.

From this evidence, a reasonable jury could conclude that Defendants enjoy and foster a culture of zero accountability for each other and that they pursued White in the face of overwhelming evidence of his innocence to protect that status rather than to bring an offender to justice. Because evidence of Defendants' lack of probable cause, racial animus, and aversion to accountability would allow a reasonable jury to infer that they acted with a "purpose other than … bringing an offender to justice," there is sufficient evidence to find Defendants acted with malice.[158]

---

[153] *Id.* at 323:4–14 ("A I don't know that they don't know about it. I can easily call and find out. Q Okay. Well, that's what I'm asking, whether you're going to. A Sure.").

[154] Connelly Dep. 538:3–539:5.

[155] Santiago Dep. 29:13–31:25.

[156] Kubas Dep. 41:8–25.

[157] Beveridge Dep. 54:12–55:25.

[158] *Criss v. Springfield Twp.*, 56 Ohio St. 3d 82, 85 (1990).

The Court should deny the motions for summary judgment on Claims 1 and 6.

**B.    Defendants have admitted all the elements of White's claims for false arrest and false imprisonment (Claims 2, 7, and 8).**

When an arrest is made in reliance on a warrant, a claim for false arrest requires proof that an officer (1) "knowingly and deliberately, or with a reckless disregard for the truth" (2) "made false statements or omissions that create[d] a falsehood," and (3) that those statements or omissions were "material, or necessary, to the finding of probable cause."[159]

**1.    Defendants admit White's warrant included false statements and omissions.**

Although Defendants are still trying to sort out who among them is to blame, there no longer appears to be any dispute that the warrant for White's arrest included false statements. Confronted with the report that it failed to produce in discovery, the City admitted Shoulders "misrepresented" White's involvement in the aggravated-menacing case its employees kept invoking to support probable cause.[160]

The City also admits that Shoulders phrased his affidavit in a way that implied certain facts, including facts that the City and other witnesses say are not true. For instance, the City says Shoulders implied that White matched the victims' descriptions of the shooter,[161] but it admits that White was in fact far shorter and far lighter.[162] The City also says Shoulders implied that the lineups used to identify White were "properly prepared and administered,"[163] but a reasonable jury could

---

[159] *Sykes*, 625 F.3d at 305.

[160] Connelly Dep. 393:23–394:2 ("Paragraph 12 seems to be misrepresented.").

[161] *Id.* at 409:17–21.

[162] *Id.* at 418:19–419:19 ("Q Okay. Is it fair to say Dalonte was roughly 8 inches shorter than the description provided in Exhibit 971? … A Roughly. … Q Okay. Would we agree that Dalonte White was roughly 100 pounds less than the description of the shooter in Exhibit 971? … Q Roughly.").

[163] *Id.* at 396:24–397:6.

accept Professor Stoughton's expert opinions that the lineups were unduly suggestive and that Shoulders would have known that.[164]

And many facts were omitted from the affidavits, including the fact that Shoulders had a failing memory,[165] the fact that the witnesses didn't recognize any of White's supposed accomplices,[166] the fact that the victims picked out White's picture without knowing he was far smaller than they had described,[167] and the fact that the victims were severely limited in their opportunity to view the shooter.[168]

> **2.    Defendants admit facts allowing a jury to conclude they made those false statements or omissions knowingly, deliberately, or with a reckless disregard for the truth.**

Not only do Defendants fail to dispute that the statements made to obtain White's arrest warrant were materially false, they disagree about who was to blame for them. Lam blames Shoulders and claims those facts were "true to his knowledge."[169] But Shoulders blames Lam for the content of his affidavit, saying he was "totally responsible for the affidavits."[170] Defendants don't explain why a jury couldn't credit Lam's testimony and hold Shoulders responsible, or why it couldn't credit Shoulders's testimony and hold Lam responsible.

More likely, a jury would conclude that both of them knew all along that they were misleading the court when they applied for the warrants. After all, Lam knew White wasn't a suspect in the aggravated-menacing case, as he admits that he read "the entire narrative of the report,"[171] and

---

[164] Stoughton Decl. at 29.

[165] Connelly Dep. 454:1–14.

[166] Id. at 304:11–307:4.

[167] Id. at 307:5–10.

[168] Id. at 307:11–312:14.

[169] Lam Mot. for Summary Judgment, ECF #191-1 at 6–7.

[170] Shoulders Dep. 62:24–63:2 ("Being a lead detective, meaning he's totally responsible for the affidavits, the witnesses, the setting the whole nine yards up. That's basically what it is.").

[171] Lam Dep. 141:1–142:12.

Shoulders swears that he personally verified the information in the report,[172] meaning that he also would have seen the report in question but nonetheless "misrepresented" it to the court, as the City puts it.[173]

### 3. Defendants admit those false statements and omissions were material.

Statements or omissions are material to the finding of probable cause if "but for these falsities the judge would not have issued the warrant."[174] Here, the City doesn't dispute that its officers' false statements and omissions may be material, and it admits that a suggestive photo array, a don't-circle instruction, and Shoulders's memory problems—none of which were disclosed—may have been material.[175] Where Rule 56 requires that there be no genuine dispute as to the whether those statements were material, the City admits "[i]t's difficult … to answer that question."[176] But if a jury were to accept the experts' conclusions that the photo lineups were unduly suggestive, the City admits that the failure to disclose that fact would be material.[177] Nor does it dispute that failing to disclose Shoulders's memory problems may have been material.[178]

In this case, several defendants admit that there were materially false statements made to obtain the warrant for White's arrest, and they disagree with each other as to their mental states in making those false statements. Because they themselves have created factual disputes as to these issues, the Court cannot grant summary judgment on the false-arrest or false-imprisonment claims (Claims 2, 7, and 8).

---

[172] Shoulders Dep. 308:6–9.

[173] Connelly Dep. 394:2.

[174] *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003).

[175] Connelly Dep. 397:13–402:7.

[176] *Id.* at 396:11–23.

[177] *Id.* at 397:13–20.

[178] *Id.* at 401:10–403:12.

### C.   Defendants have admitted all the elements of White's claim for wrongful detention (Claim 3).

A claim for wrongful detention under the Fourteenth Amendment requires evidence that the "procedures the State affords defendants following arrest and prior to [a] trial" were inadequate "in the face of repeated protests of innocence."[179] Wrongful-detention claims can also be analyzed under the Fourth Amendment.[180] That analysis requires proof of "a sustained detention stemming directly from the law enforcement officials' refusal to investigate available exculpatory evidence."[181]

White has always maintained his innocence. There being no dispute on this point, the question is whether White's sustained detention stemmed from Defendants' refusal to investigate available exculpatory evidence. Defendants' admissions created a genuine dispute as to whether that is what happened here. As discussed above, there was an abundance of evidence of Edward Bunch's guilt. But Defendants refused to follow normal investigative procedures to follow up after the victims identified him as the shooter. A jury could reasonably infer that Detective Lam's conduct in following up on the victim's identification of White in the line-up should set a baseline for a reasonable investigation; doing so would highlight how stubbornly they refused to investigate Edward Bunch: unlike with White, Defendants never sought a search warrant for Edward Bunch's DNA, for his Facebook records, for his home, or for his phone.[182] They never put his known accomplices into a lineup for the victims.[183] They never investigated his alibi.[184] And they never even tried to make a case for an arrest warrant.[185]

---

[179] *Seales v. City of Detroit, Michigan*, 959 F.3d 235 (6th Cir. 2020) (citing *Baker v. McCollan*, 443 U.S. 137, 145 (1979)).

[180] *Seales*, 959 F.3d 235 (citing *Russo v. City of Bridgeport*, 479 F.3d 196, 208 (2d Cir. 2007)).

[181] *Russo*, 479 F.3d at 208.

[182] Lam Dep. 360:25–361:9.

[183] *Id.* at 361:10–362:7.

[184] *Id.* at 366:4–12.

[185] *Id.* at 366:13–18.

Even before considering Defendants' refusal to pursue Edward Bunch, the record already contains enough evidence of his guilt that a reasonable jury could conclude that actually investigating him would have yielded sufficient evidence to set White free.[186] Because Defendants admit they failed to take routine investigative steps to follow up on the victims' identification of Edward Bunch as the shooter, a reasonable jury could conclude both that Defendants' procedures for addressing repeated protests of innocence were inadequate and that White's sustained detention stemmed directly from Defendants' refusal to investigate available exculpatory evidence.

The Court should deny the motions for summary judgment on Claim 3.

### D. Defendants have admitted all the elements of White's claim for *Brady* violations (Claim 4).

A *Brady* violation has three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.[187]

#### 1. Defendants admit the suppression of evidence favorable to White.

"[P]olice can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material."[188] Failing to disclose it violates the defendant's rights, "irrespective of the good faith or bad faith of the prosecution," and "even though there has been no request by the accused."[189]

Defendants failed to disclose both exculpatory and impeaching *Brady* evidence:

- Defendants swore that White was a suspect in the aggravated-menacing incident, and treated that fact as evidence of his guilt. Because White was actually never a suspect, the report showing that Defendants lied about it is both exculpatory and impeaching. Defendants admit that it was never disclosed.[190]

---

[186] *See, e.g.*, Connelly Dep. 459:23–460:9.

[187] *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

[188] *Jackson*, 925 F.3d at 814.

