### Expert Report of Seth W. Stoughton

I was retained by counsel for the plaintiff in this case to review the actions of employees of the Cleveland Division of Police with regard to Dalonte White on and after April 21, 2015. This report is based on the materials reviewed to date. Should any additional information cause me to expand, add, or revise any of my opinions, I reserve the right to revise, amend, or supplement this report accordingly.

Please note that this report includes citations to and discussion of documents and information that are subject to a protective order (*White v. City of Cleveland, et al*., 1:17:CV-1165, Stipulated Protective Order, Apr. 16, 2019). As such, this report may not be suitable for public release without appropriate redaction.

This space intentionally left blank.

EXHIBIT
**3**

# Table of Contents

Table of Contents ................................................................................................................ 2

Background and Qualifications ............................................................................................ 4

Compensation ...................................................................................................................... 7

Methodology ........................................................................................................................ 7

Understanding of Facts ....................................................................................................... 9

Opinions ............................................................................................................................. 19

    The justifications for my opinions are laid out below. .............................................. 21

    1.   There were substantial problems with the photographic lineups of Dalonte
        White .......................................................................................................................... 21

        A.   The use of a simultaneous, rather than sequential, lineup procedure is
            known to contribute to false positive misidentifications and was
            inconsistent with best practices in policing in 2015 ...................................... 23

        B.   The photographic arrays featuring Dalonte White were improperly and
            problematically suggestive ............................................................................ 25

        C.   Instructing an eyewitness not to indicate that they identified someone on
            a photographic lineup as a suspect is egregious, unreasonable, and contrary
            to generally accepted principles in policing ................................................. 27

        D.   The potential problems of improperly constructed and conducted
            photographic arrays are predictable and can be prevented with adequate
            training and supervision ................................................................................ 29

    2.   It is possible that Mr. White was inappropriately and unlawfully detained or
        arrested on April 24, 2015 ......................................................................................... 30

    3.   Based on the information available as of April 28, 2015, no reasonable officer
        would have thought that there was probable cause to suspect that Dalonte White
        had committed the crimes in Ms. Allums' residence ................................................ 37

    4.   The affidavits in support of the search and arrest warrants in this case were
        fatally flawed and did not establish probable cause ................................................ 37

        A.   A reasonable officer in Det. Lam's position could not have concluded that
            the affidavit in support of the search warrant for Mr. White's residence
            established probable cause ............................................................................. 38

        B.   A reasonable officer in Sgt. Shoulders' position could not have concluded
            that the affidavit in support of the arrest warrant for Mr. White establish
            probable cause ............................................................................................... 39

        C.   A reasonable officer in Det. Lam's position could not have concluded that
            the affidavit in support of the search warrant for Mr. White's DNA account
            established probable cause ............................................................................. 40

    D.    A reasonable officer in Det. Lam's position could not have concluded that the affidavit in support of the search warrant for Mr. White's Facebook account established probable cause ................................................................. 41

5.    There are inconsistencies, errors, and omissions in the documentation of the investigation into Mr. White ................................................................................ 43

    A.    Failing to document a witness's identification on a photographic lineup is egregious, unreasonable, and contrary to generally accepted principles in policing ................................................................................................................ 43

    B.    The April 24, 2015, interaction with Mr. White was not properly documented .......... 44

    C.    Det. Lam's investigative report does not accurately reflect the documentation from a prior menacing incident ............................................................................. 45

6.    Several basic investigative steps were overlooked or ignored ............................................. 45

7.    A reasonable officer could have concluded the information obtained over the source of the investigation established probable cause to believe that Edward Bunch committed the crimes at Ms. Allums residence ......................................................... 47

Appendix A: Photographic Arrays of Mr. White ................................................................. 49

    1.    White Array Administered to Ms. LaForce, 4/23/15 ................................................... 49

    2.    White Array Key for Ms. LaForce, 4/23/15 ................................................................ 50

    3.    White Array Administered to Mr. Hale, 4/23/15 ......................................................... 51

    4.    White Array Key for Mr. Hale, 4/23/15 ...................................................................... 52

    5.    White Array Administered to Ms. Allums, 4/24/15 .................................................... 53

    6.    White Array Key for Ms. Allums, 4/23/15 ................................................................. 54

Appendix B: Photographic Arrays of Mr. Bunch ............................................................... 55

    1.    Bunch Array Administered to Ms. LaForce, 5/13/15 ................................................. 55

    2.    Bunch Array Key for Ms. LaForce, 5/13/15 .............................................................. 56

    3.    Bunch Array Administered to Ms. Allums, 5/13/15 ................................................... 57

    4.    Bunch Array Key for Ms. Allums, 5/13/15 ................................................................ 58

    1.    Bunch Array Administered to Mr. Hale, 5/13/15 ....................................................... 59

    2.    Bunch Array Key for Lineup Administer to Mr. Hale, 5/13/15 ................................. 60

Submission ............................................................................................................................. 61

Declaration ............................................................................................................................. 61

This space intentionally left blank.

## Background and Qualifications

My opinions are based, in part, on my training, professional experience, education, and academic research. My background and qualifications are set forth in the curriculum vitae attached to this report. I highlight and supplement that material here with information relevant to my review and evaluation in this case.

I served as an officer in the Tallahassee Police Department in Tallahassee, Florida. The city of Tallahassee is located in northern Florida; it encompasses over 90 square miles and has a city population of over 180,000 and a metropolitan-area population of over 375,000. The Tallahassee Police Department employs over 350 sworn officers.

I was employed as an officer for a total of five and a half years. I served as a full-time officer from March 2001 until October 2005, and a reserve (part-time) officer from November 2005 until June 2006. As a full-time officer, I earned and maintained multiple operator and instructor certifications beyond my state certification as a police officer. During the course of my service with the department, I was assigned to the Uniform Patrol Division. I also had a wide range of duties beyond my standard duty assignment. Those duties included serving as a Special Response Team member, teaching report writing to other officers, establishing and teaching community self-defense courses, and serving as an acting supervisor as needed. As an officer, I responded to a variety of incidents, including violent crimes; I conducted a large number of investigations, including many involving interviews or interrogations and many involving suspect identification procedures; and I made hundreds of arrests, including arrests for violent crimes.

I also served as an investigator in the Florida Department of Education's Office of Inspector General. The Florida Department of Education has state-wide authority related to education, including providing technical assistance and support to 67 local school districts, the Florida School for the Deaf and the Blind, and 28 state and community colleges; the management of statewide education funding and teacher certifications; the administration of private school tuition voucher programs; and the operation of Florida's Division of Blind Services and Division of Vocational Rehabilitation. The Florida Department of Education has more than 2,500 employees and has an annual budget of more than $20 billion, roughly a quarter of Florida's total budgetary expenditures. The Office of Inspector General is responsible for, *inter alia*, conducting and coordinating investigations into allegations of waste, fraud, abuse, and financial mismanagement within or related to the Florida Department of Education.

I was employed as an investigator for more than two and half years, serving from November 2005 until July 2008. In that time, I earned and maintained several professional certifications related to investigations (e.g., Certified Inspector General Investigator). As an investigator, I conducted investigations into a wide variety of alleged criminal and administrative violations, including leading several multi-agency criminal investigations. I was assigned to handle several especially complicated investigations, including investigations with dozens of witnesses or voluminous

documentation, investigations involving multiple suspects, and a state whistleblower allegation that the state had improperly garnished millions of dollars in wages from hundreds of individuals who had defaulted on their student loans. My investigations regularly and frequently required me to conduct interviews of witnesses and suspects. In 2007, I was recognized with a Meritorious Performance Award for the quality of my investigations. In 2008, I was given a statewide commendation for the number of my investigations that led to arrest and prosecution. Beyond my investigative duties, I was tasked with drafting investigative policy, training new investigators, and assisting other investigators by, *inter alia*, reviewing draft investigative reports.

In addition to specialized knowledge developed as an officer and investigator, I have conducted academic research on policing for more than seven years. I am a tenured member of the faculty of the University of South Carolina School of Law, where I teach in the area of criminal law and procedure. My research focuses on the regulation of policing, including the use of force, investigative procedures, agency policies, and industry practices. My previous academic appointment was a two-year teaching fellowship at Harvard Law School, where I researched the same topics.

I have published extensively on policing. I am the principal author of *Evaluating Police Uses of Force*, a book that is scheduled for publication by New York University Press in 2020. My academic articles have been published in the *Harvard Law Review Forum*, the *Minnesota Law Review*, the *North Carolina Law Review*, the *Tulane Law Review*, the *Virginia Law Review*, the *Wake Forest Law Review*, and other prestigious academic journals. I have published or am publishing book chapters in *Evidence Based Policing: An Introduction*; in *Legal Issues Around the Globe* (Vol. I); and in *Critical Issues in Policing* (8th ed.).

My work is widely relied upon in the field. Electronic versions of my work have been downloaded thousands of times, and my work has been broadly cited by legal scholars in top journals including the *Yale Law Journal*, the *Harvard Law Review*, the *California Law Review*, the *Duke Law Journal*, the *Columbia Law Review*, the *N.Y.U. Law Review*, the *Georgetown Law Journal*, and the *Cornell Law Review*, just to name a few. My work has also been cited by scholars in other disciplines, most prominently in criminology (e.g., in *Criminology & Public Policy*, *Police Quarterly*, and *Journal of Research in Crime and Delinquency*) but also in geography (e.g., in *Political Geography*) and psychology (e.g., in *Psychonomic Bulletin & Review*). It has also been cited in textbooks, casebooks, treatises (e.g., in Wayne LaFave's *A Treatise on the Fourth Amendment*), and both popular and books academic texts (including in James Forman, Jr.'s *Locking Up Our Own*, Barry Friedman's *Unwarranted: Policing Without Permission*, Stephen Rushin's *Federal Intervention in American Police Departments*, Chris Hayes' *A Colony in a Nation*, and Norm Stamper's *To Protect and Serve*). Further, my academic research has been featured in national and international media, including in *The New York Times*, on National Public Radio, and by a host of other publications.

I have also filed or joined multiple briefs amicus curiae to the Supreme Court of the United States related to police procedure. Additionally, I have written about policing for *The New York Times*, *The Atlantic*, *TIME*, and other media publications, and I have appeared on domestic and international print, radio, and television media as a policing expert on more than four hundred occasions.

I serve as an Adviser to the American Law Institute, *Principles of the Law, Policing*. I have also served as a subject matter expert for CNA Analysis & Solutions, which received a Bureau of Justice Assistance grant to develop technical assistance related to police body-worn cameras; in that capacity, I provided verbal and written consultation, as well as presented, by invitation, a keynote address on related to the investigative use of body-worn camera footage. I provided subject matter expertise to the OIR Group in its review of the Madison Police Department, and I have conducted multiple trainings for investigators, supervisors, and lawyers employed by the City of Chicago's Civilian Office of Police Accountability.

I am regularly invited to speak about various aspects of policing to legal, law enforcement, and academic audiences. To date, I have formally presented on policing issues more than 85 times to audiences that include the Fourth Circuit Judicial Conference; the American Judges Association; the Conference of Chief Justices; the National Conference of State Courts; state judicial conferences in Indiana, Kansas, Missouri, North Dakota, Ohio, South Carolina, and Tennessee; the Manitoba Crown/Defence Conference; the Federal Law Enforcement Training Center; federal Inspectors General & Inspectors General Investigators; the Senior Executive Staff of the Bureau of Alcohol, Tobacco, Firearms, and Explosives; the National Association of Women Law Enforcement Executives; the Peace Officers' Association of Georgia; the South Carolina Police Chiefs Association; the Command Staff of the Kansas City (Missouri) Police Department; and the Washington State Criminal Justice Training Commission; as well as others.

I also provide subject matter expertise to police agencies and consultants and to legislators working on police-related legislation, and I am regularly retained to provide expert review and testimony related to police litigation. I have been retained and qualified as an expert witness in state and federal court and in the course of both civil and criminal litigation. A complete list of cases in which I have provided testimony or written reports is provided in the attached curriculum vitae.

I currently serve on the Citizen Advisory Council of the Columbia Police Department in Columbia, South Carolina, a department of approximately 350 sworn officers serving a city with a population of over 130,000 and a metropolitan-area population of over 800,000. I am one of the original members of the council, having served in that capacity since 2015.

**Compensation**

My fee in this case is $320 per hour, billed in 0.25-hour increments. On days when I am expected to testify, I bill at $320 per hour with a minimum rate of eight (8) hours; beyond that time, I bill in 0.25-hour increments.


**Methodology**

To ensure my methodology was reliable, I did not assign credibility to any witness or source of information prior to a review of provided materials, I developed my understanding of relevant facts only after reviewing the provided materials, and I assumed those facts to be true solely for the purpose of analysis. In sum, I reviewed sufficient information to reach conclusions to a reasonable degree of professional certainty. I then analyzed those facts against a backdrop of the professional standards for police officers and the protocols for seizures, arrests, investigations, identification procedures including photographic lineups, and other practices, principles and protocols recognized, relied upon, and employed in the law enforcement profession on the date of this incident, particularly with regard to investigative procedures. The methodology is consistent with the methodology utilized by other experts in the field when analyzing incidents of this type.

My testimony regarding to investigative procedure, including but not limited to identification procedures and documentation, are relevant areas of testimony that would assist a jury in understanding the evidence presented to them.

As a threshold matter, the file in this case was voluminous, containing 3,270 separate files, many containing multiple documents and running hundreds of pages long. The documents are often disorganized and contain multiple redundancies. I have provided a complete list of documents received under separate cover. Of particular note are the following documents, which are cited in this report:[1]

- Cleveland Division of Police Documents
  - Offense/Incident Reports and Related Documentation
    - Case # 2015-108018
      - Offense/Incident Report
    - Case # 2015-110291
      - Offense/Incident Report, WHITE 3125
      - Daugenti Report, WHITE 3075

---

[1] When a BATES number is provided, it refers to only one instance of the document in the record.

- Handwritten notes, CLE 2691 (scattered and disordered)
- Lam Report, WHITE 3084
- Photographic Arrays (multiple)
- Photographs (multiple)
- Social media screenshots (multiple)
- Request for Telephone/Dispatch Recording, WHITE 3091
- Event Chronology, WHITE 3092
  - Detective Unit Manual
  - Shoulder Daily Reports, Apr. 21-24 and 27-30, 2015
- Criminal Investigation & Prosecution Documents
  - Arrest Warrant and Affidavit, Apr. 28, 2015, CLE 2841
  - White Residence Search Warrant, Affidavit, and Inventory List, Apr. 28, 2015, CLE 2844
  - DNA Search Warrant, Affidavit, and Return, May 12, 2015, CLE 2824
  - Facebook Search Warrant and Affidavit, June 12, 2015, CLE 2852
  - Hearing Transcript, July 16, 2015, WHITE 367
  - Hearing Transcript, July 21, 2015, WHITE 568
  - Hearing Transcript, July 24, 2015, WHITE 631
  - Subpoena for Medical Records with Responsive Letter and Documents, WHITE 3100
- Depositions (including Exhibits)
  - David Santiago, Jr., July 10, 2019
  - John Kubas, July 11, 2019
  - Anthony Harper, Aug. 27, 2019
  - Dalonte White, Sept. 10 and 24, 2019
  - Michael Schade, Sept. 12, 2019
  - Robert Beveridge, Sept. 16, 2019
  - David Lam, Sept. 18 and 23, 2019
  - Alexandira Chandler, Sept. 23, 2019
  - Thomas Shoulder, Sept. 30, 2019
  - Cynthia Moor, Oct. 3, 2019
  - Michael Connelly, Dec. 17, 2019
- Other Documents
  - MetroHealth Medical Center, letter and medical records, WHITE 808
- Other materials not specifically identified

This space intentionally left blank.

**Understanding of Facts**

On Tuesday, April 21, 2015, at approximately 6:06pm, Ofcs. Donato Daugenti and Thomas Harrigan were dispatched to respond to a shooting at 3255 W 54th.[2] Upon arrival, Ofcs. Daugenti and Harrigan obtained information from several eyewitnesses.

