

Margaret Bull Kovera, Ph.D.
Presidential Scholar and Professor
Department of Psychology

524 W. 59Th Street
10th Floor
New York, NY 10019
T. 212.484.1112
F. 212-237-8930
mkovera@jjay.cuny.edu

Report on Eyewitness Identification Issues Identified in
*Dalonte White v. City of Cleveland et al.*
Prepared for The Chandra Law Firm, LLC.
January 19, 2020

**Purpose of the Report**

I was asked by Ms. Sandyha Gupta, Esq. and Mr. Brian Bardwell, Esq. to review relevant case materials and prepare a report on the psychological research on eyewitness identification that is relevant to understanding whether the police followed best practices in eliciting identifications of Dalonte White in their investigation of the armed robbery of Colleen Allums and the likely reliability of the eyewitness identifications of him.

**Credentials**

I have a B.A. in Psychology (with departmental honors) from Northwestern University and a Ph.D. in Social Psychology from the University of Minnesota.  I have been on the faculties of Reed College and Florida International University (FIU).  Currently, I am a Presidential Scholar and full Professor of Psychology at John Jay College of the City University of New York (CUNY), with appointments in the Psychology and Law, Basic and Applied Social Psychology, and Criminal Justice Ph.D. programs at the CUNY Graduate Center.  I have served as the Director of the Psychology and Law Ph.D. programs at both FIU and at CUNY. I have published over 80 papers (articles and chapters) and several books in the area of eyewitness identification and legal decision making.  The National Science Foundation has funded much of this research, with over $2 million in grant funding received to date.  I am a Fellow of the American Psychological Association, the Association for Psychological Science, the American Psychology-Law Society (APLS), the Society for Experimental Social Psychology, the Society for Personality and Social Psychology, and the Society for the Psychological Study of Social Issues.  I have received awards from APLS, recognizing me for my outstanding research and teaching.

I am a past-president of the American Psychology-Law Society, an interdisciplinary organization of psychologists and lawyers whose members are devoted to scholarship, practice, and public service in psychology and law.  I also served seven years as the Editor-in-Chief (and an additional seven years as Associate Editor) of the journal *Law and Human Behavior*, which is a peer-reviewed publication and the premier outlet for eyewitness

**EXHIBIT 4**



WHITE025618

identification research.  As Editor, I was responsible for guiding the peer review process for the most influential journal in psychology and law, determining which papers meet our very high standards for scientific rigor and which do not. I keep current on the research being done in the area by conducting my own research (which includes reading others' papers on the topic), serving as an editor and reviewer of many eyewitness papers, attending conference presentations on the topic, and by teaching at the undergraduate and graduate levels on eyewitness issues.  I have been qualified as an expert on a variety of social science and law issues (mostly eyewitness issues) in federal and state venues, including Connecticut, Florida, Illinois, Indiana, Iowa, Maryland, New York, South Carolina, Texas, the District of Columbia, the Eastern District of New York, the District of Massachusetts, and the Canadian province of Ontario.

I am also a co-author on the paper "Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence", recently published in the journal *Law and Human Behavior.* This paper was commissioned by the Executive Committee of the American Psychology-Law Society to provide a review of the scientific evidence examining the reliability of different procedures to elicit eyewitness identification evidence and come to conclusions about evidence-based recommendations for best practices. The Executive Committee selected six internationally-recognized eyewitness scholars to conduct this review, of which I was one.  The paper has undergone multiple rounds of public presentation and comment, two separate peer review processes, and final acceptance by the Executive Committee of APLS before it was accepted for publication at *Law and Human Behavior*. Thus, it represents generally accepted beliefs about best practices in eliciting eyewitness identification evidence.

## Materials Reviewed

This report is based on information learned from police reports, photo array documents, and depositions provided to me by the defense.

## Case Synopsis

On 4/21/15, Colleen Allums was inside her home with her daughter, Savannah LaForce, when her nephew Zachary Hale entered through the front door with two Black and one Hispanic men behind him. One of the Black men, who was wearing a black jacket and was described as 5'5", 160-170 lbs, and having dreadlocks sticking up, approached her, struck her head with a gun and demanded her money.  The man continued to strike her in the head while she reached for her gun.  Zachary and Savanna ran from the house when the shooting started. Ms. Allums reported losing consciousness and when she awoke, she discovered that her gun and her cell phone were missing, her dog had been shot, and the culprits had left.  Surveillance video was collected from a neighbor's house.  The video showed a Black man with dreadlocks wearing a dark North Face jacket, dark pants, and white shows limping and concealing a weapon in his waistband.

