## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

DALONTE WHITE,                                   CASE NO. 1:17-CV-01165

                            Plaintiff,

            -vs-                                 JUDGE PAMELA A. BARKER

CITY OF CLEVELAND, et al.,
                                                 MEMORANDUM OF OPINION AND
                            Defendants.          ORDER

This matter comes before the Court upon the Motions for Summary Judgment of Defendants David Lam, Thomas Shoulders, John Kubas, David Santiago, Robert Beveridge, Michael Schade, and the City of Cleveland (collectively, "Defendants"), all of which were filed on May 4, 2020.  (Doc. Nos. 191, 193, 195, 197, 199.)  Plaintiff Dalonte White ("White") filed a consolidated brief in opposition to Defendants' Motions for Summary Judgment on June 17, 2020, to which Defendants replied on July 15, 2020.  (Doc. Nos. 247, 262-66.)

Also, currently pending is White's Motion for Partial Summary Judgment, which seeks summary judgment on the question of liability on White's Claims 9 and 10 against John Kubas and David Santiago in their personal and official capacities.  (Doc. No. 205.)  The City of Cleveland filed a brief in opposition to White's Motion for Partial Summary Judgment on June 17, 2020, to which White replied on July 15, 2020.  (Doc. Nos. 249, 267.)  John Kubas and David Santiago filed a joint brief in opposition to White's Motion for Partial Summary Judgment on June 18, 2020, to which White replied on July 16, 2020.  (Doc. Nos. 250, 268.)

For the following reasons, Defendants' Motions for Summary Judgment (Doc. Nos. 191, 193, 195, 197, 199) are GRANTED as to White's claims under 42 U.S.C. § 1983 and DENIED as to

White's claims under state law.  White's Motion for Partial Summary Judgment (Doc. No. 205) is DENIED.  The remainder of the case is REMANDED to the Court of Common Pleas of Cuyahoga County, Ohio, from which it was removed.

## I.   Background

### a.   Factual Background

Shortly after 6 p.m. on April 21, 2015, Patrol Officers Donato Daugenti ("Daugenti") and Thomas Harrigan ("Harrigan") received a radio assignment to respond to an incident involving a female that had been shot at 3255 West 54th Street, Cleveland, Ohio.  (Doc. No. 223-11 at PageID# 7387.)  According to Daugenti's report, after arriving on the scene, he spoke to two of the victims, Savannah LaForce ("LaForce") and Zachary Hale ("Hale").[1]  (*Id.* at PageID#s 7387-88.)

LaForce stated that she was visiting her aunt, Colleen Allums ("Allums"), and that, while she was talking with Allums in the living room, her brother, Hale, entered the residence.  (*Id.* at PageID# 7387.)  After Hale walked in, three unknown males also entered, and one of them ("Suspect #1") pulled out a handgun and stated, "Nobody move."  (*Id.*)  Another one of the unknown individuals ("Suspect #2") grabbed LaForce's cell phone from her hand and then stood by the door with the third individual ("Suspect #3") so that nobody could leave.  (*Id.*)  Suspect #1 then began to strike Allums repeatedly on her head with his gun.  (*Id.*)  Subsequently, Allums's dogs came from another room and started to attack Suspect #1, who began shooting at the dogs in response.  (*Id.*)  Suspects #2 and

---

[1] LaForce and Hale were under the age of eighteen at the time of the relevant events—LaForce was fifteen years old, and Hale was thirteen years old.  (Doc. No. 223-11 at PageID#s 7379-80.)  However, both are no longer minors, and the Court therefore does not refer to them solely by their initials.  The Court does the same with other individuals that may have been minors at the time of the events described, but who the Court is now aware are over the age of eighteen.

#3 then fled the residence, after which Suspect #1 started to hit Allums again.  (*Id.*)  At that point, LaForce also fled with her brother.  (*Id.* at PageID#s 7387-88.)

According to Hale, all three suspects began following him while he was walking to Allums's house to meet up with his sister, LaForce.  (*Id.* at PageID# 7388.)  They then followed right behind him when he entered Allums's residence.  (*Id.*)  Hale's description of events inside the residence is then largely consistent with LaForce's statement.  Hale also stated, however, that upon entering the residence, Suspect #1 stated, "Where is the money?  We want everything," to which Allums responded that she did not have any money before Suspect #1 started striking her with his gun.  (*Id.*)  According to Daugenti's report, Hale also stated that one of Allums's dogs began biting Suspect #1's leg and that Suspect #1 shot several times at the dog in an attempt to get the dog off of him, which made the dog flee from the room.  (*Id.*)

Shortly after Daugenti and Harrigan arrived on the scene, EMS transported Allums to a hospital to treat a gunshot wound to her right shoulder and several lacerations to her head and face.  (*Id.* at PageID#s 7387-88.)  As such, no statement was taken from her at that time.

Daugenti's report also included a description of the suspects' physical characteristics.  Suspect #1 was described as a black male who was approximately eighteen to twenty years old, 200 to 250 lbs., and 6' to 6'1".  (*Id.* at PageID# 7378; Doc. No. 223-10 at PageID# 7367.)  Suspect #2 was described as a black male who was approximately eighteen to nineteen years old, 130 lbs., and 5'6". (Doc. No. 223-10 at PageID# 7369; Doc. No. 223-11 at Page ID# 7379.)  Suspect #3 was described as a black male who was approximately eighteen to nineteen years old, 150 lbs., and 5'9".  (Doc. No. 223-10 at PageID# 7369; Doc. No. 223-11 at Page ID# 7379.)  However, it is not clear who this information came from, as there was another witness besides Hale and LaForce identified in the

3

report.  Specifically, Daugenti noted that he also spoke with John Hale, who was playing basketball in the area and observed the three suspects enter and then run from Allums's residence.  (Doc. No. 223-11 at PageID# 7388.)

After Daugenti and Harrigan had already started their report and taken LaForce's and Hale's initial statements, Defendant Detective David Lam ("Lam"), Defendant Sergeant Thomas Shoulders ("Shoulders"), and Detective Cynthia Moore ("Moore") arrived on the scene.  (Doc. No. 191-2 at ¶ 5; Doc. No. 223-1 at 127:12–23.)  Although Lam had only joined the detective bureau about a month earlier, Shoulders assigned Lam to act as lead detective under Shoulders's supervision.  (Doc. No. 191-2 at ¶ 7; Doc. No. 223-1 at 157:14-158:25.)  Upon arrival, Lam and the other officers and detectives present canvassed the neighborhood and located a surveillance camera mounted on the home of a neighbor.  (Doc. No. 223-11 at PageID# 7389.)  The video showed a black male with dreadlocks wearing a dark colored North Face jacket, dark colored pants, and white shoes limping away from Allums's residence and concealing a firearm in his waistband.  (*Id.*)  Consistent with LaForce's and Hale's statements and the video of the suspect limping, someone requested that dispatch watch for hospital visits involving an individual with a gunshot wound or dog bites to the foot or leg.  (Doc. No. 191-2 at ¶ 10.)

While on the scene, Lam also talked to Defendant Patrol Officer Michael Schade ("Schade"), who stated that White and one other individual, Rayvion Edwards ("Edwards"), were suspects in an aggravated menacing complaint in the area of West 59th Street that had occurred the past weekend. (Doc. No. 223-11 at PageID# 7389.)  Schade further stated that it was possible that the Allums home invasion was related to that aggravated menacing complaint.  (*Id.*)  Lam's report indicates that the report number for the aggravated menacing incident was possibly Report No. 2015 082488.  (*Id.*)

4

However, Report No. 2015 082488 does not include any mention of White, involved an incident that occurred on March 26, 2015 (not the weekend immediately preceding the Allums's home invasion), and the incident did not occur near West 59th Street.  (Doc. No. 223-18.)  Rather, the aggravated menacing complaint Schade was most likely referencing was documented in Report No. 2015 108018.  (Doc. No. 225-1 at 385:16-24.)  According to Report No. 2015 108018, on April 19, 2015, White, Edwards, and one other individual known as "Shartrell" approached a game of basketball occurring in front of a house in the West 59th Street area.  (Doc. No. 225-17 at PageID# 8568.) Shartrell accused one of the individuals in front of the house of being in the "BBE" gang, and Edwards later produced a gun and pointed it at two people who came out of the house and threatened to fight them.  (*Id.*)  However, the report specifically states that White was not involved in the menacing and had attempted to convince Edwards and Shartrell that the individual they accused of being in another gang was not who they thought.  (*Id.*)  Lam does not believe that he had ever seen this second report, Report No. 2015 108018, until it was shown to him in 2020, as it was not located in his file and, because White was not a named suspect or victim in the case, it would not have come up on a search for his name.  (Doc. No. 191-2 at ¶ 11.)

On April 22, 2015, the day after the Allums's home invasion, Lam and Shoulders spoke to Defendant Patrol Officer Robert Beveridge ("Beveridge"), who was known to be knowledgeable of criminal activity in the neighborhood, including gang affiliations.  (*Id.* at ¶ 12.)  After being advised of the description of the suspects, Beveridge identified White, as well as two other young males, as being part of the Hungry Money Family or Heartless Money Family ("HMF") gang that had claimed the neighborhood, specifically the area of West 58th Street and Storer Avenue.  (*Id.*; Doc. No. 223-11 at PageID# 7389.)  Beveridge also told Lam that the HMF gang was known to rob people in the

5

neighborhood, although Lam did not recall any comments by Beveridge that any HMF members had actually been convicted of robbing anyone.  (Doc. No. 223-1 at 169:25-171:5.)  At his deposition, Beveridge admitted that he could not recall any crimes for which HMF members had been charged, but believed its members were connected to several criminal violations and recalled one incident in which a member was shot at.  (Doc. No. 226-1 at 98:8-101:10.)

Based on the information from Beveridge, Lam created three photo arrays, one for White and one for each of the other two individuals identified by Beveridge.  (Doc. No. 223-1 at 171:21-172:4.)[2] In the photo array containing White's picture, he is the only individual with dreadlocks.  (*See* Doc. No. 210-11 at PageID#s 6424-25.)  According to Lam, it was difficult to find photos of individuals with hairstyles that matched White because the pool of potential filler photos for juveniles is much smaller than for adults.  (Doc. No. 223-1 at 179:8-25.)  White was sixteen years old at that time.  (*See* Doc. No. 199-5 at PageID#s 3883-84; Doc. No. 200 at PageID# 3899.)  However, the individuals in the filler photos approximately matched White with respect to his age, height, weight, eye color, and hair color.  (*See* Doc. No. 210-11 at PageID#s 6424-25.)

The next day, on April 23, 2015, Lam and Shoulders went to interview LaForce and Hale, and two other patrol officers met them there to serve as blind administrators of the photo arrays.  (Doc. No. 223-11 at PageID#s 7389-90; Doc. No. 191-2 at ¶ 19.)  Specifically, Patrol Officer David Santiago, Jr. ("Santiago, Jr.")[3] showed the three photo arrays to LaForce, and Patrol Officer Carrucini

---

[2] White disputes this and maintains that Lam already had created these photo lineups before the Allums home invasion, citing to records from the Ohio Law Enforcement Gateway that indicate that Lam did not create any lineups between April 21, 2015 and May 1, 2015.  (*See* Doc. No. 247-16 at ¶ 8; Doc. No. 247-20 at PageID#s 17154-56.)  However, this dispute of fact is not relevant to the Court's ultimate conclusions regarding the legal issues discussed below, including the existence of probable cause for White's arrest, which White appears to concede, as he does not rely on this fact in support his claims.

[3] Santiago Jr. is the son of Defendant David Santiago.  (Doc. No. 195-6 at ¶ 4.)

showed the photo arrays to Hale. (Doc. No. 230-3 at PageID#s 8994-9003; Doc. No. 230-1 at PageID#s 8963-71.) LaForce identified White as the shooter in the home invasion with 100% certainty, but was unable to identify anyone in the other two photo arrays. (Doc. No. 230-3 at PageID#s 8994-9003; Doc. No. 223-11 at PageID# 7390.) Hale identified White as one of the three suspects with 70% certainty, and was likewise unable to identify anyone in the other two photo arrays. (Doc. No. 230-1 at PageID#s 8963-71; Doc. No. 223-11 at PageID# 7390.)