[189] *Strickler*, 527 U.S. at 280.

[190] Connelly Dep. 445:16–447:25.

- Evidence that Kubas and Santiago instructed the victims to falsify their identifications of Edward Bunch is both exculpatory and impeaching because it indicates that White was not the shooter and that Kubas and Santiago are dishonest. The City concedes that evidence of such instructions should be turned over,[191] and that it has no evidence that it was.[192]

- Evidence—discussed above—that Shoulders is a violent racist is impeaching because it suggests that he is biased and not to be believed when lobbing accusations at black children, and that his subordinates may be required to indulge his racist proclivities. The City concedes it should have given that evidence to the prosecutor[193] and that it has no evidence that it was.[194]

- Evidence that Shoulders had memory problems that limited his ability to perform basic investigative tasks and identify people by the correct names[195] is impeaching because it calls into question the validity of the information he is providing the court. The City concedes that evidence should have been turned over,[196] and that it has no evidence that it was.[197]

A reasonable jury could therefore conclude Defendants suppressed evidence favorable to White.

### 2.     Defendants admit their failure to disclose evidence may have prejudiced White.

Likely because early *Brady* cases focused on post-conviction relief rather than Section 1983 claims, the Sixth Circuit previously suggested that a *Brady* claim could not succeed where "the underlying criminal proceeding terminated in appellant's favor."[198] But since the Supreme Court's 1999 announcement of the above elements for civil *Brady* claims in *Strickler*, the Sixth Circuit has not been so strict. Rather than barring claims whenever there is any kind of favorable termination, it

---

[191] *Id.* at 455:5–8.

[192] *Id.* at 457:4–9.

[193] *Id.* at 549:3–5.

[194] *Id.* at 548:18–23.

[195] *Id.* at 9:1–10:5.

[196] *Id.* at 402:8–16.

[197] *Id.* at 454:6–14.

[198] *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988).

measures prejudice by asking whether suppressed evidence was "of a nature that would have had a reasonable probability of changing the result of the proceeding."[199]

The focus, therefore, is no longer on the final verdict after a full trial, but on whatever *proceedings* are relevant to a plaintiff's claims. Here, the proceedings at issue are the juvenile court's approval of the warrant for White; its approval of a request to hold him pending the bindover hearing; the bindover hearing at which it refused to dismiss the case with prejudice; and its consideration of the question whether to continue detaining White even after finding there was no probable cause to hold him.

Defendants argue that Sixth Circuit precedent bars *Brady* claims here because the juvenile court dismissed the case and White was never convicted.[200] They argue that both the earlier, superseded line of cases, as well as a more recent decision, *Offineer v. Kelly*, 454 F. App'x 407 (6th Cir. 2011) hold that "there is no actionable *Brady* claim if there is no conviction."[201] But this is an overstatement. *Offineer* does not say that *Brady* claims arise from convictions; it merely holds that they are barred by acquittals, which no one in this case suggests has occurred. The other cases on this point are also more limited than Defendants acknowledge. None of them holds that *Brady* claims are barred in cases like this, when the police continue to hold out the possibility of further prosecution, allowing a jury to conclude the Plaintiff remains in jeopardy.

The Sixth Circuit's actual rule, focusing on "the result of the proceeding," is far more forgiving of plaintiffs who remain under a cloud because of police or prosecutorial intransigence, and it is supported by other decisions looking specifically at how to examine "prejudice" in light of

---

[199] *Jerome v. Crum*, 695 F. App'x 935, 943 (6th Cir. 2017).

[200] Lam Mot. for Summary Judgment, ECF #191-1 at 12. *See also* Shoulders Mot. for Summary Judgment, ECF #193-1 at 21; Beveridge and Schade Mot. for Summary Judgment, ECF #199-1 at 9; Kubas and Santiago Mot. for Summary Judgment, ECF #195-1 at 13.

[201] Lam Mot. for Summary Judgment, ECF #191-1 at 12.

*Brady* violations by police rather than prosecutors. In *Craig v. Chicago Police Officers*, No. 05 C 0172, 2005 WL 1564982, at *2 (N.D. Ill. June 9, 2005), for instance, the police defendants sought to evade liability by arguing that plaintiff's eventual acquittal at trial meant their "alleged misconduct had no prejudicial impact."[202] The trial court rejected their cramped reading of *Strickler*, noting that when the police face a *Brady* claim, "the appropriate measure of prejudice is whether the disclosure of the exculpatory evidence and the truth of the fabricated evidence would have prevented the prosecutor from instituting the charges … and proceeding with the prosecution."[203]

Here, a reasonable jury could conclude from the prosecutor's own testimony—that the undisclosed exculpatory information "would have been a factor" in evaluating the case[204]—that knowing the truth may have stopped him from proceeding with the prosecution. This is the City's position, as well; it admits that disclosing the Exculpatory Report, Shoulders's memory issues, and the don't-circle instruction "would have a reasonable probability … of changing the prosecutor's decision."[205]

Given the admissions that the undisclosed exculpatory and impeachment information could have influenced the decision to proceed with the prosecution of White, the Court should deny summary judgment on his claim for *Brady* violations (Claim 4).

### E. Defendants have admitted all the elements of White's claim for *Monell* liability (Claim 5).

There are four methods of showing the municipality had a policy or custom giving rise to a constitutional violation: the plaintiff may prove "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions;

---

[202] *Craig*, 2005 WL 1564982, at *3.
[203] *Id.*
[204] Schroth Decl. ¶¶ 12–14.
[205] Connelly Dep. 459:23–460:9.

(3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."[206]

### 1. The City admits to having an unlawful policy.

"To satisfy the *Monell* requirements a plaintiff must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy."[207] "The plaintiff must show that there were formal rules or understandings—often but not always committed to writing—that were intended to, and did, establish fixed plans of action to be followed under similar circumstances consistently and over time."[208]

Despite ample evidence that the individual defendants violated White's constitutional and statutory rights, the City's motion never argues that any of their conduct violated any City policy.

### a. The City admits its policy permits misrepresentations to obtain arrest warrants.

Even though the City admits that Shoulders "misrepresented" facts in the affidavit seeking an arrest warrant,[209] the City nonetheless says "he followed our policy."[210] This testimony is consistent with the City's testimony in *Jackson*. Decades ago, the City had an official policy requiring that officers' "testimony in court" always be "truthful and unbiased."[211] But the Division's general orders no longer include such a requirement,[212] and the City's motion cites to no order requiring truthful, unbiased testimony from its officers. Absent evidence of such a policy, a reasonable jury could conclude the City rescinded its policy and left its officers with discretion as to how truthful or unbiased to be in their testimony.

---

[206] *Jackson*, 925 F.3d at 828.

[207] *Id.* at 829 (cleaned up).

[208] *Id.*

[209] Connelly Dep. 393:16–394:7.

[210] *Id.* at 146:18–147:22.

[211] Cleveland Division of Police Rules of Conduct and Discipline at CLE003278 (attached as Ex. 1-J).

[212] Cleveland Division of Police General Police Orders Manual (attached as Ex. 1-K).

Further, even though exculpatory information bears on the "totality of the circumstances" when demonstrating probable cause,[213] the City has no policy requiring officers to disclose it when seeking a warrant.[214]

In fairness, the City did allege during its deposition that it has a policy generally requiring officers to be truthful, but only "explicitly truthful."[215] It suggested it also had a policy requiring officers to be truthful in both their explicit statements and their implications, but after taking a 10-minute recess, it remained unable to find that policy.[216] In moving for summary judgment, the best the City could offer was aspirational language about ensuring "that search warrants are served in a legal and constitutional manner."[217] But superficial posturing about constitutionally executing *search* warrants doesn't establish a policy for seeking *arrest* warrants.

Even if such a policy existed, the City still admits that in practice, its policy, as implemented, actually permits officers to be untruthful when they deem it necessary. It says its purported written policy requires truthfulness "broadly speaking," but in practice mostly leaves the question of whether to be truthful to an officer's interpretation of "common sense."[218]

---

[213] *Jones v. Clark Cty., Kentucky*, 959 F.3d 748, 757 (6th Cir. 2020).

[214] Connelly Dep. 128:1–6.

[215] *Id.* at 427:19–428:2.

[216] *Id.* at 428:3–430:5.

[217] City's Mot. for Summary Judgment, ECF #197 at 14.

[218] Connelly Dep. 431:1–432:22.

> b.  **The City admits its policy allows lineups that experts say are unduly suggestive.**

A photo array is unduly suggestive when there is a substantial likelihood of irreparable misidentification.[219] In measuring that likelihood, "the court may consider 'the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves.'"[220]

Here, the jury may credit the testimony from the plaintiff's experts to conclude the lineups were unduly suggestive. Professor Stoughton's report, for example, notes "substantial problems" with the lineups used to identify White.[221] Among them were:

- The use of a simultaneous lineup, rather than the sequential presentation generally *required* by Ohio Rev. Code § 2933.83.[222]

- The use of filler photographs that were inconsistent with the witness's descriptions.[223]

- Instructing witnesses not to identify the person they believe is their perpetrator.[224]

A reasonable jury could conclude that these problems resulted in identification procedures that fall below minimum constitutional requirements, especially given Professor Stoughton's testimony that these risks are "well known within policing and eminently predictable."[225] Defendants are free to dispute these findings, but they can't seriously suggest that jurors may not credit them.