According to Ofc. Daugenti's report, the eyewitnesses reported that Collenn Allums and two other individuals, Savannah LaForce and Zackary Hale were in Ms. Allums' residence when three suspects entered. Ofc. Daugenti's report described the three suspects as follows:

- Suspect 1: An 18- to 20-year-old black male, 6' to 6'1", 200-250lbs, wearing a black "northface" (presumably referring to the Northface brand), white "airforce" tennis shoes (presumably referring to Nike Air Force 1 shoes), and a dark blue fisherman's hat, and wielding a silver revolver.[3]

- Suspect 2: An 18- to 19-year-old light-skinned black male, 5'6", 130lbs, wearing a black jacket, gray sweat pants, and black and white "Jordans" (a type of shoe).[4]

- Suspect 3: An 18- to 19-year-old black male, 5'9", 150lbs, with short "dreds" (presumably intended to be "dreads" or "dreadlocks"), wearing a black hoodie.[5]

According to the victims' later accounts, there may or may not have been an oral exchange when the suspects entered Ms. Allums' residence (accounts differ on that point), and Suspect 1 drew a silver revolver and struck Ms. Allums with it.[6] When Ms. Allums tried to draw her own firearm, the same suspect struck her multiple times in the head, causing her to (at least partially) lose consciousness. Suspect 2 grabbed one of the witness's cell phone and, with Suspect 3, stood by the apartment door to prevent anyone from exiting.[7] Ms. Allums' dogs entered the room and one bit Suspect 1,[8] and Suspect 1 began shooting at the dogs.[9] Suspect 1 then returned to striking Ms. Allums with the handgun.[10] Suspects 2 and 3 fled the residence, as did Mr. LaForce and Mr. Hale.[11] Eventually, Suspect 1 left. The suspects took two cellphones, some amount of cash, and Ms. Allums' firearm.[12] Ms. Allums, who had blacked out, woke up to find that she had been

---

[2] Daugneti Report, CLE 2697.
[3] Daugneti Report, CLE 2692.
[4] Daugneti Report, CLE 2694.
[5] Daugneti Report, CLE 2694.
[6] Daugneti Report, CLE 2699; In the matter of Dalonte White 51:1-12, 173:25, July 16, 2015, WHITE 417, 539.
[7] Daugneti Report, CLE 2699; In the matter of Dalonte White 59:15-22, July 16, 2015, WHITE 425.
[8] See In the matter of Dalonte White 97:24-98:1, 174:2-16, July 16, 2015,  WHITE 463, 540.
[9] Daugneti Report, CLE 2699; In the matter of Dalonte White 51:24-54:10, July 16, 2015, WHITE 417-420.
[10] Daugneti Report, CLE 2699; In the matter of Dalonte White 54:12-13, July 16, 2015, WHITE 420.
[11] Daugneti Report, CLE 2699; In the matter of Dalonte White 54:12-16, 175:2-6, July 16, 2015WHITE 420, 541.
[12] Lam Report, CLE 2784-5.

shot.[13]

Det. David Lam arrived on scene approximately ten to twenty minutes after the call was dispatched.[14] Later that evening, he was assigned as the lead detective on this case.[15] Det. Lam had been assigned to the Detective Bureau in either that month or the month before,[16] and this was the first case to which he had been assigned as lead detective.[17]

Officers later determined that the suspects were visible on a neighbor's video camera.[18] According to the Det. Lam's report, the video "shows a black male suspect with dreadlocks wearing a dark colored Northface jacket, dark colored pants, and white shoes limping southbound on W. 54th St and concealing a firearm into his waistband area."[19]

When the officers were on scene, they found blood on Ms. Allums' porch. They took swabs of that blood, but never submitted it for DNA testing; according to Det. Lam's later testimony, they "didn't have any reason to believe that the blood came from anybody else except Ms. Allums."[20]

According to Det. Lam's report, he learned from Ofc. Schade that there had been an "aggravated menacing complaint" in the area the prior weekend and the suspects from that incident, Dalonte White and Rayvion Edwards, could be involved.[21] The report describes how one of the suspects threatened the victims with a "small, silver, semi-automatic pistol."[22] In his later deposition, Det. Lam testified that he reviewed the police report documenting that incident and that Mr. White "was a named suspect."[23] However, contrary to Det. Lam's report and later deposition testimony, the police report of the menacing incident makes clear that while Mr. White was with the suspect in that incident, he "was not involved in the menacing and in fact attempted to" prevent it.[24] Additionally, Det. Lam later testified in a deposition that Ofc. Schade told him that the menacing incident was related to this incident (the robbery and shooting of Ms. Allums), but there is no such notation in his report.[25]

Det. Lam reported that Ofc. Robert Beveridge, a patrol officer familiar with the neighborhood, indicated that Mr. White and Mr. Edwards were connected to the "HMF" gang, which reportedly

---

[13] In the matter of Dalonte White 123:21-124:8, July 16, 2015, WHITE 489-90.
[14] Lam Dep. 129:1-4, Sept. 18, 2019.
[15] Lam Dep. 157:17-20, Sept. 18, 2019.
[16] Lam Dep. 39:2-6, Sept. 18, 2019.
[17] Lam Dep. 158:20-22, Sept. 18, 2019.
[18] Daugneti Report, CLE 2701; Lam Report, CLE 2783.
[19] Lam Report, CLE 2783.
[20] In the matter of Dalonte White 343:9-15, July 24, 2015, WHITE 709.
[21] Lam Report, CLE 2783.
[22] Cleveland Division of Police, 2015-108018, Detail, Original Narrative, Apr. 22, 2015.
[23] Lam Dep. 141:16-142:20, Sept. 18, 2019.
[24] Cleveland Division of Police, 2015-108018, Detail, Original Narrative, Apr. 22, 2015.
[25] Lam Dep. 145:19-22, Sept. 18, 2019.

stood for "Heartless Money Family."[26] Additionally Ofc. Beveridge indicated that Shetrell Harris was "known to affiliate" with Mr. White and Mr. Edwards.[27] Based on that information, Det. Lam created photographic identification arrays for Mr. White, Mr. Edwards, and Mr. Harris,[28] printing them on April 22, 2015. Notably, in Mr. White's photographic arrays—reproduced in relevant part in Appendix 1—Mr. White is the only individual in the array to have dreadlocks.[29] Det. Lam later testified that he had trouble finding filler photographs—that is, photographs of individuals other than the potential suspect—with hairstyles like Mr. White's.[30]

According to Det. Lam's report, he and Sgt. Shoulders went to Mr. Hale's residence on April 23, 2015, to interview Ms. LaForce and Mr. Hale. There are no notes of those interview in Det. Lam's report.

The three photographic arrays were administered to Ms. LaForce by Ofc. David Santiago, Jr., described as a blind administrator. Ms. LaForce "positively identified Dalonte White as the shooter in this incident . . . with 100% certainty." Ms. LaForce did not identify anyone in the other two arrays.[31] The three arrays were administered to Mr. Hale by Ofc. Carrucini, described as a blind administrator. Mr. Hale "positively identified Dalonte White as one of the suspects in this incident. He was 70% certain." Mr. Hale did not identify anyone in the other two arrays.[32]

On April 24, 2015, Det. Lam and other officers went to the hospital to interview Ms. Allums. According to the investigator's report, Ms. Allums at that point described Suspect 1 "as wearing black jacket and black jeans/approximately 5'5", 160-170lbns, and having dreadlocks sticking up" approached her and struck her with a gun.[33] Ms. Allums, described Suspect 2 as Hispanic, with "a mustache and goatee and wearing a black baseball cap, gray hooded sweatshirt, and black jeans."[34] Ms. Allums could not describe the other black male suspect in her interview.[35] These descriptions do not appear in the audio recorded portion of her interview.[36]

According to Det. Lam's report, the three photographic arrays were administered to Ms. Allums by Ofc. Kirchner, described as a blind administrator. Ms. Allums "positively identified Dalonte White as the shooter. She was 100% certain."[37] She did not identify anyone in the other two

---

[26] Lam Report, CLE 2783.
[27] Lam Report, CLE 2783.
[28] Lam Report, CLE 2783; see also In the matter of Dalonte White 283:16-286:21, 361:21-362:20, July 24, 2015, WHITE 649-52, 727-28.
[29] See, e.g., In the matter of Dalonte White 89:11-20, July 16, 2015, WHITE 455.
[30] Lam Dep. 179:23-181:7, Sept. 18, 2019.
[31] Lam Report, CLE 2783.
[32] Lam Report, CLE 2783.
[33] Lam Report, CLE 2784.
[34] Lam Report, CLE 2784.
[35] Lam Report, CLE 2784.
[36] In the matter of Dalonte White 404:16-406:1, July 24, 2015, WHITE 770-72.
[37] Lam Report, CLE 2784.

arrays.[38] Det. Lam then interviewed Ms. Allums.

Also on April 24, 2015, according to Det. Lam's later testimony, patrol officers saw Mr. White in the neighborhood on April 24, 2015. Although he had not specifically directed them to,[39] the officers "stopped [Mr. White], spoke with him and took several photographs of [him]."[40] Mr. White later testified that the officers came to his house, removed him from the home, and took pictures of his legs, feet, face, and hair.[41] According to Cmdr. Connelly's later testimony on behalf of the City of Cleveland, Ofc. Lentz and an unknown officer were on scene, although there was no documentation of who took the photographs of Mr. White[42] or how many photographs were taken.[43]

Sgt. Shoulders testified that he participated in that interaction but did not recall the details of its initiation,[44] although he later testified that it is possible that he did not interact with Mr. White on April 24, 2015, at all (because he might have confused that date with a later interaction he had with Mr. White).[45] Det. Lam received the photographs, including pictures of Mr. White's legs. There were no visible injuries in the pictures.[46] This interaction is not reflected in Det. Lam's report.

On April 28, 2015, investigators applied for an arrest warrant for Mr. White.[47] In the affidavit in support of the warrant application, Sgt. Shoulders affirmed that Ms. Allums, Ms. LaForce, and Mr. Hale had positively identified Mr. White in blindly administered photographic arrays with 100%, 100%, and 70% certainty, respectively.[48] He also affirmed that Ofc. Schade "stated that there was a recent Aggravated Menacing complaint in the area . . . and that the Menacing complaint [*sic*] could be related to the home invasion. The suspects in the Menacing case were Dalonte White and Rayvion Edwards."[49] This description, however, is inconsistent with the police report of the menacing incident, which states explicitly that Mr. White was present, but "was not involved in the menacing and in fact attempted to" prevent it.[50]

The identification of Mr. White as a suspect in the menacing case is simply untrue, a fact that would have been apparent to a reasonable officer at the time. The report of the menacing incident

---

[38] Lam Report, CLE 2784.
[39] Lam Dep. 217:20-21, Sept. 18, 2019.
[40] In the matter of Dalonte White 302:5-21, July 24, 2015, WHITE 668.
[41] White Dep. 266:5-8, Sept. 10, 2019.
[42] Connelly Dep. 279:10-280:20, Dec. 17, 2019.
[43] Connelly Dep. 294:11-23, Dec. 17, 2019.
[44] Shoulders Dep. 262:4-270:8, Sept. 30, 2019.
[45] Shoulders Dep. 355, 18-23, Sept. 30, 2015.
[46] Lam Dep. 221:7-13, Sept. 18, 2019.
[47] Arrest Warrant, 4/28/2015, CLE 2842.
[48] Arrest Warrant, 4/28/2015, CLE 2843.
[49] CLE 2842.
[50] Cleveland Division of Police, 2015-108018, Detail, Original Narrative, Apr. 22, 2015.

states explicitly that Mr. White was present, but "was not involved in the menacing and in fact attempted to" prevent it.[51]

The arrest warrant was issued on that date.[52]

On the same date, officers sought a search warrant for Mr. White's residence. In the affidavit in support of the warrant application, Det. Lam included a description of the shooter as provided by Ms. Allums ("a black male[ wearing] a dark jacket, dark pants, white tennis shoes and had dreadlocks") and as reflected in the security video (wearing "a dark colored North Face jacket, dark pants, and white tennis shoes. The male appears to be limping, which comports with the witness accounts that he was attacked by Allums' dog. The suspect also appears to be hiding a firearm in waistband [*sic*] of his pants.").[53] Det. Lam affirmed that Ofc. Schade advised "that the description of the shooter matched that of an individual identified as Dalonte White."[54] (Notably, this is not how Det. Lam's report described the information he obtained from Ofc. Schade, although it is broadly consistent with Ofc. Schade's—now Det. Schade's—later testimony[55]). Det. Lam further affirmed that "a photo lineup was conducted through a blind administrator" and that Ms. Allums', her niece[56] (Ms. LaForce) and her nephew (Mr. Hale) all positively identified Mr. White as the shooter.[57] The search warrant was issued on that date.[58]

Officers executed the arrest and search warrants at Mr. White's residence on the same day.[59] As Det. Lam later testified, the arrest was predicated on the victim's identification of Mr. White as the suspect in the photographic lineups.[60]

According to Det. Lam's report and later testimony, Mr. White was compliant in surrendering when called upon to do so.[61] He did not provide a statement.[62]

The search warrant inventory list shows officers seized six items: a black Northface jacket, a black Kyocera cellphone, tan Timberland boots, a pink sock containing stones, a prescription bottle

---

[51] Cleveland Division of Police, 2015-108018, Detail, Original Narrative, Apr. 22, 2015.
[52] Arrest Warrant, 4/28/2015, CLE 2841.
[53] White Residence Search Warrant Affidavit, CLE 2847.
[54] White Residence Search Warrant Affidavit, CLE 2848.
[55] Schade Dep. 82:12-15, Sept. 12, 2019.
[56] According to Ms. Allums' later testimony, Ms. LaForce is not actually her niece, but is considered family.  See In the matter of Dalonte White 111:18-24, July 16, 2015, WHITE 476.
[57] White Residence Search Warrant Affidavit, CLE 2848.
[58] White Residence Search Warrant, CLE 2845.
[59] Lam Report, CLE 2785-6.
[60] In the matter of Dalonte White 369:6-13, July 24, 2015, WHITE 735.
[61] Lam Report, CLE 2786; In the matter of Dalonte White 366:15-17, July 24, 2015, WHITE 732.
[62] Connelly Dep. 304:1-3, Dec. 17, 2019.