WHITE025619

On 4/23/15, blind administrators showed 3 photo arrays to 2 witnesses. One of those photo arrays contained a photo of Dalonte White with 5 fillers with hair styles that were inconsistent with the Allums's report and evidence from the surveillance video that the suspect had dreadlocks. Only Mr. White could be reasonably construed as having a hairstyle that could be described as dreadlocks that were sticking up. Savannah LaForce positively identified Mr. White as the shooter with 100% certainty, but was unable to identify any one else in the other lineups. Zachary Hale also identified Mr. White but with only 70% certainty. On 4/24/15, a blind administrator showed the three photo lineups to Ms. Allums, who was still in the hospital. She identified Mr. White with 100% certainty.

## Issues Identified

After reviewing the materials this case, I identified the following issues that increase the likelihood that identifications made under the same circumstances would be unreliable. There were features of the procedures used by the police to elicit the identification that violate evidence-based best practice recommendations because they are known to increase the risk of misidentification. (1) The lineup composition was biased (the defendant is the only lineup member with braids—as opposed to an afro—and the perpetrator was described as having a similar non-afro hair style). Biased lineup composition not only increases mistaken identifications, it also inflates witness confidence in the accuracy of their identification. Moreover, (2) the police officers did not have an articulable reason—based on evidence that linked the defendant to this specific crime—to place him in an identification procedure. A lack of an articulable, evidence-based reason for placing suspects in identification procedures results in a low base rate of guilty (vs. innocent) suspects. In addition, there were several characteristics of the witnessing conditions that are known to impair the ability of witnesses to encode culprit's faces, namely (3) stress and (4) the use of a weapon in the commission of the crime (weapon focus), (5) multiple perpetrators, which divides witnesses' attention among the perpetrators, and (6) the witness's poor opportunity to view the perpetrator given the time spent viewing a face—known as exposure duration— which also affects the ability to encode a face. (7) The identification was cross-racial: the witness was Hispanic and the defendant was black. For each of these variables, a substantial body of literature has emerged in recent years, which demonstrates the role that these variables play in decreasing the reliability of eyewitness identification evidence.

## The Predominant Form of Defective Evidence in DNA Exonerations Is Eyewitness Identification

The prominence of mistaken identifications as a source of erroneous convictions has been reaffirmed by the results of exonerations based on DNA evidence. By 1998, post-conviction DNA testing had freed 62 persons in the United States convicted by juries of crimes that they did not commit—8 of whom were on death row. In Scheck et al.'s (2000) analysis of the first 62 DNA exoneration cases, 52 were mistaken eyewitness identification cases with a total of 77 mistaken eyewitnesses. Thus, sometimes more than one witness had mistakenly identified the defendants (Kirk Bloodsworth was mistakenly identified by 5

separate witnesses!). In the current Innocence Project database, 32% of the cases that involved mistaken identifications contained *identifications of the same innocent suspect by multiple witnesses* (https://www.innocenceproject.org/dna-exonerations-in-the-united-states/).  University of Virginia law professor Brandon L. Garrett's (2008) systematic examination of the first-200 DNA exculpation cases demonstrated that the leading cause of the wrongful convictions was erroneous eyewitness identification, which occurred in 79 percent of the cases. In a quarter of the cases, eyewitness testimony was the only direct evidence against the defendant.

## Scientific Basis of Research Underlying My Analysis

The research on which my analysis is based has been conducted using the scientific method, either experiments testing how factors influence eyewitness accuracy or meta-analyses of these experiments.  Experiments are the primary method used by scientists (whether they are physicists, chemists, biologists, or psychologists) to isolate the causal effects of one variable upon another.  Eyewitness researchers conduct experiments in which they vary a set of variables that they think may affect witness accuracy and observe whether these variables do indeed change witnesses' identification decisions.  The scientific method involves generating hypotheses (identifying variables that you think will influence eyewitness accuracy), testing those hypotheses (by conducting experiments in which you vary the variables you predict to influence witness accuracy while holding others constant), collecting data to observe the effect of the manipulated variables, analyzing the data, and evaluating whether the hypotheses were supported.
When enough experiments have been conducted, it is possible to statistically combine the data across studies into a single meta-analysis, which provides an estimate of the size of a variable's effect across experiments that likely varied in a variety of ways (e.g., perpetrators, lineup pictures, witnessed events).  Those effect size estimates give us a more accurate picture of how much a variable influences eyewitness accuracy than can be achieved merely by counting the number of studies that found an effect and those that did not because whether an effect is found is in part determined by the number of participants in a study.  Sometimes effects are not found in a given study because there were too few participants for an effect that was truly there to become statistically significant. By combining the data across all the studies testing a particular research question, we can derive stable estimates of how much of an effect a given variable might have.