On April 24, 2015, Lam, Shoulders, and Moore went to the hospital to interview Allums. (Doc. No. 223-11 at PageID# 7390.) Another blind administrator, Patrol Officer Jeffrey Kirchner, also showed the same three photo arrays to Allums. (*Id.*) Allums identified White as the shooter with 100% certainty. (*Id.*; Doc. No. 230-2 at PageID#s 8982-84.) Like LaForce and Hale, Allums was unable to identify anyone in the other two photo arrays. (Doc. No. 223-11 at PageID# 7390; Doc. No. 230-2 at PageID#s 8979-81, 8985-87.)

During the interview with Allums, she provided her account of the home invasion. She stated she was inside her residence with LaForce when two unknown black males and one unknown Hispanic male entered, followed by Hale. (Doc. No. 223-11 at PageID# 7390.) At first, Allums did not find this unusual because she thought the males may have known Hale. (*Id.*) She stated that she was sitting on the couch in her living room when one of the black male suspects approached her, struck her with his gun, and stated, "Give me that. Give me all of it for that matter," in reference to some cash that was on a stool in front of Allums, along with her cell phone. (*Id.*) Allums described this individual as wearing a black jacket and black jeans, approximately 5'5" and 160 to 170 lbs., and having dreadlocks sticking up. (*Id.*) According to Allums, when he struck her, her face spun into the couch and he continued to hit her in the back of the head with the gun. (*Id.*) She then reached into

7

the couch to grab the cushion when she felt a gun, which she started to pull out.  (*Id.*)  After that, she heard a "pop" sound and was dazing in and out of consciousness.  (*Id.*)  When she gained consciousness, she discovered that the suspects had taken the gun and her cell phone.  (*Id.*)

Allums's description of the physical characteristics of the shooter, Suspect #1, as approximately 5'5" and 160 to 170 lbs. largely matched the physical characteristics of White, who was approximately 5'5" and 135 lbs.  (*See, e.g.*, Doc. No. 230-2 at PageID# 8984.)  However, it differed significantly from the information provided to Daugenti and recorded in his report, which indicated that Suspect #1 was 200 to 250 lbs. and 6' to 6'1".  (Doc. No. 223-10 at PageID# 7367.)

On the same day as the interview of Allums, Shoulders and several other Cleveland police officers went to White's house to interview him and took photos of White's legs.  (Doc. No. 244 at 262:4-265:17.)  These photos were provided to Lam.  (Doc. No. 191-2 at ¶ 24.)  There were no visible marks of a dog bite, gun shot, or any other injury on White's legs that officers had speculated may be present on Suspect #1.  (*Id.*; Doc. No. 223-1 at 221:5-17.)  Although these photos made Lam slightly less suspicious of White, he and Shoulders decided to pursue White's arrest.  (Doc. No. 223-1 at 222:17-20.)

Subsequently, on April 28, 2015, Shoulders obtained an arrest warrant for White, and Lam obtained a search warrant for White's residence.  (*Id.* at 207:11-17.)  Shoulders provided the affidavit in support of the arrest warrant.  (Doc. No. 225-9.)  Shoulders's affidavit provided, in relevant part, the following:

> 12.    Officer Schade #290 stated that there was a recent Aggravated Menacing complaint in the area of W. 59th and that the Menacing complaint could be related to the home invasion.  The suspects in the Menacing case were Dalonte White and Rayvion Edwards.

8

13.    Based on the surveillance video and Officer Schade's observation, officers created a photo array that included a photo of Dalonte White.

14.    This photo array was shown to Savanna Laforce and Zachary Hale by two blind administrators.  Laforce positively identified Dalonte White as the shooter with 100% certainty.  Zachary Hale identified Dalonte White as one of the persons involved in the home invasion with 70% certainty.

15.    A blind administrator went to Metro Hospital to present a photo array to victim Colleen Allums.  Allums positively identified Dalonte White as the shooter with 100% certainty.

(*Id.* at PageID# 8447.)  Later that day, Lam, Shoulders, Moore, and several other officers executed the warrants, arrested White, and transported him to the Cuyahoga County Juvenile Justice Detention Center.  (Doc. No. 223-11 at PageID# 7392.)

During the search of White's home, police found a black North Face jacket.  (Doc. No. 191-2 at ¶ 31.)  After White's arrest, Moore and Lam also interviewed two of White's known associates— D.M. and Edwards.  (*Id.* at ¶ 33.)  D.M. confirmed White was one of the main members of the HMF gang.  (*Id.*)  D.M. also stated that she overheard a conversation between White and Edwards in which they discussed the fact that White had been bitten by a dog approximately a week ago on a weekday. (*Id.* at ¶ 34.)  Edwards stated that White was the president of the HMF gang and that gang members were known to keep several pistols locked up at one of their residences.  (*Id.* at ¶ 35; Doc. No. 223-11 at PageID# 7393.)

On May 1, 2015, several days after White's arrest, Lam learned that an individual by the name of Edward Bunch ("Bunch") had reported to Lakewood Hospital with a gunshot wound to his right leg on April 21, 2015 within an hour of the Allums home invasion and was now in custody for an unrelated crime.  (Doc. No. 223-11 at PageID# 7394.)  According to the arresting officers, Bunch stated that he had accidentally shot himself.  (*Id.*)  However, according to the officer that interviewed

Bunch in the hospital on April 21, 2015, Bunch stated that he was shot while riding his bicycle in the area of West Boulevard and Lorain Avenue and was unwilling to provide any additional details.  (*Id.*; Doc. No. 223-6 at PageID# 7335.)  Based on the date, time, and location of Bunch's injury, which Lam indicated was consistent with the video of Suspect #1 limping away from Allums's house, Lam identified Bunch as a person of interest in the Allums home invasion.  (Doc. No. 223-11 at PageID# 7394.)  Bunch, a black nineteen-year-old male, 6'0', and 213 lbs., matched the physical description of Suspect #1 provided to Daugenti.  (Doc. No. 223-6 at PageID# 7334; Doc. No. 223-1 at 315:24-318:11.)

About two years before, in April 2013, with Beveridge's assistance in the identification, Shoulders had also arrested Bunch for a home invasion conducted in a similar manner as the Allums home invasion.  (Doc. No. 223-20 at PageID# 7494.)  According to the police report, Bunch and two other males waited for the homeowner to open the front door and forced their way in.  (*Id.* at PageID# 7493-94.)  The victim was held at gunpoint by one of Bunch's accomplices, ordered to hand over "everything," and struck repeatedly in the face with a gun.  (*Id.*)  Bunch and his accomplices took cash, a cell phone, and a gun before fleeing on foot.  (*Id.*)  When Shoulders found him, Bunch confessed to the crime.  (*Id.* at PageID# 7494.)

After Bunch was identified as a person of interest, Lam prepared two more photo arrays— one with Bunch and one with another possible suspect.  (Doc. No. 223-11 at PageID# 7394.)  On May 13, 2015, all three victims—Allums, LaForce, and Hale—went to the Second District police station, and blind administrators showed them the new photo arrays.  (*Id.*)  Specifically, Defendant Detective John Kubas ("Kubas") administered the photo arrays to Allums, Defendant Detective David Santiago ("Santiago") administered the photo arrays to LaForce, and Detective Thomas Balak

10

administered the photo arrays to Hale.  (*Id.* at PageID# 7394-95.)  The photo arrays were returned to Lam indicating that Allums and LaForce did not identify anyone, while Hale identified Bunch as one of the suspects with 90% certainty and a filler photo in the second photo array with 80% certainty. (*Id.*; Doc. No. 191-2 at ¶ 42; Doc. No. 230-1 at PageID#s 8972-77; Doc. No. 230-2 at PageID#s 8988-93; Doc. No. 230-3 at PageID#s 9004-09.)

The parties dispute, however, what actually occurred during the administration of the photo arrays to Allums and LaForce.  Allums testified during White's bindover hearing in juvenile court that when she went to the police station to look at additional photo arrays, she told the detective administering the photo arrays that she recognized the individual from one of the photos as the suspect with the gun from the home invasion.  (Doc. No. 261 at 133:5-135:19, 141:5-10.)  The individual that she recognized in the photo was Bunch, but Allums did not know that at the time.  (*See id.* at 134:22-135:3; Doc. No. 210-12 at PageID#s 6448-50.)  Rather, Allums believed she had just identified White a second time.  (Doc. No. 261 at 133:15-18.)[4]  At that time, Allums also knew that White had already been arrested, as prior to viewing the second set of photo arrays, Allums had received a letter informing her of White's arrest.  (*Id.* at 133:19-22.)  Regarding her identification, Allums further testified:

> I showed the detective that I was with and I told him that I recognized him, but I knew that I'd already received a letter for his arrest and he said not to circle him because we were -- that they were looking for the other two suspects and that if he was already arrested, that it would be them going in circles.

(*Id.* at 135:9-14.)  Based on the detective's instruction, Allums stated that she did not mark her identification.  (*Id.* at 134:18-21, 135:15-16.)  During his deposition, Kubas stated that he did not

---

[4] In fact, during the juvenile court hearing, Allums stated that she still had never heard the name Bunch before and still believed that she had identified White a second time.  (Doc. No. 261 at 142:21-143:14.)

remember administering the photo arrays to Allums, but did not dispute doing so.  (Doc. No. 222-1 at 93:17-94:8.)  However, in contrast to Allums's testimony, Kubas testified that he has never told a witness not to circle someone that they recognized while serving as a blind administrator.  (*Id.* at 163:24-164:2.)

Similar to Allums, LaForce testified before the juvenile court that when she went to the police station to view the second set of photo arrays, she told the detective administering the photo arrays that she recognized one of the individuals from the photo arrays.  (*Id.* at 100:6-101:10.)  The individual that LaForce recognized was Bunch, but, like Allums, LaForce mistakenly believed that she had just identified White a second time.  (*See id.* at 100:6-101:23; Doc. No. 210-13 at PageID#s 6464-66.)[5]  LaForce further testified that after she informed the detective that she recognized the individual from the photo, she also was told not to circle him if she had already picked him out.  (Doc. No. 261 at 98:14-25, 100:6-101:14.)  During his deposition, Santiago did not remember administering the photo arrays to LaForce, but did not dispute doing so.  (Doc. No. 224-1 at 97:8-15.)  However, Santiago also testified that he has never told a witness not to pick someone out of a lineup if he or she had already identified someone.  (Doc. No. 224-1 at 97:19-99:1.)

It appears that White's defense counsel learned of the fact that Allums had identified Bunch, but been instructed not to mark anyone, when he met with her on June 10, 2015 to discuss the case.  (Doc. No. 261 at 138:5-139:2.)  However, it does not appear that White's defense counsel took any further action with respect to that information at the time.  Also, in May and June 2015, Lam and

---

[5] During the hearing, LaForce also still believed that the person she had identified was White.  (Doc. No. 261 at 103:7-13.)  The fact that both Allums and LaForce still mistakenly believed at the time of the hearing that the photo of Bunch that they had identified was White shows the close resemblance between White and Bunch, especially because White was presumably sitting within sight at the hearing.  The juvenile court judge also noted that White and Bunch have similar features.  (*Id.* at 434:6-8.)

Shoulders obtained search warrants for White's phones, Facebook records, and DNA, but none of them yielded anything corroborating their theory that he was the shooter.  (Doc. No. 223-1 at 333:2–335:6; Doc. No. 223-11 at PageID#s 7394-96.)