---

[219] *Neil v. Biggers*, 409 U.S. 188, 198 (1972) ("It is the likelihood of misidentification which violates a defendant's right to due process.")

[220] *Campbell v. Lazaroff*, No. 1:15-CV-01302, 2016 WL 6876299, at *8 (N.D. Ohio July 19, 2016) (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1070–71 (6th Cir. 1994)). *See also United States v. Gonzales*, 246 F.3d 683 (10th Cir. 2000).

[221] Stoughton Decl. at 21.

[222] *Id.* at 23–25.

[223] *Id.* at 25–27.

[224] *Id.* at 27–29.

[225] *Id.* at 29–30. Dr. Kovera agrees, saying the City's practices "increased the likelihood that the detectives would obtain a mistaken identification," and that their dangers are generally "well-established in the literature and … case law." Kovera Decl. at 11.

And if they do, the City loses its *Monell* claim, because it admits that the creation and administration of these lineups were consistent with procedures or training established by the City.[226]

### c. The City's records show it revoked its policy requiring officers to comply with *Brady*.

The responsibility for establishing and rescinding general police orders comes from the police chief .[227] The City admits that decades ago, the chief established a policy governing "pretrial discovery rights of defense attorneys in court in criminal cases."[228] While the interpretation of that policy was never resolved, it was undisputed that General Police Order 19.73 was the City's policy governing *Brady* disclosures.

At some point, though, the City rescinded that policy, which no longer exists in its general orders, the division manual, or the detective's manual.[229] While claiming to have had "official policies in effect in 2015 precluding the types of rights violations alleged by White,"[230] the City cites to none; instead it rests on vague platitudes about respecting constitutional rights.[231]

Indeed, the City admits that rather than establishing and maintaining a policy governing *Brady* disclosures, it now treats that responsibility merely as part of an officer's general duty "to follow the law."[232] If that sort of policy fluff were enough, no *Monell* claim could exist.

---

[226] Connelly Dep. 69:18–23 ("[D]id any officers deposed in this case describe any violations of the city's training or procedures? A Not based on my memory of the depositions that I read."). The City is at odds with itself on this point; its designee testified that no one should supervise the administration of lineups. *Id.* at 248:6–13. But in *Jackson*, its designee said City policy going back to the 1970s has required a supervisor's presence when conducting a lineup. Dep. of Edward Tomba, 162:17–163:8 (attached as Ex. 1-L).

[227] Tomba Dep. 22:3–22.

[228] *Id.* at 96:20–97:8.

[229] Despite requests in discovery, Defendants never identified any policies addressing the disclosure of *Brady* evidence. A review indicates that the City's general police orders include no mention of the words "*Brady*," "exculpatory," or "impeach." Bardwell Decl. at ¶ 11 (attached as Ex. 1).

[230] City's Mot. for Summary Judgment, #ECF 197 at 14.

[231] *Id.* at 14 (citing a mission statement claiming, "We will protect the constitutional and civil rights of everyone through impartial enforcement of the law").

[232] Tomba Dep. 26:7–18. The City did claim to have embedded *Brady* obligations in its Detective's Unit Manual, but that manual only directs detectives to forward evidence "as required," begging the question of what the City requires. ECF #197-12 at 5.

2.    **The City admits failing to train and supervise the individual defendants.**

a.    **The City admits its training and supervision were inadequate.**

"When determining whether a municipality has adequately trained its employees, 'the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.'"[233] Inadequate training or supervision may exist even where the city has official policies related to the task in question, provides formal training on the task to new employees, and then provides further on-the-job training.[234] The question is not whether a municipality has some *pro forma* training requirement, but whether the training or supervision was "insufficient to inform officers of their … obligations."[235]

In this case, the evidence of the City's failure to train and supervise comes directly from the City itself. Asked about the Department of Justice report issued just months before White's arrest,[236] the City's second Rule 30(b)(6) designee endorsed its finding that Cleveland Division of Police officers "are Inadequately Supported and Trained."[237] As the City elaborated, "we need to be trained and supported—especially at that time we need more training and more support."[238] The City's admission is bolstered by those of its employees, more than one of whom literally *laughed out loud* when asked what training the City provides.[239]

---

[233] *Jackson*, 925 F.3d at 834 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)).

[234]  *Id.* at 835.

[235]  *Id.*

[236] *Investigation of the Cleveland Division of Police*, U.S. Department of Justice (Dec. 4, 2014) (attached as Ex. 1-M).

[237] Connelly Dep. 312:22–313:2.

[238] *Id.*

[239] Dep. of Michael Schade, ECF #241, 24:17–24 ("So I noticed you laughing when I asked that. A Yeah.").

### i. The City's training on lineups is inadequate.

Officer Anthony Harper is a 23-year Cleveland police veteran.[240] He became an instructor in its academy in 2013, and was also designated to testify about the City's training for creating and administering photo arrays.[241] Despite his position as a trainer, Harper himself has never been trained to create or administer photo lineups.[242] He has never created or administered a photo array.[243] He was certified to teach classes on lineups, but no one ever told him how to do that.[244] Instead, he receives a PowerPoint from the Ohio Peace Officer Training Academy and reads it to the officers in his class.[245] Rather than engaging them to ensure they understand what they've been taught, Harper just makes recruits write down "their student performance objectives," i.e., "what they're going to be tested on."[246] Kubas, another trainer, uses the same minimalistic approach, receiving a lesson plan and reading it to his class.[247]

The training for detectives is even worse. According to Schade, the City only began training detectives "not too long" before his deposition in September 2019, but even that training didn't include instruction in creating photo lineups.[248] When it does do that training, the City simply forces officers to repeat the same training modules—half of which are dedicated only to records management—year in and year out.[249] Despite talking to other detectives about how lineups should

---

[240] Dep. of Anthony Harper, ECF #239, 13:21–23.

[241] Harper Dep. 17:1–25.

[242] *Id.* at 24:4–6 ("Q Did you go through the training for creating and administering photo lineups at any point? A No. Possibly in my academy in '96.").

[243] *Id.* at 24:9–11.

[244] *Id.* at 24:12–20.

[245] *Id.* at 25:6–18.

[246] *Id.* at 34:18—35:14.

[247] Kubas Dep. 137:1–10 ("All of these courses are like patrol techniques, building searches, there would all be a lesson plan and I would read off it.").

[248] Schade Dep. 25:5–8.

[249] *Id.* at 26:1–18 ("They're both pretty much the same thing every single year.").

be created, Schade has "never heard of other detectives getting trained on these procedures" before this new training regime.[250]

After the lineup is created without training, another officer administers the lineup, also without any meaningful training. Despite the constitutional implications and the potential for even minor details to derail the identification, the City's position is that "a basic 5-minute instruction can tell somebody how to administer a photo lineup."[251] Santiago described the training as being passed down through oral tradition, "transmitted by word of mouth" from one detective to the next with no actual written policies or protocols.[252]

### ii.     The City's training on probable cause is inadequate.

The Cleveland Police Academy offers no training "on how to make a probable cause determination."[253] This subject is left to on-the-job training, where officers are taught by other officers with no training.[254] And although detectives get trained every year in "search and seizure,"[255] they appear to have little grasp of the concept. For instance, Beveridge wrongly believes that "[p]robable cause is belief that a crime occurred,"[256] and that once he has probable cause for one suspect, he must clear that suspect of involvement before pursuing another suspect.[257]

### iii.     The City's training on *Brady* obligations is inadequate.

The training on *Brady* violations is no better. The evidence shows that Lam and Shoulders were not properly trained to recognize and disclose *Brady* evidence, and the same is true for other

---

[250] *Id.* at 27:9–17 ("I never heard of anything like that").
[251] Connelly Dep. 227:20–25.
[252] Santiago Dep. 34:13–35:10.
[253] Harper Dep. 104:24–105:7.
[254] *Id.* at 105:8–23.
[255] Schade Dep. 26:8–15.
[256] Beveridge Dep. 182:25–183:1.
[257] *Id.* at 185:11–186:2 ("If you don't have evidence to clear Dalonte, how do I go after Edward Bunch for the same crime?").

officers. Detective Moore, for example, who was also responsible for mentoring Lam, was never trained about what *Brady* evidence or exculpatory evidence is.[258] Based on whatever informal training she picked up through other detectives, she could not offer any definition of "exculpatory evidence"[259] and believes that *Brady* evidence is "evidence that is withheld."[260] Shoulders doesn't remember any training on *Brady* obligations other than picking up "bits and pieces" through conversations with "the people in general that I had to work with."[261] Schade characterizes his duty to disclose exculpatory evidence not as law from the U.S. Supreme Court or even City policy, but only as "just rule of thumb."[262] The City has no position on whether an investigator's racial prejudice is *Brady* evidence.[263]

### iv.    The City's supervision was inadequate.

Despite the consensus on the inadequacy of the training offered by the City, the City acknowledges that its officers can generally expect their requests for outside training to be rejected, as well.[264] One might assume the City would therefore compensate for its sparse training with close supervision, but that's not the case either. Again, the DOJ report is instructive. According to the Civil Rights Division:

- "We also saw frequent instances in which officers clearly violated CDP policy, and these violations were neither identified nor corrected by supervisors."[265]

- "[M]ore work is necessary to ensure that officers have the proper guidance, training, support, supervision, and oversight to carry out their law enforcement responsibilities safely and in accordance with individuals' constitutional rights."[266]

---

[258] Dep. of Cynthia Moore, ECF #243, 48:1–10.