(labelled at Rayvion Edwards') with pills, and a white Samsung cellphone.[63] According to Det. Lam's later testimony, the cell phones recovered at this time were not those taken from the victims at Ms. Allums' residence,[64] and the only DNA on the jacket belonged to Mr. White.[65]

Later that day, investigators interviewed D.M. (name redacted), an acquaintance of Mr. White. D.M. identified four members of the HMF gang, which she said stood for "Hungry Money Family": the two "COs," Shetrell Harris and "Scooby," and two main members, "Romelle," and Mr. White.[66] According to Det. Lam's report, D.M. overheard a conversation between Mr. White and D.M.'s boyfriend during which there was some discussion of Mr. White having "been bitten by a dog approximately a week ago on a weekday."[67] This assertion was challenged in a proffer from attorney Hoffman, who asserted that D.M. had informed him that it was not true.[68]

On the same date, investigators interviewed R.E. (name redacted), who identified himself as a member of the HMF gang. R.E. identified four members of the HMF gang: the two "COs," Shetrell Harris and "Scooby;" the president, Mr. White; and the vice-president, "Romelle."[69] According to Det. Lam's report, R.E. told them that on April 21, 2015, he was supposed to meet Mr. White "at a party in the area of W. 53rd St." at about 7-8pm, but he received a call from "Scooby" saying that he ("Scooby") and "Romelle" were with Mr. White earlier that day but had split up.[70] "Scooby" did not indicate why they had split up, and there was no indication in Det. Lam's report of how much earlier in the day "Scooby" had been talking about.[71]

Ofc. Beveridge identified "Scooby" as Jo'von Montae Owens and "Romelle" as Romell Cleon Thomas.[72]

On May 1, 2015, Det. Lam learned that officers had arrested Edward Bunch on April 30, 2015, in an unrelated matter and discovered that he had previously been shot in the right ankle. Police records indicated that Mr. Bunch had been treated for a gunshot wound on April 21 at about 6:57pm.[73] One of the officers who arrested Mr. Bunch on April 30 told Det. Lam that Mr. Bunch originally told them that "he had shot himself on accident."[74] However, according to Det. Lam's report, when an officer interviewed Mr. Bunch at the hospital on April 21, 2015, after responding

---

[63] Search Warrant, CLE 2849.
[64] In the matter of Dalonte White 367:9-13, July 24, 2015, WHITE 733.
[65] In the matter of Dalonte White 367:14-22, July 24, 2015, WHITE 733.
[66] Lam Report, CLE 2786.
[67] Lam Report, CLE 2786.
[68] In the matter of Dalonte White 414:4-17, July 24, 2015, WHITE 780. According to Mr. White's medical records, there was a notation on April 16, 2015, that he had been bitten by a dog on his left forearm a "few weeks ago"; as of that date, the bite was "healing." White Medical Records, WHITE 811.
[69] Lam Report, CLE 2787.
[70] Lam Report, CLE 2786.
[71] Lam Report, CLE 2786.
[72] Lam Report, CLE 2787.
[73] Lam Report, CLE 2787.
[74] Lam Report, CLE 2787.

to a call about a gunshot wound, Mr. Bunch had said he was "riding a bicycle in the area of West Blvd and Lorain Ave when he suffered a gunshould [*sic*] wound. [He] was unwilling to provide any additional details to the responding officer" at the time.[75] The initial report for that interaction included a dispatch narrative that described Mr. Bunch as "very uncooperative."[76]

There were no 911 calls relating to a shooting in the area, date, and time where Mr. Bunch said he was shot, which Det. Lam later testified would have been unusual given the typical activity in the area.[77] Notably, Det. Lam did not contact the hospital to obtain surveillance video until July 29, 2015, at which time it was unavailable.[78] As of July 25, 2015, Det. Lam had not reviewed Mr. Bunch's medical records relating to the gunshot.[79]

According to Det. Lam's report, the hospital only retains video for 45 days[80] (video from April 21, 2015, would have been available until about June 5, 2015). Based on the information related to Mr. Bunch's injury, Det. Lam created a photographic array of Mr. Bunch.

On May 12, 2015, Det. Lam applied for and obtained a search warrant for Mr. White's DNA.[81]

On May 13, 2015, the victims--Ms. Allums, Ms. LaForce and Mr. Hale—were invited to a police station and shown photographic arrays of Mr. Thomas and Mr. Bunch.

The two arrays were administered to Ms. Allums by Det. Kubas, described in Det. Lam's report as a blind administrator. Ms. Allums did not identify anyone in the arrays.[82] She later testified that she saw, in one of the photographic arrays, "the same person that [she] had already circled previously"[83] as the suspect who had the gun.[84] Specifically, she testified that the individual in the "second picture in the first row" with identifier 85-01-8 was the person she identified in the previous lineup as the shooter.[85] According to the photographic array and key, Ms. Allems was referring to the picture of Mr. Bunch.[86] Ms. Allums testified:

---

[75] Lam Report, CLE 2787.  Mr. Bunch later testified that he was riding his bike from his brother's house to his aunt's house with a friend on his handlebars when he was hit by one of about five shots fired by a someone sticking a gun out the passenger side window of a passing car.  Mr. Bunch testified that after he was shot, his friend took the bike and left, then a stranger drove him to the hospital.  In the matter of Dalonte White 219:6-24, 220:23-221:1, July 21, 2015, WHITE 585, 587.

[76] Offense/Incident Report, Case Number 2015-00110336, WHITE 3059.

[77] In the matter of Dalonte White 373:6-374:9, July 24, 2015, WHITE 739-40.

[78] Lam Report, CLE 2798.

[79] In the matter of Dalonte White 355:4-5, July 24, 2015, WHITE 721.

[80] Lam Report, CLE 2798.

[81] DNA Search Warrant, CLE 2829..

[82] Lam Report, CLE 2788.

[83] In the matter of Dalonte White 133:15-20, July 16, 2015, WHITE 499.

[84] In the matter of Dalonte White 135:19, July 16, 2015, WHITE 501.

[85] In the matter of Dalonte White 134:18-135:3, July 16, 2015, WHITE 500-501.

[86] See Appendix 2, Items 3and 4.

I showed the detective that I was with and I told him that I recognized him, but I knew that I'd already received a letter for his arrest and he said not to circle him because we were -- that they were looking for the other two suspects and that if he was already arrested, that it would be them going in circles.[87]

For that reason, Ms. Allums did not identify anyone in the two arrays administered on that date. Det. Kubas testified that he has no memory of administering this lineup,[88] including whether or not she identified anyone in the lineup,[89] but he testified that he never told a witness not to indicate that they recognized someone in a lineup as a suspect.[90]

The two photographic arrays of Mr. Bunch and were administered to Mr. Hale by Det. Balak, described in Det. Lam's report as a blind administrator. Mr. Hale identified a "filler" in the Romell Thomas array as one of the suspects "with 80% certainty." He later testified that the officer administering the lineup "said pick out somebody if you recognize him, if you think it's him or not,"[91] and that he believed that the individual he identified (the filler) "kind of looked like" Suspect 1.[92] Mr. Hale concluded that his identification of this individual had been a mistake, testifying that the picture did not look enough like Suspect 1.[93] When given Edward Bunch lineup on that date, Mr. Hale identified Mr. Bunch as one of the suspects with "90% certainty."[94] Mr. Hale later testified that Mr. Bunch "looks more like" Suspect 1 than the filler he identified in the previous lineup.[95] Further, he testified that he did not believe that the individual he identified in the lineup on March 23 (Mr. White) was the same as the person as the individual he identified in the lineup on May 13 (Mr. Bunch), although he testified that they both resemble Suspect 1.[96]

The two arrays were administered to Ms. LaForce by Det. David Santiago, Sr. According to Ms. LaForce's later testimony, she was told to not pick anyone out if she had previously identified anyone.[97] Shortly thereafter, she testified that one of the people in the photographic arrays—the subject in the middle of the bottom row, identified with number 85-04-8—looked like Suspect 1, the shooter.[98] According to the photographic array and key, Ms. LaForce was referring to the picture of Mr. Bunch.[99] She testified that when she communicated her identification of the picture

[87] In the matter of Dalonte White 135:9-14, July 16, 2015, WHITE 501.
[88] Kubas Dep. 93:20-94:8, 101:6-7, July 11, 2019.
[89] Kubas Dep. 104:8-16, July 11, 2019.
[90] Kubas Dep. 163:24-164:19, 167:3-13, July 11, 2019.
[91] In the matter of Dalonte White 187:4-9, July 16, 2015, WHITE 553.
[92] In the matter of Dalonte White 186:15-17, July 16, 2015, WHITE 552.
[93] In the matter of Dalonte White 194:1-4, July 16, 2015, WHITE 560.
[94] Lam Report, CLE 2788.
[95] In the matter of Dalonte White 187:14-22, July 16, 2015, WHITE 553.
[96] In the matter of Dalonte White 189:5-14, July 16, 2015, WHITE 555.
[97] In the matter of Dalonte White 185:20-186:5, July 16, 2015, WHITE 551-552.
[98] In the matter of Dalonte White 100:6-24, July 16, 2015, WHITE 466.
[99] See Appendix B, Items 1 and 2.

to the officer, the officer "said don't circle him if you already picked him out of a lineup."[100] She testified that she believed that the person in the picture she had originally identified in the first lineup (Mr. White) was the same person she wanted to identify, but did not, in the lineup at the police station.[101] Ultimately, Ms. LaForce did not identify anyone in the two arrays administered on that date.[102] Det. Santiago testified in his deposition that he had no memory of administering the photographic array to Ms. LaForce.[103]

Det. Lam later testified that he was under the impression that Ms. Allums and Ms. LaForce had not identified anyone on the May 13 lineups.[104] According to his testimony, he was not aware of that until the bindover hearing.[105] He agreed that witness identifications must be documented, that failing to record the identifications of Mr. Bunch was a "severe violation," and that proper documentation could have changed the way he investigated the case.[106]

On June 12, 2015, Det. Lam applied for and obtained a search warrant for Facebook relating to Mr. White's account.[107] In his affidavit in support of the warrant application, Det. Lam affirmed Ms. Allums, her niece, and her nephew all positively identified Mr. White as the shooter in blindly administered photographic lineups.[108] The affidavit did not reflect that both Ms. Allums and Ms. LaForge had been given another lineup and wanted to identify someone other than Mr. White but were directed not to.

Det. Lam received responsive documents from the Facebook warrant on June 26, 2015.[109] Among other activity, it reflects that someone typically logged in to and was active on Mr. White's Facebook account from IP address 184.56.226.166.[110] The documents show that someone logged in to Mr. White's Facebook account from that IP address at 22:02:49 UTC (or 10:02:49pm UTC).[111] In April 2015, the Cleveland area was in the Eastern Daylight Savings Time Zone, which is UTC -04:00, so that time equates to 18:02:49 (or 6:02:49pm). According to the Facebook records, at 22:08:34 on that date (6:08:34pm EST), someone posted a new status to Mr. White's Facebook profile.[112]

On July 8, 2015, Det. Lam interviewed Mr. Bunch, who was incarcerated by the Cuyahoga County

---

[100] In the matter of Dalonte White 101:5-14, July 16, 2015, WHITE 467.
[101] In the matter of Dalonte White 101:15-102:2, 103-7-15, July 16, 2015, WHITE 467-68, 469.
[102] Lam Report, CLE 2788.
[103] Santiago Dep. 12:6-13, July 10, 2019.
[104] In the matter of Dalonte White 322:21:323:4, July 24, 2015, WHITE 688-89.
[105] Lam Dep. 105:1- 106:6, Sept. 18, 2019.
[106] In the matter of Dalonte White 376:6-378:10, 379:18-380:13, July 24, 2015, WHITE 742-44, 745-46.
[107] Facebook Search Warrant, CLE 0252.
[108] Facebook Search Warrant Affidavit, CLE 2856.
[109] Lam Report, CLE 2796.
[110] Facebook Business Record, CLE 1798-1820.
[111] Facebook Business Record, CLE 1820.
[112] Faceboook Business Record, CLE 1883.

Sheriff's Office at the time (having set the interview up on July 2).[113] Det. Lam showed Mr. Bunch a still image taken from the surveillance video of the suspect leaving Ms. Allums' residence as well as pictures of Mr. White and other individuals.[114] According to Det. Lam's report, Mr. Bunch stated during that interview that he had been riding his bike in the area of West Blvd and Detroit Ave when he "heard gunshots, felt the gunshot, and fell onto the ground."[115] Although it is not stated in Det. Lam's report, Det. Lam later testified that Mr. Bunch first stated that he had been at home all day on April 21, 2015, then said that he was riding back from his brother's house when he was shot.[116] He also provided multiple, contradictory locations as the location he was at when he was shot.[117]

On July 16, 2015, Mr. White was brought before a judge for the first day of a multi-day probable cause and bindover hearing. In that hearing, Ms. Allums, Ms. LaForce, and Mr. Hale again described the suspects. Ms. Allums described the suspect who assaulted and shot her as having "dookie braids" (a thicker than standard style of braid) that stuck out "all over" and hung down low enough to partially cover a sweat band.[118] He was wearing a royal blue Hollister coat, which she identified by the brand insignia, and black jeans,[119] and stood about 5'9" or 6' tall,[120] with a "huskier build."[121] Ms. LaForce described Suspect 1 as black, with dreads hanging down[122] and a dark blue Hollister brand rain jacket.[123] She testified that she had previously described this suspect to the police as "pretty tall" and that the suspect was taller than she was (Ms. LaForce was 5'7" at the time).[124] Mr. Hale described this suspect as black,[125] having "twisty dreads" that were "not that long" (about eyebrow length),[126] a hat,[127] a sweater of unknown color.[128] Mr. Hale testified that he "barely" saw this suspect's face.[129]

Ms. Allums described Suspect 2 as "a shorter individual, rather slim, looked to be Hispanic, had a goatee, had on a baseball cap and a hood."[130] She described him as "more slender"[131] than the

---

[113] Lam Report, CLE 2796.
[114] Lam Report, CLE 2796.
[115] Lam Report CLE 2797.
[116] Lam Dep. 347:7-15, Sept. 23, 2019.
[117] Lam Dep. 348:16-349:15, Sept. 23, 2019.
[118] In the matter of Dalonte White 115:19-116:6, July 16, 2015, WHITE 481-82.
[119] In the matter of Dalonte White 117:14:118-4, July 16, 2015, WHITE 483-84.
[120] In the matter of Dalonte White 119:8-9, July 16, 2015, WHITE 485.
[121] In the matter of Dalonte White 119:24, July 16, 2015, WHITE 485.
[122] In the matter of Dalonte White 89:21-90:1 July 16, 2015, WHITE 455-56.
[123] In the matter of Dalonte White 47:21-48:1, July 16, 2015, WHITE 413-14.
[124] In the matter of Dalonte White 103:3-6, July 16, 2015, WHITE 467.
[125] In the matter of Dalonte White 168:2-4, July 16, 2015, WHITE 534.
[126] In the matter of Dalonte White 162:16-24, July 16, 2015, WHITE 528.
[127] In the matter of Dalonte White 162:14-165:16, July 16, 2015, WHITE 528-29.
[128] In the matter of Dalonte White 165:25-166:19, July 16, 2015, WHITE 531-32.
[129] In the matter of Dalonte White 163:18-19, July 16, 2015, WHITE 529.
[130] In the matter of Dalonte White 118:10-12, July 16, 2015, WHITE 484.
[131] In the matter of Dalonte White 119:25, July 16, 2015, WHITE 485.

first suspect and "rather short and maybe about five-foot, five-two at best."[132] Ms. LaForce described this suspect as "a Puerto Rican guy" with a lot of acne and a beard starting to grow in, wearing "baggy jogging pants," a hoodie, and a baseball hat.[133] Mr. Hale described this suspect as "Puerto Rican, light skinned," [134] about 5'5" tall,[135] but could not provide any additional description.[136]

Ms. Allums testified that she could tell only that the third suspect was a tall (about 6'2"[137]), slender black male.[138] Ms. LaForce could not provide a description of the third suspect.[139] Mr. Hale described this suspect as a black male,[140] a little taller than the other suspects,[141] but could not provide any additional description.[142]

On July 24, 2015, during a bindover and probable cause hearing for Mr. White, Judge Denise N. Rini concluded that the evidence presented "did not [establish] probable cause that Dalone White was part of the home invasion."[143]

**Opinions**

I hold the opinions below to a reasonable degree of professional certainty. The basis and reasons for my opinions are premised upon my education, training, and experience in law enforcement; my knowledge and research as a policing scholar; my knowledge of law enforcement standards, analysis, and study; my familiarity with generally accepted police practices and the professional and academic literature in the field; and my understanding of the facts of this case based upon a comprehensive review of the materials listed above. Where the facts are in dispute or I have otherwise relied upon assumptions or hypotheticals, my opinions are conditioned on those assumptions or hypotheticals.