Does this research meet the scientific standards required by the courts? One can address this question from multiple perspectives.  Under the traditional *Frye* standard, the relevant question would be whether the testimony is generally accepted within the relevant scientific community.  Under the Federal Rules of Evidence and *Daubert* considerations such as whether: (a) the expert is qualified; (b) the testimony assists the trier of fact; (c) the expert's testimony is sufficiently reliable, and (d) the materials about which the expert testifies are the product of the scientific method (including falsifiable theories, peer-review).

Virtually all of the empirical eyewitness research conducted by psychologists makes use of standard experimental methods employed in all the experimental sciences.  Use of

WHITE025621

appropriate research methods is an essential requirement for publication in peer-reviewed scientific journals across all scientific disciplines and psychology is no exception. The results and conclusions summarized below are the products of precisely the methods underscored by the Supreme Court in *Daubert* and are generally accepted in the relevant scientific community as required by *Frye*.

**Eyewitness Identifications are Unreliable**

**Face Recognition is Far from Perfect Even Under Optimal Testing Conditions.** Megreya and Burton (2008) conducted a study in which participants were shown a live person for 30 seconds and were then tested, from memory, on a 10-person photoarray. When the target was in the array, 70% of the participants identified him and 10% of the participants identified someone else from the array. When the target was not in the array, 20.5% misidentified someone else from the array. When participants were shown the live person and the photoarray together (a matching task rather than a recognition memory test), 66.9% of the participants identified the target but 15% of the participants identified someone else (even when the target person was standing before them when they were choosing from the photo array!). When the target was not in the array, 37.8% misidentified someone else, again, even though they could view the live target person as they were selecting a photo.

**Field Experiments Show High Rates of Witness Identification Errors.** Realistic field studies of eyewitness identification provide relevant data about the accuracy rates of actual eyewitness identifications. Across several studies, the average correct identification rate from presentations which included the target person was 41.8%. Thus, nearly 60% of witnesses failed to identify the target when he was present. Unfortunately, the false identification rate of innocent foils was nearly as high as the rate of guilty-target identifications (35.8%). In short, identification errors were frequent (Valentine, 2008).

**Archival Studies of Real Witness Performance Show High Rates of Identification Errors.** Similarly, studies of actual witnesses reveal low accuracy rates from actual eyewitness identifications. In these studies, it is not known whether the suspect is the actual perpetrator, but it is still possible to gauge the rate of inaccurate identifications of fillers (i.e., the known-innocents placed in arrays along with the suspects). The results from nearly 17,000 actual eyewitnesses showed that nearly *40% of positive identifications were identifications of an innocent filler*, which underscores that many witnesses are willing to guess and consequently they make errors at a high rate (e.g., Valentine, 2008).

**Aspects of the Identification Procedures in the Present Case that Affect Identification Accuracy**

Eyewitness identifications take place in a social context in which the eyewitness's performance can be influenced by *his or her* expectations and inferences, which in turn can be influenced by the verbal and nonverbal behaviors of investigators, the structure of the identification test and the environment in which the identification test is conducted. Suggestive procedures are aspects of the identification test that are under the control of

police investigators and that enhance the likelihood that an eyewitness will choose someone—whether that choice is correct or not.

**Lineup Composition.** In this case, the defendant was the only member of the lineup who had hair that could be a reasonable match to the description that the witnesses provided of the gunman. Thus, the lineup violated best practices for lineup composition because the defendant stands out from the other lineup members because of this unique feature (NAS, 2014; Wells, Kovera, Douglass, Brewer, Meissner, & Wixted, 2020). The term "functional size" (Lindsay & Wells, 1980) refers to the number of viable lineup members, or the number of lineup members who plausibly match the eyewitness's description of the crime perpetrator.  The quality and the number of foils in an array clearly influence the fairness of the array as reflected in the tendency for witnesses to make identifications, particularly mistaken identifications. Studies of actual arrays show that suspects are picked 2 to 3 times the rates one would expect from a fair array (Brigham et al. 1990; Brigham et al. 1999; Wells & Bradfield, 1999).