On July 8, 2015, Lam and Shoulders interviewed Bunch, who was incarcerated at the Cuyahoga County Jail at that time.  (Doc. No. 223-11 at PageID# 7396.)  Bunch denied any involvement in the Allums home invasion.  (*Id.* at PageID# 7397.)  With respect to his gunshot wound the night of April 21, 2015, Bunch stated that he was shot while riding a bicycle in the area of West Boulevard and Madison Avenue.  (*Id.*)  He also stated that he was picked up and transported to the hospital by a passing motorist, which conflicted with his statement at the hospital the day of the injury that family and friends dropped him off.  (*Id.*; Doc. No. 247-6 at PageID# 15363.)  Bunch signed a medical authorization that allowed the prosecutor to obtain his medical records from that emergency room visit.  (Doc. No. 191-2 at ¶ 45.)  Lam also requested the surveillance footage of Bunch's hospital visit, but was unable to obtain it, as it was no longer retained.  (*Id.*)

On July 16, 2015, the juvenile court conducted a bindover hearing to determine whether there was probable cause to transfer the case against White to an adult criminal court.  (Doc. No. 261 at 5:2-11.)  That day, Allums and LaForce testified regarding their identifications of Bunch, as described above.  This was the first time that the prosecutor assigned to the Allums home invasion, Norman Schroth ("Schroth"), learned of the alleged "serious and exculpatory" improprieties in the administration of the photo arrays to Allums and LaForce.  (Doc. No. 257 at ¶¶ 6-7.)  The bindover hearing continued on July 21, 2015 and concluded on July 24, 2015.  (*See* Doc. No. 261.)  At the conclusion of the hearing, the judge held that there was no probable cause that White was part of the Allums home invasion, noting that all three witnesses had identified Bunch, that White was the only

13

one with dreadlocks or twists in the photo arrays in which he had been identified (while all of the individuals in Bunch's photo arrays had similar hairstyles), the conflicting descriptions of Suspect #1's height and weight, Bunch's injury the night of the home invasion, and the lack of evidence corroborating the initial identification of White, including the lack of marks on White's legs.  (*Id.* at 432:14-435:6.)  Despite this finding, the judge did not dismiss the case against White nor release him from detention.  Schroth indicated his belief that if there was no probable cause, the court had to dismiss the case.  (*Id.* at 435:8-9.)  However, after a short recess, the judge stated that Ohio's Eighth District Court of Appeals has held that it is the state's case and it may dismiss the case if it wishes, but that she was not comfortable dismissing the charges outright.  (*Id.* at 435:10-20.)  As a result, the judge set the matter for trial, while noting the prosecution could dismiss the case.  (*Id.* at 435:20-436:3.)

On July 31, 2015, a week after the conclusion of the hearing, White was released to house arrest. (Doc. No. 189-1 at 247:24-248:2.)  However, he violated the terms of his release and returned to juvenile detention on September 17, 2015.  (*Id.* at 248:3-252:12.)  Several months later, on December 8, 2015, the charges against White related to the Allums home invasion were dismissed without prejudice.  (Doc. No. 181 at ¶ 46.)  White was not released from detention at that time, however, as he had committed several assaults while he was in detention.  As a result of his sentencing on those assaults, White spent a year in a juvenile detention center in Pennsylvania and was ultimately released on December 1, 2016.  (Doc. No. 189-1 at 252:16-253:25.)

14

b. **Procedural History**[6]

On May 9, 2017, White filed this civil rights suit in the Court of Common Pleas of Cuyahoga County, Ohio against the Defendants City of Cleveland (the "City"), Shoulders, Schade, Lam, and several other named and John Doe police officers.  (Doc. No. 1-1.)  The Complaint set forth claims pursuant to 42 U.S.C. § 1983 and Ohio law related to the circumstances surrounding White's arrest and detention for the Allums home invasion.  (*Id.*)  The action was removed to this Court on June 5, 2017.  (Doc. No. 1.)

On August 3, 2017, White filed a First Amended Complaint, removing the John Doe defendants and certain named defendants and adding Santiago, Jr., Kubas, and Beveridge as defendants.  (Doc. No. 23.)  Following a brief stay and the completion of discovery, White filed a Motion for Leave to File a Second Amended Complaint, seeking to substitute Santiago as a party defendant in place of his son, Santiago, Jr.  (Doc. No. 172.)  On April 16, 2020, the Court granted White's Motion despite Defendants' objections that his amendment would be futile because White's claims against Santiago are barred by the relevant statutes of limitations, finding that White's Second Amended Complaint would relate back to his First Amended Complaint under Fed. R. Civ. P. 15(c) and would therefore be timely.  (Doc. No. 179.)[7]

Subsequently, on April 17, 2020, White filed his Second Amended Complaint against the City and the individual Defendants in their personal and official capacities.  (Doc. No. 181.)  In his Second

---

[6] This case has an extensive procedural history with which the parties are familiar.  The Court will describe that history only to the extent it is relevant to the parties' motions and to provide a brief background.

[7] On May 4, 2020, the Court also denied Defendants' Motion for Reconsideration of that decision.  (Doc. No. 201.) Santiago now makes the same argument in support of his Motion for Summary Judgment, asserting that the claims against him are barred by the relevant statutes of limitations because White's Second Amended Complaint does not relate back to his First Amended Complaint.  (Doc. No. 195-1 at PageID#s 3170-76.)  Because the Court ultimately finds in favor of Santiago on White's federal claims and declines to exercise supplemental jurisdiction over White's state law claims, the Court need not address Santiago's argument in this regard.

15

Amended Complaint, White brings the following claims: Fourth and Fourteenth Amendment malicious prosecution under 42 U.S.C. § 1983 against all Defendants (Claim 1); Fourth and Fourteenth Amendment false arrest/false imprisonment under 42 U.S.C. § 1983 against all Defendants, except Kubas and Santiago (Claim 2); Fourth and Fourteenth Amendment wrongful detention under 42 U.S.C. § 1983 against all Defendants (Claim 3); Fourteenth Amendment due process violation under 42 U.S.C. § 1983 against all Defendants (Claim 4); Fourth and Fourteenth Amendment failure to train under 42 U.S.C. § 1983 against the City (Claim 5); malicious prosecution under Ohio law against all Defendants (Claim 6); false arrest under Ohio law against all Defendants, except Kubas and Santiago (Claim 7); false imprisonment under Ohio law against all Defendants (Claim 8); intimidation (using materially false or fraudulent writings to attempt to influence public servants) under Ohio Revised Code ("O.R.C.") § 2921.03 against all Defendants (Claim 9); and civil liability for criminal acts under O.R.C. § 2307.60 against all Defendants (Claim 10). (*Id.* at ¶¶ 50-106.)

On May 4, 2020, Defendants filed their respective Motions for Summary Judgment, each seeking judgment on all of White's claims against them. (Doc. Nos. 191, 193, 195, 197, 199.) White filed a consolidated brief in opposition to Defendants' Motions for Summary Judgment on June 17, 2020, to which Defendants replied on July 15, 2020. (Doc. Nos. 247, 262-66.)[8] On May 5, 2020, White also filed a Motion for Partial Summary Judgment in which he seeks summary judgment on the question of liability on Claims 9 and 10 against Kubas and Santiago in their personal and official

---

[8] Defendants also objected to the length of White's opposition brief, arguing that White failed to comply with the Court's order regarding page limitations based on several issues, including his excessive use of footnotes. (Doc. No. 256.) In response, White filed a reformatted version of his opposition brief demonstrating such issues did not allow him to exceed his allotted page limitations. (Doc. No. 259.) As such, the Court finds no merit to Defendants' objections.

capacities. (Doc. No. 205.) The City filed a brief in opposition to White's Motion for Partial Summary Judgment on June 17, 2020, to which White replied on July 15, 2020. (Doc. Nos. 249, 267.) Kubas and Santiago filed a joint brief in opposition to White's Motion for Partial Summary Judgment on June 18, 2020, to which White replied on July 16, 2020. (Doc. Nos. 250, 268.)

## II.     Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may

also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 F. App'x at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

"[O]n cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Dixon v. Univ. of Toledo*, 702 F.3d 269, 273 (6th Cir. 2012) (quoting *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001)).

**III.    Analysis**

**a.  Evidentiary Objections**

Defendants make numerous objections as to the admissibility of certain evidence that White relies on in his briefs on summary judgment.  (*See, e.g.*, Doc. No. 262 at PageID#s 18335-37; Doc. No. 265 at PageID#s 18378-79.)  Because the Court ultimately finds in Defendants' favor even when considering the objected to evidence cited by White, the Court need not address each of Defendants' numerous objections.  Nonetheless, the Court will briefly address the appropriateness of the Court's consideration of the transcript from White's bindover hearing in juvenile court, as it is central to the Court's analysis of White's malicious prosecution claims against Kubas and Santiago.  Defendants argue that testimony from the juvenile court transcript is inadmissible to establish a question of fact

18

on summary judgment because (1) Ohio's juvenile court rules prohibit the use of the transcript outside of juvenile court, and (2) it is hearsay. (Doc. No. 191-1 at PageID#s 2888-89; Doc. No. 193-1 at PageID# 2993; Doc. No. 195-1 at PageID#s 3178-79; Doc. No. 197 at PageID# 3297 n.3.)[9] In response, White contends that White's use of the transcript was authorized by the juvenile court and that the transcript is not inadmissible hearsay because the facts contained therein could be presented in a form that would be admissible at trial. (Doc. No. 247 at PageID#s 14842 n.3, 14849 n.59.) The Court agrees with White that it may consider the transcript for purposes of ruling on the parties' motions for summary judgment.

First, White's use of the transcript is not prohibited by Ohio's juvenile court rules. Ohio R. Juv. Proc. 37(B) provides that "[n]o public use shall be made by any person, including a party, of any juvenile court record, including the recording or a transcript of any juvenile court hearing, except in the course of an appeal or *as authorized by order of the court* or by statute." Ohio R. Juv. Proc. 37(B) (emphasis added). In this case, White's counsel obtained permission from the juvenile court to use the transcripts from White's juvenile case for purposes of representing White in this action. (*See* Doc. Nos. 247-3, 247-4.) As such, White's use of the transcript was "authorized by order of the court." *See Benton v. City of Cleveland*, No. 1:18-cv-2159, 2020 WL 1233949, at *5 (N.D. Ohio Mar. 13, 2020).

Second, the transcript is not inadmissible hearsay at the summary judgment stage. As explained by the Sixth Circuit, "[t]he submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial." *Alexander v. CareSource*, 576

---

[9] Some Defendants also object to the juvenile court transcript because White filed an unsigned version. However, White later filed a signed version of the transcript, rendering this objection moot. (*See* Doc. No. 261.)

F.3d 551, 558 (6th Cir. 2009). Instead, "the party opposing summary judgment must show that she *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Id.*; *Tranter v. Orick*, 460 F. App'x 513, 515 (6th Cir. 2012) ("The proffered evidence need not be in admissible *form*, but its *content* must be admissible.") (quoting *Bailey v. Floyd Cty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997)). "For instance, deposition testimony will assist a plaintiff in surviving a motion for summary judgment, even if the deposition itself is not admissible at trial, provided substituted oral testimony would be admissible and create a genuine issue of material fact." *Tranter*, 460 F. App'x at 515 (quoting *Bailey*, 106 F.3d at 145). Consequently, courts have held that hearing transcripts from separate proceedings are admissible for consideration at the summary judgment stage under Fed. R. Civ. P. 56. *See, e.g.*, *Thomas v. Harvey*, 381 F. App'x 542, 547 (6th Cir. 2010) ("District courts routinely consider properly authenticated deposition transcripts, and hearing transcripts of equal reliability should be treated in the same way."); *Ricupero v. Wuliger, Fadel & Beyer*, No. 1:91CV0589, 1994 WL 483871, at *4 (N.D. Ohio Aug. 26, 1994) ("[T]he transcripts are not 'hearsay' merely because they consist of statements made by a witness in a prior proceeding, any more than an affidavit or a deposition offered in support of a motion for summary judgment is inherently hearsay.").

Accordingly, statements from the juvenile court transcript relied on by White are not considered inadmissible hearsay at this stage. Moreover, to the extent that any of the testimony from the juvenile court hearing itself contains hearsay statements—that is, occasions when the witness relays statements from a third party—the Court will not consider that portion of the testimony unless it falls into a hearsay exception. The Court notes, however, that any statements by Allums or LaForce

about the instructions Kubas and Santiago gave them related to the photo arrays at issue are not hearsay, as they are statements offered as evidence against the party who made them.  *See* Fed. R. Evid. 801(d)(2).

### b.  Defendants' Motions for Summary Judgment

### i.  Claims Under 42 U.S.C. § 1983

To maintain a claim under 42 U.S.C. § 1983, a plaintiff must establish that he or she was deprived of a right secured by the Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Simescu v. Emmet Cty. Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991).  Here, there is no dispute that Defendants acted under color of state law.  As such, the only remaining question is whether White was deprived of a right secured by the Constitution or the laws of the United States.