[259] Moore Dep. 47:1–19.

[260] *Id.* at 47:20–25.

[261] Shoulders Dep. 189:22–190:12.

[262] Schade Dep. 136:3–7.

[263] Connelly Dep. 82:19–24.

[264] *Id.* at 363:9–12.

[265] *Investigation of the Cleveland Division of Police*, U.S. Department of Justice (Dec. 4, 2014), at 44.

[266] *Id.* at 2.

- "Officers report that they receive little supervision, guidance, and support from the Division, essentially leaving them to determine for themselves how to perform their difficult and dangerous jobs."[267]

This case was no exception. The City concedes that Shoulders turned a rookie detective loose on a major crime within a month of joining the bureau, and that doing so was "not the best-case scenario."[268] It also concedes it has no evidence that Shoulders supervised Lam's preparation of photo lineups,[269] Lam's research into potentially related crimes,[270] any officer administering lineups,[271] Lams' preparation of the warrant affidavits,[272] or Lam's *Brady* disclosures.[273] Failing to supervise any of these tasks is consistent with Division policy.[274]

Given the crucial nature of these tasks in investigating and prosecuting White, one might assume that failing to supervise a wet-behind-the-ears detective suggests a failure of Shoulders's supervisors, but the City would disagree. It has no evidence that Lieutenant Plent, the officer to whom Shoulders reported, supervised any of these tasks,[275] nor that he supervised Shoulders's work as a supervisor of these tasks.[276] In fact, Lieutenant Plent had no known involvement in supervising the Colleen Allums case at all.[277] He was required to review Shoulders's daily duty reports, but the City otherwise had no expectation that he would take any action to supervise Shoulders or Lam.[278]

---

[267] *Id.* at 3.

[268] Connelly Dep. 467:5–17.

[269] *Id.* at 497:5–501:14 ("Does the city have any evidence that a supervisor approved the preparation of any lineups in this case? A No.").

[270] *Id.* at 468:17–23.

[271] *Id.* at 501:15–20.

[272] *Id.* at 464:2–13.

[273] *Id.* at 463:6–15.

[274] *Id.* at 468:13–16 ("Q Is the level of supervision that Sergeant Shoulders provided consistent with division policy? A I think it was consistent, yes.").

[275] *Id.* at 473:12–475:1.

[276] *Id.* at 475:12–17 ("Sitting here today do you have any evidence of Lieutenant Plent supervising the investigation of the Colleen Alums case in any way? MR. PUIN: Objection. A No.").

[277] *Id.* at 476:5–11.

[278] *Id.* at 481:3–10.

This lack of supervision is a constant theme in the Division. Schade, for instance, admitted that supervisors do not help or watch to ensure that officers create photo lineups correctly.[279] Even on his first time creating a lineup, Schade "didn't know what to do,"[280] and no supervisors provided oversight.[281] Schade has never seen anyone else send a lineup for supervisory review.[282] He has never seen a policy requiring supervisory input,[283] and if one exists, he expects that he could violate it with impunity.[284]

Absent oversight, it's unsurprising to hear Defendants admit that whatever training exists, it need not bear any relation to their actual practice.[285] Based on this evidence, a reasonable jury could conclude the City's training was inadequate in relation to the tasks its officers must perform.

> **b.** **The City admits it knew the risks of its inadequate training and supervision.**

A plaintiff can demonstrate deliberate indifference through either (1) "prior instances of unconstitutional conduct demonstrating that the City had notice that the training was deficient and likely to cause injury but ignored it" or (2) "evidence of a single violation of federal rights, accompanied by a showing that the City had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation."[286]

---

[279] Schade Dep. 28:24–29:5.

[280] *Id.* at 28:1–3.

[281] *Id.* at 28:24–29:5 ("Do you have a supervisor who is watching you to make sure you are doing it correctly - - A No.").

[282] *Id.* at 29:22–30:3.

[283] *Id.* at 29:14–17.

[284] *Id.* at 30:4–7 ("Q What would happen if you did not [seek a supervisor's review]? … A I don't think anything to be honest with you.").

[285] Kubas Dep. 61:24–62:4 ("How are you trained to act as a blind administrator when somebody comes to you with a photo array to administer? A Just to clarify, how was I trained or how do I proceed as a blind administrator? Those are two different things.").

[286] *Jackson*, 925 F.3d at 836 (quoting *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 794 (6th Cir. 2012)).

i.  **A reasonable jury could find that the City has long been on notice that its training and supervision are deficient.**

The evidence demonstrates the City has been using improper lineups going back at least 45 years, to the day officers threatened a young black boy to coerce him into identifying Ricky Jackson and his friends as the perpetrators in a crime the child didn't even see.[287] White's case is hardly the first unduly suggestive lineup since then. While it is unlikely anyone will ever know just how many of the Division's arrests rely on the same violations evidenced here, there are many previous court decisions putting the City on notice that its training and supervision have been deficient for decades, not only on the question of identification procedures,[288] but also on establishing probable cause[289] and disclosing *Brady* evidence.[290]

---

[287] Dep. of Edward Vernon, 80:3–84:25 (attached as Ex. 1-N).

[288] *In re T.W.*, 100 N.E.3d 1239, 1242 (Ohio Ct. App. 2017) ("The state did not contest T.W.'s claim that the identification procedure was unduly suggestive."); *State v. Johnstone*, No. 92885, 2010 WL 1712237, at *3 (Ohio Ct. App. Apr. 29, 2010) ("Here, we are troubled by the procedure employed in obtaining the photo array identification and find it to be unduly suggestive."); *Jells v. Mitchell*, 538 F.3d 478, 512 (6th Cir. 2008), *writ denied*, No. 1:98 CV 0 2453, 2011 WL 1257306 (N.D. Ohio Mar. 31, 2011) ("[I]t is clear that the pretrial identification procedure was unduly suggestive."); *State v. Broom*, 40 Ohio St. 3d 277, 284 (1988) ("We agree that the showup of the defendant at the hospital, where he was identified by the Grissoms, was both unnecessary and suggestive."); *In the Matter Finley*, No. 48356, 1984 WL 6377, at *4 (Ohio Ct. App. Dec. 20, 1984) ("[W]e find that the identification procedure was suggestive."); *State v. Merrill*, 22 Ohio App. 3d 119, 122 (1984) ("In looking at the hair, age, and weight factors the photographic array was suggestive.").

[289] *Harris v. Langley*, 647 Fed.Appx. 585, 592 (6th Cir.2016) ("Officer Pendleton's seizure of Harris was demonstrably unreasonable."); *Rolen v. City of Cleveland*, No. 1:12 CV 1914, 2015 WL 12803699, *11 (N.D. Ohio 2015) ("Given that Craska admitted to not having probable cause at that point, such unlawful detention would satisfy the elements of false arrest."); *Patrizi v. Huff*, 690 F.3d 459, 461 (6th Cir.2012) ("[T]he law was clearly established that Huff and Connole lacked probable cause to arrest Patrizi."); *City of Cleveland v. Bruner*, No. 81227, 2002-Ohio-6512, ¶ 15 (Ohio Ct. App. Nov. 27, 2002) ("[C]ompetent, credible evidence exists to support the trial court's determination that no probable cause existed to arrest the defendant."); *State v. Reniff*, No. 78481, 768 N.E.2d 667, 675 (Ohio Ct. App. Sept. 24, 2001) ("There is nothing to support even the barely arguable existence of probable cause here, much less to spur serious argument among competent judges."); *State v. Jefferson*, No. 35010, 1976 WL 191029, at *2 (Ohio Ct. App. Apr. 8, 1976) ("[A]ppellant failed to establish probable cause for arrest.").

[290] *State v. Buehner*, No. 106319, 2018 WL 5734615, at *6 (Ohio Ct. App. Nov. 1, 2018) (["T]he Cleveland Police Department's knowledge is imputed to the state. ... Buehner had no knowledge of the exculpatory information contained in the undisclosed police reports. ... Buehner was avoidably prevented from discovering the exculpatory evidence."); *State v. Phillips*, 95 N.E.3d 1017, 1021 (Ohio Ct. App. 2017) ("[T]he officers' statements ... call into question the accuracy and truthfulness of Officers Lentz's and Keane's testimony at trial and raise questions about possible *Brady* violations."); *Keenan v. Bagley*, No. 1:01 CV 2139, 2012 WL 1424751, at *45 (N.D. Ohio Apr. 24, 2012) (finding "serious and disturbing violations of the State's constitutional obligation to produce to defendants any and all exculpatory information in their possession");

The Court may consider these cases in reliance on the residual exception to the rule against hearsay[291] or through judicial notice.[292]

**ii.    The City admits the constitutional violations alleged in this case arose from recurring situations presenting obvious potential for constitutional violations.**

The City acknowledges that that central constitutional violations in this case arose from recurring situations fraught with risks to its constituents' constitutional rights:

- The City admits that officers create photo arrays "on a daily basis."[293] It also admits that failing to train and supervise officers in the creation and administration of photo arrays "could lead to a violation of a suspect's Fourth Amendment rights."[294]

- The City admits its officers prepare affidavits in support of arrest warrants daily.[295] It also admits that failing to train and supervise officers in the preparation of affidavits "could lead to a violation of a suspect's Fourth Amendment rights."[296]

- The City admits its officers are responsible for making *Brady* disclosures "every day."[297] It also admits that failing to train and supervise officers in the disclosure of *Brady* evidence "could lead to a violation of a suspect's Fourth Amendment rights."[298]

- The City admits Shoulders's supervision of Lam should have been not just recurring, but continuous.[299] It also admits that "failing to train supervisors how to supervise all of these activities could lead to a violation of a suspect's Fourth Amendment rights."[300]

---

*Jells v. Mitchell*, 538 F.3d 478, 512 (6th Cir. 2008) ("[T]he withheld information refutes the prosecution's weak presentation of evidence regarding whether a kidnapping occurred."); *D'Ambrosio v. Bagley*, No. 1:00 CV 2521, 2006 WL 1169926, at *56 (N.D. Ohio Mar. 24, 2006), aff'd, 527 F.3d 489 (6th Cir. 2008) ("D'Ambrosio was denied the right to due process pursuant to the Fourteenth Amendment as interpreted in *Brady v. Maryland*.").