My opinions in this case are as follows:

1. There were substantial problems with the photographic lineups of Dalonte White

    A. The use of a simultaneous, rather than sequential, lineup procedure is known to contribute to false positive misidentifications and was inconsistent with best

---

[132] In the matter of Dalonte White 119:15-16, July 16, 2015, WHITE 485.
[133] In the matter of Dalonte White 46:3-13, July 16, 2015, WHITE 412.
[134] In the matter of Dalonte White 167:5-12, July 16, 2015, WHITE 533.
[135] In the matter of Dalonte White 171:7-9, July 16, 2015, WHITE 537.
[136] In the matter of Dalonte White 167:5-12, July 16, 2015, WHITE 533.
[137] In the matter of Dalonte White 119:18-19, July 16, 2015, WHITE 485.
[138] In the matter of Dalonte White 118:24-119:4, July 16, 2015, WHITE 484-85.
[139] In the matter of Dalonte White 47:3, July 16, 2015, WHITE 413.
[140] In the matter of Dalonte White 167:18-22, July 16, 2015, WHITE 533.
[141] In the matter of Dalonte White 172:5-10, July 16, 2015, WHITE 538.
[142] In the matter of Dalonte White 167:18-22, July 16, 2015, WHITE 533.
[143] In the matter of Dalonte White 435:4-6, July 24, 2015, WHITE 801.

practices in policing in 2015

    B. The photographic arrays featuring Dalonte White were improperly and problematically suggestive

    C. Instructing an eyewitness not to indicate that they identified someone on a photographic lineup as a suspect is egregious, unreasonable, and contrary to generally accepted principles in policing

    D. The potential problems of improperly constructed and conducted photographic arrays are predictable and can be prevented with adequate training and supervision

2. It is possible that Mr. White was inappropriately and unlawfully detained or arrested on April 24, 2015

3. Based on the information available as of April 28, 2015, no reasonable officer would have thought that there was probable cause to suspect that Dalonte White had committed the crimes in Ms. Allums' residence

4. The affidavits in support of the search and arrest warrants in this case were fatally flawed and did not establish probable cause

    A. A reasonable officer in Det. Lam's position could not have concluded that the affidavit in support of the search warrant for Mr. White's residence established probable cause

    B. A reasonable officer in Sgt. Shoulders' position could not have concluded that the affidavit in support of the arrest warrant for Mr. White establish probable cause

    C. A reasonable officer in Det. Lam's position could not have concluded that the affidavit in support of the search warrant for Mr. White's DNA account established probable cause

    D. A reasonable officer in Det. Lam's position could not have concluded that the affidavit in support of the search warrant for Mr. White's Facebook account established probable cause

5. There are inconsistencies, errors, and omissions in the documentation of the investigation into Mr. White

    A. Failing to document a witness's identification on a photographic lineup is egregious, unreasonable, and contrary to generally accepted principles in policing

    B. The April 24, 2015, interaction with Mr. White was not properly documented

    C.  Det. Lam's investigative report does not accurately reflect the documentation from a prior menacing incident

6.  Several basic investigative steps were overlooked or ignored

7.  A reasonable officer could have concluded the information obtained over the source of the investigation established probable cause to believe that Edward Bunch committed the crimes at Ms. Allums residence

The justifications for my opinions are laid out below.

### 1.  There were substantial problems with the photographic lineups of Dalonte White

Photographic lineups are identification procedures; in essence, a witness is asked to review a number of photographs to determine if they can identify the relevant person (e.g., the individual they observed in a certain situation) or object (e.g., the type of weapon a suspect brandished). As with other identification procedures, a photographic lineup is only of investigative value if it is reliable. To maximize reliability, a photographic lineup must be properly created and conducted. Improperly created or conducted photographic lineups are unreliable because of the increased potential for a witness to identify someone other than the individual who committed the crime (a "false positive" misidentification) or to fail to identify the individual who committed the crime (a "false negative").

The phenomenon of proven false positive misidentifications in criminal cases is well documented. As a threshold matter, a misidentification is considered to be a proven when it has been conclusively established that the individual identified could not have committed the crime, such as:

> when it can be objectively established that the defendant could not have committed the crime because it would have been physically impossible to have done so (e.g., he was in another location at the time of the crime); . . . when the true perpetrator of a crime is identified and his guilt can be objectively established; or . . . when scientific evidence, in recent years most commonly DNA evidence, conclusively establishes the defendant's innocence."[144]

---

[144] Richard A. Leo, *False Confessions: Causes, Consequences, and Implications*, 37 J. AM. ACAD. PSYCH. L. 332 (2009) (defining falsity in the context of confessions); see also  Richard A. Leo & Richard J. Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J CRIM L. & CRIM. 429 (1998).

Early researchers identified 56 instances of eyewitness misidentifications in 350 "miscarriage of justice" cases for potentially capital crimes (homicide and rape) between 1900 and 1987.[145] Modern researchers have identified hundreds of eyewitness misidentifications in more recent decades. According to the National Registry of Exonerations, there have been 2,535 exonerations between 1989 and January 2020. Of those 2,535 exonerations, 730 (or 28.8%) involved a false positive misidentification (that is, an innocent party identified as the suspect).[146] As documented by database of DNA exonerations, out of 367 DNA exonerations between 1989 and 2019, 245 (or 66.76%) involve a false positive misidentification by an eyewitness. More specifically:

- 210 exonerees (or 57.22%) had been identified by a victim (as opposed to a non-victim witness);
- 108 exonerees (or 29.43%) had been identified by a victim or witness through a photographic array;
- 108 exonerees (or 29.43%) had been identified through any means by a victim or witness of a different race (a "cross racial identification").[147]
- A total of 94 exonerees (or 25.61%) had been identified by a victim making a cross-racial identification from a photographic array.[148]

It is worth pointing out that those cases include only *proven* misidentifications as that term is described above; it does not include cases in which a misidentification was probable or even highly probable. Because of the stringent requirements that must be satisfied to classify a potential misidentification as "proven," it is likely that the true number of misidentifications is substantially higher than the number of known cases. It is also worth pointing out that almost all of the known misidentification cases relate to serious crimes; it is likely there are a number of such cases involving low level crimes that have simply evaded identification.

As an industry, policing has developed a series of evidence-based procedures for maximizing the reliability of identification procedures, including photographic lineups. As of April 2015, best practices within policing called for photographic lineups to be administered sequentially rather than simultaneously. As of April 2015, it was a generally accepted principle in policing that photographic lineups should not be constructed in a way that inappropriately draws attention to the picture of the potential suspect.

---

[145] Hugh A. Bedau & Michael L. Radelet, *Miscarriages of Justice in Potentially Capital Cases*, 40 Stanford L. Rev. 21 (1987).

[146] http://www.law.umich.edu/special/exoneration/Pages/Exonerations-in-the-United-States-Map.aspx.    Of the 84 exonerations in Ohio, 30 exonerations involved a mistaken identification.

[147] https://www.convictingtheinnocent.com/.

[148] Four of those 94 exonerations were in Ohio: Brian Piszczek, convicted of rape in 1991 and exonerated in 1994; Dante Booker, convicted of rape in 1987 and exonerated in 2005; Joseph Fears, convicted of rape in 1984 and exonerated in 2009; and Raymond Towler, convicted of rape in 1981 and exonerated in 2010.    See https://www.convictingtheinnocent.com/.

### A. The use of a simultaneous, rather than sequential, lineup procedure is known to contribute to false positive misidentifications and was inconsistent with best practices in policing in 2015

Traditionally, a photographic lineup involved a "simultaneous" administration in which the witness was shown six pictures—the suspect and five fillers—at the same time, typically on a single sheet of paper. Over time, a tremendous body of scientific evidence has developed to suggest that a "sequential" administration, in which the witness was shown a series of pictures one at a time, was preferable. In April 2015, the use of sequential lineup procedures was a best practice within policing.

It has been well documented that simultaneous administrations increase the likelihood that the witness will use "relative judgement." In essence, by looking at the photographs in the lineup relative to each other rather than comparing each one independently to their memory of the suspect.[149] This increases the likelihood of a false positive misidentification when the actual perpetrator is not included in the lineup.

> When presented as a standard simultaneous lineup (a small group of people or a photo array), the witness is allowed to examine all the people or pictures prior to making a decision. Under such conditions, it is easy for the witness to compare lineup members, note which lineup member is closest to their memory for the criminal, and then convince themselves that this must be the guilty party. If the guilty person is in the lineup, the relative judgement strategy will usually result in a correct identification. If the guilty party is absent, the relative judgement strategy leads to false positive choices.[150]

Scientifically rigorous studies have found that there is a significantly lower rate of false positive misidentifications (that is, a witness misidentifying an innocent person as the subject) when sequential procedures are followed compared to simultaneous procedures.[151]

This information was well known in policing by 2015. In 1999, for example, the Department of Justice published *Eyewitness Evidence: A Guide for Law Enforcement*, which stated, "Scientific research indicates that identification procedures such as lineups and photo arrays produce more reliable evidence when the individual lineup members or photographs are shown to the witness

---

[149] Gary L. Wells and Eric P. Seelau, *Eyewitness Identification: Psychological Research and Legal Policy on Lineups*, 1 PYSCH. PUB. POL. & L. 765 (1995).

[150] Rod C.L. Lindsay, *Applying Applied Research: Selling the Sequential Lineup*, 13 APPLIED COGNITIVE PSYCHOLOGY 219 (1999).

[151] Gary L. Wells et al., *Double-blind Photo Lineups Using Actual Eyewitnesses: An Experimental Test of a Sequential Versus Simultaneous Lineup Procedure*, 39 L. & HUMAN BEHAV. 1 (2015) (finding an 11% false positive rate for sequential lineups versus an 18% false positive rate for simultaneous lineups.)

sequentially—one at a time—rather than simultaneously."[152] In 2004, the American Bar Association published *Statement of Best Practices for Promoting Accuracy of Eyewitness Identification Procedures*, which called for more research as to the use of "promising sequential techniques," stating "[t]here is near uniform agreement in all the published literature that the sequential procedure produces a lower rate of mistaken identifications when the perpetrator is absent."[153] In 2010, the International Association of Chiefs of Police issued a model policy for photographic lineups that called for the use of sequential, rather than simultaneous, lineups.[154] The National Institute of Justice published a number of articles prior to 2015 describing the existing research and advocating for the adoption of, among other things, sequential lineup procedures.[155] As a result, a number of police agencies and states adopted sequential lineup procedures. In 2001, for example, the New Jersey Attorney General adopted a regulation on photographic lineups that included sequential administration.[156] In 2010, the Wisconsin Office of the Attorney General promulgated a similar model policy and procedures, including blinded sequential lineups.[157] In 2011, the Virginia Department of Criminal Justice Services promulgated a model policy that, *inter alia*, set out the procedures for sequential photographic lineups.[158] In 2012, the Michigan Commission on Law Enforcement Standards promulgated similarly procedures, including blinded sequential lineups. In short, as of April 2015, the use of sequential photographic lineups was a best practice in policing.[159]

In this case, the photographic lineups that Det. Lam prepared and had administered were conducted as simultaneous presentations, with the picture of Mr. White and five fillers provided on the same page and at the same time for each witness.[160] For the reasons stated above, in 2015, this

---

[152] U.S. DEPARTMENT OF JUSTICE, EYEWITNESS EVIDENCE: A GUIDE FOR LAW ENFORCEMENT, 9 (1999).  Notably, the DOJ did not, in that document, recommend against the use of simultaneous lineups or recommend a particular sequential lineup procedure.

[153] American Bar Association, *Statement of Best Practices for Promoting Accuracy of Eyewitness Identification Procedures*, at 8 (2004) (internal quotation marks omitted).

[154] IACP Model Policy, Eyewitness Identification (2010).  Note that the IACP changed its position in 2016, describing both sequential and simultaneous lineups as valid.

[155] See, e.g., Maureen McGough, *To Err is Human: Using Science to Reduce Mistaken Eyewitness Identifications Through Police Lineups* (2012), https://nij.ojp.gov/topics/articles/err-human-using-science-reduce-mistaken-eyewitness-identifications-through-police; Beth Schuster, *Police Lineups: making Eyewitness Identification More Reliable* (2007), https://nij.ojp.gov/topics/articles/police-lineups-making-eyewitness-identification-more-reliable#note14.

[156] New Jersey Attorney General, *Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures* (2001).

[157] https://www.doj.state.wi.us/sites/default/files/2009-news/eyewitness-public-20091105.pdf.

[158] https://bit.ly/2Fv1mhh.

[159] That is not to suggest that the matter is universally accepted as scientific fact.  The relative value of sequential versus simultaneous lineups remains a subject of academic inquiry, with some researchers arguing that the use of a diagnosticity ratio (Hit Rate / False Positive Rate) to evaluate the effectiveness of eyewitness identification procedures is less theoretically sound than using other evaluative frameworks.  Essentially, the point of contention in current academic research is on how lineup procedures are best evaluated.

[160] See Appendix A.

presentation was known in policing to contribute to false positive misidentifications and was inconsistent with best practices.

**B. The photographic arrays featuring Dalonte White were improperly and problematically suggestive**

When creating a lineup, officers use a picture of the suspect and five "filler" pictures (individuals who are not suspects). Unless circumstances prevent it, officers generally seek to use a picture of the suspect that is consistent with the known description of the individual who committed the crime. The filler pictures must be consistent with the suspect description and photograph, and must be generally consistent with each other to ensure that none of them stand out. When there are notable inconsistencies between pictures, an eyewitness is more likely to identify the picture that stands out as the suspect (even if they are not consciously aware of or focused on the inconsistencies). In other words, a witness's identification of a picture that stands out may be *because* the picture stands out. This is because of the malleable nature of human memory. Modern neuroscience and psychology identify three phases of human memory: encoding, storage, and retrieval. Essentially, a photographic lineup requires the witness to retrieve their previously encoded and stored memory of the perpetrator and to compare that memory to the photographs in the lineup. Unlike conventional conceptions of digital data, however, human memory is malleable; when a lineup is unduly suggestive, it can lead the witness to re-encode their memory of the perpetrator with the image of the photograph that stands out, leading the witness to (falsely) believe that they *are* identifying the perpetrator.

This problem is well known in policing. It is a generally accepted principle in policing that photographic lineups must not be improperly or problematically suggestive.[161] As Ohio law puts it in the context of describing the "folder system" of administering photographic lineups:

> The investigating officer uses one 'suspect photograph' that resembles the description of the suspected perpetrator of the offense provided by the eyewitness [and] five 'filler photographs' of persons not suspected of the offense that match the description of the suspected perpetrator but . . . not cause the suspect photograph to unduly stand out.[162]

It has been well established for years that, to prevent photographic arrays from being improperly suggestive, all of the photographs in a lineup must be consistent with the known description of the suspect. In 1999, for example, the Department of Justice provided guidance that instructed

---

[161] A photographic lineup can be unduly suggestive when a photograph stands out, but also in other ways. For example, best practices for photographic lineups include instructing the witness that the suspect may or may not appear in the photographs they are about to review to avoid suggesting to the witness that the suspect is definitely included.

[162] Ohio Rev. Code § 2933.83(A)(6)(a).

officers:

> Select fillers who generally fit the witness' description of the perpetrator. When there is a limited/inadequate description of the perpetrator provided by the witness, or when the description of the perpetrator differs significantly from the appearance of the suspect, fillers should resemble the suspect in significant features.[163]

Hairstyle can be a relevant characteristic, especially when there is reason to believe that the suspect had a particular hairstyle. By their accounts, this was well known to several of the detectives involved in this case. Det. Lam testified in his deposition that the pictures used in a photo array should have similar physical characteristics, including hair style.[164] Sgt. Shoulders testified similarly, saying, "you had to have similarities in characteristics so as not to have one person stand out against another person."[165] He referred to consistency between photographs as "the main thing" and specifically identified hair and hair style as a characteristic that must be similar between individuals.[166] In his deposition testimony, Det. Kubas similarly stated that, when he creates photographic lineups, he "select[s] people that match similar characteristics; hair, build. Try to get pictures that are similar to the suspect."[167] Det. Santiago made a similar point, testifying that filler photographs are selected based on the potential suspect's appearance, including hair style.[168] Det. Moore testified similarly, including "hairstyles" as one of a list of factors.[169]

In this case, specifically, Det. Lam had reason to know that hairstyle was a relevant part of the suspect descriptions at the point when he created the photographic arrays of Mr. White on April 22, 2015. According to Ofc. Daugenti's report, one of the suspects had been described as having short "dreds" (presumably intended to be "dreads" or "dreadlocks").[170] According to Det. Lam's report, a review of the video footage obtained from a neighbor on the date of the incident "shows a black male suspect with dreadlocks wearing a dark colored Northface jacket, dark colored pants, and white shoes limping southbound on W. 54th St and concealing a firearm into his waistband area."[171] Thus, he had reason to know that at least one, and possibly both, of the black male suspects had their hair in dreadlocks.