There are two primary strategies for selecting fillers for lineups.  The match-to-suspect strategy involves choosing fillers who have features that are similar to the features of the suspect the police have in custody.  The match-to-culprit description strategy involves choosing fillers who share the features of the culprit that the witness mentioned in his or her description of the culprit, but who vary on other features (Luus & Wells, 1991). For example, if the witness's description of the culprit mentioned that the culprit was in his mid-20's, around 6 feet tall, with a large build, light brown hair with a reddish-tint, and tanned skin, then all the fillers should share these features.  To test whether different methods of selecting foils influenced the accuracy of lineup identifications, researchers constructed a new lineup for each participant witness, manipulating which foil selection strategy was used (Wells, Rydell, & Seelau, 1993).  When foils are selected by matching to description rather than suspects, witnesses were more likely to make a correct identification from a target-present lineup, without increasing the rate of false identifications in target-absent lineups.

A meta-analysis of 17 independent studies with 6,650 participants that compared performance on arrays with high, moderate and low similarities among suspects and fillers found that the rate of misidentifications of innocent suspects doubled when lineups contained fillers with low similarity to the suspect as opposed to moderate or high similarity (Fitzgerald et al., 2013). The authors concluded that the suspect should not stand out from the other lineup members, as recommended by several guidelines for best practice, including those issued by the National Institute of Justice (Technical Working Group on Eyewitness Evidence, 1999), the National Academy of Sciences (2014), and the American Psychology-Law Society (Wells et al., 2020).  The inclusion of dissimilar fillers in a lineup also increases witness confidence in their identifications of suspects (Charman, Wells, & Joy, 2011).

**Evidence-Based Suspicion and the Problem of Low Base Rates of Suspect Guilt.**
Conducting lineups without evidence-based reasons for suspicion increases the likelihood of mistaken identification. Thus, best practice is for the police to have evidence linking a

suspect to the specific crime under investigation before placing him in an identification procedure (Wells et al., 2020). Specifically, placing an individual in an identification procedure in the absence of evidence that the individual is likely to be the perpetrator of the specific crime under investigation increases the likelihood that there will be a high base rate of culprit-absent lineups, and consequently a higher rate of mistaken identifications (Wells, Yang, & Smalarz, 2015). In the case of lineups, the base rate refers to the percentage of lineups in which the suspect in the lineup is guilty versus innocent.

To explain the importance of base rates in diagnostic testing, consider medical practices for testing for prostate cancer.  Typically, doctors do not order tests of a man's prostate-specific antigen (PSA) levels unless a man is over 50 and rarely order a PSA test for men under 30 unless there is a very specific reason to suspect that they have prostate cancer. The difference in testing practices for men under 30 and over 50 has nothing to do with the changing accuracy of PSA tests at different ages.  The PSA test is just as accurate for men under 30 and men over 50.  The difference is that if a man under 30 has a positive PSA test it is almost always a false positive result because the prevalence of prostate cancer in men under 30 is almost zero.  Because the base rate of prostate cancer is so low in men under 30, a positive PSA result in that population is almost always a mistaken indicator of prostate cancer.  Similarly, if the base rate of guilty suspects in identifications is low because police officers place suspects in lineups without adequate evidence linking them to the specific crime under investigation, they do so at the risk of inflating the rate of mistaken identifications.

Consider the evidence that Commander Connelly testified was the basis for placing Mr. White in an identification procedure.  Mr. White had a violent history but so did a multitude of others in the city.  Moreover, this history did not include a history of crimes with a similar *modus operandi*, which would have provided a link to this specific crime if he had. In the absence of that similarity, Mr. White's violent history does not link him to this specific crime.  Mr. White was a member of a local gang.  Again, so are many others and this information does not link him to the specific crime being investigated. There was a report that Mr. White had been threatening the witnesses in this case but there was no documentation that the reliability of that complaint was investigated, again providing at best a tenuous link to the crime.  He lived near the location of the crime but so do many others and this information does not provide a connection to the specific crime (e.g., he wasn't identified as being near the house at the time of the crime). Mr. White owned a North Face jacket, as did the perpetrator and thousands of other people in the city.  This information does not establish a link between Mr. White and the crime to the exclusion of others.  Overall, the police increased the likelihood of conducting a culprit-absent lineup by placing Mr. White into an identification procedure without evidence linking him specifically, and to the exclusion of others, to the specific crime under investigation.  A high base-rate of culprit-absent lineups increases the likelihood of mistaken identifications.

In contrast, the police had much stronger evidence to place Edward Bunch in an identification procedure.  He matched the description provided by the witnesses. The gunman was seen on surveillance video leaving the scene of the crime with a limp. EB was treated at the hospital for a gunshot wound to his leg a half an hour after the crime was

WHITE025624

committed. He had committed a crime with a *modus operandi* that matched the crime under investigation. All of this evidence linking Bunch to the crime supported his inclusion in an identification procedure.