However, "[p]olice officers are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015).  To determine whether an officer is entitled to qualified immunity, courts "apply a well-established two-prong test: (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such 'that a reasonable official would understand that what he is doing violates that right.'"  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).  These steps may be addressed in any order, and the defendant officer need only prevail on one of them to be granted qualified immunity.  *See Coffey v. Carroll*, 933 F.3d 577, 584 (6th Cir. 2019); *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018).

21

With regard to the second step, "clearly established" means that the law is so clear at the time of the incident that every reasonable officer would understand the unlawfulness of his conduct. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).  As the Supreme Court recently explained:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.  The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (*per curiam* ), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd, supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).  It is not enough that the rule is suggested by then-existing precedent.  The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.  *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088.  Otherwise, the rule is not one that "every reasonable official" would know.  *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him.  The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ----, ----, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (*per curiam* ). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff, supra*, at 2023 (internal quotation marks and citation omitted).  A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson, supra*, at 641, 107 S.Ct. 3034.

*Id.* at 589-90.  Thus, in evaluating whether a constitutional right was clearly established for purposes of qualified immunity, courts "must examine the *particular* situation that [the defendant officers] confronted and ask whether the law clearly established that their conduct was unlawful." *Howse v. Hodous*, 953 F.3d 402, 407 (6th Cir. 2020).  As such, for each claim below, the Court will assess whether a violation occurred, and, if necessary, whether that violation was of a clearly established right.

22

### 1.  False Arrest/False Imprisonment (Claim 2)

In Claim 2 of his Second Amended Complaint, White asserts he was arrested without probable cause and brings a claim for false arrest/false imprisonment under § 1983 against all Defendants, except for Kubas and Santiago.  (Doc. No. 181 at ¶ 57.)  In their Motions for Summary Judgment, Lam and Shoulders assert they are entitled to judgment on White's false arrest claim because they relied on a valid arrest warrant and White's arrest was supported by probable cause, while Schade and Beveridge assert they cannot be held liable because they were not involved in White's arrest. (Doc. No. 191-1 at PageID#s 2890-92; Doc. No. 193-1 at PageID#s 2996-99; Doc. No. 199-1 at PageID#s 3780-81.)  White acknowledges that his arrest was made in reliance on a judicially approved warrant, but contends his claim for false arrest nonetheless survives summary judgment because Lam and Shoulders made false statements and omitted information in the application for White's arrest warrant that were material to the finding of probable cause.  (Doc. No. 247 at PageID#s 14867-69.)  White does not directly respond to Schade's and Beveridge's argument regarding their lack of involvement in White's arrest.  Upon review, the Court agrees with Defendants that they are entitled to summary judgment on White's claims for false arrest.

At the outset, the Court notes that "only those officers who participated in the arrest of an individual can be subject to liability for false arrest."  *Johnson v. Thivierge*, No. 11–cv–10652, 2012 WL 2601909, at *6 (E.D. Mich. June 13, 2012); *see also Webb v. United States*, 789 F.3d 647, 667 (6th Cir. 2015) (holding officers were entitled to summary judgment where the plaintiff did not allege that they "were at the scene of his arrest or that any of them implicitly authorized the unconstitutional conduct of a subordinate"); *Palmer v. Town of Jonesborough*, No. 2:08–cv–345, 2009 WL 1255780,

23

at \*6 (E.D. Tenn. May 1, 2009) ("It is axiomatic that a claim against an officer for false arrest must demonstrate, inter alia, that that officer took part in the arrest.").

In this case, there is no dispute that Schade's and Beveridge's only involvement in the Allums home invasion case was the provision of investigative leads in which they both mentioned White to Lam and Shoulders based on their knowledge of recent incidents and individuals from the neighborhood.  Neither Schade nor Beveridge participated further in the investigation of White, the creation of the photo arrays at issue, the applications for arrest and search warrants, or the actual arrest of White.  White does not identify any acts committed by Schade or Beveridge that would establish their liability for his alleged false arrest (*see* Doc. No. 247 at PageID#s 14867-69), and White cannot survive summary judgment by simply attempting to lump Schade and Beveridge together with other Defendants.  *See Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014) ("[T]o establish liability and to overcome a qualified immunity defense, an individual must show that his or her *own* rights were violated, and that the violation was committed *personally* by the defendant.").  As such, Schade and Beveridge are entitled to summary judgment on White's false arrest claims against them.

Lam and Shoulders did participate in White's arrest, however, so the Court must more fully assess White's claims against them.  "A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff."  *Voyticky v. Vill. of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005).  "An arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest or false imprisonment made pursuant to § 1983."  *Id.*  However, "[a] facially valid warrant is not always sufficient to merit summary judgment in an action brought pursuant to § 1983 when evidence exists that a defendant

24

intentionally mislead or intentionally omitted information at a probable cause hearing for an arrest or a search warrant provided that the misleading or omitted information is critical to the finding of probable cause." *Id.* at 677 n.4.  In other words, "[w]here, as here, a facially valid warrant was issued, a plaintiff must prove by a preponderance of the evidence that in order to procure the warrant, [the defendant] knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood and such statements or omissions [we]re material, or necessary, to the finding of probable cause." *Jerome v. Crum*, 695 F. App'x 935, 940-41 (6th Cir. 2017) (internal citations omitted) (quoting *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010)).  If the affidavit does contain such false statements or omissions, courts "set aside the statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause." *Sykes*, 625 F.3d at 305.

In this case, White asserts that Shoulders's affidavit in support of White's arrest warrant contained several false statements and omissions that were material to the finding of probable cause. (Doc. No. 247 at PageID#s 14867-69.)  Specifically, White argues that, in his affidavit, Shoulders (1) misrepresented White's involvement in the prior aggravated menacing case, (2) falsely implied that White matched the victims' descriptions of the shooter when he was in fact far shorter and lighter, (3) falsely implied that the lineups used to identify White were properly prepared and administered when the lineups were actually unduly suggestive, (4) omitted that Shoulders had a failing memory, (5) omitted that the victims did not recognize any of White's suspected accomplices, (6) omitted that the victims identified White's picture without knowing he was far smaller than they had described, and (7) omitted that the victims were severely limited in their opportunity to view the shooter.  (*Id.* at PageID#s 14867-68.)  Even if the Court assumes these false statements and omissions were made

deliberately and knowingly or with a reckless disregard for the truth and assesses the warrant application as if it had excluded the false statements and included the information omitted—taking into account that several of White's blanket statements are not completely accurate, as discussed below—probable cause still supported the warrant for White's arrest.

Although the Sixth Circuit "has inconsistently treated the ultimate question of probable cause in civil cases as both a question of fact for the jury *and* as a question of law for the judge," the Sixth Circuit recently examined the issue in depth and concluded that "the ultimate question of probable cause (*separate* from the determination of historical facts) in a civil case when the historical facts are undisputed is a question of law for the court and not a jury." *Gerics v. Trevino*, 974 F.3d 798, 803-05 (6th Cir. 2020); *accord Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005) ("When no material dispute of fact exists, probable cause determinations are legal determinations that should be made by a court.").  As such, unless there is a genuine dispute of fact that is material to the existence of probable cause, the issue is a legal determination that should be made by the Court.

Probable cause exists "when, at the moment the officer seeks the arrest, 'the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense.'"  *Jones v. Clark Cty., Kentucky*, 959 F.3d 748, 756-57 (6th Cir. 2020) (quoting *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015)).  "A probable cause determination is based upon the 'totality of the circumstances' and must consider 'both the inculpatory and exculpatory evidence.'"  *Id.* at 757 (quoting *Wesley*, 779 F.3d at 429).  "That means an officer cannot simply turn a blind eye toward evidence favorable to the accused, nor ignore information which becomes available in the course of routine investigations."  *Id.* (internal citations and quotations

26

omitted).  However, "a 'probable cause determination . . . does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands.'"  *Id.* (quoting *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975)).  Instead, the Supreme Court has explained that "[p]robable cause 'is not a high bar'" and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  *Wesby*, 138 S. Ct. at 586 (citations omitted).

 "A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest."  *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999); *accord Legenzoff v. Steckel*, 564 F. App'x 136, 142 (6th Cir. 2014) ("[A]n eye witness identification and accusation, by itself, is sufficient to establish probable cause.").  However, the eyewitness allegations must be reasonably trustworthy.  *Wesley*, 779 F.3d at 429.  As explained by the Sixth Circuit:

> An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.  This comports with the general notion that, since eyewitnesses' statements are based on firsthand observations, they are generally entitled to a presumption of reliability and veracity.

*Ahlers*, 188 F.3d at 370 (internal citations and quotations omitted).

Here, as noted above, in support of his false arrest claim, White first contends that Shoulders falsely represented in his affidavit that White was a suspect in a prior aggravated menacing complaint that may have been related to the Allums home invasion.  (Doc. No. 247 at PageID# 14867.)  Assuming Shoulders's knowledge of the falsity of this representation, the Court will set aside that statement and examine whether the affidavit is still sufficient to establish probable cause were that statement not included.

This exclusion is not material unless White also can show that the three victim identifications of White cannot independently support probable cause.  To wit, even without the statement regarding the prior menacing complaint, Shoulders's affidavit accurately states that all three victims identified White as being involved in the Allums home invasion, specifically noting that "Laforce positively identified Dalonte White as the shooter with 100% certainty," "Hale identified Dalonte White as one of the persons involved in the home invasion with 70% certainty," and "Allums positively identified Dalonte White as the shooter with 100% certainty."  (Doc. No. 225-9 at PageID# 8447.)  Absent sufficient reason to doubt the trustworthiness of these identifications, they are sufficient by themselves to support probable cause for White's arrest.  Thus, the circumstances surrounding the identifications that White asserts should have been included in the warrant affidavit will be considered to determine if they were material to a finding of probable cause.[10]

The first problem with Shoulders's affidavit that White identifies as relevant to this question is the fact that, according to White, Shoulders implied that White matched the victims' descriptions of the shooter when he was in fact far shorter and lighter.  (Doc. No. 247 at PageID# 14867.)  Relatedly, White asserts Shoulders omitted that the victims identified White's picture without knowing he was far smaller than they had described.  (*Id.* at PageID# 14868.)  However, contrary to White's assertions, White did, in fact, match the description of the shooter provided by at least one of the victims.  According to Allums, the shooter was approximately 5'5" and 160 to 170 lbs. with

---

[10] White argues that the City, through its Fed. R. Civ. P. 30(b)(6) witness, admitted that the false statements and omissions from Shoulders's affidavit were material.  (Doc. No. 247 at PageID# 14869.)  However, "a lay witness cannot testify as to legal conclusions, and such questions exceed the permissible scope of a 30(b)(6) deposition."  *Majestic Bldg. Maint., Inc. v. Huntington Bancshares Inc.*, No. 2:15-CV-3023, 2018 WL 3358641, at *11 (S.D. Ohio July 10, 2018) (quoting *Brooks v. Caterpillar Glob. Mining Am., LLC*, No. 4:14CV-00022-JHM, 2016 WL 5213936, at *5 (W.D. Ky. Sept. 20, 2016)).

dreadlocks sticking up, which is largely consistent with White's characteristics, who had dreadlocks at the time and was approximately 5'5" and 135 lbs.  (Doc. No. 223-11 at PageID# 7390; Doc. No. 230-2 at PageID# 8984.)  On the other hand, the description of Suspect #1 provided to Daugenti differed significantly from White—White was approximately seven inches shorter and 65 lbs. lighter than the lower end estimate of the shooter.  (*See* Doc. No. 223-10 at PageID# 7367.)  It is not clear who provided those descriptions to Daugenti.  However, even assuming it was LaForce and Hale, where multiple witnesses have identified a suspect, differences between the suspect's physical characteristics and witness descriptions do not necessarily negate probable cause.  *See Stahl v. Czernik*, 496 F. App'x 621, 625-27 (6th Cir. 2012) (holding that because "two witnesses identified [the plaintiff] as the perpetrator," a four inch difference in height between the plaintiff and the perpetrator described by witnesses was "too minor to preclude a finding of probable cause").