[291] *Jones v. Cannizzaro*, No. CV 18-503, 2019 WL 2289470, at *7 (E.D. La. May 28, 2019) (finding state-court decisions " far more probative of Defendant's Brady violations than requiring Plaintiff to put on dozens of mini-trials to show each of those violations").

[292] *Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 816 (6th Cir. 2010) ("[A] court may take judicial notice of other court proceedings."). *Accord Wagner v. Fawcett Publications*, 307 F.2d 409, 411 (7th Cir. 1962) (taking judicial notice of state criminal proceedings involving no parties to the federal civil case).

[293] Connelly Dep. 481:25–482:6.

[294] *Id.* at 484:25–488:22; 490:6–19.

[295] *Id.* at 482:7–9.

[296] *Id.* at 488:24–489:5; 490:20–491:1.

[297] *Id.* at 482:10–25.

[298] *Id.* at 489:6–13; 491:2–8.

[299] *Id.* at 467:11–468:16.

[300] *Id.* at 489:16–22.

Because there is evidence that the City was on notice of threats to White's constitutional rights—both from its prior conduct and from the nature of the activities at issue—a reasonable jury could conclude the City was deliberately indifferent to the risks posed by its failure to train and supervise its officers.

Relying on this substantial evidence that White's damages resulted from the City's failure to establish policies, training, and supervision addressing its employees' recurring constitutional-rights violations, a reasonable jury could conclude that the City is liable for those employees' actions. The Court should deny the City's motion for summary judgment on *Monell* liability (Claim 5).

## F. Defendants have admitted all the elements of White's claim for intimidation under Ohio Rev. Code §§ 2921.03 and 2307.60 (Claim 9).

Under Ohio law, it is a criminal offense for a police officer "using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner" to "attempt to influence, intimidate, or hinder a public servant … in the discharge of the [public servant's] duty."[301]

### 1. Defendants admit the use of false writings in this case.

Here, the City acknowledges that Shoulders submitted a false affidavit in support of his arrest warrant.[302] And two of the victims in the case testified that Kubas and Santiago directed them to falsify the paperwork from their photo lineups. Kubas and Santiago admit that they don't have any memory that would allow them to deny the victims' accounts, and that they passed on that paperwork to Lam and Shoulders, who used it to support the arrest and prosecution of White. The

---

[301] *Steele*, 138 Ohio St. 3d at 6 ("[W]e hold that a police officer may be prosecuted for the offense of intimidation when the police officer's actions during an interrogation satisfy the elements provided in R.C. 2921.03.").

[302] Connelly Dep. 393:16–394:10.

materiality of those false writings is detailed above,[303] as is the evidence of Defendants' attempt to influence and hinder public servants in the discharge of their duties.[304]

2. **Defendants' admissions allow a jury to conclude they acted with malicious purpose, in bad faith, or in a wanton or reckless manner.**

A defendant acts recklessly "when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist."[305] "When recklessness suffices to establish an element of an offense, then knowledge or purpose is also sufficient culpability for such element."[306] A defendant acts knowingly "when the person is aware that such circumstances probably exist."[307]

Here, a jury could find that Kubas and Santiago acted knowingly—and therefore recklessly—because they were the ones who directed the victims to falsify the photo-lineup paperwork. Because the City testified that Schade told Lam about the Exculpatory Report, and Lam admitted that he found and read the report Schade told him about,[308] a jury could find that Lam also acted knowingly. And because Shoulders testified that he "personally verif[ied] all of the information" in his affidavit,[309] a jury could conclude that he also read the Exculpatory Report and knew his statement that White was a suspect was false. Further, a jury may infer that Defendants acted in bad faith based on the evidence that they arrested White without probable cause.

Given the evidence that Defendants knowingly used materially false writings to influence the prosecution and detention of White, a reasonable jury could find them liable for intimidation under

---

[303] Sec. I.B.3, *infra*.

[304] Sec. I.A.1, *infra*.

[305] Ohio Rev. Code § 2901.22(C).

[306] Ohio Rev. Code § 2901.22(E).

[307] Ohio Rev. Code § 2901.22(B).

[308] Lam Dep. 140:25–141:12 ("At a minimum, we will read the entire narrative of the report").

[309] Shoulders Dep. 308:6–9.

Ohio Rev. Code §§ 2921.03 and 2307.60. The Court should therefore deny their motions for summary judgment on the intimidation claim (Claim 9).

### G. Defendants have admitted all the elements of White's claim for interference with civil rights under Ohio Rev. Code § 2307.60 (Claim 10).

Under Ohio Rev. Code § 2307.60(A)(1), "[a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action … and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code." The statute, "by its plain and unambiguous terms, creates a statutory cause of action for damages resulting from any criminal act."[310] Under Ohio's law, it is a criminal act if a "public servant, under color of his office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right."[311]

### 1. The evidence shows Defendants attempted to interfere with White's right to be free from unreasonable search and seizure.

Because a suspect has a right to be free from unreasonable search and seizure, both before and after the time of his arrest, "pretrial detention can violate the Fourth Amendment not only when it precedes, but also when it follows, the start of legal process."[312]

As discussed above, there is evidence that Defendants acted knowingly in using false information to advance the case against White in the absence of probable cause.[313] Further, given the evidence that every defendant involved in this case made unjustifiable false statements about White, a jury could infer they were acting in concert, conspiring to manufacture a case against White— perhaps because they believed White was a gang member, perhaps simply to cover up the initial error in targeting White—or perhaps to indulge Shoulders's racism.

---

[310] *Jacobson v. Kaforey*, 149 Ohio St. 3d 398, 400 (2016).
[311] Ohio Rev. Code § 2921.45.
[312] *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911 (2017).
[313] Sec. I.B.1, *infra*.

2. **The evidence shows Defendants attempted to interfere with White's right to a fair trial.**

The Sixth Amendment gives a criminal defendant "the right to a fair proceeding in front of an impartial factfinder based on reliable evidence."[314] Here, the evidence shows Defendants all possessed exculpatory information about White—from the flimsiness of his supposed "gang affiliation" to his non-involvement in the aggravated-menacing case, to the suggestive nature of the first set of lineups, to the don't-circle instruction in the second set of lineups, to Shoulders's memory problems and bias against black children—but none of them disclosed those facts to the judge who approved White's arrest warrant, to the prosecutor trying the case, or to White's defense. Although White never actually had a trial that could have been rendered unfair by their conduct, a jury could still find that Defendants conspired or attempted to deprive him of that right, which is equally criminal conduct under Ohio Rev. Code §§ 2921.45 and 2923.03.

3. **The evidence shows Defendants attempted to interfere with White's right to due process.**

An identification procedure violates a defendant's right to due process if it "was so unnecessarily suggestive as to run the risk of irreparable mistaken identification."[315] Here, a reasonable jury could conclude that Lam, Shoulders, Kubas, and Santiago were involved in creating and administering an unlawful identification. Even though the victims all identified a large man as the shooter, Lam and Shoulders cooked up a photo array that would dupe all three of them into picking a small boy as the shooter. Given the evidence that Defendants conspired to deprive White of his rights under the Fourth, Sixth, and Fourteenth Amendments, a reasonable jury could find them liable for criminally interfering with his civil rights.

The Court should deny the motions for summary judgment on Claim 10.

---

[314] *Stumpf v. Robinson*, 722 F.3d 739, 751 (6th Cir. 2013).

[315] *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005).

II. **Genuine disputes as to material facts preclude Defendants from claiming qualified immunity or political-subdivision immunity.**

"Qualified immunity does not apply if (1) on the plaintiff's facts, a constitutional violation occurred, and (2) the alleged violation was of clearly established constitutional rights of which a reasonable person would have known."[316] Similarly, Ohio's political-subdivision immunity doesn't apply if "the employee's acts or omission were with malicious purpose, in bad faith, or in a wanton or reckless manner."[317]

With both qualified immunity and political-subdivision immunity, the Sixth Circuit prohibits summary judgment in cases where there are unresolved fact questions as to the defendant's conduct.[318] In *Cline*, 495 F. App'x 578, for instance, the plaintiffs brought claims alleging police officers had made false statements to obtain their warrant and then unlawfully detained them after the evidence made clear there was no basis to do so. The district court denied the officers' motion for summary judgment, which sought both qualified immunity and political-subdivision immunity, and the Sixth Circuit affirmed; because there were unresolved fact questions—as to whether officers knew they obtained their warrant based on false statements and as to whether the time they continued to detain the plaintiffs after executing the warrant was reasonable—neither immunity was available.