As explained above, the suspect *and* the filler photographs selected for a lineup should match the suspect description in all relevant respects whenever possible. In this case, however, both a review

---

[163] U.S. DEPARTMENT OF JUSTICE, EYEWITNESS EVIDENCE: A GUIDE FOR LAW ENFORCEMENT, 29 (1999).
[164] Lam Dep. 94:4-19, Sept. 18, 2019.
[165] Shoulders Dep 84:8-11, Sept. 30, 2019.
[166] Shoulders Dep. 89:2-20, Sept. 30, 2019.
[167] Kubas Dep. 54:1-3, July 11, 2019.
[168] Santiago Dep. 115:5-19, July 11, 2019.
[169] Moore Dep. 66:24-67:4, Oct. 3, 2019.
[170] Daugneti Report, CLE 2694.
[171] Lam Report, CLE 2783.

of Mr. White's photographic lineups[172] and the testimony of Det. Lam himself indicates that the photograph of Mr. White is the only on with dreadlocks.[173] One potential effect of this presentation is that an eyewitness reviewing the lineup could, even unconsciously, dismiss from consideration the pictures of individuals without dreadlocks, increasing the likelihood that the witness would select Mr. White. As a result, the photographic array was improperly and problematically suggestive.

Additionally, all three suspects were initially described as wearing black tops (a black "northface," a black jacket, and a black hoodie, respectively[174]). Det. Lam's report reflects that the suspect seen limping from Ms. Allums' residence was wearing "a dark colored Northface jacket."[175] Clothing can, of course, be changed, but it was a relevant part of the descriptions provided such that any photographic lineups should have either featured suspect and filler pictures with dark colored tops or, if that was not practicable, without dark colored tops. In this case, however, a review of Mr. White's photographic lineup indicates that he and two of the five fillers were pictured in dark colored tops, while the other three were pictured in lighter colored tops. One potential effect of this presentation is that an eyewitness reviewing the lineup could dismiss from consideration fully half of the six pictures shown, increasing the likelihood that the witness would select Mr. White or one of the fillers wearing a black top. As a result, the photographic array was improperly and problematically suggestive.

### C. Instructing an eyewitness not to indicate that they identified someone on a photographic lineup as a suspect is egregious, unreasonable, and contrary to generally accepted principles in policing

Officers investigating criminal activity are, to borrow a cliché, supposed to follow the evidence wherever it leads. Interviewing witnesses about potential suspects, including through photographic lineups, can be a critical method of gathering information during an investigation. However, to be of any investigative value, the information obtained must be reliable. To that end, while officers and investigators must use their professional judgment, training, and experience to find, gather, and interpret the evidence and information they obtain, they must refrain from inappropriately manipulating, contaminating, or otherwise biasing the investigation.

As is specifically relevant here, it is a generally accepted principle within policing that officers administering a photographic lineup must not influence the witness's ultimate identification or non-identification. For example, the practice of having photographic lineups administered blind or blinded—meaning that the officer administering the lineup does not know either who the suspect is at all (blind) or where the suspect falls in the lineup (blinded)—is to prevent officers

---

[172] See Appendix A.
[173] See, e.g., In the matter of Dalonte White 89:11-20, July 16, 2015, WHITE 455.
[174] Daugneti Report, CLE 2694.
[175] Lam Report, CLE 2783.

from consciously or unconsciously affecting the witness's selection.

It would be egregious inappropriate, unreasonable, and contrary to generally accepted principles in policing for a lineup administrator to discourage a witness from identifying someone. This appears to be well known among several of the detectives relevant to this case. In his deposition testimony, for example, Det. Schade tesitifed that instructing a witness not to indicate they've identified someone in a lineup is "not what a blind administrator is supposed to do."[176] Det. Santiago described discouraging a witness identification as "corrupting an investigation."[177] Ofc. Harper testified that there would be no reason for an officer to advise someone not to identify a suspect they recognized in a photographic lineup.[178] Cmdr. Connelly, testifying for the City of Cleveland, stated that a photographic lineup administrator should "absolutely not" instruct a witness to not identify someone, and that doing so would (inappropriately) influence the witness.[179]

In this case, there is a factual dispute as to whether Det. Kubas instructed Ms. Allums not to indicate her identification of Mr. Bunch's picture on the May 13, 2015, photographic array that he administered. On the one hand, Ms. Allum testified, in the context of discussing the May 13, 2015, photographic array (of Mr. Bunch):

> I showed the detective that I was with and I told him that I recognized him, but I knew that I'd already received a letter for his arrest and he said not to circle him because we were -- that they were looking for the other two suspects and that if he was already arrested, that it would be them going in circles.[180]

On the other hand, Det. Kubas testified that while he has no memory of administering this lineup[181]--including whether or not Ms. Allums identified anyone in the lineup[182]—he testified that he has never told a witness not to indicate that they recognized someone in a lineup as a suspect.[183]

There is a similar factual dispute as to whether Det. Santiago instructed Ms. LaForce not to indicate her identification of Mr. Bunch's picture on the May 13, 2015, photographic array that he administered. On the one hand, Ms. LaForce testified that during the May 13, 2015, lineup, she identified one of the pictures in the photographic array (the picture of Mr. Bunch) as the suspect

---

[176] Schade Dep. 133:9-19, Sept. 12, 2019.
[177] Santiago Dep. 101:5-6, July 10, 2019.
[178] Harper Dep. 74:6-16, Aug. 27, 2019.
[179] Connelly Dep. 244:4-8, Dec. 17, 2019.
[180] In the matter of Dalonte White 135:9-14, July 16, 2015, WHITE 501.
[181] Kubas Dep. 93:20-94:8, 101:6-7, July 11, 2019.
[182] Kubas Dep. 104:8-16, July 11, 2019.
[183] Kubas Dep. 163:24-164:19, 167:3-13, July 11, 2019.

who had beaten and shot Ms. Allums.[184] She testified that when she communicated her identification of the picture to the officer, the officer "said don't circle him if you already picked him out of a lineup."[185]

On the other hand, while Det. Santiago testified in his deposition that he had no memory of administering the photographic array to Ms. LaForce[186]—specifically that he did not remember giving her instructions during the photograph lineup[187]—he did testify that he "would never" instruct an eyewitness to not identify a picture in a photographic lineup.[188] Separately, he testified that no one had ever told him, while he was administering a photographic lineup, that they had already identified someone in that lineup.[189]

The factual disputes prevent me from rendering an opinion as to whether Det. Kubas or Det. Santiago discouraged Ms. Allums or Ms. LaForce, respectively, from indicating that they recognized someone on a photographic array. If they had done so, such an action would be egregiously inappropriate, unreasonable, and contrary to generally accepted principles of policing.

### D. The potential problems of improperly constructed and conducted photographic arrays are predictable and can be prevented with adequate training and supervision

The potential problems described in the preceding subsections are well known within policing and eminently predictable. They are also preventable; well trained and well supervised officers can avoid unnecessarily increasing the potential for misidentifications.

It is not entirely clear from the record whether, in April 2015, the Cleveland Division of Police directed or required officers to prepare and administer simultaneous as opposed to sequential photographic lineups. Ofc. Anthony Harper, testifying on behalf of the City of Cleveland, indicated that simultaneous photographic arrays were not consistent with Academy training.[190] However, Cmdr. Connelly, also testifying on behalf of the City of Cleveland, stated that simultaneous lineups are "absolutely preferred."[191] According to Det. Kubas' deposition testimony, he is not aware of anyone in the Cleveland Division of Police that uses the "folder method" to blindly administer photographic lineups sequentially.[192]

---

[184] In the matter of Dalonte White 100:6-24, July 16, 2015, WHITE 466.
[185] In the matter of Dalonte White 101:5-14, July 16, 2015, WHITE 467; see also In the matter of Dalonte White 185:20-186:5, July 16, 2015, WHITE 551-552.
[186] Santiago Dep. 12:6-13, 87:16, July 10, 2019.
[187] Santiago Dep. 90:11-13, July 10, 2019.
[188] Santiago Dep. 97:19-98:4, July 10, 2015.
[189] Santiago Dep. 137:12-17, July 10, 2015.
[190] Harper Dep. 60:4-11, Aug. 27, 2019.
[191] Connelly Dep. 231:5-13, Dec. 17, 2019.
[192] Kubas Dep. 107:21-108:1, July 11, 2019.

It appears that there is insufficient training on the issue of creating and administering photographic lineups. Det. Lam testified in his deposition that he had not received any formal training on photographic lineups,[193] although he was informally trained by his supervisor, Sgt. Shoulders,[194] and learned about the procedures from the Detective Unit Manual.[195] Det. Kubas, similarly, testified in his deposition that he received training in the Academy, but received no additional formal training on photographic lineups "other than being shown by another detective."[196] Det. Moore, who was assigned as a detective in early 2015, testified that she had never received formal training on lineups.[197] Det. Schade—who had been "Ofc. Schade" in 2015—testified that with regard to lineup procedures, he neither received any formal training[198] nor was he aware of any formal training.[199] Ofc. Harper, testifying on behalf of the City of Cleveland, stated that police recruits get pre-service training one lineups, but "there are no in-service training on lineups."[200] According to Cmdr. Connelly, testifying on behalf of the City of Cleveland, the Cuyahoga County Prosecutor's Office provided training on photographic lineups to "all of the detective" in "the year that law [presumably the lineup law] came into effect,"[201] which was 2010.[202] Notably, this was prior to Det. Lam,[203] Det. Kubas,[204] and Det. Moore[205] becoming detectives.

### 2.  It is possible that Mr. White was inappropriately and unlawfully detained or arrested on April 24, 2015

Officers are generally trained that they have the authority to initiate a limited seizure, or investigative detention, under *Terry v. Ohio*.[206] They learn that, for Fourth Amendment purposes, an individual is seized when officers establish "an intentional acquisition of physical control."[207] They have the requisite physical control, the officers learn, in two situations. First, when an individual submits to an officer's "assertion of authority" under circumstances in which a reasonable person would not feel free to "disregard the police and go about his business."[208] Second, when officers engage in "grasping or [the] application of physical force with lawful

---

[193] Lam Dep. 22:11-13, Sept. 18, 2019.
[194] Lam Dep. 23:17-24:1, Sept. 18, 2019.
[195] Lam Dep. 31:7-16, Sept. 18, 2019.
[196] Kubas Dep. 78:4-7, July 11, 2019.
[197] Moore Dep. 54:20-25, Oct. 3, 2019.
[198] Schade Dep. 26:19-22, Sept. 12, 2019.
[199] Schade Dep. 24:17-19, Dept. 12, 2019.
[200] Harper Dep. 110:14-15, Sept. 18, 2019.
[201] Connelly Sep. 61:20-62:19, Dec. 17, 2019.
[202] See http://codes.ohio.gov/orc/2933.83 (identifying an effective date of July 6, 2010).
[203] Lam Dep. 39:2-6, Sept. 18, 2019.
[204] Kubas Dep. 15:2-3, July 11, 2019.
[205] Moore Dep. 19:9-23, Oct. 3, 2019.
[206]  392 U.S. 1 (1968).
[207] Brower v. County of Inyo, 489 U.S. 593, 596 (1989).
[208] California v. Hodari D., 499 U.S. 621, 626-27, 628 (1991).

authority."[209] Officers learn that, per *Terry*, they can effect an investigative detention if, and only if, they have at least reasonable suspicion to believe that the individual was involved in criminal activity. Reasonable suspicion, officers learn, is a quantum of proof that must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the detention.[210] This requires more than an "inchoate and unparticularized suspicion or hunch."[211] Reasonable suspicion does not require the information to be correct, but it must be reasonable; that is, reasonable mistakes and errors can still support reasonable suspicion, but unreasonable mistakes and errors cannot.

Officers also learn that exceeding the scope of an investigative detention can, for constitutional purposes, convert the interaction from a detention into an arrest. For example, officers are generally taught that moving a detained person from the location of the detention to a new location, even a relatively close location, can convert an investigative detention into an arrest.[212] Officers are taught they can arrest someone when they have probable cause to believe that the individual committed a crime. Officers learn that, according to the Supreme Court, "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed.[213] Like reasonable suspicion, information supporting probable cause must be reasonable, but not necessarily correct; that is, reasonable mistakes and errors can still support probable cause, but unreasonable mistakes and errors cannot.

In this case, there are some indications in the record that Mr. White was detained or arrested on April 24, 2015. Specifically, Mr. White testified that officers came to his mother's house—3347 West 59th Place—and took multiple pictures of him.[214] The relevant pictures have handwritten notations indicating they were taken on April 24, 2015.[215] Cmdr. Connelly, testifying for the City of Cleveland, stated that the city's position is that the photographs were taken on April 24, 2015.[216] The pictures reflect Mr. White standing outside by a police car with a house in the background. Partial screen captures of the relevant pictures are provided on the next page for reference:

This space intentionally left blank.

---

[209] California v. Hodari D., 499 U.S. 621, 624-26 (1991).
[210] Terry v. Ohio, 392 U.S. 1, 21(1968).
[211] Terry v. Ohio, 392 U.S. 1, 27 (1968).
[212] See, e.g., Florida v. Royer, 460 U.S. 491 (1983).
[213] Brinegar v. United States, 338 U.S. 160, 175-1765 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)).
[214] White Dep. 42:17-22, 266:5-7, Sept. 10, 2019.
[215] See, e.g., WHITE 389.
[216] Connelly Dep. 280:21-281:4, Dec. 17, 2019.

Image 1: Photograph of Mr. White, WHITE 389



Image 2: Google Maps Image of 3354 West 59th Place (https://bit.ly/37WymLI)



An examination of Google Maps suggests that the house behind him is 3354 West 59th Place. According to Google Maps, 3354 West 59th Place is across the street and two houses south of 3347 West 59th Place. A screen capture with notations is provided for reference.

Image 3: Google Maps Overheard Image (https://bit.ly/383pkwB)



There is a lacuna of information in the record about the April 24, 2015, interaction between Cleveland police officers and Mr. White. According to Det. Lam's later testimony, patrol officers saw Mr. White in the neighborhood and, although he had not specifically directed them to,[217] they "stopped [Mr. White], spoke with him and took several photographs of [him]."[218] According to Cmdr. Connelly's later testimony on behalf of the City of Cleveland, Ofc. Lentz and an unknown officer were on scene, although there was no documentation of who took the photographs of Mr. White[219] or how many photographs were taken.[220] Other than the photographs themselves and an entry in Ofc. Lentz's duty log, there appears to be no documentation of this interaction at all.

The lack of information prevents me from offering a conclusive opinion about the nature of the interaction. If Mr. White consensually accompanied an officer to where their car was parked and voluntarily agreed to have pictures taken, then it is likely that it was a consensual encounter. If Mr. White was stopped while walking down the sidewalk under circumstances where a reasonable person would not feel free to leave (e.g., put into handcuffs), then the interaction was likely an investigative detention. If Mr. White was detained, removed from his home, and relocated for the purposes of taking pictures, then the interaction was likely an arrest for Fourth Amendment purposes. It is worth noting that Det. Lam stated that officers "stopped" Mr. White[221] and that, in the picture, Mr. White is standing in a position consistent with being handcuffed.[222]

As described above, officers can detain an individual when they can articulate reliable information amounting to reasonable suspicion that the criminality is afoot.[223] Because of a troubling lack of documentation, it is not clear what the officers who interacted with Mr. White knew or could have known, and thus it is not clear whether they had reasonable suspicion to justify a detention, let alone probable cause to justify an arrest.