## Witnessing and Crime Factors in the Present Case that Influence the Accuracy of Identifications

**Stress.** The culprit was witnessed under stressful conditions (e.g., while in the midst of shots being fired). Deffenbacher and his colleagues (2004) conducted a meta-analysis of 27 tests of the effects of heightened stress on identification accuracy, including work published between 1974 and 1997, with a total of 1,727 participants. The mean proportions correct for culprit-present lineups under high and low stress conditions were .39 and .59, respectively (with mistaken identification rates of 34% and 19% respectively). The effect of stress was larger for culprit-present than for culprit-absent lineups—that is, stress particularly reduced correct identification rates.  The effect was twice as large for eyewitness-identification studies that simulated eyewitness conditions (e.g., staged crimes) than for studies that induced stress in other ways.

These effects are confirmed and extended in a study by Morgan et al. (2004) who examined the eyewitness capabilities of more than 500 active-duty military personnel enrolled in a survival-school program. Participants experienced both a high stress interrogation with real physical confrontation and a low-stress interrogation without physical confrontation. Both interrogations were 40 minutes long and were conducted by different persons. A day after release from the camp, the participants were tested on their ability to recognize the interrogators—recognition accuracy for the low-stress interrogators was as high as 76% but for high-stress interrogators it was as low as 27%.

A confirmation of these findings comes from a study conducted in the "Horror Labyrinth" of the London Dungeon tourist attraction.  Tourists encountered a "scary person" while slowly walking around the labyrinth for approximately 7 minutes (Valentine & Mesout, 2009).  About 45 minutes later, after they completed their tour, they were tested to see if they could identify the scary person from a nine-person photo-array.  Participants were divided into two groups reflecting the 50% with the highest reported anxiety produced by the event and the 50% with the lowest scores.  Seventy-five percent of the witnesses experiencing lower anxiety were able to identify the scary person/culprit but only 18% of those with higher anxiety were able to do so.

**Weapon Focus.**  The perpetrator of this crime was brandishing a weapon during the crime. When a weapon is present during a crime, witnesses divide their attention between the weapon and the perpetrator's face.  Weapon focus refers to the attention witnesses give to a perpetrator's weapon during a crime. It is expected that the attention the witness focuses on a weapon will reduce their ability to later recognize the perpetrator because the witness will be spending less attention to the perpetrator's face than would be the case if the weapon were not present.

Researchers have assessed eyewitness accuracy in an attempt to assess the effects of weapon-focus effects on memory; Steblay (1992) reviewed the relevant studies were reviewed using meta-analytic methods. The meta-analysis included 19 studies with a total sample of 2,082 participants. The weapon-focus effect on identifications was statistically significant.  A recent dissertation study by one of our students at John Jay College (an active duty Connecticut police chief) DeCarlo (2010) illustrates the effect.  DeCarlo used a videotaped robbery and found that in a no weapon condition, witnesses were able to correctly identify the target 78% of the time. Accuracy dropped to 55% when a weapon was implied (i.e., the perpetrator waving his hands around in his pocket); accuracy dropped to 33% when a weapon was actually shown. When the perpetrator was absent from the lineup the correct rejection was 89% for the no weapon condition, but when a weapon was implied, accuracy dropped to 76% and when a weapon was actually shown, correct rejections dropped to 65%.  A new meta-analysis (Fawcett, et al., 2013) confirms these conclusions using data from 47 comparisons and further notes that the size of the effects was "unaffected by whether the event occurred in a laboratory, simulation, or real-world environment."

**Multiple Perpetrators.**  The witnesses reported that three strangers entered their home to commit the robbery. Just as a weapon can divide the attention of witnesses, multiple perpetrators can divide their attention as well. Identification accuracy declines as the number of perpetrators increases (Clifford & Hollin, 1981; Fahsing, Ask, & Granhag, 2004; Megreya & Burton, 2006).  This impairment was clearly illustrated in the dissertation research by John Jay student DeCarlo (2010). He showed witnesses a videotaped robbery involving one or two perpetrators. When the perpetrator was present in the lineup, the single perpetrator condition produced a correct identification rate of 55% versus 33% in the multiple perpetrator condition.  In the two-perpetrator condition, 82% of witnesses correctly rejected perpetrator-absent arrays versus 92% in the single perpetrator condition.  In another study comparing the performance of witnesses seeing one or two perpetrators, when the perpetrator was present in an array witnesses made fewer correct identifications (29%) and more incorrect decisions (71%) for the two-perpetrator condition than the single-perpetrator condition (54% and 46%, respectively; Megreya & Bindeman, 2012).  Over a third of witnesses made misidentifications from perpetrator-absent arrays.  The authors note (p. 448): "the double-perpetrator disadvantage is not simply due to a difficulty in separating the facial characteristics of two people that are encountered simultaneously, which therefore cannot be encoded and stored accurately (see Palermo & Rhodes, 2002). Instead, we suggest that this effect might reflect the need to divide attention between two concurrent culprits, which limits the depth or detail of the stored descriptions that can be formed for these persons (see Fahsing et al., 2004)."