Next, White asserts that Shoulders's affidavit improperly implied that the lineups used to identify White were properly prepared and administered when the lineups were actually unduly suggestive.  (Doc. No. 247 at PageID# 14867-68.)  The Sixth Circuit has made it clear that assessing the impact of the suggestive nature of an identification procedure in the context of determining whether probable cause existed to support an arrest is distinct from the determination of whether such an identification could be used as evidence at trial.  In *Legenzoff*, the Sixth Circuit stated:

> The inquiry here . . . focuses on a pre-trial finding of probable cause, and as this circuit has stated, "evidence that supports probable cause for an arrest is not always admissible at trial."  *United States v. Washam*, 468 Fed.Appx. 568, 582 (6th Cir.2012); *see Illinois v. Gates*, 462 U.S. 213, 256, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Following our sister circuits, we do not find that it is necessary for our present analysis to formally incorporate into our probable cause discussion the *Biggers*'s framework, which is commonly employed for the admissibility of witness identifications at trial. *Compare Robinson v. Cook*, 706 F.3d 25, 34 (1st Cir.2013) (declining to apply the *Biggers*'s framework to a probable cause assessment in a § 1983 case alleging unlawful arrest); *Stansbury v. Wertman*, 721 F.3d 84, 91 (2nd Cir.2013) (same);

29

> *Phillips v. Allen*, 668 F.3d 912, 914–15 (7th Cir.2012) (same); *Good v. Curtis*, 601 F.3d 393, 398 (5th Cir.2010) (similar); with *Gregory v. City of Louisville*, 444 F.3d 725 (discussing the *Biggers*'s framework generally in the context of a one-on-one show-up analysis, not in the context of a probable cause determination). This is not to say that the court is turning a blind eye to potentially suggestive police procedures. These are still "relevant considerations in the totality-of-the circumstances analysis that has traditionally guided probable cause determinations" and we do consider them. *See Gates*, 462 U.S. at 233, 103 S.Ct. 2317; *Cook*, 706 F.3d at 34; *Allen*, 668 F.3d at 917. But this Court's analysis ultimately focuses on the issue of probable cause.

564 F. App'x at 141 n.3; *see also Penn v. Bergtold*, 803 F. App'x 900, 906 n.2 (6th Cir. 2020) (rejecting the plaintiff's argument that two witness identifications were not reasonably reliable "because they stemmed from an unduly suggestive show-up," noting the distinction between "admitting potentially unreliable show-up identifications as evidence *at trial*" and "whether a police officer may rely on a show-up identification in the context of whether there is probable cause to initiate a prosecution"). In accordance with these principles, the Court will assess White's arguments as to the suggestive nature of the photo array as another factor in the overall probable cause determination.

In asserting that the photo array of White was unduly suggestive, White cites to the expert report of Professor Seth Stoughton ("Stoughton"), without further explanation. (Doc. No. 247 at PageID#s 14867-68.) In reviewing Stoughton's report, he notes two issues that, in his opinion, caused the photo array to be problematically suggestive: (1) White is the only individual pictured with dreadlocks, which was a known characteristic of two of the suspects; and (2) only White and two of the five fillers were wearing dark colored tops, and all three suspects had been described as wearing black tops. (Doc. No. 247-23 at PageID#s 17283-85.)[11] The Court will assess each issue in turn.

_____

[11] Elsewhere in his opposition brief, White also cites to the expert report of Dr. Margaret Bull Kovera ("Kovera"), who likewise concludes that the photo array of White was biased against him for similar reasons. (Doc. No. 247 at PageID# 14858.) To the extent that Stoughton's and Kovera's expert reports address other reasons that the victims' identifications

First, case law does not support White's argument that the clothing in his picture renders the photo array unduly suggestive. The Sixth Circuit has noted that "[m]any cases . . . indicate that a photo array is not suggestive where only the defendant is dressed in clothing or has a personal attribute that is expressly referenced by a witness." *Legenzoff*, 564 F. App'x at 144; *see also United States v. Peterson*, 411 F. App'x 857, 865 (6th Cir. 2011) ("In light of the many substantial similarities between those in the photo array, the alleged differences in clothing and age are too minor to render the spread unduly suggestive."). Moreover, two other fillers were wearing dark colored tops, meaning that half of the individuals pictured in the photo array were wearing dark colored tops. (*See* Doc. No. 210-11 at PageID#s 6424-25.) This would hardly cause White to stand out as conspicuous. In addition, White appears to be wearing a regular shirt, while the witnesses had described the suspects as wearing a jacket or hoodie. (Doc. No. 223-10 at PageID#s 7367, 7369.) The other two fillers with dark tops are wearing sweatshirts or hoodies that actually better match the witnesses' descriptions of the suspects. (*See* Doc. No. 210-11 at PageID#s 6424-25.)

On the second point, however, the Court agrees with White that his inclusion in the photo array as the only individual with dreadlocks, consistent with the video and the description of one of

---

were not reliable, the Court finds that White has not adequately addressed these issues in his brief and it is not the Court's responsibility to search the record in support of White's arguments. *See Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996).

In his opposition to Defendants' Motions for Summary Judgment, White also argues that "a jury could reasonably conclude, as Dr. Kovera and Professor Stoughton did, that those lineups were not reliable enough to factor into the probable-cause determination" and that "a reasonable jury could accept Professor Stoughton's expert opinions that the lineups were unduly suggestive and that Shoulders would have known that." (Doc. No. 247 at PageID#s 14858, 14867-68.) However, whether eyewitness identifications are reasonably reliable information is a legal question, not a fact question. *Bergtold*, 803 F. App'x at 904. Thus, White's experts' conclusions are not relevant to that determination. *See Zuress v. City of Newark, OH*, 815 F. App'x 1, 8 (6th Cir. 2020) ("The testimony of plaintiff's experts on a legal question cannot establish a genuine dispute of a material fact."); *Clements-Jeffrey v. City of Springfield, Ohio*, No. 3:09–cv–84, 2011 WL 3207363, at *4 (S.D. Ohio July 27, 2011) (holding an expert's opinion on a question of law was irrelevant).

the suspects in Daugenti's report, does contribute to the suggestive nature of the photo array. While this case involves a probable cause determination, courts have held that a lineup is suggestive when a defendant is the only individual with hair that matches the description of the perpetrator in the context of the admission of witness identifications at trial. *See Sanders v. Berghuis*, No. 13-cv-12935, 2015 WL 9302347, at \*5 (E.D. Mich. Dec. 22, 2015) ("[B]ecause at least one of the witnesses described the suspect to the police as having braids (*Wade* Hr'g Tr., 10, July 11, 2008), and because Petitioner was the only participant in the line-up with long, braided hair (*id.* at 15-16), the lineup was suggestive."); *Pasley v. Romanowski*, No. 04-CV-71020-DT, 2005 WL 2291011, at \*5 (E.D. Mich. Sept. 20, 2005) (holding pretrial identification procedure was impermissibly suggestive, in part, because the petitioner was the only one with braids in the line-up after the complainant had described one of the perpetrators as having braids or long, wild hair).[12]

However, instructions on the photo array forms indicated that the victim or witness should be told to "keep in mind that hair styles, beards, and mustaches may be easily changed." (*E.g.*, Doc. No. 230-2 at PageID# 8979.) Additionally, in a declaration submitted by Lam, he indicates that the instructions that are read to witnesses specifically state that he or she should not focus on hairstyles, as they can be changed. (Doc. No. 191-2 at ¶ 17; *see also* Doc. No. 222-1 at 64:10-18.) This instruction would have reduced, at least a little, the suggestiveness of the identification procedure, and it would have been reasonable for Lam and Shoulders to have assumed that this instruction had been properly given and factored that into their probable cause assessment. In addition, there were

---

[12] The Court notes that the finding of suggestiveness in the context of these cases does not necessarily mean the identification will be excluded from trial. Instead, it means the court must proceed to the second step of the analysis to evaluate the "totality of the circumstances" to determine whether there were nevertheless sufficient independent indicia of reliability. *Pasley*, 2005 WL 2291011, at \*4.

other indicators that the identifications were reliable.  Specifically, the photo arrays were given by blind administrators, there was no reason to suspect any of the victims were not telling the truth, the identifications were made within a few days of the home invasion, two of the witnesses were 100% confident in their identifications, and other than hairstyle, White and all of the fillers shared substantially the same characteristics.

Next, White asserts that Shoulders's affidavit should have included the fact that the victims were severely limited in their opportunity to view the shooter.  (Doc. No. 247 at PageID# 14868.)  However, the evidence presented by White to support this assertion is limited.  White cites to Lam's admissions during his deposition that Allums was struck by Suspect #1 and thereafter spun around face down onto the couch while dazing in and out of consciousness.  (Doc. No. 223-1 at 307:11-310:14.)  But there is no evidence as to the length of time between when the suspects entered Allums's house and when she was hit.  (*Id.* at 308:10-15.)  Without evidence that such time was minimal, Shoulders would have had no reason to doubt the veracity of Allums's identification or to include in the affidavit that her opportunity to view the shooter was limited.  Next, White cites to Lam's testimony regarding certain statements made by LaForce and Hale to Lam during a recorded interview, such as LaForce not wanting to look at the person robbing her and putting her hands over her eyes.  (*Id.* at 310:15-311:19.)  However, Lam did not recall hearing such statements, and White has not presented the Court with evidence of the actual recording.  (*Id.*)  As such, White has failed to present any admissible evidence as to LaForce's and Hale's statements.  Counsel's questions describing the victim's statements are not evidence and, although Lam stated he would have no reason to dispute White's counsel if she told him those statements were in the audio recording, Lam testified that he did not recall any of the statement being made.  *See Sherry v. Coldwell Banker Preferred-*

33

*Canton*, No. 07-CV-136, 2008 WL 3876351, at *7 (E.D. Mich. Aug. 18, 2008) ("The question by counsel is not evidence, and the response from Dobis was that he did not know the date. In no way does this testimony show that the decision was made on November 3.").

The last two omissions from Shoulders's affidavit that White identifies do little to undercut the reliability of the victims' identifications of White. White asserts that Shoulders omitted that none of the victims identified White's suspected accomplices from the other two photo arrays that were presented. (Doc. No. 247 at PageID# 14868.) There are numerous reasons why this could have happened that would not cast doubt on the victims' identifications of White. For example, White may have acted with different individuals or the victims may not have gotten as good of a view of the other suspects because their focus was on the shooter. Finally, White asserts that Shoulders's memory problems should have been included in the affidavit. (*Id.*) During his deposition, Shoulders testified that as a result of chemotherapy and radiation treatment for cancer in 2000, he has difficulty remembering things, such as specific names and dates. (Doc. No. 244 at 9:1-10:12.) It is unclear whether these issues were present in 2015. But even if they were, White does not explain how this would reduce the trustworthiness of the victims' identifications of White that Shoulders accurately reported in his affidavit.

Taking all of the circumstances described above into account, the Court concludes that the false statements and omissions identified by White were not material to the finding of probable cause. An affidavit setting aside the false statements from Shoulders's affidavit and including an accurate account of the relevant omissions identified by White as supported by the evidence would show the following:

34

1) Allums and LaForce identified White from a photo array as the shooter from the home invasion with 100% certainty, and Hale identified White from a photo array as one of the individuals involved in the home invasion with 70% certainty.

2) The photo array presented to the victims was suggestive to the extent that White was the only individual pictured with dreadlocks, but this suggestiveness was reduced by instructions not to pay too much attention to hairstyle, as it can be easily changed, and there were other indicators of the reliability of the identifications, including the fact that there was no reason to suspect the victims were not telling the truth, blind administrators presented the photo arrays, the identifications were made within a few days of the home invasion, and White and the fillers were substantially similar in characteristics other than hairstyle.

3) White's height and weight were a close match to those of the suspect with the gun described by Allums, but significantly different from the estimates of Suspect #1's height and weight provided to Daugenti.  The victims were not aware of this inconsistency when they made their identifications.

4) None of the victims identified White's suspected accomplices.

5) Shoulders had difficulty with his memory, including issues with remembering specific dates and names.[13]

This is sufficient to establish probable cause for White's arrest.  Significantly, all three victims identified White as being involved in the Allums home invasion, two with 100% certainty and one with 70% certainty.  These identifications were made within a few days of the home invasion to blind administrators, and there was no reason to doubt that they were telling the truth.  In addition, White's physical characteristics were a close match to those of the suspect described by Allums.  While the photo array was suggestive because of White's unique hairstyle—although this suggestiveness was reduced by the instructions regarding hairstyle and the substantial similarities between White and the fillers with regard to other characteristics—and White's physical characteristics were inconsistent with the description of Suspect #1 provided to Daugenti, these issues do not render the identifications

---

[13] The Court does not include the fact that the victims were severely limited in their opportunity to view the shooter, as White has not presented any evidence in support of this contention, as described above.