Defendants come to summary judgment in the same posture, arguing not that they are entitled to immunity despite the allegations against them, but merely because they have denied those allegations. Kubas and Santiago, for instance, never argue that even accepting the victims' sworn testimony would still leave them within the bounds of clearly established law; they just cite to the portions of their depositions where they deny those allegations. And Lam, who admitted in his

---

[316] *Jackson*, 925 F.3d at 813 (cleaned up, quoting *Hoover v. Radabaugh*, 307 F.3d 460, 465 (6th Cir. 2002)).
[317] *Campbell v. Springboro*, 700 F.3d at 791.
[318] *Cline v. Myers*, 495 F. App'x 578, 583 (6th Cir. 2012).

deposition to deficiencies in his investigation and disclosures to the court and prosecutor, now seeks to deep-six that testimony; reading his motion, which relies entirely on a declaration his attorney drafted for him, one wouldn't even know he spent two days being deposed.

But immunity isn't a participation trophy for everyone who can muster a minimally competent denial; it requires the party claiming it to marshal all the evidence and prove that even on the worst set of facts, he did not violate clearly established law or act in bad faith. None of the defendants ever suggest they can satisfy that standard, because it's clearly established that officers can't seek a warrant where they reasonably should know their affidavit does not support probable cause.[319] And it's clearly established that officers can't use unduly suggestive identification procedures.[320] So, too, it's clearly established that officers must take action once it becomes clear that any probable cause they had to arrest a suspect has since evaporated.[321]

Here, there are unresolved factual questions as to whether Defendants violated those clearly established rights. Discussed more fully in the preceding sections, among them are questions as to whether Schade knew he was falsely portraying White as a suspect in the aggravated-robbery report; whether Beveridge knew that he was exaggerating White's involvement in "gang activity"; whether Lam and Shoulders knew the statements supporting their arrest warrant were false; and whether Kubas and Santiago ordered the victims to falsify their identifications. Given these unresolved questions, the Court should not grant Defendants qualified or political-subdivision immunity.

---

[319] *Malley v. Briggs*, 475 U.S. 335, 345 (1986) ("The … question in this case is whether a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.").

[320] *Gregory v. City of Louisville*, 444 F.3d 725, 746 (6th Cir. 2006) ("Plaintiff has a due process right which includes the right to be free from unduly suggestive and unreliable identification procedures.").

[321] *Russo v. City of Bridgeport*, 479 F.3d 196, 208 (2d Cir. 2007) (holding Fourth Amendment protects against "a sustained detention stemming directly from the law enforcement officials'" refusal to investigate available exculpatory evidence").

III.   **Genuine disputes as to material facts preclude the Court from limiting White's damages on summary judgment.**

   A.   **Defendants' admissions create a genuine dispute as to the proximate cause of White's injuries.**

      1.   **Defendants waived fact questions related to causation.**

As part of their request that White stipulate to a motion to modify the Court's case-management order, Defendants stipulated in return that they would limit their motions for summary judgment to "the question of liability, and *legal questions* surrounding proximate causation and punitive damages."[322] After reaching that agreement, White didn't seek an expert opinion or other evidence that reasonable officers in Defendants' position should have foreseen that placing White in detention could lead to his being assaulted, especially where his attacker was a member of a gang that they believed had a rivalry with the gang they suspected White of affiliating with.

The Court granted the motion,[323] but Defendants—with the exception of the City—now seek to evade their commitment, arguing that White cannot prove that they could have foreseen his injuries resulting from their misconduct. But foreseeability is not, generally speaking, a "legal" question. Outside outlandishly improbable circumstances "of such a kind that no foresight could have been expected to look out for them,"[324] the Sixth Circuit recognizes that proximate cause and the question of what is foreseeable "is a question of fact for the jury."[325]

Having secured White's stipulation, Defendants cannot now argue that they are entitled to summary judgment because White has not yet come forward with evidence on a jury question that they agreed should wait for trial.

---

[322] Joint Motion to Modify Case-Management Order, ECF #132 at 2 (emphasis added).

[323] Minutes of Proceedings, ECF #133.

[324] *Bear v. Delaware Cty., Ohio*, No. 2:14-CV-0043, 2016 WL 234848, at *17 (S.D. Ohio Jan. 20, 2016).

[325] *Cooper v. Cty. of Washtenaw*, 222 F. App'x 459, 472 (6th Cir. 2007) (quoting *James v. Meow Media, Inc.*, 300 F.3d 683, 692 (6th Cir. 2002)).

### 2.     Defendants' admissions create a genuine dispute as to the foreseeability of White's damages.

"[C]ourts have framed the § 1983 proximate-cause question as a matter of foreseeability, asking whether it was reasonably foreseeable that the complained of harm would befall the § 1983 plaintiff as a result of the defendant's conduct. Even if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, *provided that the third party's actions were foreseeable*."[326]

The question, then, is not whether someone piled more wrongful conduct on top of Defendants' but whether "if the intervening event is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable."[327] Intervening acts cannot relieve a defendant of liability where:

> (a) the actor at the time of his negligent conduct should have realized that a third person might so act, or (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted.[328]

Even outside Cuyahoga County, the dangers associated with placing a person in a detention facility are hardly unforeseeable. Courts have therefore long accepted the principle that "when an illegal arrest sets off a chain of indignities inflicted on the hapless victim, … [he] is entitled to obtain damages for these indignities whether or not they are independent violations of the Constitution."[329]

---

[326] *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 609 (6th Cir. 2007).

[327] *Pugh v. Akron-Chicago Transp. Co.*, 64 Ohio App. 479, 486 (1940).

[328] *Id.* at 486–87.

[329] *Herzog v. Vill. of Winnetka, Ill.*, 309 F.3d 1041, 1044 (7th Cir. 2002) ("They are foreseeable consequences of the illegal arrest, and the ordinary rules of tort causation apply to constitutional tort suits."). *See also Ross v. Kohler*, 163 Ky. 583 (1915) (collecting cases); *Drumm v. Cessnum*, 61 Kan. 467 (1900) ("The injuries suffered by defendant in error while in the county jail sprang immediately from the imprisonment, to which the malice of plaintiffs in error directly contributed."); *San Antonio & A.P. Ry. Co. v. Griffin*, 20 Tex. Civ. App. 91, 95 (1898), *writ refused* ("[C]ompensation may be recovered for the bodily and mental suffering caused by the imprisonment … These rules are elementary."); *Abrahams v. Cooper*, 81 Pa. 232, 235 (1876) ("The suffering of the plaintiff from cold, the want of a bed to lie upon, and deprivation of food for many hours, sprang directly from the imprisonment to which the malice of the defendant exposed the plaintiff. Because others may have

Defendants never engage these standards. Rather than arguing that they could not have foreseen that their alleged misconduct would lead to White being detained, or to him being injured in detention, or to his detention being prolonged, they simply argue that someone else was more directly involved. Schade and Beveridge, for instance, argue that neither of them "had any involvement" in White's arrest or prosecution.[330] Kubas and Santiago argue they did so little that White's mother and teachers are just as much to blame as they are.[331] But the question is not whether *any* actors or events intervened between Defendants' malicious conduct and White's injuries, it is whether those actors or events were foreseeable, a question whose answer "depends upon the knowledge of the defendant, which must be determined by the totality of the circumstances."[332]

Only Lam and Shoulders actually argue that jail violence is "not reasonably foreseeable" to an officer who puts someone in jail,[333] but their argument is at odds with their co-defendants' testimony and their own expert report. If it credits (1) the City's testimony that White was a member of a gang;[334] (2) White's testimony that his attacker was a member of a different gang;[335] (3) Beveridge's testimony those two gangs were rivals with a history of violence toward each other;[336] and (4) the defense expert's admission that "[n]o one asserts that prisoner detention facilities are without conflict and violence,"[337] a jury could reasonably conclude that Defendants should have

---

also been in fault, it does not take away the participation of the defendant in the wrong done to the plaintiff.").

[330] Beveridge and Schade Mot. for Summary Judgment, ECF #199-1 at 17.

[331] Kubas and Santiago Mot. for Summary Judgment, ECF #195-1 at 16.

[332] *Simpkins v. Grace Brethren Church of Delaware*, 16 N.E.3d 687, 699–700 (Ohio Ct. App. 2014).

[333] Lam Mot. for Summary Judgment, ECF #191-1 at 24; Shoulders Mot. for Summary Judgment, ECF #193-1 at 23. The City does not contest the foreseeability of White's damages.

[334] Connelly Dep. 30:16–21.

[335] White Dep. 189:13–16.

[336] Beveridge Dep. 101:23–102:4.

[337] Campisi report at 13 (attached as Ex. 1-G).

known that putting White in a detention center would have put him in danger of an attack by a member of another gang, or any of the other injuries he suffered while detained. Going further, a reasonable jury could even treat Shoulders's racism as evidence that his motive in working with the other defendants was to *create* a danger of the same kind of violence he had previously visited on Patrick Carner.