As a minimum, the following information was available: First, the initial description of the shooting suspect (an 18- to 20-year-old black male, 6' to 6'1", 200-250lbs, wearing a black Northface jacket, white Air Force shoes, and a dark blue fisherman's hat and wielding a silver revolver).[224] This information does not support reasonable suspicion to believe that Mr. White was the suspect. Mr. White's height and weight are obviously and significantly different from that of the suspect description. Officers are taught that eyewitness descriptions of suspects are approximations, and the reliability of any given description must be evaluated on a case-by-case basis. Officers learn that various factors can increase or decrease the reliability of an eyewitness's description. Such factors may be extrinsic to the witness or intrinsic to the witness. Extrinsic

[217] Lam Dep. 217:20-21, Sept. 18, 2019.
[218] In the matter of Dalonte White 302:5-21, July 24, 2015, WHITE 668.
[219] Connelly Dep. 279:10-280:20, Dec. 17, 2019.
[220] Connelly Dep. 294:11-23, Dec. 17, 2019.
[221] In the matter of Dalonte White 302:5-21, July 24, 2015, WHITE 668.
[222] WHITE 389.
[223] Terry v. Ohio, 392 U.S. 1, 30 (1968).
[224] Daugneti Report, CLE 2692.

factors include, but are not limited to, ambient lighting (the intensity and positioning of light sources), whether the witness was in a familiar location, the distance between the eyewitness and the suspect, the number of times the eyewitness viewed the suspect, the duration over which the eyewitness has viewed the suspect, and so on. Intrinsic factors relate to the eyewitness's ability to accurate perceive, remember, and describe the suspect, such as the witness's eyesight, their certainty in their observations, whether there was a substantial delay between the observation and the description, et cetera. The eyewitness's own physical stature is also a relevant consideration; people are familiar with their own height and weight, and therefore tend to use it as a benchmark when estimating other's height and weight. Although witnesses are rarely exact, in most cases they can reliably describe a suspect's overall build or identify whether the suspect was significantly shorter or taller, or lighter or heavier than they are themselves. Officers know that the potential for inaccuracy in an eyewitness's description does not allow them to disregard substantial and obvious inconsistencies between that description and any individuals they observe. Doing so would eliminate the value of having a description in the first place. Mr. White's height and weight are substantially and obviously inconsistent with the description of the suspect. The suspect was described as 6'0" to 6'1 and 200 to 250lbs. According to the best available information, Mr. White was approximately 5'5" and about 135lbs. Someone who is 7 to 8 inches and 65 to 115lbs smaller than the description suspect—potentially less than half as much as the described weight—simply does not fall within a reasonable range of variation such that a reasonable officer could suspect them to be the person described.

Second, a security video showing "a black male suspect with dreadlocks wearing a dark colored Northface jacket, dark colored pants, and white shoes limping southbound on W. 54th St and concealing a firearm into his waistband area."[225] The relationship that Mr. White bore to the suspect seen on the security video was that they were black males with dreadlocks and white shoes. Officers use descriptions of suspects' appearances to exclude or include individuals as potential suspects, but officers know that they cannot rely on descriptions that merely reflect what many people are wearing at the relevant time. When a suspect is described as wearing long-sleeved clothing, for example, no reasonable officer will rely on that description when the weather is such that most people in the area are wearing long-sleeved clothing – in such cases, the description no longer helps officers separate the suspect from non-suspects. In this case, there is no reason to believe that "black male with dreadlocks and white shoes" narrows the field of potential suspects to such a degree as to establish reasonable suspicion.

Third, the prior report of an aggravated menacing in which Mr. White was present, but not a suspect.[226] Although Det. Lam's report and testimony suggests that Mr. White was a suspect in a prior aggravated menacing[227] complaint, this information simply was not true. The report of that

---

[225] Lam Report, CLE 2783.
[226] Cleveland Division of Police, 2015-108018, Detail, Original Narrative, Apr. 22, 2015.
[227] Lam Report, CLE 2783; Lam Dep. 141:16-142:20, Sept. 18, 2019.

incident states explicitly that Mr. White was present, but "was not involved in the menacing and in fact attempted to" prevent it.[228] Given the information available to officers—specifically, the report of the prior menacing incident—it is and would have been unreasonable to believe that Mr. White was a suspect in that incident.

Fourth, Ofc. Beveridge's indication that Mr. White was affiliated with the "HMF" gang.[229] This information simply does nothing to connect him to the crimes at Ms. Allums' house.

Fifth, Ms. LaForce's and Mr. Hale's identification of Mr. White as the shooting suspect.[230] As described above, the photographic lineups administered to Ms. LaForce and Mr. Hale on April 23, 2015, were inconsistent with best practices and inappropriately and problematically suggestive. In short, the identifications were based on a deeply flawed photographic lineup that was not a reliable source of information on which reasonable suspicion could be based.

No reasonable officer could conclude, based on the information above, that there was reasonable suspicion to believe that Mr. White was the suspect who assaulted and shot Ms. Allums. No reasonable officer could conclude, based on the information above, that there was probable cause to believe that Mr. White was the suspect who assaulted and shot Ms. Allums.

In addition to the foregoing information, it is not clear whether officers interacted with Mr. White before or after Det. Lam interviewed Ms. Allums on April 24, 2015, and thus could have known about the information she provided. First, like Ms. LaForce and Mr. Hale, Ms. Allums identified Mr. White from a flawed and suggestive photographic array. As with their identifications, the inherent lack of reliability in the photographic lineup that was administered precludes her identification from supporting reasonable suspicion or probable cause.

Second, although it was not captured during the audio recorded portion of the interview, Det. Lam's report indicates that Ms. Allums described the suspect who assaulted and shot her "as wearing black jacket and black jeans/approximately 5'5", 160-170lbns, and having dreadlocks sticking up" approached her and struck her with a gun.[231] If this information was available to the officers, the similarities between Mr. White and this description would tend to support reasonable suspicion. In my opinion, however, it would not establish probable cause.

For the reasons laid out above, no reasonable officer could conclude that the information available prior to Ms. Allums' interview established reasonable suspicion justifying an investigative detention. A reasonable officer could conclude that the information from Ms. Allums' interview established reasonable suspicion to detain, but not probable cause to arrest, Mr. White. Depending

---

[228] Cleveland Division of Police, 2015-108018, Detail, Original Narrative, Apr. 22, 2015.
[229] Lam Report, CLE 2783.
[230] Lam Report, CLE 2783.
[231] Lam Report, CLE 2784.

– 36 –

on the nature of the interaction between Mr. White and officers on April 24, 2019, it is possible that Mr. White was that Mr. White was inappropriately and unlawfully detained or arrested on that date.

3. **Based on the information available as of April 28, 2015, no reasonable officer would have thought that there was probable cause to suspect that Dalonte White had committed the crimes in Ms. Allums' residence**

Officers are taught that arrests, both with and without a warrant, and search warrants require probable cause. The standard that officers learn for probable cause is laid out above.[232]

On April 28, 2015, Det. Lam obtained and executed an arrest warrant for Mr. White and a search warrant for Mr. White's residence. At that point, officers had available to them the information described in the preceding section.[233] As described and for the reasons laid out in the preceding Opinion, no reasonable officer would believe that this information established probable cause to believe that Mr. White assaulted and shot Ms. Allums.

Additionally, officers had the information obtained during the April 24, 2015, interaction with Mr. White; namely, Mr. White's current appearance and the fact that he did not have any injuries to his legs. While this information does not, in and of itself, exonerate Mr. White, the fact that the suspect might have had a leg injury (caused either by the dog attack or a self-inflicted gunshot) and that Mr. White did not have any visible injuries to his legs reduces the strength of any belief that he assaulted and shot Ms. Allums.

In short, as of April 28, 2015, no reasonable officer could conclude that the reliable information available establishes probable cause to believe that Mr. White had committed the crimes in Ms. Allums' residence.

It is worth noting that on July 24, 2015, during a bindover and probable cause hearing for Mr. White, Judge Denise N. Rini concluded that the evidence presented "did not [establish] probable cause that Dalone White was part of the home invasion."[234]

4. **The affidavits in support of the search and arrest warrants in this case were fatally flawed and did not establish probable cause**

In assessing whether the information included in an application for a search warrant establishes probable cause, courts have instructed that the facts in the warrant application must be assessed for reliability, falsity, and material omissions. The question is whether the information provided in the warrant and affidavit, less any unreliable or false information and including any material

---

[232] See Opinion 2, supra.
[233] See Opinion 2, supra.
[234] In the matter of Dalonte White 435:4-6, July 24, 2015, WHITE 801.

information which was omitted, is sufficient to establish probable cause.[235] The need to provide correct, accurate, and all material information in an affidavit supporting an arrest warrant is well known in policing. Det. Lam, for example, testified at some length about the need to include relevant exculpatory information.[236]

In this case, several of the warrants issued were predicated on information that was unreliable, false or misleading, or failed to include material information. As a result, those warrants were fatally flawed.

### A. A reasonable officer in Det. Lam's position could not have concluded that the affidavit in support of the search warrant for Mr. White's residence established probable cause

The affidavit submitted by Det. Lam on April 28, 2014, in support of a search warrant for Mr. White's residence contained unreliable and false information, as well as material omissions.

First, Det. Lam described in the warrant application that Ofc. Schade "advised . . . that the description of the shooter matched that of an individual identified as Dalonte White with whom Ofc. Schade was familiar through prior criminal activity."[237] There is a factual discrepancy in the record with regard to the accuracy of this information. In his report, Det. Lam indicated that Ofc. Schade stated that "there was an aggravated menacing complaint in the area" the prior weekend and that "the suspects from that incident [included] Dalonte White."[238] As a threshold matter, the underlying information is inaccurate. The report of that incident states explicitly that Mr. White was present, but "was not involved in the menacing and in fact attempted to" prevent it.[239] Additionally, Mr. White does not match the description of the shooter that officers had at the time Det. Lam spoke to Ofc. Schade (as discussed above). The evidentiary value of this information is limited to the extent that the information provided was incorrect, and could not reasonably be thought to be correct at the time, and to the extent that Det. Lam failed to clarify that Mr. White was not the suspect in the prior menacing complaint.

Second, Det. Lam described in the warrant application that Ms. Allums, her niece (Ms. LaForce), and her nephew (Mr. Hale) "all positively identified Dalonte White as the individual who shot Allums."[240] As described above, a reasonable officer at the time would have known that the photographic lineups were flawed and inappropriately suggestive.[241] The evidentiary value of this information is sharply limited by how unreliable the underlying identifications were.

---

[235] See Sykes v. Anderson, 625 F.3d 294, 305 (6th Cir. 2010).
[236] Lam Dep. 76:4-83:24, Sept. 18, 2019.
[237] CLE 2848.
[238] Lam Report, CLE 2790.
[239] Cleveland Division of Police, 2015-108018, Detail, Original Narrative, Apr. 22, 2015.
[240] CLE 2848.
[241] See Opinion 0.

Third, Det. Lam omitted any mention of the discrepancy between the original description of the suspect who assaulted and shot Ms. Allums (as 6'0"-6'1", 200-250lbs) and Mr. White (5'5", 135lbs). Cmdr. Connelly, testifying for the City of Cleveland, specifically acknowledged that search warrant application omitted this exculpatory information.[242]

Fourth, although discussing explicitly the victims' account that the suspect who assaulted and shot Ms. Allums had been attacked by a dog and was seen on video limping away from the scene, Det. Lam omitted any mention of the fact that officers had photographed Mr. White's legs on April 24, 2015, and that the photographs suggest no visible injuries. Although this information does not, in and of itself, exonerate Mr. White, the fact that the suspect might have had a leg injury (caused either by the dog attack or a self-inflicted gunshot) and that Mr. White did not have any visible injuries to his legs is material to assessing the strength of the evidence that Mr. White was the suspect.

Taking into consideration the foregoing, a reasonable officer in the position of relevant officers in this case—Det. Lam—could not have reasonably concluded that remainder of the information in the affidavit submitted in support of the search warrant established probable cause.

### B.  A reasonable officer in Sgt. Shoulders' position could not have concluded that the affidavit in support of the arrest warrant for Mr. White establish probable cause

The affidavit submitted by Sgt. Shoulders on April 28, 2014, in support of a search warrant for Mr. White's residence contained unreliable and false information, as well as material omissions. Specifically:

First, Sgt. Shoulders stated in the warrant application that Ofc. Schade "stated that there was a recent Aggravated Menacing complaint in the area . . . and that the Menacing complaint [*sic*] could be related to the home invasion. The suspects in the Menacing case were Dalonte White and Rayvion Edwards."[243] As a threshold matter, there is no information provided as to how the menacing complaint "could be related to the home invasion," nor any assertion that officers had any reason to believe that the incidents *were*, in fact, related. Further, as previously discussed, the identification of Mr. White as a suspect in the menacing case is simply untrue, a fact that would have been apparent to a reasonable officer at the time. The report of the menacing incident states explicitly that Mr. White was present, but "was not involved in the menacing and in fact attempted to" prevent it.[244]

Second, although discussing explicitly the victims' account that the suspects had been attacked

---

[242] Connelly Dep. 141:6-9, Dec. 17, 2019.
[243] CLE 2842.
[244] Cleveland Division of Police, 2015-108018, Detail, Original Narrative, Apr. 22, 2015.

by Ms. Allums dogs, as well as stating that security video obtained from a neighbor showed a suspect "limping" away from Ms. Allum's residence,[245] Sgt. Shoulders omitted any mention of the fact that officers had photographed Mr. White's legs on April 24, 2015, and that the photographs suggest no visible injuries. Although this information does not, in and of itself, exonerate Mr. White, the fact that the suspect might have had a leg injury (caused either by the dog attack or a self-inflicted gunshot) and that Mr. White did not have any visible injuries to his legs is material to assessing the strength of the evidence that Mr. White was the suspect.

Third, Sgt. Shoulders described in the warrant application that Ms. LaForce, Mr. Hale, and Ms. Allums all "positively identified Dalonte White as the shooter."[246] As described above, a reasonable officer at the time would have known that the photographic lineups were flawed and inappropriately suggestive.[247] The evidentiary value of this information is sharply limited by how unreliable the underlying identifications were.

Fourth, Sgt. Shoulders describes the suspect seen on the security camera footage ("a black male with dreadlocks wearing a dark colored Northface jacket, dark colored pants and white shoes"[248]), but omitted any description of Mr. White as well as the obvious and substantial discrepancies between the original description of the suspect who assaulted and shot Ms. Allums (as 6'0"-6'1", 200-250lbs) and Mr. White (5'5", 135lbs).

Taking into consideration the foregoing, a reasonable officer in the position of relevant officers in this case—Sgt. Shoulders—could not have reasonably concluded that remainder of the information in the affidavit submitted in support of the search warrant established probable cause.

## C. A reasonable officer in Det. Lam's position could not have concluded that the affidavit in support of the search warrant for Mr. White's DNA account established probable cause

The affidavit submitted by Det. Lam on May 12, 2014, in support of a search warrant for Mr. White's DNA contained unreliable information and omitted material information.

First, Det. Lam described in the warrant application that Ms. Allums, Ms. LaForce, and her Mr. Hale odemtofoed Mr. White "as the shooter" from photographic arrays.[249] As described above, a reasonable officer at the time would have known that the photographic lineups were flawed and inappropriately suggestive.[250] The evidentiary value of this information is sharply limited by how

---

[245] CLE 2842-43.
[246] CLE 2843.
[247] See Opinion 0.
[248] C:E 2843.
[249] CLE 2832.
[250] See Opinion 0.

unreliable the underlying identifications were.