**Exposure Duration.** The crime unfolded quickly and two of the witnesses reported fleeing as the initial shots were fired. The time available for viewing a perpetrator is positively associated with the witness's ability to subsequently identify him.  Shapiro and Penrod's (1986) meta-analysis of more than 100 experiments showed that exposure time was a reliable predictor of accuracy.  Similarly, a recent meta-analysis demonstrated that the effect of exposure time on eyewitness identification accuracy was moderate to large ($d$ =

Page 9 of 14

WHITE025626

0.63), with witness accuracy greater for longer than for shorter exposures (Bornstein, Deffenbacher, McGorty, & Penrod, 2012).

However, it should be noted that even a long exposure is no guarantee of accuracy—when researchers tested the memory of soldiers participating in a mock POW training exercise as a part of survival training school for their interrogators, the soldiers had been interrogated for 40 minutes and yet the rate of correct identifications among high-stress soldiers ranged from only 27 to 49% when targets were present. Foil identification rates approached 50% using standard lineups and photospreads (Morgan et al., 2004). Thus, even under long exposure times, witness identifications can be quite unreliable.

In this case, as is often the case, we have to rely on the estimates of the witnesses for the length of their exposure to the perpetrator. However, relying on witness estimates of exposure duration can be problematic. In his 2000 study, Yarmey found that witnesses to non-routine events were, on average, overestimated by between 25% (for an event lasting 13 minutes) and more than 100% (events lasting 24 seconds or less). An event lasting 46 seconds was overestimated by 67% and events lasting one minute 20 seconds and two minutes 58 seconds were over-estimated by 40%.

**Own Race Bias in Cross-Racial Identifications.** The witnesses in this case are White and Mr. White is Black. Research on cross-race identification impairment began forty years ago and has included various mixes of Caucasian, Asian, Hispanic, Black, and middle-eastern witnesses. Meissner and Brigham (2001) have reviewed research on the problems of what interchangeably has been called other-race or cross-race identifications or own-race bias (ORB). Meissner and Brigham analyzed data from 39 research articles, with 91 independent samples involving nearly 5,000 witness participants. They examined measures of correct identifications and false alarm rates, as well as aggregate measures of discrimination accuracy and response criterion. Overall, they reported that when the perpetrator is present, the ratio of correct to incorrect identifications was 40% higher for same-race identifications. The ratio of mistaken identifications to correct rejections in target-absent arrays was 56% greater for other-race identifications. Overall, the ratio of correct to incorrect identifications was more than 2.2 greater for own-race faces as compared with performance on other-race faces.

## Witness Confidence and Witness Accuracy

**Witnesses are Over-Confident.** Witnesses are overly-confident in the accuracy of their identifications. In one study, eyewitnesses who were very confident of the accuracy of their identifications (95% certain) were only about 70%-75% correct (Brewer, Keast, & Rishworth, 2002). Another study reported that among witnesses who made an identification with 90-100% confidence, 40% were inaccurate; for witnesses who were 70-80% confident, there was a 50% error rate among those who are 70%-80% confident (Sauer, Brewer, & Wells, 2008). A recent study involving the identification of individuals with whom participants interacted for up to a minute showed poor calibration of accuracy and confidence, with participants being over-confident about their accuracy (Sučić, Tokić, & Ivešić, 2015).

WHITE025627

**Post-Identification Confidence, if Measured Properly, is Modestly Correlated with Accuracy.** A meta-analysis of research testing whether witness identification accuracy is associated with witness confidence revealed a confidence-accuracy correlation of .41 among those witness who made an identification from the lineup (Sporer, Penrod, Read, & Cutler, 1995). This finding suggests that witnesses who are highly confident in their identifications are somewhat more likely to be correct than are witnesses who display little confidence. However, recent research suggests that high confidence is an indicator of accuracy only *when the procedures used to collect the identifications are pristine* (Wixted & Wells, 2017). Procedures are pristine if there is 1) only one suspect, 2) the lineup is not biased toward the suspect (e.g., fillers do not cause the suspect to stand out), 3) the witnesses are instructed that the perpetrator may not be in the photo array, 4) the administrator does not know who the suspect is (i.e., procedure is double-blind), and 5) witness confidence is collected immediately after the identification by a blind administrator. These conditions were not met in this case because the eyewitness identification was collected with a photo array that was biased toward the suspect (as described above). Therefore, any statements of confidence now made by the witnesses are of no evidentiary value.