35

so unreliable that probable cause could not be based on them.  And the rest of the omissions identified by White do not change that conclusion, as they are either not supported by the evidence or, at most, minimally relevant.[14]  Accordingly, Lam and Shoulders did not violate White's constitutional rights and are entitled to summary judgment on White's false arrest claims.

Finally, even if the false statements and omissions from Shoulders's affidavit were material to probable cause, Lam and Shoulders are nonetheless entitled to qualified immunity.  The Supreme Court has "recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  In other words, "under § 1983, an officer 'is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of . . . the information possessed at the time by the arresting agent.'" *Barton v. Martin*, 949 F.3d 938, 950 (6th Cir. 2020) (quoting *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008)); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.").

---

[14] In support of his false arrest claims, White does not specifically argue that Shoulders wrongfully omitted from his affidavit in support of White's arrest warrant the fact that White did not have any visible injuries on his legs three days after the Allums home invasion.  (*See* Doc. No. 247 at PageID#s 14867-69.)  The Court notes, however, that even considering this additional exculpatory information, the strength of the eyewitness identifications from each of the three victims still supported probable cause for White's arrest.  While Lam and Shoulders certainly suspected that the shooter had suffered a dog bite or gunshot wound to the leg, there was no definitive evidence of such an injury.  (*See* Doc. No. 223-1 at 221:18-222:2; Doc. No. 244 at 268:3-14, 274:2-277:17.)

Based on the evidence described above, it was reasonable for Lam and Shoulder to conclude that probable cause existed for White's arrest, even if that conclusion may have been mistaken. Nor has White cited any cases in which it is clearly established that probable cause did not exist in the circumstances present here. *See Legenzoff*, 564 F. App'x at 146 ("Thus, given the strength of the multiple witness identifications, and the minimal grounds on which Legenzoff's photo differed from the others, we cannot say it was clearly established that there was no probable cause for arrest, even despite the alleged infirmities in the photo array."); *Penn v. Bergtold*, No. 17-CV-10862, 2019 WL 1595869, at *5 (E.D. Mich. Apr. 15, 2019) (finding no clearly established law "that an officer may not rely upon an identification from an allegedly-suggestive show up when determining whether he has probable cause to arrest"), *rev'd and remanded on other grounds*, 803 F. App'x 900 (6th Cir. 2020). Accordingly, even if probable cause was lacking, Lam and Shoulders are entitled to qualified immunity on Whites' claims for false arrest.

### 2.  Malicious Prosecution and Wrongful Detention (Claims 1, 3)

In Claim 1 of his Second Amended Complaint, White sets forth a claim for malicious prosecution based on Defendants' alleged actions of making or influencing the decision to prosecute him—and continue to prosecute him—without probable cause. (Doc. No. 181 at ¶ 51.) Similarly, in Claim 3, White sets forth a claim for wrongful detention, alleging that Defendants deprived White of his Fourth Amendment right to be free from unreasonable seizure by continuing to detain him without probable cause. (*Id.* at ¶ 64.) Defendants each move for summary judgment on Claim 1 and assert a variety of reasons that judgment in their favor is warranted. Namely, either some or all of Defendants argue summary judgment is warranted because (1) probable cause existed for White's prosecution and continued detention, (2) they did not fabricate or conceal evidence from the prosecutor or judge

in White's case, (3) the case against White did not terminate in his favor, and (4) their actions did not influence White's prosecution or continued detention.  (Doc. No. 191-1 at PageID#s 2893-95; Doc. No. 193-1 at PageID#s 2990-94; Doc. No. 195-1 at PageID#s 3176-79; Doc. No. 197 at PageID#s 3297-99; Doc. No. 199-1 at PageID#s 3778-80.)  Except for Lam, all Defendants also treat White's Claims 1 and 3 synonymously and argue Claim 3 should be dismissed for the same reasons.  (Doc. No. 193-1 at PageID#s 2990-94; Doc. No. 195-1 at PageID#s 3176-79; No. 197 at PageID#s 3297-99; Doc. No. 199-1 at PageID#s 3778-80.)  In opposition to Defendants' Motions for Summary Judgment, White asserts that genuine issues of material fact preclude summary judgment on both Claims 1 and 3.  (Doc. No. 247 at PageID#s 14851-67.)  White also treats his Claim 3 for wrongful detention as distinct from his Claim 1 for malicious prosecution, asserting that Claim 3 should survive summary judgment because the procedures afforded White after his arrest were inadequate in the face of his repeated protests of innocence and his detention resulted from Defendants' refusal to investigate available exculpatory evidence.  (*Id.* at Page ID#s 14870-71.)  The Court concludes that Defendants are entitled to summary judgment on both Claims 1 and 3.

"Under federal law, a plaintiff must prove four elements to establish a malicious prosecution claim: (1) that a criminal prosecution was initiated against the plaintiff and that the defendant 'made, influenced, or participated in the decision to prosecute;' (2) that the state lacked probable cause for the prosecution; (3) that the plaintiff suffered a deprivation of liberty because of the legal proceeding; and (4) that the criminal proceeding was 'resolved in the plaintiff's favor.'"  *Jones*, 959 F.3d at 756 (quoting *Sykes*, 625 F.3d at 308-09).  "The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017).  However, "the § 1983 version of 'malicious

38

prosecution' is not limited to the institution of proceedings; it can also support a claim for 'continued detention without probable cause.'" *Id.* (citation omitted).

Although not clearly delineated by the parties in their briefing, White's claims for malicious prosecution focus on Defendants' actions at two separate points in time: (1) White's initial arrest, and (2) after the victim's allegedly identified Bunch.  To illustrate, Beveridge's and Schade's only involvement in White's case arose from their statements prior to White's arrest.  If they influenced the decision to prosecute White, it could only have occurred in the time leading up to the decision to arrest White.  On the other hand, Kubas and Santiago did not become involved until serving as blind administrators during the alleged identifications of Bunch, which occurred well after the initial arrest.  Lam and Shoulders are the only Defendants alleged to have been involved in White's juvenile case the entire time it was pending.  As such, the Court will analyze White's malicious prosecution claims in light of the different points in time at which Defendants' actions may have affected his prosecution.

In addition, the Court finds it appropriate to treat the assessment of Claim 1 and Claim 3 together, as the allegations that White sets forth in his Second Amended Complaint in support of Claim 3 are identical to the allegations that would support a claim for malicious prosecution with respect to the second point in time noted above—after the alleged identifications of Bunch.  (*See* Doc. No. 181 at ¶ 64 ("Defendants deprived Dalonte of his Fourth Amendment right to be free from unreasonable seizure by continuing to detain him without probable cause . . . including after they acquired information undermining their initial basis for Dalonte's arrest warrant, such as the fact that all three witnesses positively identified Edward Bunch in a photo array.").)[15]

_____

[15] In his opposition to Defendants' Motions for Summary Judgment, White appears to rely on a different theory of liability than was presented in his Second Amended Complaint to support his claims for wrongful detention.  (*See* Doc. No. 247 at PageID# 14870-71.)  Instead of basing his claim on a lack of probable cause, White contends his constitutional rights

With respect to the first period in time, the point of White's arrest, the Court finds that Defendants are entitled to summary judgment.  First, neither Kubas nor Santiago were involved at all in the investigation of White prior to his arrest and did not influence his arrest or the initial decision to prosecute White in any way.  Thus, White cannot satisfy the first element of his claims against Kubas and Santiago with respect to the initiation of White's prosecution, as there is no evidence that either of them made, influenced, or participated in the decision to prosecute White at that time.

With respect to the other Defendants—Lam, Shoulders, Schade, and Beveridge—the Court's analysis above with regard to probable cause is also dispositive of White's malicious prosecution claims.  Because the lack of probable cause is an element of a malicious prosecution claim, the Court's conclusion that probable cause existed at the time of White's arrest is fatal to White's malicious prosecution claims based on Defendants' actions at the time of his arrest.

Moreover, the Court's conclusion as to the existence of probable cause for White's arrest is even more strongly supported with respect to White's malicious prosecution claims.  As noted by the Sixth Circuit, a "malicious prosecution claim differs from [a] false arrest claim because the review of probable cause includes all information known to the officer at the time of his actions and not just the

---

were violated by either inadequate post-arrest procedures in light of his repeated claims of innocence or Defendants' refusal to investigate exculpatory evidence.  (*Id.*)  Even considering these theories of liability, however, the Court finds Defendants would still be entitled to summary judgment.  White relies on cases that either dealt with the failure to correct arrests based on mistaken identity or the refusal to investigate specific, readily verifiable claims of innocence.  *See Baker v. McCollan*, 443 U.S. 137, 143-44 (1979); *Seales v. City of Detroit, Michigan*, 959 F.3d 235, 240 (6th Cir. 2020) ("[A] plaintiff must prove that his jailers 'acted with something akin to deliberate indifference in failing to ascertain' that the person in custody is not the person wanted on the warrant.") (citation omitted); *Russo v. City of Bridgeport*, 479 F.3d 196, 209 (2d Cir. 2007) (holding officers' refusal to watch a video of the crime that exonerated the plaintiff violated the officers' "duty to investigate specific, readily-verifiable claims of innocence in a reasonable time period").  Here, there was no readily available piece of evidence that would have exonerated White, and his arrest was not the result of mistaken identity regarding the target of the warrant.  Moreover, Defendants did take substantial steps to investigate Bunch once he was brought to their attention as a potential suspect, including conducting photo arrays with all three victims, interviewing Bunch, obtaining the release of his medical records, and attempting to obtain surveillance video from the hospital.  (Doc. No. 191-2 at ¶¶ 39, 42, 45.)  Thus, Defendants are also entitled to summary judgment under these alternative theories of White's wrongful detention claims.

40

information included in the arrest warrant application itself." *Fry v. Robinson*, 678 F. App'x 313, 320 (6th Cir. 2017). Thus, in addition to the victims' identifications, as described above, probable cause for White's arrest and prosecution also was supported by Defendants' knowledge that White was part of a gang that had claimed the area, the proximity of White's house to the Allums home invasion, and that White had a criminal history and was already on probation. (Doc. No. 191-2 at ¶¶ 12, 21; Doc. No. 244 at 351:18-25.)[16] Accordingly, the Court finds no constitutional violation for malicious prosecution at the time of the initiation of White's prosecution and his arrest. Moreover, for the same reasons discussed above, even if probable cause was lacking, Defendants' belief in the existence of probable cause was not unreasonable, and they would nonetheless be entitled to qualified immunity.

Next, the Court assesses whether Defendants are entitled to summary judgment on White's claims for malicious prosecution based on Defendants' actions after the alleged identifications of Bunch by each of the victims. As noted above, "a plaintiff must prove four elements to establish a malicious prosecution claim: (1) that a criminal prosecution was initiated against the plaintiff and that the defendant 'made, influenced, or participated in the decision to prosecute;' (2) that the state lacked probable cause for the prosecution; (3) that the plaintiff suffered a deprivation of liberty because of the legal proceeding; and (4) that the criminal proceeding was 'resolved in the plaintiff's favor.'" *Jones*, 959 F.3d at 756 (quoting *Sykes*, 625 F.3d at 308-09).

---

[16] Some Defendants assert the video also supported probable cause for White's arrest. (*E.g.*, Doc. No. 193-1 at PageID# 2995.) However, during his deposition, Lam testified that the video was of lower quality, making it difficult to determine specific characteristics, such as height or hairstyle. (Doc. No. 223-1 at 184:11-22.) As a result, there is at least some dispute as to the evidentiary value of the video, although there is no evidence that the physical features of the suspect seen on the video were inconsistent with those of White.