Still, Defendants argue there was *no way* they could have known injury might befall someone they put in jail. They offer little factual support for their argument and instead rely on a series of cases primarily dealing with foreseeability in the context of excessive-force incidents. But when considering the possible harms associated with the use of force, courts must make "allowance for the fact that police officers are often forced to make split-second judgments … about the amount of force that is necessary in a particular situation."[338] Malicious prosecutions and false arrests do not implicate those interests.

White's situation is therefore more similar to that in *Kerman v. City of New York*,[339] where the plaintiff brought Fourth Amendment claims against an officer who transported him to a mental hospital without legal justification. The district court found that the officer couldn't be held liable for the hospital's independent, wrongful decision to hold the plaintiff overnight, but the Second Circuit reversed, holding that a third party's aggravation of a constitutional harm need not relieve the original wrongdoer of liability.[340]

The Sixth Circuit follows the same rule. For instance:

- A prosecutor who mischaracterized the circumstances surrounding the reversal of a Marine recruit's murder conviction could be held liable for damages that resulted when the Marines wrongfully excluded him from the service.[341]

---

[338] *Graham v. Connor*, 490 U.S. 386, 397 (1989).

[339] 374 F.3d 93, 126 (2d Cir. 2004).

[340] *Kerman*, 374 F.3d at 126.

[341] *Harris v. Bornhorst*, 513 F.3d 503, 519 (6th Cir. 2008) ("Usually, the question of causation is a factual issue to be resolved by a jury, and may be satisfied by circumstantial evidence.").

- A county commissioner who complained about a meeting attendee to her employer could be held liable when her employer then terminated her without cause.[342]

- A public defender who failed to alert a judge that his client was indigent could be held liable when the court improperly ordered him to jail for failing to pay a fine.[343]

- Officers who dropped off a drunk driver at Taco Bell rather than arresting him because they didn't want to find a Spanish interpreter could be held liable for the driver's death when he decided he preferred Wendy's, stumbled away, and was killed by a distracted driver more than a mile down the road.[344]

Here, there are sufficient facts for a reasonable jury to conclude that White's injuries were not only the foreseeable result of Defendants' actions, but the intended result. The Court should deny the motion to limit damages on summary judgment.

## B. Defendants' admissions create a genuine dispute as to the availability of punitive damages.

### 1. Defendants have not met their initial burden of demonstrating the absence of a genuine issue of material fact.

The party moving for summary judgment "*always bears the initial responsibility* of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."[345] Doing so requires a moving party to "make a showing that is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact."[346]

Here, Defendants have failed to even carry their initial burden in seeking summary judgment. Even though all five of their motions ask the Court to grant summary judgment on the question of punitive damages, none of them includes a citation to even a single fact that would allow

---

[342] *Paige v. Coyner*, 614 F.3d 273, 280 (6th Cir. 2010) ("[A] jury might find that the firing was a reasonably foreseeable consequence of the action taken by Coyner.").

[343] *Powers*, 501 F.3d at 610 ("[T]he Public Defender's silence about his asserted indigency made it reasonably foreseeable that he would be jailed for non-payment of his fine.").

[344] *Bear*, 2016 WL 234848, at *17 ("A reasonable jury … could find that such distracted driving was foreseeable.").

[345] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (emphasis added).

[346] *Vakilian*, 335 F.3d at 520.

the Court to do so. But Defendants do make unsupported assertions that are contradicted by their own testimony. Shoulders, for instance, argues—without evidence—that he can't be held liable for punitive damages because he "resolved a difficult case within a reasonable timeframe."[347] Meanwhile, the City and Lam insist the case is not resolved but still open.[348]

Given the complete absence of evidentiary support for this part of their motions, the Court should deny Defendants' request to grant summary judgment on the question of punitive damages.

### 2. A reasonable jury could find Defendants acted with sufficient culpability to warrant punitive damages.

"Punitive damages are appropriate in a § 1983 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'"[349] So long as there is *some* evidence to support such a finding, the availability of punitive damages is a question for the jury.[350]

In this case, the Court should be guided by the Sixth Circuit's decision in *Wesley*. There, a school counselor brought a false-arrest claim against a detective who had him charged with sexually assaulting a student, relying on a warrant that was based only on the alleged victim's identification. After hearing evidence that the detective omitted critical information from her affidavit—including information suggesting the identification was unreliable, that searching the counselor's office and administering a physical exam failed to corroborate any allegations, that an alibi witness could account for him at the time of the attack—the jury found the officer liable for false arrest and awarded $500,000 in punitive damages. The detective appealed, but the Sixth Circuit affirmed,

---

[347] Shoulders Mot. for Summary Judgment, ECF #193-1 at 26.

[348] Connelly Dep. 376:6–9; Lam Dep. 254:11–12 ("Q Is this investigation still open? A It's still open.").

[349] *Wesley v. Campbell*, 864 F.3d 433, 442–43 (6th Cir. 2017) (quoting *King v. Zamiara*, 788 F.3d 207, 216 (6th Cir. 2015)).

[350] *See Dorr v. City of Ecorse*, 305 F. App'x 270, 277 (6th Cir. 2008) ("[T]here was sufficient evidence to present a question of fact for the jury on the issue of punitive damages.").

finding that there was little reason to find her immune from punitive damages if she recklessly omitted material information from her affidavit: "In addition to the exculpatory evidence discussed previously, the jury heard testimony that would allow them to conclude that Rigney's investigation was less than thorough—and, because probable cause had not been established by J.S.'s allegations alone, Rigney's duty to investigate was never discharged."[351]

All the same is true here. White's detention was based on a false account of his involvement in the aggravated-menacing incident and on the victims' identifications. But a reasonable jury could conclude Defendants knew that those identifications were based on unreliable recollections and unduly suggestive lineups; that they were uncorroborated by the searches of his home, his phone, his social media history, and his DNA; that Facebook records and his mother credibly accounted for his whereabouts at the time of the robbery; and that the investigation was "less than thorough" in the failure to make any similar efforts to investigate Edward Bunch.

All these facts would allow a reasonable jury to find that Defendants acted with at least reckless indifference to White's constitutional rights, warranting an award of punitive damages. The Court should deny Defendants' unexplained motion to limit those damages.

## IV.    White's claims against Beveridge and Santiago are not barred by any statute of limitations.

### A.    The statute of limitations does not bar claims against Santiago.

#### 1.    White's claims against Santiago relate back to the original complaint.

Santiago argues that the second amended complaint's claims against him are barred by the applicable statute of limitations. Fed. R. Civ. P. 15's "relation back" provisions do not revive those claims, he says, for two reasons: during Rule 4(m)'s 90-day service period he (1) lacked either actual

---

[351] *Wesley*, 864 F.3d at 443.

or constructive knowledge of White's lawsuit and (2) neither knew nor should have known that the lawsuit would have been brought against him but for a mistake concerning his identity.

This ship has sailed. Rule 15 is implicated only when a plaintiff seeks to amend his complaint. Once leave to amend is granted, as it was here, Rule 15 drops out as irrelevant. Santiago cannot now bootstrap his statute-of-limitations defense on his failed Rule 15 effort to block White's second amended complaint. His attempt to do so amounts to nothing more than an impermissible "second bite at the apple."[352] And even if the issue were not moot, this Court's disposition of the issue still controls, as next explained.

### 2.      Santiago had constructive knowledge of White's lawsuit.

The Court has found that "each of the factors articulated by the Sixth Circuit supports the conclusion that Santiago had constructive knowledge of White's suit."[353] Santiago disregards the facts supporting that finding, as well as their significance for the "constructive knowledge" inquiry. He instead seeks to impose an additional, unwarranted requirement on Rule 15(c)(1)(C)'s applicability. He had no constructive knowledge of the suit, he insists, because he is not a "high official" of the City. Contrary to Santiago's assumption, being a "high official" of the original municipal defendant is not a prerequisite to a finding of constructive knowledge; it is at best only one consideration among many others.

Santiago cites *Force v. City of Memphis, Tennessee*[354] as the source of this extra putative requirement. But *Force* neither formulated nor applied such a test. It merely affirmed, as not "clearly erroneous," the district court's finding that—for a variety of reasons—the to-be-named defendants

---

[352] Third bite, actually. Santiago has already sought, and been denied, reconsideration of this Court's allowance of White's second amended complaint (ECF #201).

[353] Order, ECF #179 at 9.

[354] *Force v. City of Memphis*, 101 F.3d 702 (6th Cir. 1996).

lacked constructive knowledge of the plaintiff's suit.[355] Neither the district court nor the Sixth Circuit even hinted that "high official" status is a necessary condition of constructive knowledge under Rule 15(c)(1)(C), or even that it is a particularly important factor. Indeed, *Chidester v. Shelby Cty.*,[356] the case on which Santiago relies most heavily, omits "high official" status from its list of factors demonstrating constructive knowledge and relegates it to merely "[a]nother factor to be considered."[357] In truth, courts routinely impute "constructive notice" to rank-and-file police officers and other low-level public officials without adverting to any supposed "high official" criterion.[358]

Finally, whether or not a prospective defendant had actual or constructive knowledge of a plaintiff's suit is a "patently factual" determination.[359] As such it would be an inappropriate ground on which to grant Santiago's motion for summary judgment.