Second, Det. Lam omitted any mention of the discrepancy between the original description of the suspect who assaulted and shot Ms. Allums (as 6'0"-6'1", 200-250lbs) and Mr. White (5'5", 135lbs). Cmdr. Connelly, testifying for the City of Cleveland, specifically acknowledged that this information was information was exculpatory.[251]

Third, although discussing explicitly the that the suspect who assaulted and shot Ms. Allums had been attacked by a dog,[252] Det. Lam omitted any mention of the fact that officers had photographed Mr. White's legs on April 24, 2015, and that the photographs suggest no visible injuries. Although this information does not, in and of itself, exonerate Mr. White, the fact that the suspect might have had a leg injury (caused either by the dog attack or a self-inflicted gunshot) and that Mr. White did not have any visible injuries to his legs is material to assessing the strength of the evidence that Mr. White was the suspect.

Taking into consideration the foregoing, the information on the affidavit is limited to the fact that Mr. White was a member of the "HMF Gang" who did not match the initial description of the suspect, and who was uninjured while the suspect was potentially, but not certainly, injured. A reasonable officer in the position of relevant officers in this case—Det. Lam—could not have reasonably concluded that remainder of the information in the affidavit submitted in support of the search warrant established probable cause.

> **D.  A reasonable officer in Det. Lam's position could not have concluded that the affidavit in support of the search warrant for Mr. White's Facebook account established probable cause**

The affidavit submitted by Det. Lam on June 12, 2014, in support of a search warrant for Mr. White's residence contained unreliable and false information, as well as material omissions. Specifically:

First, Det. Lam described in the warrant application that Ofc. Schade "advised . . . that the description of the shooter matched that of an individual identified as Dalonte White with whom Ofc. Schade was familiar through prior criminal activity."[253] There is a factual discrepancy in the record with regard to the accuracy of this information. In his report, Det. Lam indicated that Ofc. Schade stated that "there was an aggravated menacing complaint in the area" the prior weekend and that "the suspects from that incident [included] Dalonte White."[254] As a threshold matter, the underlying information is inaccurate. The report of that incident states explicitly that Mr. White

---

[251] Connelly Dep. 141:6-9, Dec. 17, 2019.
[252] CLE 2832.
[253] CLE 2856.
[254] Lam Report, CLE 2790.

was present, but "was not involved in the menacing and in fact attempted to" prevent it.[255] Additionally, Mr. White does not match the description of the shooter that officers had at the time Det. Lam spoke to Ofc. Schade (as discussed above). The evidentiary value of this information is limited to the extent that the information provided was incorrect, and could not reasonably be thought to be correct at the time, and to the extent that Det. Lam failed to clarify that Mr. White was not the suspect in the prior menacing complaint.

Second, Det. Lam described in the warrant application that Ms. Allums, her niece (Ms. LaForce), and her nephew (Mr. Hale) "all positively identified Dalonte White as the individual who shot Allums."[256] As described above, a reasonable officer at the time would have known that the photographic lineups were flawed and inappropriately suggestive.[257] The evidentiary value of this information is sharply limited by how unreliable the underlying identifications were.

Third, Det. Lam omitted any mention of the discrepancy between the original description of the suspect who assaulted and shot Ms. Allums (as 6'0"-6'1", 200-250lbs) and Mr. White (5'5", 135lbs). Cmdr. Connelly, testifying for the City of Cleveland, specifically acknowledged that this information was information was exculpatory.[258]

Fourth, although discussing explicitly the victims' account that the suspect who assaulted and shot Ms. Allums had been attacked by a dog and was seen on video limping away from the scene, Det. Lam omitted any mention of the fact that officers had photographed Mr. White's legs on April 24, 2015, and that the photographs suggest no visible injuries. Although this information does not, in and of itself, exonerate Mr. White, the fact that the suspect might have had a leg injury (caused either by the dog attack or a self-inflicted gunshot) and that Mr. White did not have any visible injuries to his legs is material to assessing the strength of the evidence that Mr. White was the suspect.

Fifth, Det. Lam omitted any mention that, in a photographic lineup administered on May 13, 2015, Mr. Hale positively identified someone other than Mr. White as the shooter. This information was properly documented and available to him at the time. Although this information does not, in and of itself, exonerate Mr. White, the fact that an eyewitness identified someone other than Mr. White is material to assessing the strength of the evidence that Mr. White was the suspect.

Sixth, Det. Lam omitted any mention that, in photographic arrays administered on May 13, 2015, Ms. Allums and Ms. LaForce indicated that they recognized someone other than Mr. White as the shooter. Both Ms. Allums and Ms. LaForce testified that they indicated their identification of someone—Mr. Bunch, although they did not know that at the time—to the officers who were

---

[255] Cleveland Division of Police, 2015-108018, Detail, Original Narrative, Apr. 22, 2015.
[256] CLE 2856.
[257] See Opinion 0.
[258] Connelly Dep. 141:6-9, Dec. 17, 2019.

administering their lineups.[259] The officers who administered those lineups—Det. Kubas and Det. Santiago, respectively—testified that they have no memory of administering the lineups, including whether any identifications were made.[260] Det. Lam indicated that he was not aware that either Ms. Allums or Mr. LaForce had identified someone other than Mr. White as the shooter; under the collective knowledge doctrine. Officers are, however, generally familiar with the collective knowledge doctrine which permits the collective knowledge of multiple officers working together to be considered together for purposes of probable cause determinations.[261]

Taking into consideration the foregoing, a reasonable officer in the position of relevant officers in this case—Det. Lam—could not have reasonably concluded that remainder of the information in the affidavit submitted in support of the search warrant established probable cause.

## 5. There are inconsistencies, errors, and omissions in the documentation of the investigation into Mr. White

Police investigations are intended to obtain and document facts that may be used by, *inter alia,* prosecutors, defense attorneys, judges, and juries to determine whether specific individuals committed particular crimes. For that reason, one of an investigator's most important roles is to produce accurate records of events and information that they obtain, including from other individuals. Failing to record relevant information can preclude an investigation from coming to an accurate or timely conclusion.

### A. Failing to document a witness's identification on a photographic lineup is egregious, unreasonable, and contrary to generally accepted principles in policing

The need to properly document investigative actions and information gathered extends to a witness's identification of someone in a photographic lineup. It is generally accepted in policing that an administrator must record the witness's identification and their level of confidence (typically in percentage terms) in their identification. Indeed, both Ohio law and the Cleveland Police Department's Detective Unit Manual require documenting witness identifications. Per state statute, the "administrator conducting the lineup shall make a written record that includes . . . [a]ll identification . . . results obtained during the lineup, signed by the eyewitnesses, including the eyewitnesses' confidence statements made immediately at the time of the identification."[262] According to the Cleveland Division of Police Detective Unit Manual, "If the victim or witness identifies the suspect in the array/digital lineup, indicate the number of the photo picked . . . . Detectives shall have the victim/witness initial and date next to the number of the suspect's photo

---

[259] In the matter of Dalonte White 100:6-24, 134:18-135:3, July 16, 2015, WHITE 500-501/
[260] Kubas Dep. 93:20-94:8, 101:6-7, 104:8-16, July 11, 2019; Santiago Dep. 12:6-13, 87:16, July 10, 2019.
[261] See United States v. Woods, 544 F.2d 2420259-60 (6th Cir. 1976).
[262] Ohio Rev. Code § 2933.83(B)(4)(a).

that is identified."[263] This requirement appears to have been understood by some of the detectives relevant to this case. As Sgt. Shoulders testified in his deposition, for example, when a witness identified someone in a lineup, the lineup administrator was supposed to record the identification itself and the witness's level of certainty in the identification.[264]

As it currently exists, the record in this case indicates that Ms. Allums' identified Mr. Bunch during the May 13, 2015, lineup. Specifically, Ms. Allums testified that she informed the officer administering the lineup (Det. Kubas) that the individual in the "second picture in the first row" with identifier 85-01-8 was the person she identified in the previous lineup as the shooter.[265] According to the photographic array and key, Ms. Allems was referring to the picture of Mr. Bunch.[266] Det. Kubas testified that he has no memory of administering this lineup,[267] including whether or not Ms. Allums identified anyone in the lineup,[268] and so did not refute this assertion.

Similarly, as it currently exists, the record in this case indicates that Ms. LaForce identified Mr. Bunch during the May 13, 2015, lineup. Specifically, Ms. LaForce testified that one of the people in the photographic arrays—the subject in the middle of the bottom row, identified with number 85-04-8—looked like Suspect 1, the individual with the firearm.[269] According to the photographic array and key, Ms. LaForce was referring to the picture of Mr. Bunch.[270] Det. Santiago testified in his deposition that he had no memory of administering the photographic array to Ms. LaForce and did not remember whether she said made any identifications,[271] and so did not refute this assertion.

### B.  The April 24, 2015, interaction with Mr. White was not properly documented

As described above,[272] officers interacted with and may have detained or arrested Mr. White on April 24, 2015. This information was not documented in Det. Lam's investigative report. When questioned about how his interaction with Mr. White on April 24, 2015, was documented, Sgt. Shoulders testified, "[O]bviously there would have been a note or indication in the report that it was -- to some extent that it would have been done."[273] Cmdr. Connelly, testifying for the City of Cleveland, stated that he did not know who took the pictures because, although that information

---

[263] Detective Unit Manual, at 13 (rev. Jan 1, 2013).
[264] Shoulders Dep. 88:7-20, Sept. 30, 2019.
[265] In the matter of Dalonte White 134:18-135:3, July 16, 2015, WHITE 500-501.
[266] See Appendix 2, Items 3and 4.
[267] Kubas Dep. 93:20-94:8, 101:6-7, July 11, 2019.
[268] Kubas Dep. 104:8-16, July 11, 2019.
[269] In the matter of Dalonte White 100:6-24, July 16, 2015, WHITE 466.
[270] See Appendix B, Items 1 and 2.
[271] Santiago Dep. 12:6-13, 87:16, July 10, 2019.
[272] See Opinion 2.
[273] Shoulders Dep. 287:4-8, Sept. 30, 2019,

should have been documented, it was not.[274]

In short, there was a substantial failure to properly document relevant and material investigative activity.

### C.  Det. Lam's investigative report does not accurately reflect the documentation from a prior menacing incident

Det. Lam's report states, in relevant part, that Ofc. Schade "stated during the past weekend there was an aggravated menacing complaint in the area . . . . [T]he suspects from that incident [included] Dalonte White."[275]

This is incorrect, as a cursory review of the report for that incident would have established. That report states explicitly that Mr. White was present, but "was not involved in the menacing and in fact attempted to" prevent it.[276]

### 6.  Several basic investigative steps were overlooked or ignored

It is important for officers to fully, thoroughly, and timely investigate leads so that, through the investigative process, they are include or eliminate potential suspects. In this case, there were several pertinent failures.

First, Det. Lam became aware of information indicating that Mr. Bunch was a person of interest on May 1, 2015. On that date, Det. Lam learned that officers had arrested Mr. Bunch on April 30, 2015, in an unrelated matter and, at that time, discovered that he had been shot in the right ankle on April 21, 2015 – the date of the home invasion at Ms. Allums' residence. Police records indicated that Mr. Bunch had been treated for a gunshot wound on April 21 at about 6:57pm.[277] One of the officers who arrested Mr. Bunch on April 30 told Det. Lam that Mr. Bunch originally told them that "he had shot himself on accident."[278] However, according to Det. Lam's report, when an officer interviewed Mr. Bunch at the hospital on April 21, 2015, after responding to a call about a gunshot wound, Mr. Bunch had said he was "riding a bicycle in the area of West Blvd and Lorain Ave when he suffered a gunshould [*sic*] wound. [He] was unwilling to provide any additional details to the responding officer" at the time.[279] The initial report for that interaction

---

[274] Connelly Dep. 279:1-5, Dec. 17, 2019.
[275] Lam Report, CLE 2790.
[276] Cleveland Division of Police, 2015-108018, Detail, Original Narrative, Apr. 22, 2015.
[277] Lam Report, CLE 2787.
[278] Lam Report, CLE 2787.
[279] Lam Report, CLE 2787.  Mr. Bunch later testified that he was riding his bike from his brother's house to his aunt's house with a friend on his handlebars when he was hit by one of about five shots fired by a someone sticking a gun out the passenger side window of a passing car.  Mr. Bunch testified that after he was shot, his friend took the bike and left, then a stranger drove him to the hospital.  In the matter of Dalonte White 219:6-24, 220:23-221:1, July 21, 2015, WHITE 585, 587.

included a dispatch narrative that described Mr. Bunch as "very uncooperative."[280] There were no 911 calls relating to a shooting in the area, date, and time where Mr. Bunch said he was shot, which Det. Lam later testified would have been unusual given the typical activity in the area.[281] Additionally, Mr. Bunch was known to the Cleveland Division of Police to have been involved in a home invasion robbery with a similar *modus operandi* to the incident at Ms. Allums' residence.

It would have been relatively straightforward for an investigator to obtain security camera footage from the hospital where Mr. Bunch was treated for the gunshot wound, which could have provided valuable information about whether, on that date and time, he matched the description of the suspect who assaulted and shot Ms. Allums. Det. Lam did not make such a request until July 29, 2015, by which time it was unavailable.[282] According to Det. Lam's report, the hospital only retains video for 45 days,[283] so the video from April 21, 2015, would have been available until about June 5, 2015.

Additionally, it would have been relatively straightforward to examine Mr. Bunch's medical records to determine whether they would have allowed an assessment of the angle of entry or caliber of weapon used. This information could have helped determine the likelihood that the gunshot to Mr. Bunch's ankle was self-inflicted, which would have been consistent with the hypothesis that he was Ms. Allums' assailant and had shot himself when her dogs attacked. As of July 25, 2015, Det. Lam had not reviewed Mr. Bunch's medical records relating to the gunshot.[284]

Second, officers observed and collected blood on Ms. Allums' front porch, but did not have it tested to determine whether it was hers or, as seemed plausible given the video of the suspect limping away from Ms. Allums' residence, whether it came from the suspect (regardless of whether the suspect's injury was caused by a dog bite or a self-inflicted gunshot wound. Det. Lam testified to the effect that his working theory was that Ms. Allums was the source of this blood, but a relatively easy investigative action—having the blood tested—could have confirmed that theory or provided valuable evidence.

Third, it is unusual that officers did not record the portion of the interviews with Ms. Allums and Ms. LaForce in which the victims described the suspects.  If they did not

Additionally, it is worth noting that that Ms. Allums told the police at some point about another potential suspect—Christian Hughes—who could have had a motive to retaliate against her.[285] Ms. Allums did not know whether the officers ever investigated Mr. Hughes, and there is no

---

[280] Offense/Incident Report, Case Number 2015-00110336, WHITE 3059.
[281] In the matter of Dalonte White 373:6-374:9, July 24, 2015, WHITE 739-40.
[282] Lam Report, CLE 2798.
[283] Lam Report, CLE 2798.
[284] In the matter of Dalonte White 355:4-5, July 24, 2015, WHITE 721.
[285] In the matter of Dalonte White, July 16, 2015, Transcript 148:15-18, WHITE 514.

indication of such in Det. Lam's report.

### 7. A reasonable officer could have concluded the information obtained over the source of the investigation established probable cause to believe that Edward Bunch committed the crimes at Ms. Allums residence

During the course of this investigation, officers became aware of numerous pieces of information that, *in toto*, a reasonable officer could conclude satisfied the standard for probable cause (described above[286]) to believe that Mr. Bunch committed the home invasion at Ms. Allums' residence.

First, the suspect who assaulted and shot Ms. Allums was originally described as an 18- to 20-year-old black male, 6' to 6'1", 200-250lbs.[287]  According to the information on the photographic lineup keys, Mr. Bunch he was a 19-year-old black male who stood 6' and weighed 213 lbs, matching every aspect of the initial description.