## Conclusions

The eyewitness identification procedures used to elicit identifications of Dalonte White violated best practices (Wells et al., 2020) and increased the likelihood that the detectives would obtain a mistaken identification. For example, the lineup composition was suggestive because the defendant was the only lineup member with hair that was a reasonable match to the witnesses' description of the gunman's hair, causing his picture to stand out from the others. In addition, the evidence used to support the Detective Lam's placement of Dalonte White into the photo array as a suspect did connect White to this particular crime to the exclusion of many other people. Because the confidence of the witness was not recorded at the time of the identification and the identification was not made using recommended procedures, the witness's stated confidence is not a reliable indicator of the witness's accuracy in this case.

Violating best practice is never advisable but is especially problematic when used to test the witness memories that are likely weak. There are several features of the witnessing conditions in this case that would interfere with the witnesses' ability to strongly encode the gunman's face into memory, including the presence of a weapon, the stress of the shootings, multiple perpetrators, the limited exposure time, and the cross-racial nature of the identification. Because it would have been difficult for the witness to encode the culprit's face well under these circumstances, it increases the likelihood of an unreliable identification. These factors are well-established in the literature and, perhaps with the exception of multiple perpetrators, in case law.

Taken together, in my opinion, there is substantial evidence that there were factors present in this case that would have adversely affected the witness's ability to make a correct identification. The police contributed to these factors by implementing a photo array that

was biased against Mr. White and by placing Mr. White in an identification procedure without evidence that linked Mr. White, to the exclusion of others, to this specific crime.

I declare under penalty of perjury that to the best of my ability the foregoing is true and correct.  Executed on January 19, 2020.

Margaret Bull Kovera, Ph.D.

References

Bornstein, B. H., Deffenbacher, K. A., McGorty, K., & Penrod, S. D. (2012). Effects of exposure time and cognitive operations on facial identification accuracy: A meta-analysis of two variables associated with initial memory strength.  *Psychology, Crime & Law, 18,* 473-490*.*

Brewer, N., Keast, A. & Rishworth, A. (2002). The confidence-accuracy relationship in eyewitness identification: The effects of reflection and disconfirmation on correlation and calibration. *Journal of Experimental Psychology: Applied, 8, 44*-56.

Brigham, J. C., Ready, D. J., & Spier, S. A. (1990). Standards for evaluating the fairness of photograph lineups. *Basic and Applied Social Psychology, 11*(2), 149-163.

Brigham, J. C., Meissner, C. A., & Wasserman, A. W. (1999). Applied issues in the construction and expert assessment of photo lineups. *Applied Cognitive Psychology, 13,* S73-S92.

Charman, S. D., Wells, G. L., & Joy, S. W. (2011). The dud effect: Adding highly dissimilar fillers increases confidence in lineup identifications. *Law and Human Behavior, 35*, 479–500.

Clifford, B. R., & Hollin, C. (1981). Effects of the type of incident and the number of perpetrators on eyewitness memory. *Journal of Applied Psychology, 66,* 364-370.

DeCarlo, J. (2010). *A study comparing the eyewitness accuracy of police officers and citizens.* Dissertation completed at City University of New York.

Deffenbacher, K. A., Bornstein, B. H., Penrod, S. D., & McGorty, K. (2004). A meta-analytic review of the effects of high stress on eyewitness memory. *Law and Human Behavior, 28,* 687-706*.*

Fahsing, I. A., Ask, K. & Granhag, P. A. (2004). The man behind the mask: Accuracy and predictors of eyewitness offender descriptions. *Journal of Applied Psychology, 89,* 722–729.

Fawcett, J. M., Russell, E. J., Peace, K. A., & Christie, J. (2013). "Of guns and geese: A meta-analytic review of the 'weapon focus' literature". *Psychology, Crime & Law, 19*, 35–66.

Fitzgerald, R. J., Price, H. L., Oriet, C., & Charman, S. D. (2013). The effect of suspect-filler similarity on eyewitness identification decisions: A meta-analysis. *Psychology, Public Policy, and Law, 19*, 151-164.