With respect to the first element, the Sixth Circuit has explained that the fact that officers "did not *make* the decision to prosecute does not per se absolve them from liability." *Sykes*, 625 F.3d at 311. Instead, the first element of a malicious prosecution claim "is met when an officer 'could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty' and the misconduct actually does so." *Jackson v. City of Cleveland*, 925 F.3d 793, 820 (6th Cir. 2019) (quoting *Sykes*, 625 F.3d at 316). For example, "[t]his element is met when an officer includes 'misstatements and falsehoods in his investigatory materials' and those materials influence a prosecutor's decision to bring charges." *Id.* at 821 (quoting *Sykes*, 625 F.3d at 316). However, "even false testimony is not actionable as malicious prosecution unless deliberate—i.e., given with knowledge of, or reckless disregard for, its falsity." *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015). "[A]llegations of negligence or innocent mistake are insufficient." *Robertson v. Lucas*, 753 F.3d 606, 617 n.7 (6th Cir. 2014) (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). In other words, "a defendant's participation must be marked by some kind of blameworthiness, something beyond mere negligence or innocent mistake, to satisfy the elements of a malicious prosecution claim under the Fourth Amendment." *Johnson*, 790 F.3d at 655.

In this case, White has not presented any evidence that Lam, Shoulders, Schade, or Beveridge engaged in any such deliberate or reckless falsehoods *after* White's initial arrest. Indeed, it is undisputed that Schade and Beveridge had no further involvement in White's case after discussing the case with Lam and Shoulders shortly after the Allums home invasion. Similarly, although Lam and Shoulders remained the leading officers in the investigation, White has not presented any evidence in support of his malicious prosecution claims that they presented any false information or deliberately withheld exculpatory information from the prosecutor after White's arrest, including the

information they received regarding Bunch.  (Doc. No. 191-2 at ¶¶ 40, 45, 46, 50; Doc. No. 244 at 353:14-354:7.)  Instead, the evidence shows that neither Lam nor Shoulders were aware of the identifications of Bunch that Kubas and Santiago allegedly covered up until White's bindover hearing, at which point the prosecutor also learned of the alleged improprieties.  (Doc. No. 191-2 at ¶ 47; Doc. No. 244 at 335:4-336:1.)  Moreover, it appears that White's defense counsel learned about Allums's identification of Bunch and the alleged instruction from Kubas not to mark anyone approximately one month before the bindover hearing, which was even earlier than when Lam and Shoulders learned of the alleged misconduct.  (Doc. No. 261 at 138:5-139:2.)  Thus, Lam, Shoulders, Schade, and Beveridge cannot be held liable for a malicious prosecution claim based on the continued detention of White after his initial arrest and the Bunch identifications because they did not influence White's continued prosecution and detention in a sufficiently blameworthy manner, if at all, to satisfy the first element of such a claim.

In contrast, White has presented sufficient evidence to create a genuine dispute of fact as to whether Kubas and Santiago deliberately falsified documents that could foreseeably contribute to a decision to continue to prosecute White.  To wit, at the bindover hearing, Allums testified that when she went to the police station to view the second set of photo arrays, she identified Bunch's photo as the shooter, but was told not to circle her identification.  (Doc. No. 261 at 133:5-135:19.)  Although Allums did not identify the name of the officer that gave her this instruction, it is undisputed that Kubas was the officer that administered the second set of photo arrays to Allums.  (Doc. No. 222-1 at 93:17-94:8; Doc. No. 230-2 at PageID#s 8988-93.)  Similarly, at the bindover hearing, LaForce testified that when she went to the police station to view the second set of photo arrays, she identified Bunch's photo, but was also told not to pick him out.  (Doc. No. 261 at 98:14-25, 100:6-101:14.)

43

Again, LaForce did not identify the name of the officer that gave her this instruction, but there is no dispute that Santiago was the officer that administered the second set of photo arrays to LaForce. (Doc. No. 224-1 at 97:8-15; Doc. No. 230-3 at PageID#s 9004-09.)  While Kubas and Santiago deny ever having provided such an instruction (Doc. No. 222-1 at 163:24-164:2; Doc. No. 224-1 at 97:19-99:1), White's evidence is clearly sufficient to establish a genuine issue of fact.  And if such exculpatory evidence was withheld, it is foreseeable that it would influence the decision of whether to prosecute White.  *See Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) ("Because there exists a genuine issue of material fact about whether Katz intentionally withheld exculpatory information in order to continue Plaintiff's detention without probable cause, this Court reverses the district court's grant of summary judgment on this claim.").

Nonetheless, White's malicious prosecution claims against Kubas and Santiago fail for a different reason—there is no evidence that their alleged actions actually influenced White's continued prosecution and detention.  To satisfy the first element of a malicious prosecution claim, it is not enough that an officer could reasonably foresee that his or her misconduct would contribute to an independent decision that results in a deprivation of liberty.  The officer's misconduct must "actually do[] so."  *Jackson*, 925 F.3d at 820; *see also Mills*, 869 F.3d at 482 ("Investigators are deemed to have participated in a prosecution where 'misstatements and falsehoods in [their] investigatory materials . . . *ultimately influenced [a plaintiff's] continued detention*.'") (emphasis added) (quoting *Sykes*, 625 F.3d at 316); *Gregory*, 444 F.3d at 760 ("Without some link between the allegedly false investigative notes and Plaintiff's continued detention, Plaintiff fails to state a viable cause of action.").

44

To illustrate, in *Zavatson v. City of Warren, Michigan*, the Sixth Circuit held that although a defendant's false statements influenced the grant of an arrest warrant, no jury could conclude that his statements influenced the judge's decision to bind the plaintiff over for trial because the defendant "corrected those inaccurate or misleading statements while testifying at the preliminary hearing." 714 F. App'x 512, 526 (6th Cir. 2017).  The court noted that "a trial court's awareness of the falsity of an officer's prior testimony would 'dispositive[ly]' demonstrate that the trial court had not 'then relied on those falsehoods to bind the Plaintiffs over for trial.'"  *Id.* (quoting *Sykes*, 625 F.3d at 314 n.12).  As such, the court held that the defendant was entitled to summary judgment on the plaintiff's malicious prosecution claim because "although [the defendant's] misstatements and omissions may have influenced [the plaintiff's] initial arrest, there is no indication that those statements contributed to [the plaintiff's] continued prosecution."  *Id.*; *see also Sykes*, 625 F.3d at 314 n.12 (stating that evidence that the defendant conceded she had made misleading or false statements during a preliminary hearing would have been dispositive of plaintiffs' malicious prosecution claims against her).

Similarly, in this case, Allums's and LaForce's identifications of Bunch and Kubas's and Santiago's alleged misconduct regarding those identifications came to light on the first day of White's bindover hearing.  Nonetheless, at the conclusion of the hearing, the juvenile court judge declined to dismiss the charges against White and set the matter for trial.  (Doc. No. 261 at 435:19-21.)  Because the judge was aware of the alleged falsification of evidence and withholding of exculpatory material by Kubas and Santiago at the time of her decision, there is no possibility that the judge relied on those alleged falsehoods at the time of her decision to allow the prosecution to proceed against White.

Likewise, the prosecutor assigned to White's case, Schroth, became aware of Kubas's and Santiago's alleged misconduct the same day as the judge.  (Doc. No. 257 at ¶¶ 6-7.)  Thus, Schroth's decision to proceed with White's prosecution after the conclusion of the bindover hearing also could not have been influenced by Kubas's and Santiago's alleged actions regarding the victims' identifications of Bunch.

Nor is there any evidence on which a reasonable jury could conclude that Schroth would have ended the prosecution of White before the bindover hearing had he become aware of the identifications of Bunch earlier.  The evidence establishes that Schroth became aware of the relevant information on the first day of the bindover hearing, yet continued to put on evidence and prosecute the case against White for two more hearing days until the conclusion of the hearing over a week later.  (*See* Doc. No. 261.)  Schroth still did not dismiss the charges against White after the juvenile court held that probable cause did not exist that White had been involved in the Allums home invasion, despite the judge making clear that the state could dismiss the case if it wanted.  (*Id.* at 435:17-436:3.)  Instead, Schroth did not dismiss the charges against White until almost six months later.  (Doc. No. 181 at ¶ 46.)  Given that Schroth continued to prosecute White well after learning of the exculpatory information and even a court finding of a lack of probable cause, there is no indication that Schroth would have dismissed the case on his own had he discovered the exculpatory evidence before the bindover hearing.

Indeed, Schroth still has not indicated that he would have done so.  In his declaration, Schroth indicates only that the fact of the victims' identifications of Bunch and the officers' instructions to the victims' not to identify Bunch should have been provided to him, weaken the case against White, and would have been a factor in his evaluation of the case.  (Doc. No. 257 at ¶¶ 12-13.)  But when he

46

actually received such information, Schroth did not dismiss the case for another six months.  In his declaration, Schroth also states that once the juvenile court found no probable cause as to any of the charges against White, he believed the court should have dismissed the case.  (*Id.* at ¶ 15.)  But this also does not support the conclusion that he would have dismissed the case earlier had he found out about the information before the bindover hearing.  Schroth himself had every right to dismiss the case after the court's conclusion regarding probable cause, but did not do so.  And the judge explicitly stated the prosecution could dismiss the case because she did not feel comfortable dismissing the charges outright in light of precedent from Ohio's Eighth District Court of Appeals.  (Doc. No. 261 at 435:17-436:3.)[17]  Thus, there is no evidence on which a reasonable jury could conclude that either Santiago's or Kubas's actions actually influenced White's continued prosecution and detention.  Consequently, the Court finds that no constitutional violation occurred, and they are also entitled to summary judgment on White's claims for malicious prosecution.

### 3.  Due Process Violations (Claim 4)

In Claim 4, White asserts that Defendants violated his due-process rights when they failed to turn over material, exculpatory information to his attorney, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  (Doc. No. 181 at ¶ 69.)  Defendants argue that they are entitled to summary judgment on Claim 4 because they did not improperly withhold any evidence and because White's charges were dismissed before trial, meaning he has no actionable claim for any alleged wrongful suppression

---

[17] Although the Court was unable to find exactly what case the judge was referencing, the Court did find more recent authority that appears to confirm her belief that she did not have the authority to dismiss the charges against White during a bindover hearing.  *See State v. Frazier*, Nos. 106772 and 106773, 2019 WL 1755381, at *7 (Ohio Ct. App. 8th Dist. Apr. 18, 2019) ("R.C. 2152.12(I) does not afford a juvenile court with the authority to dismiss counts on the basis of whether or not the state has established probable cause.  Indeed, the state's bindover motion, pursuant to R.C. 2152.10, does not allow or explicitly empower the juvenile court with this authority.").

47

of evidence.  (Doc. No. 191-1 at PageID# 2896; Doc. No. 193-1 at PageID#s 3000-01; Doc. No. 195-1 at PageID#s 3179-80; Doc. No. 197 at PageID#s 3299-3300; Doc. No. 199-1 at PageID#s 3781-82.)  In response, White contends that he has presented sufficient evidence that Defendants suppressed evidence favorable to White and that the Sixth Circuit does not bar his claim simply because the juvenile proceeding terminated in his favor.  (Doc. No. 247 at PageID#s 14871-74.)  The Court finds that summary judgment in favor of Defendants on Claim 4 is warranted.

In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87. It has "since held that the duty to disclose such evidence is applicable even though there has been no request by the accused."  *Strickler v. Greene*, 527 U.S. 263, 280 (1999).  In addition, "[p]rosecutors are not the only state actors bound by *Brady*, and 'police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material.'" *Jackson*, 925 F.3d at 814 (quoting *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009)).

To establish a *Brady* violation, plaintiffs must demonstrate three elements: "[1] the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued."  *Id.* (quoting *Strickler*, 527 U.S. at 281-82).  With respect to the third element, "[t]he Sixth Circuit has recognized that when a defendant is acquitted at trial any supposed *Brady* violation was not prejudicial and, thus, not actionable."  *Taylor v. Montoya*, No. 1:11 CV 1901, 2012 WL 2120716, at *4 (N.D. Ohio June 8, 2012); *accord Offineer v. Kelly*, 454 F. App'x 407, 419 (6th Cir. 2011) ("Cases from this court confirm that due process claims based on the wrongful

suppression of exculpatory evidence are unavailable where, as here, the claimant was acquitted of his criminal charges.").  This same logic also has been applied to cases in which the criminal charges were dismissed before trial.  *See Jerome*, 695 F. App'x at 943 ("Because here Jerome's criminal proceeding ended in the prosecutor's request for, and the trial court's subsequent grant of, a *nolle prosequi* order, he cannot establish the required elements of a *Brady* claim."); *Taylor*, 2012 WL 2120076, at *4 ("If there is no *Brady* claim where a defendant is tried and then acquitted, there can be no *Brady* violation where a defendant's indictment is dismissed prior to a trial.").  Indeed, the Sixth Circuit has broadly held that "where 'the underlying criminal proceeding terminated in [a defendant]'s favor, he has not been injured by the act of wrongful suppression of exculpatory evidence.'"  *Jerome*, 695 F. App'x at 943 (quoting *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988)).