### 3.    Santiago knew or should have known that this lawsuit would have been brought against him but for a mistake concerning his identity.

This Court has also dispensed with Santiago's contention that he lacked constructive knowledge that he was White's intended target.[360] Santiago offers the Court nothing that should cause it to reconsider this conclusion. His motion focuses on his lawyers' representations about what he knew and ignores what he is legally presumed to have known, based on their representation of existing defendants and other considerations. Immediately upon service of White's original complaint, Santiago's attorneys knew that White intended to sue the officer who witnesses said instructed them not to circle the individual they had identified.[361] Defendant Lam heard those

---

[355] *Id.* at *3.

[356] 2006 WL 418002 (W.D. Tenn. 2006).

[357] *Chidester v. Shelby Cty.*, No. 02-2556 MA/A, 2006 WL 418002, at *4 (W.D. Tenn. Feb. 21, 2006).

[358] *See, e.g., Berndt*, 796 F.2d 879 (mental-health staff members); *Burdine v. Szilagyi*, No. 3:98CV7094, 1999 WL 675294, at *3–4 (N.D. Ohio Aug. 20, 1999) (police officers).

[359] *Berndt*, 796 F.2d 879.

[360] Order, ECF #179 at 10.

[361] *See* Complaint, ECF #1-1, ¶ 31.

witnesses identify Santiago, and he told Defendant Shoulders,[362] who shares counsel with Santiago. Despite that knowledge, they misinformed White's counsel as to Santiago's identity and appear to have concealed the true facts for a considerable time thereafter.[363] The effect was, from White's perspective at the very least, a classic "mistake" within the meaning of Rule 15(c)(1)(C).

Santiago also disregards the significance of his having fully and voluntarily participated in discovery, during which he referred to himself throughout as "Defendant" and provided deposition testimony in lieu of his (properly noticed) son. He did all this while (actually or constructively) knowing full well that White's claim targeted the officer who had improperly administered the photo array, and he has behaved exactly as he would have had he been a defendant from the start. Of a similarly positioned defendant, the Fifth Circuit remarked that he "would have done nothing more had he been properly sued in the first place."[364] The fact that Santiago knew enough to defend himself against White's claims, and therefore would not be prejudiced by having to continue doing so, informs the Rule 15(c)(1)(C) inquiry:

> Since the effect of Rule 15(c) is to avoid the impact of the statute of limitations, the sufficiency of the notice must be evaluated in light of the policy objectives of the statute of limitations, i.e., to avoid undue surprise, to permit investigation and collection of evidence while it is fresh and other similar considerations. … When appellee's agent … and his attorneys learned of the suit …, they should have taken steps to investigate the claim, including collecting and preserving evidence against any foreseeable eventuality. Therefore, the appellee cannot claim that he has been prejudiced through the loss of evidence or by undue surprise.[365]

Because Santiago was actually or constructively aware, from its earliest stages, of White's lawsuit and its focus on his conduct, and because he has actively and voluntarily defended against the lawsuit for nearly a year, Santiago, if made to continue defending, will experience far less

---

[362] Lam Dep. 354:9–16 ("Q When you learned that Santiago and Kubas gave the don't circle instruction, did you report that testimony to Shoulders? … A I informed Sergeant Shoulders of what had occurred.").

[363] Counsel must have known what they were doing, for instance, well before producing Santiago in lieu of David Santiago, Jr. at the time appointed for the latter's deposition.

[364] *Kirk v. Cronvich*, 629 F.2d 404, 407–08 (5th Cir. 1980).

[365] *Id.* at 408. *See also Simpson v. City of Maple Heights*, 720 F. Supp. 1303, 1305 (N.D. Ohio 1988).

prejudice than did the *Kirk* appellee. For this reason also, White has satisfied all Rule 15(c)(1)(C) "relation back" conditions.

### B.     The statute of limitations does not bar claims against Beveridge.

Beveridge argues that Claims 6, 7 and 8 are barred by a one-year statute of limitations. His first mistake is misstating by a year the date White initiated this case.[366] The Complaint made clear White was suing the officers who focused Lam on White based on "completely unrelated" allegations of criminal activity.[367] His first amended complaint—the one naming Beveridge as one of those officers—was filed less than three months after the original, on August 3, 2017.[368] This was before any Defendant filed a responsive pleading, permitted under Rule 15(a)(1)'s "once as a matter of course" provision, and within Rule 4(m)'s 90-day service period.

Even if filed outside the applicable limitations period for a malicious-prosecution or false-imprisonment claim, White's amended complaint "relates back" to the date he filed his original complaint under Rule 15(c)(1)(C). As explained above, an amendment adding a new party defendant "relates back" to the date of the original filing if, within Rule 4(m)'s 90-day-service period, the prospective defendant had actual or constructive notice of the pending lawsuit and knew or should have known that the plaintiff intended to name him.

Here, Beveridge had actual notice of White's claims against him within the Rule 4(m) service period, having been named as a defendant on August 3, 2017. White's allegations against Beveridge—that he and other Defendants ignored evidence of White's innocence and tried to

---

[366] *Compare* ECF #199-1 at 15 ("Plaintiff's Complaint was filed on May 9, 2016") *with* Complaint, ECF #1-1 ("New Case Electronically Filed: May 9, 2017").
[367] Complaint at ¶ 17.
[368] ECF #23.

implicate him in a completely unrelated crime—leave little doubt that Beveridge had been among White's intended targets all along.[369]

Beveridge cites *Cox v. Treadway*[370] in support of his contention that, in substituting him for a John Doe defendant, White fails to satisfy Rule 15(c)(1)(C)'s "mistaken identity" requirement. But as other courts in this Circuit make clear, it is a defendant's notice of the suit that really counts.[371] And even *Cox* recognized that an amended complaint relates back when the "'imputed knowledge' doctrine of *Berndt v. Tennessee*" applies: "In *Berndt*, knowledge was imputed to the newly added defendants because they were officials of the originally named defendant, the State of Tennessee."[372] The only reason the *Cox* plaintiff's amended complaint did not relate back is that "the City … was never named as a defendant in this case."[373] Here, of course, White *did* name the City as a defendant in his original complaint. Because Beveridge is a City official, *Berndt*'s "imputed knowledge" doctrine applies. At a minimum, "the inquiry of whether the new defendants knew or should have known that the suit should have been brought against them … is a patently factual inquiry …"[374] The issue, in other words, is not amenable to summary judgment.

---

[369] *Berndt*, 796 F.2d 884 ("[W]here the complaint alleges in substance that the new defendants committed the illegal acts and are officials of the original defendant, that relationship may imply receipt of sufficient notice").

[370] *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996).

[371] *See, e.g., Ringrose v. Engelberg Huller Co.*, 692 F.2d 403, 405 (6th Cir. 1982) (inquiry is whether defendant knew or should have known it was intended target "*or* had actual notice of the action within the limitations period and would not be prejudiced in defending the case") (emphasis added); *Daily v. Monte*, 26 F. Supp. 2d 984, 988 (E.D. Mich. 1998) (amendment related back because John Doe employees "knew or should have known that they would be named, but for the Plaintiff's ignorance as to their identity;" "because Plaintiff's Complaint details the assault that investigation revealed took place on Ward 206, Defendants knew or should have known that Plaintiff intended to name them in the Complaint") (citing 6 C. Wright & A. Miller, *Federal Practice and Procedure*, § 1498 at 512 (1971), whose authors saw "'no justification' for a restrictive interpretation of Rule 15(c) so long as the notice requirement is satisfied"); *accord Clark v. Oakland Cty.*, No. 08-14824, 2009 WL 5217682, at *8–9 (E.D. Mich. Dec. 29, 2009).

[372] *Cox*, 75 F.3d at 240 (citing *Berndt*, 796 F.2d 884 ("[W]here the complaint alleges in substance that the new defendants committed the illegal acts and are officials of the original defendant, that relationship may imply receipt of sufficient notice.")).

[373] *Id.*

[374] *Berndt*, 796 F.2d 884. The inquiry is also policy-driven. *See Kirk*, 629 F.2d 408.

## CONCLUSION

Ignoring the proper standard under Rule 56, Defendants move for immunity and summary judgment merely because they deny the allegations of the complaint, and despite their own admissions creating genuine issues of material fact. Naturally, they failed to carry their burden with respect to any claim or with respect to immunity. Because those outstanding questions of fact can only be resolved by a jury, the Court should deny Defendants' motions in full.

June 17, 2020

Respectfully submitted,

/s/ Brian D. Bardwell
Subodh Chandra (0069233)
Donald P. Screen (0044070)
Patrick Haney (0092333)
Brian D. Bardwell (0098423)
The Chandra Law Firm LLC
The Chandra Law Building
1265 West Sixth Street, Suite 400
Cleveland, OH 44113
T: 216.578.1700
F: 216.578.1800
Subodh.Chandra@ChandraLaw.com
Don.Screen@ChandraLaw.com
Patrick.Haney@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

*Counsel for Plaintiff Dalonte White*

## LOC. R. 7.1 CERTIFICATION

This case was assigned to the standard track. This memorandum complies with the modified page limit as ordered by the Court on June 15, 2020.

/s/ Brian D. Bardwell
Brian D. Bardwell (0098423)

*Counsel for Plaintiff Dalonte White*