Second, the suspect was seen was described by the victims as having been attacked by a dog and then having shot "all over the living room trying to hit the dogs."[288] The suspect was seen on security camera footage limping away from Ms. Allums' residence.  As several officers later testified, the evidence suggested that the suspect could have, but did not necessarily, suffer a leg injury (either a dog bite or a self-inflicted gunshot).  During the investigation, Det. Lam learned that Mr. Bunch had been shot in the right ankle on April 21, and was treated at a nearby hospital—although apparently not the closest possible hospital.[289]  The initial field report indicates that the home invasion at Ms. Allums' residence was dispatched at 6:06pm and occurred from 6:00pm until 6:05pm.  Officers were dispatched to the hospital to respond to the reported gunshot wound (to Mr. Bunch's ankle) at 6:57pm.

Third, Mr. Bunch gave conflicting and inconsistent descriptions of how he came to suffer a gunshot wound.  One of the officers who arrested Mr. Bunch on April 30 told Det. Lam that Mr. Bunch originally told them that "he had shot himself on accident."[290] However, according to Det. Lam's report, when an officer interviewed Mr. Bunch at the hospital on April 21, 2015, after responding to a call about a gunshot wound, Mr. Bunch had said he was "riding a bicycle in the area of West Blvd and Lorain Ave when he suffered a gunshould [*sic*] wound. [He] was unwilling to provide any additional details to the responding officer" at the time.[291] There were no 911 calls relating to a shooting in the area, date, and time where Mr. Bunch said he was shot, which apparently would have been unusual given the typical activity in the area.[292]  Mr. Bunch also gave

---

[286] See Opinion 2, *supra*.
[287] Daugneti Report, CLE 2692.
[288] Daugenti Report, CLE 2699.
[289] Lam Report, CLE 2787.
[290] Lam Report, CLE 2787.
[291] Lam Report, CLE 2787.  Mr. Bunch later testified that he was riding his bike from his brother's house to his aunt's house with a friend on his handlebars when he was hit by one of about five shots fired by a someone sticking a gun out the passenger side window of a passing car.  Mr. Bunch testified that after he was shot, his friend took the bike and left, then a stranger drove him to the hospital.  In the matter of Dalonte White 219:6-24, 220:23-221:1, July 21, 2015, WHITE 585, 587.
[292] In the matter of Dalonte White 373:6-374:9, July 24, 2015, WHITE 739-40.

conflicting descriptions of his location at the time he was shot.  Additionally, the initial report for that interaction included a dispatch narrative that described Mr. Bunch as "very uncooperative."[293]

Fourth, the record indicates that, when administered a photographic lineup featuring Mr. Bunch, all three victims expressed to the administering officer that they recognizing Mr. Bunch as the suspect who assaulted and shot Ms. Allums, as described above.[294]  Mr. Hale identified Mr. Bunch with 90% certainty, while the lineup administrators did not document Ms. Allums' or Ms. LaForce's identifications.

Fifth, Mr. Bunch appears to have been involved in a home invasion conducted in a manner similar to the one at Mr. Allums' residence.  Specifically, three suspects entered the victim's home, the victim's cellphone was taken, and the suspect wielding a firearm struck the victim with it.  Cmdr. Connelly, testifying for the City of Cleveland, stated that the *modus operandi* of the incident at Ms. Allums' residence was similar to a prior incident that Mr. Bunch had committed.[295]

Given the foregoing information, a reasonable officer could have concluded that there was probable cause to believe that Mr. Bunch committed the home invasion at Ms. Allums' residence.

This space intentionally left blank.

---

[293] Offense/Incident Report, Case Number 2015-00110336, WHITE 3059.
[294] See Opinion 5.A, supra.
[295] Connelly Dep. 213:7-216:3, Dec. 17, 2019.

**Appendix A: Photographic Arrays of Mr. White**

1.  **White Array Administered to Ms. LaForce, 4/23/15**
    WHITE 3376



2. **White Array Key for Ms. LaForce, 4/23/15**
   WHITE 3377



# Photo Lineup Key

| | | |
|---|---|---|
| **Lineup ID:** 59-00-5 | | **Lineup ID:** 57-01-5 |
| **Source ID:** 818790895 | | **Source ID:** 818790175 |
| **Name:** E▮ M▮ | | **Name:** WHITE, DALONTE |
| **Date of Birth:** ▮1999 | | **Date of Birth:** 5/10/1998 |
| **Height:** 5'6" | | **Height:** 5'5" |
| **Weight:** 130 | | **Weight:** 135 |
| **EyeColor:** Brown | | **EyeColor:** Brown |
| **HairColor:** Black | | **HairColor:** Black |
| **Race:** | | **Race:** |
| **Lineup ID:** 99-02-9 | | **Lineup ID:** 60-03-6 |
| **Source ID:** 818790999 | | **Source ID:** 818790806 |
| **Name:** G▮ D▮ | | **Name:** K▮ B▮ |
| **Date of Birth:** ▮1997 | | **Date of Birth:** ▮1998 |
| **Height:** 5'5" | | **Height:** 5'4" |
| **Weight:** 140 | | **Weight:** 135 |
| **EyeColor:** Brown | | **EyeColor:** Brown |
| **HairColor:** Black | | **HairColor:** Black |
| **Race:** | | **Race:** |
| **Lineup ID:** 70-04-7 | | **Lineup ID:** 39-05-3 |
| **Source ID:** 818802107 | | **Source ID:** 818790993 |
| **Name:** B▮ D▮ | | **Name:** C▮ L▮ |
| **Date of Birth:** ▮1996 | | **Date of Birth:** ▮1996 |
| **Height:** 5'6" | | **Height:** 5'4" |
| **Weight:** 140 | | **Weight:** 132 |
| **EyeColor:** Brown | | **EyeColor:** Brown |
| **HairColor:** Black | | **HairColor:** Black |
| **Race:** | | **Race:** |

3. **White Array Administered to Mr. Hale, 4/23/15**
   WHITE 3391



**4.  White Array Key for Mr. Hale, 4/23/15**
    WHITE 3392



# Photo Lineup Key

| | |
|---|---|
| **Lineup ID:** 99-00-9 | **Lineup ID:** 59-01-5 |
| **Source ID:** 818790999 | **Source ID:** 818790895 |
| **Name:** G▮ D▮ | **Name:** E▮ M▮ |
| **Date of Birth:** ▮1997 | **Date of Birth:** ▮1999 |
| **Height:** 5'5" | **Height:** 5'6" |
| **Weight:** 140 | **Weight:** 130 |
| **EyeColor:** Brown | **EyeColor:** Brown |
| **HairColor:** Black | **HairColor:** Black |
| **Race:** | **Race:** |
| **Lineup ID:** 57-02-5 | **Lineup ID:** 60-03-6 |
| **Source ID:** 818790175 | **Source ID:** 818790806 |
| **Name:** WHITE, DALONTE | **Name:** K▮ B▮ |
| **Date of Birth:** ▮1998 | **Date of Birth:** ▮1998 |
| **Height:** 5'5" | **Height:** 5'4" |
| **Weight:** 135 | **Weight:** 135 |
| **EyeColor:** Brown | **EyeColor:** Brown |
| **HairColor:** Black | **HairColor:** Black |
| **Race:** | **Race:** |
| **Lineup ID:** 70-04-7 | **Lineup ID:** 39-05-3 |
| **Source ID:** 818802107 | **Source ID:** 818790993 |
| **Name:** B▮ D▮ | **Name:** C▮ L▮ |
| **Date of Birth:** ▮1996 | **Date of Birth:** ▮996 |
| **Height:** 5'6" | **Height:** 5'4" |
| **Weight:** 140 | **Weight:** 132 |
| **EyeColor:** Brown | **EyeColor:** Brown |
| **HairColor:** Black | **HairColor:** Black |
| **Race:** | **Race:** |

**5. White Array Administered to Ms. Allums, 4/24/15**
WHITE 3406



**6. White Array Key for Ms. Allums, 4/23/15**
WHITE 3407



# Photo Lineup Key

| | |
|---|---|
| **Lineup ID:** 57-00-5 | **Lineup ID:** 99-01-9 |
| **Source ID:** 818790175 | **Source ID:** 818790999 |
| **Name:** WHITE, DALONTE | **Name:** G██ D██ |
| **Date of Birth:** 5/10/1998 | **Date of Birth:** ██1997 |
| **Height:** 5'5" | **Height:** 5'5" |
| **Weight:** 135 | **Weight:** 140 |
| **EyeColor:** Brown | **EyeColor:** Brown |
| **HairColor:** Black | **HairColor:** Black |
| **Race:** | **Race:** |

| | |
|---|---|
| **Lineup ID:** 59-02-5 | **Lineup ID:** 70-03-7 |
| **Source ID:** 818790895 | **Source ID:** 818802107 |
| **Name:** E██ M██ | **Name:** B██ D██ |
| **Date of Birth:** ██1999 | **Date of Birth:** ██1996 |
| **Height:** 5'6" | **Height:** 5'6" |
| **Weight:** 130 | **Weight:** 140 |
| **EyeColor:** Brown | **EyeColor:** Brown |
| **HairColor:** Black | **HairColor:** Black |
| **Race:** | **Race:** |

| | |
|---|---|
| **Lineup ID:** 60-04-6 | **Lineup ID:** 39-05-3 |
| **Source ID:** 818790806 | **Source ID:** 818790993 |
| **Name:** K██ B██ | **Name:** C██ L██ |
| **Date of Birth:** ██1998 | **Date of Birth:** ██1996 |
| **Height:** 5'4" | **Height:** 5'4" |
| **Weight:** 135 | **Weight:** 132 |
| **EyeColor:** Brown | **EyeColor:** Brown |
| **HairColor:** Black | **HairColor:** Black |
| **Race:** | **Race:** |

**Appendix B: Photographic Arrays of Mr. Bunch**

1. **Bunch Array Administered to Ms. LaForce, 5/13/15**
   WHITE 3385



**2.  Bunch Array Key for Ms. LaForce, 5/13/15**
WHITE 3386



# Photo Lineup Key

| | |
|---|---|
| **Lineup ID:** 47-00-4 | **Lineup ID:** 25-01-2 |
| **Source ID:** 824692874 | **Source ID:** 824692852 |
| **Name:** P██ M█ | **Name:** B█ J█ |
| **Date of Birth:** ██1995 | **Date of Birth:** ██1994 |
| **Height:** 6'2" | **Height:** 5'10" |
| **Weight:** 220 | **Weight:** 217 |
| **EyeColor:** Brown | **EyeColor:** Brown |
| **HairColor:** Black | **HairColor:** Black |
| **Race:** | **Race:** |
| **Lineup ID:** 78-02-7 | **Lineup ID:** 06-03-0 |
| **Source ID:** 824692987 | **Source ID:** 824692860 |
| **Name:** P█ J█ | **Name:** S█ A█ |
| **Date of Birth:** ██1993 | **Date of Birth:** ██1994 |
| **Height:** 6'1" | **Height:** 5'10" |
| **Weight:** 200 | **Weight:** 219 |
| **EyeColor:** Brown | **EyeColor:** Brown |
| **HairColor:** Black | **HairColor:** Black |
| **Race:** | **Race:** |
| **Lineup ID:** 85-04-8 | **Lineup ID:** 10-05-1 |
| **Source ID:** 824692358 | **Source ID:** 824692801 |
| **Name:** B█ E█ | **Name:** H█ K█ |
| **Date of Birth:** ██1995 | **Date of Birth:** ██1996 |
| **Height:** 6'0" | **Height:** 5'11" |
| **Weight:** 213 | **Weight:** 200 |
| **EyeColor:** Brown | **EyeColor:** Brown |
| **HairColor:** Black | **HairColor:** Black |
| **Race:** | **Race:** |

3. **Bunch Array Administered to Ms. Allums, 5/13/15**
   WHITE 3415



**4.  Bunch Array Key for Ms. Allums, 5/13/15**
   WHITE 3416



# Photo Lineup Key

| | |
|---|---|
| **Lineup ID:** 06-00-0 | **Lineup ID:** 85-01-8 |
| **Source ID:** 824692860 | **Source ID:** 824692358 |
| **Name:** S. ▓ A ▓ | **Name:** B ▓ E ▓ |
| **Date of Birth:** ▓1994 | **Date of Birth:** ▓1995 |
| **Height:** 5'10" | **Height:** 6'0" |
| **Weight:** 219 | **Weight:** 213 |
| **EyeColor:** Brown | **EyeColor:** Brown |
| **HairColor:** Black | **HairColor:** Black |
| **Race:** | **Race:** |
| **Lineup ID:** 25-02-2 | **Lineup ID:** 78-03-7 |
| **Source ID:** 824692852 | **Source ID:** 824692987 |
| **Name:** B ▓ J ▓ | **Name:** P ▓ J ▓ |
| **Date of Birth:** ▓1994 | **Date of Birth:** ▓993 |
| **Height:** 5'10" | **Height:** 6'1" |
| **Weight:** 217 | **Weight:** 200 |
| **EyeColor:** Brown | **EyeColor:** Brown |
| **HairColor:** Black | **HairColor:** Black |
| **Race:** | **Race:** |
| **Lineup ID:** 47-04-4 | **Lineup ID:** 10-05-1 |
| **Source ID:** 824692874 | **Source ID:** 824692801 |
| **Name:** P ▓ M ▓ | **Name:** H ▓ K ▓ |
| **Date of Birth:** ▓1995 | **Date of Birth:** ▓1996 |
| **Height:** 6'2" | **Height:** 5'11" |
| **Weight:** 220 | **Weight:** 200 |
| **EyeColor:** Brown | **EyeColor:** Brown |
| **HairColor:** Black | **HairColor:** Black |
| **Race:** | **Race:** |

1. **Bunch Array Administered to Mr. Hale, 5/13/15**
   WHITE 3400



2. **Bunch Array Key for Lineup Administer to Mr. Hale, 5/13/15**
   WHITE 3401



# Photo Lineup Key

| | |
|---|---|
| **Lineup ID:** 78-00-7 | **Lineup ID:** 06-01-0 |
| **Source ID:** 824692987 | **Source ID:** 824692860 |
| **Name:** P J. | **Name:** S A |
| **Date of Birth:** 1993 | **Date of Birth:** 1994 |
| **Height:** 6'1" | **Height:** 5'10" |
| **Weight:** 200 | **Weight:** 219 |
| **EyeColor:** Brown | **EyeColor:** Brown |
| **HairColor:** Black | **HairColor:** Black |
| **Race:** | **Race:** |
| **Lineup ID:** 85-02-8 | **Lineup ID:** 47-03-4 |
| **Source ID:** 824692358 | **Source ID:** 824692874 |
| **Name:** B E | **Name:** P M |
| **Date of Birth:** 995 | **Date of Birth:** 1995 |
| **Height:** 6'0" | **Height:** 6'2" |
| **Weight:** 213 | **Weight:** 220 |
| **EyeColor:** Brown | **EyeColor:** Brown |
| **HairColor:** Black | **HairColor:** Black |
| **Race:** | **Race:** |
| **Lineup ID:** 25-04-2 | **Lineup ID:** 10-05-1 |
| **Source ID:** 824692852 | **Source ID:** 824692801 |
| **Name:** B J | **Name:** H K |
| **Date of Birth:** 1994 | **Date of Birth:** 1996 |
| **Height:** 5'10" | **Height:** 5'11" |
| **Weight:** 217 | **Weight:** 200 |
| **EyeColor:** Brown | **EyeColor:** Brown |
| **HairColor:** Black | **HairColor:** Black |
| **Race:** | **Race:** |

**Submission**

The preceding constitutes my expert report regarding the actions of employees of the Cleveland Division of Police with regard to Dalonte White on and after April 21, 2015. This report is based on the materials reviewed to date. Should any additional information cause me to expand, add, or revise any of my opinions, I reserve the right to revise, amend, or supplement this report accordingly.

Please note that this report includes citations to and discussion of documents and information that are subject to a protective order (*White v. City of Cleveland, et al.*, 1:17:CV-1165, Stipulated Protective Order, Apr. 16, 2019). As such, this report may not be suitable for public release without appropriate redaction.

Respectfully Submitted,

Seth Stoughton
June 13, 2020

**Declaration**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____          Executed on June 13, 2020.