Garrett, B. L. (2008). Judging innocence. *Columbia Law Review*, *108*. 55–142.

Lindsay, R. C. L., & Wells, G. L. (1980). What price justice? Exploring the relationship between lineup fairness and identification accuracy. *Law and Human Behavior, 4,* 303-314.

Luus, C. A. E., & Wells, G. L. (1991). Eyewitness identification and the selection of distractors for lineups. *Law and Human Behavior, 15,* 43-57.

Megreya, A. M., & Burton, A. M. (2006). Recognising faces seen alone or with others: When two heads are worse than one. *Applied Cognitive Psychology, 20,* 957–972.

Megreya, A. M., & Burton, A. M. (2008).  Matching faces to photographs: Poor performance in eyewitness memory (without the memory). *Journal of Experimental Psychology: Applied*, 14, 364-372.

Megreya, A. M., & Bindemann, M. (2012) Identification accuracy for single- and double-perpetrator crimes: Does accomplice gender matter?' *British Journal of Psychology, 103,* 439-453.

Meissner, C. A., & Brigham, J. C. (2001). Thirty years of investigating the own-race bias in memory for faces: A meta-analytic review. *Psychology, Public Policy, & Law, 7,* 3-35.

Morgan III, C. A., Hazlett, G. A., Doran, A., Garrett, S., Hoyt, G., Thomas, P., et al. (2004). Accuracy of eyewitness memory for persons encountered during exposure to highly intense stress. *International Journal of Law and Psychiatry, 27*, 265–279.

National Academy of Sciences. (2014). *Identifying the culprit: Assessing eyewitness identification*. Washington, D. C.: The National Academies Press. Retrieved from https://www.nap.edu/catalog/18891/identifying-the-culprit-assessing-eyewitness-identification

Palermo, R., & Rhodes, G. (2002). The influence of divided attention on holistic face perception. *Cognition*, 82, 225–257.

Sauer, J. D., Brewer, N., & Wells, G. L. (2008). Is there a magical time boundary for diagnosing eyewitness identification accuracy in sequential line-ups? *Legal and Criminological Psychology, 13*(1), 123–135.

Scheck, B., Neufeld, P., & Dwyer, J. (2000).  *Actual innocence.* New York: Doubleday.

Shapiro, P. N., & Penrod, S. D. (1986). Meta-analysis of facial identification studies. *Psychological Bulletin, 100*, 139-156.

Sporer, S., Penrod, S.D., Read, D. & Cutler, B.L. (1995). Gaining confidence in confidence: A new meta-analysis on the confidence- accuracy relationship in eyewitness identification studies. *Psychological Bulletin, 118,* 315-327.

WHITE025630

Steblay, N. M. (1992). A meta-analytic review of the weapon focus effect. *Law & Human Behavior, 16*, 413-424.

Sučić, I., Tokić, D., & Ivešić, M. (2015). Field study of response accuracy and decision confidence with regard to lineup composition and lineup presentation. *Psychology, Crime & Law, 21*(8), 798–819.

Technical Working Group for Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement*. Washington, DC: U.S. Department of Justice, Office of Justice Programs.

Valentine, T. (2008). Identifying perpetrators. In G. Davies, C. Hollin, & R. Bull (Eds.), *Forensic psychology.* Hoboken, NJ: John Wiley & Sons.

Valentine, T., & Mesout, J. (2009). Eyewitness identification under stress in the London Dungeon. *Applied Cognitive Psychology*, 23, 151-161.

Wells, G. L., & Bradfield, A. L. (1999). Measuring the goodness of lineups: Parameter estimation, question effects, and limits to the mock witness paradigm. *Applied Cognitive Psychology, 13,* 27-40.

Wells, G. L., Kovera, M. B., Douglass, A. B., Brewer, N., Meissner, C. A., & Wixted, J. (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior.*

Wells, G. L., Rydell, S. M., & Seelau, E. P. (1993). The selection of distractors for eyewitness lineups. *Journal of Applied Psychology, 78,* 833-844.

Wells, G. L., Yang, Y., & Smalarz, L. (2015). Eyewitness identification: Bayesian information gain, base-rate effect equivalency curves, and reasonable suspicion. *Law and Human Behavior, 39,* 99-122.

Wixted, J. T., & Wells, G. L. (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science in the Public Interest*, *18*, 10–65. doi:10.1177/1529100616686966

Yarmey, A. D. (2000). Retrospective duration estimations for variant and invariant events in field situations. *Applied Cognitive Psychology, 14*, 45-57.

WHITE025631