Because it is undisputed that the criminal charges against White were dismissed without prejudice prior to trial, White cannot show that he was prejudiced by any alleged wrongful withholding of exculpatory information by Defendants.  As such, White cannot establish a necessary element of his claims based on Defendants' alleged *Brady* violations, and Defendants are entitled to summary judgment on Claim 4.

White attempts to avoid this holding by arguing that if the undisclosed evidence would have affected any of proceedings in the underlying criminal case such that the prosecution would have been stopped earlier, then a plaintiff may still establish a *Brady* violation even if the charges were dismissed before trial.  (Doc. No. 247 at PageID#s 14872-74.)  The Court finds this argument unpersuasive, as the Sixth Circuit has already considered similar arguments and rejected them.  For example, in *Snow v. Nelson*, the plaintiff argued that despite never standing trial and ultimately being

49

released, he "stated a proper *Brady* claim because the alleged failure to disclose resulted in his detention for fifty-two days." 634 F. App'x 151, 156 (6th Cir. 2015). The Sixth Circuit dismissed his argument, explaining:

> This argument, however, misperceives the harm *Brady* claims are designed to redress. *Brady*'s "ultimate concern [is] ensuring that criminal defendants receive a fundamentally fair trial." *Moldowan*, 578 F.3d at 378 (internal quotation marks omitted). In light of this concern, we have held that liability for a *Brady* violation only exists when evidence sufficient to " 'put the whole case in such a different light as to undermine confidence in the *verdict* ' " is improperly withheld. *Johnson v. Mitchell*, 585 F.3d 923, 933 (6th Cir.2009) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)) (emphasis added). Furthermore, a *Brady* claim requires "a showing that there is a 'reasonable probability' that had the evidence been timely disclosed to the defense the *outcome* would have been different." *Garner*, 507 F.3d at 405 (emphasis added).
>
> Here, the State did not secure a criminal conviction by improperly withholding exculpatory evidence. On the contrary, the record is clear that the State was complying with discovery requests. Moreover, there is no question that before a plea was discussed or trial dates set, Snow's attorney learned of the allegedly exculpatory information. Perhaps Snow would have been released earlier had the alleged misidentification come to light sooner, but he can have no complaints about the ultimate *outcome* of his case. The fifty-two days Snow spent in jail awaiting a plea or a trial is simply not the type of deprivation *Brady* claims are intended to remedy.

*Id.*; *see also Offineer*, 454 F. App'x at 419 (holding *Brady* claim failed where the plaintiff was acquitted even though the plaintiff asserted that the withholding of exculpatory evidence may have influenced the prosecutor's decision to bring charges in the first place). As such, the Court finds that the dismissal of charges against White is dipositive of his *Brady* claims against Defendants.

### 4. *Monell* Liability (Claim 5)

In Claim 5 of his Second Amended Complaint, White seeks to hold the City liable for its failure to train and supervise its officers. (Doc. No. 181 at ¶ 76.) In *Monell v. Dep't of Soc. Services of City of New York*, the Supreme Court held that § 1983 "imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights."

50

436 U.S. 658, 692 (1978).  However, "[t]here can be no liability under *Monell* without an underlying constitutional violation."  *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014); *accord France v. Lucas*, 836 F.3d 612, 631 (6th Cir. 2016).  Because the Court has found that each of the individual Defendants are entitled to summary judgment and no underlying constitutional violation occurred, the City is entitled to summary judgment on White's *Monell* claim.[18]

### ii.  State Law Claims (Claims 6-10)

Having found summary judgment in favor of Defendants is warranted on all of White's § 1983 claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

Pursuant to 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over state law claims once they have dismissed all claims over which they had original jurisdiction.  "In determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'"  *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  "[A] district court has broad discretion to decide whether to exercise jurisdiction over state law claims."  *Smith v. Erie Cty. Sheriff's Dep't*, 603 F. App'x 414, 424 (6th Cir. 2015).  However, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed."  *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89

---

[18] For this same reason, the City and the individual Defendants in their official capacities are also entitled to summary judgment on each of White's § 1983 claims in Claims 1-4.  *See Kraemer v. Luttrell*, 189 F. App'x 361, 366 (6th Cir. 2006) ("Suing a municipal officer in his official capacity for a constitutional violation pursuant to 42 U.S.C. § 1983 is the same as suing the municipality itself, and thus a successful suit against a municipal officer in his official capacity must meet the requirements for municipal liability stated in [*Monell*].").

F.3d 1244, 1254-55 (6th Cir. 1996); *accord Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims.").

In this case, issues of comity strongly support the Court's decision to decline jurisdiction over White's state law claims. As other courts have recognized, "[t]he interest in avoiding needless decisions on state-law issues as a matter of comity weighs heavily against supplemental jurisdiction." *Howell v. Buckeye Ranch, Inc.*, No. 2:11–cv–1014, 2013 WL 1282518, at *8 (S.D. Ohio Mar. 27, 2013); *see also Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 522 (6th Cir. 2007) (noting "the Supreme Court's general comity-related principle that residual supplemental jurisdiction be exercised with hesitation, to avoid needless decisions of state law").

Here, were the Court to retain jurisdiction, it would be required to delve into numerous purely state law issues. For instance, White's Claims 9 and 10 are statutory claims under Ohio law for which there are no similar federal claims. Claim 9 is a claim for intimidation based on Defendants' alleged use of materially false or fraudulent writings to attempt to influence public servants under O.R.C. § 2921.03, and Claim 10 seeks to hold Defendants civilly liable for criminal acts committed under Ohio law under O.R.C. § 2307.60. (Doc. No. 181 at ¶¶ 94-106.) Moreover, Kubas and Santiago have raised a statute of limitations defense to Claims 9 and 10 that would require the Court to interpret the statutes at issue to determine whether they are primarily remedial or punitive in nature, as that will affect which Ohio statute provides the relevant statute of limitations. (*See* Doc. No. 250 at PageID#s 17360-61; Doc. No. 268 at PageID#s 18475-77.) Such statutory interpretation is better left to state courts, especially given that there appears to be some disagreement between Ohio's courts of appeals. *Compare Steinbrick v. Cleveland Elec. Illuminating Co.*, No. 66035, 1994 WL 463817, at *2 (Ohio

Ct. App. 8th Dist. Aug. 25, 1994) (holding O.R.C. § 2307.60 contemplates a penalty and is therefore subject to a one-year statute of limitations), *with Brothers v. Nixon*, 157 N.E.3d 164, 170-71 (Ohio Ct. App. 7th Dist. 2020) (holding an arguably "analogous" statute is not subject to a one-year statute of limitations because its overall purpose is to compensate victims).

Additionally, with respect to all of White's state law claims, the Court would be required to assess whether Defendants are entitled to statutory immunity under Ohio's Political Subdivision Tort Liability Act, which would also portend a separate analysis as applied to the individual Defendants as employees of a political subdivision and the City as a political subdivision itself.  (*See* Doc. No. 191-1 at PageID#s 2904-06; Doc. No. 193-1 at PageID#s 3003-05; Doc. No. 195-1 at PageID#s 3182-83; Doc. No. 197 at PageID#s 3307-11; Doc. No. 199-1 at PageID#s 3784-85.)  Finally, even White's claims for malicious prosecution, false arrest, and false imprisonment under Ohio law differ in certain ways from his corresponding claims under § 1983. *See, e.g.*, *Wright v. City of Euclid*, 962 F.3d 852, 878 (6th Cir. 2020) ("Unlike Wright's federal malicious-prosecution claim, his Ohio state law claim requires a showing of malice.").  Because the Court's rulings on White's federal law claims do not fully resolve the remaining state law claims, comity concerns weigh in favor of the Court declining jurisdiction to avoid needlessly deciding state law issues.

Considerations regarding judicial economy, convenience, and fairness do not outweigh these concerns.  Indeed, there is no indication that remanding the case to state court would cause any additional inconvenience to the parties.  As far as the Court is aware, all of the parties and witnesses are located in Cleveland, Ohio, and litigating in state court upon remand will be at least as convenient as litigating in this Court, which is in the same location. *See Fox v. Brown Memorial Home, Inc.*, 761 F. Supp. 2d 718, 725 (S.D. Ohio 2011).  Moreover, with respect to judicial economy, the risk of

duplicative litigation appears low, as the parties will presumably be able to resume litigating White's claims in state court at the same procedural juncture where they left off in federal court, and there is no reason their discovery cannot be made available for the state court proceedings.  *See id.*

The Court is cognizant that certain considerations relevant to the factors of judicial economy, fairness, and comity do tend to support retaining jurisdiction.  For example, this action has been pending in federal court for over three years, discovery has closed, and the parties have fully briefed motions for summary judgment.  However, such things are common in situations in which courts have declined to exercise jurisdiction.  *Lloyd v. Midland Funding, LLC*, No. 3:12-CV-566-TAV-HBG, 2016 WL 3129199, at *2 (E.D. Tenn. June 2, 2016) (noting that "[w]hen a court rules on a motion for summary judgment, it is commonplace for the case to have been in litigation for many years, for the parties to have completed discovery, and for the case to be on the eve of trial," but that the court "has regularly declined to exercise supplemental jurisdiction over state-law claims at that stage in litigation"); *see also Packard v. Farmers Ins. Co. of Columbus Inc.*, 423 F. App'x 580, 585 (6th Cir. 2011) (affirming remand of state law claims despite the fact that the case had been pending for over three years).  Also weighing against remand is the fact that there is the potential for overlap in the analysis of some of White's federal and state law claims.  For example, it is likely that the presence of probable cause for White's arrest will be relevant to some of his state law claims, assuming that the state court reaches the merits of his claims after examining Defendants' claims of statutory immunity.  However, the Court finds this concern does not outweigh the issues of comity described above.  *See Howell*, 2013 WL 1282518, at *8 (declining jurisdiction over state law claims based on considerations of comity despite some "overlapping analysis").

54

Accordingly, the Court declines to exercise supplemental jurisdiction over White's remaining state law claims and denies Defendants' Motions for Summary Judgment with respect to White's state law claims without prejudice to any right Defendants may have to refile their Motions upon remand to state court.[19]

### c.  White's Motion for Partial Summary Judgment

White moved for partial summary judgment solely with respect to Claims 9 and 10, which are both claims brought pursuant to Ohio law.  (Doc. No. 205.)  Because the Court has decided to decline to exercise jurisdiction over White's state law claims, the Court denies White's Motion for Partial Summary Judgment without prejudice to any right White may have to refile his Motion upon remand to state court.

## IV.  Conclusion

For the reasons set forth above, Defendants' Motions for Summary Judgment (Doc. Nos. 191, 193, 195, 197, 199) are GRANTED as to White's claims under 42 U.S.C. § 1983 and DENIED as to White's claims under state law.  White's Motion for Partial Summary Judgment (Doc. No. 205) is DENIED.  The remainder of the case is REMANDED to the Court of Common Pleas of Cuyahoga County, Ohio, from which it was removed.

**IT IS SO ORDERED.**

 _s/Pamela A. Barker_
PAMELA A. BARKER
Date:  December 23, 2020          U. S. DISTRICT JUDGE

---

[19] Because the Court has found Defendants are entitled to summary judgment on White's federal claims and is declining jurisdiction over White's state law claims, it is also unnecessary for the Court to address Defendants' Motions for Summary Judgment with respect to limiting White's damages.  (*See* Doc. No. 191-1 at PageID#s 2906-09; Doc. No. 193-1 at PageID#s 3001-03, 3006-07; Doc. No. 195-1 at PageID#s 3181-82, 3184; Doc. No. 199-1 at PageID#s 3789-91.)